**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| ZENIMAX MEDIA INC. and ID SOFTWARE LLC<br><br>      Plaintiffs,<br><br>    v.<br><br>OCULUS VR, LLC, PALMER LUCKEY AND FACEBOOK, INC.,<br><br>      Defendants. | Case No.:  3:14-cv-01849-P |

**APPENDIX TO DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF**
**DOCUMENTS AND SUPPLEMENTAL INTERROGATORY RESPONSE (ECF**
**NO.  182)**

| Document | Exhibit | Page(s) |
|---|---|---|
| ZeniMax Media Inc. and id Software LLC's Responses and Objections to Facebook, Inc.'s First Set of Interrogatories to Plaintiffs | 1 | App. 001-093 |
| ZeniMax Media Inc. and id Software LLC's First Amended and Superseding Responses and Objections to Facebook, Inc.'s First Set of Interrogatories to Plaintiffs | 2 | App. 094-184 |
| ZeniMax Media Inc. and id Software LLC's Responses and Objections to Defendants' First Set of Requests for Production of Documents and Things to Plaintiffs | 3 | App. 185-285 |
| ZeniMax Media Inc. and id Software LLC's First Amended and Superseding Responses and Objections to Defendants' First Set of Requests for Production of Documents and Things to Plaintiffs | 4 | App. 286-386 |
| ZeniMax Media Inc. and id Software LLC's Responses and Objections to Defendants' Second Set of Requests for Production of Documents and Things to Plaintiffs | 5 | App. 387-441 |
| ZeniMax Media Inc. and id Software LLC's First Amended and Superseding Responses and Objections to Defendants' Second Set of Requests for Production of Documents and Things to Plaintiffs | 6 | App. 442-496 |

| Document | Exhibit | Page(s) |
|---|---|---|
| ZeniMax Media Inc. and id Software LLC's Responses and Objections to Defendants' Third Set of Requests for Production of Documents and Things to Plaintiffs | 7 | App. 497-506 |
| ZeniMax Media Inc. and id Software LLC's First Amended and Superseding Responses and Objections to Defendants' Third Set of Requests for Production of Documents and Things to Plaintiffs | 8 | App. 507-516 |
| May 12, 2015 Letter from Michael Rhodes to P. Anthony Sammi | 9 | App. 517-525 |
| May 22, 2015 Letter from P. Anthony Sammi to Michael Rhodes | 10 | App. 526-531 |
| May 29, 2015 Emails between Richard Smith, Kurt Wm. Hemr and others | 11 | App. 532-534 |
| Declaration of Matthew D. Caplan in Support of Defendants' Motion to Compel | 12 | App. 535-537 |

Date:  July 17, 2015

Respectfully submitted,

*/s/ Heidi L. Keefe*

Richard A. Smith
Texas Bar No. 24027990
rsmith@lynnllp.com
Elizabeth Y. Ryan
Texas Bar No. 24067758
eryan@lynnllp.com
**LYNN TILLOTSON PINKER & COX LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3800
Fax: (214) 981-3839

Michael G. Rhodes (pro hac vice)
mrhodes@cooley.com
COOLEY LLP
101 California St., 5th Floor
San Francisco, California  94111
Phone:  (415) 693-2000

Heidi L. Keefe (pro hac vice)
hleefe@cooley.com
Mark R. Weinstein (pro hac vice)
mweinstein@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Phone:  (650) 843-5000

**CERTIFICATE OF SERVICE**

On July 17, 2015, I hereby certify that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  I hereby certify that I have served all counsel who are deemed to have consented to electronic service or by another manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Heidi L. Keefe*
Heidi L. Keefe

119254013 v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA INC. and<br>ID SOFTWARE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>OCULUS VR, LLC<br>PALMER LUCKEY,<br>and FACEBOOK, INC.<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL CASE NO. 3:14-cv-01849-P**<br><br><br>**CONTAINS HIGHLY<br>CONFIDENTIAL INFORMATION<br>SUBJECT TO PROTECTIVE ORDER<br>(Docket No. 107)** |

## ZENIMAX MEDIA INC. AND ID SOFTWARE LLC'S RESPONSES AND OBJECTIONS TO FACEBOOK INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Pursuant to the Federal Rules of Civil Procedure, ZeniMax Media Inc. ("ZeniMax") and id Software LLC ("id Software") (collectively, "Plaintiffs") hereby serve these Responses and Objections to Facebook Inc.'s ("Facebook") (together with Oculus VR, LLC ("Oculus") and Palmer Luckey, "Defendants") First Set of Interrogatories to Plaintiffs.

## GENERAL RESPONSES AND OBJECTIONS

Plaintiffs assert the following General Objections. Each individual Response to the Interrogatories is subject to, and limited in accordance with, the following General Objections, which are incorporated as if fully set forth therein. The following General Objections are not waived, or in any way limited by, the Specific Responses and Objections. Although Specific Objections are also interposed in response to individual Interrogatories, Plaintiffs' failure to repeat any part of their General Objections shall not be construed as a waiver of those objections.

1.      The Responses set forth below are for the purposes of discovery only, and Plaintiffs expressly reserve any and all objections they may have to the relevance, competence, materiality, admissibility or use at deposition, hearing or trial of any information stated, produced, identified or referred to herein. Plaintiffs also expressly reserve their right to rely, at any later time including at deposition, hearing or trial, upon additional documents or information not included in the Specific Responses.

2.      An objection to a specific Interrogatory or a willingness to provide a Response does not imply, and should not be construed as an acknowledgement, that complete answers to that Interrogatory are available or exist.

1


EXHIBIT
1

App. 001

3.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they purport to impose discovery obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of the Northern District of Texas, the Requirements for Chief Judge Jorge A. Solis or any other applicable law or rule.

4.     Plaintiffs object to the Interrogatories as premature, including because Defendants have delayed fact discovery by refusing to timely produce relevant documents, and because the parties have not yet designated experts or exchanged expert reports.  Moreover, Plaintiffs object to any contention Interrogatories as premature to the extent they seek responses prior to the close of discovery. *See* Fed. R. Civ. P. 33(a).

5.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they are vague, ambiguous, non-specific or confusing, and thus not susceptible to a reasoned interpretation or response.

6.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they seek information that is not relevant to the claims or defenses of either party, and thus not reasonably calculated to lead to the discovery of admissible evidence.

7.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they are duplicative, cumulative, and/or seek information that may be obtained from other sources or through other means of discovery that are more convenient, more efficient, more practical, less burdensome and/or less expensive.

8.     Plaintiffs object to the Interrogatories as overbroad and unduly burdensome because Defendants, and not Plaintiffs, employ the majority of persons with knowledge of topics referenced in the Interrogatories, are in possession of the majority of documents relevant to the Interrogatories, and are in the best position to know the answers to the Interrogatories.

9.     Plaintiffs object to Interrogatories, and the Definitions and Instructions, to the extent they are overly broad, overly expansive, oppressive and/or unduly burdensome and would impose upon Plaintiffs an unreasonable burden of inquiry, or to the extent they seek information not within Plaintiffs' possession, custody or control.  Plaintiffs also object to the Interrogatories, and the Definitions and Instructions, as unduly burdensome to the extent that the information requested is within the knowledge of Defendants, can be determined by referring to documents within the possession, custody or control of Defendants, is within the public domain or is otherwise more readily or equally available to Defendants and thus more conveniently obtained by Defendants.

10.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, as unduly burdensome to the extent they seek information that can be found in Plaintiffs' Complaint, document productions, expert reports, and Court filings.  Plaintiffs' further object to those Interrogatories asking them to "state all facts" as improper contention interrogatories. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation

omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation. For this reason, Plaintiffs note that all citations provided in these Responses are provided by way of example only, and should not be construed as limiting in any manner. Plaintiffs explicitly reserve the right to rely on additional documents not cited in these Responses during the course of this litigation.

11.     The Responses set forth below are based upon Plaintiffs' interpretation of the language used in the Interrogatories and in the Definitions and Instructions. Plaintiffs reserve their right to amend or to supplement their Responses to the Interrogatories in the event Facebook or Defendants assert, or the Court adopts, an interpretation that differs from Plaintiffs' interpretation.

12.     Plaintiffs object to Facebook's definition of "ZeniMax," id Software," "Plaintiffs," "you," and "your" in Definition Nos. 1-4 as overly broad and/or unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to discovery of admissible evidence. For purposes of answering these Interrogatories, Plaintiffs use the term "ZeniMax" to mean ZeniMax Media Inc., "id Software" to mean id Software LLC, and "Plaintiffs" to mean both ZeniMax Media Inc. and id Software LLC, only.

13.     Plaintiffs object to Facebook's definition of "concerning," "document," "person," "persons," and "related to" in Definition Nos. 10-13 and "identify," "identifying," "identity," or "identification" in Definition No. 15 as unduly burdensome, potentially beyond the discovery obligations set forth in the Federal Rules of Civil Procedure, and not reasonably calculated to lead to the discovery of admissible evidence. For the purposes of answering these Interrogatories, Plaintiffs use and interpret the above-referenced terms according to their plain meaning and common sense usage.

14.     Plaintiffs object to Interrogatories, and the Definitions and Instructions, to the extent that they call for the production of information or documents subject to a claim of privilege or immunity, including the attorney-client privilege, the attorney work-product doctrine or any other applicable evidentiary privilege or immunity from disclosure. Nothing contained in these Responses is intended to be nor should be considered as a waiver of any attorney-client privilege, work-product protection or any other applicable evidentiary privilege or immunity. The inadvertent production of any response or document subject to such privileges or immunities is not intended to relinquish any privilege or immunity and shall not be deemed to constitute a waiver of any applicable privilege or immunity.

15.     The Responses and Objections herein are based on Plaintiffs' present knowledge, information and belief. Defendants have delayed the production of relevant documents for more than eight (8) months, and have yet to produce any source code. Moreover, Defendants made their first document production of material size shortly before the due date of these Responses. Plaintiffs therefore reserve all their rights to amend, revise, correct or clarify these Responses pursuant to Federal Rule of Civil Procedure 26(e).

3

Each of the foregoing General Responses and Objections are incorporated by reference into each and every Specific Response set forth below. Subject to the General Responses and Objections, and without waiver, modification or limitation thereof, Plaintiffs' Specific Responses and Objections to the Interrogatories are set forth below.

4

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

State all facts related to your allegation that "[t]he use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendants' product and services emanate from, are authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)" contained in paragraph 9 of your Complaint, including without limitation identifying each of the alleged "use[s] of the ZeniMax Marks by Oculus and Luckey," identifying the specific "products and services" referenced therein, and describing the basis of any alleged infringement.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts" and "each of the alleged 'use[s].'" Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding Plaintiff's trademark infringement and false designation claims. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as irrelevant, including because Facebook is not currently accused of trademark infringement or false designation under the Lanham Act. Plaintiffs also object to this Interrogatory as vague, ambiguous, and confusing, including because the portion of Interrogatory No. 1 appearing in quotes is not found in paragraph 9 of Plaintiffs' Complaint.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about the "use[s] of the ZeniMax Marks" and the

5

"specific 'products or services' referenced therein." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 1 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 1 that the principal facts related to the allegation that "[t]he use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.     On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.     ZeniMax or its affiliates' intellectual property includes ownership of the entire right, title, and interest in and to valid, subsisting, and uncancelled United States Trademark Registrations No. 2,050,083 for "DOOM" (P0011831)[1]; No. 2,928,605 for "DOOM 3" (P0011839); No. 2,303,100 for "DOOM II" and design (P0011832); No. 2,165,125 for "ID" (P0011833); No. 3,923,244 for "RAGE" (P0011836); No. 4,198,972 for "RAGE" and design (P0011844); No. 4,094,299 for "RAGE" and design (P0011837); No. 3,972,050 for "RAGE" and design (P0011830); No. 4,080,839 for "SKYRIM" (P0011840); No. 4,097,150 for "SKYRIM" (P0011834); and No. 4,280,859 for "SKYRIM" (P0011842) (collectively, "ZeniMax Marks").[2]

3.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in virtual reality (for the purposes of all verified Responses, "VR") technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").

4.     On or about April 2012, id Software's Technical Director, John Carmack, discovered through an Internet forum that a college-aged inventor, Palmer Luckey, had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a

---

[1]   All citations provided in these Responses are provided by way of example only, and should not be construed as limiting in any manner. Plaintiffs explicitly reserve the right to rely on additional documents not cited in these Responses during the course of this litigation.

[2]   All defined terms are applicable only to their corresponding Specific Response, unless otherwise noted.

**App. 006**

crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

6.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at the 2012 Electronic Entertainment Expo (for the purposes of all verified Responses, "E3 2012"). (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

7.      On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.)

8.      On or about July 13, 2012, in response to this request, ZeniMax proposed a call with Defendants to discuss how VR headset development should proceed moving forward. Defendants ignored ZeniMax's request. (P0000039.)

9.      On or about July 26, 2012, after not responding to ZeniMax's request for a call, Defendants again asked ZeniMax for help with their Kickstarter video, noting that Mr. Carmack's reputation had helped the credibility of the Rift project. (P0000034.) In subsequent emails, Mr. Carmack responded that Defendants should not show anything that could be construed as ZeniMax property, and refused Defendants' request for a clip from the *DOOM 3: BFG Edition* computer program. (P0000069.)

10.      On or about August 1, 2012, Defendants launched their Kickstarter campaign. In blatant disregard of ZeniMax's rights, Defendants' Kickstarter video impermissibly used, copied, publicly displayed, and distributed ZeniMax's intellectual property, including the ZeniMax Marks. Without prior authorization or commercial agreement, Defendants' Kickstarter video featured multiple clips showing *DOOM 3: BFG Edition* displayed on the modified Rift headset, used ZeniMax's *DOOM 3: BFG Edition* logo, and promised certain backers of the Kickstarter

7

campaign copies of *DOOM 3: BFG Edition*. The Kickstarter video further referenced ZeniMax's VR Technology as "the magic that sets the Rift apart." Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.    Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.*, P0010495; P0010530.)

12.    During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Brendan Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

13.    On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' non-disclosure agreement (for the purposes of all verified Responses, "NDA"), ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

14.    On or about August 16, 2012, after hearing no response from Defendants regarding an equity stake in Oculus, ZeniMax again requested that Defendants not disclose or discuss anything about future ZeniMax titles, release dates, timing or future commitments. (P0000090.)

