IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA, INC. and | § | |
| ID SOFTWARE LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 3:14-CV-01849-P |
| | § | |
| OCULUS VR, LLC, | § | |
| PALMER LUCKEY, and | § | |
| FACEBOOK, INC. | § | |
| | § | |
| Defendants. | § | |

## ORDER

Now before the Court is Defendants Oculus VR's ("Oculus") and Palmer Luckey's ("Luckey") (collectively "Defendants") Motion to Dismiss Counts 1, 3, and 6, and in the Alternative to Dismissing Count 1, Motion for Order Requiring Identification of Trade Secrets with Particularity, filed September 19, 2014. Doc. 45. Plaintiffs filed a Response on October 10, 2014. Doc. 65. Defendants filed a Reply on October 24, 2014. Doc. 78. After reviewing the parties' briefing, the evidence, and the applicable law, the Court DENIES Defendants' Motion to Dismiss. Also before the Court is Plaintiffs' Motion for Leave to File Supplemental Appendix, doc. 126, in support of its opposition to Defendants' Motion to Dismiss, doc. 45. Because the Court did not rely on the supplemental appendix to deny Defendants' Motion to Dismiss, the Court DENIES as moot Plaintiffs' Motion for Leave to File Supplemental Appendix.

## I.    Introduction[1]

This is a dispute about who owns intellectual property that was vital in creating a virtual-reality ("VR") headset.  Plaintiffs, who are in the video game industry, contend that Defendants, who develop VR technology, misappropriated Plaintiffs' trade secrets and copyrighted code to create a virtual reality headset, and also used Plaintiffs' trademarks to market it.

Although VR technology would be a game-changer in the video game industry, developing that kind of technology posed significant challenges, such as optical distortions.  *Id.* at 2.  In the 1990s, Plaintiff ZeniMax ("ZeniMax"), and its now subsidiary id Software, ("id") conducted research into VR technology, including video game headsets.  *Id.* at 9.  ZeniMax even developed "prototype software" that would enable players to experience video games on a VR headset.  *Id.* at 9.

Despite ZeniMax's gains in the VR technology field, a commercially viable VR headset remained an elusive accomplishment.  *Id.*  The key obstacle was resolving the latency effect— the delay between a user's movement and the corresponding change in the displayed image.  *Id.* Nonetheless, by March 2012, ZeniMax had developed a prototype VR headset advanced enough to showcase at an E3 Convention.[2]  *Id.* at 11.

Enters Luckey.  By April 2012, after years of tinkering and experimentation, Luckey had developed a prototype VR headset—the Rift.[3]  *Id.*  John Carmack, a ZeniMax employee who had

---

[1] All of the information found in this section is drawn from Amended Complaint.  Doc. 38.  Though the Court uses definite language, the information is based on allegations only.
[2] The E3 Convention is a major annual trade fair for the video game industry held each year at the Los Angeles Convention Center.
[3] The purpose of the Rift is to display imaginary worlds in goggle-like headsets that provide video and audio, immersing the user entirely in the projected environment."  Doc. 38 at 2.  Generally today, video games are played by pressing a key or moving a game controller to explore the virtual environment.  With the Rift, users could simply turn their heads to look around, as they do in real life.  *Id.*

unique programming skills, discovered the Rift while browsing an Internet forum. *Id.* He contacted Luckey and obtained the Rift prototype. *Id.* At the time, the Rift lacked commercially viable display technology, a head mount, motion sensors, and virtual reality software. *Id.* at 10-11.

Once Carmack got his hands on the Rift, he "evaluated, analyzed, and began modifying it using ZeniMax's VR technology. *Id.* at 12. Carmack began his Rift modifications by adding specially-designed sensors and other hardware necessary to track user movements. *Id.* He also identified, applied, and developed solutions to address "field of view, center of projection, and chromatic aberration issues." *Id.* But most importantly, Carmack developed software that reduced latency and prevented image distortions. *Id.* The latency breakthrough combined with the other technological and hardware advances—a.k.a. the "Holy Grail" combination— transformed the Rift into a powerful, immersive virtual reality experience. *Id.* at 13. This unearthing of the gaming Grail prompted ZeniMax to seek a formal agreement with Luckey to protect its proprietary technology incorporated into the Rift. *Id.*

