IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA, INC. and<br>ID SOFTWARE LLC, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 3:14-CV-01849-P |
| | § | |
| OCULUS VR, LLC, | § | |
| PALMER LUCKEY, and | § | |
| FACEBOOK, INC. | § | |
| | § | |
| Defendants. | § | |

## ORDER

Now before the Court is Defendant Facebook's ("Facebook") Motion to Dismiss Counts

1, 2, 4, 5, and 6, filed September 19, 2014.  Doc. 47.  Plaintiffs filed a Response on October 10,

2014.  Doc. 67.  Defendant filed a Reply on October 24, 2014.  Doc. 79.  After reviewing the

parties' briefing, the evidence, and the applicable law, the Court DENIES Defendant's Motion to

Dismiss.

## I.    Introduction[1]

This is a dispute about who owns intellectual property that was vital in creating a virtual-

reality ("VR") headset.  Plaintiffs, who are in the video game industry, contend that Defendant,

an online social networking service, misappropriated Plaintiffs' trade secrets, infringed on their

copyrighted materials, tortiously interfered with a contract, unfairly competed against Plaintiffs,

and unjustly benefitted from their intellectual property.

---

[1] All of the information found in this section is drawn from Amended Complaint.  Doc. 38.  Though the Court uses
definite language, the information is based on allegations only.

Although VR technology would be a game-changer in the video game industry, developing that kind of technology posed significant challenges, such as optical distortions. *Id.* at 2. In the 1990s, Plaintiff ZeniMax ("ZeniMax"), and its now subsidiary id Software, ("id") conducted research into VR technology, including video game headsets. *Id.* at 9. ZeniMax even developed "prototype software" that would enable players to experience video games on a VR headset. *Id.* at 9.

Despite ZeniMax's gains in the VR technology field, a commercially viable VR headset remained an elusive accomplishment. *Id.* The key obstacle was resolving the latency effect— the delay between a user's movement and the corresponding change in the displayed image. *Id.* Nonetheless, by March 2012, ZeniMax had developed a prototype VR headset advanced enough to showcase at an E3 Convention.[2] *Id.* at 11.

Enters Luckey. By April 2012, after years of tinkering and experimentation, Luckey had developed a prototype VR headset—the Rift.[3] *Id.* John Carmack, a ZeniMax employee who had unique programming skills, discovered the Rift while browsing an Internet forum. *Id.* He contacted Luckey and obtained the Rift prototype. *Id.* At the time, the Rift lacked commercially viable display technology, a head mount, motion sensors, and virtual reality software. *Id.* at 10-11.

Once Carmack got his hands on the Rift, he "evaluated, analyzed, and began modifying it using ZeniMax's VR technology. *Id.* at 12. Carmack began his Rift modifications by adding

---

[2] The E3 Convention is a major annual trade fair for the video game industry held each year at the Los Angeles Convention Center.

[3] The purpose of the Rift is to display imaginary worlds in goggle-like headsets that provide video and audio, immersing the user entirely in the projected environment." Doc. 38 at 2. Generally today, video games are played by pressing a key or moving a game controller to explore the virtual environment. With the Rift, users could simply turn their heads to look around, as they do in real life. *Id.*

specially-designed sensors and other hardware necessary to track user movements. *Id.* He also identified, applied, and developed solutions to address "field of view, center of projection, and chromatic aberration issues." *Id.* But most importantly, Carmack developed software that reduced latency and prevented image distortions. *Id.* The latency breakthrough combined with the other technological and hardware advances—a.k.a. the "Holy Grail" combination—transformed the Rift into a powerful, immersive virtual reality experience. *Id.* at 13. This unearthing of the gaming Grail prompted ZeniMax to seek a formal agreement with Luckey to protect its proprietary technology incorporated into the Rift. *Id.*

On or around May 24, 2012, Luckey and ZeniMax entered into a Non-Disclosure Agreement (hereinafter the "NDA"). *Id.* The NDA placed Luckey under a broad duty to keep ZeniMax's proprietary information strictly confidential. With respect to [ZeniMax's] Proprietary Information, [Luckey] undertakes and agrees that [Luckey] shall secure and keep such Proprietary Information strictly confidential[.]" *Id.* at 14. The NDA also provided that ZeniMax retained exclusive ownership of any proprietary information it disclosed under the NDA: "All Proprietary Information . . . which shall come into [Luckey's] custody or possession, is and at all times shall be the exclusive property of [ZeniMax]." *Id.* at 15.

On the eve of the E3 Convention, Carmack invited online publication *The Verge* to id's offices, where he demonstrated "a heavily modified Oculus Rift headset." *Id.* at 16. *The Verge*'s review of the Rift was positive, stating that "[t]his head mounted display is really like no other." *Id.* Then from June 5 to June 7, 2012, Carmack used the Rift to showcase a specially-configured version of ZeniMax's video game Doom 3 at the E3 Convention. *Id.* The appointment-only

demonstrations resulted in world-wide publicity for the Rift.  *Id.* at 17.  Moreover, the Rift was awarded the E3 Game Critic Award for "Best Hardware/Peripheral."  *Id.*

Following the E3 success, Luckey founded Oculus LLC (the corporate predecessor to Defendant Oculus VR, LLC) in June 2012.  A few days later, ZeniMax and id set up a file transfer protocol[4] arrangement to share VR proprietary information with Luckey.  *Id.* at 18. Luckey's objective was to develop and promote the Rift as a commercially-viable VR headset. *Id.*  To that end, ZeniMax sent Luckey proprietary information on an ongoing basis.  *Id.* Throughout June 2012, Luckey continually emailed ZeniMax seeking and receiving access to ZeniMax's "proprietary information, trade secrets, and know-how."  *Id.*  For example, ZeniMax sent Luckey software that permitted him to install customized firmware "onto the sensors that ZeniMax selected for the Rift."  *Id.* at 20.  Additionally, Luckey received "binary code for the tracking sensors that Carmack had added to the Rift."  *Id.*  Moreover, ZeniMax sent Luckey hardware to use in the Rift, including "cables," "customized sensors," as well as improvements to the Rift's "optics calibration and sensor mounting."  *Id.* at 18.  ZeniMax asserts that all these disclosures were made "pursuant to the NDA."  *Id.*

In June 2012, Luckey increased its efforts to fund Oculus.  *Id.* at 19.  To that end, Luckey began developing a Kickstarter[5] campaign to raise funds for his enterprise.  *Id.*  As part of its fundraising campaign, Luckey requested that Carmack promote the Rift in a keynote speech he was scheduled to give at QuakeCon[6] and to put together a promotional "cameo or blurb" on a

---

[4] A file transfer protocol is a program that permits users to transfer files from one computer to another over a transmission control protocol-based network, such as the internet.

[5] Kickstarter.com is a fundraising website that allows "project creators" to post their ideas online.  If others like the project, they can pledge money to help fund it.  The project creator retains complete control over his project; Kickstarter merely provides the platform on which he can pitch his project to donors.

[6] QuakeCon is an annual Dallas gaming convention that id sponsors.

video he planned use as part of his Kickstarter pitch.  *Id.*  In response, ZeniMax proposed that the parties entered a formal agreement.  *Id.* at 20.  Luckey "ignored" this suggestion, but continued to ask ZeniMax for proprietary information—which for unknown reasons ZeniMax continued to provide.  *Id.*

On August 1, 2012, Luckey launched the Oculus Kickstarter campaign.  *Id.*  Luckey's Kickstarter page featured a five-minute video describing the Rift.  *Id.*  The video featured multiple clips from video game DOOM 3 displayed on a Rift—a video game ZeniMax had prohibited Luckey from using.  *Id.*  Luckey prominently displayed the DOOM 3 logo and touted DOOM 3 as the first Rift-ready game.  *Id.*  Luckey described the "ultra-low latency head tracking"—ZeniMax's VR technology—as "the magic that sets the Rift apart."  *Id.* at 22. Luckey also promised that certain backers would receive a free copy of DOOM 3 and Rift technical support.  The Kickstarter project ultimately generated $2.44 million—far surpassing its original goal of $250,000.  *Id.* at 21-22.

QuakeCon took place from August 2 to August 5, 2012.  During the convention, Luckey and Carmack jointly demonstrated the Rift and participated in panel discussions about how the Rift was developed.  *See* Doc. 38 at 22-23.  Meanwhile, ZeniMax executives met with Oculus's CEO to discuss giving ZeniMax an equity stake in Oculus as compensation for "Oculus's dependence on ZeniMax's proprietary [VR] technology."  *Id.* at 24; *see also id.* at 23 (ZeniMax had to assist Luckey at QuakeCon in order to get the Rift to function properly); *id.* at 24 (interview where Luckey admits that he "can't do software at all . . . .").  Yet, despite not reaching a formal agreement, ZeniMax provided Oculus with an executable version of DOOM 3 for use in Oculus Rift demonstrations.  However, ZeniMax required that Oculus obtain prior

approval before each showing and requested a schedule of anticipated Rift demonstrations.  *Id.* at 24-25.

In late August and early September 2012, ZeniMax made "multiple requests" to Oculus to discuss "compensation for ZeniMax's role in developing and promoting the Rift."  *Id.* at 26. On September 21, 2012, Oculus forwarded ZeniMax a proposal "designed to kick off a formal discussion" of the parties' future relationship.  *Id.*

No agreement was reached and ZeniMax finally ceased to provide proprietary information or technological assistance to Oculus.  *Id.* at 32.  After Carmack's employment contract with ZeniMax expired in June 2013, Oculus hired Carmack as its Chief Technical Officer on August 1, 2013.  *Id.*  Moreover, in February 2014, to ZeniMax's loss and to Oculus's fortune, "five additional senior employees of ZeniMax, all of whom had worked closely with Carmack, simultaneously resigned" and joined Oculus.  *Id.* at 33-34.

On March 25, 2014, Facebook announced a planned acquisition of Oculus for $2 billion in cash and stock.  *Id.* at 34.  At the time of the acquisition, Facebook knew, or had reason to know that Oculus's representation—that it had titled, owned, or was authorized to use the intellectual property necessary to carry on its business—was false.  Doc. 38 at 36.  On July 21, 2014, Facebook closed its acquisition of Oculus, despite Facebook's knowledge of Plaintiffs' claims against Oculus and Luckey.  *Id.* at 37.  Facebook's purpose in acquiring Oculus was for the financial benefit of its core business of online social networking and advertising.  *Id.* at 38.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 8(a), a complaint must contain "a short, plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Federal Rule 12(b)(6) provides for the dismissal of a complaint when a defendant shows that the plaintiff has failed to state a claim for which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual matter contained in the complaint must allege actual facts, not legal conclusions masquerading as facts.  *Id.* ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)).  Additionally, the factual allegations of a complaint must state a plausible claim for relief.  *Id.* at 679.  A complaint states a "plausible claim for relief" when the factual allegations contained therein infer actual misconduct on the part of the defendant, not a "mere possibility of misconduct."  *Id.*; *see also Jacquez v. Procunier*, 801 F.2d 789, 791-92 (5th Cir. 1986).  Labels, conclusions, or mere formulaic recitations of the elements of a claim will not do.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The Court's focus in a 12(b)(6) determination is not whether the plaintiff should prevail on the merits but rather whether the plaintiff has failed to state a claim.  *Twombly*, 550 U.S. at 563 n.8 (holding "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (overruled on other grounds) (finding the standard for a 12(b)(6) motion is "not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

## III.   Discussion

Defendant moves to dismiss Counts 1 (common law misappropriation of trade secrets), 2 (copyright infringement), 4 (tortious interference with contract), 5 (unfair competition), and 6 (unjust enrichment).

### a.   Misappropriation of trade secrets and preemption, Count 1.

Defendant asserts that Count 1 should be dismissed because Plaintiffs failed to identify the alleged trade secrets with specificity.   In light of the Court's Order requiring Plaintiffs to further identify with sufficient particularity the alleged trade secrets misappropriated by Defendants, doc. 109, Plaintiffs' compliance with the Order by further identifying the allegedly misappropriated trade secrets, doc. 113-1, and the parties' joint notice to the Court confirming the identification of the trade secrets, doc. 116, Defendant's argument to dismiss Count 1 is considered moot.

Defendant also asserts preemption under the TUTSA.   Doc. 47 at 13.   Defendant contends that Count 1 cannot stand because Plaintiffs only assert a common law claim that applies to conduct occurring before September 1, 2013—the date the TUTSA was enacted.  *Id.* And Plaintiffs' allegations against Defendant occurred after that date.   Therefore, Plaintiffs were required to plead its claim under the TUTSA, but instead erroneously pled a common law claim. *Id.*; *see* Adoption of the Uniform Trade Secrets Act, 2013, 83rd Leg., ch. 10 (S.B. 953), § 3 ("The change in law made by this Act applies to the misappropriation of a trade secret made on or after the effective date [September 1, 2013] of this Act."); *see also In re Mandel*, No. 13-

40751, 2014 WL 3973479, *6 n.8 (5th Cir. Aug. 15, 2014) (noting that TUTSA did not apply because all of the allegations related to conduct prior to September 1, 2013).

In rebuttal, Plaintiffs claim that Defendant joined a course of continuing misappropriation of trade secrets that began prior to the TUTSA being enacted, and thus liability is governed by the common law. Plaintiffs point to the TUTSA, which states that "[a] misappropriation of a trade secret made before and a continuing misappropriation beginning before the effective date of this Act are governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose." 2013 Tex. Sess. Law Serv. Ch. 10 (S.B. 953) § 3. Therefore, Plaintiffs assert that Texas common law applies to their claim based on a continuing misappropriation that began prior to the TUTSA. Doc. 67 at 23-24.

Plaintiffs' plausibly pled a common law misappropriation of trade secrets claim. By acquiring Oculus, Defendant (rather than engaging on a new independent misappropriation) joined an alleged ongoing misappropriation which had started prior to the TUTSA being enacted. And the legislature presumably intended that misappropriation acts initiated prior to the TUTSA would be governed by the common law. *See* 2013 Tex. Sess. Law Serv. Ch. 10 (S.B. 953) § 3. This would avoid instructing a jury under two different laws for the same misappropriation act. Therefore, the Court finds that Plaintiff's claim are not preempted by the TUTSA.

Alternatively with the same result, Defendant announced that it would acquire Oculus in March 2014. An acquisition of this magnitude by a sophisticated party like Defendant would have involved a considerable amount of due diligence—the kind of due diligence that may have put Defendant on notice of the NDA and the timing of Carmack's departure to Oculus. So it is

conceivable that an independent misappropriation could have started during the months leading up to March 2013, and between March and September 2013, while Oculus and Defendant worked to formalize Defendant's purchase of Oculus.   Therefore, Plaintiffs plausibly state a claim for relief under the common law.  *See* doc. 38 at 39.  If discovery reveals that Defendant's alleged misappropriation was independent of Oculus's and Luckey's, and occurred after the date the TUTSA was enacted, the Court will instruct the jury accordingly.

### b.  Copyright infringement, Count 2.

To establish a claim for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.  *See Gen. Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004).  Vicarious copyright infringement occurs when the defendant (1) had a direct financial interest in the infringing activity and (2) had the right and ability to supervise the infringing party's acts which caused the infringement.  Knowledge of the infringing activity is not required.  *See Controversy Music v. Down Under Pub Tyler, Inc.*, 488 F. Supp. 2d 572, 577 (E.D. Tex. 2007); *Jack Preston Wood: Design, Inc. v. B L Bldg. Co.*, No. H-03-713, 2004 WL 5866352, at *19 (S.D. Tex. June 22, 2004).

Defendant contends that Plaintiffs' allegations in their Complaint are conclusory.  Doc. 47 at 30.  Plaintiffs disagree, claiming that the Complaint sufficiently alleges that Defendant is at least vicariously liable for copyright infringement.  Doc. 67 at 16-17.  Plaintiffs allege that Defendant knew that Luckey and Oculus had been accused of copyright infringement at the time Defendant acquired Oculus.  Doc. 38 at 36-37.  Plaintiffs also allege that Defendant, through its acquisition, support, direction, and financing, contributed to Oculus's infringing conduct.  *Id.* at

37. Additionally, Plaintiffs claim that Defendant, as the sole owner of Oculus, had the right and ability to supervise Oculus's infringing acts, such as continuing use of software derived in whole or part from Plaintiffs' copyrighted materials. Doc. 38 at 42.

Plaintiffs have sufficiently pled their copyright infringement claim. According to Plaintiffs, Defendant acquired Oculus for a substantial amount of money despite knowing about the copyright infringement allegations. As the owner of Oculus, Defendant allegedly financed and supported Oculus's conduct of developing software based on Plaintiffs' copyrighted information. These allegations are sufficient to at least plead a plausible claim of vicarious copyright infringement and give Defendant fair notice of the nature of the claim and the grounds upon which the claim rests. *See Swierkiwicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

### c.  Counts 4, 5, and 6.

### i.    Tortious interference with contractual relations, Count 4.

Under Texas law, the elements of tortious interference with an existing contract are: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

Defendant contends, inter alia, that Plaintiffs have insufficiently pled their claim. *Id.* at 22. Plaintiffs' Complaint alleges that Defendant, despite being aware of the NDA, induced, financed, and supported of Luckey's and Oculus' breach of the NDA. Doc. 38 at 54. The breach intentionally induced by Defendant caused Plaintiffs' contract-protected information to be used for unauthorized purposes under the NDA, allegedly. *Id.* Plaintiffs add the Defendant's interference caused Plaintiffs irreparable injury, actual damages, and loss.

The Court finds that based on Plaintiff's complaint and for the reasons stated under Subsection III.a above, Plaintiffs sufficiently pled a plausible claim for relief that puts Defendant on notice of the grounds upon which the relief is based on.  Accordingly, Defendant's motion is denied.

ii.   **Common law unfair competition, Count 5.**

The tort of unfair competition under Texas law has been defined as follows:

> [U]nfair competition "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." To recover on this tort, a plaintiff must show an illegal act by the defendant which interfered with the plaintiff's ability to conduct his business. The illegal act must constitute at least an independent tort if not a violation of criminal law.

*Grand Time Corp. v. Watch Factory, Inc.*, No. 3:08-CV-1770, 2010 WL 92319, at *3 (N.D. Tex. Jan. 6, 2010) (footnote, citations omitted) (denying motion to dismiss unfair competition claim). This Court has previously held that "[t]o the extent Plaintiff may have alleged an independent tort, the Court will not foreclose Plaintiff the opportunity at this stage in the proceedings to plead a claim of unfair competition." *Settlement Capital Corp. v. BHG Structured Settlements Inc.*, 319 F. Supp. 2d 729, 734 (N.D. Tex. 2004).

Defendant contends that Plaintiffs' claim should be dismissed because it is insufficiently pled. Doc. 47 at 27.  Defendant also contends that since Plaintiffs' trade secret misappropriation, tortious interference, and unjust enrichment claims fail, their unfair competition claim necessarily suffers the same fate. Doc. 79 at 11.

Plaintiffs rebut by arguing that they have sufficiently alleged independent torts to form the basis of an unfair competition claim. Doc. 67 at 21.  Additionally, Plaintiffs allege in their

Complaint that Defendant interfered with Plaintiffs' ability to conduct its business by depriving Defendant of the control of its proprietary inventions and confidential know-how, and by interfering with Defendant's ability to return value to its shareholders for the time, money, and effort invested in developing virtual reality technology.  Doc. 38 at 46.

Because Plaintiffs has sufficiently pled the torts discussed above—the independent torts—and have alleged illegal conduct by Defendant—depriving control of their copyrighted information—the Court finds that Plaintiffs claim survives Defendant's 12(b)(6) challenge.

### iii.   Unjust enrichment, Count 6.

Defendant asserts, *inter alia*, that Plaintiffs' claim is preempted by the TUTSA because it is based on Plaintiffs' misappropriation of trade secrets claim.  *See* doc. 79 at 3.  Plaintiffs counter by arguing that they have sufficiently pled an unjust enrichment claim that stands independently from their misappropriation of trade secrets allegations.  *See, e.g.*, *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 448 (E.D. Pa. 2013); ("However unlikely the case may be, if APT fails to prove that its coated SBP method constituted a trade secret but nonetheless proves that it was a benefit conferred by XXPC upon VWR, which unjustly retained it, APT should be able to pursue an unjust enrichment claim.").

Here, Plaintiffs assert that aside from the Defendant's alleged misappropriation of trade secrets, Defendant has been unjustly enriched by receiving the benefits of Plaintiffs' research, technical guidance, and other valuable support, without compensating Plaintiffs for the benefits received.  Doc. 67 at 31.

The Court agrees with Plaintiffs.  Plaintiffs are entitled to plead in the alternative, and to the extent that Plaintiffs fail to recover on their trade secrets claim, Plaintiffs can alternatively seek damages under a theory of unjust enrichment. Accordingly, Defendant's motion is denied.

**IV.**      **Conclusion**

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED.

**IT IS SO ORDERED.**

Signed this _10th_ day of August, 2015.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE