IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ZENIMAX MEDIA INC. and<br>ID SOFTWARE LLC,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>OCULUS VR, LLC,<br>PALMER LUCKEY,<br>and FACEBOOK, INC.<br><br>　　　　　Defendants. | **CIVIL CASE NO. 3:14-cv-01849-P** |

**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION
FOR A PROTECTIVE ORDER PROHIBITING PLAINTIFFS FROM
<u>DEPOSING MARK ZUCKERBERG, FACEBOOK'S CHIEF EXECUTIVE OFFICER</u>**

In this action, Plaintiffs ZeniMax Media Inc. and id Software LLC (collectively, "ZeniMax") contend that (i) Defendants Oculus VR, LLC ("Oculus") and Palmer Luckey misappropriated confidential and proprietary technology belonging to ZeniMax; and (ii) Facebook, Inc. acquired Oculus to make use of that misappropriated ZeniMax technology, with full knowledge of ZeniMax's already-pending claims against Oculus and Luckey for its misappropriation of that technology. Widely-publicized reports regarding that acquisition render it beyond dispute that Mark Zuckerberg, the Chief Executive Officer of Facebook, <u>personally</u> tested prototypes of the Rift virtual reality headset prior to deciding whether to proceed with Facebook's multi-billion-dollar acquisition of Oculus, and that Mr. Zuckerberg <u>personally</u>

1

communicated with Oculus's CEO Brendan Iribe to discuss Facebook's acquisition of Oculus.[1] It is likewise beyond dispute that Facebook's board of directors has invested Mr. Zuckerberg with considerable personal authority[2] to make independent decisions regarding significant acquisitions by Facebook, such as the acquisition of Oculus.

ZeniMax has noticed Mr. Zuckerberg's deposition to explore how his personal decision to acquire Oculus, as well as his personal valuation of Oculus, depended on his personal testing of the Oculus Rift headset, including features of the Rift headset that were based on misappropriated ZeniMax technology. That testimony will support ZeniMax's proof of liability and damages on its claims. ZeniMax is willing to take the deposition of Mr. Zuckerberg at a date and place reasonably convenient to him (which need not be the date and time proposed in the notice propounded by ZeniMax). Defendants have offered no good reason to prohibit ZeniMax from taking that deposition. Their Motion for Protective Order (Dkt. No. 251) should be denied.

## ARGUMENT

A recent cover story in *Vanity Fair* magazine describes in detail Mr. Zuckerberg's personal, hands-on involvement in testing Oculus technology and his subsequent decision that Facebook would acquire Oculus:

> [Zuckerberg] invited [Oculus CEO Brendan] Iribe to show him a prototype at Facebook's headquarters.

---

[1] (*See generally* App'x Vol. 1, Ex. 1 (Max Chafkin, *It's All in the Eyes*, Vanity Fair, Oct. 2015); App'x Vol. 1, Ex. 2 (Steven Tweedie, *Oculus CEO Reveals How He Convinced Mark Zuckerberg to Try the Rift*, Business Insider, Dec. 3, 2014).)

[2] (*See generally* App'x Vol. 1, Ex. 3 (Shayndi Raice et al., *In Facebook Deal, Board Was All But Out of the Picture*, Wall Street Journal, April 18, 2012); *see also* App'x Vol. 1, Ex. 4 at 25 (Facebook, Inc., 2015 Form 10-K ("Mr. Zuckerberg has the ability to control … major strategic investments of our company as a result of his position as our CEO and his ability to control the election or replacement of our directors.")).)

2

> The demo in [Facebook COO Sheryl] Sandberg's office went spectacularly well. "We were running around high-fiving," says Cory Ondrejka, a Facebook engineer who was helping to lead Zuckerberg's V.R. search.
>
> Iribe told Zuckerberg that if he thought that was cool he'd better come to [Oculus's headquarters in] Irvine and see a more advanced version. **When Zuckerberg arrived**, [Palmer] Luckey introduced himself and then quickly walked away. "I'm a big fan," he said, "but I actually have to get back to work." […]
>
> **Zuckerberg seemed taken aback by Luckey's brusqueness but also charmed. "They definitely have the hacker culture that we have," he says. "Those shared values were what attracted us to each other and made us comfortable." Discussions ensued over the next few weeks, during which Facebook offered roughly $1 billion**, which Iribe considered low. The deal seemed to peter out until late February, after news of the WhatsApp deal hit: Facebook had agreed to pay $19 billion for the messaging service. That got Iribe's attention. "Hey Mark," he wrote in an e-mail, "we should talk."
>
> Iribe met with Zuckerberg for brunch on the patio at Zuckerberg's Palo Alto home on a Sunday, in March [2014]. They ordered pizza, and **Zuckerberg made a new offer: more than $2 billion in cash and stock**. It was rich, considering that Oculus had not yet released a consumer product. **Zuckerberg promised that Oculus would operate independently within Facebook**, just as Instagram did and WhatsApp would. There would be games, sure, but eventually much more: news, sports, movies and TV, cat videos — everything. **"I want to do this, and I want this to be the future of Facebook, long-term," Zuckerberg said**, but Iribe would have to act quickly and promise not to shop the deal. […]
>
> [The deal] was sealed at Zuckerberg's house just three days after his and Iribe's Sunday meeting, over a dinner featuring mushroom risotto and scallops. The meal, Luckey recalls, was "*so* good." And Facebook was the right fit. […]
>
> Less than a week after shaking hands on the deal, Zuckerberg announced the acquisition on his Facebook page. He sketched a vision of vast possibilities.

(App'x Vol. 1, Ex. 1 at 8-9 (emphasis added).)

The argument of Defendants' Motion is that although Mr. Zuckerberg has time to speak with a journalist for *Vanity Fair* about his personal decision that Facebook would acquire Oculus, it would be "harass[ing]" (Dkt. No. 251 at 1) for this Court to require Mr. Zuckerberg to appear to be deposed by ZeniMax on that same subject. ZeniMax respectfully disagrees.

3

Tellingly, Defendants have <u>not</u> submitted — and of course could not submit — any affidavit or declaration from Mr. Zuckerberg denying the following publicly-reported facts:

(i)  Mr. Zuckerberg personally tested the Oculus Rift on more than one occasion,

(ii) Mr. Zuckerberg personally made the decision, including on the basis of his own experience in testing the Rift, that Facebook would acquire Oculus, and

(iii) Mr. Zuckerberg personally negotiated key terms of the deal, including a value of Oculus that reflected (among other things) his own experience in testing the Rift.

Instead, Defendants have attempted to artfully word their Motion in an attempt to avoid acknowledging those facts:

> **To the extent [Mr. Zuckerberg] has any knowledge about Facebook's decision to acquire Oculus** or Facebook's valuation of Oculus at the time of the acquisition, that knowledge is duplicative of the knowledge possessed by other witnesses more personally involved in the acquisition process, including, for example, Amin Zoufonoun (Facebook's Vice President of Corporate Development), who led the acquisition team.

(Dkt. No. 251 at 2.)  Defendants' implication that it might be the case that Mr. Zuckerberg lacks "any knowledge regarding <u>Facebook's</u> decision to acquire Oculus or <u>Facebook's</u> valuation of Oculus" (*id.*, emphasis added) is absurd in view of the publicly-reported facts that Mr. Zuckerberg personally tested the Rift on multiple occasions, and that in light of that experience Mr. Zuckerberg personally decided that Facebook would acquire Oculus, and also personally negotiated the price that Facebook would pay for Oculus.

Defendants' further suggestion that there are "other witnesses more personally involved in the acquisition process" (*id.*) is misleading at best.  There are no doubt many executives, bankers, and attorneys who spent more hours on the details of Facebook's acquisition of Oculus than Mr. Zuckerberg did.  But <u>no one</u> else is better positioned to testify regarding Mr. Zuckerberg's personal decision-making regarding that acquisition than Mr. Zuckerberg, who is uniquely knowledgeable regarding his own experience in testing the Oculus Rift and the decisions he

4

made based on that experience.  Documents that ZeniMax has obtained in discovery — which Defendants have designated "Highly Confidential," and which ZeniMax has submitted herewith in a sealed appendix — confirm the already-public fact of Mr. Zuckerberg's personal involvement over the course of many months in critical aspects of this acquisition, including (for example) multiple face-to-face meetings and e-mails between Mr. Zuckerberg and Mr. Iribe and other key Oculus personnel.  (*See* App'x Vol. 2, Exs. 5-10.)

Under those circumstances, Defendants are not entitled to a protective order permitting Mr. Zuckerberg to avoid a deposition simply because he is the CEO of defendant Facebook.  Courts in this District have refused to enter protective orders shielding an executive from deposition where the record shows that the executive was personally involved in the facts in dispute in the action:

- Recently, in *Gaedeke Holdings VII, Ltd. v. Mills*, No. 3:15-mc-36-D-BN, 2015 WL 3539658 (N.D. Tex. June 5, 2005), Magistrate Judge Horan declined to quash a notice of deposition for the plaintiffs' CEO, concluding that the CEO "has personal knowledge of facts relevant to the issue of damages," and "had personal involvement in conduct that is relevant to the issue of damages."  *Id.* at *4.

- In *Kimberly-Clark Corp. v. Continental Casualty Co.*, Civil Action No. 3:05-CV-0475-D, 2006 WL 3436064 (N.D. Tex. Nov. 29, 2006), Judge Fitzwater declined to quash a notice of deposition for the chairman and CEO of the plaintiff corporation, observing that "in this case Continental has shown that [the CEO] has personal involvement in a multimillion insurance dispute that requires his testimony."  *Id.* at *4.

- In *Simms v. National Football League*, Civil Action No. 3:11-CV-0248-M-BK, 2013 WL 9792709 (N.D. Tex. July 10, 2013), Magistrate Judge Toliver granted a plaintiff's motion to compel the deposition of the commissioner of the defendant sports league, having concluded that that witness "possesses firsthand knowledge of relevant information regarding the events giving rise to Plaintiffs' causes of action for breach of contract and fraudulent inducement."  *Id.* at *3.

Unsurprisingly, the authorities on which Defendants rely largely involve circumstances where (unlike here) an executive proposed as a deponent had little or no firsthand relevant knowledge of relevant facts.  For example, in *Computer Acceleration Corp. v. Microsoft Corp.*,

5

No. 9:06-CV-140, 2007 WL 7684605 (E.D. Tex. June 15, 2007), a plaintiff alleged that Microsoft had infringed a patent on a technology that speeded the launch of computer programs, and sought the deposition of former Microsoft CEO Bill Gates on the ground that Mr. Gates had generally expressed an interest in having programs launch more quickly. The court granted a protective order, holding that "there is no indication that Mr. Gates possesses firsthand and non-repetitive knowledge regarding issues relevant to this lawsuit." *Id.* at \*1; *see also Salter v. Uphohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (postponement of deposition not an abuse of discretion in light of "defendant's reasonable assertions that [the witness] was extremely busy and did not have any direct knowledge of the facts"). Likewise, in *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985), a court reconsidered an order granting a plaintiff the opportunity to depose the CEO of the defendant corporation in a product liability action after that CEO "signed an affidavit professing ignorance to the information the plaintiffs seek." *Id.* at 366. No such affidavit has been (or could be) provided by Mr. Zuckerberg here.[3] Mr. Zuckerberg does have firsthand, personal knowledge regarding relevant issues, and indeed no one is better positioned than he is to testify regarding his personal experience with testing the Oculus Rift and with his consequence thinking and decision-making in connection with Facebook's acquisition of Oculus.

---

[3] *Accord Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (citing *Mulvey*; denying deposition where "it has also not been demonstrated that [the witness] has any superior or unique personal knowledge"); *Schmidt v. Goodyear Tire & Rubber Co.*, No. 2:01-CV-272-D.F., 2003 U.S. Dist. LEXIS 28130, at \*4 (E.D. Tex. Jan. 7, 2003) (similarly; witness "possesses no unique information regarding the issues in this case"); *Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011 WL 1753982, at \*1 (N.D. Cal. May 9, 2011) (deposition of Steve Jobs denied in patent action; plaintiff "fail[ed] to show that Jobs possesses unique, personal non-repetitive firsthand knowledge of relevant facts"); *Guan Ming Lin v. Benihana Nat'l Corp.*, No. 10 Civ. 1335(VM)(JCF), 2010 WL 4007282, at \*2 (S.D.N.Y. Oct. 5, 2010) (proposed deponent "has attested that he has no special personal knowledge of the facts alleged by the plaintiffs").

Defendants alternatively propose that the deposition of Mr. Zuckerberg should follow other discovery, perhaps including the depositions of other Facebook personnel involved in the Oculus acquisition, at which point (presumably) ZeniMax would be required to file a motion to compel Mr. Zuckerberg's appearance at a deposition.  Here, however, ZeniMax has already taken comprehensive document and interrogatory discovery from Facebook, and ZeniMax has certainly not demanded that Mr. Zuckerberg appear as Facebook's first or only witness.  The depositions of other Facebook officers cannot avoid the need to depose Mr. Zuckerberg where he personally tested the Oculus Rift on multiple occasions, personally met with the key Oculus personnel, personally made the acquisition decision and negotiated a price based on his own experience with testing the Rift.[4]  This Court should not be burdened with several rounds of discovery motion practice before ZeniMax may depose an individual whose personal knowledge is clearly relevant to ZeniMax's claims.  If Mr. Zuckerberg can find time to talk to *Vanity Fair*, he can find time to talk to ZeniMax's counsel as well.

---

[4] By contrast, in *Gauthier v. Union Pacific R.R. Co.*, Civil Action No. 1:07-CV-12 (TH/KFG), 2008 WL 2467016 (D. Colo. June 27, 2011), a plaintiff sought the depositions of the defendant's senior officers for the asserted purpose of determining the defendant's "formal policy pertaining to the upgrades of railroad crossings." *Id.* at *4.  The court observed that kind of information could more conveniently be obtained in a Rule 30(b)(6) deposition.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' Motion should be denied.

Dated: November 16, 2015                    Respectfully submitted,

*s/ Phillip B. Philbin*

| | |
|---|---|
| P. ANTHONY SAMMI | PHILLIP B. PHILBIN |
| E-mail: Anthony.Sammi@skadden.com | Texas State Bar No. 15909020 |
| KURT WM. HEMR | E-mail: phillip.philbin@haynesboone.com |
| E-mail: Kurt.Hemr@skadden.com | MICHAEL D. KARSON |
| JAMES Y. PAK | Texas State Bar No. 24090198 |
| Texas State Bar No. 24086376 | E-mail: michael.karson@haynesboone.com |
| E-mail: James.Pak@skadden.com | **HAYNES AND BOONE LLP** |
| KRISTEN VOORHEES | 2323 Victory Avenue, Suite 700 |
| E-mail: Kristen.Voorhees@skadden.com | Dallas, Texas 75219 |
| DEVIN A. KOTHARI | Telephone No.: 214-651-5000 |
| E-mail: Devin.Kothari@skadden.com | Facsimile No.: 214-651-5940 |
| (the foregoing attorneys admitted *pro hac vice*) | |
| **SKADDEN, ARPS, SLATE,** | |
| **    MEAGHER & FLOM LLP** | |
| Four Times Square | |
| New York, New York 10036 | |
| Telephone No.: 212-735-3000 | *Attorneys for Plaintiffs* |
| Facsimile No.: 212-735-2000 | *ZeniMax Media Inc. and id Software LLC* |

8

**CERTIFICATE OF SERVICE**

      On November 16, 2015, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Dated: November 16, 2015                          *s/ Phillip B. Philbin*
                                                                Phillip B. Philbin