1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
    ZENIMAX MEDIA INC. and ID      )        3:14-CV-1849-K
5   SOFTWARE LLC                   )
                   Plaintiffs,     )
6                                  )
                                   )
7   VS.                            )
                                   )        DALLAS, TEXAS
8                                  )
    OCULUS VR, LLC, PALMER         )
9   LUCKEY, FACEBOOK, INC.,        )
    BRENDAN IRIBE and JOHN         )
10  CARMACK,                       )
                   Defendants.     )        January 9, 2017
11

12
                  TRANSCRIPT OF PRETRIAL HEARING
13
              BEFORE THE HONORABLE ED KINKEADE
14
                  UNITED STATES DISTRICT JUDGE
15

16
    A P P E A R A N C E S:
17

18  FOR THE PLAINTIFFS:        MR. P. ANTHONY SAMMI
                               Skadden, Arps, Slate,
19                               Meagher & Flom LLP
                               Four Times Square
20                             New York, New York  10036
                               (212) 735-2307
21                             anthony.sammi@skaddden.com

22
                               MR. PHILLIP B. PHILBIN
23                             Haynes and Boone LLP
                               2323 Victory Avenue, Suite 700
24                             Dallas, Texas  75219
                               (214) 651-5000
25                             phillip.philbin@haynesboone.com

**MR. KURT WILLIAM HEMR**
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(617) 573-4833
kurt.hemr@skaddden.com


**MR. CHRISTOPHER A LISY**
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800
christopher.lisy@skaddden.com


**MR. MICHAEL R. WALSH**
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4862
michael.walsh@skadden.com


**MR. JAMES Y. PAK**
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-2546
james.pak@skaddden.com


**MR. MICHAEL DALEY KARSON**
Haynes and Boone LLP
2323 Victory Avenue
Suite 700
Dallas, Texas  75219
(214) 651-5000
michael.karson@haynesboone.com



1                              **MS. RACHEL R. BLITZER**
                               Skadden, Arps, Slate,
2                                 Meagher & Flom LLP
                               Four Times Square
3                              New York, New York  10036
                               (212) 735-3000
4                              rachel.blitzer@skaddden.com

5

                               **MR. WILLIAM J. CASEY**
6                              Skadden, Arps, Slate,
                                  Meagher & Flom LLP
7                              525 University Avenue
                               Palo Alto, California  94301
8                              (650) 470-4500
                               william.casey@skaddden.com
9

10                             **MR. SCOTT MICHAEL FLANZ**
                               Skadden, Arps, Slate,
11                                Meagher & Flom LLP
                               Four Times Square
12                             New York, New York  10036
                               (212) 735-3000
13                             sflanz@skaddden.com

14

                               **MS. EMILY WHITCHER**
15                             Skadden, Arps, Slate,
                                  Meagher & Flom LLP
16                             Four Times Square
                               New York, New York  10036
17                             (212) 735-3605
                               emily.whitcher@skaddden.com
18

19                             **MS. JENNIFER H. DOAN**
                               Haltom & Doan
20                             6500 Summerhill Road, Suite 100
                               Texarkana, Texas  75503
21                             (903) 255-1000
                               jdoan@haltomdoan.com
22

23

24

25

```
 1                              MR. JOSH R. THANE
                                Haltom & Doan
 2                              6500 Summerhill Road, Suite 100
                                Texarkana, Texas  75503
 3                              (903) 255-1000
                                jthane@haltomdoan.com
 4

 5
      FOR THE DEFENDANTS:       MS. BETH A. WILKINSON
 6                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
 7                              Suite 800
                                Washington, DC  20036
 8                              (202) 847-4000
                                bwilkinson@wilkinsonwalsh.com
 9

10                              MR. BRANT W. BISHOP
                                Wilkinson Walsh & Eskovitz LLP
11                              1900 M Street NW
                                Suite 800
12                              Washington, DC  20036
                                (202) 847-4000
13                              bbishop@wilkinsonwalsh.com

14
                                MS. CALI COPE-KASTEN
15                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
16                              Suite 800
                                Washington, DC  20036
17                              (202) 847-4000
                                ccope-kasten@wilkinsonwalsh.com
18

19                              MS. KIRSTEN NELSON
                                Wilkinson Walsh & Eskovitz LLP
20                              1900 M Street NW
                                Suite 800
21                              Washington, DC  20036
                                (202) 847-4000
22                              knelson@wilkinsonwalsh.com

23

24

25
```



```
 1                              MS. RUTH VINSON
                                Wilkinson Walsh & Eskovitz LLP
 2                              1900 M Street NW
                                Suite 800
 3                              Washington, DC  20036
                                (202) 847-4000
 4                              rvinson@wilkinsonwalsh.com

 5
                                MR. MAX WARREN
 6                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
 7                              Suite 800
                                Washington, DC  20036
 8                              (202) 847-4000
                                mwarren@wilkinsonwalsh.com
 9

10                              MR. HAYTER WHITMAN
                                Wilkinson Walsh & Eskovitz LLP
11                              1900 M Street NW
                                Suite 800
12                              Washington, DC  20036
                                (202) 847-4000
13                              hwhitman@wilkinsonwalsh.com

14
                                MR. KOSTA S. STOJILKOVIC
15                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
16                              Suite 800
                                Washington, DC  20036
17                              (202) 847-4050
                                kstojilkovic@wilkinsonwalsh.com
18

19
                                MS. HEIDI L. KEEFE
20                              Cooley LLP
                                3175 Hanover Street
21                              Palo Alto, California  94304
                                (650) 843-5000
22                              hkeefe@cooley.com

23

24

25
```



1        **MR. BRETT DeJARNETTE**
         Cooley LLP
2        3175 Hanover Street
         Palo Alto, California  94304
3        (650) 843-5000
         bdejarnette@cooley.com
4

5        **MS. ELIZABETH LEE STAMESHKIN**
         Cooley LLP
6        3175 Hanover Street
         Palo Alto, California  94304
7        (650) 843-5000
         lstameshkin@cooley.com
8

9        **MR. RICHARD A. SMITH**
         Richard Smith, PC
10       Campbell Centre I
         8350 N. Central Expressway
11       Suite 1111
         Dallas, Texas  75206
12       (214) 242-6484
         richard@rsmithpc.com
13

14       **MR. RAGESH KUMAR TANGRI**
         Durie Tangri LLP
15       217 Leidesdorff Street
         San Francisco, California  94111
16       (415) 362-6666
         rtangri@durietangri.com
17

18       **MR. BENJAMIN B. AU**
         Durie Tangri LLP
19       217 Leidesdorff Street
         San Francisco, California  94111
20       (415) 362-6666
         bau@durietangri.com
21

22       **MR. MARK RANDOLPH WEINSTEIN**
         Cooley LLP
23       3175 Hanover Street
         Palo Alto, California  94304
24       (650) 843-5000
         mweinstein@cooley.com
25



1          **MR. JOSEPH B. WOODRING**
           Cooley LLP
2          1333 2nd Street, Suite 400
           Santa Monica, California  90401
3          (310) 883-6400
           jwoodring@cooley.com
4

5           **MR. MATTHEW D. CAPLAN**
           Cooley LLP
6          101 California Street
           5th Floor
7          San Francisco, California  94111
           (415) 693-2000
8          mcaplan@cooley.com

9

10         **MS. JULIE B. RUBENSTEIN**
           Wilkinson Walsh & Eskovitz LLP
           1900 M Street NW
11         Suite 800
           Washington, DC  20036
12         (202) 847-4000
           jrubenstein@wilkinsonwalsh.com
13

14         **MR. KOSTA S. STOJILKOVIC**
           Wilkinson Walsh & Eskovitz LLP
15         1900 M Street NW
           Suite 800
16         Washington, DC  20036
           (202) 847-4050
17         kstojilkovic@wilkinsonwalsh.com

18

19         **MS. ELIZABETH Y. RYAN**
           Lynn Pinker Cox & Hurst, LLP
           2100 Ross Avenue
20         Suite 2700
           Dallas, Texas   75201
21         (214) 981-3821
           eryan@lynnllp.com
22

23

24

25

```
 1                              MS. CHRISTEN DUBOIS
                                Facebook, Inc.
 2                              1601 Willow Road
                                Menlo Park, California  94025
 3                              (650) 862-5980
                                cdubois@fb.com
 4

 5                              MR. PAUL GREWAL
                                Facebook, Inc.
 6                              1601 Willow Road
                                Menlo Park, California  94025
 7                              (650) 814-3157
                                paulgrewal@fb.com
 8

 9   COURT REPORTER:            MR. TODD ANDERSON, RMR, CRR
                                United States Court Reporter
10                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
11                              (214) 753-2170

12

13

14

15

16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                    PRETRIAL - JANUARY 9, 2017
 2                    P R O C E E D I N G S
 3           THE COURT:  Okay.  All right.  Case of ZeniMax Media
 4   and id Software, Inc., and id Software LLC versus Oculus and
 5   others.
 6           Here today, set for jury trial, start picking the
 7   jury here in just a little bit.
 8           And for Plaintiffs we have got the same offering that
 9   I've had here on my last trial.  Apparently you are going to be
10   on every one of my jury trials on some side.
11           Mr. Anthony Sammi --
12           MR. SAMMI:  Yes, Your Honor.
13           THE COURT:  -- you are here from Skadden Arps, but
14   you are from the New York version.
15           MR. SAMMI:  I am, Your Honor.
16           THE COURT:  And Mr. Kurt Hemr is here.  Do you
17   pronounce it Hemr?
18           MR. HEMR:  Hemr, Your Honor.
19           THE COURT:  Hemr.  Okay.  And you realize there ought
20   to be one more vowel before the R in the name?
21           MR. HEMR:  Lost it in the Depression, Your Honor.
22           THE COURT:  Okay.  There we go.  Okay.
23           And then Mr. Christopher -- do you pronounce it Lisy
24   or Lisy?
25           MR. LISY:  Good morning, Your Honor.  Lisy.
```

```
 1                  THE COURT:  Lisy, from Skadden.
 2                  And Mr. Phillip Philbin from Haynes & Boone and the
 3       world.
 4                  MR. PHILBIN:  Good morning, Your Honor.
 5                  THE COURT:  All right.  So y'all ready?
 6                  MR. SAMMI:  We are, sir.
 7                  THE COURT:  Okay.  And then we've got a bunch of
 8       others lawyer you've got with y'all that I'll let you introduce
 9       that are here if you want to.
10                  MR. SAMMI:  That's fine, Your Honor.
11                  THE COURT:  Okay.  All right.  And we've got
12       Ms. Wilkinson.
13                  MS. WILKINSON:  Good morning, Your Honor.
14                  THE COURT:  And you're here and you're from your own
15       law firm, Wilkinson, Walsh, Eskovitz.
16                  MS. WILKINSON:  That's right.
17                  THE COURT:  Okay.  And you're ready.
18                  And Mrs. Heidi Keefe from Cooley?
19                  MS. KEEFE:  Yes, Your Honor.
20                  THE COURT:  And you're ready?
21                  MS. KEEFE:  Yes, Your Honor.
22                  THE COURT:  And Mr. Richard Smith is local counsel.
23       And you're ready?
24                  MR. SMITH:  Good morning, Your Honor.  I am.
25                  THE COURT:  Okay.  All right.  Let's go over some of
```

1    these motions that we've got and make sure that I've got all

2    that right.

3              Oh, my goodness.  Y'all have got me pictures of your

4    folks.  That's good.  Kind of Glamour Shots.

5              Did y'all have those done out at the mall over in

6    Mesquite?

7              That's really neat.

8              I kind of like those.

9              Those are good.

10             Okay.  So let's go over -- I've got your motions that

11   were filed with regard -- by Mr. Carmack where he's claiming

12   that the company ZeniMax still owes him some money in an

13   employment contract, and those are his counterclaims, and then

14   the Plaintiffs' motion to dismiss.

15             I'm ready to hear anything else you've got about

16   that, but I can rule on this if y'all want me to.  But I'm glad

17   to hear anything else you want me to hear today.

18             So it's -- it's Defendants' -- excuse me --

19   Defendants' motions.

20             Mr. Carmack, do you want to argue anything else

21   regarding that?

22             MR. SMITH:  No, Your Honor.

23             THE COURT:  All right.  Do y'all want to argue

24   anything on the counterclaims?

25             MR. HEMR:  No, Your Honor.

```
 1              MR. SAMMI:  No.
 2              THE COURT:  Okay.  All right.  So I am going to
 3    let -- let those go forward.  They're not -- yes, I agree
 4    they're not trademark kind of claims.  But we've got everybody
 5    kind of cubbied up in here, and let's get all the fighting out
 6    that we can get out in one time.  And so it's not that I don't
 7    agree with y'all that it's different, but there's nothing wrong
 8    with having them all -- and it's not -- it's not that big a
 9    part of the case.  I think it will be okay.
10              All right.  Now, with regard to the alleged
11    spoliation, whether I am going to sanction, I'm just going to
12    carry that.  I am going to listen to the evidence with regard
13    to that, and I'll decide what I instruct the jury or not,
14    depending upon what I hear in the evidence.
15              Everybody understand that?
16              MS. WILKINSON:  Yes, Your Honor.
17              MR. SAMMI:  Yes, Your Honor.
18              THE COURT:  Okay.  Good.
19              And then let's go down your limine's motions.  One of
20    them is to remove the confidential stamps from any exhibit to
21    be presented at trial.
22              Here's my question with regard to that,
23    Ms. Wilkinson.
24              Were those confidentiality stamps made as part of the
25    trial or were they already there?
```

```
 1              Kind of help me understand.  I'm not sure I'm clear
 2    about that.
 3              MS. WILKINSON:  Is it okay if I stand here, Your
 4    Honor, or would you like me at the podium?
 5              THE COURT:  Either way.  Just keep your voice up.
 6              MS. WILKINSON:  Yes, sir.
 7              They were put on in discovery, so because we have a
 8    protective order, they were stamped so that we all agreed how
 9    we were going to treat them.  Some, as you know, were just
10    attorneys' eyes only.  Some were --
11              THE COURT:  Let me stop you right there.
12              Here's my question.  Back before the lawsuit was
13    filed and everybody was getting along and then they weren't
14    getting along and all that, were there stamps on it at that
15    point?
16              MS. WILKINSON:  No, sir.
17              THE COURT:  Okay.  All right.  That's kind of all I
18    need to -- I understand that.
19              And so you don't want those stamps on there because
20    they weren't part of what was going on during the trial?
21              MS. WILKINSON:  Exactly.  And the whole idea is how
22    did they treat the trade secrets.  So if the jury sees them
23    stamped as confidential, they might think, oh, they treated
24    them, you know, with special care when they maintained them.
25    And that -- at least those stamps don't reveal that because
```

```
 1          they weren't there.

 2                    THE COURT:  Okay.  Okay.  Thanks.

 3                    And I'm assuming, Mr. Sammi, you have a response to

 4          that?

 5                    MR. SAMMI:  I do, Your Honor.

 6                    THE COURT:  Do you pronounce it Sammi?

 7                    MR. SAMMI:  Yes, sir.

 8                    THE COURT:  Okay.  Is there a Smith in your case so I

 9          can have somebody that I can pronounce their name?  Or a Billy

10          Bob?

11                    Is there any Billy Bob on either side?

12                    MR. SAMMI:  Tony Sammi, the guy with two first names.

13                    THE COURT:  I mean, you've got Philbin.  My stars.

14          Phil Philbin.  My goodness.  Okay.  There we go.

15                    MR. SAMMI:  Your Honor, on the confidentiality issue,

16          first of all, let's talk about source code, if we might.

17                    id Software treats source code very confidential, and

18          it can't stamp an electronic source code repository.

19                    THE COURT:  Okay.

20                    MR. SAMMI:  So as it's kept in the ordinary course of

21          business, it is lock-and-key, need-to-know access.  So when

22          those exhibits under the protective order are even printed,

23          they're limited.  They're printed on yellow paper.  That should

24          be reflected, number one.

25                    Number two, Your Honor, in our view, if exhibits are
```

```
 1    around the courtroom, et cetera, that contain our trade secrets
 2    and our confidential information.  That's precisely one of the
 3    reasons why we have such stringent protections in the
 4    protective order to keep those.
 5              THE COURT:  Okay.  Do you understand there's going to
 6    be humans from everywhere in the world watching this and
 7    they're going to see all this?
 8              MR. SAMMI:  We do, Your Honor.
 9              THE COURT:  My guess it would be somebody from China.
10              MR. SAMMI:  Yes.
11              THE COURT:  They could care less what the trademarks
12    and copyrights are.  They're going to reverse engineer this,
13    and we're going to have some version of this from them next
14    year that will be in a lawsuit here suing them.
15              MR. SAMMI:  What I -- what we might recommend is when
16    we publish it on the screen, any portions of the source code,
17    it will be small portions for discussion that won't contain the
18    thousands of lines of the module source code, which is really
19    what you need to look at.
20              THE COURT:  Yeah, here's what I want you to kind of
21    do, and we'll start this way with a few of the documents.  I
22    want you to show the documents without anything on it that --
23    this is the way it was when they were talking about it.  When
24    they were at the company and flying it around, they didn't have
25    this big stamp of confidentiality on it, I'm assuming.  These
```

```
 1    are a bunch of engineers.  They didn't do that, I'm assuming.
 2              MR. SAMMI:  From our side, Your Honor?
 3              THE COURT:  Was there anybody with stamps on it when
 4    it was flying around the company?
 5              MR. SAMMI:  Yes.  From id and ZeniMax.  For example,
 6    when we took it to a trade show, we have security.  We take it
 7    on one desktop computer, not a laptop, so we carry the code on
 8    that.
 9              If we have to move it -- for example, the code went
10    from Dallas to Maryland, and it had two people with it, with an
11    actual carry-on laptop.
12              THE COURT:  Yeah, yeah, I'm not talking about that.
13              MR. SAMMI:  Okay.
14              THE COURT:  I'm talking about did it have a stamp of
15    highly confidential on it.
16              MR. SAMMI:  Yes, at the top of every module of source
17    code it is stamped.
18              THE COURT:  Even when they were circulating it in the
19    company?
20              MR. SAMMI:  ZeniMax?  Well, Your Honor, it's in one
21    repository and people can access that repository.
22              THE COURT:  That's not what I'm asking.
23              MR. SAMMI:  Sorry, Your Honor.  I apologize.
24              THE COURT:  You're going to answer them the way I ask
25    them, not the way you want to answer it.
```

```
 1              MR. SAMMI:  Yes, sir.
 2              THE COURT:  Did it have stamps on it when they were
 3   circulating it around the company?
 4              MR. SAMMI:  No.
 5              THE COURT:  Okay.  You can't do that here.
 6              But you can go into all that explanation and then you
 7   can show -- I don't mind you showing it here and saying but it
 8   wasn't on there at the time when we were circulating, but we
 9   did these other things.  We -- we kept it in the super secret
10   module like on Get Smart that nobody could ever hear.
11              MR. SAMMI:  Right.
12              THE COURT:  You know, that sort of thing.  You know
13   what that is.  Old people will.
14              MR. SAMMI:  I do.
15              THE COURT:  The code of silence.
16              MR. SAMMI:  Yeah, the shoe phone and all that.
17              THE COURT:  Yeah, and all that.  Exactly.
18              So you can say all that, and that's fine.  I just
19   don't want you to show something that has a stamp on it that
20   didn't have a stamp on it when they were working on it.  And
21   they were doing other things to make it secret, keeping it on
22   one laptop and all these other things, but they weren't
23   stamped.  That's all I'm saying.
24              Does that make sense?
25              MR. SAMMI:  It does, Your Honor.  And I will
```

 1    double-check with all of the evidence in the case.  If there
 2    was a stamp when we kept it --
 3              THE COURT:  Then let me know before you offer it.
 4              MR. SAMMI:  Yes.
 5              THE COURT:  And Ms. Wilkinson can fuss about that at
 6    the time.
 7              MR. SAMMI:  Thank you.
 8              THE COURT:  Okay.
 9              MR. SAMMI:  Thank you.
10              MS. WILKINSON:  I won't fuss, Your Honor.  If he
11    shows it to me in advance, I'm sure we can work these things
12    out.  If he says there's a stamp on there, we can check.  Then
13    we won't have a problem.
14              THE COURT:  It's just -- that's really what this
15    whole -- a lot of the fight -- not all of the fight, but that's
16    what a lot of this fight is about.  I just want it to be a fair
17    fight.  Okay?
18              MR. SAMMI:  Yes, Your Honor.
19              THE COURT:  In other words, if it had neon lights on
20    it or that -- that lit up when you saw it, when y'all were
21    circulating it around the company, more power to you.  You can
22    show all that.  But if it didn't, you've got to show it however
23    it was.
24              MR. SAMMI:  Understood.
25              THE COURT:  And then you can make clear that at some

```
 1    point it did get a stamp, and this is how.

 2             Does that make sense?

 3             MR. SAMMI:  It does, Your Honor.

 4             We can describe the protections that we have for

 5    this.

 6             THE COURT:  You bet.

 7             MR. SAMMI:  Absolutely.

 8             THE COURT:  I'm not -- you can offer -- obviously,

 9    all that comes in.

10             MR. SAMMI:  Thank you, Your Honor.

11             THE COURT:  Okay.  Let me go to the next one.  Let's

12    see.

13             I think the Defendants had all theirs -- you put all

14    yours in one motion and y'all filed separate motions on each of

15    your numbers?

16             MR. SAMMI:  We did, Your Honor.

17             THE COURT:  Okay.  Let me go over the Defendants'

18    limines.

19             Do you want to address any of them?

20             MS. WILKINSON:  Not unless we lose, Your Honor.  No,

21    of course not.

22             THE COURT:  Just because I rule against you on this

23    doesn't mean it's not coming in later.  It just means it

24    doesn't comes in here.

25             On concerning escrow or identification agreements,
```

```
 1    help me with that.
 2            What's going on there?
 3            MS. WILKINSON:  In 2014, right around the time they
 4    were negotiating the deal between Oculus and Facebook, when
 5    Facebook was buying Oculus --
 6            THE COURT:  Okay.
 7            MS. WILKINSON:  -- Mr. Carmack negotiated -- his wife
 8    was his advisor, but she did most of the negotiating -- but
 9    negotiated an indemnity from Oculus for him for anything -- any
10    case, any --
11            THE COURT:  Is his wife a lawyer?
12            MS. WILKINSON:  No.  She's just a very --
13            THE COURT:  She's a negotiator.
14            MS. WILKINSON:  She's the wife you want, Judge.
15            THE COURT:  Wow.  Whoa, whoa.  I can barely handle
16    the one I've got, but, I mean, she would be the one to protect.
17            MS. WILKINSON:  Yes, sir.
18            THE COURT:  Okay.  She was --
19            MS. WILKINSON:  She was relentless.
20            THE COURT:  -- with regard to that.
21            Okay.  And is -- I'm not saying that won't come in.
22    I'm saying before you try to bring that in, Mr. Sammi, approach
23    the bench.  Okay?  Just let me know.
24            MR. SAMMI:  Yes, sir.
25            THE COURT:  Is that something you wanted to lead
```

```
 1   with?
 2           MR. SAMMI:  It is, Your Honor.  It is at the heart of
 3   this case, number one, if I may.
 4           THE COURT:  Yes.  You can stand right there and argue
 5   rather than y'all go back and forth.
 6           MR. SAMMI:  Even though Mr. Carmack's wife
 7   negotiated, it was drafted by both sides.  It is critical to
 8   the case.  It was not anything like insurance.  Mr. Carmack
 9   knew he wanted protection for these very claims.  This very
10   lawsuit.  It shows consciousness of guilt.  It shows he knows
11   he needs --
12           THE COURT:  So every time we get an indemnification
13   it means you're consciously guilty?
14           MR. SAMMI:  No, Your Honor.  It wasn't a forward
15   looking -- it wasn't for actions going forward.  It was for his
16   actions --
17           THE COURT:  I have all kinds of indemnifications,
18   and -- I own some apartments and from my tenants.
19           Am I consciously guilty?
20           MR. SAMMI:  No, Your Honor.  It's part of all the
21   evidence in this case, including the fact that the deal itself,
22   the billion dollar deal that would have Mr. Carmack join
23   Facebook was contingent on this very specific negotiated
24   indemnity for two very specific things, the hiring of our
25   employees and his work on VR.  And these are the language from
```

```
 1    the indemnity, his work on VR for ZeniMax, nothing else.
 2            THE COURT:  Okay.  You still have to approach the
 3    bench, okay, so I'm granting that.
 4            Okay.  The second one --
 5            MS. WILKINSON:  So, Your Honor, just to be clear, he
 6    won't mention --
 7            THE COURT:  Just to be clear, I granted it.  You say
 8    any more, I'll ungrant it.
 9            MR. SAMMI:  Can I mention it in opening, Your Honor?
10            THE COURT:  Do what?
11            MR. SAMMI:  May I mention it in opening?  It's a big
12    part of our case.
13            THE COURT:  What are you wanting to do in opening?
14    How can I -- if I've ruled against you, I'm going to have to
15    unrule.
16            MR. SAMMI:  Your Honor, it's -- it's critical to the
17    evidence presented as to what happened at a moment in time when
18    Facebook was going to purchase Oculus, and Mr. Carmack, after
19    taking thousands of documents from id and technology, was the
20    last one to sign and said to everyone stop and delayed the
21    entire billion dollar deal that Facebook was ready to announce
22    on a Monday until a Tuesday, because of this indemnity.
23            THE COURT:  No.  I'm not going to let you make that
24    argument.
25            Okay.  Motion in limine 2, to exclude evidence or
```

```
 1   arguments concerning other lawsuits brought or contemplated
 2   against the Defendants.
 3           So what?  ZeniMax sues a bunch.
 4           Is that the point?
 5           MS. WILKINSON:  Honestly, Your Honor, they made a
 6   motion where they want -- they don't want lawsuits or their
 7   litigiousness introduced.  We don't want it introduced against
 8   us, so we would agree to not have it either way, but they
 9   didn't want to agree to that.  We don't think really -- and the
10   Court, as you said, so what.  It's not really relevant.
11           THE COURT:  You both are litigious.  Mercy.
12           MR. SAMMI:  Your Honor, there's a difference, with
13   respect.  The difference is --
14           THE COURT:  Yeah, there's a difference.  There's you
15   and there's them.
16           MR. SAMMI:  What I mean by that is, from the parties'
17   positions, the Defendants have not identified any specific
18   litigation.  We have identified only litigations insofar as
19   there's been evidence in those litigations regarding to these
20   facts and circumstances in this case that, regardless of those
21   cases and what they're about, the evidence in those cases are
22   directly germane to this case.  That's different, Your Honor,
23   we would submit.
24           THE COURT:  So somebody owns a cell phone -- I just
25   finished a cell phone case not too long ago involving
```

1    BlackBerry and there are 6 or 800 different patents just in a
2    BlackBerry phone, and they sued about all of them, and people
3    are suing about every little thing in there.  What I had was
4    the camera.  And before they died, before the company -- well,
5    they didn't completely die, it became something else -- Kodak
6    sued everybody that had a camera in a phone.
7         Okay.  I mean, I don't get it.  I don't understand --
8    that's what y'all are in the business of.  These are patents or
9    trademarks, and everybody thinks that theirs is the original
10   thing, and sometimes it is, sometimes it is not.
11        I don't -- I don't understand what's the -- I mean,
12   it just seems tit for tat for me.  Help me understand why yours
13   is different.  You are wanting to bring the Winklevosses in
14   here and say, Mark Zuckerberg took advantage of us.
15        MR. SAMMI:  No, sir.  We identified very specific
16   litigations, again, that we don't need to introduce the fight
17   that the case itself -- and I will give an example, Judge.
18        THE COURT:  Give me an example.
19        MR. SAMMI:  Sure.  There is a lawsuit -- there was
20   one lawsuit when one of the Defendants was involved in,
21   Mr. Palmer Luckey, in which he was signing contracts regarding
22   virtual reality work and exclusivity, and there is evidence in
23   that case regarding what he was doing and when.
24        We don't need to introduce the fact there was
25   litigation, but there is evidence that we sought and received

```
 1    in discovery in that case regarding signed contracts, when they
 2    were issued, and what testimony was given.
 3           Moreover, in other cases, other Defendants have
 4    testified under oath at depositions about these circumstances,
 5    about Mr. Carmack and when did you start working on VR.
 6           For example, here is a question from another case.
 7    Another lawyer asked, under oath, Mr. Carmack, "Was the work
 8    you were doing on VR part of the work you were doing at id?"
 9           And he gave answers under oath, Judge, about very
10    specific circumstances in this case, different than -- there's
11    some other litigation out there.
12           THE COURT:  Yeah.  Some of that is going to come in.
13    If it involves this VR and this stuff, then it is going to come
14    in.  Otherwise, just -- you know, if it's -- they are suing
15    under other kind of things, it's probably not going to come in.
16    But you're still going to have to approach the bench so I can
17    make a distinction.  Okay.
18           MR. SAMMI:  Yes, sir.
19           THE COURT:  Which means you don't get to make an
20    opening statement about it.
21           MR. SAMMI:  Yes, sir.
22           THE COURT:  Okay.  So three, the interview, I don't
23    even get this.  Is this a live interview?  Was it just typed
24    or -- what do you mean a fake interview?  What in the heck?  I
25    don't get it.
```

1           MS. WILKINSON:  What happened is, when we produced

2    documents, Mr. Luckey had a copy of what we call the "fake

3    interview."  He had done a real interview, and someone else had

4    typed up disparaging language, what they might think are funny

5    answers, really some bad language.

6           He was deposed about it, he said it wasn't his, and

7    Plaintiffs still want to introduce it.  I think the only reason

8    must be, to, you know --

9           THE COURT:  Is there not a copy of the oral

10   interview?

11          MS. WILKINSON:  There isn't, Your Honor.  And he --

12   all that came out in the -- in the deposition.

13          THE COURT:  Was there a reporter or is it an

14   interview with some other engineer or --

15          MS. WILKINSON:  I don't even remember exactly.

16          MR. SAMMI:  It was written questions, Your Honor.

17          THE COURT:  Is it one of these things online and they

18   are back and forth?

19          MS. WILKINSON:  Right.  They are writing the

20   questions and he's writing the answers.  He said these weren't

21   his answers.  It really -- it really has some foul language,

22   and so the only reason they want to introduce it is to try to

23   make Mr. Luckey look like a bad guy, and it is totally

24   irrelevant and it's prejudicial.

25          THE COURT:  What is the interview about?

```
 1              MR. SAMMI:  It's about his work on VR, Your Honor.

 2              May I respond very quickly?  First of all, counsel

 3    said someone else wrote it.  When I asked Mr. Luckey about this

 4    deposition, about this interview, he first said he wrote it,

 5    and then he started reading some of the answers and said

 6    somebody else wrote it.

 7              And then I said, "Are you aware that your lawyers

 8    produced it, and you weren't" --

 9              THE COURT:  I have heard enough.  That comes in.

10    Deny the motion in limine on that.

11              Okay.  John Carmack's Google search.  Is this his

12    search to see how to wipe out certain things on the computer?

13              MR. SAMMI:  Absolutely it is, Your Honor.

14              THE COURT:  And you don't think that comes in?

15              MS. WILKINSON:  I don't think it should, Your Honor,

16    no.

17              THE COURT:  It's coming in.

18              MS. WILKINSON:  Thank you.

19              THE COURT:  Okay.  And y'all have some explanation

20    about what he was doing and what was going on.

21              MS. WILKINSON:  We do and witness testimony also.

22              THE COURT:  I get it.  Okay.  I think that goes to

23    weight versus admissibility.

24              "To preclude evidence on argument concerning former

25    employees who left and joined Oculus."
```

1          Well, there were several, right?

2          MR. SAMMI:  Indeed, Your Honor, there were five of

3    Mr. Carmack's specific team that worked with him at id, and

4    there's very much evidence regarding the scheme of Oculus to

5    get those employees.  It goes to trade secret misappropriation,

6    unfair competition.  It is part of the entire apparatus of

7    facts here.

8          THE COURT:  And you say?

9          MS. WILKINSON:  We say they left six months

10   afterwards.  They asked Mr. Carmack once they left.  He gave

11   them an affidavit and said that they weren't -- excuse me, Your

12   Honor -- that they weren't --

13         THE COURT:  You're fine.

14         MS. WILKINSON:  That they didn't leave because

15   Mr. Carmack had any, you know, participation in their

16   recruitment.

17         THE COURT:  Yes.

18         MS. WILKINSON:  They deposed all those folks.  They

19   didn't work on VR.  They all said that is not why they left.

20   There's no evidence that they left because Mr. Carmack

21   recruited them, but, most importantly, they didn't sue any of

22   those employees for leaving for that reason.  So they just want

23   to bring it in.

24         Again, they can't prove that they took any trade

25   secrets.  They didn't work on virtual reality when they were

 1    there.  They are just trying to dirty us up to make it look

 2    like because people eventually left because they didn't like

 3    working at id without Mr. Carmack, that somehow this shows they

 4    took trade secrets.

 5            THE COURT:  I get the point.  If you haven't sued

 6    them, why does all that come in?

 7            MR. SAMMI:  Because, first of all, Your Honor, I need

 8    to correct the record.  It is absolutely not true that there is

 9    no evidence that these individuals worked with Carmack.  Indeed

10    one of the four individuals, one of the five individuals

11    checked in source code regarding virtual reality with John

12    Carmack at id, number one.

13            Number two, cell phone message exchanges show

14    information going from id to Oculus with names of their phone

15    numbers -- the phone numbers, names, salaries.

16            Number two -- number three, Mr. Carmack's affidavit

17    is false in the following -- is false, period.  There are

18    e-mails showing contemporaneous discussions among Defendants

19    who told you not to hire these employees, and on the other

20    hand, you have got a signed declaration saying, I have no

21    knowledge and never had any discussions.

22            It is critical.  To say that if an employee leaves

23    and it is part of an apparatus of facts, misappropriation --

24            THE COURT:  Okay.  I will let you offer that.

25    Just -- let me just tell you, I don't see it as critical as you

1   do.  Don't spend a whole lot of time on that.  Okay?

2             MR. SAMMI:  Yes, sir.

3             THE COURT:  All right.  Let's see.  That's all

4   your --

5             MS. WILKINSON:  No, there is one more, Your Honor.

6             THE COURT:  There is?  I'm sorry.

7             MS. WILKINSON:  Yes, sir.  There was one.  Maybe you

8   thought it was related to the Google search, but it's quite

9   different.

10            THE COURT:  Oh, wait.  Did I miss one?  The Rage

11  code?  Oh, you're right.

12            MS. WILKINSON:  It wasn't virtual reality.  It was

13  something he worked on long before this.  He had it on an old

14  computer.  It isn't something that they made a claim is a trade

15  secret, and so they just want to introduce it, I think, again,

16  to show, look, we took --

17            THE COURT:  I'm sorry.

18            MS. WILKINSON:  -- old code.

19            THE COURT:  I'm sorry.  I missed that.

20            MS. WILKINSON:  Number five.

21            THE COURT:  Number five.  How did I skip one?  Okay.

22            MR. SAMMI:  Your Honor, first, let me again correct

23  the record.  Absolutely, we have expert reports on the fact

24  that Rage code is related to VR.

25            Number one, the laptop on which this code was found

1    contained millions of lines of Rage code as well as

2    Mr. Carmack's work on mobile VR that he was doing for Oculus.

3    He has said at a speech at SMU that MegaTextures, which are

4    found in Rage, are useful for VR.

5            Number three -- I forgot which number I'm on, but

6    when I had deposed Mr. Carmack the first time, I spent an hour

7    going through every computer that he had.  He did not remember,

8    and then a month later he said he found this laptop in a closet

9    afterwards containing millions of lines of our source code.

10           Now, we have taken that laptop into evidence.  We

11   have also found that not only was it -- may have been found in

12   his closet after my deposition, it was turned on a month after

13   this litigation had already started, and yet it was never

14   turned over to the lawyers.  We have stacks of evidence

15   regarding its relation to virtual reality, sir.

16           THE COURT:  Okay.  I will let that in.  Okay.

17           All right.  So I deny your motion on that.

18           Let's go over your motions in limine.

19           (Pause)

20           THE COURT:  Oh, okay.  Y'all's -- regarding your

21   prediscovery identification of potentially misappropriated

22   trade secrets.  Okay.  What about that?

23           MR. SAMMI:  Yes, Your Honor.  We -- may I argue from

24   here or shall I come up?

25           THE COURT:  You're fine.

```
 1                    MR. SAMMI:  Okay.  Thank you, Your Honor.
 2              First of all --
 3                    THE COURT:  Talk loud.
 4                    MR. SAMMI:  Magistrate Judge Stickney had given the
 5     order at the very start of this case before any discovery was
 6     had, please give us an identification, an initial -- an initial
 7     identification of your trade secrets in which the --
 8                    THE COURT:  Did you overidentify?  Is that the
 9     problem?
10                    MR. SAMMI:  We did.  And most of the evidence of
11     misappropriation lies with the Defendants because they took our
12     employees and Mr. Carmack.  We had no one to ask, so we have
13     to --
14                    THE COURT:  Then how many are we talking about?
15                    MR. SAMMI:  We identified 28, and we have narrowed
16     it, and we should not be faulted for narrowing our trade
17     secrets, making this trial go fast just like a patent case.
18                    THE COURT:  What did you narrow it to?
19                    MR. SAMMI:  Seven operative ones.
20                    THE COURT:  Can we narrow it some more if I keep you
21     standing?
22                    MR. SAMMI:  We may.
23                    THE COURT:  Okay.  There we go.
24                    MR. SAMMI:  But, Judge, that should not be used
25     against us.  That was prediscovery, not even a page by the
```

```
 1   lawyers --

 2              THE COURT:  Defense?

 3              MS. WILKINSON:  Your Honor, the whole point of this

 4   case is that they say these were trade secrets that they knew

 5   and they took care of.  So when they identified 28, including a

 6   head strap, and they say they are responsible for these things,

 7   they should know what their trade secrets are.

 8              One of our defenses is they didn't treat any of this

 9   like trade secrets, and they didn't have it -- they didn't

10   believe it was at the time, and then when they say Mr. Carmack

11   and their employees are the only people that can identify it,

12   yet they do VR, where are all the other folks that supposedly

13   treated all this information so carefully?

14              So one of the responses the Defense -- we have is

15   they say they treated all of this, look what they told us were

16   trade secrets, all of these things.  Now they are saying they

17   are not.

18              So the ones that they are saying right now that are

19   seven, they also didn't treat carefully, they published, they

20   put out on the internet, and so we want to show that they are

21   not actually treating trade secrets or even identifying them

22   properly.

23              THE COURT:  Let me stop you there.

24              Did y'all put out on the internet this, that these

25   were misappropriated trade secrets?
```

```
 1              MR. SAMMI:  No, Your Honor.  The document that she is
 2    talking -- that counsel is talking about, 113, is a legal
 3    document written about cataloguing all the trade secrets that
 4    may have been misappropriated by the defense.
 5              To use that against us is to say -- that's like
 6    saying you argue this in your motion, and now, you know, where
 7    is that evidence at trial?  It's fundamentally prejudicial.
 8              THE COURT:  I get that.  Just because it is
 9    prejudicial doesn't mean it doesn't come in.
10              MR. SAMMI:  Understood.
11              THE COURT:  I have got to think about it.
12              MR. SAMMI:  It --
13              MS. WILKINSON:  Your Honor, could I clarify that?
14              THE COURT:  No, I want you to.
15              MS. WILKINSON:  My point.
16              When I'm talking about what they put out on the
17    internet, they let Mr. Carmack publish an article in 2013 about
18    all of this work on latency mitigation, all these fancy terms
19    you are going to hear.
20              They put out their entire Doom 3 BFG software out on
21    open source so you can see their code.  So there is a huge
22    argument about how they treat anything as trade secrets
23    correspondence and what they actually believed were, and all
24    these other 21 trade secrets they claimed were at the beginning
25    is part of our argument that they really are just kind -- to
```

```
 1    identify anything they can because they're mad that they didn't
 2    invest in this deal and they lost out on $2 billion when they
 3    had the chance to invest.
 4              MR. SAMMI:  Your Honor, may I respond?
 5              THE COURT:  Yes.
 6              MR. SAMMI:  Briefly.
 7              Number one, the blog posts we are talking about is
 8    nine pages of description that contains no source code.  The
 9    open source is a red herring.  It is easy to confuse.  Even
10    ZeniMax put out very old versions of code to their fans and the
11    public, not the code that is in our trade secrets.
12              If the Defendants would like to argue to the jury, as
13    I'm sure they will, that we don't treat our trade secrets that
14    we are claiming in this case as secret, absolutely, that's what
15    we are here for.  But to say that you've identified other
16    know-how and information and then try to pick that apart when
17    it is not even an issue in this case, we don't think --
18              THE COURT:  All right.  I am going to grant it for
19    now, but I want you to know it is a pretty close call.  It's a
20    pretty close call.  This could change depending upon what some
21    of your witnesses say and what evidence comes in.
22              Ms. Wilkinson -- you may open that door to her to be
23    able to go, now, wait a minute, wait a minute, you claimed this
24    was a trade secret.  Kind of depends.  So I'm going to listen
25    for that.  It means you can't do it in your opening statements,
```

1    but it may come in later on.

2            I mean, you're still going to be able to argue, I'm

3    assuming, hey, these folks handle their trade secrets like -- I

4    mean, I'm not trying to preclude you from being able to make

5    that.

6            MS. WILKINSON:  Understood, Your Honor.  In Doom 3

7    BFG they do say the trade secret and copy mark -- copyright and

8    we are -- it is central.

9            THE COURT:  They say it --

10           MS. WILKINSON:  They say that this was something that

11   they gave to Oculus.

12           THE COURT:  I know.  When did they say that it was a

13   trade secret?

14           MS. WILKINSON:  They've said that since the

15   beginning.

16           THE COURT:  In the court?

17           MR. SAMMI:  Yes.

18           THE COURT:  In our court?

19           MS. WILKINSON:  Yes.

20           MR. SAMMI:  Yes.  No, no.  When we -- absolutely,

21   Judge.  We have identified our source code as trade secrets.

22   Doom 3 BFG -- first of all, we have to clear something up.

23   There are many different versions --

24           THE COURT:  Stop.

25           Do you claim it as a trade secret, yes or no?

```
 1              MR. SAMMI:  Not the open source version, Your Honor.
 2    We never have claimed the open source version of code as a
 3    trade secret.  Hence the distinction there are multiple
 4    versions of these millions of lines of code.  I don't mean to
 5    belabor the point, Your Honor.  I apologize for that, but
 6    it's --
 7              THE COURT:  No, no.  I get it.
 8              What you're saying is once Chevrolet -- it wouldn't
 9    be Chevrolet.  It's been a long time since they had some kind
10    of unique vehicle.
11              Once Lexus puts out the new car, you know, everybody
12    can look at that one.  And that's it, and they can look at it
13    and see what it is.
14              MR. SAMMI:  Right.  But what we --
15              THE COURT:  But until you've got it out or whatever
16    the most current is, you're saying, hey, that's the one we're
17    claiming.
18              MR. SAMMI:  Yes, and --
19              THE COURT:  Did you at some point claim the old
20    version as a trade secret?
21              MR. SAMMI:  No.
22              THE COURT:  Why wouldn't you?
23              MR. SAMMI:  The -- no.  When it was secret,
24    absolutely.
25              THE COURT:  When it was the new version?
```

1          MR. SAMMI:  Yes.  When it was -- before it was open

2    source, absolutely.

3          THE COURT:  When it was a new version?

4          MR. SAMMI:  The new -- I'm sorry?

5          THE COURT:  When the old one was the new one --

6          MR. SAMMI:  Yes.

7          THE COURT:  -- you originally claimed it as a trade

8    secret.

9          MR. SAMMI:  That's correct.

10          THE COURT:  And then it became something less later

11    on.

12          MR. SAMMI:  That's correct.

13          And we have a fan base that loves to work with us and

14    we make certain code open to --

15          THE COURT:  What were you going to say,

16    Ms. Wilkinson?

17          MS. WILKINSON:  Your Honor, it's during the exact

18    time period of when they're alleging our clients stole trade

19    secrets.  So one of the key time periods is June 2012, and they

20    say that it was a secret then.  Then they put it out in

21    November of 2012, so Doom BFG --

22          THE COURT:  You can ask just what I did, much more

23    enjoyably than I did, about originally this was a trade secret,

24    but it's not now.  You can do that.

25          MR. SAMMI:  And we can bring out that they put it on

```
 1    the internet and made the old version --
 2              THE COURT:  You can say whatever it was.  I mean,
 3    that the old version is no longer a trade secret, but now this
 4    one is.  But it was originally labeled as a trade secret.
 5              MS. WILKINSON:  They did label it, but they didn't
 6    have it out on the internet.  That's right.
 7              THE COURT:  I mean, you just admitted --
 8              MR. SAMMI:  It's not a requirement, Judge, for us
 9    to label --
10              THE COURT:  I agree.  I didn't say there was.  But
11    it's okay for them to go back and say originally it was a trade
12    secret, but that's not what you can say.  But that's not what
13    we're fighting about here.
14              MR. SAMMI:  That's actually right, Your Honor.
15    That's not what we're fighting about there.
16              THE COURT:  I know.
17              MR. SAMMI:  I'm sure --
18              THE COURT:  You're a great lawyer, and you'll be able
19    to clear that right up.
20              MR. SAMMI:  I'll try my best.
21              THE COURT:  Oh, you'll be good.
22              MR. SAMMI:  I'll try my best.
23              THE COURT:  Okay.  So we've got that one.
24              MR. SAMMI:  May I respond to one more -- may I come
25    back to the indemnity just for a moment, Your Honor?
```

1          THE COURT:  No.

2          Maybe in a minute.

3          Let's go through the rest of these.

4          This head mount display stuff.

5          MR. SAMMI:  Yes, sir.

6          THE COURT:  Y'all produced this right at the very

7    end, maybe even before you got hired.

8          MS. WILKINSON:  No.  It was right around that time,

9    Your Honor.

10          THE COURT:  Okay.

11          MS. WILKINSON:  Maybe I should let Ms. Keefe handle

12    it because she was -- she knows more about it.

13          THE COURT:  I just want to know why you waited until

14    the very end.  That's not a good thing.  The very last day of

15    discovery.

16          MS. KEEFE:  So we actually already informed them that

17    these existed, and we were trying to gather them all together.

18    And so we had told them that they existed earlier than the very

19    end.  They said they didn't want to come see them or they

20    didn't actually come and see them, and so when we said we were

21    going to use them, they finally said, well, we need to see

22    them, so we made them available for them.  These are just a

23    collection of head-mounted displays that Mr. Luckey had been

24    collecting in his time in working on VR from the very

25    beginning.

1          THE COURT:  These are his earlier versions?

2          MS. KEEFE:  These are versions that he had been

3    collecting.  These are not earlier versions of his device.

4    This is so --

5          THE COURT:  Somebody else invented these things?

6          MS. KEEFE:  It's to show -- exactly.  It's to show

7    that he had been working on VR, that this is something that he

8    had been doing all along to also show exactly how much he knows

9    about it.

10          One of the things that Plaintiffs keep trying to do

11    is trying to say that Mr. Luckey doesn't know what he's doing

12    or Mr. Luckey doesn't really know about head-mounted displays

13    or VR, and this is another way to demonstrate exactly how deep

14    his knowledge is.

15          THE COURT:  He was a kid.

16          MS. KEEFE:  Yes.  Who had been involved the whole

17    time.

18          THE COURT:  Okay.  I watched August Rush this weekend

19    where the kid was leading the concert, and he's about ten years

20    old and went to Juilliard.  I get all that.  He was still a

21    freaking kid.  My gosh.

22          MS. KEEFE:  Absolutely.

23          THE COURT:  How much he knew or didn't know, y'all

24    are going to test him when he gets -- I'm assuming he's going

25    to testify.

```
1              Is he here?

2              MS. KEEFE:  Yes, he is, Your Honor.

3              THE COURT:  Where is he?

4              MS. KEEFE:  This is Mr. Luckey right here.

5              THE COURT:  Is this the first time you've ever had a

6    suit on in your life?

7              MR. LUCKEY:  No, Your Honor.

8              THE COURT:  Almost.

9              MR. LUCKEY:  Almost, Your Honor.

10             THE COURT:  Yeah, that's correct.  I thought so.

11             All right.  Good to meet you, sir.

12             How old are you now?

13             MR. LUCKEY:  24 years old.

14             THE COURT:  Well, good.  You're all cleaned up and

15   look good.  That's great.

16             Thank you for being here.

17             And I'm assuming Mr. Carmack is here somewhere.

18             MS. WILKINSON:  He's right here, Your Honor.

19             THE COURT:  Oh, there's Mr. Carmack.

20             And Mr. Carmack kind of discovered Mr. Luckey; isn't

21   that right?  That's the relationship?  He sort of brought him

22   to this first company, right?

23             MR. CARMACK:  Yeah, I found him online and used his

24   head-mounted display at the E3 trade show.

25             THE COURT:  Okay.  Here's the way you answer that
```

1    question:  "Yes, Your Honor."  Okay?

2            MR. CARMACK:  Yes, Your Honor.

3            THE COURT:  Thank y'all.  Y'all be seated.

4            MR. SAMMI:  Your Honor, may I respond on the

5    headsets?

6            THE COURT:  Yes.  What about that?  What --

7            MR. SAMMI:  Yes.

8            THE COURT:  I mean, they just want to show him off

9    because he understands all this stuff.

10           MR. SAMMI:  Well, you know what, that would be fair,

11   Judge, in my view if during discovery, before I took

12   Mr. Luckey's deposition, number one, they had told us about it;

13   number two, before expert discovery is over, so my experts

14   could look at it.

15           Number three, Mr. Luckey can testify about what he

16   did, but to now, 23 minutes before discovery is over, say we've

17   got a personal -- and they call it a personal collection of

18   headsets that Mr. Luckey has.

19           MS. WILKINSON:  You're --

20           THE PLAINTIFF:  May I have a moment?

21           THE COURT:  I love it when y'all jump up and down.

22           MS. WILKINSON:  Your Honor --

23           Whoa, whoa.  You can do it when he gets through.

24           MR. SAMMI:  Where was I?

25           So 23 minutes before discovery is over, they say

1  Mr. Luckey has a personal collection of headsets, some of which

2  he had something to do with and others that he's collected from

3  outside.

4       To roll 62 of those into this courtroom in front of

5  the jury when we have had no opportunity to depose him on it

6  and to have him testify, there will be confusion about did he

7  create them all from scratch?  Which ones are a collection?

8  Which ones are not?

9       We have asked in discovery for -- as a number one

10  interrogatory -- number one discovery request, Your Honor, and

11  I'll sit down --

12       THE COURT:  Stop.

13       Ms. Wilkinson.

14       MS. WILKINSON:  I'm just going to say, Your Honor, we

15  won't bring them in.  We could take a few pictures.  We don't

16  need to have a big fight.  It's not --

17       THE COURT:  Here's what I'm going to let you do.

18       MS. WILKINSON:  Thank you.

19       THE COURT:  Don't bring them all in.  You can talk

20  about "I've been studying this since I was in diapers" or

21  whatever.  I don't know when he started looking at them.

22  And -- and he had seen a lot of these, knew what was going on a

23  little bit, got interested in it, and you can show two or three

24  of them.

25       MS. WILKINSON:  Great.  Thank you, Your Honor.

```
 1              THE COURT:  All right.  23 minutes.  You got it down.
 2              MR. SAMMI:  (Indicating.)
 3              THE COURT:  Good job.
 4              MR. SAMMI:  That's not me.  It's the team.
 5              THE COURT:  Well, somebody got it down.  That was
 6   good.
 7              MR. SAMMI:  Your Honor --
 8              THE COURT:  I get your point, but some of that still
 9   has got to come in because of what -- his background.  He
10   didn't just wake up one day -- because you're going to want to
11   cross-examine him about all that anyway.
12              MR. SAMMI:  Yes.  And that's great, Judge.  But he
13   can talk about it, but to roll them in and say --
14              THE COURT:  Oh, you want me to let it back in because
15   I've already --
16              MR. SAMMI:  I'm sitting down already, sir.
17              THE COURT:  Okay.  Great.
18              "The quantum of damages sought are obtained in other
19   civil actions."
20              What in the heck does that have to do with anything?
21              MR. SAMMI:  Exactly.
22              THE COURT:  I mean, I don't get it.
23              MR. SAMMI:  I don't either, Judge.  This case is
24   about this case.  And what the motion --
25              THE COURT:  Ms. Wilkinson, why do you need to say
```

```
 1   they've asked for too much money in other cases?

 2            MS. WILKINSON:  We're not going to say that, Your

 3   Honor.  It's just to cross-examine Mr. Jackson.  Mr. Jackson

 4   says that --

 5            THE COURT:  Who's Mr. Jackson?

 6            MS. WILKINSON:  He's their damages expert.

 7            THE COURT:  Okay.

 8            MS. WILKINSON:  So he says I didn't really value the

 9   trade secrets.  It's the deal that shows me the value, the

10   $2 billion price tag from Facebook shows me -- from Facebook

11   shows me the price.

12            So we want to say, well, you've done these kind of

13   calculations in other cases, and you don't do it that way.  You

14   don't ask for damages.  That way you actually value these trade

15   secrets or you value the trademarks or the copyrights, so it's

16   only in the context of cross-examining him that other damage

17   requests are asked.

18            THE COURT:  But they were in suits involving him and

19   his other --

20            MS. WILKINSON:  Yes, him, as the witness.

21            THE COURT:  No.  Other suits involving ZeniMax.

22            MR. SAMMI:  No, Your Honor.  It's about his

23   methodology.  It's not about him.

24            THE COURT:  What about that?

25            MR. SAMMI:  Your Honor, you can question an expert
```

1    witness on his methodology, but that's not saying, well, have

2    you ever testified on an X number of dollars in this case or --

3              THE COURT:  Not in this case.  I agree.  But he can

4    go back and say -- she can go back and say, look, your normal

5    methodology is something different than this, and you've done

6    this and that, this and that.

7              MR. SAMMI:  Sure.  And she can question his -- or any

8    lawyer from their side can question our damages expert's

9    methodology, but to say -- for example, you've never given a

10   damages opinion this large, have you?  You know, the quantum,

11   the amount is what is the problem.  There's a difference

12   between the methodology and the amount.  It has no --

13             THE COURT:  Yeah, yeah, I agree you can't -- you've

14   never done one this big.  That's a different deal.

15             MR. SAMMI:  Yes.  Thank you, Your Honor.

16             THE COURT:  I agree.

17             Okay.  So with regard to it being this big, it

18   just -- it just is what it is.

19             Okay.  Next one, leak of the non-disclosure

20   agreement.

21             Tell me about that.

22             MR. SAMMI:  Sure.  When this case was first filed,

23   the non-disclosure agreement, the NDA between Palmer Luckey and

24   ZeniMax was attached as a sealed exhibit to the complaint.  It

25   was on the internet.  I don't know how it got on the internet.

 1   Mr. Luckey had -- I think the testimony --

 2            THE COURT:  It was a document in this case that both

 3   sides agreed should not have been produced, and it got shown

 4   somehow.

 5            MR. SAMMI:  Somehow, yes.  Yes.

 6            THE COURT:  Now, what about that, Ms. Wilkinson?

 7            MS. WILKINSON:  Your Honor, it depends on who they

 8   call to the witness stand and the motivation for leaking that.

 9   That's it.  It's the only thing, because -- excuse me.

10            MR. SAMMI:  Sorry, I apologize.  I apologize.

11            I'll sit down.  My turn to sit.  I apologize.

12            MS. WILKINSON:  *New York versus Washington* -- I

13   thought I talked a lot.

14            THE COURT:  You know, I knew I was going to have

15   Yankees here, but, you know -- when one of you is up, if you'll

16   just wait, I promise I'll listen to the other one.

17            MR. SAMMI:  Thank you, Your Honor.

18            THE COURT:  Okay.  Go ahead.

19            MS. WILKINSON:  So, Your Honor, one of their claims

20   is that Facebook ignored or wasn't aware of and then when they

21   were aware of ignored the non-disclosure agreement.

22            So we believe they leaked that to try and make

23   Facebook look bad.

24            THE COURT:  Yeah, but you don't know that they leaked

25   it, do you?

```
 1                MS. WILKINSON:  We do.

 2                And why would we leak it, Your Honor?

 3                THE COURT:  I don't know why anybody does anything.

 4     I quit trying to figure that.  I mean, that didn't -- I don't

 5     know -- unless you can prove that they leaked it.

 6                MS. WILKINSON:  I won't do it unless I come up to the

 7     bench, and I talk to Mr. Sammi.

 8                THE COURT:  All right.  Then I grant it.

 9                So it will be one of those Perry Mason moments.

10                MS. WILKINSON:  Right.

11                THE COURT:  Okay.

12                Do you know what a Perry Mason moment is, sir.

13                MR. SAMMI:  I do, sir.

14                THE COURT:  We'll get the music.  I'll even play the

15     music.  I'll get it.  Okay.

16                "Financial difficulties faced by either Plaintiff."

17                They don't have any -- I don't know.

18                What financial difficulties that ZeniMax has?

19                MR. SAMMI:  Sure.  And that's -- yes, Your Honor.

20     That's the subject of the motion, we think.  There's been lots

21     of deposition questions to our witnesses about oh, isn't --

22     wasn't id a failing studio, a failing studio.  You guys were

23     failing, and you had financial difficulties, so you're just

24     trying to get a payday for this case.

25                THE COURT:  Now, they can go into whether what they
```

```
 1    were doing was working or successful.  I don't want you to go
 2    into whether they're losing money.
 3              MR. SAMMI:  Yes.  Thank you, Your Honor.
 4              THE COURT:  Other than -- other than just, wait a
 5    minute, on your financial page, this or that, this or that.
 6    But you can't go, oh, you're -- y'all are suing here because
 7    you need money.  That's not -- that's not a fair shot.
 8              MR. SAMMI:  That was the concern, Your Honor.
 9              THE COURT:  A fair shot is you were over here and you
10    tried to do this.  That didn't work.  You're over here, and you
11    tried to do this and that didn't work.  That's okay.
12              Does that make sense?
13              MS. WILKINSON:  Yes.  And there's a few other
14    examples --
15              THE COURT:  Okay.  Give me some other ones.
16              MS. WILKINSON:  -- since I have the opportunity, Your
17    Honor.
18              THE COURT:  You bet.
19              MS. WILKINSON:  One is, it is not just id, it is also
20    ZeniMax, and their share price changed over time, and so it
21    shows did they really value the -- we want to show their
22    financials.  They don't value their -- these supposed trade
23    secrets anywhere on their financials and that they -- if they
24    thought VR was very valuable, the rest of their business was
25    not going as well, and so they're asking for $2 billion saying
```

1    these are what these trade secrets are worth.  It is not they

2    need money, therefore, they're asking for this big amount of

3    money.

4              THE COURT:  Okay.

5              MS. WILKINSON:  It's how did they treat the trade

6    secrets, and for Mr. Altman, if he testifies, he's biased, how

7    much of the company he owns and how much it is worth.  So it's

8    not financial difficulty, but I don't want --

9              THE COURT:  He's the financial backer.  He's not

10   the --

11             MS. WILKINSON:  No, he's the CEO and chairman, Your

12   Honor.

13             THE COURT:  Yeah, but he's not the engineer-type guy,

14   right?

15             MS. WILKINSON:  No, sir.

16             THE COURT:  Right.

17             MS. WILKINSON:  But he -- if he testifies, true of

18   any of their witnesses --

19             THE COURT:  He's got to put all of the money up.

20             MS. WILKINSON:  Yes.

21             THE COURT:  Most of the money up anyway.

22             MS. WILKINSON:  Yes.

23             THE COURT:  Okay.  All right.  What about that?

24             MR. SAMMI:  Your Honor, the -- first of all, ZeniMax

25   is not a publicly traded company.  It's private.

1          Number two, the cost accounting, we don't put
2    technology -- we're not in the business of cataloguing and
3    valuing IP when it is in-house and our engineers are working on
4    it and developing.  It is only when it comes into a commercial
5    product.
6          The whole point here is that we didn't -- we didn't
7    value it internally.  A fair market value was put on our trade
8    secrets by a third party purchasing it for $2 billion, and our
9    internal accounting of -- we don't even keep track, and this is
10   a huge fight through this litigation.  You know, give us, you
11   know, your line item for this VR.  We don't even keep track.
12   We keep track of a game which takes years to make.
13          THE COURT:  Okay.  But that doesn't affect
14   admissibility.  You get to make your argument; she gets to make
15   her argument.  So I'm denying that one.
16          Okay.  Robert Altman's prior litigation, why does
17   that come in?
18          MS. WILKINSON:  As I said, Your Honor, it shouldn't
19   if the litigation against us isn't going to come in.  I mean,
20   there is an explanation, and there was for the indemnity, but
21   since you granted that motion, we wouldn't bring it in.
22          One of the witnesses may say that they were, you
23   know, aware of Mr. --
24          THE COURT:  Look, I get it, I get it, but I think
25   both sides are litigious, period, based on what I'm reading

```
1   here.  I'm not faulting you for that.  You've got a good
2   lawsuit, great.  Lawyers are going to make a lot of money.  A
3   bunch of lawyers are here making a lot of money.  Hallelujah.
4   Praise the Lord.  That's great.  I don't have any problem with
5   that.
6           And -- it's just -- I don't know why it's relevant,
7   why is either of the lawsuits relevant?  They are litigious and
8   you are litigious.
9           MR. SAMMI:  It goes back to, Your Honor -- I think we
10  have taken care of this -- that the evidence in those other
11  litigations as it relates here, I think, you've ruled on.
12          THE COURT:  Yeah, I've already ruled on that.  I
13  don't think his litigiousness comes in or not.
14          MR. SAMMI:  Understood.  We -- they haven't even
15  pointed any other litigation that ZeniMax has filed in this
16  whole case.
17          THE COURT:  Maybe it's he individually.  I don't
18  know.
19          MR. SAMMI:  I -- I don't know.  I can't find it in
20  the papers at all.
21          THE COURT:  I granted it.
22          Okay.  You win on that one.
23          MR. SAMMI:  Thank you, Your Honor.
24          THE COURT:  Okay.  And, then, let's see.  Mr. Carmack
25  filed some at the last minute here, and this has to do with --
```

1    was this regarding all the other stuff found on his computer?

2             MR. SMITH:  Yes, it is, Your Honor.  May I?

3             THE COURT:  Do you want to go into all that?

4             Wait.  No.  You answer that first.  That may keep me

5    from having to deal with that.

6             MR. SAMMI:  Other stuff, meaning -- I think he's

7    talking about the Rage code, and that absolutely is related to

8    virtual reality found on his computer.  The 10,000 documents

9    that he downloaded, we have expert testimony and evidence from

10   those 10,000 documents that they contain documents and code

11   directly related to virtual reality, absolutely, Your Honor.

12            THE COURT:  Stop.  Now make your argument.

13            MR. SMITH:  If I may, Your Honor, this relates to the

14   USB drive that Mr. Carmack copied files onto as he was getting

15   close to leaving id Software.

16            THE COURT:  Yes.

17            MR. SMITH:  The only claim in the case that depends

18   upon that USB drive is the conversion claim, and the only

19   remedy they seek is return of it.

20            That has already been returned to them.  They have

21   taken physical custody of it.  We have also offered to have the

22   other files that are subject to the conversion claim be deleted

23   from his computers.  They have refused that offer, insist that,

24   in fact, Mr. Carmack has to keep possession of these files so

25   that they can complain about him keeping possession of the

 1    files.

 2              We don't think that that sort of duplicitousness

 3    should be permitted to be brought to the jury's attention.

 4              THE COURT:  Wouldn't it be pretty good for you to be

 5    able to say we offered, and they wouldn't even take it back?

 6              MR. SMITH:  Be happy to, but then that just drags

 7    Mr. Carmack through the mud for having copied the things in the

 8    first place when the complete relief that they sought has

 9    already been either given to them with respect to the USB drive

10    or offered to them with respect to the others.

11              THE COURT:  Stop.  Go ahead.  Stop.  Stay there.

12              MR. SAMMI:  Your Honor, first of all, the files have

13    been commingled with other files, and the offer is we will

14    delete those from our computers, and we said we can't delete

15    evidence, we have to present evidence of what's on the complete

16    computer, because on the USB drive, it was plugged in to an

17    Oculus computer, and those files are all together.  So when

18    counsel says we offered to give them back by deleting your

19    portion off, we say we can't do that because we have to have

20    evidence of the case.

21              The USB drive is critical to spoliation because in

22    last three days before his contract was up, Mr. Carmack plugged

23    that USB drive in and took those 10,000 documents on it.

24              They produced.  We got it.  We don't want to use it

25    for any other evidence that's not on there.  It's not related

1  to VR.

2       THE COURT:  And?

3       MR. SMITH:  Again, Your Honor, evidence of spoliation

4  of a matter that has already been fully resolved by giving them

5  the full relief they seek with respect to that USB drive.

6       THE COURT:  Okay.  I'm going to overrule your motion

7  in limine but just maintain that you can only go into the

8  things related to the virtual reality.

9       MR. SAMMI:  Virtual reality, yes, sir.

10      THE COURT:  And you can continue to object if there

11 is something -- if there is a sweet note to his wife or

12 something and they want to offer that, you can object.

13      MR. SAMMI:  And for those documents, Your Honor --

14 that's fine.

15      Our claims regard our trade secrets as well as unfair

16 competition and breach of contract.  Those documents are id

17 property, and in order to talk about those documents, there are

18 confidential documents regarding game code as well as VR and --

19      THE COURT:  Whoa, whoa, whoa.  Game code, that's

20 something involving other things?

21      MR. SAMMI:  It's not, Your Honor, because game code

22 is the -- the way this works is that all of the work that we do

23 on games is putting you one step into virtual reality.  All the

24 MegaTextures, the lighting, the 3D effects, all of that code is

25 useful for VR.

```
 1            You can't just take VR in a vacuum.  You need your
 2  code around you, like I need all this paper around me.  And
 3  that's very critical, and we concede pieces being code drawn
 4  from here --
 5            THE COURT:  Just makes sure it relates to VR.
 6            MR. SAMMI:  Yes.
 7            THE COURT:  If it doesn't relate to VR, you will get
 8  a big fat "ladies and gentlemen of the jury, that shouldn't
 9  have come in, that shouldn't have been offered, please ignore
10  that, and the lawyers shouldn't have put that in," kind of
11  instruction.  Okay?
12            MR. SAMMI:  Yes, Your Honor.
13            THE COURT:  All right.  There we go.
14            Is that it?
15            MR. SAMMI:  Your Honor --
16            THE COURT:  That's everything.  Is there anything
17  else?
18            There's bound to be some more stuff y'all want to
19  talk about.
20            MR. SAMMI:  I need to return to indemnity if you will
21  let us, Your Honor.  Just a brief moment, Your Honor.
22            THE COURT:  Okay.
23            MR. SAMMI:  We're not using the indemnity only to
24  show that there is any sort of intent or consciousness of
25  wrongdoing.  It also shows the notice to Facebook.
```

1              The testimony in this case is critical.
2    Mr. Zuckerberg himself was apprised of Mr. Carmack, at the
3    eleventh hour, seeking an unlimited indemnity and never
4    apprised the board of Facebook.
5              That shows Facebook's knowledge of the fact that our
6    goods were stolen.  Mr. Carmack is basically saying, listen,
7    I'm not going to get 100 -- I'm not going to take $100 million
8    from you unless you give me unlimited protection.  Unlimited
9    protection.  For what?  Not any general lease, not insurance,
10   nothing.  This -- my work on VR with ZeniMax.  Very specific.
11             And Facebook said, okay, and that was the holdup to
12   the entire deal.
13             It shows notice to Facebook.  There is a Fifth
14   Circuit case on *DSC* that I would respectfully -- is in our
15   briefing, Your Honor.  The indemnity is -- it is a huge part of
16   showing how all of this happened.
17             THE COURT:  I am unmoved.  Okay?  I don't agree at
18   all with you.  I mean, I don't think this one is a close one.
19   I mean, I just think people protect themselves.  That's not
20   bad.  It's smart to do that.  He should have done that.
21             I mean, the fact that he thought, hey, maybe there
22   are going to be wild and crazy lawsuits out of this, I'm coming
23   from a company that sues a lot of people.  I mean, all kind of
24   things, you know.
25             There was ice in front of our apartments yesterday.

1    I was worried about somebody slipping and falling.  I thought

2    about going to get an indemnity from all the tenants.  I

3    didn't, but I could have.  That doesn't mean that I'm terrible.

4    It just means I was cautious and thought about it.

5        MR. SAMMI:  Your Honor, if the indemnity law is being

6    negotiated and it has contemporaneous emails with things like,

7    "We're not going to -- Oculus poked the beehive.  We're not

8    going to be responsible for what some crazy judge or jury

9    does," that's the e-mail that --

10        THE COURT:  I didn't say that e-mail wouldn't come

11    in.  I didn't say that.  That's a different deal.  That's not

12    the indemnity.  "We're not going to be responsible for what

13    some crazy judge or jury" -- that's a different thing.

14        You can still approach.  Maybe I'll get moved.  I'm

15    not moved now, but maybe I will get moved.  Okay?

16        MR. SAMMI:  Okay.

17        THE COURT:  You know, I get it.  I know you think

18    that's really important to your case, right?

19        MR. SAMMI:  Yes, Your Honor.

20        THE COURT:  Okay.  I will continue -- I will look at

21    it again.  I will -- do you want me to read that -- what was

22    it?  V -- what was the case?

23        MR. SAMMI:  *DSC*, Your Honor, *DSC*.

24        THE COURT:  *DSC*.  I will read *DSC* again.

25        MR. SAMMI:  Thank you.

```
 1              THE COURT:  I'll look at that again.
 2              MR. SAMMI:  Thank you.
 3              THE COURT:  I understand.  Do you understand why I'm
 4    not letting it in?  I want to make sure you have addressed my
 5    thoughts.
 6              MR. SAMMI:  I do.  I think it is just fundamentally
 7    different than insurance and generalized protection.
 8              THE COURT:  And that's what the cases say?
 9              MR. SAMMI:  Yes.
10              THE COURT:  Okay.
11              MR. SAMMI:  Because -- absolutely not, you know --
12    Your Honor, excuse my language, not "you know."
13              It's absolutely not, "Listen, I have a corporate
14    standard form indemnity."  This was also negotiated saying, I'm
15    not -- I don't want just coverage of my lawyer's fees; I want
16    full settlement.
17              Facebook says Oculus says no, it is just the lawyers,
18    and they say, oh, we'll take it back.  We need to sign this
19    deal.  We need to get you.
20              And they say, no, I need full -- not just lawyer fees
21    but full indemnity.  It shows notice to Facebook, notice to
22    Oculus that you took 10,000 documents and stole our code.  He
23    has computers full of millions of lines of code.
24              THE COURT:  And you are telling me that is what *DSC*
25    says?
```

```
 1          MR. SAMMI:  DSC is related to -- that --- Mr. Hemr,
 2   if you could tell --
 3          THE COURT:  So DSC says indemnities always come in if
 4   they are negotiated and they're not a standard form of
 5   insurance or some other standard form.  They come in to show
 6   your bad intentions.
 7          MR. SAMMI:  No.  That -- Your Honor, it doesn't.  May
 8   I ask --
 9          THE COURT:  No, it doesn't.  I know it doesn't.
10          MR. SAMMI:  Yes.  I'm just trying to draw the
11   distinction between generalized insurance and indemnities in
12   general versus the specific indemnity here, which is very
13   different.
14          THE COURT:  Mr. Hemr?
15          MR. HEMR:  I would say two things.  Number one,
16   Judge, Rule 411 says that liability insurance doesn't come in.
17   That's not what this is.  Number two, the DSC case makes a
18   distinction between forward-looking indemnity and
19   backward-looking indemnity that covers specific acts of
20   misconduct.
21          THE COURT:  Okay.  So maybe I need to look at that,
22   the backward-looking indemnity.
23          That was something you forgot to argue, Mr. Sammi.
24          MR. SAMMI:  I apologize.  That's why I have got
25   smarter people than I.
```

```
 1            THE COURT:  Okay.  Is that that Harvard education
 2  coming out, Mr. Hemr?
 3            MR. HEMR:  Wonderful trade school, Your Honor.
 4            THE COURT:  Oh, it is.  We are proud of those --
 5  those original colonies.  We really improved on it down here
 6  where we were originally a country, you know.  We worked on it
 7  a little bit.  Okay.
 8            MR. SAMMI:  Thank you, Your Honor, for taking
 9  that under --
10            THE COURT:  I will.  And I will look at it again.
11  And so y'all need to know I'll look at that again.
12            Ms. Wilkinson, get your -- who is your book person
13  over here?
14            MS. WILKINSON:  I think -- well, Kosta will be our
15  main book person.
16            THE COURT:  Who will?
17            MS. WILKINSON:  Mr. Stojilkovic.
18            THE COURT:  This man right here?
19            MS. WILKINSON:  Yes.
20            THE COURT:  I will be looking at him then.
21            You go look at that DSC case and be ready to argue.
22            MR. STOJILKOVIC:  Absolutely, Your Honor.
23            THE COURT:  You think you know that stuff?
24            MR. STOJILKOVIC:  I do.
25            THE COURT:  Okay.  All right.  Good.  Did you go to
```

```
 1   Harvard too?
 2            MR. STOJILKOVIC:  No, sir.
 3            THE COURT:  Where?
 4            MR. STOJILKOVIC:  University of Virginia Law School.
 5            THE COURT:  UVA.  Pretty good school.
 6            MR. STOJILKOVIC:  I agree, Your Honor.
 7            THE COURT:  Okay.  Here we go.  That was the right
 8   answer.
 9            All right.  What else do y'all need?
10            MS. WILKINSON:  That is all from us, Your Honor.
11            THE COURT:  Oh, can I ask you just to review one more
12   time the order of jury voir dire, how you -- when you talk --
13            THE COURT:  Hold on.
14            What was that word?
15            MS. WILKINSON:  Jury voir dire.  Oh, my goodness.
16   Voir dire.
17            THE COURT:  Are you going to say soda and pop, too,
18   in here.
19            MS. WILKINSON:  No, Your Honor.
20            THE COURT:  Mercy.  Okay.
21            MS. WILKINSON:  I know you'll make fun of me if I do
22   that.
23            THE COURT:  I'm going to make fun of you anyway, but
24   only because I love y'all.  I love lawyers.
25            Here we go.  So you're worried about, what, the
```

1    order?

2              MS. WILKINSON:  Just the order when you --

3              THE COURT:  So I start.

4              MS. WILKINSON:  Yes.

5              THE COURT:  I will start and I'll read some general

6    things and I will make a general statement about the case, of

7    which I'm happy for y'all to read if you have some objection to

8    it and tell me you want me to correct.  I just make a general

9    reference to it, and then I talk about all of the witnesses and

10   if they know any of them.  They're all going to know

11   Mr. Luckey, because he's famous and he invented Facebook.  I'm

12   kidding.  They're going to know Mr. Zuckerberg, obviously.  And

13   we'll talk about that.  Some of them will think he's Jesse

14   Eisenberg.  Believe it or not, they will, and it's funny how

15   people think.

16             And then we'll just deal with that.  And I will deal

17   with that right then, and we will deal with them individually.

18             I do not want y'all to go individually down the row

19   and ask people questions.  To make up for that, so that y'all

20   don't feel slighted, you can question anyone you want

21   individually up here.  I do this to avoid what I call

22   sermonizing by jurors, prospective venire persons.  So they

23   will not go, well, let me tell you what I know.  I think that

24   Zuckerberg fellow, whatever.  Or they may say I know that

25   fellow put out the money for ZeniMax, and he's dah, dah, dah,

```
 1    dah, whatever.  I won't let them do that.
 2              MS. WILKINSON:  What about hardship, Your Honor?
 3              Do you ask them or --
 4              THE COURT:  I deal with that.  We'll deal with that
 5    up here.
 6              We don't deal with that -- you can -- they can all
 7    raise their hand, and I'll ask them to -- you know, that sort
 8    of thing.  It's not going to be as bad as you might think.
 9    Here's the things that I will grant.  They've already prepaid
10    tickets somewhere, if they're having cancer surgery, that sort
11    of thing.  Here's what I will not let them out for, you know,
12    an appointment to a doctor that they can change that's not for
13    some life-threatening sort of thing, that they're going to have
14    Botox or something and I'm not -- that won't do it.  That
15    won't -- I won't let them out.
16              I won't let school teachers out because they're
17    giving such and such test.  I won't let them out for that.  I
18    don't think any of those are scheduled right now anyway.
19              Individual proprietors, I make them still stay here.
20    I mean, occasionally, I let those people out.  They go, look,
21    I've got a once in a lifetime deal.  I'm selling this invention
22    to this company for $2 billion.  I might let me them out for
23    that.  I really might, so that's what you might see.
24              What other questions?
25              MS. WILKINSON:  That's all.
```

```
 1                THE COURT:  Yeah, you --
 2                MS. WILKINSON:  I assume Mr. Sammi goes first and
 3      then I go second?
 4                THE COURT:  Yes.  And you'll each get about 15
 5      minutes, that sort of thing, and I will do general questions
 6      and that sort of thing.  But don't go down the row because
 7      we're going to be wasting our time.
 8                Everybody raising their hand -- somebody is going to
 9      be keeping a record of that.  I am assuming Mr. Philbin or one
10      of your team --
11                MR. PHILBIN:  Yes, Your Honor.
12                THE COURT:  -- are writing all of that?
13                MR. PHILBIN:  We will, Your Honor.
14                THE COURT:  Okay.  What else?
15                MS. WILKINSON:  That's all.
16                THE COURT:  What else, Mr. Sammi?
17                MR. SAMMI:  That's it for now, Your Honor.  Thank
18      you.
19                THE COURT:  Okay.  I suspect we'll get a jury by the
20      middle of the afternoon.  You know, it may be harder than I
21      think, but I don't think so.  I don't think so.
22                MS. WILKINSON:  Will we go right to openings?
23                THE COURT:  No.  No.  Not unless you really go fast
24      we could.  I will do that if y'all wanted me to.
25                Usually, lawyers kind of like the overnight to worry,
```

```
 1   fuss, you know, pray, and think about all of the -- all of
 2   that.
 3           MS. WILKINSON:  We did that last night, Your Honor.
 4           THE COURT:  Okay.  Okay.  Okay.
 5           MR. SAMMI:  We will bone up on it tonight.
 6           THE COURT:  You know, we'll just see where we are,
 7   and I'll talk about it.  I don't want to push y'all into not
 8   being ready to do whatever you want to do.
 9           Have y'all worked on your exhibits, trying to getting
10   an agreement on your exhibits?
11           MR. SAMMI:  We have removed --
12           THE COURT:  Wait.  Let me ask you this.
13           Have you reached an agreement on a number of
14   exhibits?
15           MR. SAMMI:  We sent 47, 50 of them and asked for a
16   response.  We haven't received it yet.
17           THE COURT:  Okay.  And y'all sent some to them yet.
18           MS. WILKINSON:  No, Your Honor.  We were waiting for
19   their witnesses.  We will send over our -- like, they're going
20   to call Mr. Carmack.  We will send over -- we'll send over our
21   exhibits.  We have no idea what exhibits they want --
22           THE COURT:  I'm not making you do that.  It just
23   saves time.  It'll save time for y'all, this business of --
24           THE PLAINTIFF:  Absolutely.
25           THE COURT:  If you can get your exhibits preadmitted,
```

```
 1    it will help.
 2              MR. SAMMI:  And it was last week, and we said, look,
 3    here's our -- we're not going have 2000 on each side,
 4    obviously.  Here's what --
 5              THE COURT:  How many do you think you're going to
 6    have?  A hundred?
 7              MR. SAMMI:  A hundred maybe, 150.
 8              THE COURT:  How many do you think you're going to
 9    have, Ms. Wilkinson?
10              MS. WILKINSON:  Less than a hundred, Your Honor.
11              THE COURT:  It's not going to be that big a deal then
12    anyway I don't think.
13              Now, if it's -- if one of yours is, yes, and it has
14    4,000 parts, that's a different sort of thing.  That's --
15    lawyers play that game, too.
16              You're not having any of those?
17              MR. SAMMI:  No.  No, Your Honor.  If it's -- if it's
18    one big thing, it's one big thing.  We're not, you know,
19    putting multiples into one.
20              THE COURT:  Are y'all going to mike your witnesses?
21              MR. SAMMI:  We sure can.  I mean, most of our
22    witness -- most of the witnesses we're going to call in our
23    case are theirs.  We're happy to do whatever makes sense, Your
24    Honor.  I know if they move away from the mike --
25              THE COURT:  Well, but then you understand you're
```

```
 1    going to have to put your case on, and I'll tell the jury that
 2    and you'll probably have witnesses here.  I'm just suggesting,
 3    you don't have to, but come sit in this seat, and you will know
 4    what I'm talking about.  Your witness are going to do this.
 5              MS. WILKINSON:  We will, Your Honor.  We told them
 6    that we would like them to wear the microphone that you
 7    recommended that works best up here, so we'll have -- even if
 8    he calls them, we'll put the mike on.
 9              THE COURT:  Yeah, just put the mike on here in his
10    part, too, also, and it will be -- I promise it will be better.
11              What else?  What other questions do y'all have?
12    Problems?
13              Y'all got any problems with anything?
14              MS. WILKINSON:  None.
15              THE COURT:  And the room is working out okay?
16              MS. WILKINSON:  Great.  Judge Stickney --
17              THE COURT:  Okay.  On the record, y'all have agreed
18    to supplement the juror pay $50.00 per person, each side split
19    it, correct?
20              MR. SAMMI:  Yes, Your Honor.
21              MS. WILKINSON:  Yes, Your Honor.
22              THE COURT:  And -- I mean, if y'all don't want to do
23    that, I'm okay with --
24              MR. SAMMI:  No.
25              MS. WILKINSON:  We want to do it.
```

```
 1            THE COURT:  It will make -- I promise they'll be
 2   happier.
 3            And you pay for lunch?
 4            MR. SAMMI:  Yes.
 5            MS. WILKINSON:  Yes.
 6            MR. SAMMI:  Absolutely.
 7            THE COURT:  And I'm going to run it -- I'm going to
 8   appoint a second special master just for this, Mr. Stanton, who
 9   has helping me on the big hip implant case.  He's my special
10   master, and he's already got that all set up.  We'll use his
11   office to run all that through, because we don't want to run it
12   through y'all's anyway.  That wouldn't look right.  So we'll do
13   that, and I'll explain that to them.
14            And if you have any hesitation about that, I'm fine
15   with not doing it.  It's okay with me, so just let me know
16   before I talk to the jurors, though.
17            But you still want --
18            MS. WILKINSON:  We have no hesitation.  Your Honor.
19   We'd like to do it.
20            MR. SAMMI:  None.
21            THE COURT:  Okay.
22            MR. SAMMI:  Your Honor, may I -- I just got passed a
23   note.  I didn't mean to interrupt you.  I'm sorry.
24            THE COURT:  Yeah, I see people passing notes.
25            MR. SAMMI:  During the course of trial we may show,
```

1    obviously, some source code, and I know that there's some law

2    out there that says if I don't move the Court to seal it, then

3    later on the Defendants might argue we're vitiating our trade

4    secrets by publishing it in court, and I don't want to disrupt

5    the proceedings.  We can try to proceed in such a way that the

6    exhibits --

7           THE COURT:  I'll seal whatever you want to seal, but

8    you just need to know there are going to be human beings in

9    here --

10          MR. SAMMI:  Yes.

11          THE COURT:  -- that maybe some other -- I hope they

12   don't have some kind of fancy thing on that makes it able to

13   take a picture.  I don't know.  I'm not strip searching them,

14   okay.

15          MR. SAMMI:  Absolutely.

16          THE COURT:  So I don't know what -- I'm not going to

17   let them take pictures of it and that sort of thing in here.

18          MR. SAMMI:  Okay.

19          THE COURT:  But I've let -- there's a reporter in

20   here right now, and he knows not to take a picture of it.

21          THE REPORTER:  Yes, Your Honor.

22          THE COURT:  But he's going to be writing as fast as

23   he can, you know, whatever -- typing as fast as he can, excuse

24   me.

25          MR. SAMMI:  Thank you, Your Honor.

1          THE COURT:  But, yes, I'm glad to seal that.

2          And you will have the same thing maybe.  I don't

3    know.  Yes?

4          MS. WILKINSON:  Unlikely, Your Honor, but --

5          THE COURT:  Oh, unlikely.  Okay.  All right.

6          But if something does, I'm happy to seal that.

7          MR. SAMMI:  Thank you, Your Honor.

8          And one more thing comes to mind, I apologize for

9    bending the court's ear.  We've asked about any sort of live

10   demonstratives that Defendants want to use with the jury, and

11   I'm not sure of what the plan is.  I wanted to see if we could

12   work together, but we've asked in e-mails what's the plan.  I

13   know they want to put one on you, and that's great.  But if

14   they want to put --

15         THE COURT:  No, I'm not going to do that.

16         MR. SAMMI:  Thank you.

17         THE COURT:  I'll look and see it, you know, whatever.

18   I'm not going to do anything in front of the jury.  I'm not

19   going to do it.

20         MS. WILKINSON:  Oh, no that's not -- excuse me, Your

21   Honor.

22         THE COURT:  No.

23         MS. WILKINSON:  I don't know if that's what he meant.

24   I think we have the demonstration ready.  What we told him is

25   we thought you wanted to see it outside the presence of the

```
 1   jury.
 2             THE COURT:  I don't care.
 3             MS. WILKINSON:  All right.  Then we will show it to
 4   them, and then we'll -- we'll do it --
 5             THE COURT:  Here's what I'm thinking you're going to
 6   do and you help me.  You're going to somehow show on a
 7   projector how this really works.
 8             MS. WILKINSON:  In part.  We actually were going to
 9   bring in the headsets so they can put on the headsets and see.
10             MR. SAMMI:  That's the issue, Your Honor.
11             THE COURT:  You want to do headsets for jurors?
12             MS. WILKINSON:  Yes, we have three sets, so you can
13   do three at a time.  Mr. Sammi and his colleagues can put them
14   on beforehand so they can see exactly -- it's about a minute
15   and a half for --
16             THE COURT:  Why can't you just do that over the --
17             MS. WILKINSON:  Because the whole point of virtual
18   reality is that you're not locking at a screen, is that you're
19   immersed.  And so if you look at that, that's exactly what VR
20   is not.  VR is virtual reality -- because it has a different
21   field to have the whole rest of the --
22             MR. SAMMI:  May I respond, Your Honor?
23             THE COURT:  Let me just say I watched 15 minutes of a
24   program yesterday.  There's a big tech show going on, and they
25   showed how you can do it on the internet -- on this.  So I
```

```
 1    really want you do that.  I don't want them to be -- you can --
 2    they can pass it around, but I'm going to think twice whether
 3    I'm going to let them put it on, okay.
 4              MS. WILKINSON:  Sure.
 5              THE COURT:  I'm not sure I'm going to let you do
 6    that, so you might want to think about -- because I know you
 7    can do -- yes, it's not the whole experience, and I get all of
 8    that, but it --
 9              MS. WILKINSON:  But I can pass around the headsets.
10              THE COURT:  You can pass around the headsets, and
11    they can look at it and that sort of thing, but whether we're
12    going to do the demonstration for the jurors, I'm very
13    reluctant to do that.
14              MS. WILKINSON:  Why don't I go back and talk to our
15    team --
16              THE COURT:  See what you can do.
17              MS. WILKINSON:  Yes.
18              THE COURT:  And I'll stay open to what -- I want to
19    let you do kind of what you want to do.  I get that, but I'm
20    not going to have jurors -- we didn't do hip implants on them.
21    We did not.  We did pass them around.  They did look at those,
22    and that sort of thing.  So, you know, --
23              Well, you object to that?
24              MR. SAMMI:  Yes, Your Honor.  Under your
25    consideration, while you consider the issue, number one,
```

1   there's been narcotics cases where you don't have the jury try

2   the narcotic.

3             THE COURT:  No.  But they do get to see them.

4             MR. SAMMI:  Also, it's -- we're not able to control

5   what each juror sees, and each juror can see a different thing,

6   number one.

7             Number two, there's issues with nausea that may come

8   up from jurors.

9             THE COURT:  Yeah, and I was surprised they talked

10  about that.  One of the hotshots -- I can't remember his

11  name -- it was on that show.  Y'all would know him if I could

12  remember his name.  He was talking about that he got nauseas --

13  nauseated.  I'm assuming it's something like -- like

14  seasickness.

15            MR. SAMMI:  Yes.  And, you know, the unfortunate

16  thing about it is that if we --

17            THE COURT:  Or like if you ride a ride at the fair or

18  something.

19            MR. SAMMI:  If we have a claim that we invented this

20  technology and --

21            THE COURT:  And it makes you sick.

22            MR. SAMMI:  -- they don't like it and it makes

23  somebody sick, it's -- there's a whole host of issues, Judge.

24  We won't be able to see what each juror sees, and each juror

25  won't see the same thing.

```
 1              For example, in one of the demos, if you look this
 2     way, you see a billboard of Mr. Luckey.  I mean, it's --
 3     it's -- I've got some --
 4              THE COURT:  You saw what the big gripe about it is it
 5     hasn't come very far.  People now expect everything to be what
 6     they showed Tom Cruz in that minority report.
 7              MR. SAMMI:  Yes, when he was doing this and moving
 8     the things around.
 9              THE COURT:  Well, or what was the TV shows with the
10     forensic --
11              MR. SAMMI:  CSI?
12              THE COURT:  When they (indicating).
13              MR. SAMMI:  Yeah.
14              THE COURT:  The three or four shows that do that.  I
15     think Hawaii Five-0 does the same thing.
16              MR. SAMMI:  Your Honor, as I said, I don't think we
17     need to go through the rest of it.  We'll go back and talk and
18     we'll come back to court --
19              THE COURT:  If you can't agree on documents, I'm okay
20     with that.  It would just -- it would give you some more time.
21     I mean, it just gives you more time.  I'm happy to rule on them
22     as they come and that sort of thing, and that's fine, if that
23     is what y'all want to do.  It just saves time.  But that's
24     okay.  Do as much as you can.
25              Anything else?
```

```
 1              Ronnie is going to send you the signed
 2   questionnaires.
 3              THE CLERK:  They've already got them.
 4              THE COURT:  They've already got them.  Y'all have
 5   already got them.  So you -- so somebody is already looking at
 6   them I'm assuming.
 7              Okay.  So work on those.
 8              And the jurors I think are ready to come up.
 9              So there we go.
10              So I'm assuming we'll get cranking here in the next
11   10 or 15 minutes.  Probably about 10:30 they'll have them up
12   here out here.
13              Any other questions?  They all have numbers.
14              MS. WILKINSON:  And will we get a list of the names
15   separate from the questionnaires?
16              THE COURT:  Yes, ma'am.
17              MS. WILKINSON:  Great.
18              THE COURT:  Yes, ma'am.
19              Anything else?
20              MR. SAMMI:  Thank you, Your Honor.
21              THE COURT:  Okay.  Y'all are going to sit on this
22   side of your -- for that?
23              MR. SAMMI:  Yes.
24              THE COURT:  And make sure you -- when you do that,
25   you're going to have your back to the court reporter, so you're
```

1    going to have keep your voices up very loud or mike yourselves.

2          You know, that is the other thing.  We had to -- the

3    acoustics are terrible in here, and so it is very hard to hear.

4    So I'm trying to think how we've done it in the past.

5          If you're going walk around, you are going to have to

6    mike yourself.  Okay?

7          MS. WILKINSON:  Yes, sir.

8          THE COURT:  If you're going to do that, you know,

9    walk in front there and kind of do that, that's okay, but

10   otherwise you are going to have to stay in front of a

11   microphone.  Okay?

12         MR. SAMMI:  Sure.

13         THE COURT:  Do y'all have any of these?

14         MR. SAMMI:  We have them, yes.  I think we have them.

15         THE COURT:  Do you have any of these, Ms. Wilkinson?

16         MS. WILKINSON:  We do, Your Honor.

17         THE COURT:  You do?

18         MS. WILKINSON:  Yes.

19         THE COURT:  And you only have three of these

20   headsets?

21         MS. WILKINSON:  No, we have more.  We just -- they

22   come with the setup, and we only thought three would fit in the

23   courtroom.

24         THE COURT:  Okay.  All right.  However y'all want to

25   do it.  Okay.

1          Off the record.

2          (Discussion off the record)

3          (Recess from 10:16 to 11:00.)

4          THE COURT:  Y'all can sit down.

5          Here's the deal.  With regard to -- we're going to

6    run it through -- we're going to still use -- I'm not going to

7    issue a separate order to make another master.  We'll just keep

8    the one master with Daniel Denton, but I'll kind of run it

9    through the other lawyer that I mentioned, his account, because

10   we've already got it set up and how to do it, and then he will

11   bill Daniel.  Daniel will bill y'all.  And we'll get it done

12   that way.  I think we can do it that way cleanly.

13         Let's see.  Oh, I've looked again at this issue of

14   indemnity.  I'm still not -- still not -- and it's not a

15   circuit case.  It's just another trial judge.  Some poor --

16   some poor sole struggling like I am out here, and I'll let you

17   know in the morning if I change my mind.  At this point I'm

18   not, but I'll look at some other things.

19         Some of the other circuits are much clearer about it

20   and just say absolutely not, but it's a -- you know, it's an

21   important -- I get it that it's an important issue and what

22   y'all are arguing about with regard to that, but I'll let you

23   know for sure before you do your opening statements tomorrow.

24         Okay.  I think that's it.

25         Okay.  What else?  Anything before we bring them in?

```
1            MR. SAMMI:  Judge, one point.  I think I'm not able
2    to reach an agreement with the Defendants on some set of
3    exhibits I want to use in the opening.
4            THE COURT:  Well, let me see them.  We're not doing
5    an opening right now.
6            MR. SAMMI:  For tomorrow, just, you know --
7            THE COURT:  Well, fine.  I'll look at them.  Maybe by
8    tonight y'all will warm up.  You'll have some chicken fried
9    steak in you and become more reasonable.
10           MR. SAMMI:  Will do.
11           THE COURT:  We'll work on that a little bit.  Y'all
12   try harder, okay?
13           Okay.  Y'all are going to come to the podium.  That's
14   good.
15           And, Ronnie, you've got that turned around.  Wherever
16   you are, thank you.
17           Are we ready to bring them?
18           MS. WILKINSON:  Your Honor, I have a mike unless you
19   would rather me to be in front of the podium.
20           THE COURT:  I'm happy with you having a mike.  That's
21   good.
22           Have you ever used one?
23           MS. WILKINSON:  I have.
24           THE COURT:  All right.  What are y'all doing?
25           MR. SAMMI:  If I don't have a mike, if I keep my
```

```
 1 │ voice up nicely --
 2 │         THE COURT:  You won't be able to keep it up enough, I
 3 │ promise you.  You are going to have to stay at the podium.
 4 │         MR. SAMMI:  Okay.
 5 │         THE COURT:  You just can't when you have your back in
 6 │ here.  It just doesn't work.  I mean, unless you're talking
 7 │ like this, and you're not going to, that loudly.  You don't
 8 │ want to shout at the jurors.
 9 │         MR. SAMMI:  No.
10 │         THE COURT:  All right.  Okay.
11 │         Where is Ronnie?
12 │         (End of Pretrial)
13 │
14 │
15 │
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
```



1                                INDEX
2  Pretrial................................................. 9
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          I, TODD ANDERSON, United States Court Reporter for the

2     United States District Court in and for the Northern District

3     of Texas, Dallas Division, hereby certify that the above and

4     foregoing contains a true and correct transcription of the

5     proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 9th day of January, 2017.

7

8

9                              /s/Todd Anderson
10                             TODD ANDERSON, RMR, CRR
                               United States Court Reporter
11                             1100 Commerce St., Rm. 1625
                               Dallas, Texas  75242
12                             (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25