15.    On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.) That same day, Plaintiffs asked Defendants for an update on ZeniMax's proposal for an equity stake in Oculus. Defendants side-stepped ZeniMax's question regarding equity. (P0000093.)

16.    On September 10, 2012, after multiple requests from ZeniMax to discuss compensation, Defendants drafted a proposal designed to kick off business discussions with ZeniMax. (P0000105; P0000106.) Its proposal demanded, *inter alia*: (i) that ZeniMax grant Defendants a worldwide, exclusive license to programming code that had been provided by ZeniMax pursuant to the parties' NDA; (ii) that ZeniMax create additional intellectual property for Defendants' sole use; (iii) that ZeniMax provide extensive marketing and ten thousand free copies of *DOOM 3: BFG Edition* to Defendants; and (iv) that ZeniMax permit Mr. Carmack to serve as a technical advisor to Defendants. In return, Defendants offered ZeniMax an equity stake of 2%, subject to dilution, and other additional conditions. Defendants also offered

8

ZeniMax the right to pay an additional $1.2 million for an additional 3% stake in Oculus. (P0000106.)

17.     On or about September 27, 2012, Defendants sent their latest "investor prospectus" to ZeniMax.  (P0000006; P0000007.)  The prospectus, which Defendants used or intended to use to recruit new investors, listed Mr. Carmack as an "advisor/endorser" and used the id Software company logo next to Mr. Carmack's name.  (P0000007.)  id Software had not authorized the use of its name and logos in the prospectus, and had not officially endorsed the Rift.  In disregard of ZeniMax's directives not to use its property to promote the Rift, the prospectus also featured *DOOM* and other ZeniMax game logos on multiple slides.  (*Id.*) ZeniMax is the owner of these logos and the ZeniMax Marks.  Defendants' investor prospectus further included a "product roadmap" representing that ZeniMax's *DOOM 3: BFG Edition* and *Skyrim* franchises would be made to work with the Rift.  (*Id.*)  ZeniMax had reached no such agreement with Defendants.

18.     On or about December 11, 2012, Defendants circulated a revised investor prospectus that contained the same unauthorized references to ZeniMax's intellectual property, including the ZeniMax Marks, and wrongly suggested ZeniMax's endorsement for the Rift. (P0000118.)  This investor prospectus also omitted any disclosure of Defendants' use of ZeniMax VR Technology or Defendants' heavy reliance on ZeniMax to develop the Rift.

19.     On or about January 22, 2013, Defendants began further efforts to obtain financing, and again invited ZeniMax to invest money and resources.  (*See* P0000113.) Defendants' offer still did not provide any compensation for the contributions that ZeniMax had already made to the Rift.  Defendants continued using ZeniMax VR Technology without license or permission, and further promoted themselves as the developers and owners of ZeniMax's breakthrough VR Technology.

20.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding.  (P0000007.)

21.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (*Id.*)

22.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

23.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with other rounds of funding received by Oculus, confirmed the market value of the ZeniMax Marks, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

25.     The use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendants' products or services emanated from, were authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax.

26.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Defendants' use of the ZeniMax Marks.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain the full extent and nature of Defendants' trademark infringement and false designation.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 2:**

Identify each and every person who has participated in any research and development related to virtual reality conducted by or for you at any time.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 1 and 2.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "each and every person" and participation in "any research and development … at any time."

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation and because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ many of the people who have "participated in any research and development related to virtual reality" for Plaintiffs.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 2 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Persons having knowledge of research and development related to virtual reality conducted by or for Plaintiffs may include:

| No. | Name | Position & Business Affiliation | Business Address & Telephone Number |
|-----|------|---------------------------------|-------------------------------------|
| 1 | Antkow, Christian | Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 2 | Carmack, John | Chief Technical Officer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |

| No. | Name | Position & Business Affiliation | Business Address & Telephone Number |
|---|---|---|---|
| 3 | Duffy, Robert | Programming Director, id Software | 1500 North Greenville Ave 7th Floor Richardson, Texas 75081 (972) 613-3589 |
| 4 | Hooper, Matthew | Director of Development, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 5 | Kennickell, Gloria | Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 6 | Kim, Jason D. | Product Manager, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 7 | van Waveren, Jan Paul | Senior Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 8 | Willits, Tim | Studio Director, id Software | 1500 North Greenville Ave 7th Floor Richardson, Texas 75081 (972) 613-3589 |
| 9 | Wright, Jonathan E. | Senior Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |

*(End of verified Response.)*

     In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case, and also reserve their right to rely in this litigation on documents or testimony from persons not identified in this Response. Plaintiffs further reserve the right to rely in this litigation on the persons identified in this Response for testimony outside of the subject matter of this Interrogatory.

## INTERROGATORY NO. 3:

State all resources you have ever invested in any research and development related to virtual reality conducted by or for you at any time.

## RESPONSE TO INTERROGATORY NO. 3:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Facebook's Interrogatory No. 10.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all resources" invested in "any research and development ... at any time."

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation, and because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ many of the people who have knowledge of the resources invested in VR research and development by Plaintiffs.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 3 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. During that time, ZeniMax invested tens of millions of dollars in research and development, including research into VR and immersive technologies. The "resources ... invested in any research and development related to virtual reality" by ZeniMax may include, without limitation:

- Resources invested in attracting, hiring, and retaining core personnel, which may include but are not limited to the provision of salary and equity compensation necessary to attract top talent;

- Resources invested in creating, developing, and maintaining state of the art work environments, which may include but are not limited to game production studios, publishing shops, and other facilities;

13

- Resources invested in business equipment, which may include but are not limited to state of the art computers and related software, television monitors, high speed networks, computer peripherals, and other equipment necessary for game and VR research and development;

- Resources invested in public relations and marketing related to ZeniMax video games and VR, which may include but are not limited to promoting and generating interest in said products at gaming conventions and through industry media and industry events.

- Resources invested in VR-related products, which may include but are not limited to the development of VR source code, and the procurement of displays, screens, computer chips, sensors, cables, and other related hardware; and

- Resources invested by ZeniMax in the acquisition of id Software on or around June 23, 2009.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that additional discovery, including deposition discovery of Plaintiffs' former employees now employed by Defendants, will enable Plaintiffs to further ascertain the full extent of the resources invested in VR research and development. Plaintiffs specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

14

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**INTERROGATORY NO. 4:**

Describe the "breakthrough modifications to the Rift prototype" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

**RESPONSE TO INTERROGATORY NO. 4:**

# Redacted

15

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

App. 017

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

App. 018

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**INTERROGATORY NO. 5:**

Describe the "additional ZeniMax VR Technology needed to develop the Rift" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

**RESPONSE TO INTERROGATORY NO. 5:**

# Redacted

19

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

App. 021

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

**HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY**

**INTERROGATORY NO. 6:**

     Identify everything, including without limitation data, files and information, you allege Defendants downloaded from the "file transfer protocol site" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

**RESPONSE TO INTERROGATORY NO. 6:**

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

# Redacted

**INTERROGATORY NO. 7:**

Identify every person to whom you have disclosed the alleged trade secrets at issue in this action, including identifying the specific information disclosed to each person and the reasons for each such disclosure.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "every person," "specific information disclosed to each person," and "the reasons for each such disclosure."

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know whether and to whom trade secrets were disclosed in this litigation, and because the requested persons are readily ascertainable from Plaintiffs' document production. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 7 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 7 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs have disclosed their trade secrets to Defendants Palmer Luckey and Oculus pursuant to the parties' NDA and confidential business relationship. (*See* Dkt. No. 120.) Plaintiffs specifically identify at least the following personnel of Defendants to whom they have disclosed the trade secrets identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (*see id.*) for the purpose of VR research and development:

- Michael Antonov (Chief Software Architect, Oculus) (*see, e.g.,* P0013017; P013036; P0013001; P0012993; P0013021; P0013037; P0000075; P0010235; P0013029; P0013009; P0013005; P0012991; P0012985; P0013033);

- Brendan Iribe (Chief Executive Officer, Oculus) (*see, e.g.,* P0013041; P0012979; P0013017; P0013036; P0013001; P0012993; P0013021; P0013037; P0013009;

P0000075; P0010235; P0012998; P0013029; P0013021; P0013005; P0012991; P0012985; P0013005; P0013033);

- Palmer Luckey (Founder, Oculus) (*see, e.g.,* P0000077; P0013003; P0013041; P0012979; P0013017; P0000074; P0013036; P0013001; P0012993; P0013021; P0013037; P0012999; P0000075; P0010235; P0013009; P0012998; P0013029; P0013005; P0012991; P0012985; P0000457; P0013033);

- Jack McCauley (Vice President of Engineering, Oculus) (*see, e.g.,* P0013003; P0013021; P0013017; P0013012; P0013036; P0013001; P0012993; P0013009; P0013041; P0000075; P0010235; P0012998; P0013029; P0013037; P0013005; P0012991; P0012985;  P0013033);

- Nate Mitchell (Vice President of Product, Oculus) (*see, e.g.,* P0013041; P0012979; P0013017; P0013036; P0013001; P0012993; P0013021; P0013037; P0013029; P0013009; P0013037; P0013005; P0012991; ; P0012985; P0013033); and

- Nirav Patel (Engineer, Oculus) (*see, e.g.,* P0013021; P0013017; P0013036; P0013001; P0012993; P0013009; P0013041; P0013029; P0013009; P0013037; P0013005; P0012991; P0012985; P0013033).

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain whether and to whom trade secrets were disclosed in this litigation. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 8:**

State all facts related to your allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment" contained in paragraph 1 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 3 and 7.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of the intellectual property transferred under the parties' binding NDA. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 8 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 8 that the principal facts related to the allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment" include the following:

27

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

12.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

29

13.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

14.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

15.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

16.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

17.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

18.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

19.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

20.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

21.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

22.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

23.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

24.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the intellectual property developed by ZeniMax after years of research and development and transferred to Defendants under the NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain the intellectual property transferred under the parties' binding NDA. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**App. 031**

## INTERROGATORY NO. 9:

State all facts related to your allegation that "Defendants have wrongfully taken that ZeniMax intellectual property and commercially exploited it for their own gain" contained in paragraph 1 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 9:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 5 and 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Defendants have wrongfully taken … ZeniMax intellectual property and commercially exploited it for their own gain." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of the wrongful taking and commercial exploitation of Plaintiffs' intellectual property. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 9 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 9 that the principal facts related to the allegation that "Defendants have wrongfully taken … ZeniMax intellectual property and commercially exploited it for their own gain" include the following:

32

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information. In addition to third-party confidentiality agreements, ZeniMax also protects its trade secrets and confidential information by, *inter alia*, including confidentiality provisions in key employment agreements and using secured password-protected networks and databases. (*See, e.g.,* P0000230.)

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials.

33

(P0000056.)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information.  (*Id.*)

7.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).  (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012.  (*See* P0000109.)  These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.  (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral."  (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").  In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.  (P0000044.)

11.     On or about July 13, 2012, in response to this request, ZeniMax proposed a call with Defendants to discuss how VR headset development should proceed moving forward.  Defendants ignored ZeniMax's request.  (P0000039.)

12.     On or about July 26, 2012, after not responding to ZeniMax's request for a call, Defendants again asked ZeniMax for help with their Kickstarter video, noting that Mr. Carmack's reputation had helped the credibility of the Rift project.  (P0000034.)  In subsequent emails, Mr. Carmack responded that Defendants should not show anything that could be construed as ZeniMax property, and refused Defendants' request for a clip from the *DOOM 3: BFG Edition* computer program.  (P0000069.)

34

13.     On or about August 1, 2012, Defendants launched their Kickstarter campaign. In blatant disregard of ZeniMax's rights, Defendants' Kickstarter video impermissibly used, copied, publicly displayed, and distributed ZeniMax's intellectual property. Without prior authorization or commercial agreement, Defendants' Kickstarter video featured multiple clips showing *DOOM 3: BFG Edition* displayed on the modified Rift headset, used ZeniMax's *DOOM 3: BFG Edition* logo, and promised certain backers of the Kickstarter campaign copies of *DOOM 3: BFG Edition*. The Kickstarter video further referenced ZeniMax's VR Technology as "the magic that sets the Rift apart." Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

14.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.*, P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

15.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

16.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

17.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

18.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

19.     On or about August 16, 2012, after hearing no response from Defendants regarding an equity stake in Oculus, ZeniMax again requested that Defendants not disclose or discuss anything about future ZeniMax titles, release dates, timing or future commitments. (P0000090.)

20.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.) That same day, Mr. Hollenshead asked Defendants for an update on ZeniMax's proposal for an equity stake in Oculus. Defendants side-stepped ZeniMax's question regarding equity. (P0000093.)

21.     On September 10, 2012, after multiple requests from ZeniMax to discuss compensation, Defendants drafted a proposal designed to kick off business discussions with ZeniMax. (P0000105; P0000106.) Its proposal demanded, *inter alia*: (i) that ZeniMax grant Defendants a worldwide, exclusive license to programming code that had been provided by ZeniMax pursuant to the parties' NDA; (ii) that ZeniMax create additional intellectual property for Defendants' sole use; (iii) that ZeniMax provide extensive marketing and ten thousand free copies of *DOOM 3: BFG Edition* to Defendants; and (iv) that ZeniMax permit Mr. Carmack to serve as a technical advisor to Defendants. In return, Defendants offered ZeniMax an equity stake of 2%, subject to dilution, and other additional conditions. Defendants also offered ZeniMax the right to pay an additional $1.2 million for an additional 3% stake in Oculus. (P0000106.)

22.     On or about September 27, 2012, Defendants sent their latest "investor prospectus" to ZeniMax. (P0000006; P0000007.) The prospectus, which Defendants used or intended to use to recruit new investors, listed Mr. Carmack as an "advisor/endorser" and used the id Software company logo next to Mr. Carmack's name. (P0000007.) id Software had not authorized the use of its name and logos in the prospectus, and had not officially endorsed the Rift. In disregard of ZeniMax's directives not to use its property to promote the Rift, the prospectus also featured *DOOM* and other ZeniMax game logos on multiple slides. (*Id.*) ZeniMax is the owner of these logos and the ZeniMax Marks. Defendants' investor prospectus further included a "product roadmap" representing that ZeniMax's *DOOM 3: BFG Edition* and *Skyrim* franchises would be made to work with the Rift. (*Id.*) ZeniMax had reached no such agreement with Defendants.

23.     On or about October 19, 2012, ZeniMax made a counter-proposal to Defendants, agreeing to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.)

24.     On or about November 13, 2012, Defendants responded to this counter-proposal, asserting that ZeniMax's proposal "is so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

25.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided

36

around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

26.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

27.     On or about December 11, 2012, Defendants responded to ZeniMax's October 19, 2012 counter-proposal. (P0000114; P0000115.) Defendants' revised proposal would not grant ZeniMax any equity in Oculus, but would only permit ZeniMax to purchase equity in exchange for several million dollars and additional contributions. (P0000115.) Defendants also circulated a revised investor prospectus that contained the same unauthorized references to ZeniMax's intellectual property and wrongly suggested ZeniMax's endorsement for the Rift. (P0000118.) This investor prospectus also omitted any disclosure of Defendants' use of ZeniMax VR Technology or Defendants' heavy reliance on ZeniMax to develop the Rift.

28.     On or about January 22, 2013, Defendants began further efforts to obtain financing, and again invited ZeniMax to invest money and resources. (*See* P0000113.) Defendants' offer still did not provide any compensation for the contributions that ZeniMax had already made to the Rift. Defendants continued using ZeniMax VR Technology without license or permission, and further promoted themselves as the developers and owners of ZeniMax's breakthrough VR Technology.

29.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

30.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

31.     On or about June 2013, Mr. Carmack's employment agreement with ZeniMax expired. Mr. Carmack worked as a part-time technical advisor to ZeniMax for approximately two months following the expiry of his employment agreement. (*See* P0000344.)

32.     On or about August 2013, Mr. Carmack joined Oculus as Chief Technical Officer. (*See, e.g.*, P0010413.)

33.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (P0000007.) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

34.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

35.     On or about February 17, 2014, five additional senior employees of ZeniMax, all of whom had worked closely with Mr. Carmack, simultaneously resigned and immediately joined Oculus. (P0000278; P0000285; P0000292; P0000299; P0000307; P0000313.)  All of those employees had access to ZeniMax confidential information and trade secrets, and all were subject to strict post-employment confidentiality and non-solicitation obligations. (P0000278; P0000285; P0000292; P0000299; P0000307; P0000313; P0000320.)   At least one of the resigning employees refused to certify to ZeniMax upon his resignation that all ZeniMax confidential information in his possession had been returned to ZeniMax. (*See, e.g.*, P0000292.)  Defendants continued to hire former ZeniMax employees who have had access to ZeniMax's intellectual property with the knowledge that those former employees will inevitably disclose ZeniMax's trade secrets.

36.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

37.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

38.     On or about April 19, 2014, several months into his tenure at Oculus, Mr. Carmack announced that he was "in a hurry" to re-implement code.

39.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. Facebook has noted that it considers the modified Rift the computing platform of the future, and commented that it plans to monetize the modified Rift both as a free-standing commercial product and as a social media tool integrated into its multitude of platforms.

40.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the ZeniMax intellectual property Defendants' have wrongfully taken and commercially exploited for their own gain.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Defendants' wrongful taking and commercial exploitation of Plaintiffs'

intellectual property.   Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 10:**

State all facts related to your allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology" contained in paragraph 4 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Facebook's Interrogatory No. 3.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation, and because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons who have knowledge of the resources invested in VR research and development.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 10 that the principal facts related to the allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology" include the following:

40

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research and development related to VR technology. The resources invested in research and development related to virtual reality by ZeniMax may include, without limitation:

- Resources invested in attracting, hiring, and retaining core personnel, which may include but are not limited to the provision of salary and equity compensation necessary to attract top talent;

- Resources invested in creating, developing, and maintaining state of the art work environments, which may include but are not limited to game production studios, publishing shops, and other facilities;

- Resources invested in business equipment, which may include but are not limited to state of the art computers and related software, television monitors, high speed networks, computer peripherals, and other equipment necessary for game and VR research and development;

- Resources invested in public relations and marketing related to ZeniMax video games and VR, which may include but are not limited to promoting and generating interest in said products at gaming conventions and through industry media and industry events.

- Resources invested in VR-related products, which may include but are not limited to the development of VR source code, and the procurement of displays, screens, computer chips, sensors, cables, and other related hardware; and

- Resources invested by ZeniMax in the acquisition of id Software on or around June 23, 2009.

ZeniMax's investment in these and other resources amounted to tens of millions of dollars in research and development, including research into VR and immersive technologies.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to the Plaintiffs' Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that discovery, including deposition discovery of Plaintiffs' former employees now employed by Defendants, will enable Plaintiffs to further ascertain the full extent of the resources invested in VR research and development. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 11:**

State all facts related to your allegation that "Carmack and other ZeniMax personnel added numerous improvements to the prototype" contained in paragraph 6 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6 and Facebook's Interrogatory Nos. 4, 5, and 12.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Carmack and other ZeniMax personnel added numerous improvements to the [Rift] prototype." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons, including John Carmack, who have knowledge of Plaintiffs' "numerous improvements to the [Rift] prototype." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 11 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 11 that the principal facts related to the allegation that "Carmack and other ZeniMax personnel added numerous improvements to the [Rift] prototype" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video

42

game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax.   In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition.   (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology.   In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").   ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype.   At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift.  (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.)  The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose.  Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*,

43

P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)  These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.  (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral."  (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").  In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.  (P0000044.)  Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million.  (P0000007.)

11.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift.  (*See* P0000488.)  In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

12.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.  Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus.  (P0000007.)

13.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks.  (P0010505.)  ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions.  (*Id.*)  Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3:*

44

*BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

14.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

15.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

16.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

17.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

18.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

19.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

20.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

21.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

22.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding

received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

23.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

24.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for its numerous improvements to the prototype of the Rift.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Moreover, Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the numerous improvements to Defendants' prototype.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

46

**INTERROGATORY NO. 12:**

State all facts related to your allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift and to develop, modify, and tune the Rift hardware ... ZeniMax designed the specifications and functionality embodied in the Rift SDK, and directed its development" contained in paragraph 9 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6 and Facebook's Interrogatory Nos. 4, 5, and 11.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift ... " *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of person who have knowledge of Defendants' use of Plaintiffs' hardware and software. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 12 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 12 that the principal facts related to the allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift" include the following:

47

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.    On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.    ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code*, *ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.    On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

4.    Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

5.    On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

6.    On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

7.    On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials.

(P0000056.)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information.  (*Id.*)

8.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).  (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012.  (*See* P0000109.)  These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.  (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral."  (P0011811; P0000007.)

10.      On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").  In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.  (P0000044.)  Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million.  (P0000007.)

11.      Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012.  (*See, e.g.*, P0010495; P0010530.)  While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance.  (*See* OCULUS00000447.)

12.      On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift.  (*See* P0000488.)  In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

13.      During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.  Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors,

49

and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

15.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

16.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

17.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

18.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

19.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.) Upon information and belief, the Rift SDK and/or other related software and firmware are substantially similar to certain of the ZeniMax Copyrighted Materials.

20.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

50

21.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

22.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)  Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

23.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

24.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

25.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

26.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the ZeniMax VR Technology and ZeniMax Copyrighted Materials used by Defendants to create the Rift SDK.

                                    *(End of verified Response.)*

     In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Defendants' use of their hardware and software.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 13:**

State all facts related to your allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets" contained in paragraph 125 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Facebook's improper acquisition of Plaintiffs' trade secrets. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 13 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 13 that the principal facts related to the allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.     On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.     On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.     On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.     On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax

53

transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)   These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.    On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter").   Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.    During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.   For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

12.    On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

13.    On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

14.    On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.    On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.   Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

16.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

17.     On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

18.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus.  Neither ZeniMax nor its counsel received any response to this letter.

19.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others."  (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

20.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all ... consultants, advisors, ... and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] ... unencumbered and unrestricted exclusive ownership, of all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

21.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

22.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.)  An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.,* cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

23.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times, Wall Street Journal,* and *USA Today,* and in the industry press.

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had notice that ZeniMax trade secrets and ZeniMax VR Technology were confidential, proprietary, and highly valuable.   Through its acquisition of ZeniMax, Facebook therefore improperly acquired access to ZeniMax trade secrets and ZeniMax VR Technology.

25.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

26.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

27.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's misappropriation of ZeniMax trade secrets and ZeniMax VR Technology.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.   Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Facebook's improper acquisition of Plaintiffs' trade secrets.   Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 14:**

State all facts related to your allegation that. "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials" contained in paragraph 139 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Facebook's knowledge that "Oculus['s] products were derived from ZeniMax's Copyrighted Materials." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 14 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 14 that the principal facts related to the allegation that "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.    On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code, ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

4.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

5.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

6.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

7.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

8.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and

chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)   Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)    These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter").   Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.   For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.    Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

12.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding.  (P0000007.)

13.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

14.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

16.     On or about March 25, 2014, Facebook announced a proposed acquisition of

Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax Copyrighted Materials, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

17. On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

18. On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus. Neither ZeniMax nor its counsel received any response to this letter.

19. In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

20. In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

21. At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

22. Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.) An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.,* cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

23. On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times, Wall Street Journal,* and *USA Today,* and in the industry press.

60

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had knowledge that the Oculus products were derived from ZeniMax Copyrighted Materials.   As the sole owner of Oculus, Facebook has a direct financial interest in the infringing activity of Oculus and Luckey and has the right and ability to supervise their infringing acts.   Facebook has substantially participated in the infringing activity of Oculus and Luckey by inducing, causing, or materially contributing to the infringing conduct.

25.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

26.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

27.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's infringement of ZeniMax Copyrighted Materials.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.   Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Facebook's knowledge that "Oculus['s] products were derived from ZeniMax's Copyrighted Materials."   Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 15:**

State all facts related to your allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders for the time, money, and effort invested in developing revolutionary virtual reality technology" contained in paragraph 168 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 8.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders ... " *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Oculus and Facebook's interference with ZeniMax's ability to return value to its shareholders. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 15 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 15 that the principal facts related to the allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.    On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.    ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code*, *ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.    ZeniMax or its affiliates' intellectual property includes ownership of the entire right, title, and interest in and to valid, subsisting, and uncancelled United States Trademark Registrations No. 2,050,083 for "DOOM" (P0011831); No. 2,928,605 for "DOOM 3" (P0011839); No. 2,303,100 for "DOOM II" and design (P0011832); No. 2,165,125 for "ID" (P0011833); No. 3,923,244 for "RAGE" (P0011836); No. 4,198,972 for "RAGE" and design (P0011844); No. 4,094,299 for "RAGE" and design (P0011837); No. 3,972,050 for "RAGE" and design (P0011830); No. 4,080,839 for "SKYRIM" (P0011840); No. 4,097,150 for "SKYRIM" (P0011834); and No. 4,280,859 for "SKYRIM" (P0011842) (collectively, "ZeniMax Marks").

4.    On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

5.    Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

6.    On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

7.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

8.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

9.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

10.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

11.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

12.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter"). Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

13.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this

64

demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

15.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

16.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

17.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation. Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

18.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

19.     On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

20.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus. Neither ZeniMax nor its counsel received any response to this letter.

21.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

22.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

23.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

24.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.)  An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.,* cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

25.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times, Wall Street Journal,* and *USA Today,* and in the industry press.

26.     On or about July 21, 2014, Facebook closed on its acquisition of Oculus, and became its sole owner.  At the time of the acquisition, Facebook had knowledge of ZeniMax's claims for misuse of its intellectual property, including ZeniMax's claims for trade secret misappropriation, copyright infringement, breach of contract, trademark infringement and false designation against Oculus and Luckey.

27.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

28.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

29.     As a direct result of Oculus's illegal conduct, Oculus and Facebook have deprived ZeniMax of the control and dissemination of its proprietary inventions and confidential know-how concerning VR headset devices and related VR technology.  In so doing, Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders for the time, money, and effort invested in developing revolutionary VR technology.

30.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for its contributions.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further

Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.   Moreover, Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the harm suffered by Plaintiffs as a result of Defendants' actions.   Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 16:

If your response to Defendants' Request for Admission number 1, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 1.

*[Defendants' Request for Admission No. 1, reprinted here for reference: "Admit that Oculus VR is not a party to the alleged 'Non-Disclosure Agreement' referenced in your Complaint."]*

## RESPONSE TO INTERROGATORY NO. 16:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 1, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 6 and 7.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the basis for Plaintiffs' Response to Defendants' Request for Admission No. 1. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know that Oculus is a party to the parties' NDA. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 16 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 16 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 1 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     As discussed in these Responses and Objections, Luckey disclosed information protected under the NDA to third-parties, without expressly-authorized permission or authorization from ZeniMax. Oculus knew and had reason to know that Luckey received such information pursuant to the NDA. Moreover, as further discussed in these Responses and Objections, employees of Oculus repeatedly sought ZeniMax VR Technology from employees of ZeniMax. (*See, e.g.,* P0000001; P0000003; P0000004; P0000074; P0000075; P0000077; P0000354; P0010081; P0010229; P0010235; P0012985; P0012988; P0012990; P0012993; P0013001; P0013003.) By their actions and conduct, Defendants therefore established that Oculus was also bound by the NDA.

10.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

11.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

12.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.,* P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

70

13.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift.  (*See* P0000488.)  In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

14.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.  Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus.  (P0000007.)

15.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks.  (P0010505.)  ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions.  (*Id.*)  Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game.  (*See* P0010488.)

16.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support."  (P0000089.)

17.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences.  (P0000090.)

18.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus.  (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.)  ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA.  In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions.  (P0000108; P0000109.)  Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

19.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift.  (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.)  Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

71

20.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

21.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

22.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.,* P0010413.)

23.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.   Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax. (*Id.*)

24.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

25.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

26.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

27.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Oculus's breach of the parties' NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain that Oculus is a party to the parties' NDA.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 17:**

If your response to Defendants' Request for Admission number 4, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 4.

*[Defendants' Request for Admission No. 4, reprinted here for reference: "Admit that 'proper purpose' is not defined in the alleged 'Non-Disclosure Agreement' referenced in your Complaint.]*

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 4, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 6 and 7. Plaintiffs further object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation and because fact discovery is ongoing.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 4. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 17 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 4 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1. On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology.  In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").

3.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift."  Mr. Luckey lacked the technical expertise to create a viable prototype.  At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

4.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift.  (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

5.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.)  The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose.  Proper purpose is defined in the NDA to mean purposes for which the parties agree in writing.  (P0000056.)  Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials.  (*Id.*)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information.  (*Id.*)

6.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).  (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

7.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

8.      On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through

the website Kickstarter.com ("Kickstarter").   In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.  (P0000044.)  Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million.  (P0000007.)

9.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.   Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus.  (P0000007.)

10.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift.  (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.)  Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

11.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware.  (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

12.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding.  (P0000007.)

13.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (*Id.*)  Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

14.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

16.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

17.    As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Oculus and Luckey's breach of the parties' NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain that "proper purpose" is defined in the parties' NDA.   Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

76

## INTERROGATORY NO. 18:

If your response to Defendants' Request for Admission number 6, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 6.

*[Defendants' Request for Admission No. 6, reprinted here for reference: "Admit that Facebook has not persuaded any party to the contract alleged to exist in Counts 3 and 4 of your Complaint to breach that contract."]*

## RESPONSE TO INTERROGATORY NO. 18:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 6, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs. Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 6. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know that Facebook persuaded Defendants to breach contracts in this case. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 18 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 18 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 6 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at the E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

3.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

4.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

5.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

6.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

7.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts,

improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

8.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)   These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.   (*Id.*)   The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

9.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").   In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.   (P0000044.)   Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

10.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.)   In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

11.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.   For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.     Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

12.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift.   (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.)   Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

13.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

14.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding.  (P0000007.)

15.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (*Id.*)

16.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

17.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

18.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

19.     On or about April 7, 2014, following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology disclosed pursuant to the NDA and embodied in the modified Rift.  Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

20.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus.  Neither ZeniMax nor its counsel received any response to this letter.

21.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others."  (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

22.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property."  (Merger Agreement § 2.9(g).)

23.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

24.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.)  An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.,* cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

25.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times, Wall Street Journal,* and *USA Today,* and in the industry press.

26.     On or about July 21, 2014, Facebook closed on its acquisition of Oculus, and became its sole owner.  At the time of the acquisition, Facebook had knowledge of the existence and terms of the NDA.  Facebook interfered with the parties' NDA by willfully and intentionally causing Oculus and Luckey to use ZeniMax's VR Technology for a purpose not approved by ZeniMax and in breach of the obligations that Oculus and Luckey had under the NDA.

27.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

28.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

29.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's tortious interference with the NDA between ZeniMax and Oculus and Luckey.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain that Facebook persuaded Defendants to breach contracts in this case.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 19:

If your response to Defendants' Request for Admission number 7, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 7.

*[Defendants' Request for Admission No. 7, reprinted here for reference: "Admit that none of Oculus VR's products contain any ZeniMax Source Code."]*

## RESPONSE TO INTERROGATORY NO. 19:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 7, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 7. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents and source code in this litigation, and because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Oculus products that contain Plaintiff's source code. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 19 and made their first document production of material size shortly before the due date of these Responses.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 19 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 7 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax.  In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.)  Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment.  ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition.  (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology.  In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").   ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift."  Mr. Luckey lacked the technical expertise to create a viable prototype.  At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift.  (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.)  The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose.  Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.,* P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

12.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift. (*See* OCULUS00000447.)

13.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with

84

ZeniMax's *RAGE* video game, again without ZeniMax's permission.   Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14.   On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

15.   On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

16.   On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

17.   Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

18.   Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.,* P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

19.   Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

20.   On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

85

21.    During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

22.    On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

23.    On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

24.    On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

25.    On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

26.    As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Defendants' impermissible use of ZeniMax's source code in Oculus's products.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that documents and source code yet to be produced by Defendants will enable Plaintiffs to further ascertain the Oculus products that contain Plaintiffs' source code. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 20:**

Describe all of the relief you seek in this action.

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.    Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 8.

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation, and because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 20 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs seek "relief ... in this action" that will fairly and fully compensate it for Defendants' misconduct, and request at least the following categories of relief, in an amount to be proven at trial:

1.    Actual Damages;

2.    Restitution;

3.    Disgorgement;

4.    Unjust Enrichment;

5.    Equitable Relief;

6.    Injunctive Relief;

7.    Punitive and Exemplary Damages;

8.    Statutory Damages under 17 U.S.C. § 101 et seq.;

9.    Enhanced Damages;

10.    Prejudgment and Post-Judgment Interest;

11.     Court Costs;

12.     Attorney Fees; and

13.     All other relief to which ZeniMax is entitled.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to the Plaintiffs' Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Moreover, Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the harm to and relief sought by Plaintiffs. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 21:**

Describe all of Plaintiffs' uses of the alleged trade secrets set forth in "Plaintiffs' Further Identification of Misappropriated Trade Secrets," filed with the Court on February 25, 2015, ECF document number 113-1.

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate the reservation of rights included in their Further Identification of Misappropriated Trade Secrets, filed with the Court on February 25, 2015 (Dkt. No. 120).

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 5 and 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all … uses." Plaintiffs also object to this Interrogatory because the phrase "Plaintiffs' uses" is vague, ambiguous, and confusing.

Plaintiffs object to this Interrogatory as premature, including because Defendants have delayed production of relevant documents in this litigation, and because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. In addition, Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of Plaintiffs' uses of trade secrets.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 21 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs' uses for the above-identified trade secrets may include, without limitation:

- Advancing ZeniMax's knowledge regarding VR and head mounted displays;

- Performing research and development related to VR;

- Creating a commercially viable head mounted display;

- Seeking to generate revenue from sales of a head mounted display and related software and peripherals;

89

- Seeking to provide VR functionality in ZeniMax's video games;

- Seeking to create publicity for ZeniMax's video games;

- Seeking to create additional sales for ZeniMax video games by including VR functionality; and

- Furthering ZeniMax's reputation as an innovator and thought leader.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the uses of its trade secrets. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**App. 090**

Dated: April 2, 2015

Respectfully submitted,

_____

PHILLIP B. PHILBIN
Texas State Bar No. 15909020
E-mail: phillip.philbin@haynesboone.com
MICHAEL D. KARSON
Texas State Bar No. 24090198
E-mail: michael.karson@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone No.: 214-651-5000
Facsimile No.: 214-651-5940


P. ANTHONY SAMMI
E-mail: Anthony.Sammi@skadden.com
KURT WM. HEMR
E-mail: Kurt.Hemr@skadden.com
JAMES Y. PAK
Texas State Bar No. 24086376
E-mail: James.Pak@skadden.com
KRISTEN VOORHEES
E-mail: Kristen.Voorhees@skadden.com
DEVIN A. KOTHARI
E-mail: Devin.Kothari@skadden.com
(admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE,**
      **MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone No.: 212-735-3000
Facsimile No.: 212-735-2000


*Attorneys for Plaintiffs*
*ZeniMax Media Inc. and id Software LLC*

91

**App. 091**

## CERTIFICATE OF SERVICE

I, Kristen Voorhees, counsel for Plaintiffs, do hereby certify that I caused a true and correct copy of the foregoing *ZeniMax Media Inc. and id Software LLC's Responses and Objections to Facebook Inc.'s First Set of Interrogatories to Plaintiffs* to be served on Defendants by electronic mail to the following addresses: lcarter@carterscholer.com, lstahl@carterscholer.com, and FacebookOculusZenimaxMediaInc@cooley.com.

Dated: April 2, 2015

Kristen Voorhees

## **VERIFICATION**

I, James L. Leder, state under penalty of perjury that I have read the foregoing *ZeniMax Media Inc. and id Software LLC's Responses and Objections to Facebook Inc.'s First Set of Interrogatories to Plaintiffs* (Nos. 1-21), and that based upon matters within my personal knowledge and upon information that has been assembled and provided to me, the foregoing responses are correct, to the best of my knowledge and belief.

Dated: April 2, 2015

James L. Leder
Chief Operating Officer, ZeniMax Media Inc.

on behalf of Plaintiffs
ZeniMax Media Inc. and id Software LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA INC. and<br>ID SOFTWARE LLC, | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| | § | **CIVIL CASE NO. 3:14-cv-01849-P** |
| v. | §<br>§ | |
| OCULUS VR, LLC<br>PALMER LUCKEY,<br>and FACEBOOK, INC. | §<br>§<br>§<br>§ | **CONTAINS HIGHLY<br>CONFIDENTIAL INFORMATION<br>SUBJECT TO PROTECTIVE ORDER<br>(Docket No. 107)** |
| Defendants. | § | |

### ZENIMAX MEDIA INC. AND ID SOFTWARE LLC'S
### FIRST AMENDED AND SUPERSEDING RESPONSES AND OBJECTIONS
### TO FACEBOOK INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Pursuant to the Federal Rules of Civil Procedure, ZeniMax Media Inc. ("ZeniMax") and id Software LLC ("id Software") (collectively, "Plaintiffs") hereby serve these First Amended and Superseding Responses and Objections to Facebook Inc.'s ("Facebook") (together with Oculus VR, LLC ("Oculus") and Palmer Luckey, "Defendants") First Set of Interrogatories to Plaintiffs.

### GENERAL RESPONSES AND OBJECTIONS

Plaintiffs assert the following General Objections. Each individual Response to the Interrogatories is subject to, and limited in accordance with, the following General Objections, which are incorporated as if fully set forth therein. The following General Objections are not waived, or in any way limited by, the Specific Responses and Objections. Although Specific Objections are also interposed in response to individual Interrogatories, Plaintiffs' failure to repeat any part of their General Objections shall not be construed as a waiver of those objections.

1.      The Responses set forth below are for the purposes of discovery only, and Plaintiffs expressly reserve any and all objections they may have to the relevance, competence, materiality, admissibility or use at deposition, hearing or trial of any information stated, produced, identified or referred to herein. Plaintiffs also expressly reserve their right to rely, at any later time including at deposition, hearing or trial, upon additional documents or information not included in the Specific Responses.

2.      An objection to a specific Interrogatory or a willingness to provide a Response does not imply, and should not be construed as an acknowledgement, that complete answers to that Interrogatory are available or exist.

1



App. 094

3.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they purport to impose discovery obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of the Northern District of Texas, the Requirements for Chief Judge Jorge A. Solis or any other applicable law or rule.

4.     Plaintiffs object to the Interrogatories as premature, including because fact discovery is ongoing and because the parties have not yet designated experts or exchanged expert reports.  Plaintiffs object to any contention Interrogatories as premature to the extent they seek responses prior to the close of discovery. *See* Fed. R. Civ. P. 33(a).

5.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they are vague, ambiguous, non-specific or confusing, and thus not susceptible to a reasoned interpretation or response.

6.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they seek information that is not relevant to the claims or defenses of either party, and thus not reasonably calculated to lead to the discovery of admissible evidence.

7.     Plaintiffs object to the Interrogatories, and the Definitions and Instructions, to the extent that they are duplicative, cumulative, and/or seek information that may be obtained from other sources or through other means of discovery that are more convenient, more efficient, more practical, less burdensome and/or less expensive.

8.     Plaintiffs object to the Interrogatories as overbroad and unduly burdensome because Defendants, and not Plaintiffs, employ the majority of persons with knowledge of topics referenced in the Interrogatories, are in possession of the majority of documents relevant to the Interrogatories, and are in the best position to know the answers to the Interrogatories.

9.     Plaintiffs object to Interrogatories, and the Definitions and Instructions, to the extent they are overly broad, overly expansive, oppressive and/or unduly burdensome and would impose upon Plaintiffs an unreasonable burden of inquiry, or to the extent they seek information not within Plaintiffs' possession, custody or control.  Plaintiffs also object to the Interrogatories, and the Definitions and Instructions, as unduly burdensome to the extent that the information requested is within the knowledge of Defendants, can be determined by referring to documents within the possession, custody or control of Defendants, is within the public domain or is otherwise more readily or equally available to Defendants and thus more conveniently obtained by Defendants.

10.    Plaintiffs object to the Interrogatories, and the Definitions and Instructions, as unduly burdensome to the extent they seek information that can be found in Plaintiffs' Complaint, document productions, expert reports, and Court filings. Plaintiffs' further object to those Interrogatories asking them to "state all facts" as improper contention interrogatories. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation

2

omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008
U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only
requiring a party to "generally explain" its factual bases in response to a contention
interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this
litigation. For this reason, Plaintiffs note that all citations provided in these Responses are
provided by way of example only, and should not be construed as limiting in any manner.
Plaintiffs explicitly reserve the right to rely on additional documents not cited in these Responses
during the course of this litigation.

      11.    The Responses set forth below are based upon Plaintiffs' interpretation of the
language used in the Interrogatories and in the Definitions and Instructions. Plaintiffs reserve
their right to amend or to supplement their Responses to the Interrogatories in the event
Facebook or Defendants assert, or the Court adopts, an interpretation that differs from Plaintiffs'
interpretation.

      12.    Plaintiffs object to Facebook's definition of "ZeniMax," id Software," "Plaintiffs,"
"you," and "your" in Definition Nos. 1-4 as overly broad and/or unduly burdensome and seeking
information neither relevant nor reasonably calculated to lead to discovery of admissible
evidence. For purposes of answering these Interrogatories, Plaintiffs use the term "ZeniMax" to
mean ZeniMax Media Inc., "id Software" to mean id Software LLC, and "Plaintiffs" to mean
both ZeniMax Media Inc. and id Software LLC, only.

      13.    Plaintiffs object to Facebook's definition of "concerning," "document," "person,"
"persons," and "related to" in Definition Nos. 10-13 and "identify," "identifying," "identity," or
"identification" in Definition No. 15 as unduly burdensome, potentially beyond the discovery
obligations set forth in the Federal Rules of Civil Procedure, and not reasonably calculated to
lead to the discovery of admissible evidence. For the purposes of answering these
Interrogatories, Plaintiffs use and interpret the above-referenced terms according to their plain
meaning and common sense usage.

      14.    Plaintiffs object to Interrogatories, and the Definitions and Instructions, to the
extent that they call for the production of information or documents subject to a claim of
privilege or immunity, including the attorney-client privilege, the attorney work-product doctrine
or any other applicable evidentiary privilege or immunity from disclosure. Nothing contained in
these Responses is intended to be nor should be considered as a waiver of any attorney-client
privilege, work-product protection or any other applicable evidentiary privilege or immunity.
The inadvertent production of any response or document subject to such privileges or immunities
is not intended to relinquish any privilege or immunity and shall not be deemed to constitute a
waiver of any applicable privilege or immunity.

      15.    The Responses and Objections herein are based on Plaintiffs' present knowledge,
information and belief. Plaintiffs reserve all their rights to amend, revise, correct or clarify these
Responses pursuant to Federal Rule of Civil Procedure 26(e).

      Each of the foregoing General Responses and Objections are incorporated by reference
into each and every Specific Response set forth below. Subject to the General Responses and

3

Objections, and without waiver, modification or limitation thereof, Plaintiffs' Specific Responses and Objections to the Interrogatories are set forth below.

App. 097

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

State all facts related to your allegation that "[t]he use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendants' product and services emanate from, are authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)" contained in paragraph 9 of your Complaint, including without limitation identifying each of the alleged "use[s] of the ZeniMax Marks by Oculus and Luckey," identifying the specific "products and services" referenced therein, and describing the basis of any alleged infringement.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts" and "each of the alleged 'use[s].'" Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding Plaintiff's trademark infringement and false designation claims. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as irrelevant, including because Facebook is not currently accused of trademark infringement or false designation under the Lanham Act. Plaintiffs also object to this Interrogatory as vague, ambiguous, and confusing, including because the portion of Interrogatory No. 1 appearing in quotes is not found in paragraph 9 of Plaintiffs' Complaint.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about the "use[s] of the ZeniMax Marks" and the

"specific 'products or services' referenced therein." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 1.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 1 that the principal facts related to the allegation that "[t]he use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.     On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.     ZeniMax or its affiliates' intellectual property includes ownership of the entire right, title, and interest in and to valid, subsisting, and uncancelled United States Trademark Registrations No. 2,050,083 for "DOOM" (P0011831)[1]; No. 2,928,605 for "DOOM 3" (P0011839); No. 2,303,100 for "DOOM II" and design (P0011832); No. 2,165,125 for "ID" (P0011833); No. 3,923,244 for "RAGE" (P0011836); No. 4,198,972 for "RAGE" and design (P0011844); No. 4,094,299 for "RAGE" and design (P0011837); No. 3,972,050 for "RAGE" and design (P0011830); No. 4,080,839 for "SKYRIM" (P0011840); No. 4,097,150 for "SKYRIM" (P0011834); and No. 4,280,859 for "SKYRIM" (P0011842) (collectively, "ZeniMax Marks").[2]

3.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in virtual reality (for the purposes of all verified Responses, "VR") technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").

4.     On or about April 2012, id Software's Technical Director, John Carmack, discovered through an Internet forum that a college-aged inventor, Palmer Luckey, had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

---

[1]   All citations provided in these Responses are provided by way of example only, and should not be construed as limiting in any manner. Plaintiffs explicitly reserve the right to rely on additional documents not cited in these Responses during the course of this litigation.

[2]   All defined terms are applicable only to their corresponding Specific Response, unless otherwise noted.

5.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

6.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at the 2012 Electronic Entertainment Expo (for the purposes of all verified Responses, "E3 2012"). (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

7.      On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.)

8.      On or about July 13, 2012, in response to this request, ZeniMax proposed a call with Defendants to discuss how VR headset development should proceed moving forward. Defendants ignored ZeniMax's request. (P0000039.)

9.      On or about July 26, 2012, after not responding to ZeniMax's request for a call, Defendants again asked ZeniMax for help with their Kickstarter video, noting that Mr. Carmack's reputation had helped the credibility of the Rift project. (P0000034.) In subsequent emails, Mr. Carmack responded that Defendants should not show anything that could be construed as ZeniMax property, and refused Defendants' request for a clip from the *DOOM 3: BFG Edition* computer program. (P0000069.)

10.     On or about August 1, 2012, Defendants launched their Kickstarter campaign. In blatant disregard of ZeniMax's rights, Defendants' Kickstarter video impermissibly used, copied, publicly displayed, and distributed ZeniMax's intellectual property, including the ZeniMax Marks. Without prior authorization or commercial agreement, Defendants' Kickstarter video featured multiple clips showing *DOOM 3: BFG Edition* displayed on the modified Rift headset, used ZeniMax's *DOOM 3: BFG Edition* logo, and promised certain backers of the Kickstarter campaign copies of *DOOM 3: BFG Edition*. The Kickstarter video further referenced ZeniMax's

7

VR Technology as "the magic that sets the Rift apart." Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.*, P0010495; P0010530.)

12.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Brendan Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

13.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' non-disclosure agreement (for the purposes of all verified Responses, "NDA"), ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

14.     On or about August 16, 2012, after hearing no response from Defendants regarding an equity stake in Oculus, ZeniMax again requested that Defendants not disclose or discuss anything about future ZeniMax titles, release dates, timing or future commitments. (P0000090.)

15.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.) That same day, Plaintiffs asked Defendants for an update on ZeniMax's proposal for an equity stake in Oculus. Defendants side-stepped ZeniMax's question regarding equity. (P0000093.)

16.     On September 10, 2012, after multiple requests from ZeniMax to discuss compensation, Defendants drafted a proposal designed to kick off business discussions with ZeniMax. (P0000105; P0000106.) Its proposal demanded, *inter alia*: (i) that ZeniMax grant Defendants a worldwide, exclusive license to programming code that had been provided by ZeniMax pursuant to the parties' NDA; (ii) that ZeniMax create additional intellectual property for Defendants' sole use; (iii) that ZeniMax provide extensive marketing and ten thousand free copies of *DOOM 3: BFG Edition* to Defendants; and (iv) that ZeniMax permit Mr. Carmack to serve as a technical advisor to Defendants. In return, Defendants offered ZeniMax an equity stake of 2%, subject to dilution, and other additional conditions. Defendants also offered ZeniMax the right to pay an additional $1.2 million for an additional 3% stake in Oculus. (P0000106.)

8

17.     On or about September 27, 2012, Defendants sent their latest "investor prospectus" to ZeniMax. (P0000006; P0000007.) The prospectus, which Defendants used or intended to use to recruit new investors, listed Mr. Carmack as an "advisor/endorser" and used the id Software company logo next to Mr. Carmack's name. (P0000007.) id Software had not authorized the use of its name and logos in the prospectus, and had not officially endorsed the Rift. In disregard of ZeniMax's directives not to use its property to promote the Rift, the prospectus also featured *DOOM* and other ZeniMax game logos on multiple slides. (*Id.*) ZeniMax is the owner of these logos and the ZeniMax Marks. Defendants' investor prospectus further included a "product roadmap" representing that ZeniMax's *DOOM 3: BFG Edition* and *Skyrim* franchises would be made to work with the Rift. (*Id.*) ZeniMax had reached no such agreement with Defendants.

18.     On or about December 11, 2012, Defendants circulated a revised investor prospectus that contained the same unauthorized references to ZeniMax's intellectual property, including the ZeniMax Marks, and wrongly suggested ZeniMax's endorsement for the Rift. (P0000118.)   This investor prospectus also omitted any disclosure of Defendants' use of ZeniMax VR Technology or Defendants' heavy reliance on ZeniMax to develop the Rift.

19.     On or about January 22, 2013, Defendants began further efforts to obtain financing, and again invited ZeniMax to invest money and resources.   (*See* P0000113.) Defendants' offer still did not provide any compensation for the contributions that ZeniMax had already made to the Rift. Defendants continued using ZeniMax VR Technology without license or permission, and further promoted themselves as the developers and owners of ZeniMax's breakthrough VR Technology.

20.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

21.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

22.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

23.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with other rounds of funding received by Oculus, confirmed the market value of the ZeniMax Marks, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

25.     The use of the ZeniMax Marks by Oculus and Luckey infringes ZeniMax's exclusive rights in its federally registered ZeniMax Marks and is likely to cause confusion and to cause the relevant public to mistakenly believe that Defendants' products or services emanated

9

from, were authorized, endorsed, sponsored or licensed by, or connected or affiliated in some way with ZeniMax.

26.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Defendants' use of the ZeniMax Marks.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain the full extent and nature of Defendants' trademark infringement and false designation. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

10

## INTERROGATORY NO. 2:

Identify each and every person who has participated in any research and development related to virtual reality conducted by or for you at any time.

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 1 and 2 and Facebook's Interrogatory No 11.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "each and every person" and participation in "any research and development ... at any time."

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ many of the people who have "participated in any research and development related to virtual reality" for Plaintiffs.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 2 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Persons who have participated in research and development related to virtual reality conducted by or for Plaintiffs may include:

| No. | Name | Position & Business Affiliation | Business Address & Telephone Number |
|---|---|---|---|
| 1 | Antkow, Christian | Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 2 | Carmack, John | Chief Technical Officer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 3 | Duffy, Robert | Programming Director, id Software | 1500 North Greenville Ave 7th Floor Richardson, Texas 75081 (972) 613-3589 |

11

| No. | Name | Position & Business Affiliation | Business Address & Telephone Number |
|---|---|---|---|
| 4 | Hooper, Matthew | Director of Development, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 5 | Kennickell, Gloria | Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 6 | Kim, Jason D. | Product Manager, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 7 | van Waveren, Jan Paul | Senior Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |
| 8 | Willits, Tim | Studio Director, id Software | 1500 North Greenville Ave 7th Floor Richardson, Texas 75081 (972) 613-3589 |
| 9 | Wright, Jonathan E. | Senior Engineer, Oculus | 19800 MacArthur Boulevard Suite 200 Irvine, California 92612 (949) 502-2070 |

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery, including deposition discovery of Plaintiffs' former employees now working for Defendants, will enable Plaintiffs to further ascertain the persons who have participated in any research and development related to virtual reality on behalf of Plaintiffs. Plaintiffs specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case, and also reserve their right to rely in this litigation on documents or testimony from persons not identified in this Response. Plaintiffs further reserve the right to rely in this litigation on the persons identified in this Response for testimony outside of the subject matter of this Interrogatory.

**INTERROGATORY NO. 3:**

State all resources you have ever invested in any research and development related to virtual reality conducted by or for you at any time.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Facebook's Interrogatory No. 10.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all resources" invested in "any research and development ... at any time."

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ many of the people who have knowledge of the resources invested in VR research and development by Plaintiffs.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 3 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. During that time, ZeniMax invested tens of millions of dollars in research and development, including research into VR and immersive technologies. The "resources ... invested in any research and development related to virtual reality" by ZeniMax may include, without limitation:

- Resources invested in attracting, hiring, and retaining core personnel, which may include but are not limited to the provision of salary and equity compensation necessary to attract top talent;

- Resources invested in creating, developing, and maintaining state of the art work environments, which may include but are not limited to game production studios, publishing shops, and other facilities;

- Resources invested in business equipment, which may include but are not limited to state of the art computers and related software, television monitors, high speed

13

networks, computer peripherals, and other equipment necessary for game and VR research and development;

- Resources invested in public relations and marketing related to ZeniMax video games and VR, which may include but are not limited to promoting and generating interest in said products at gaming conventions and through industry media and industry events.

- Resources invested in VR-related products, which may include but are not limited to the development of VR source code, and the procurement of displays, screens, computer chips, sensors, cables, and other related hardware; and

- Resources invested by ZeniMax in the acquisition of id Software on or around June 23, 2009.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery, including deposition discovery of Plaintiffs' former employees now employed by Defendants, will enable Plaintiffs to further ascertain the full extent of the resources invested in VR research and development. Plaintiffs specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

14

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

## INTERROGATORY NO. 4:

Describe the "breakthrough modifications to the Rift prototype" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

## RESPONSE TO INTERROGATORY NO. 4:

**Redacted**

15

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

Redacted

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**INTERROGATORY NO. 5:**

Describe the "additional ZeniMax VR Technology needed to develop the Rift" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

**RESPONSE TO INTERROGATORY NO. 5:**

**Redacted**

19

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

Redacted

App. 113

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**INTERROGATORY NO. 6:**

Identify everything, including without limitation data, files and information, you allege Defendants downloaded from the "file transfer protocol site" referenced in your response to Defendants' sixth interrogatory, dated August 29, 2014.

**RESPONSE TO INTERROGATORY NO. 6:**

**Redacted**

HIGHLY CONFIDENTIAL — FOR OUTSIDE COUNSEL ONLY

**Redacted**

24

**INTERROGATORY NO. 7:**

Identify every person to whom you have disclosed the alleged trade secrets at issue in this action, including identifying the specific information disclosed to each person and the reasons for each such disclosure.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "every person," "specific information disclosed to each person," and "the reasons for each such disclosure."

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know whether and to whom trade secrets were disclosed in this litigation, and because the requested persons are readily ascertainable from Plaintiffs' document production. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 7.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 7 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs have disclosed their trade secrets to Defendants Palmer Luckey and Oculus pursuant to the parties' NDA and confidential business relationship. *(See* Dkt. No. 120.) Plaintiffs specifically identify at least the following personnel of Defendants to whom they have disclosed the trade secrets identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets *(see id.)* for the purpose of VR research and development:

- Michael Antonov (Chief Software Architect, Oculus) *(see, e.g.,* P0013017; P013036; P0013001; P0012993; P0013021; P0013037; P0000075; P0010235; P0013029; P0013009; P0013005; P0012991; P0012985; P0013033);

- Brendan Iribe (Chief Executive Officer, Oculus) *(see, e.g.,* P0013041; P0012979; P0013017; P0013036; P0013001; P0012993; P0013021; P0013037; P0013009;

P0000075; P0010235; P0012998; P0013029; P0013021; P0013005; P0012991; P0012985; P0013005; P0013033);

- Palmer Luckey (Founder, Oculus) *(see, e.g.,* P0000077; P0013003; P0013041; P0012979; P0013017; P0000074; P0013036; P0013001; P0012993; P0013021; P0013037; P0013009; P0000075; P0010235; P0013009; P0012998; P0013029; P0013005; P0012991; P0012985; P0000457; P0013033);

- Jack McCauley (Vice President of Engineering, Oculus) *(see, e.g.,* P0013003; P0013021; P0013017; P0013012; P0013036; P0013001; P0012993; P0013009; P0013041; P0000075; P0010235; P0012998; P0013029; P0013037; P0013005; P0012991; P0012985;  P0013033);

- Nate Mitchell (Vice President of Product, Oculus) *(see, e.g.,* P0013041; P0012979; P0013017; P0013036; P0013001; P0012993; P0013021; P0013037; P0013029; P0013009; P0013037; P0013005; P0012991; ; P0012985; P0013033); and

- Nirav Patel (Engineer, Oculus) *(see, e.g.,* P0013021; P0013017; P0013036; P0013001; P0012993; P0013009; P0013041; P0013029; P0013009; P0013037; P0013005; P0012991; P0012985; P0013033).

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain whether and to whom trade secrets were disclosed in this litigation. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

26

**INTERROGATORY NO. 8:**

State all facts related to your allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment" contained in paragraph 1 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 3 and 7.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of the intellectual property transferred under the parties' binding NDA. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 8.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 8 that the principal facts related to the allegation that "[u]nder a binding Non-Disclosure Agreement, ZeniMax provided Palmer Luckey and Oculus VR, LLC with access to intellectual property developed by ZeniMax after years of research and investment" include the following:

App. 120

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. *(See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia,* its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. *(Id.)*

28

7.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

12.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

13.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

14.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

15.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

16.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

17.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.,* P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

18.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

19.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

20.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

30

21.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

22.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

23.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

24.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the intellectual property developed by ZeniMax after years of research and development and transferred to Defendants under the NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain the intellectual property transferred under the parties' binding NDA. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 9:

State all facts related to your allegation that "Defendants have wrongfully taken that ZeniMax intellectual property and commercially exploited it for their own gain" contained in paragraph 1 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 9:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.   Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 5 and 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts."  Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Defendants have wrongfully taken ... ZeniMax intellectual property and commercially exploited it for their own gain." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory).  Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports.  Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of the wrongful taking and commercial exploitation of Plaintiffs' intellectual property.  Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 9.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 9 that the principal facts related to the allegation that "Defendants have wrongfully taken ... ZeniMax intellectual property and commercially exploited it for their own gain" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video

32

game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax.  In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax.  (P0000230.)  Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment.  ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition.  (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology.  In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").  ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift."  Mr. Luckey lacked the technical expertise to create a viable prototype.  At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift.  (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information. In addition to third-party confidentiality agreements, ZeniMax also protects its trade secrets and confidential information by, *inter alia*, including confidentiality provisions in key employment agreements and using secured password-protected networks and databases.  (*See, e.g.*, P0000230.)

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.)  The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose.  Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information.  (*Id.*)

7.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified,

applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)   Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.     Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)   These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").    In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.)

11.     On or about July 13, 2012, in response to this request, ZeniMax proposed a call with Defendants to discuss how VR headset development should proceed moving forward. Defendants ignored ZeniMax's request. (P0000039.)

12.     On or about July 26, 2012, after not responding to ZeniMax's request for a call, Defendants again asked ZeniMax for help with their Kickstarter video, noting that Mr. Carmack's reputation had helped the credibility of the Rift project. (P0000034.) In subsequent emails, Mr. Carmack responded that Defendants should not show anything that could be construed as ZeniMax property, and refused Defendants' request for a clip from the *DOOM 3: BFG Edition* computer program. (P0000069.)

13.     On or about August 1, 2012, Defendants launched their Kickstarter campaign. In blatant disregard of ZeniMax's rights, Defendants' Kickstarter video impermissibly used, copied, publicly displayed, and distributed ZeniMax's intellectual property. Without prior authorization or commercial agreement, Defendants' Kickstarter video featured multiple clips showing *DOOM 3: BFG Edition* displayed on the modified Rift headset, used ZeniMax's *DOOM 3: BFG Edition* logo, and promised certain backers of the Kickstarter campaign copies of *DOOM 3: BFG*

34

*Edition.* The Kickstarter video further referenced ZeniMax's VR Technology as "the magic that sets the Rift apart." Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

14.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.,* P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

15.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

16.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.     Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

17.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

18.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

19.     On or about August 16, 2012, after hearing no response from Defendants regarding an equity stake in Oculus, ZeniMax again requested that Defendants not disclose or discuss anything about future ZeniMax titles, release dates, timing or future commitments. (P0000090.)

20.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.) That same day, Mr. Hollenshead asked Defendants for an update on ZeniMax's proposal for an equity stake in Oculus. Defendants side-stepped ZeniMax's question regarding equity. (P0000093.)

21. On September 10, 2012, after multiple requests from ZeniMax to discuss compensation, Defendants drafted a proposal designed to kick off business discussions with ZeniMax. (P0000105; P0000106.) Its proposal demanded, *inter alia*: (i) that ZeniMax grant Defendants a worldwide, exclusive license to programming code that had been provided by ZeniMax pursuant to the parties' NDA; (ii) that ZeniMax create additional intellectual property for Defendants' sole use; (iii) that ZeniMax provide extensive marketing and ten thousand free copies of *DOOM 3: BFG Edition* to Defendants; and (iv) that ZeniMax permit Mr. Carmack to serve as a technical advisor to Defendants. In return, Defendants offered ZeniMax an equity stake of 2%, subject to dilution, and other additional conditions. Defendants also offered ZeniMax the right to pay an additional $1.2 million for an additional 3% stake in Oculus. (P0000106.)

22. On or about September 27, 2012, Defendants sent their latest "investor prospectus" to ZeniMax. (P0000006; P0000007.) The prospectus, which Defendants used or intended to use to recruit new investors, listed Mr. Carmack as an "advisor/endorser" and used the id Software company logo next to Mr. Carmack's name. (P0000007.) id Software had not authorized the use of its name and logos in the prospectus, and had not officially endorsed the Rift. In disregard of ZeniMax's directives not to use its property to promote the Rift, the prospectus also featured *DOOM* and other ZeniMax game logos on multiple slides. (*Id.*) ZeniMax is the owner of these logos and the ZeniMax Marks. Defendants' investor prospectus further included a "product roadmap" representing that ZeniMax's *DOOM 3: BFG Edition* and *Skyrim* franchises would be made to work with the Rift. (*Id.*) ZeniMax had reached no such agreement with Defendants.

23. On or about October 19, 2012, ZeniMax made a counter-proposal to Defendants, agreeing to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.)

24. On or about November 13, 2012, Defendants responded to this counter-proposal, asserting that ZeniMax's proposal "is so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

25. Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

26. Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

36

27.     On or about December 11, 2012, Defendants responded to ZeniMax's October 19, 2012 counter-proposal. (P0000114; P0000115.) Defendants' revised proposal would not grant ZeniMax any equity in Oculus, but would only permit ZeniMax to purchase equity in exchange for several million dollars and additional contributions. (P0000115.) Defendants also circulated a revised investor prospectus that contained the same unauthorized references to ZeniMax's intellectual property and wrongly suggested ZeniMax's endorsement for the Rift. (P0000118.) This investor prospectus also omitted any disclosure of Defendants' use of ZeniMax VR Technology or Defendants' heavy reliance on ZeniMax to develop the Rift.

28.     On or about January 22, 2013, Defendants began further efforts to obtain financing, and again invited ZeniMax to invest money and resources.     (*See* P0000113.) Defendants' offer still did not provide any compensation for the contributions that ZeniMax had already made to the Rift. Defendants continued using ZeniMax VR Technology without license or permission, and further promoted themselves as the developers and owners of ZeniMax's breakthrough VR Technology.

29.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

30.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

31.     On or about June 2013, Mr. Carmack's employment agreement with ZeniMax expired. Mr. Carmack worked as a part-time technical advisor to ZeniMax for approximately two months following the expiry of his employment agreement. (*See* P0000344.)

32.     On or about August 2013, Mr. Carmack joined Oculus as Chief Technical Officer. (*See, e.g.*, P0010413.)

33.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (P0000007.)  Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

34.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

35.     On or about February 17, 2014, five additional senior employees of ZeniMax, all of whom had worked closely with Mr. Carmack, simultaneously resigned and immediately joined Oculus.  (P0000278; P0000285; P0000292; P0000299; P0000307; P0000313.)  All of those employees had access to ZeniMax confidential information and trade secrets, and all were subject to strict post-employment confidentiality and non-solicitation obligations. (P0000278; P0000285; P0000292; P0000299; P0000307; P0000313; P0000320.)     At least one of the resigning employees refused to certify to ZeniMax upon his resignation that all ZeniMax confidential information in his possession had been returned to ZeniMax. (*See, e.g.*, P0000292.) Defendants

37

continued to hire former ZeniMax employees who have had access to ZeniMax's intellectual property with the knowledge that those former employees will inevitably disclose ZeniMax's trade secrets.

36.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

37.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

38.     On or about April 19, 2014, several months into his tenure at Oculus, Mr. Carmack announced that he was "in a hurry" to re-implement code.

39.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. Facebook has noted that it considers the modified Rift the computing platform of the future, and commented that it plans to monetize the modified Rift both as a free-standing commercial product and as a social media tool integrated into its multitude of platforms.

40.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the ZeniMax intellectual property Defendants' have wrongfully taken and commercially exploited for their own gain.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Defendants' wrongful taking and commercial exploitation of Plaintiffs' intellectual property.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 10:**

State all facts related to your allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology" contained in paragraph 4 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.    Plaintiffs further object to this Interrogatory as duplicative of Facebook's Interrogatory No. 3.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts."   Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory).   Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports.   Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons who have knowledge of the resources invested in VR research and development.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 10 that the principal facts related to the allegation that "[f]or many years, ZeniMax invested tens of millions of dollars in research and development, including research into virtual reality and immersive technology" include the following:

39

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research and development related to VR technology. The resources invested in research and development related to virtual reality by ZeniMax may include, without limitation:

- Resources invested in attracting, hiring, and retaining core personnel, which may include but are not limited to the provision of salary and equity compensation necessary to attract top talent;

- Resources invested in creating, developing, and maintaining state of the art work environments, which may include but are not limited to game production studios, publishing shops, and other facilities;

- Resources invested in business equipment, which may include but are not limited to state of the art computers and related software, television monitors, high speed networks, computer peripherals, and other equipment necessary for game and VR research and development;

- Resources invested in public relations and marketing related to ZeniMax video games and VR, which may include but are not limited to promoting and generating interest in said products at gaming conventions and through industry media and industry events.

- Resources invested in VR-related products, which may include but are not limited to the development of VR source code, and the procurement of displays, screens, computer chips, sensors, cables, and other related hardware; and

- Resources invested by ZeniMax in the acquisition of id Software on or around June 23, 2009.

ZeniMax's investment in these and other resources amounted to tens of millions of dollars in research and development, including research into VR and immersive technologies.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to the Plaintiffs' Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that discovery, including deposition discovery of Plaintiffs' former employees now employed by Defendants, will enable Plaintiffs to further ascertain the full extent of the resources invested in VR research and development. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 11:

State all facts related to your allegation that "Carmack and other ZeniMax personnel added numerous improvements to the prototype" contained in paragraph 6 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 11:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6 and Facebook's Interrogatory Nos. 2, 4, 5, and 12.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Carmack and other ZeniMax personnel added numerous improvements to the [Rift] prototype." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons, including John Carmack, who have knowledge of Plaintiffs' "numerous improvements to the [Rift] prototype." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 11.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 11 that the principal facts related to the allegation that "Carmack and other ZeniMax personnel added numerous improvements to the [Rift] prototype" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.    On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

41

**App. 134**

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.  On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.  Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.  On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.  On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.  On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.  Between April 2012 and June 2012, ZeniMax's former Technical Director, John Carmack, made breakthrough modifications to the Rift prototype based upon prior research. In addition, other former senior employees of ZeniMax, including but not limited to Christian Antkow, Matthew Hooper, Gloria Kennickell, Jason Kim, Jan Paul van Waveren, and Jonathan Wright may have also added numerous improvements. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware;

42

programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) id Software's Studio Director, Tim Willits, and Programming Director, Robert Duffy, provided user testing and feedback on the Rift. Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.    The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.    Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.    On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.    On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

12.    During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

13.    On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of

43

the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. *(Id.)* Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition (see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. *(See* P0010488.)

14. On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

15. On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

16. Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

17. Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. *(See, e.g.,* P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

18. Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. *(See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

19. On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

20. On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. *(Id.)* Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

21. On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

22.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

23.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

24.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for its numerous improvements to the prototype of the Rift.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery, including deposition discovery of Plaintiffs' former employees now working for Defendants, will enable Plaintiffs to further ascertain the circumstances surrounding the numerous improvements to Defendants' prototype. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

45

## INTERROGATORY NO. 12:

State all facts related to your allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift and to develop, modify, and tune the Rift hardware ... ZeniMax designed the specifications and functionality embodied in the Rift SDK, and directed its development" contained in paragraph 9 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 12:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.   Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6 and Facebook's Interrogatory Nos. 4, 5, and 11.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift ... " *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of person who have knowledge of Defendants' use of Plaintiffs' hardware and software.   Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 12.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 12 that the principal facts related to the allegation that "Oculus used ZeniMax's hardware and software technology to create a software development kit ('SDK') for the Rift" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.     On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.     ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code*, *ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.     On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. *(See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

4.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").     ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

5.     On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

6.     On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

7.     On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials.

47

**App. 140**

(P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

8.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.,* P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

12.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

13.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors,

48

and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

15.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

16.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

17.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

18.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

19.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.) Upon information and belief, the Rift SDK and/or other related software and firmware are substantially similar to certain of the ZeniMax Copyrighted Materials.

20.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

49

21.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

22.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (*Id.*)  Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

23.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

24.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

25.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

26.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for the ZeniMax VR Technology and ZeniMax Copyrighted Materials used by Defendants to create the Rift SDK.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory.  Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Defendants' use of their hardware and software.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 13:

State all facts related to your allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets" contained in paragraph 125 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 13:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Facebook's improper acquisition of Plaintiffs' trade secrets. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 13.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 13 that the principal facts related to the allegation that "Facebook improperly acquired access to ZeniMax Trade Secrets" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.     On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

51

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See*, *e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

7.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See*, *e.g.*, P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)    These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.  (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter").    Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

12.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

13.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

14.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

16.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding

53

received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

17.     On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

18.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus. Neither ZeniMax nor its counsel received any response to this letter.

19.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

20.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

21.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

22.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.) An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – i.e., cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

23.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times*, *Wall Street Journal*, and *USA Today*, and in the industry press.

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had notice that ZeniMax trade secrets and ZeniMax VR

54

Technology were confidential, proprietary, and highly valuable. Through its acquisition of ZeniMax, Facebook therefore improperly acquired access to ZeniMax trade secrets and ZeniMax VR Technology.

25.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

26.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

27.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's misappropriation of ZeniMax trade secrets and ZeniMax VR Technology.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Facebook's improper acquisition of Plaintiffs' trade secrets. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 14:

State all facts related to your allegation that. "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials" contained in paragraph 139 of your Complaint.

## RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials." *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Facebook's knowledge that "Oculus['s] products were derived from ZeniMax's Copyrighted Materials." Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 14.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 14 that the principal facts related to the allegation that "Facebook had knowledge that the Oculus products were derived from ZeniMax's Copyrighted Materials" include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code*, *ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.*, P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

4.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

5.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

6.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

7.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

8.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and

57

chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.,* P0000074; P0000075; P0000077; P0010235.)   Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

9.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.)   These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.   (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter").   Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.   For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.     Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.   Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

12.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

13.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

14.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.   Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

16.     On or about March 25, 2014, Facebook announced a proposed acquisition of

58

Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax Copyrighted Materials, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

17. On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

18. On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus. Neither ZeniMax nor its counsel received any response to this letter.

19. In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

20. In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

21. At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

22. Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.) An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.*, cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

23. On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times, Wall Street Journal,* and *USA Today,* and in the industry press.

59

24.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had knowledge that the Oculus products were derived from ZeniMax Copyrighted Materials.  As the sole owner of Oculus, Facebook has a direct financial interest in the infringing activity of Oculus and Luckey and has the right and ability to supervise their infringing acts.  Facebook has substantially participated in the infringing activity of Oculus and Luckey by inducing, causing, or materially contributing to the infringing conduct.

25.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

26.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

27.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's infringement of ZeniMax Copyrighted Materials.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain Facebook's knowledge that "Oculus['s] products were derived from ZeniMax's Copyrighted Materials." Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 15:**

State all facts related to your allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders for the time, money, and effort invested in developing revolutionary virtual reality technology" contained in paragraph 168 of your Complaint.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.   Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 8.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all facts." Plaintiffs also object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it seeks "all facts" regarding the allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders ... " *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Oculus and Facebook's interference with ZeniMax's ability to return value to its shareholders. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 15.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 15 that the principal facts related to the allegation that "Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders" include the following:

61

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.　　On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.　　ZeniMax's intellectual property includes valid copyrights in the *ZeniMax VR Testbed Code*, *ZeniMax VR Implementation Code*, and the *DOOM 3: BFG Edition* computer program (collectively, "ZeniMax Copyrighted Materials"). (P0000339; P0000340; P0000342.)

3.　　ZeniMax or its affiliates' intellectual property includes ownership of the entire right, title, and interest in and to valid, subsisting, and uncancelled United States Trademark Registrations No. 2,050,083 for "DOOM" (P0011831); No. 2,928,605 for "DOOM 3" (P0011839); No. 2,303,100 for "DOOM II" and design (P0011832); No. 2,165,125 for "ID" (P0011833); No. 3,923,244 for "RAGE" (P0011836); No. 4,198,972 for "RAGE" and design (P0011844); No. 4,094,299 for "RAGE" and design (P0011837); No. 3,972,050 for "RAGE" and design (P0011830); No. 4,080,839 for "SKYRIM" (P0011840); No. 4,097,150 for "SKYRIM" (P0011834); and No. 4,280,859 for "SKYRIM" (P0011842) (collectively, "ZeniMax Marks").

4.　　On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. (*See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

5.　　Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

6.　　On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

7.       On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

8.       On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

9.       Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

10.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

11.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

12.      On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the modified Rift through the website Kickstarter.com ("Kickstarter"). Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

13.      During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this

63

demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

15.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*)

16.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

17.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation. Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

18.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

19.     On or about April 7, 2014 following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology embodied in the modified Rift. Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

20.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus. Neither ZeniMax nor its counsel received any response to this letter.

21.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others." (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

22.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property." (Merger Agreement § 2.9(g).)

23.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

24.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax. (Merger Agreement art. VIII.) An escrow agreement entered into in connection with the Merger Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.*, cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

25.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times*, *Wall Street Journal*, and *USA Today*, and in the industry press.

26.     On or about July 21, 2014, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had knowledge of ZeniMax's claims for misuse of its intellectual property, including ZeniMax's claims for trade secret misappropriation, copyright infringement, breach of contract, trademark infringement and false designation against Oculus and Luckey.

27.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

28.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

29.     As a direct result of Oculus's illegal conduct, Oculus and Facebook have deprived ZeniMax of the control and dissemination of its proprietary inventions and confidential know-how concerning VR headset devices and related VR technology. In so doing, Oculus and Facebook interfered with ZeniMax's ability to return value to its shareholders for the time, money, and effort invested in developing revolutionary VR technology.

30.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for its contributions.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' pre-filing letters to Defendants, Complaint, Court filings, including but not limited to its Further

Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the harm suffered by Plaintiffs as a result of Defendants' actions. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 16:**

If your response to Defendants' Request for Admission number 1, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 1.

*[Defendants' Request for Admission No. 1, reprinted here for reference: "Admit that Oculus VR is not a party to the alleged 'Non-Disclosure Agreement' referenced in your Complaint."]*

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 1, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 6 and 7.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the basis for Plaintiffs' Response to Defendants' Request for Admission No. 1. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know that Oculus is a party to the parties' NDA. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 16.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 16 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 1 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.     On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.     On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. *(See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.     On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.     On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.     On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia,* its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. *(Id.)*

68

7.    Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8.    The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9.    As discussed in these Responses and Objections, Luckey disclosed information protected under the NDA to third-parties, without expressly-authorized permission or authorization from ZeniMax. Oculus knew and had reason to know that Luckey received such information pursuant to the NDA. Moreover, as further discussed in these Responses and Objections, employees of Oculus repeatedly sought ZeniMax VR Technology from employees of ZeniMax. (*See, e.g.*, P0000001; P0000003; P0000004; P0000074; P0000075; P0000077; P0000354; P0010081; P0010229; P0010235; P0012985; P0012988; P0012990; P0012993; P0013001; P0013003.) By their actions and conduct, Defendants therefore established that Oculus was also bound by the NDA.

10.   Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

11.   On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

12.   Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.*, P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

69

13.     On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.)  In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

14.     During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.     Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

15.     On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.)  ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*)  Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

16.     On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

17.     On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

18.     Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.)  ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA.  In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.)  Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

19.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.)  Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

70

20.    Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

21.    On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

22.    During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

23.    On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax. (*Id.*)

24.    On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

25.    On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

26.    On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

27.    As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Oculus's breach of the parties' NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain that Oculus is a party to the parties' NDA. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 17:**

If your response to Defendants' Request for Admission number 4, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 4.

*[Defendants' Request for Admission No. 4, reprinted here for reference: "Admit that 'proper purpose' is not defined in the alleged 'Non-Disclosure Agreement' referenced in your Complaint.]*

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 4, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.   Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 6 and 7.  Plaintiffs further object to this Interrogatory as premature, including because fact discovery is ongoing.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 4. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.,* No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory).  Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 17 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 4 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

72

2.     Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology.  In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology").

3.     On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift."  Mr. Luckey lacked the technical expertise to create a viable prototype.  At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

4.     On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift.  (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

5.     On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.)  The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose.  Proper purpose is defined in the NDA to mean purposes for which the parties agree in writing.  (P0000056.)  Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials.  (*Id.*)  Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information.  (*Id.*)

6.     Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research.  Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).  (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.)  Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

7.     The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

8.     On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").   In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift

73

in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

9.      During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.      Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

10.     Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.,* P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

11.     Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

12.     On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

13.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

14.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

15.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

16.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

74

17.    As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Oculus and Luckey's breach of the parties' NDA.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain that "proper purpose" is defined in the parties' NDA.  Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

## INTERROGATORY NO. 18:

If your response to Defendants' Request for Admission number 6, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 6.

*[Defendants' Request for Admission No. 6, reprinted here for reference: "Admit that Facebook has not persuaded any party to the contract alleged to exist in Counts 3 and 4 of your Complaint to breach that contract."]*

## RESPONSE TO INTERROGATORY NO. 18:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 6, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs. Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 6. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task … ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know that Facebook persuaded Defendants to breach contracts in this case. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 18.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 18 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 6 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE.

76

Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at the E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

3.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

4.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

5.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia*, its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. (*Id.*)

6.      Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

7.      The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

8.      Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See*

P0000109.)  These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees.  (*Id.*)  The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral."  (P0011811; P0000007.)

9.  On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter").  In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax.  (P0000044.)  Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million.  (P0000007.)

10.  On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift.  (*See* P0000488.)  In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift.

11.  During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors.  For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with ZeniMax's *RAGE* video game, again without ZeniMax's permission.  Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus.  Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus.  (P0000007.)

12.  Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift.  (*See, e.g.*, P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.)  Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

13.  Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware.  (*See, e.g.*, P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

14.  On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding.  (P0000007.)

15.  On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding.  (*Id.*)

78

16.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

17.     On February 20, 2014, March 13, 2014, and March 26, 2014, ZeniMax informed Mr. Carmack and Defendant Oculus of potential claims that it subsequently asserted in this litigation.  Upon information and belief, Defendant Facebook knew or should have known of these claims, including because it encountered these letters during due diligence for its proposed acquisition of Oculus (discussed below).

18.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock.  This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of ZeniMax trade secrets, ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

19.     On or about April 7, 2014, following Facebook's announcement, ZeniMax's counsel contacted Oculus yet again by letter to point out ZeniMax's continuing rights and ownership of ZeniMax trade secrets and ZeniMax VR technology disclosed pursuant to the NDA and embodied in the modified Rift.  Legal counsel to Oculus rejected ZeniMax's claims without addressing their factual basis.

20.     On or about April 10, 2014, ZeniMax's counsel sent a letter to Colin S. Stretch, Vice President, General Counsel and Secretary of Facebook, to ensure that Facebook was aware of the dispute between ZeniMax and Oculus.  Neither ZeniMax nor its counsel received any response to this letter.

21.     In the agreement pursuant to which Facebook acquired Oculus, Oculus purported to represent to Facebook that it "has full title and ownership of, or is duly licensed under or otherwise authorized to use, all Intellectual Property necessary to enable it to carry on [its] Business, free and clear of any Encumbrances and without any conflict with or infringement upon the rights of others."  (Amended And Restated Agreement And Plan Of Merger ("Merger Agreement") § 2.9(b).)

22.     In that Merger Agreement, Oculus further purported to represent to Facebook that Oculus "has secured from all … consultants, advisors, … and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for [Oculus] … unencumbered and unrestricted exclusive ownership of, all of [those] Authors' right, title and interest in and to such Intellectual Property."  (Merger Agreement § 2.9(g).)

23.     At the time those representations were made – and at the time the acquisition transaction subsequently closed – those representations were false, Oculus and Luckey knew them to be false, and Facebook knew or had reason to know that they were false.

24.     Accordingly, in that Merger Agreement, Facebook required Oculus's shareholders to indemnify Facebook for "any failure of any representation or warranty" given by Oculus in the Merger Agreement, including indemnification against claims by third parties such as ZeniMax.  (Merger Agreement art. VIII.)  An escrow agreement entered into in connection with the Merger

79

Agreement also provided that Facebook would withhold ten percent of the consideration for the acquisition transaction – *i.e.*, cash and stock having a value of approximately $200,000,000 – to provide Facebook with security for those indemnification obligations.

25.     On May 21, 2014, ZeniMax commenced this action against Oculus and Luckey to obtain full and fair compensation for their unlawful use of its intellectual property. ZeniMax's filing of this action was widely covered in the national media, including in *The New York Times*, *Wall Street Journal*, and *USA Today*, and in the industry press.

26.     On or about July 21, 2014, Facebook closed on its acquisition of Oculus, and became its sole owner. At the time of the acquisition, Facebook had knowledge of the existence and terms of the NDA. Facebook interfered with the parties' NDA by willfully and intentionally causing Oculus and Luckey to use ZeniMax's VR Technology for a purpose not approved by ZeniMax and in breach of the obligations that Oculus and Luckey had under the NDA.

27.     Following Facebook's acquisition of Oculus, at least one officer of the newly-formed Oculus VR, LLC is a high-level employee of Facebook, and Oculus's principal business office is Facebook's corporate headquarters in Menlo Park, California.

28.     After Facebook's acquisition of Oculus, Facebook has publicly confirmed that it did not acquire Oculus solely for the purpose of entering the business of selling VR headsets. Rather than make a profit off the sale of VR headsets, Defendants intended to leverage and commercially exploit Oculus's VR technology – which is built upon ZeniMax's unlawfully misappropriated intellectual property – for the financial benefit of Facebook's core business of online social networking and advertising.

29.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Facebook's tortious interference with the NDA between ZeniMax and Oculus and Luckey.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint and Court filings for further information relevant to this Interrogatory. Plaintiffs anticipate that documents yet to be produced by Defendants will enable Plaintiffs to further ascertain that Facebook persuaded Defendants to breach contracts in this case. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

80

## INTERROGATORY NO. 19:

If your response to Defendants' Request for Admission number 7, served concurrently herewith, is anything other than an unqualified admission, explain the factual basis for your response to Request for Admission number 7.

*[Defendants' Request for Admission No. 7, reprinted here for reference: "Admit that none of Oculus VR's products contain any ZeniMax Source Code."]*

## RESPONSE TO INTERROGATORY NO. 19:

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate all of their General and Specific Objections to Defendants' Request for Admission No. 7, included in their Responses and Objections to Defendants' First Set of Requests for Admission to Plaintiffs.

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory No. 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive to the extent it might be construed to seek all facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 7. *See Gregg v. Local 305 IBEW*, No. 1:08-CV-160, 2009 U.S. Dist. LEXIS 40761, at *16 (N.D. Ind. May 13, 2009) ("Gregg's interrogatory encompasses virtually every factual basis for all of the Defendants' contentions. To respond would be an unduly burdensome task ... ") (citation omitted); *see also Alexander v. Hartford Life & Accident Ins. Co.*, No. 3-07-CV-1486-M, 2008 U.S. Dist. LEXIS 27210, at *10-13 (N.D. Tex. Apr. 3, 2008) (rev'd on other grounds) (only requiring a party to "generally explain" its factual bases in response to a contention interrogatory). Plaintiffs are under no obligation to marshal facts for Defendants in this litigation.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, are in the best position to know about Oculus products that contain Plaintiff's source code. Plaintiffs further object to this Interrogatory because Defendants are in possession of the majority of documents relevant to Interrogatory No. 19.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 19 that the principal facts constituting the factual basis for Plaintiffs' Response to Defendants' Request for Admission No. 7 include the following:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

1.      On or about June 23, 2009, ZeniMax acquired id Software, a recognized leader in the development of interactive computer graphics technology, video game engines, and video game franchises, including such popular titles as DOOM, Quake, Wolfenstein, and RAGE. Through its acquisition of id Software, ZeniMax acquired the clear and unencumbered right, title, and interest in and to all of id Software's intellectual property and franchise assets.

2.      On or about May 19, 2009, just prior to the completion of ZeniMax's acquisition of id Software, John Carmack, id Software's Technical Director, entered into a four (4) year term employment agreement with ZeniMax. In his employment agreement, Mr. Carmack agreed to disclose to ZeniMax inventions relating to the company's current or anticipated research and development that he created during the term of his employment, and further agreed that all such inventions would be the exclusive property of ZeniMax. (P0000230.) Mr. Carmack also agreed that ZeniMax would also be the author and owner of any copyrightable works that he prepared within the scope of his employment. ZeniMax entered into similar agreements with several other key id Software employees at the time of the acquisition. *(See, e.g.,* P0000189; P0000200; P0000209; P0000219; P0000257; P0000268.)

3.      Between the 1990s and 2012, ZeniMax and id Software (collectively, "ZeniMax") pursued research in VR technology. In the process, ZeniMax amassed valuable and confidential know-how and trade secret information about how to develop, combine, and optimize hardware, firmware, and software for an improved and competitively advantageous VR experience ("ZeniMax VR Technology"). ZeniMax had planned to demonstrate the ZeniMax VR Technology at E3 2012 prior to ever having made contact with Defendant Palmer Luckey.

4.      On or about April 2012, Mr. Carmack discovered through an Internet forum that Mr. Luckey had assembled a primitive headset that Mr. Luckey termed the "Rift." Mr. Luckey lacked the technical expertise to create a viable prototype. At the time, the Rift was a little more than a crude display panel, and lacked a head mount, VR specific software, integrated motion sensors, and other critical features and basic capabilities.

5.      On or about May 23, 2012, ZeniMax and Mr. Luckey began formalizing a NDA in order to protect the ZeniMax VR Technology being used in the modified Rift. (P0000054.) ZeniMax uses NDAs to maintain the secrecy of its trade secret and confidential information.

6.      On or about May 24, 2012, ZeniMax formalized the NDA with Mr. Luckey. (P0000054; P0000056.) The NDA represented a valid, enforceable, and binding contract that obligated Defendants to use or disclose ZeniMax's proprietary information only for a proper purpose. Under the NDA, ZeniMax's proprietary information includes, *inter alia,* its business and financial information, source code, and other scientific, technical or engineering materials. (P0000056.) Per the parties' agreement, ZeniMax continues to be the exclusive owner of this proprietary information. *(Id.)*

7. Between April 2012 and June 2012, ZeniMax made breakthrough modifications to the Rift prototype based upon prior research. Among other improvements, ZeniMax identified, applied, and developed proprietary solutions to address field of view, center of projection, and chromatic aberration issues; added specially-designed sensors and other hardware; programmed software to reduce latency and to prevent distortions; and made other modifications discussed in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120). (*See, e.g.*, P0000074; P0000075; P0000077; P0010235.) Through these and other changes, ZeniMax transformed the Rift from $500 worth of optics into the "Holy Grail" combination of specially-tailored VR hardware and software.

8. The information provided by ZeniMax to Defendants pursuant to the NDA constituted confidential and proprietary programming code, methods, plans, designs, concepts, improvements, modifications, research data and results, and know-how related to commercially-viable VR headsets, which may include but is not limited to items referenced in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

9. Between June 5, 2012 and June 7, 2012, ZeniMax displayed the modified Rift with a specially-configured version of the *DOOM 3: BFG Edition* video game at E3 2012. (*See* P0000109.) These demonstrations were conducted by appointment only in the Bethesda Softworks booth and were manned by ZeniMax employees. (*Id.*) The demonstrations at E3 2012 and the corresponding press interviews succeeded in garnering world-wide publicity for the modified Rift and won the modified Rift an E3 Game Critic Award for "Best Hardware/Peripheral." (P0011811; P0000007.)

10. On or about June 20, 2012, Defendants looked to capitalize on the public recognition generated during E3 2012 and sought crowd sourced fundraising for the Rift through the website Kickstarter.com ("Kickstarter"). In support of their Kickstarter campaign, Defendants asked ZeniMax to put together a "cameo or blurb," and to include the modified Rift in Mr. Carmack's keynote speech at QuakeCon in August 2012, an annual convention for computer gamers sponsored by ZeniMax. (P0000044.) Through the unauthorized use of ZeniMax intellectual property, the Kickstarter project raised $2.44 million. (P0000007.)

11. Between August 2, 2012 and August 5, 2012, Defendants promoted the modified Rift at QuakeCon 2012. (*See, e.g.*, P0010495; P0010530.) While at QuakeCon, Defendants, lacking sufficient VR expertise, could not get the modified Rift to function properly without ZeniMax's assistance. (*See* OCULUS00000447.)

12. On or about August 5, 2012, Mr. Luckey appeared on a panel at QuakeCon and further promoted the modified Rift. (*See* P0000488.) In that panel discussion, Mr. Luckey stated that he does not "do software at all," and acknowledged that ZeniMax's contributions were critical to the development of the modified Rift. (*See* OCULUS00000447.)

13. During the summer of 2012, Defendants also used ZeniMax VR Technology to demonstrate the modified Rift to potential investors. For example, the Wall Street Journal reported that Oculus's current Chief Executive Officer, Mr. Iribe, met Mr. Luckey in a Long Beach, California hotel room, where Mr. Iribe saw the modified Rift in conjunction with

ZeniMax's *RAGE* video game, again without ZeniMax's permission. Based on this demonstration, Mr. Iribe and at least one of his associates became founding members, investors, and/or officers of Oculus. Defendants have represented in an investor prospectus that Mr. Iribe and his associates provided $2.55 million in seed funding to Oculus. (P0000007.)

14. On or about August 2012, after the Kickstarter launch, ZeniMax again reached out to Defendants to talk about working together more closely and to discuss a potential partnership with Bethesda Softworks. (P0010505.) ZeniMax also discussed demonstrations of the modified Rift with *DOOM 3: BFG Edition* at various upcoming conventions. (*Id.*) Pursuant to the parties' NDA, ZeniMax provided Defendants with an executable version of *DOOM 3: BFG Edition* (*see* P0000457) but required Defendants to obtain approval from ZeniMax for each additional showing of the game. (*See* P0010488.)

15. On or about August 7, 2012, Mr. Iribe sent an e-mail to Todd Hollenshead, the President of id Software, acknowledging ZeniMax's "incredible support." (P0000089.)

16. On August 22, 2012, Defendants informed ZeniMax that it had been performing multiple presentations of the modified Rift with *DOOM 3: BFG Edition* behind closed doors at the Gamescom, Unite, and PAX Prime computer gaming conferences. (P0000090.)

17. Between August 2012 and December 2012, the parties exchanged proposals for an equity stake in Oculus. (P0010505; P0000090; P0000105; P0000106; P0000108; P0000109; P0000111; P0000114; P0000115.) ZeniMax proposed that it would agree to provide on-going support, including much of the support requested by Defendants, as well as a license to the ZeniMax VR Technology that had been disclosed pursuant to the parties' NDA. In return, ZeniMax asserted its rights to a larger share of equity in Oculus to reflect ZeniMax's past and continuing contributions. (P0000108; P0000109.) Defendants responded to this proposal by asserting that it was "so far out of the ballpark, we're left wondering if there's any hope." (P0000111.)

18. Between November 2012 and December 2012, notwithstanding Defendants' failure to engage in discussions with ZeniMax regarding these business issues, senior technical personnel at Oculus continued to reach out to and rely on ZeniMax to obtain additional ZeniMax VR Technology needed to develop the Rift. (*See, e.g.,* P0000001; P0000003; P0000004; P0012993; P0013001; P0013003.) Certain of the additional ZeniMax VR Technology provided around this time period pursuant to the NDA is identified in Plaintiffs' Further Identification of Misappropriated Trade Secrets (Dkt. No. 120).

19. Upon information and belief, Defendants used this ZeniMax VR Technology to create a software development kit ("SDK") for the Rift and to develop, modify, and tune the Rift's hardware, software, and firmware. (*See, e.g.,* P0000354; P0010081; P0010229; P0012985; P0012988; P0012990.)

20. On or about January 2013, Defendants represented in an investor prospectus that Oculus raised $10 million in Series A funding. (P0000007.)

84

21.     During the summer of 2013, Defendants sought additional VR know-how by recruiting at least ZeniMax employee John Carmack to Oculus. (*See, e.g.*, P0010413.)

22.     On or about September 2013, Defendants represented in an investor prospectus that Oculus raised $30 million in Series B funding. (*Id.*) Around that same time, Defendants acknowledged in a press conference the enormous contribution that Mr. Carmack had made to the Rift while employed at ZeniMax.

23.     On or about December 2013, news reports indicated that Oculus raised $75 million in venture capital funding from the Andreessen Horowitz firm.

24.     On or about March 25, 2014, Facebook announced a proposed acquisition of Oculus for $2 billion in cash and stock. This valuation, along with the other rounds of funding received by Oculus, confirmed the market value of the ZeniMax VR Technology and other intellectual property provided to Defendants pursuant to the parties' NDA.

25.     On or about July 21, 2014, with full awareness of ZeniMax's claims against Oculus and Luckey, Facebook closed on its acquisition of Oculus, and became its sole owner.

26.     As of the date of these Responses and Objections, ZeniMax has yet to receive any compensation for Defendants' impermissible use of ZeniMax's source code in Oculus's products.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that documents and source code yet to be produced by Defendants will enable Plaintiffs to further ascertain the Oculus products that contain Plaintiffs' source code. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 20:**

Describe all of the relief you seek in this action.

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs further object to this Interrogatory as duplicative of Defendants' Interrogatory No. 8.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 20 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs seek "relief ... in this action" that will fairly and fully compensate it for Defendants' misconduct, and request at least the following categories of relief, in an amount to be proven at trial:

1.      Actual Damages;

2.      Restitution;

3.      Disgorgement;

4.      Unjust Enrichment;

5.      Equitable Relief;

6.      Injunctive Relief;

7.      Punitive and Exemplary Damages;

8.      Statutory Damages under 17 U.S.C. § 101 et seq.;

9.      Enhanced Damages;

10.     Prejudgment and Post-Judgment Interest;

11.     Court Costs;

12.   Attorney Fees; and

13.   All other relief to which ZeniMax is entitled.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to the Plaintiffs' Complaint, Court filings, and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the harm to and relief sought by Plaintiffs. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

**INTERROGATORY NO. 21:**

Describe all of Plaintiffs' uses of the alleged trade secrets set forth in "Plaintiffs' Further Identification of Misappropriated Trade Secrets," filed with the Court on February 25, 2015, ECF document number 113-1.

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiffs reincorporate all of their General Objections as if specifically alleged herein. Plaintiffs also incorporate the reservation of rights included in their Further Identification of Misappropriated Trade Secrets, filed with the Court on February 25, 2015 (Dkt. No. 120).

Plaintiffs object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege or immunity. Plaintiffs also object to this Interrogatory as duplicative of Defendants' Interrogatory Nos. 5 and 6.

Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly with respect to the request for "all ... uses." Plaintiffs also object to this Interrogatory because the phrase "Plaintiffs' uses" is vague, ambiguous, and confusing.

Plaintiffs object to this Interrogatory as premature, including because fact discovery is ongoing and the parties have not yet designated experts or exchanged expert reports. In addition, Plaintiffs also object to this Interrogatory as overbroad and unduly burdensome because Defendants, and not Plaintiffs, now employ the majority of persons with knowledge of Plaintiffs' uses of trade secrets.

Subject to and without waiving the foregoing General and Specific Objections, upon information and belief, Plaintiffs state in response to Interrogatory No. 21 as follows:

*(The following Response has been verified on behalf of Plaintiffs by an authorized representative of Plaintiffs, whose signed verification is attached to these Responses and Objections.)*

Plaintiffs' uses for the above-identified trade secrets may include, without limitation:

- Advancing ZeniMax's knowledge regarding VR and head mounted displays;

- Performing research and development related to VR;

- Creating a commercially viable head mounted display;

- Seeking to generate revenue from sales of a head mounted display and related software and peripherals;

- Seeking to provide VR functionality in ZeniMax's video games;

88

- Seeking to create publicity for ZeniMax's video games;

- Seeking to create additional sales for ZeniMax video games by including VR functionality; and

- Furthering ZeniMax's reputation as an innovator and thought leader.

*(End of verified Response.)*

In addition to the verified Response above, Plaintiffs refer Defendants to Plaintiffs' Amended Complaint, Court filings, including but not limited to its appendix of technology transfer emails (Dkt. No. 97) and Further Identification of Misappropriated Trade Secrets (Dkt. No. 120), and Plaintiffs' expert reports that will be served in accordance with the scheduling order entered in this case, for further information relevant to this Interrogatory. Plaintiffs anticipate that additional discovery will enable Plaintiffs to further ascertain the uses of its trade secrets. Plaintiffs therefore specifically reserve their right to further supplement or amend the foregoing Response as discovery proceeds in this case.

Dated: July 10, 2015

Respectfully submitted,

PHILLIP B. PHILBIN
Texas State Bar No. 15909020
E-mail: phillip.philbin@haynesboone.com
MICHAEL D. KARSON
Texas State Bar No. 24090198
E-mail: michael.karson@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone No.: 214-651-5000
Facsimile No.: 214-651-5940

P. ANTHONY SAMMI
E-mail: Anthony.Sammi@skadden.com
KURT WM. HEMR
E-mail: Kurt.Hemr@skadden.com
JAMES Y. PAK
Texas State Bar No. 24086376
E-mail: James.Pak@skadden.com
KRISTEN VOORHEES
E-mail: Kristen.Voorhees@skadden.com
DEVIN A. KOTHARI
E-mail: Devin.Kothari@skadden.com
(admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone No.: 212-735-3000
Facsimile No.: 212-735-2000

*Attorneys for Plaintiffs*
*ZeniMax Media Inc. and id Software LLC*

90

## CERTIFICATE OF SERVICE

I, Devin A. Kothari, counsel for Plaintiffs, do hereby certify that I caused a true and correct copy of the foregoing *ZeniMax Media Inc. and id Software LLC's First Amended and Superseding Responses and Objections to Facebook Inc.'s First Set of Interrogatories to Plaintiffs* to be served on Defendants by electronic mail to the following addresses: rsmith@lynnllp.com and FacebookOculusZenimaxMediaInc@cooley.com.

Dated: July 10, 2015

Devin A. Kothari

**App. 184**