On or around May 24, 2012, Luckey and ZeniMax entered into a Non-Disclosure Agreement (hereinafter the "NDA"). *Id.* The NDA placed Luckey under a broad duty to keep ZeniMax's proprietary information strictly confidential. With respect to [ZeniMax's] Proprietary Information, [Luckey] undertakes and agrees that [Luckey] shall secure and keep such Proprietary Information strictly confidential[.]" *Id.* at 14. The NDA set forth a broad definition of the Proprietary Information that Luckey was to keep confidential:

> [A]ll information and know-how, regardless of whether or not in writing, of a private, secret or confidential nature that relates to the business, technical or financial affairs of [ZeniMax or its] subsidiaries . . . provided or disclosed to [Luckey] or which becomes known to [Luckey], whether or not marked or

otherwise designated as "confidential" [or] "proprietary" [. . . ].   Proprietary
Information includes, by way of illustration and not limitation, all forms and types
of financial, business, scientific, technical, or engineering information, including
patterns, plans, compilations, inventions and developments, products, formulas,
designs, prototypes, methods, techniques, processes, procedures, computer
programs and software (whether as source code or object code), documentation,
technologies, plans, research, marketing, and reports, other technical information
relating to [ZeniMax's] business, and any information not generally known to the
public or within the industry or trade in which [ZeniMax] competes, whether
tangible or intangible, and whether or not stored, compiled, or memorialized
physically, electronically, graphically, photographically, or in writing.

*Id.*

The NDA also provided that ZeniMax retained exclusive ownership of any proprietary

information it disclosed under the NDA: "All Proprietary Information . . . which shall come into

[Luckey's] custody or possession, is and at all times shall be the exclusive property of

[ZeniMax]." *Id.* at 15.

On the eve of the E3 Convention, Carmack invited online publication *The Verge* to id's

offices, where he demonstrated "a heavily modified Oculus Rift headset." *Id.* at 16.   *The Verge's*

review of the Rift was positive, stating that "[t]his head mounted display is really like no other."

*Id.* Then from June 5 to June 7, 2012, Carmack used the Rift to showcase a specially-configured

version of ZeniMax's video game Doom 3 at the E3 Convention.   *Id.*   The appointment-only

demonstrations resulted in world-wide publicity for the Rift.   *Id.* at 17.   Moreover, the Rift was

awarded the E3 Game Critic Award for "Best Hardware/Peripheral." *Id.*

Following the E3 success, Luckey founded Oculus LLC (the corporate predecessor to

Defendant Oculus VR, LLC) in June 2012. A few days later, ZeniMax and id set up a file transfer protocol[4] arrangement to share VR proprietary information with Luckey. *Id.* at 18. Luckey's objective was to develop and promote the Rift as a commercially-viable VR headset. *Id.* To that end, ZeniMax sent Luckey proprietary information on an ongoing basis. *Id.* Throughout June 2012, Luckey continually emailed ZeniMax seeking and receiving access to ZeniMax's "proprietary information, trade secrets, and know-how." *Id.* For example, ZeniMax sent Luckey software that permitted him to install customized firmware "onto the sensors that ZeniMax selected for the Rift." *Id.* at 20. Additionally, Luckey received "binary code for the tracking sensors that Carmack had added to the Rift." *Id.* Moreover, ZeniMax sent Luckey hardware to use in the Rift, including "cables," "customized sensors," as well as improvements to the Rift's "optics calibration and sensor mounting." *Id.* at 18. ZeniMax asserts that all these disclosures were made "pursuant to the NDA." *Id.*

In June 2012, Luckey increased its efforts to fund Oculus. *Id.* at 19. To that end, Luckey began developing a Kickstarter[5] campaign to raise funds for his enterprise. *Id.* As part of its fundraising campaign, Luckey requested that Carmack promote the Rift in a keynote speech he was scheduled to give at QuakeCon[6] and to put together a promotional "cameo or blurb" on a video he planned use as part of his Kickstarter pitch. *Id.* In response, ZeniMax proposed that the parties enter a formal agreement. *Id.* at 20. Luckey "ignored" this suggestion, but continued to ask ZeniMax for proprietary information—which for unknown reasons ZeniMax continued to provide. *Id.*

---

[4] A file transfer protocol is a program that permits users to transfer files from one computer to another over a transmission control protocol-based network, such as the internet.
[5] Kickstarter.com is a fundraising website that allows "project creators" to post their ideas online. If others like the project, they can pledge money to help fund it. The project creator retains complete control over his project; Kickstarter merely provides the platform on which he can pitch his project to donors.
[6] QuakeCon is an annual Dallas gaming convention that id sponsors.

On August 1, 2012, Luckey launched the Oculus Kickstarter campaign. *Id.* Luckey's Kickstarter page featured a five-minute video describing the Rift. *Id.* The video featured multiple clips from video game DOOM 3 displayed on a Rift—a video game ZeniMax had prohibited Luckey from using. *Id.* Luckey prominently displayed the DOOM 3 logo and touted DOOM 3 as the first Rift-ready game. *Id.* Luckey described the "ultra-low latency head tracking"—ZeniMax's VR technology—as "the magic that sets the Rift apart." *Id.* at 22. Luckey also promised that certain backers would receive a free copy of DOOM 3 and Rift technical support. The Kickstarter project ultimately generated $2.44 million—far surpassing its original goal of $250,000. *Id.* at 21-22.

QuakeCon took place from August 2 to August 5, 2012. During the convention, Luckey and Carmack jointly demonstrated the Rift and participated in panel discussions about how the Rift was developed. *See* Doc. 38 at 22-23. Meanwhile, ZeniMax executives met with Oculus's CEO to discuss giving ZeniMax an equity stake in Oculus as compensation for "Oculus's dependence on ZeniMax's proprietary [VR] technology." *Id.* at 24; *see also id.* at 23 (ZeniMax had to assist Luckey at QuakeCon in order to get the Rift to function properly); *id.* at 24 (interview where Luckey admits that he "can't do software at all . . . ."). Yet, despite not reaching a formal agreement, ZeniMax provided Oculus with an executable version of DOOM 3 for use in Oculus Rift demonstrations. However, ZeniMax required that Oculus obtain prior approval before each showing and requested a schedule of anticipated Rift demonstrations. *Id.* at 24-25.

In late August and early September 2012, ZeniMax made "multiple requests" to Oculus to discuss "compensation for ZeniMax's role in developing and promoting the Rift." *Id.* at 26.

On September 21, 2012, Oculus forwarded ZeniMax a proposal "designed to kick off a formal discussion" of the parties' future relationship. *Id.* Oculus offered ZeniMax a 2% equity stake, subject to dilution, in exchange for:

(a) granting Oculus a worldwide, exclusive license to "source code" Carmack had created that served to "support" the Rift headset;
(b) creating "key IP that remains exclusive to Oculus and is not shared with other companies or competitors, such as improvements to the Oculus [software development kit] and Rift hardware;"
(c) Providing marketing as well as 10,000 free copies of "DOOM 3: BFG Edition" for Oculus's Kickstarter investors. Doc. 38 at 9-10.

Under Oculus's proposal, ZeniMax's 2% stake would vest only after three years, subject to the condition that Carmack participate "as a technical advisor to Oculus" during that time. *Id.* at 27. Additionally, Oculus offered ZeniMax an additional 3% equity stake for $1.2 million. *Id.*

On October 19, 2012, ZeniMax responded with a counter-proposal. *Id.* at 28. ZeniMax agreed to provide "much of the support requested by Oculus," and to provide a "license to ZeniMax's [VR] technology that had been disclosed" pursuant to the NDA. *Id.* In exchange, however, ZeniMax asked for more than 2% equity subject to dilution. *Id.*

On December 11, 2012, Oculus responded to ZeniMax's counter-proposal. *Id.* at 30. This time around, Oculus did not offer ZeniMax any equity. *Id.* Instead, Oculus "would only permit ZeniMax to purchase equity in exchange for several million dollars and additional contributions." *Id.* Predictably, ZeniMax did not accept Oculus's latest proposal.

Based on the lack of negotiation progress, ZeniMax finally ceased to provide proprietary information or technological assistance to Oculus. *Id.* at 32. An agreement was never reached, and after Carmack's employment contract with ZeniMax expired in June 2013, Oculus hired Carmack as its Chief Technical Officer on August 1, 2013. *Id.* Moreover, in February 2014, to

ZeniMax's loss and to Oculus's fortune, "five additional senior employees of ZeniMax, all of whom had worked closely with Carmack, simultaneously resigned" and joined Oculus. *Id.* at 33-34.

On March 25, 2014, Facebook announced a planned acquisition of Oculus for $2 billion in cash and stock. *Id.* at 34.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 8(a), a complaint must contain "a short, plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule 12(b)(6) provides for the dismissal of a complaint when a defendant shows that the plaintiff has failed to state a claim for which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual matter contained in the complaint must allege actual facts, not legal conclusions masquerading as facts. *Id.* ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)). Additionally, the factual allegations of a complaint must state a plausible claim for relief. *Id.* at 679. A complaint states a "plausible claim for relief" when the factual allegations contained therein infer actual misconduct on the part of the defendant, not a "mere possibility of misconduct." *Id.*; *see also Jacquez v. Procunier*, 801 F.2d 789, 791-92 (5th Cir. 1986). Labels, conclusions, or mere formulaic recitations of the elements of a claim will not do. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The Court's focus in a 12(b)(6) determination is not whether the plaintiff should prevail on the merits but rather whether the plaintiff has failed to state a claim. *Twombly*, 550 U.S. at 563 n.8 (holding "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (overruled on other grounds) (finding the standard for a 12(b)(6) motion is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

## III.   Discussion

Defendants move to dismiss Counts 1 (common law misappropriation of trade secrets), 3 (breach of contract), 6 (unjust enrichment), or the in the alternative, Defendants move for a more definite statement of Count 1.

### a.   Count 3, Breach of Contract—the NDA

#### 1.   The "Proper Purpose."

The elements of breach of contract under Texas law are "(1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach." *Petras v.Criswell*, 248 S.W.3d 471, 477 (Tex. App. 2008) (citing *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App. 2005)).

Defendants contend that the NDA is unenforceable because the term Proper Purpose remains undefined. Doc. 45 at 8. The term Proper Purpose was to later be agreed on in writing, but never was. *Id.*; *see also* doc. 65 at 16 (contract snapshot). Essentially, Defendants' argument is that the undefined term rendered the NDA a mere unenforceable agreement to agree, because

by not defining the term, it was impossible for the parties to ascertain what could properly be disclosed under the NDA. *Id.*

In response, Plaintiffs assert, *inter alia*, that the NDA is enforceable notwithstanding whether a further agreement in writing concerning the Proper Purpose was needed. Doc. 65 at 17. The NDA provides confidentiality for any disclosed proprietary information and did not grant a transfer of rights or a license to use that information. Doc. 65 at 17. Plaintiffs contend that Luckey was bound by the confidentiality provisions of the contract and breached such provisions by disclosing plaintiffs' contract protected information. *Id.*; *see also* doc. 38 at 43-44.

The parties' merit-based rhetoric is engaging but premature. The Defendants proffer a reasonable argument as to why the NDA is unenforceable. However, Defendants' argument does not conclusively establish that their view of the NDA is the only reasonable interpretation. Moreover, it is not the Court's duty at this juncture to decide whether Defendants would prevail on the merits of the case. *Twombly*, 550 U.S. at 533 n.8. At this stage, all Plaintiffs are required to do is plead sufficient factual matter to state a plausible claim for relief.

Here, Plaintiffs' Amended Complaint alleges that Luckey agreed not to disclose Plaintiff's information without its prior approval. Doc. 38 at 43. The Complaint further alleges that Luckey disclosed proprietary information to Oculus without Plaintiff's authorization. *Id.* at 44. From these allegations, a reasonable plausibility of misconduct can be inferred—that Luckey breached the confidentiality provisions of the NDA. Moreover, these allegations give Defendants fair notice of the nature of the claim and the ground upon which it rests. *See Swierkiwicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

In due time, Plaintiffs will have to confront the enforceability, or lack thereof, of the NDA.   But that time is not now.   Accordingly, Plaintiff's claims is not dismissed based on the on the terms of the NDA.

### 2.  Consideration.

"Consideration is a present exchange bargained for in return for a promise.  It consists of either a benefit to the promisor or a detriment to the promisee.  The detriment must induce the making of the promise, and the promise must induce the incurring of the detriment." *PlainsBuilders, Inc. v. Steel Source, Inc.*, 408 S.W.3d 596, 602 (Tex. 2013) (quoting *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991)).

Defendants contend that the NDA is unenforceable because it lacks consideration.  Doc. 45 at 14.  Their argument is not unlike the one stated above.  Under the NDA, Luckey agreed to receive confidential information—the consideration—in exchange for confidentiality.  Doc. 78-1 at 6.  However, since the term Proper Purpose was never agreed to in writing, the consideration was inadequate; and consequently, the NDA fails as a matter of law.  *Id.*

In disagreement, Plaintiffs assert that the parties acknowledged in the NDA that the agreement was supported by consideration—proprietary information in exchange for a promise to keep it confidential.  Doc. 65 at 20.

Plaintiffs' claim is not dismissed based on a lack of consideration.   The Amended Complaint alleges that Plaintiffs disclosed proprietary information to Luckey, and that he agreed not to use it or disclose it without Plaintiffs' permission.  Doc. 38 at 43-44.  The Complaint further states that Luckey used the information to test and develop the Rift without Plaintiffs' approval.  These allegations are sufficient to create a reasonable inference that the proprietary

information that Plaintiffs provided Luckey was sufficiently beneficial to him. Moreover, the lack of written agreement about the Proper Purpose is not dispositive of Plaintiffs' claim. An uncertain contract term can be made readily clear by reasonable implications of fact. *See Bendalin v. Delgado*, 406 S.W.2d 897, 901 (Tex. 1966). For instance, a reasonable conclusion could be drawn that Proper Purpose under the NDA was to test, develop, and market the Rift. *See* Section I (citing to the Amended Complaint). Therefore, Plaintiffs' claim is not dismissed due to a lack of consideration.

### 3. Oculus' liability.

Under California law, a company may succeed to another entity's rights and obligations if "there is an express or implied agreement of assumption" or "the purchasing corporation is a mere continuation of the seller." *Ray v. Alad Corp.*, 560 P.2d 7, 27 (Cal. 1977). This holds true even when the predecessor business was a sole proprietorship. *Rawlings v. D. M. Oliver, Inc.*, 159 Cal. Rptr. 119, 124 (Cal. Ct. App. 1979). Liability under a mere continuation theory can be established by showing one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholder of both corporations. *Ray*, 560 P.2d at 7 (citations omitted).

In Texas, contract liability may be established under the principle of estoppel. *See Cadillac Bar West End Real Estate v. Landry's Restaurants, Inc.*, 399 S.W.3d 703 (Tex. App. 2013). In *Cadillac Bar*, Landry's assigned its commercial lease to Cadillac Bar. *Id.* at 705. Cadillac Bar failed to pay property taxes, and the property owner sued Landry's and Cadillac Bar. *Id.* Landry's cross-claimed against Cadillac Bar seeking indemnification. *Id.* Cadillac Bar asserted that an effective lease assignment had not been executed. *Id.* The Court held that

Cadillac Bar was estopped from denying liability because Cadillac Bar obtain all the benefits of the assignment—possession of the property, operation of a restaurant business, and revenue from the business—and could not now claim that the assignment was ineffective or non-existent. *Id.* at 706.

Defendants contend that the NDA only bound Luckey, his directors, officers, or attorneys, because Oculus never signed the NDA. Doc. 45 at 15-16. In fact, Oculus was founded after Luckey signed the NDA. *Id.* at 16. Moreover, Defendants contend that the Complaint is devoid of factual allegations from which it could be inferred that Oculus was bound by the NDA. *Id.* Therefore, Defendants argue that Plaintiffs' claim against Oculus fails as a matter of law. *Id.*

In rebuttal, Plaintiffs assert that Oculus is bound by the NDA because Oculus is a mere continuation of Luckey's prior work. Doc. 65 at 22-23. Plaintiffs also assert Oculus's liability under an estoppel theory. Doc. 65 at 23.

The Amended Complaint contains sufficient allegations to raise Plaintiffs claim above a speculative level. First, the Amended Complaint sufficiently alleges that Oculus is bound by the NDA as a mere continuation of Luckey. Luckey formed Oculus shortly after signing the NDA. And Oculus's purpose was the same as Luckey's—to develop and commercialize the Rift. Furthermore, as a founder of Oculus, Luckey was one its officers, directors, or stockholders. Therefore, the factual allegations in the Complaint create a reasonable inference that Oculus may be liable pursuant to a continuation liability theory.

Second, the factual allegations in the Complaint sufficiently plead Oculus's liability under the principle of estoppel. The Complaint claims that Oculus's officers and employees received confidential and proprietary information from ZeniMax under the NDA, including

information specifically requested by Oculus. *See* doc. 38 at 28-30. This information aided Oculus in the Rift's development and commercialization. *Id.* The Complaint plausibly pleads an estoppel theory of recovery because it alleges that, even though Oculus was not a party to the NDA, it is bound by it because Oculus requested, received, used, and benefited from confidential information only available to it under the NDA. Accordingly, the breach of contract claim against Oculus survives Defendant's 12(b)(6) challenge.

### b.  Count 1, Trade Secrets Misappropriation

#### 1.  Waiver of the trade secret claim.

For information to remain a "trade secret," the owner of the trade secret must take reasonable steps to maintain its secrecy. *See Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984). Using of a non-disclosure agreement is a reasonable measure to ensure the secrecy of a trade secret. *E.g.*, *MedioStream, Inc. v. Microsoft Corp.*, 749 F. Supp. 2d 507, 516 (E.D. Tex. 2010).

Defendants' argument that Plaintiffs have waived their trade secrets claim is premised on the basis that the NDA is unenforceable and that Oculus never signed the NDA. *See* doc. 45 at 17. However, as discussed above, at this stage of the proceeding the Court does not find that the NDA was unenforceable or that Oculus was not bound by the NDA. Accordingly, Plaintiffs have not waived their trade secrets claim.

#### 2.  Failure to plead a trade secrets claim.

Defendants contend that the trade secrets claim should be dismissed because Plaintiff's pleadings are generic and fail to meet the Rule 8 standard. *See* doc. 45 at 18-25. Alternatively,

Defendants contend that Plaintiffs should be ordered to allege their claim with reasonable particularity—to plead a more definite statement under Fed. R. Civ. P. 12(e). *Id.*

In light of the Court's Order requiring Plaintiffs to further identify with sufficient particularity the alleged trade secrets misappropriated by Defendants, doc. 109, Plaintiffs' compliance with the Order by further identifying the allegedly misappropriated trade secrets, doc. 113-1, and the parties' joint notice to the Court confirming the identification of the trade secrets, doc. 116, Defendants' motion to dismiss Count 1, or for a more definite statement, is denied as moot.

### c.  Count 6, Unjust Enrichment

Defendants contend that Plaintiffs' claim should be dismissed because unjust enrichment is not a cause of action recognized under Texas law. Doc. 45 at 25; *see Baisden v. I'm Ready Prods., Inc.*, No. H-08-0451, 2008 WL 2118170, at *10 (S.D. Tex. May 16, 2008). Plaintiffs counter argue that courts in this District have recently denied motions to dismiss unjust enrichment claims. *See, e.g., Janvey v. Wieselberg*, No. 3:10-CV-1394-N, 2014 WL 2883897, at *2 (N.D. Tex. June 25, 2014).

The Court elects not to dismiss Plaintiffs' claim at this time. While it seems unsettled whether unjust enrichment may stand as an independent cause of action, "where a plaintiff has plead a breach of contract action, [as Plaintiffs has in this case] it may maintain an unjust theory of recovery as well." *Breckenridge Enters., Inc., v. Avio Alternatives*, LLC, No. 3:08-CV-1782-M, 2009 WL 1469808, at *10 (N.D. Tex. May 27, 2009). Accordingly, Defendants' Motion to Dismiss is denied.

IV.    **Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss is DENIED.    Additionally,

Plaintiffs' Motion for Leave to File Supplemental Appendix is DENIED as moot.

**IT IS SO ORDERED.**

Signed this _27th_ day of July, 2015.

_Jorge A. Solis_
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE