```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF TEXAS

 3                      DALLAS DIVISION

 4

 5  ZENIMAX MEDIA INC. and ID    )      3:14-CV-1849-K
    SOFTWARE LLC                 )
 6            Plaintiffs,        )
                                 )
 7                               )
    VS.                          )
 8                               )      DALLAS, TEXAS
                                 )
 9  OCULUS VR, LLC, PALMER       )
    LUCKEY, FACEBOOK, INC.,      )
10  BRENDAN IRIBE and JOHN       )
    CARMACK,                     )
11            Defendants.        )      January 17, 2017

12

13          TRANSCRIPT OF JURY TRIAL, VOLUME 5

14           BEFORE THE HONORABLE ED KINKEADE

15             UNITED STATES DISTRICT JUDGE

16

17  A P P E A R A N C E S:

18

19  FOR THE PLAINTIFFS:        MR. P. ANTHONY SAMMI
                               Skadden, Arps, Slate,
                                 Meagher & Flom LLP
20                             Four Times Square
                               New York, New York  10036
21                             (212) 735-2307
                               anthony.sammi@skaddden.com
22

23                             MR. PHILLIP B. PHILBIN
                               Haynes and Boone LLP
24                             2323 Victory Avenue, Suite 700
                               Dallas, Texas  75219
25                             (214) 651-5000
                               phillip.philbin@haynesboone.com
```



1

2          **MR. KURT WILLIAM HEMR**
           Skadden, Arps, Slate,
3            Meagher & Flom LLP
           Four Times Square
4          New York, New York   10036
           (617) 573-4833
5          kurt.hemr@skaddden.com

6          **MR. CHRISTOPHER A LISY**
           Skadden, Arps, Slate,
7            Meagher & Flom LLP
           500 Boylston Street
8          Boston, Massachusetts   02116
           (617) 573-4800
9          christopher.lisy@skaddden.com

10

11         **MR. MICHAEL R. WALSH**
           Skadden, Arps, Slate,
12           Meagher & Flom LLP
           500 Boylston Street
13         Boston, Massachusetts   02116
           (617) 573-4862
14         michael.walsh@skadden.com

15         **MR. JAMES Y. PAK**
           Skadden, Arps, Slate,
16           Meagher & Flom LLP
           Four Times Square
17         New York, New York   10036
           (212) 735-2546
18         james.pak@skaddden.com

19         **MR. MICHAEL DALEY KARSON**
           Haynes and Boone LLP
20         2323 Victory Avenue
           Suite 700
21         Dallas, Texas   75219
           (214) 651-5000
22         michael.karson@haynesboone.com

23

24

25



1

2                                   MS. RACHEL R. BLITZER
                                    Skadden, Arps, Slate,
3                                      Meagher & Flom LLP
                                    Four Times Square
4                                   New York, New York  10036
                                    (212) 735-3000
5                                   rachel.blitzer@skaddden.com

6                                   MR. WILLIAM J. CASEY
                                    Skadden, Arps, Slate,
7                                      Meagher & Flom LLP
                                    525 University Avenue
8                                   Palo Alto, California  94301
                                    (650) 470-4500
9                                   william.casey@skaddden.com

10

11                                  MR. SCOTT MICHAEL FLANZ
                                    Skadden, Arps, Slate,
12                                     Meagher & Flom LLP
                                    Four Times Square
13                                  New York, New York  10036
                                    (212) 735-3000
14                                  sflanz@skaddden.com

15                                  MS. EMILY WHITCHER
                                    Skadden, Arps, Slate,
16                                     Meagher & Flom LLP
                                    Four Times Square
17                                  New York, New York  10036
                                    (212) 735-3605
18                                  emily.whitcher@skaddden.com

19

20                                  MS. JENNIFER H. DOAN
                                    Haltom & Doan
                                    6500 Summerhill Road, Suite 100
21                                  Texarkana, Texas  75503
                                    (903) 255-1000
22                                  jdoan@haltomdoan.com

23

24

25

```
 1
                                  MR. JOSH R. THANE
 2                                Haltom & Doan
                                  6500 Summerhill Road, Suite 100
 3                                Texarkana, Texas  75503
                                  (903) 255-1000
 4                                jthane@haltomdoan.com

 5

 6   FOR THE DEFENDANTS:         MS. BETH A. WILKINSON
                                  Wilkinson Walsh & Eskovitz LLP
 7                                1900 M Street NW
                                  Suite 800
 8                                Washington, DC  20036
                                  (202) 847-4000
 9                                bwilkinson@wilkinsonwalsh.com

10

                                  MR. BRANT W. BISHOP
11                                Wilkinson Walsh & Eskovitz LLP
                                  1900 M Street NW
12                                Suite 800
                                  Washington, DC  20036
13                                (202) 847-4000
                                  bbishop@wilkinsonwalsh.com
14

15                                MS. CALI COPE-KASTEN
                                  Wilkinson Walsh & Eskovitz LLP
16                                1900 M Street NW
                                  Suite 800
17                                Washington, DC  20036
                                  (202) 847-4000
18                                ccope-kasten@wilkinsonwalsh.com

19
                                  MS. KIRSTEN NELSON
20                                Wilkinson Walsh & Eskovitz LLP
                                  1900 M Street NW
21                                Suite 800
                                  Washington, DC  20036
22                                (202) 847-4000
                                  knelson@wilkinsonwalsh.com
23

24

25
```



MS. RUTH VINSON
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
rvinson@wilkinsonwalsh.com


MR. MAX WARREN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
mwarren@wilkinsonwalsh.com


MR. HAYTER WHITMAN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
hwhitman@wilkinsonwalsh.com


MR. KOSTA S. STOJILKOVIC
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4050
kstojilkovic@wilkinsonwalsh.com


MS. HEIDI L. KEEFE
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
hkeefe@cooley.com

```
 1                          MR. BRETT DeJARNETTE
 2                          Cooley LLP
                            3175 Hanover Street
 3                          Palo Alto, California  94304
                            (650) 843-5000
 4                          bdejarnette@cooley.com

 5
                            MS. ELIZABETH LEE STAMESHKIN
 6                          Cooley LLP
                            3175 Hanover Street
 7                          Palo Alto, California  94304
                            (650) 843-5000
 8                          lstameshkin@cooley.com

 9
                            MR. RICHARD A. SMITH
10                          Richard Smith, PC
                            Campbell Centre I
11                          8350 N. Central Expressway
                            Suite 1111
12                          Dallas, Texas  75206
                            (214) 242-6484
13                          richard@rsmithpc.com

14
                            MR. RAGESH KUMAR TANGRI
15                          Durie Tangri LLP
                            217 Leidesdorff Street
16                          San Francisco, California  94111
                            (415) 362-6666
17                          rtangri@durietangri.com

18
                            MR. BENJAMIN B. AU
19                          Durie Tangri LLP
                            217 Leidesdorff Street
20                          San Francisco, California  94111
                            (415) 362-6666
21                          bau@durietangri.com

22
                            MR. MARK RANDOLPH WEINSTEIN
23                          Cooley LLP
                            3175 Hanover Street
24                          Palo Alto, California  94304
                            (650) 843-5000
25                          mweinstein@cooley.com
```

1

2      MR. JOSEPH B. WOODRING
       Cooley LLP
3      1333 2nd Street, Suite 400
       Santa Monica, California  90401
       (310) 883-6400
4      jwoodring@cooley.com

5

6      MR. MATTHEW D. CAPLAN
       Cooley LLP
7      101 California Street
       5th Floor
       San Francisco, California  94111
8      (415) 693-2000
       mcaplan@cooley.com

9

10     MR. PHILIP MAO
       Cooley LLP
11     3175 Hanover Street
       Palo Alto, CA 94304
12     (650) 843-5000
       pmao@cooley.com

13

14     MR. DANIEL TEIMOURI
       Cooley LLP
15     1700 Seventh Avenue
       Suite 900
16     Seattle, Washington  98101
       (206) 452-8791
17     dteimouri@cooley.com

18

19     MS. JULIE B. RUBENSTEIN
       Wilkinson Walsh & Eskovitz LLP
       1900 M Street NW
20     Suite 800
       Washington, DC  20036
21     (202) 847-4000
       jrubenstein@wilkinsonwalsh.com

22

23

24

25



```
 1                              MS. ELIZABETH Y. RYAN
                                Lynn Pinker Cox & Hurst, LLP
 2                              2100 Ross Avenue
                                Suite 2700
 3                              Dallas, Texas   75201
                                (214) 981-3821
 4                              eryan@lynnllp.com

 5
                                MS. CHRISTEN DUBOIS
 6                              Facebook, Inc.
                                1601 Willow Road
 7                              Menlo Park, California  94025
                                (650) 862-5980
 8                              cdubois@fb.com

 9
                                MR. PAUL GREWAL
10                              Facebook, Inc.
                                1601 Willow Road
11                              Menlo Park, California  94025
                                (650) 814-3157
12                              paulgrewal@fb.com

13
   COURT REPORTER:             MR. TODD ANDERSON, RMR, CRR
14                              United States Court Reporter
                                1100 Commerce St., Rm. 1625
15                              Dallas, Texas  75242
                                (214) 753-2170
16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

Todd Anderson, RMR, CRR     (214) 753-2170

```
1              JURY TRIAL - JANUARY 17, 2017

2                  P R O C E E D I N G S

3        THE COURT:   Whose microphone is goofing up?

4        MR. SAMMI:  I hope it wasn't mine, Judge.  I don't

5   think it is.

6        THE COURT:  It's you, Mr. Zuckerberg.  It's going to

7   be okay.  Anyway, you got your Janet Jackson thing here, and

8   you'll be all right.

9        Okay.  We've got one matter.  Y'all want to talk

10  about this before we bring the jury in?

11       And that's this letter that y'all want to offer.

12       Are you going to make the argument, Mr. Philbin?

13       MR. PHILBIN:  I am, Your Honor.  It is PX1507, which

14  is the attachment letter to PX787, which has already been

15  admitted into evidence.

16       PX1507 is a letter from Skadden Arps addressed to

17  counsel for Oculus.

18       The letter goes to notice not only of legal claims

19  but also Oculus's duty to preserve evidence.  It's not hearsay

20  because it's not being offered for the truth of the matter

21  asserted in the document but rather to show that Oculus was put

22  on notice of the claims in the Skadden Arps letter.

23       THE COURT:  Ms. Wilkinson.

24       MS. WILKINSON:  Yes, Your Honor.  I won't take issue.

25  I think it is being introduced for the truth of the matter
```

```
 1   asserted that, you know, they were put on notice, but
 2   Mr. Zuckerberg received the letter, it's between the lawyers,
 3   so it's just not appropriate with this witness.  I just don't
 4   think -- that's my real objection.
 5           I don't object to them getting it in at some point,
 6   but --
 7           THE COURT:  He's going to say he doesn't know
 8   anything about it.
 9           MS. WILKINSON:  Never seen it.  He has 200 lawyers
10   who work for him and do their jobs well.
11           THE COURT:  Well, I'm glad a lot of lawyers are
12   getting work.  It's always a good thing.
13           So you're going to try to put it in through him?
14           MR. PHILBIN:  He's the chief executive officer of
15   Facebook, and Facebook was on notice in an exhibit that was
16   already admitted into evidence, and PX1507 is evidence of what
17   they were on notice of.  Whether or not he knows about it or
18   not, we're getting ready to find out.
19           THE COURT:  Okay.  Well, I will let you ask him.  If
20   he says I don't know, then that's the end of that.
21           MR. PHILBIN:  Thank you, Your Honor.
22           THE COURT:  All right.  You can put it in through
23   somebody.  If he doesn't know, he doesn't know.  So we will
24   find that out.  And I'm assuming Ms. Wilkinson says he doesn't
25   know, and I'm taking her at her word.
```

```
 1              Okay.  But I'll let you ask that one question at some
 2     point.
 3              Are you taking him, Mr. Zuckerberg?
 4              MR. SAMMI:  I am, sir.
 5              THE COURT:  Mr. Sammi, okay.
 6              MR. SAMMI:  Yes, sir.
 7              THE COURT:  So you can ask that -- that one question.
 8              Okay.  We've got everything set up kind of the way we
 9     want it?
10              MR. SAMMI:  We do, Your Honor.
11              THE COURT:  Everything is working?
12              MR. SAMMI:  I've got no boards or any fancy stuff
13     today.
14              THE COURT:  Okay.  Good.  All right.
15              And let's see.  Anything else y'all need to tell me
16     about as we get cranking?
17              MS. WILKINSON:  Nothing from us, Your Honor.
18              THE COURT:  Okay.
19              MR. SAMMI:  Nothing from us.
20              THE COURT:  All right.  Let's bring the jury in.
21              (Pause)
22              SECURITY OFFICER:  All rise for the jury.
23              (Jury in)
24              THE COURT:  For a minute I heard some laughing in
25     there.
```

```
 1                    Y'all be seated.

 2                    We're working today.  We can't enjoy ourselves.  Come

 3     on, now.

 4                    I hope y'all had a great weekend.  So sad for the

 5     Cowboys.  I'm just so sad about it.  We'll -- we'll live

 6     through it somehow, but anyway, it's going to be okay.

 7                    So we're ready.  We're ready to call our next

 8     witness.

 9                    Mr. Sammi, so here we go.

10                    MR. SAMMI:  Thank you, Your Honor.  The Plaintiffs

11     call to the stand Mark Zuckerberg.

12                    THE COURT:  Mr. Zuckerberg, if you'll come up here.

13     This is Mr. Jacobson.  He's going to swear you in.  You can

14     stand right here.

15                    And if you'll turn and just raise your right hand to

16     be sworn in.

17                    (The witness was sworn)

18                    THE COURT:  All right.  If you'll take a seat right

19     here next to me, Mr. Zuckerberg.  Is there water?

20                    You don't have any papers or anything for him?

21                    MR. SAMMI:  No, sir.

22                    THE COURT:  Okay.  Since you're wired up, I don't

23     have to worry about the chair.  The chair will lean back and

24     twist, but it does not move up and back.

25                    If you want to lean up, you can, but since you've got
```

```
 1    that microphone, it's not going to be a problem.
 2              Let's see how your sound is.
 3              Say "Facebook has been a great business for me."
 4              THE WITNESS:  Facebook has been pretty great.
 5              THE COURT:  That's good.  All right.  Here we go.
 6              MR. SAMMI:  Thank you.
 7               MARK ZUCKERBERG, PLAINTIFFS' WITNESS, SWORN
 8                         DIRECT EXAMINATION
 9    BY MR. SAMMI:
10    Q.   Good morning, Mr. Zuckerberg.
11    A.   Good morning.
12    Q.   Welcome to the trial.  How are you?
13    A.   Doing pretty well.
14    Q.   Good.  You're the CEO of Facebook, right?
15    A.   That is correct.
16    Q.   That is the chief executive officer, right?
17    A.   Yes.
18    Q.   Facebook is a public company, correct?
19    A.   Yes.
20    Q.   Facebook has a board of directors?
21    A.   Yes.
22    Q.   And they advise you and they help in setting the direction
23    of Facebook, correct?
24    A.   Yes.
25    Q.   You are the chairman of the board of the Facebook -- of
```

1   the board of directors of Facebook?  Do I have that right?

2   A.    That's correct.

3   Q.    And, Mr. Zuckerberg, Facebook bought your co-defendant,

4   Oculus, in 2014 for about $3 billion.  Do I have that right?

5   A.    We bought the company for about $2 billion, and then had

6   a -- an additional, I think, $700 million for ongoing retention

7   for key folks and a $300 million earnout if certain milestones

8   were hit.

9   Q.    So 2 billion plus 700 million and 300 million for earnouts

10  on the back end.

11          Can we say 3 billion total value of the deal?

12  A.    Well, I just want to make sure that we're complete here.

13  The deal -- Facebook paid $3 billion all in for the company and

14  has continued to invest a lot more going forward in developing

15  virtual reality.

16          The transaction for the company itself was

17  $2 billion.

18  Q.    Got it.  So Facebook -- but Facebook paid all in

19  3 billion?

20  A.    I just want to make sure I'm complete here on this.

21  Q.    Sure.

22  A.    We paid $2 billion for the company.  We had an additional

23  $700 million plus earnouts in ongoing compensation for the key

24  people involved, and we've also invested a lot more capital in

25  building virtual reality since the acquisition.  So, you know,

1    I think it would be more accurate to say we paid $2 billion for

2    the company and have invested much more than $3 billion in the

3    effort to build out virtual reality over the last few years.

4    Q.   Got it.  I'm just thinking about what you just said when

5    you said Facebook paid all in $3 billion.

6         Can we work with that number?

7         We can do it however you like.  Say 2 to 3 billion;

8    is that fair?

9    A.   I'm -- I have said what I have to say on this.

10   Q.   Okay.  I just want to know how to refer to it, because I

11   don't -- sometimes it gets confusing.

12        Did Facebook pay 2 billion or did Facebook pay

13   3 billion for Oculus?

14        I know it's complicated financials, but let's leave

15   it there for a minute.  Okay?

16        That's a lot of money, isn't it?

17   A.   Yes.

18   Q.   Let's put that in perspective a little bit.

19        Facebook, your company, is worth about, if I have it

20   right, $350 billion.

21        Do I have that right?

22   A.   In that range, yes.

23   Q.   In that range.

24        Well, you know, it's a fantastic success story.

25        Did Facebook recently, if I remember, invest another

```
1   half a billion into Oculus in October of last year?

2   A.   I think what you're referring to is at the Oculus

3   developer conference we announced that we were going to fund

4   developers who were building content on top of the Oculus

5   platform.

6        Beyond that, we've also invested more in continuing

7   to grow the Oculus team.  I think it's many times larger now

8   than at the time of the acquisition.

9   Q.   Got it.

10  A.   And all of this reflects, I think, a key point to

11  understand here, which is that there's a lot more to develop to

12  make virtual reality a mainstream product than what was there

13  when we bought the company.

14  Q.   Got it.

15  A.   So that -- we expect to invest for 5, 10, 15 years more

16  before this becomes a real mainstream platform, and that is the

17  plan that we have.

18  Q.   Thanks, Mr. Zuckerberg.

19        I know we want to get to that, and we will talk about

20  that.  We're going to talk a lot about what VR was when you

21  bought Oculus.  I know we're going to talk about the future

22  too, but let's stay the course.  Okay?

23        Have you read the complaint in this case, sir?

24  A.   I don't think I've read the whole thing.

25  Q.   Have you skimmed it?
```

1    A.    I think probably at some point.

2    Q.    Okay.  Are you aware that ZeniMax, id, the Plaintiffs, are

3    charging Facebook with -- and Oculus with theft of intellectual

4    property, right?

5    A.    I'm aware of the claims.

6    Q.    Violation of copyrights, are you aware of that?

7    A.    Not specifically.

8    Q.    Okay.  How about misappropriation of trade secrets?  Does

9    that ring a bell?

10   A.    Not specifically, but, I mean, it's all -- these are all

11   related.

12   Q.    Yeah.

13         Infringement of trademarks, breach of contract, and

14   unjust enrichment, have you heard of those in the complaint?

15   A.    I don't think specifically.

16   Q.    Okay.  Facebook publishes policies on how it operates,

17   right?

18   A.    Generally, yes.

19   Q.    Sure.

20         Do you have a code of conduct?

21   A.    Yes.

22   Q.    And that's what you tell the public, right?  That's -- I

23   can find that on your website?

24   A.    I'm not sure if it's on our website.  I wouldn't be

25   surprised if it is.  I think it's more for internal conduct and

```
 1   employees.
 2   Q.   I found it on your website.
 3   A.   All right.  Well, I've -- I'm not going to dispute that.
 4   Q.   And Facebook wants to live with -- by its code of conduct,
 5   right?
 6   A.   Of course.
 7   Q.   Right.
 8        And you should be aware, Mr. Zuckerberg, that
 9   Facebook's code of conduct requires employees to act lawfully,
10   ethically, and honestly, right?
11   A.   I sure hope it does.
12   Q.   And it does.  It does.
13        Are you aware that you also have some statements that
14   you tell the world on your website about third parties, other
15   party's intellectual property?
16        Do you know of any statements that Facebook makes
17   about those?
18   A.   Not specifically.
19   Q.   Okay.  There's an "About" page on your website, and it
20   says "Facebook is committed to helping people and organizations
21   protect their intellectual property rights."
22        Is that something you agree with?
23   A.   Yes.
24   Q.   Okay.  That's something that Facebook wants to do, right?
25   A.   Yes.
```

```
 1   Q.   Now, if your employees, for example, don't comply with the
 2   code of conduct, you take disciplinary action, I presume, you
 3   or somebody at Facebook?
 4   A.   Yeah, in general.
 5   Q.   Okay.
 6   A.   The HR department would deal with that.
 7   Q.   Sure.
 8        That might even include firing somebody if there's
 9   some sort of very bad conduct, right?
10   A.   In severe cases, yes.
11   Q.   Okay.  So that's sort of the public side of Facebook.
12   Let's look at what happens within Facebook.
13        Mr. Zuckerberg, are you aware that in this court last
14   Friday, Facebook's vice president of product at Oculus and the
15   senior programmer admitted to the intentional violation of
16   another company's copyrights?
17   A.   I hadn't seen the other testimony, no.
18   Q.   Have you been following this trial, sir?
19   A.   Sorry?
20   Q.   Have you been following this trial?
21   A.   In what context?
22   Q.   In -- well, there's some transcripts that you can look at.
23   Have you talked about the testimony that's gone on so far last
24   week here in Dallas?
25        MS. WILKINSON:  Your Honor, I'm going to object to
```

1    the transcript following.  He's a fact witness, and generally

2    we don't allow fact witnesses to follow transcripts.

3              THE COURT:  Well, either way.  We kind of need to

4    move on from this.  He said he didn't know.

5              MR. SAMMI:  Okay.

6    BY MR. SAMMI:

7    Q.   So, Mr. Zuckerberg, if a senior Facebook official, an

8    employee, admits to intentionally violating another company's

9    copyrights, you'd discipline that person, right?

10   A.   In general, yes, but, you know, context is pretty

11   important.

12   Q.   It depends -- if somebody admits to infringing copyrights

13   and says it's illegal, it depends whether you'd discipline

14   them?

15   A.   I'm thinking we would definitely investigate it and try to

16   understand what happened.

17   Q.   Okay.  Are you aware that the testimony we heard last week

18   was given more than a year ago in a deposition?

19   A.   I already said that I'm not aware of the testimony from

20   last week.

21   Q.   Okay.  You're not even aware that -- that those acts were

22   committed, right?

23   A.   I'm not sure what you're referring to.

24   Q.   Sure.

25              I'm talking about the evidence in this trial

1    regarding the fact that a senior vice president of Oculus and a

2    senior programmer at Facebook admitted in this court to

3    intentionally violating the copyrights of another company.

4            Do you know about those acts at all?

5            MS. WILKINSON:  Objection, asked and answered.

6            THE COURT:  Sustained.

7    BY MR. SAMMI:

8    Q.   Mr. Zuckerberg, are you aware that in this court last

9    Friday, an independent Court-appointed expert, not our expert,

10   testified that Oculus computer files had been intentionally

11   wiped and the evidence on them was irrevocably destroyed after

12   Facebook and Oculus had received notice of this litigation?

13           MS. WILKINSON:  Objection, Your Honor.  He's already

14   said he's not following the testimony, and now we're hearing

15   testifying from --

16           THE COURT:  Well, if he knows.  I'll overrule the

17   objection.

18           THE WITNESS:  I haven't followed any of the testimony

19   in this case.

20   BY MR. SAMMI:

21   Q.   Wouldn't that be plainly inconsistent with Facebook's code

22   of conduct?

23   A.   Sorry?  Can you --

24   Q.   Sure.  Let me ask it this way.

25           Wouldn't intentionally wiping files from a computer

```
 1   at Facebook after being on notice of a lawsuit to preserve
 2   evidence be against your code of conduct that we just talked
 3   about?
 4   A.   I -- that certainly sounds like something that we would
 5   want to look into.
 6   Q.   Have you looked into it?
 7   A.   I have -- our team, I'm sure, has.  I have not personally
 8   looked into it, but, you know, we have a -- a legal team with
 9   some great folks, and an HR team that typically does these
10   investigations.  And I'm sure if this was brought to our
11   attention, we would have looked into it.
12   Q.   Okay.  Your lawyers were here last week, right?  You
13   weren't?
14   A.   Yes.
15   Q.   You understand that the destruction of evidence is a
16   criminal act, right?
17           MS. WILKINSON:  Objection, Your Honor, calls for a
18   legal conclusion.
19           THE COURT:  I'll let him answer that.
20           Overruled.
21           THE WITNESS:  I know it's very serious.  I don't know
22   exactly how that's judged.
23   BY MR. SAMMI:
24   Q.   I mean, let's use common sense.  If you want to use
25   evidence in court and you destroy it, that seems like it should
```

1    be against the law, doesn't it?

2    A.   Yeah, I mean, it certainly seems bad.

3    Q.   Yeah, it is bad, right?

4    A.   Yeah.

5    Q.   Are you aware that an independent court expert has given

6    evidence that one of the computers on which files were wiped

7    belonged to Mr. Carmack, Oculus's chief technology officer?

8           MS. WILKINSON:  Objection, Your Honor.  He's already

9    answered that he doesn't follow the testimony.

10           MR. SAMMI:  Your Honor --

11           THE COURT:  If he knows.  He may know --

12           MR. SAMMI:  If he knows.

13           THE COURT:  He may know it independently.  Overruled.

14           MR. SAMMI:  Absolutely.

15           THE WITNESS:  I'm sorry.  Can you restate the

16    question?

17    BY MR. SAMMI:

18    Q.   I will.

19           Are you aware that one of the computers on which

20    files were wiped in this case belongs to Mr. Carmack, the chief

21    technology officer of Oculus?

22    A.   I don't think I'm aware of that.

23    Q.   You're not aware of that.

24           Okay.  Are you aware that files on Mr. Carmack's

25    computer were wiped after Plaintiffs sent Facebook and Oculus

```
 1   notice of this litigation?  Are you aware of that?
 2           MS. WILKINSON:  Objection to mischaracterizing the
 3   testimony and asking what he's already said he's not following.
 4           THE COURT:  I couldn't hear you.
 5           MS. WILKINSON:  I'm sorry, Your Honor.
 6           Objection to mischaracterizing the testimony and to
 7   asking him something he's already repeatedly said he's not
 8   followed.
 9           THE COURT:  I'm going to let him answer it one more
10   time.  Okay?
11           That's it.  Okay?
12           MR. SAMMI:  Your Honor, these are --
13           THE COURT:  I overrule the objection.
14           MR. SAMMI:  Thank you.  These are different
15   questions.
16           I have to establish some salient facts to get ground
17   rules of what Mr. Zuckerberg knows and what he doesn't know so
18   we can proceed with the examination, sir, if I may?  Thank you.
19           THE COURT:  You may not, but go ahead.
20   BY MR. SAMMI:
21   Q.   Mr. Zuckerberg, are you aware of that?
22   A.   Sorry, can you repeat it?
23   Q.   Sure.  That files on Mr. Carmack's computer were wiped
24   after Plaintiffs sent Facebook and Oculus notice of this
25   litigation?
```

1    A.    I'm not sure that I was aware of that.

2    Q.    Okay.  You don't know whether you know?

3    A.    No, I don't think I heard specifically about files

4    relevant to this case being wiped from a computer.

5    Q.    Okay.  Are you aware that shortly after Plaintiffs gave

6    notice of this litigation that Mr. Carmack typed a Google

7    search "How do you wipe a hard drive on Mac OS X?"

8              Do you know that?

9              MS. WILKINSON:  Same objection.

10             THE COURT:  If he knows.  Overruled.

11             THE WITNESS:  So for this I want to -- I have a

12   question on this, which is, if I'm only aware of something like

13   that because I've prepped with our counsel, what -- how do I

14   handle that here if it's privileged?

15             THE COURT:  You're asking me?

16             THE WITNESS:  I -- I don't know who I'm supposed to

17   ask.  This is actually my first time testifying in a trial, so

18   I -- I don't know how this works.

19             THE COURT:  It's okay.  You can ask me, and the

20   answer is, if you know, you can say I only know because my

21   lawyer told me.

22             THE WITNESS:  Okay.

23             THE COURT:  You can say that --

24             THE WITNESS:  Okay.

25             THE COURT:  -- if that's the way you found it.

```
1              It's just -- if it's privileged, your lawyer will

2    jump up and make an objection, and Ms. Wilkinson is a good

3    lawyer, and Mr. Sammi is a good lawyer.  They will do that.

4    So -- but that's a good question to ask.  Okay.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  You bet.

7              Now you can answer it.

8              THE WITNESS:  All right.  I think I'm only aware of

9    that because of the prep sessions with -- with my counsel.

10   BY MR. SAMMI:

11   Q.   And thank you for that.  I don't want to go into your

12   discussions with your lawyers.  I just want to know whether you

13   know.

14              You understand that one of the fundamental

15   allegations in this case is that Oculus stole ZeniMax's VR

16   technology -- right? -- generally speaking?

17   A.   I'm aware of the claims, and I'm here because I believe

18   they're false, and I think it's important to testify to that.

19   Q.   Okay.  Would you agree with me that it's essential to

20   preserve evidence after notice of a litigation is given?

21   A.   Yes.

22   Q.   That would be something that would be in a code of

23   conduct?  That would be honest, ethical, right?

24   A.   Regardless of whether it's in a code of conduct, it is the

25   right thing to do, and it's important.
```

```
 1   Q.   Uh-huh.  Uh-huh.
 2           Are you aware, sir, if you are, if you know, that
 3   another Oculus computer of a senior programmer at Facebook,
 4   Mr. Lee Cooper, had data deleted from it?
 5           Are you aware of that fact?
 6   A.   No.
 7   Q.   Now, are you aware, sir, that Mr. Carmack, your chief
 8   technology officer, was in possession of millions of lines of
 9   source code of ZeniMax after he had left our employment and
10   become the chief technology officer of Oculus?
11           MS. WILKINSON:  Objection, mischaracterizes the
12   testimony.
13           THE COURT:  Whether he knows.  I will overrule your
14   objection.  If he knows.
15           THE WITNESS:  That he was in possession of millions
16   of lines of code?  No, I was not.
17   BY MR. SAMMI:
18   Q.   You were not aware of that.  Okay.
19           Were you aware that shortly before Mr. Carmack left
20   our employment, ZeniMax's employment, he downloaded more than
21   10,000 documents onto a USB drive and then uploaded those to an
22   Oculus computer that he was doing Oculus work on?
23           Are you aware of that, if you know?
24   A.   No, I wasn't aware of that then, and I'm still not aware
25   of that today, that that happened.
```

```
 1   Q.   And we know that you haven't seen the evidence in the
 2   trial.
 3        Okay.  If that's the case, is that honest, ethical
 4   behavior, in Facebook's view?
 5   A.   It's something we should investigate.  I mean, you know,
 6   the way you're asking it, then -- I would say in a lot of
 7   cases, that probably is not good behavior.
 8        There are, of course, edge cases, like, if they were
 9   open source software that he had a license to use but just
10   happened to be part of his work at a previous company, then it
11   would probably would be perfectly fine.
12        So I think it's important to investigate and
13   understand the context, but I think I understand what you're
14   asking and I think in general it is something that is very
15   serious.
16   Q.   An edge case.
17        Let me ask it this way.  Do you think if somebody
18   takes 10,000 documents that it's happy birthday emails or notes
19   about groceries or work that they're doing at the company?
20   What do you think?
21   A.   I don't know.  I would have no way to know.
22   Q.   You know Mr. Carmack, don't you?
23   A.   Yeah.  Yes.
24   Q.   He's a singular genius, right?
25   A.   I would say that.
```

```
 1   Q.   You would agree with me there?
 2   A.   Yes.
 3   Q.   It seems to me that any time I have met him, he talks
 4   technology like nobody else, right?
 5   A.   He is very into technology, yes.
 6   Q.   Yes.  That is very true.
 7        Would you think that -- that if 10,000 of his
 8   documents, while he was with us, would concern technology, or
 9   do you think they would all be personal?
10        MS. WILKINSON:  Objection, calls for speculation.
11        THE COURT:  Sustained.
12   BY MR. SAMMI:
13   Q.   If you know, Mr. Zuckerberg, are you aware that the
14   Court-appointed expert in this case has found that evidence
15   submitted to him by your lawyers was mischaracterized to the
16   Court?
17   A.   No, I'm not aware of this.
18   Q.   You don't -- I presume you don't know about any
19   communications or instructions that Facebook has given to its
20   lawyers to say, well, you know, we shouldn't mischaracterize
21   things?
22   A.   I'm not aware specifically, but I'm sure that that's a
23   part of our -- of our procedures.  Of course we want to be
24   accurate in how we characterize things.
25   Q.   Okay.  Do you know that -- are you aware that Oculus's
```

1  CTO, Mr. Carmack, the man we've been talking about, submitted

2  an affidavit to this Court swearing that he never wiped any

3  files and that the Court-appointed expert disagrees with that?

4  A.    I don't -- I don't know.

5  Q.    Okay.  You don't know that?

6  A.    No.  I mean, you're asking a lot of specific questions

7  about other testimony and things in this case.  And we take the

8  case very seriously, and that's why I'm here, and that's why I

9  have had a team of our top lawyers and folks work on this.

10        I do think that the areas of this case that I have

11  unique knowledge around are around how the deal came together

12  and the vision for what we're trying to do with the virtual

13  reality.  So I'm happy to answer any questions that you have.

14  I feel kind of bad that I don't know the answer to these

15  specifics questions, but they are just things that I haven't

16  followed that closely as part of this case, and they're not

17  things that I'm uniquely an expert on.

18  Q.    And I appreciate that.  And I think maybe a little bit of

19  a disconnect is, whether you've been following the trial or

20  not, I think some of these facts I want to ask you about,

21  whether you know them as the CEO of Facebook and these are your

22  employees, that's what I'm really trying to get at.  Okay?

23  A.    Okay.

24  Q.    You can set aside whether, you know, this is a trial or

25  not.  I just want to know what -- what you know as the top guy

```
 1 | at Facebook.  Okay?
 2 | A.   (Indicating in the affirmative.)
 3 | Q.   And we will get into the deal and VR in a moment.
 4 |        If an employee of Facebook took millions of lines of
 5 | Facebook source code and left and went to another company, you
 6 | wouldn't like that, right?
 7 |        MS. WILKINSON:  Calls for speculation.
 8 |        THE COURT:  Sustained.
 9 | BY MR. SAMMI:
10 | Q.   Do you let Facebook employees, programmers of Facebook who
11 | write confidential source code of Facebook, take that source
12 | code out of Facebook after they leave?
13 |        MS. WILKINSON:  Excuse me.  Objection.  Calls for
14 | speculation.  It is an incomplete hypothetical.
15 |        THE COURT:  Yeah, rephrase that.
16 |        Sustained.
17 | BY MR. SAMMI:
18 | Q.   Mr. Zuckerberg, is there any policy at Facebook that you
19 | know of that requires employees who do confidential work, like
20 | write source code for Facebook, to not take that away from
21 | Facebook and take it somewhere else after they leave?
22 | A.   Yes, I believe so.  You're not supposed to take
23 | confidential information from Facebook after you leave.
24 |        One thing that I think is worth clarifying here is
25 | that a lot of the work that Facebook does, just like in the
```

```
 1   rest of the technology industry is, you know, what we call open
 2   source.  So we write code, and then we release it so that it is
 3   publicly available.
 4          A lot of the work we do at Facebook is that.  If
 5   someone worked on that, I don't think we would have a problem
 6   with people accessing that code and continuing to do work on
 7   those things after they left.
 8   Q.   Got it.  So that's a good point.
 9          So I think I'm aware that Facebook does write some
10   code and release it open source, but are you saying there is no
11   code at Facebook that's not open source?  I mean confidential.
12   A.   No.  That's definitely not what I'm saying.  We do a lot
13   of open source projects, and we do a lot that's not open source
14   as well.
15   Q.   Okay.  And if it is not open source, like you said, you
16   definitely wouldn't want your employees taking that code out,
17   right?
18          MS. WILKINSON:  Same objection.  Incomplete
19   hypothetical and calls for speculation.
20          THE COURT:  I'm going to let him answer it this one
21   time.
22          Overruled.
23          THE WITNESS:  We don't want to -- our employees
24   taking confidential information.  I think that's generally
25   correct.
```

```
 1   BY MR. SAMMI:
 2   Q.   Have you disciplined or -- Mr. Carmack or fired him?
 3   A.   Well, we certainly haven't fired him.
 4   Q.   Good.  I mean, I didn't know.  Maybe -- but you haven't
 5   fired him, right?
 6   A.   No, not that I'm aware of.  I certainly hope not.
 7   Q.   Okay.
 8   A.   My understanding is the claims in this case are false, so
 9   it would be wrong to fire him for that.
10   Q.   Yes.  I'm sure that's your understanding.
11        Have any of the employees at Facebook been
12   disciplined in any way as a result of this litigation?
13   A.   Again, you know, I have asked our teams to look into this.
14   We have.  Our conclusion is that the claims are wrong, so I
15   think it would not only be inappropriate, but it would be wrong
16   to discipline people because of claims that, from our
17   perspective, are false.
18   Q.   Okay.  So you've asked your people to look into it, right?
19   A.   Yes.
20   Q.   And are your people able to look into files that have been
21   wiped?  They can't, right?
22        MS. WILKINSON:  Objection.
23        I'll withdraw my objection.  I'm not sure I
24   understand the question, but I will withdraw the objection.
25   BY MR. SAMMI:
```

1    Q.   Did you understand my question?  Did you understand my

2    question?

3    A.   Can you repeat it?

4    Q.   Sure.

5         You just said you've asked your team to look into it

6    and you think our claims are meritless, I take it.  That's your

7    position.  You agree?

8    A.   Yes.

9    Q.   Okay.  I'm asking you, your experts in your team, they

10   can't look at files that are gone, right?

11   A.   I think in general that's true, yes.

12   Q.   That's just a basic sort of thing, right?

13   A.   Yes.

14   Q.   Okay.

15   A.   But the claims in this case are not about whether there

16   are files.  It's whether, you know, any technology was used,

17   and I think we can do an analysis of that and determine that

18   there is no shared code in what we do.

19   Q.   You have to compare your code or Oculus's code with

20   something else, right?

21   A.   Sure.

22   Q.   Right?

23        If you want to know if something has been used, you

24   have got to compare your code with our code, right?  Is that

25   right?

1    A.    Sure, or you could just trace the lineage of where the

2    code came from.

3    Q.    And if there are pieces of the lineage missing or there

4    are computers that don't have any files on them because they've

5    been wiped, it is hard to compare your code with that code,

6    right?

7    A.    I'm not a forensic expert on this, but my understanding is

8    you can trace the lineage of how different code got checked in

9    to different things and understand it that way.

10   Q.    Okay.  You've done some programming, right?

11   A.    A lot.

12   Q.    A lot.  Indeed you have.

13         You can write code without ever checking it in to a

14   repository, can't you?

15   A.    Yeah, of course.

16   Q.    Yeah.  You could write code, for example, on a laptop

17   without checking it in to a repository, right?

18   A.    Yes.

19   Q.    Okay.  And if you never checked that code in to a

20   repository and you drop your laptop into the gutter and it

21   breaks and it is irretrievable, you can't get that code back,

22   can you?

23   A.    You can probably try, but, I mean, I assume you're

24   hypothetically assuming that the --

25   Q.    It's carried off by --

1   A.   It's been destroyed.  So, yes, sure, if it's gone, it's

2   gone.

3   Q.   If it's gone, it's gone.

4             Let's talk about Oculus and VR, Mr. Zuckerberg.

5             Is it true that Facebook wasn't interested in VR in

6   2011 and 2012?

7   A.   I'm sorry.  Wasn't interested?

8   Q.   Yes.

9   A.   I'm not sure that's exactly right.  So what I'd say is

10  that VR is something that I've actually been personally

11  interested in for a long time, since well before I made

12  Facebook and back from when I was a student.

13            I -- you know, the mission for Facebook is to give

14  people more tools to be able to share their experiences,

15  whether that's just typing a text update or sharing a photo of

16  a moment or, you know, increasingly taking videos, but we want

17  to get closer to this really kind of perfect representation so

18  you can perfectly capture a moment or an experience that you

19  have.  And from my -- my perspective nothing can do that better

20  than being able to capture a whole scene like you can in VR

21  where you can capture it, and then you can put on a headset and

22  you can feel like you're there.  And you can look around, and,

23  you know, that -- that, I think, is really in line with what

24  we're trying to do in the world.

25            Now, the key thing here is that VR has been a common

1    theme of science fiction for decades, right?  And it just -- it

2    wasn't clear that it was going to be possible to build this any

3    time soon, and once I started getting to know the Oculus folks

4    and seeing some of the work that they had built, I -- I

5    realized that you -- it was actually closer to being built and

6    that now was a good time to start investing in it.

7           So going back to your question, in 2011 did I think

8    that now was the right time for us to start building VR?  I

9    probably wasn't thinking about that, and I probably had assumed

10   that that was quite far off into the future.  But, you know,

11   was it something that we thought about as a future direction

12   for Facebook?  Yeah, I think that that would be part of the

13   vision for what we would eventually have over decades on the

14   time horizon.

15   Q.   Thank you for that answer, and you'll have a chance to

16   have your lawyer ask you questions.

17          I want to sort of tighten up the questions here.

18          My question is, I know that you want to talk about

19   the future of VR, but around 2011 and 2012, if your top deal

20   guy Amin Zoufonoun comes into this Court and says, look, we

21   weren't really interested in VR in 2011 and '12, would he be

22   wrong?

23   A.   I don't think we were out looking at VR companies, so from

24   his perspective, as our top deal guy, I think he would be

25   accurate to say that I certainly in 2011 and 2012 hadn't

1  instructed him to go out into the market and find the best VR

2  companies.

3         This came as somewhat of a surprise to me that --

4  that now it was possible to build a quality of experience that

5  the Oculus team can.

6  Q.   Okay.

7  A.   And I think that's why there has been somewhat of a

8  resurgence in VR over the last few years and the investment in

9  there, but there's a lot more to do.  It's not ready yet, and

10 they're probably a decade or more of an investment that's

11 required before it is the quality that I think we all want it

12 to be, but now I think it's time to start investing in it.

13 Q.   Let me -- let me back up for just minute, Mr. Zuckerberg.

14 I need to get back to the code of conduct that we were talking

15 about just for a second.

16        Did I understand you correctly that nobody has been

17 disciplined or fired, to your knowledge, at Facebook or Oculus

18 as a result of this litigation?  And I think you said that

19 because you think our claims are meritless, right?

20 A.   Yeah, I don't think anyone has been fired because of this.

21 Q.   Okay.  Don't you think someone should get fired if they

22 admit to copyright violations?

23        MS. WILKINSON:  Objection, calls for speculation.

24        THE COURT:  I'll let him answer that.

25        Overruled.

1          THE WITNESS:  I mean, that is certainly something

2    that we would look into it and want to understand it more

3    closely.

4    BY MR. SAMMI:

5    Q.   How long does it take to look into that if somebody admits

6    it?

7    A.   I think we would want to do an investigation to understand

8    what happened.

9          You know, I think the context is really important on

10   this.  You know, if someone, you know, had some -- some files

11   that they wrote somewhere else, then that certainly is not

12   good, right?  And I'm not going to stand up here and say that

13   that's okay behavior.

14         At the same time, I think the claims in this case are

15   much more serious.  It's that not only were the -- were there

16   files or things that someone had, but that they were used.

17         And, you know, that's the part that I just find

18   really wrong here.

19         Oculus products are based on Oculus technology.

20   Q.   Okay.

21   A.   And the idea that Oculus products are based on something

22   that someone else built is wrong.

23   Q.   Okay.  So let's take that step by step.  Okay?

24         It's okay to have something that's not yours and

25   that's stolen as long as you don't use it; is that right?

1    A.    I did not say that.

2    Q.    Okay.  You knew when we sat down for a deposition that

3    Mr. Carmack was in possession of ZeniMax's confidential

4    information, didn't you?

5    A.    I don't remember specifically, but I wouldn't be surprised

6    if that was right.  I don't remember the exact timeframe for

7    when I was told about that.

8    Q.    Why don't we just take that one thing --

9    A.    Actually, I do.  I -- I did know at that point.

10    Q.    Why don't we just take that one thing right there.

11          The fact that the chief technology officer of Oculus,

12    a company that you bought for $3 billion is in possession of

13    ZeniMax confidential information.  That's not a big deal?

14    A.    That's not what I said.

15    Q.    Okay.  But you said we have to make a distinction --

16    right? -- between -- it's one thing to have something, but it's

17    another thing to use it, right?

18          I want to go with step one, having it in the first

19    place.

20          That's wrong, right?  Will you admit that?

21    A.    We've gone through this a few times.  I think it's

22    certainly something that we need to understand more.  I think

23    there are gradations and there are reasons why he might have

24    that.  In general it sounds like it's something that's pretty

25    serious, and the point that I was trying to make is not that

```
 1   that isn't an issue, but that I view using someone else's thing
 2   is a much bigger issue.
 3   Q.   Okay.  And are you aware that there's an NDA in this case?
 4   A.   I'm sure there are many NDAs.
 5   Q.   There's an NDA between ZeniMax and the founder of Oculus
 6   named Palmer Luckey.  Are you aware of that?
 7   A.   I think -- I may have only learned about that through
 8   counsel, but I'm aware of that.
 9   Q.   Actually, sir, you learned about it from me, didn't you,
10   at your deposition, literally on the spot?
11        Do you remember that?
12   A.   Apparently not.
13   Q.   Okay.  I asked you, "Hey, do you know the existence of an
14   NDA signed between ZeniMax and Palmer Luckey?"
15        And you said, "Well, no, but now that you're telling
16   me, I think I do."
17        Do you remember that?
18        MS. WILKINSON:  Objection, mischaracterizes the
19   testimony.
20        THE COURT:  What -- whatever.  He's already answered
21   it.
22        Overruled.
23   BY MR. SAMMI:
24   Q.   Do you remember that?
25   A.   No.
```

1   Q.    Okay.  I've got it in here somewhere.

2            This is -- I'm going to read from page 43, lines 22

3   from Mr. Zuckerberg's deposition.

4            "Question:  Okay.  Do you know today that Palmer

5   Luckey signed an NDA with ZeniMax?

6            "Answer:  I don't.

7            "Question:  You don't know that at all?

8            "Answer:  Are you telling me that?

9            "Question:  I'm asking you whether you know that.

10            "And I'm sorry.  I probably then asked the question

11   twice.

12            "So it's safe to assume that you have no idea that

13   Palmer Luckey, the founder of Oculus, signed an NDA with

14   ZeniMax?

15            "Answer:  Well, now that you're telling me, I'm not

16   sure that I don't know it anymore."

17            Do you remember that exchange?

18   A.    Roughly.

19   Q.    Okay.  So the case -- this case had been pending for about

20   a year and a half before we sat down for a deposition; is that

21   right?

22   A.    That sounds about right.

23   Q.    Okay.  An operative document in this case, the

24   nondisclosure agreement signed by Palmer Luckey and ZeniMax,

25   you found out about it through me, opposing counsel?

1          Do I have that right?

2    A.    That's what it sounds like.

3    Q.    Okay.  None of your lawyers ever told you about it?

4          MS. WILKINSON:  Objection, calls for attorney-client

5    communication.

6    BY MR. SAMMI:

7    Q.    That's a fact.  Were you made aware of this NDA at any

8    time prior to sitting down?

9          THE COURT:  I'm going to sustain the objection about

10   that, about his lawyers.

11   BY MR. SAMMI:

12   Q.    How about this?

13         MR. SAMMI:  Thank you, Your Honor.  Let me change my

14   question.

15         THE COURT:  Yes, sir.

16   BY MR. SAMMI:

17   Q.    How about this?  When did you buy Oculus for $3 billion,

18   roughly?

19   A.    I can answer the question on the date, notwithstanding the

20   fact that we had a whole exchange before about how we didn't

21   buy Oculus for $3 billion.

22   Q.    Okay.  When did you buy Oculus for $2-point-something

23   billion?

24   A.    It was in early 2014.

25   Q.    Early 2014.

```
 1                    We sat down, you and me, March 2016.

 2                    How much time is that?

 3      A.    About two years.

 4      Q.    About two years.

 5                    Now, after you bought Oculus, I've seen some pictures

 6      of you going on a victory lap and, you know, talking with

 7      Oculus and being on the stage with Mr. Carmack, Mr. Luckey,

 8      Mr. Iribe, right?  Right?

 9      A.    I wouldn't characterize that as a victory lap.

10      Q.    Okay.  A celebratory conference.  I don't know.

11                    What do you want to call it?

12      A.    How about a developer conference.

13      Q.    A developer conference.

14                    You're onstage and you're with those guys, right?

15                    At some point within those two years after you bought

16      Oculus and after we sued you, you were onstage with those guys.

17      You were working with them, right?

18      A.    Yeah.  I think that most of what you're referring to as

19      celebration was actually work, so those conferences were to

20      build a developer community so that there would actually be

21      content for the Oculus platform.

22      Q.    Okay.

23      A.    And yes, we worked together frequently.

24      Q.    Okay.  So let me take it back.  I don't want to call it a

25      celebration.  The work.
```

```
 1              You worked with these people for about two years,
 2   right?
 3              And these people, I mean, the defendants in this
 4   case, Mr. Luckey, Mr. Iribe, Mr. Carmack, correct?
 5   A.   Yes.
 6   Q.   And now, I'm not asking you about your lawyers.  I'm
 7   asking you about them.
 8              It never came up, the NDA?
 9   A.   No.
10   Q.   You never turned to any of these guys and said, "What's up
11   with this suit on that ZeniMax's filing?"
12   A.   No.
13              The work that we do together is mostly focused on
14   building technology and products and all of the work that needs
15   to happen to make virtual reality a thing that millions of
16   people can enjoy.
17              So that's the substance of what we actually do.  On
18   top of that, if I had questions about a lawsuit, I would ask
19   our legal team.
20   Q.   You would ask the lawyers.  I get that.
21              Did you -- how about Palmer Luckey?  Did you ever ask
22   him, "Hey, Palmer, did you ever sign a nondisclosure agreement
23   regarding virtual reality technology as the founder of Oculus
24   before we bought your business for $2-point-something billion?"
25   A.   No.
```

```
1   Q.   No.  All right.
2   A.   I can give more context if you want, but --
3   Q.   I'm just asking whether you asked it, whether it ever came
4   up, right?  Because we've established --
5   A.   No.
6   Q.   -- that I'm the guy --
7   A.   Uh-huh.
8   Q.   -- who told you about it for the first time, right?
9   A.   That sounds right.
10  Q.   It is right.
11           MS. WILKINSON:  Objection, Your Honor.
12           THE COURT:  Sustain the objection.
13  BY MR. SAMMI:
14  Q.   Are you aware, sir, that Mr. Carmack in June of 2012 at an
15  industry convention called E3 gave a demo of breakthrough VR
16  technology, if you know?
17  A.   I don't remember.
18  Q.   Okay.  You may have known once, but you don't remember.
19  which one?
20  A.   I'm not sure.
21  Q.   Okay.
22  A.   I mean, he -- I may have known.  I don't specifically
23  remember that.
24  Q.   Okay.
25  A.   So I think the answer is probably no.
```

```
 1   Q.   Let's take a look at the NDA.  It's in evidence,
 2   Plaintiffs' Exhibit 1.  Let's you and I look at it together.
 3            MS. WILKINSON:  Your Honor, I'm going to object.  He
 4   said he hasn't seen it.  He didn't know about it.
 5            MR. SAMMI:  It's already been admitted, Your Honor.
 6   It's in evidence.  I'd like to walk through the document with
 7   the witness.
 8            THE COURT:  Okay.  It's your time.
 9            Overruled.
10   BY MR. SAMMI:
11   Q.   Now, have you seen it, the NDA?
12            MS. WILKINSON:  First of all, I'm going to object.
13   He doesn't even have the full document.
14            MR. SAMMI:  I've got it.
15            Permission to approach, sir?
16            THE COURT:  Yes.
17            MR. SAMMI:  Thank you, Your Honor.
18   BY MR. SAMMI:
19   Q.   Mr. Zuckerberg, I'm handing you what's been marked as
20   Plaintiffs' Exhibit 1.
21            Now, I put portions of it on the screen.  I just want
22   to ask you first, have you ever seen this document?  Yes or no.
23   I don't want to get into anything you talked to your lawyers
24   about.
25   A.   I don't think so.
```

1   Q.   Okay.  Well, let's take a look.

2          If you look on the screen, do you agree with me it

3   says, id Software and ZeniMax as the disclosing party.

4          Do you see that?

5   A.   Yes.

6   Q.   And the receiving party is identified with the words on

7   this document as Palmer Luckey.

8          Do you see that?

9   A.   Yes.

10  Q.   And there's a clause here that -- you can read the whole

11  thing.  Let me read this portion to you.

12         "Regarding the disclosing party, that's ZeniMax's

13  proprietary computer entertainment software, including virtual

14  reality (VR), testbed software, and related assets."

15         Do you see that there?

16  A.   Yes.

17  Q.   And you see that it says, "The receiving party" -- that's

18  Mr. Luckey as above -- "and each of his officers, directors,

19  employees, and counsel, if any, will be legally bound."

20         Do you see that it says that?

21  A.   I see that.

22  Q.   Okay.  It's not too long.  Let's just go to the next page.

23         Now, there's -- there is a section that says

24  "Proprietary Information."

25         Do you see it says, "Scientific, technical,

1  engineering information, inventions, developments, products,

2  formulas, prototypes, methods, techniques, processes,

3  procedures" -- do you see that so far?  Are you with me?

4  A.    Yes.

5  Q.    Okay.  Then it says "computer programs and software

6  (whether as source code or object code)."

7        Do you see that?

8  A.    Yes.

9  Q.    Okay.  Now, setting that aside, do you know what -- you're

10  a programmer.  You know what object code is, right, sir?

11  A.    I assume it refers to an executable.

12  Q.    Yes.  Some people call it an executable.  Thank you.

13        "Documentation, technologies, plans, research."

14        Let's look at the next portion here.

15        It says, "Proprietary information shall not

16  include" -- and there's four things.  Let me point you to the

17  fourth -- "things that are independently developed without

18  reference or use of the proprietary information above."

19        Do you see it says that?

20  A.    Yes.

21  Q.    Okay.  And there is one more point I want to walk through.

22        Let's go to the next page.

23        "Ownership."  Do you see it says, "All prior

24  information that shall come into the receiving party's custody

25  or possession is and at all times shall be the exclusive

```
 1   property of the disclosing party."
 2           Do you see that, sir?
 3   A.   Yeah, I see what you have up on the screen.
 4   Q.   Okay.  Great.
 5           Are you aware, if you know, that only after this NDA
 6   was signed ZeniMax opened up what is known as an SFPT site and
 7   gave Palmer Luckey a password and sent software to Mr. Luckey?
 8   A.   No.
 9   Q.   Okay.  Are you aware of whether anyone at Oculus,
10   including Mr. Luckey, ever asked ZeniMax to sign a
11   nondisclosure agreement before sending any of their stuff to
12   us?
13           MS. WILKINSON:  Objection, Your Honor.  This is in
14   2012.  Mr. Zuckerberg didn't know these folks.  He's just
15   testifying.  He has no basis for asking these questions to
16   Mr. Zuckerberg.
17           THE COURT:  If he knows.  Only if he knows.
18   Overruled.
19           THE WITNESS:  Sorry.  Can you repeat the question?
20   BY MR. SAMMI:
21   Q.   Sure.  Are you aware of any nondisclosure agreement that
22   Oculus made ZeniMax sign before giving ZeniMax anything?
23   A.   No.
24   Q.   Okay.
25           (Pause)
```

```
 1   Q.   Are you aware that Mr. Carmack has stated that Oculus
 2   wouldn't exist as a funded company without ZeniMax?
 3   A.   No, I'm not aware of that.
 4   Q.   Okay.  Let's talk about how you decided to buy Oculus.
 5        You were introduced to Oculus by your friend Marc
 6   Andreessen, right?
 7   A.   Yes.  And he's a Facebook board member.
 8   Q.   And he's a member of the board of Facebook, right?
 9        Let's talk about Mr. Andreessen for just a minute.
10   Mr. Andreessen is what is known as a Silicon Valley venture
11   capitalist, right?
12   A.   Yes, he is a venture capitalist, and he lives in Silicon
13   Valley.
14   Q.   Let me back up for just a minute.  Just a couple of things
15   I want to ask you as well.
16        Do you have any knowledge of a founder of Oculus, a
17   person by the name of Mr. Nate Mitchell coming to id's offices
18   here in Dallas with a desktop computer and getting virtual
19   reality technology software from id?  Do you have any knowledge
20   of that?
21   A.   No.
22   Q.   Are you aware of whether in the fall of 2012 into 2013,
23   whether Mr. Carmack, while working at id and ZeniMax, provided
24   technical advice over and over to Oculus?  Are you aware of any
25   of that?
```

1   A.   Not really.

2   Q.   Let's get back to Mr. Andreessen just for a second.  Okay?

3        Mr. Andreessen is a friend of yours, Silicon Valley

4   venture capitalist.  Will you agree with me on that?

5   A.   Yes.

6   Q.   Okay.  Also on the board of Facebook, correct?

7   A.   Yes.  I think that that's the most important connection

8   here.

9   Q.   Okay.  You take his advice and counsel sometimes?

10  A.   Sometimes, yes.  He's a smart guy.

11  Q.   Okay.  He is.

12       And when he, Mr. Andreessen, introduced Oculus to

13  you, he told you that the key was John Carmack, didn't he?

14  A.   I think he sent an email where he mentioned John in

15  addition to a number of other technical accomplishments that

16  the Oculus team had.

17  Q.   Let's take a look.

18       Let's put up PX1288.

19       Mr. Zuckerberg, I'll hand you a copy of it as well.

20  A.   Thank you.

21  Q.   Okay.  This is an email from Mr. Andreessen to you, sir,

22  dated November 5, 2013, with the subject line "Have you seen

23  Oculus?"

24       Do you see that?

25  A.   Yes.

```
 1    Q.   Let's take a look at it.

 2              Mr. Andreessen says, "It blew my brain wide open."

 3              Do you see that?

 4    A.   Yes.

 5    Q.   And Mr. Andreessen is telling you here that he,

 6    Mr. Andreessen, has been working in and around 3D graphics and

 7    VR for 25 years and this was a totally new experience.

 8              He's telling you that, right?

 9    A.   That's what it says here.

10    Q.   That's right.

11              And -- and you take him for his word when you read

12    it?

13    A.   Yes.

14    Q.   Okay.  And then this last paragraph says, "The key seems

15    to be that they" -- and you know the "they" he's referring to

16    is Oculus, right?

17    A.   Yes.

18    Q.   -- "they have added John Carmack, co-founder of id,

19    co-creator of Doom and Quake, and essentially the inventor of

20    3D computer games and one of the great all-time hackers, as

21    their CTO.  He's completely obsessed with every detail of it.

22    I wanted to just give him all my money on the spot."

23              Do you see that?

24    A.   Yes.

25    Q.   It's a pretty ringing endorsement, isn't it, of Oculus?
```

```
 1   A.    He seemed excited.

 2   Q.    You have the email.

 3         Do you see the name "Palmer Luckey" anywhere on that

 4   email?

 5   A.    No.

 6   Q.    Okay.  So you decided to try a demo from Oculus, a VR

 7   demo -- right? -- at some point in time after you were

 8   introduced?

 9   A.    Yes.  And I think that this email is asking me --

10   Andreessen was interested in investing in Oculus, and since

11   Andreessen was a board member at Facebook, he thought that I

12   could serve as a reference for Brendan, Oculus's CEO, about

13   what Andreessen might be like as a board director at Oculus.

14         So that's how I got connected to Brendan.  We talked

15   about the technology and agreed that we would connect the next

16   time he was up in Northern California and near our offices so I

17   can check out what they were working on.

18   Q.    Got it.

19         What's the address of Facebook?

20   A.    1601 Willow Road.

21   Q.    Isn't it -- isn't it -- do you have an address at 1 Hacker

22   Way?

23   A.    Yeah.  I think that that might be an internal -- I'm

24   actually not sure how this works.  Those are both the address.

25   Q.    Got it.
```

1    A.   I think 1601 Willow Road, my understanding, is the address

2    of the campus, and then within the campus there are

3    different -- different numbers, and we call the main road

4    Hacker Way.

5    Q.   Hacker Way.

6         Okay.  Now, let's take a look at an email you wrote

7    to Brendan after -- I'm going to hand it to you.

8         Well, let's put it up on the screen and look at it

9    first before we talk about it.

10        This is PX377.

11        There you go.  I will give you a moment to peruse it,

12   and let me know when you're ready.

13        (Pause)

14   A.   Okay.

15   Q.   Okay.  So I put some portions on it -- on the screen.

16        Is this an email from you to Mr. Iribe at some point

17   after you had seen a demo of Oculus?  Right?

18   A.   Yes.

19   Q.   Okay.  And you say, "It was great hearing your vision and

20   seeing the demos yesterday."

21        And then you say, "As I said yesterday, my immediate

22   reaction was that a huge amount of the value will be in the

23   social space created, and the most valuable social space will

24   be the one that establishes a massive active network first."

25        Do you see that?

```
 1   A.    Yes.
 2   Q.    And you knew that whoever gets into VR first and
 3   establishes a massive social network, active network, first
 4   would have a real advantage, right?
 5   A.    Yes, but I want to make sure that this is complete.
 6           So being in VR and building the social services for
 7   VR are somewhat different -- right? -- just like Facebook is an
 8   app that runs on phones, but we don't own the phones or run the
 9   phones.
10           So, you know, I tend to, because of what I do, think
11   about things from the perspective of connecting people and
12   building social experiences.  So, yeah, that was my first
13   reaction upon seeing where -- what they had built with VR was,
14   wow, this is a platform where you could build some amazing
15   social experiences, and, of course, social experiences are more
16   valuable when your friends and your community are there.  So
17   whoever builds an active network and community around that
18   social experience first, I think, has the best shot of building
19   out those social experiences for the world.
20   Q.    And you told me at our deposition that you missed the
21   mobile -- the smartphone revolution, and you didn't want to
22   miss VR, right?
23   A.    Yes, something like that.  The mobile phones --
24   smartphones came out in 2003, right, before Facebook was
25   founded.
```

1    Q.    Right.

2    A.    So Facebook started in 2004, and these two waves of

3    technology have sort of developed around the same time.

4          Because of that, Facebook hasn't really been involved

5    in designing the operating systems and phones, companies like

6    Google and Apple have done that instead, and that in some cases

7    meant we haven't been able to design the experiences that we

8    hoped to deliver for our community.

9    Q.    Okay.

10   A.    So we look at virtual reality and future computing

11   platforms that -- you know, there's always a new one, right?  I

12   mean, there are desktop computers, and then there's mobile

13   phones after that, and there is going to be more after that.

14         And we looked at virtual reality and augmented

15   reality as one example of the type of platform that could

16   happen, that could come in the future and -- by both building

17   the community and the social services around that and playing a

18   role in developing how VR worked, we thought that we could

19   build the best experiences for our community.  So we wanted to

20   make sure we were involved in both.

21   Q.    Got it.

22         Okay.  Let's -- let's see what else you've said about

23   Oculus.

24         You shopped around, too, right?  You looked at other

25   VR experiences in addition to Oculus, didn't you?

```
 1   A.   Yes.
 2   Q.   Let's take a look at PX142.  It's multiple pages.
 3   A.   All right.
 4   Q.   PX142 are messages between you and Amin Zoufonoun.  I
 5   mentioned him earlier.  He's your top deal guy at Facebook,
 6   right?
 7   A.   Yes.  He runs corporate development.
 8   Q.   Okay.  So you write to him, "I just went to this VR lab at
 9   Stanford, and it was totally awesome."
10        Right?  Is that what you write?
11   A.   It looks like it.
12   Q.   Yeah.  And Stanford is the Stanford University out in Palo
13   Alto, California?
14   A.   Yes.
15   Q.   Okay.  And then immediately after that, you write, "It
16   also confirmed for me that Oculus is miles ahead of everyone
17   else."
18        Do you see that?
19   A.   Yes.
20   Q.   So you knew Oculus was first in that space at that time,
21   right?
22   A.   I'm not sure that's what this says, but I certainly
23   believe that Oculus had an advantage.
24   Q.   So --
25   A.   It doesn't say anything about them being first.  It says
```

1    about them being ahead.

2    Q.   So they're miles ahead of everyone else.

3         We can agree on that, right?

4    A.   That's certainly what I thought at this point.

5    Q.   Okay.  Now, at some point in time you had a meeting at

6    your house, on your patio, in March of 2014 with John Carmack

7    and Brendan Iribe right when you were thinking about buying

8    Oculus.

9         Do you remember that meeting?

10   A.   Yes.

11   Q.   That was the first time you had ever met John Carmack,

12   right?

13   A.   Yes.

14   Q.   It was the three of you at your house, correct?

15   A.   I think the three of us were there, although I thought

16   there were different conversations.  I remembered talking to

17   Brendan and Carmack separately.  We may have also spoken

18   together, I think, for a period, but I think we also each had

19   time separately.

20   Q.   Okay.  And you knew who John Carmack was, right?

21   A.   Yes.

22   Q.   And you knew that John Carmack was associated with id

23   before he ever went to Oculus, right?

24   A.   I did not.

25   Q.   Okay.  Let's take a look at PX102.

```
 1              (Pause)
 2    BY MR. SAMMI:
 3    Q.   This is an email from you on Sunday, March 16th, to
 4    John Carmack, and I believe this is the day of the meeting or a
 5    meeting that you had at your house where you met Mr. Carmack on
 6    first -- for the first time face-to-face.
 7              Do I have that right?
 8    A.   Yes.
 9    Q.   Okay.  And you write, "It was surreal for me as I grew up
10    playing your games and have always admired your work."
11              Do you see that?
12    A.   Yes.
13    Q.   Okay.  And so you at least knew of the games that
14    John Carmack --
15    A.   Yeah.
16    Q.   -- had built, right?
17    A.   Yes.  I knew of his games.
18    Q.   Like Doom and Quake and all those?
19    A.   Yes.
20    Q.   You grew up playing those games?
21    A.   Yes.
22    Q.   Now, John Carmack really talked about VR -- right? -- with
23    you, at that meeting?
24    A.   That was the topic of the meeting.
25    Q.   That was the topic of the meeting.
```

```
 1              Okay.  Three days later -- three -- well, let me ask
 2    you this:  In the meeting that you had with John Carmack to
 3    discuss VR, was Palmer Luckey in that in-person meeting?
 4    A.    No.
 5    Q.    Okay.  And after --
 6    A.    But actually, I think most of that meeting was one-on-one.
 7    Q.    One-on-one with Mr. Character?
 8    A.    Yeah.  And I think Brendan was there for a portion of it
 9    and then we talked afterwards was my recollection.
10    Q.    Okay.  And after Carmack left, you worked out a deal, a
11    pre-deal with Brendan Iribe to buy Oculus, right?
12    A.    I think we'd been talking about that for a while.  I'm not
13    sure when we finalized that, but we probably continued talking
14    about it that day.
15    Q.    Okay.  So this is on Sunday, March 16th.  Three days later
16    you set out your ideal schedule for purchasing Oculus.  Okay?
17              Do you remember writing an email to maybe an
18    administrative assistant or yourself that lays out your
19    schedule for buying Oculus?
20    A.    Yes.
21    Q.    Okay.  Let's take a look at that.  That's PX658.
22              And this is an email from you to Ms. Andrea Besmehn.
23              Is that someone that works with you?
24    A.    Yeah.
25    Q.    Okay.
```

```
 1   A.   Yes.
 2   Q.   And so you write, "Here's the timeline I made for myself
 3   of the ideal schedule for all things that need to get done with
 4   Oculus over the next week."
 5          Do you see that?
 6   A.   Yes.
 7   Q.   Okay.  So you laid it out and you said, "Okay.  Thursday,
 8   I'm going talk to Andreessen in person."
 9          Do you see that?
10   A.   Yes.
11          MR. SAMMI:  I would like to move, if I haven't
12   already, Your Honor, PX658 into evidence.
13          MS. WILKINSON:  No objection.
14          MR. SAMMI:  Thank you.
15          THE COURT:  It's admitted into evidence.
16          (Plaintiffs' Exhibit No. 658 received)
17          MR. SAMMI:  Thank you.
18   BY MR. SAMMI:
19   Q.   So you want to talk to Andreessen, your friend who
20   recommended Oculus, in person on Thursday, correct?
21   A.   Yes, in his capacity as a director of Facebook.
22   Q.   In his capacity as a director of Facebook.
23          You knew at this point in time that Mr. Andreessen
24   was also a board member of Oculus, correct?
25   A.   Yes.
```

```
 1   Q.   Okay.  Was it just you and him?
 2            First of all, did you have that meeting on Thursday
 3   with Mr. Andreessen?
 4   A.   I had the meeting.  I don't know if it was Thursday, but I
 5   think it probably was.
 6   Q.   Was that meeting face-to-face, sir?
 7   A.   Yes.
 8   Q.   Did you take any notes?
 9   A.   No.
10   Q.   Okay.  Friday, you have a follow-up call with
11   Mr. Andreessen, correct?
12   A.   I don't think so.
13   Q.   You actually say that in your schedule, right?
14   A.   I don't think that happened.  I think I -- as part of
15   this, I was -- I wanted to make sure that I had time allocated
16   in case Andreessen wanted to follow up the next day to talk
17   through any concerns that he had.
18   Q.   Okay.
19   A.   I don't think he -- he had any concerns, and he recused
20   himself from the deal.  So I think we just had that first
21   conversation in person.
22   Q.   Okay.  And Mr. Andreessen recused himself from the deal?
23   A.   Yes.
24   Q.   Because he's on both sides, right?
25   A.   Yes.
```

```
 1    Q.   He's a board member of Facebook, a board member of Oculus.
 2    He owns a chunk of Oculus, and they're selling Oculus to
 3    Facebook, right?
 4    A.   Yes.  So he didn't vote on the deal on either side.
 5    Q.   He didn't vote on the deal.  Okay?
 6    A.   Uh-huh.
 7    Q.   Friday you write, "begin legal diligence."
 8              Do you see that?
 9    A.   Yes.
10    Q.   So your plan was for a $2-point-something billion deal to
11    begin the legal diligence on Friday and to sign the deal on
12    Monday, over a weekend, right?
13    A.   Yeah.
14    Q.   Okay.  You wanted to have a board call on Sunday to
15    finalize the deal that -- that's talking about the board of
16    Facebook, right?
17    A.   Yes.
18    Q.   That's the evening before you wanted to sign the deal on
19    Monday, right?
20    A.   Yes.
21    Q.   Okay.  Just out of curiosity, at this time, did you know
22    that Mr. Andreessen and his fund had invested about $37 million
23    into Oculus?
24    A.   I knew that he had invested.
25    Q.   Okay.
```

1   A.   I don't know the exact amount.

2   Q.   Okay.  And when the deal -- and when the deal closed, you

3   know that Mr. Andreessen and his fund made about

4   $270-some million in less than a year?

5   A.   That is not surprising.

6   Q.   Okay.  Now, just to put this in perspective, Oculus is the

7   second largest acquisition in Facebook's history; am I correct?

8   A.   That is correct.

9   Q.   You bought Instagram for $1 billion.

10          Do I have that right?

11  A.   Around that, yes.

12  Q.   Okay.  Now, you wanted to begin legal diligence on a

13  Friday and sign the deal on Monday for a

14  $2-point-something billion company over a weekend.

15          It takes longer than that to inspect a house, doesn't

16  it?

17  A.   I can't really speak to the time to inspect a house, but

18  we've done --

19  Q.   It took that long --

20  A.   -- multiple -- we've done multiple large deals, and, you

21  know, an important piece of context is that these are often

22  young and small companies.  Oculus did not have a lot of

23  employees.  They -- you know, they hadn't been -- they didn't

24  have a lot of products in the market or anything like that, so

25  our experience having bought WhatsApp, which is a larger

1    acquisition, and they had hundreds of millions of people using

2    their app, and having bought Instagram, which had I think

3    20 million or so people using their app at the time of the

4    acquisition, was that we were able to complete legal diligence

5    on a relatively new company pretty quickly because there just

6    weren't -- it's not like there were decades of documents to go

7    through.

8            Now, in practice, my understanding is that this

9    actually took longer, so whether this was the timeline that I

10   had set out or noted for myself, I don't actually think we

11   announced it on Monday.  So I think it did end up taking a

12   little bit longer to get through everything and conclude that

13   we wanted to move forward.

14   Q.    It took one day longer, didn't it?  It was announced on

15   Tuesday instead of Monday, right?

16   A.    Yeah, I think Tuesday or Wednesday.

17   Q.    Okay.  So it took one day longer, and we're going to get

18   to that.

19           But let's look at Friday when you start legal

20   diligence.  I want to take you to some communications between

21   Mr. Amin Zoufonoun, your top deal guy who you were working with

22   on this acquisition.  Okay?

23           Let's take a look at PX146.

24           Now, this is between you and Mr. Zoufonoun.

25           Do you see that on the screen?

```
 1   A.   Yes.
 2   Q.   And this is Friday morning, and the red is Dallas time
 3   because it's -- the texts come in UTC, which is universal time.
 4            MS. WILKINSON:  Your Honor, I'd just ask Mr. Sammi to
 5   refer to the specific -- I don't mind him putting it up
 6   there -- but the number on the left so we have it in the record
 7   because there's a lot of WhatsApp.
 8            THE COURT:  Be more specific in what you're talking
 9   about.
10            MR. SAMMI:  I will, Your Honor.
11            THE COURT:  Locate it.
12            MR. SAMMI:  Let me get that number.
13            (Pause)
14            MR. SAMMI:  The top text is -- give me a moment.
15   I've got it right here -- 26129.
16            MS. WILKINSON:  Thank you.
17            MR. SAMMI:  You're welcome.
18   BY MR. SAMMI:
19   Q.   Now, you write, "I'm starting to get more worried about
20   Oculus."
21            Do you see that there?
22   A.   Yes.
23   Q.   That's a Friday morning when you begin legal diligence.
24            You wrote that, right?
25   A.   Yes.
```

1    Q.   Okay.  Then right around that time, you wrote in text

2    26131, "I think they misrepresented some things to us that

3    would have led us to offer a lower price than we have."

4            You wrote that, right?

5    A.   Yes.

6    Q.   Okay.  That's Friday morning.  Let's go to the next slide.

7            And you are writing, now an hour or so later, a

8    couple minutes later, in text 26148 to Mr. Amin Zoufonoun, "Do

9    we mostly have to choose between doing this as-is or walking

10   away?"

11           You wrote that, right?

12   A.   Yes.

13   Q.   And then Amin writes back to you, "Often that's the

14   result, breaking up.  I am not sure if that would be the case

15   here.  There are things they told us that simply aren't true."

16           Do you see that?

17   A.   Yes.

18   Q.   So Mr. Zoufonoun is writing to you on the first day you

19   begin legal diligence on a $3 billion deal that there are

20   things that Oculus told you, Facebook, that simply aren't true.

21           He's writing that, right?

22   A.   That's what he said.

23   Q.   Okay.  And then Mr. Amin, in text Number 26183, tells

24   you -- this is hours later -- "There is more risk in doing this

25   quickly over a weekend without really digging in on their

```
 1  agreements, IP, et cetera."
 2          Do you see that?
 3  A.   Yes.
 4  Q.   Okay.  So Mr. Zoufonoun is writing these things to you
 5  while you're doing diligence, correct?
 6  A.   While he's doing diligence.
 7  Q.   You're not doing any diligence?
 8  A.   Well --
 9  Q.   He's the one doing it?
10  A.   The legal diligence and reading all the documents was our
11  legal and deal team.
12  Q.   Okay.  And let's see the next slide, which is text 26186.
13  Okay?
14          This is from you back to Amin, and you write, "Let's
15  keep pushing forward until we have something we can sign on a
16  moment's notice.  Then we can figure out how long we wait for
17  diligence."
18          You wrote that, right, sir?
19  A.   Yes.
20  Q.   Okay.  You were intent on acquiring Oculus.  You wanted to
21  buy Oculus, right?
22  A.   Yes.
23  Q.   Okay.  So did you tell the Facebook board that your top
24  deal guy is telling you that there is risk in doing this over a
25  weekend without digging into their agreements and their IP?
```

```
 1   A.    I'm sure that was part of the discussion.
 2   Q.    Do you remember specifically, sir, whether you told the
 3   board of Facebook that your top deal guy is telling you on the
 4   day you're doing diligence there is risk in doing this over a
 5   weekend without digging into their agreements and their IP?
 6   A.    No, I don't remember that specifically, but I also think
 7   that -- that was Friday.  The board call would be a couple days
 8   later at earliest.
 9   Q.    Okay.
10   A.    Amin and the legal team would have led that part of the
11   discussion, and they would have flagged whatever risks that
12   they saw and also wouldn't have wanted us to proceed unless
13   they were comfortable with it.
14   Q.    Okay.  Did you tell the board, sir, of Facebook that there
15   are things that you thought Oculus told Facebook that simply
16   weren't true?
17   A.    I don't remember specifically, but I would imagine we did
18   talk about the things that we -- that we disagreed with them
19   on.
20         The things -- and just to make sure that we go
21   through the context on this, you know, these ended up being
22   things like how long it would take to deliver a product.
23   Q.    Uh-huh.
24   A.    Where -- I mean, just like when, you know, you used the
25   house analogy before, you know, I think anyone who has built a
```

1    house knows that the people who are the experts who are working
2    on it often get their estimates wrong about how long it's going
3    to take.
4            So our team had a different estimate of how long it
5    would take to bring the Oculus product to market than the
6    Oculus team did.
7    Q.   Okay.
8    A.   That's reasonable, right?  I mean, that doesn't speak to
9    any lack of integrity or them trying to do anything wrong here.
10   It's just that we disagreed with their assessment after having
11   dug into it, which might make us feel a little bit differently
12   about the deal.
13   Q.   Okay.
14   A.   But, you know, we decided that this was still by far the
15   best team that was out there and they still were going to do
16   the best work.  So even though it was going to take a little
17   bit longer and their advantage might be a little bit less than
18   we thought originally, we still concluded that it was the right
19   thing to move forward.
20   Q.   I've never built a house, but I think I get your point,
21   number one.
22           Number two, let me ask you this.  You didn't use the
23   word "exaggeration."  You used the words "simply not true,"
24   right?
25   A.   I think Amin used that.

```
1    Q.   Amin.  Your top deal guy did not tell you they are

2    exaggerating some of their estimates.  He said, "They are

3    telling us things that simply aren't true," right?  Isn't that

4    what he wrote?

5    A.   I think that's what he wrote.

6    Q.   Okay.

7    A.   But I do think it's important because you said

8    exaggeration, that --

9              MR. SAMMI:  Your Honor, I haven't asked a question.

10             THE COURT:  Wait, wait, wait.  Do you have an

11   objection?

12             MR. SAMMI:  I do, Your Honor.  The witness is

13   narrating.  I haven't asked a question.

14             THE COURT:  So is your objection, "Your Honor, please

15   instruct the witness not to answer a question if I haven't

16   asked one"?

17             MR. SAMMI:  Yes, sir.  Thank you for that.

18             THE COURT:  I will sustain that objection.

19             MR. SAMMI:  Your Honor, please.

20             THE COURT:  Mr. Zuckerberg, you have to wait till

21   they ask you a question.  I have to help these lawyers.

22             MR. SAMMI:  Thank you, Your Honor.  Thanks for the

23   help.

24             THE COURT:  I promise I will help your lawyer

25   equally.
```

```
 1            Let's stop.  Let's take a 15-minute break.
 2            MR. SAMMI:  Okay.
 3            THE COURT:  And I will teach Mr. Sammi how to build a
 4   house.
 5            MR. SAMMI:  Thank you, Your Honor.
 6            SECURITY OFFICER:  All rise.
 7            (Jury out)
 8            THE COURT:  Y'all better take a break.
 9            MS. WILKINSON:  Yes, sir.
10            THE COURT:  If you've got a seat, you get to keep
11   your seat, whatever.  So I don't think those people across the
12   hall are going to rush in here.  That's the way it is supposed
13   to be anyway.  So, I mean, you better go to the restroom,
14   y'all, if you're going to go.
15            Todd, run away.
16            (Recess at 10:18)
17            THE COURT:  Okay.  All right.  Are you ready?
18            MR. SAMMI:  Yes, sir.
19            THE COURT:  Have you got your mike on?
20            MR. SAMMI:  Yes, sir.
21            THE COURT:  Have you got your mike on?
22            THE WITNESS:  Yes, Your Honor.
23            THE COURT:  Okay.  There we go.
24            All right.  Did you learn how to build a house?
25            MR. SAMMI:  No, I didn't.
```

```
 1              (Pause)
 2              SECURITY OFFICER:  All rise for the jury.
 3              (Jury in)
 4              THE COURT:  Y'all be seated.
 5              Any of you need cough drops, I keep cough drops.
 6    Okay?
 7              I'll give them to David after the break.
 8              All right.  Mr. Sammi.
 9              MR. SAMMI:  Thank you, Your Honor.
10    BY MR. SAMMI:
11    Q.   Mr. Zuckerberg, are you ready to continue?
12    A.   I am.
13    Q.   Okay.  We left off with the weekend of diligence on the
14    deal for Oculus.
15              There was a big hitch in the deal, wasn't there, and
16    that hitch was Mr. Carmack balked and wouldn't become the CTO
17    of Oculus and join Facebook even though he's being offered
18    $100 million because he was concerned about ZeniMax's claims on
19    his work on VR; isn't that right?
20    A.   I don't know that to be true.
21    Q.   Are you aware that Mr. Carmack testified that he gave
22    notice to Oculus and Facebook that he was concerned that
23    ZeniMax would sue him for his work on virtual reality?
24    A.   Am I aware of that?  I haven't followed the testimony.
25    Q.   Okay.  Don't you know that as a fact that on the weekend
```

1   of the deal, Mr. Carmack made his concerns clear and gave

2   notice to Oculus and Facebook that he was concerned that

3   ZeniMax would sue him for his work on virtual reality?  Yes or

4   no.

5   A.   I don't think so.

6   Q.   You don't think so.

7        Is it your testimony here today that the entire deal

8   was delayed for 24 hours because of other issues besides

9   Mr. Carmack making his notice clear to Oculus and Facebook that

10  ZeniMax -- he thought ZeniMax was going to sue him for his VR

11  work?  Is that what you're saying?

12  A.   Yes.  From my perspective, we were evaluating up until the

13  end, and probably the delay was on, if any -- from the

14  timeframe was on my side trying to figure out whether we wanted

15  to move forward with the deal.

16  Q.   Okay.  Let me ask it this way.

17       Well, was Facebook on notice of Mr. Carmack's

18  concerns that ZeniMax would sue him for his work on virtual

19  reality?

20       MS. WILKINSON:  Objection, foundation.

21       THE COURT:  Sustain the objection.

22  BY MR. SAMMI:

23  Q.   So is Mr. Carmack wrong when he says under oath that he

24  made it clear to Oculus and Facebook that he was concerned that

25  ZeniMax would sue him for virtual reality -- for his work on

1    virtual reality?

2            MS. WILKINSON:  Objection, foundation.

3    BY MR. SAMMI:

4    Q.   Is he wrong?

5            THE COURT:  Sustained.

6    BY MR. SAMMI:

7    Q.   Why was the deal delayed, sir?

8    A.   Well, first, I'm not sure you can actually call it

9    delayed, because it happened pretty quickly, but to the extent

10   it took a couple of days longer than we thought it was going

11   to, we were having a lot of conversations internally on our

12   side about whether this was the right thing to go forward and

13   do.

14           And I think everyone can agree that $2 billion is a

15   big investment, and not only that, but we knew that we were

16   going to have to invest a lot more going forward and that this

17   would take a lot of focus from Facebook, which is a company

18   that, to date, hadn't really done anything in virtual reality.

19   We build social products.

20           So this was a really big strategy decision for us to

21   make, that we wanted to make a big investment to try to help

22   build this new computing platform, and we had taken a lot of

23   time to get to know the team, to confirm that we thought that

24   they were the best folks that were -- that were out there.

25           But it was a big and contentious discussion inside

1    the company that I think up until we came to a clear decision,

2    we -- we weren't 100 percent sure that we wanted to do it.

3    Q.   My question, sir, is specifically related to Mr. John

4    Carmack.  The deal was delayed, correct?  Yes or no.  In some

5    fashion.

6    A.   That's not my perspective.

7    Q.   Okay.  That's not your perspective.

8           Okay.  Are you aware of any concerns that Mr. Carmack

9    had regarding signing the deal and going to Facebook?

10          MS. WILKINSON:  Objection, foundation.

11          THE COURT:  Sustained.

12   BY MR. SAMMI:

13   Q.   Didn't you threaten to back out if John Carmack wouldn't

14   sign up with Facebook?

15   A.   There was a term in the deal that the key folks had to

16   join in order to close the deal, which, you know, makes sense.

17   I mean, that's -- you know, given that a huge amount of what we

18   were doing was trying to build the best team to work on virtual

19   reality with this notion that, you know, it wasn't just the

20   technology they had but five to ten more years worth of work

21   was what was going to be necessary.

22          So we needed all the key people to sign, and that

23   included John.  It wasn't only John, but it certainly included

24   him.

25          I was aware that Amin was having some sort of

1   negotiation with John and, I think, his wife about the terms

2   under which he would join, but I don't know that I had many

3   more specifics than that, and I always had a good deal of

4   confidence that we would end up working through those because,

5   in all of my conversations with John, he's very passionate

6   about this.

7           And it was very clear that if Oculus joined Facebook,

8   this was going to be by far the best place to work on virtual

9   reality, so I was always pretty confident that he was going

10  to -- that we were going to work through those issues.

11  Q.   Didn't you tell me at your deposition that if John Carmack

12  wouldn't move forward with the deal, it wouldn't happen?

13  A.   I don't remember what I said at the deposition, but I just

14  said that just 30 seconds ago.

15  Q.   And John -- so let's get this right.  If John Carmack

16  didn't sign up to come to Facebook, Facebook would not have

17  bought Oculus for $2-plus billion.

18          Do I have it right?

19  A.   Yes.  If the key people did not join, then we would not

20  have closed the deal.  That includes John.  It also includes

21  Brendan, and I think it includes Palmer, and I think it

22  includes Atman and a handful of the other key folks who were

23  involved in building Oculus.

24  Q.   All of those people that you just mentioned, sir, they

25  were already onboard and signed up by Sunday night, and the

```
 1 | last one was John Carmack, right?
 2 |          MS. WILKINSON:  Objection, foundation.
 3 |          THE COURT:  If he knows.  Overruled.
 4 |          THE WITNESS:  I'm not sure.  Just because one person
 5 | was the last to sign up doesn't mean that -- I'm just trying to
 6 | push back on your characterization that he was somehow the only
 7 | important person here because he was the last.  That's the only
 8 | thing I want to make sure --
 9 | BY MR. SAMMI:
10 | Q.   Sure.
11 | A.   -- is complete in my testimony.
12 | Q.   And thank you for that.
13 |          And so I just want to focus on the fact, fact number
14 | one.  You told me that if John Carmack wouldn't come, the deal
15 | wouldn't happen?  Do we agree on that?  I'm not
16 | mischaracterizing that in any way.
17 | A.   I think that's right.  We definitely specifically put into
18 | the deal that if any of the key people didn't join, we had a
19 | right to not close it.
20 | Q.   Okay.  And John Carmack was one of those people, right?
21 | A.   Yes.
22 | Q.   Okay.  Why did you think that John Carmack would withdraw
23 | and not come to Facebook?
24 | A.   I didn't.
25 | Q.   You had -- meaning when -- when the deal was being delayed
```

```
 1    and negotiations were going on between your right-hand man,

 2    Amin, and the Carmacks, Mr. Carmack and his wife, what did you

 3    think John's concerns were?

 4              MS. WILKINSON:  Objection, foundation, and your prior

 5    ruling.

 6              THE COURT:  Sustained.

 7    BY MR. SAMMI:

 8    Q.   Mr. Carmack's concerns were eventually satisfied, correct,

 9    and he signed on?

10    A.   You would have to ask him.

11    Q.   Well, let me ask it this way.

12              He signed on, right?

13    A.   Yes.

14    Q.   Okay.  When did you announce the deal?  Do you remember

15    you announced the deal on a Tuesday instead of a Monday?

16    A.   I think it was a Tuesday or Wednesday.

17    Q.   Okay.  How much did John Carmack get in the deal, roughly

18    speaking?

19    A.   A lot of money.

20    Q.   Yeah.  Like $100 million?

21    A.   Sounds reasonable.

22    Q.   Okay.  Let's take a look at Plaintiffs' Exhibit 1868.

23              Is that the announcement of the deal?

24    A.   I think this is one of the announcements.

25    Q.   An announcement of the deal, March 25, 2014 -- right? --
```

1   right after Menlo Park, California?

2            Do you see that?

3   A.    Yes.

4   Q.    And Facebook filed this with the Securities and Exchange

5   Commission; do you know?

6   A.    I think that's correct.

7   Q.    Okay.  So in the announcement that you filed with the

8   Government, you said you think that Facebook plans to extend

9   Oculus's existing advantage in gaming to new verticals and you

10  hope it is a strong candidate to emerge as the next social and

11  communications platform, right?

12  A.    Yes.

13  Q.    Okay.  So where are we now?  You've done diligence over a

14  weekend, we have got the deal that's been announced, and you

15  have an agreement -- an agreement to buy Oculus, but you -- the

16  money hasn't changed hands yet, right?

17  A.    Yes.

18  Q.    Okay.  So you have an agreement.

19           Now, you have the right -- Facebook had the right to

20  walk away from this entire deal, right?

21  A.    No.  There were certain closing conditions.  The deal,

22  after we announced it, we sought Government approval.

23  Q.    Uh-huh.

24  A.    And assuming that we got Government approval and that a

25  few other conditions were met, including the key people signing

```
 1   on, the deal would automatically close.  So it's not as if we
 2   had any kind of decision at that point.
 3   Q.   Okay.  Let me enter PX411.  This is an agreement and plan
 4   of merger, and I will show it to you on the screen.
 5            Okay.  So this is the agreement.  You recognize this
 6   front page or the title of this as the agreement to buy Oculus?
 7   A.   No.
 8   Q.   Okay.
 9            (Pause)
10   A.   Thank you.
11   Q.   Sure.
12            And I'm using this just to put it in front of you to
13   see if you recognize it.  I'm going to put portions on the
14   screen, and we can go through that in particular.
15   A.   All right.  I assume you don't want me to read through
16   this whole thing.
17   Q.   No, no.
18            First, that's your signature -- right? --
19   Mr. Zuckerberg, on the screen?
20   A.   Yes.
21   Q.   You entered into this agreement on behalf of Facebook,
22   correct?
23   A.   Yes.
24   Q.   And that's Mr. Iribe's signature, Mr. Brendan Iribe's
25   signature, and he entered into this agreement on behalf of
```

1  Oculus, right?

2  A.   Yes.

3  Q.   So let's look at a couple of things.

4        MR. SAMMI:  Go to the next slide.

5        Okay.  These are warranties.  Okay?  And isn't it

6  true that -- that one of the things Oculus warrantied to

7  Facebook was that it had full title and ownership of all

8  intellectual property necessary to enable it to carry on the

9  business.

10       Are you with me so far?

11  A.   Yes.

12  Q.   Okay.  And then there is something called termination

13  where at any time prior to closing -- and closing means when

14  the money changes hands, right?

15       At any time prior to closing, you, Facebook, can

16  terminate and abandon this agreement if there shall have been

17  any inaccuracy in any warranty?

18       Do you see that?

19  A.   Yes.

20  Q.   So just to, you know, kitchen table it for a second, that

21  means Oculus gives you a warranty that I own all the IP, and if

22  you see something that you think that Oculus's warranty is bad,

23  you can walk away.  That's the simplest way to put it, right?

24  A.   Sure.

25  Q.   Okay.  Now, what happens next?  Two weeks later after you

1  entered into this agreement, ZeniMax, through my law firm, sent

2  Facebook a letter.

3          Do you have any understanding of a letter that

4  Skadden, the law firm representing ZeniMax, sent to Facebook on

5  April -- around early April, April 10th?

6  A.   I know that you sent a letter.

7  Q.   Okay.

8          MR. SAMMI:  And let's put on the screen PX787.

9          (Pause)

10  Q.   And this is a letter --

11          MR. SAMMI:  If we can scroll down.

12  Q.   -- April 10, 2014.  This is to Mr. Colin Stretch.  I

13  believe he's your top lawyer, right?

14  A.   Yes.

15  Q.   He's here with us today, I think.

16  A.   I don't see him, but I think he is.  There he is.

17  Q.   There he is.

18          Okay.  He's the general counsel of Facebook, right?

19  A.   Yes.

20  Q.   Now, this is a one-paragraph letter sent by one of my

21  partners.  He's probably a little nicer than me.  It's a pretty

22  standard paragraph.

23          Do you ever remember seeing this?

24  A.   I don't remember.

25  Q.   Did anybody bring this letter to your attention on or

```
 1    around April 10, 2014?
 2    A.   I think so.
 3    Q.   Who?
 4    A.   I assume it would be someone from our legal team.
 5    Q.   Okay.  And you see it says in the last sentence -- well,
 6    let's read it.
 7            "We represent ZeniMax in connection with its claimed
 8    interest in certain property used by Oculus VR in its Oculus
 9    Rift product.  Enclosed please find correspondence sent today
10    to counsel for Oculus regarding these matters.
11            "As you will see, ZeniMax is hopeful that it will be
12    able to resolve these matters expeditiously.  Nevertheless, in
13    light of Facebook's announced acquisition of Oculus, we wanted
14    you to be aware of these matters."
15            Do you see that?
16    A.   Yes.
17    Q.   Okay.  So ZeniMax gave Facebook notice after it agreed to
18    buy Oculus but before it finished the deal that it had claims,
19    right?
20            MS. WILKINSON:  Objection, foundation.
21            THE COURT:  Well, I will let him -- I will let him
22    ask that.
23    BY MR. SAMMI:
24    Q.   Isn't that what it said?
25            THE COURT:  Overruled.  Overruled.
```

```
 1              THE WITNESS:  Can you state that again?
 2   BY MR. SAMMI:
 3   Q.   Sure.  So ZeniMax is telling Facebook after it agreed to
 4   buy Oculus but before it closed that ZeniMax has claimed
 5   interest in property used by Oculus in its Oculus Rift product,
 6   right?
 7   A.   That seems to be what ZeniMax is saying in this letter.
 8   Q.   Got it.
 9              Did you ever see the letter that we sent to Oculus
10   that was attached to this letter?
11   A.   I don't think so.
12   Q.   Okay.  Did anyone ever bring that letter to your
13   attention?
14   A.   I'm not sure what you're referring to.
15   Q.   The letter that is stated here, "Enclosed please find
16   correspondence that we sent today, April 10, to counsel for
17   Oculus."  That letter.
18   A.   I don't think so.
19   Q.   Okay.
20              MR. SAMMI:  I don't want to publish this yet.
21              Do you mind if I show it to the witness?
22              MS. WILKINSON:  You can show it to him.
23              (Pause)
24              THE WITNESS:  Thanks.
25              (Pause)
```

```
1    A.   Do you want me to read this whole thing?

2    Q.   No.  I want you to skim it, sir, and see if you recognize

3    it.

4    A.   I don't recognize this.

5    Q.   Okay.  Are you aware of whether in that letter that was

6    attached to the letter we saw to Facebook ZeniMax specifically

7    discussed the nondisclosure agreement that Palmer Luckey

8    signed?

9              MS. WILKINSON:  Objection, Your Honor.  He already

10   said he's not aware -- objection, foundation.  He already said

11   he's not aware of the letter.

12             THE COURT:  What about that?

13             MR. SAMMI:  Okay.

14             THE COURT:  Sustained.

15   BY MR. SAMMI:

16   Q.   I'm just asking you are you aware -- you know what, let's

17   go.

18             So you never saw -- someone brought -- just so I have

19   it straight, someone, probably a lawyer, brought to your

20   attention the first letter, the small paragraph that we saw,

21   right?

22   A.   I think so.

23   Q.   Nobody brought to your attention the letter that was

24   actually attached to it as well from us to Oculus?

25   A.   No.
```

```
 1              I think what would normally happen in a case like
 2    this is, if someone has some claim or alleges something, our
 3    legal team will look into it.  That's their job, and we have a
 4    lot of good lawyers who will look into this.
 5              Now, it is pretty common when you announce a big deal
 6    or do something that all kinds of people just kind of come out
 7    of the woodwork and try to claim that they own some portion of
 8    the deal.
 9              I mean, this case, I think like probably a lot of the
10    people in the Court, I had never even heard of ZeniMax before,
11    and I bet that most of the -- that a lot of the people on our
12    legal team hadn't either.
13              So I know our legal team would take this seriously
14    and would look into this and examine this, but they're not
15    going to take a lot of my time going through a lot of details
16    on something that they don't think is credible.
17    Q.   Come out of the woodwork.  Let's talk about that for a
18    second, sir.
19              Come out of the woodwork.  Did everyone at Oculus and
20    Facebook forget that the only place that chief technology
21    officer of Oculus worked for his entire career was ZeniMax and
22    id?  Did they forget that?  Was that out of the woodwork, that
23    fact?
24    A.   I'm not sure that most people knew that.
25    Q.   Most people, not on the street.  People who are buying a
```

```
 1   virtual reality company called Oculus whose chief technology
 2   officer they make on day one John Carmack.
 3          Those people thought that ZeniMax was just out of the
 4   woodwork.
 5          Is that what you're saying?
 6   A.   Sorry.  Can you state your question again?
 7   Q.   Yeah.
 8          You said, you know, in transactions like this people
 9   come out of the woodwork, just, you know, a money-grab claim.
10          I'm asking:  The people really involved here --
11   John Carmack himself; Brendan Iribe; Palmer Luckey, the guy who
12   signed the NDA; anyone at Oculus -- did these people forget
13   that John Carmack worked for us for 20 years?
14          MS. WILKINSON:  Objection, foundation.  He can't
15   speak for the people.
16          THE COURT:  Sustained.
17   BY MR. SAMMI:
18   Q.   Do you think -- do you -- are you sitting here before this
19   jury and telling this jury that by the time you closed this
20   agreement and we sent you a letter that the team, the people
21   that worked on diligence at Facebook and yourself really had no
22   idea who we were and we came out of the woodwork?
23          MS. WILKINSON:  Same objection, foundation.
24          THE COURT:  Sustained.
25   BY MR. SAMMI:
```

```
 1   Q.   Mr. Zuckerberg, just so I have it right, you think that
 2   ZeniMax came out of the woodwork.
 3           Do I have that right?
 4   A.   I want to make sure you're not misstating what I said.
 5   What I said was that often when you launch a product or you --
 6   there's a deal that -- where there's a lot of money involved,
 7   different people and companies will try to make claims, and
 8   we've had a lot of examples of that at Facebook.  And a lot of
 9   them have been untrue, and that's something we're pretty used
10   to dealing with.
11           Now, we take them seriously, when there are claims.
12   I'm here personally because I take this seriously.  This is --
13   this is an important case, and we're all spending a lot of time
14   on this.  And it's serious and important that we get to the
15   right answer here, but I also just want to make sure that I
16   provide the context because you're asking these questions about
17   why I may or may not have been briefed on specific details.
18           And I think it's important to give that context that
19   we -- I asked -- you know, I had my legal team look into all
20   claims that would come up, and they're going to come bring me
21   the stuff that they think is important for me to know.
22   Q.   Okay.  So let me -- let me do it this way.
23           When John Carmack says that he gave notice to Oculus
24   and Facebook on that weekend before coming over to Facebook
25   that he was concerned about ZeniMax suing him for his work on
```

```
 1   VR, in your opinion, is that coming out of the woodwork?
 2            MS. WILKINSON:  Objection, foundation, calls for
 3   opinion.
 4            THE COURT:  Sustained.
 5   BY MR. SAMMI:
 6   Q.   Is that an example of coming out of the woodwork as you've
 7   defined that term, "coming out of the woodwork"?
 8            MS. WILKINSON:  Same objection.
 9            THE COURT:  Same ruling.
10   BY MR. SAMMI:
11   Q.   So Facebook has a big team of lawyers -- right? -- you
12   said, looking into these things?
13   A.   Yes.
14   Q.   Did anybody write back to ZeniMax?
15   A.   I don't know.
16   Q.   Do you know?
17   A.   I don't know.
18   Q.   Anybody pick up the phone and call?  Do you know?
19   A.   No, I don't know.
20   Q.   After the notice letter of April 10 that we looked at,
21   something else happened.
22            ZeniMax sued Oculus, right?
23   A.   Yeah, at some point.
24   Q.   You know how it works, right?
25            Do you know the facts, and just tell me if you don't,
```

1  that ZeniMax first sued Oculus and then sued Facebook, right?

2  A.   I'm not specifically aware of that, but if they sued

3  before Oculus was formally a part of Facebook, that makes

4  sense.

5  Q.   Let's go through that.

6          Have you seen -- let me put up slide 15.  This is the

7  complaint, just the first page, of what -- of us, ZeniMax,

8  suing Oculus after you had signed the agreement with Oculus but

9  before you closed the deal, dated May 21, 2014.

10         Are you aware, sir, that ZeniMax, after you made this

11 announcement, only sued Oculus and not Facebook?

12 A.   I wasn't aware of that until you just put this up.

13 Q.   Until right now?

14 A.   Right.  I mean, Oculus wasn't a part of Facebook yet, so

15 it makes sense that if they wanted to sue Oculus, they would've

16 sued Oculus and not Facebook.

17 Q.   Okay.  But you remember this document -- right? -- the

18 merger plan or the -- I'm sorry, the agreement and plan of

19 merger, right?

20 A.   I remember?

21 Q.   Yeah, we just talked about it.

22 A.   Yes.

23 Q.   Right?

24         This one is the one that said that if you think

25 anything is wrong with the warranties that Oculus is making,

```
 1   you could walk away.
 2           Do you remember that one?
 3   A.   Yes.
 4   Q.   Okay.  So ZeniMax sues Oculus.
 5           Have you ever read that complaint?
 6   A.   No.
 7   Q.   Okay.  Do you know that on the first page, the first
 8   paragraph on the first sentence says "under a binding
 9   nondisclosure agreement."
10           Do you see that?
11           You don't know that, right?  Until now?
12           MS. WILKINSON:  Objection, Your Honor, asked and
13   answered.
14           THE COURT:  I think he has answered that.
15           Sustained.
16           MR. SAMMI:  Okay.  I'll move on.
17   BY MR. SAMMI:
18   Q.   Do you know if anybody called ZeniMax after Oculus was
19   sued?
20   A.   I already said that I don't know.
21   Q.   Okay.  Now, did you call John Carmack after you found out
22   that Oculus was sued?
23   A.   Me, personally?
24   Q.   Yeah, let's start there.
25   A.   No.
```

```
 1   Q.   Okay.  Do you know if anybody at Facebook called
 2   John Carmack and said, "Hey, what's going on with ZeniMax"?
 3              MS. WILKINSON:  Objection, foundation.
 4   BY MR. SAMMI:
 5   Q.   Do you know?
 6              THE COURT:  If he knows only.
 7              THE WITNESS:  I don't know, but I assume that they
 8   did.
 9   BY MR. SAMMI:
10   Q.   You assume, okay.
11              Even though we sued Oculus first, we sued Oculus, you
12   closed the deal anyway, didn't you?
13   A.   Yes.
14   Q.   Okay.  Let's take a look at that.
15              I'm just going to show you PX1707.
16              MR. SAMMI:  I move this into evidence.
17              (Pause)
18   BY MR. SAMMI:
19   Q.   That was PX1707.  That is just the front page of the
20   merger on the 21st day of July, 2014.
21              And the reason I put this up, sir, is you'd agree
22   with me on the 21st of July, 2014, that that agreement that you
23   had finally closed?
24   A.   I don't remember the exact date, but this seems real.
25   Q.   It seems pretty accurate?
```

```
 1   A.    Yes.
 2   Q.    You don't have any reason to dispute the date?
 3   A.    I do not.
 4   Q.    Okay.  Now, are you aware, sir, that only after you closed
 5   that deal and actually bought Oculus did ZeniMax sue Facebook?
 6   A.    Sorry, can you say that again?
 7   Q.    Yes, I can.
 8         Are you aware that only after Facebook went through
 9   with the deal did we sue Facebook?
10   A.    I'm not specifically aware of that other than the
11   conversation that we're having now.
12   Q.    Okay.  I'm going to just recap, and then we can move on.
13         MR. SAMMI:  But let's go to slide -- the next slide.
14   BY MR. SAMMI:
15   Q.    That's the -- you know, the front page of the complaint
16   where Facebook is now added to the complaint.
17         Have you ever read that complaint?
18         I think I may have asked you that question in one of
19   the earlier questions.
20         You haven't read it, right?
21   A.    No.
22   Q.    Okay.  Let's go on.
23         MR. SAMMI:  Next slide, please.
24   BY MR. SAMMI:
25   Q.    Okay.  Now, this first slide is just a little bit of a
```

```
 1   recap.  Okay?
 2           You have the meeting at your house with Carmack on
 3   Sunday, right?  We went through that?
 4   A.   Yes.
 5   Q.   Then you start legal diligence on Friday, correct?
 6   A.   That was what was in my document.  I think it's likely
 7   that we were looking at a bunch of things before then, too.
 8   Q.   Okay.  And we went through these messages that you and
 9   Amin were sending to each other.  "I think Oculus
10   misrepresented some things.  There are things they told us that
11   simply aren't true.  There's more risk in doing this quickly
12   over a weekend.  Keep pushing forward."
13           Do you remember those?
14   A.   Yes.
15   Q.   Okay.  Then we come down to Sunday.
16           And "Carmack warns Facebook," you don't know about
17   that?
18   A.   Yeah, I've already said that.
19   Q.   Right.
20           "Carmack reluctant to sign," you don't know about
21   that?
22   A.   I don't think that is accurate.
23   Q.   Okay.  You --
24   A.   I think he negotiated and then signed.
25   Q.   Will you agree with me that Carmack was at least part of
```

```
 1   the reason for the delay?
 2   A.   We already talked about this.
 3   Q.   Yeah.  I'm just saying, would you agree with me that
 4   Carmack was at least a part of the reason for the whole deal
 5   being delayed?
 6             MS. WILKINSON:  Objection, asked and answered.
 7             THE COURT:  Sustained.
 8             MR. SAMMI:  Okay.
 9   BY MR. SAMMI:
10   Q.   Don't worry about that.
11             Now, we talked about the agreement where you could
12   have exited -- right? -- the merger plan agreement?
13   A.   Yes.
14   Q.   Okay.  You announced that you'd buy it -- Facebook --
15   Oculus on March 25.
16             MR. SAMMI:  Let's go to the next slide.
17   BY MR. SAMMI:
18   Q.   After you announced it --
19             MR. SAMMI:  And I'm sorry.  Let's go back.
20             Forwards, I apologize.  One more.  Yeah.
21   BY MR. SAMMI:
22   Q.   After you announced it, we sent you a letter on April 10,
23   right?  We went through that, the one-paragraph letter?
24             MS. WILKINSON:  Your Honor, I'm going to object to
25   this demonstrative because I don't think these are words that
```

```
 1   Mr. Zuckerberg has agreed to.  I mean, this was --
 2             THE COURT:  Well, he can just say one way or the
 3   other whether it's right or wrong.
 4             MR. SAMMI:  Sure.
 5   BY MR. SAMMI:
 6   Q.   Let's just reference the April 10 letter.  I showed you
 7   that letter and you saw some language in there about claims to
 8   property regarding VR.
 9             Do you remember that?
10   A.   Yeah.  I mean, this is what you're saying.
11   Q.   Yes.  I just want to recap so we all understand.
12             We went through the nondisclosure agreement.
13             ZeniMax sued Oculus, not Facebook, and then you still
14   could have walked away -- correct? -- if you wanted to?
15   A.   Yes.
16   Q.   Okay.  And then you closed the transaction, right?
17             MS. WILKINSON:  Your Honor, I'm going -- see the
18   last --
19             MR. SAMMI:  We can take it down.  We can take it
20   down.  We can take it down.
21             THE COURT:  What are you taking down?  Oh, that
22   statement --
23             MS. WILKINSON:  Yeah.
24             MR. SAMMI:  It's just --
25             MS. WILKINSON:  It's advocacy.  It's not testimony.
```

```
 1    BY MR. SAMMI:
 2    Q.    Mr. Zuckerberg, didn't Facebook have two chances to walk
 3    away?
 4    A.    I mean, we had many chances to not move forward.
 5    Q.    Specifically regarding -- the first chance that we've
 6    talked about here today was before you agreed to purchase
 7    Oculus, correct?
 8          You didn't have to agree to purchase Oculus.  We all
 9    know that.
10    A.    No, of course not.
11    Q.    Got it.
12          And the second chance was after you received an
13    April 10 letter, after you had seen Oculus had been sued by
14    ZeniMax, you didn't have to close the deal, correct?
15    A.    I think that's right, but I do think that -- you know, you
16    showed me a lot of things that are legal language, and, you
17    know, of course, I'm not a lawyer, right?  So I think it's --
18    you'd want a lawyer's impression of that.
19          The representations and warranties that a company
20    like Oculus would make when they're joining us are important,
21    and if they said something that was just completely untrue,
22    then, yeah, I think we'd have the right to not go forward with
23    it.  But I think it's also the spirit of these things that if
24    it's -- that unless it's something completely egregious that
25    you are supposed to move forward.
```

```
 1          And a company that you haven't heard of, that hadn't
 2   previously made any claim publicly about being involved in this
 3   or doing anything here, coming out and making a claim that,
 4   after we looked into it, we determined was not true, I don't
 5   think would give us recourse to get out of a deal at that point
 6   if we wanted to.
 7          So I do think that is more of a legal point --
 8   Q.   Okay.
 9   A.   -- that I'd want to have the lawyers weigh in on, but I
10   want to make sure I'm providing a complete testimony and not
11   just buying into your -- your assumption here that we would've
12   legally been able to get out of that deal at that point.
13   Q.   Got it.
14          Okay.  So let me try to simplify it, just wrap it up.
15          You had a $2-plus billion deal pending and a third
16   party sues the company you're buying regarding claims on VR,
17   and to your knowledge, nobody ever contacted that third party,
18   ZeniMax?
19          MS. WILKINSON:  Objection, foundation and not the
20   testimony.
21          THE COURT:  Wait.  If he knows, I'll let him answer
22   that.  We're getting to the end, I understand.
23          THE WITNESS:  I don't know that they did, and also
24   I'm not sure that it's normal practice for a lawyer to contact
25   someone who is claiming something about you anyway.
```

```
 1              So I think, you know, you as a lawyer would
 2     understand that better than me, but I just want to make sure
 3     that, to give complete testimony here, I'm not saying or
 4     implying that I don't know that they did something that would
 5     be, you know, off in any way.
 6     Q.   Do you think that -- after we sued you, Facebook, ZeniMax
 7     did, now -- now Facebook must have investigated the claims,
 8     correct?
 9     A.   Yes.
10     Q.   Okay.  Okay.  And we know that a year and a half after we
11     sued you, you still hadn't ever seen the NDA that we went
12     through, right?
13              MS. WILKINSON:  Objection, asked and answered.
14              MR. SAMMI:  We have already gone through that.
15              THE COURT:  Sustained.
16     BY MR. SAMMI:
17     Q.   Okay.  You were working with John Carmack after you bought
18     Oculus, correct?
19     A.   Yes.
20     Q.   Okay.  Let me show you slide 20.
21              That's you and Mr. Carmack, right?
22     A.   It is.
23     Q.   So at any time -- that was taken on September 24th, on or
24     about, 2015, and that's on your Facebook feed that I got that.
25              We sued you in August of 2014, more than a year --
```

1    this was taken more than a year after we sued you, right?

2    A.   I guess so.

3    Q.   Okay.  Did you -- did you ever ask Mr. Carmack about

4    "What's going on with ZeniMax?  Did you take anything?"

5            MS. WILKINSON:  Objection, asked and answered.

6            THE COURT:  Sustained.

7    BY MR. SAMMI:

8    Q.   Okay.  How about --

9            MR. SAMMI:  Let's go to slide 21.

10   BY MR. SAMMI:

11   Q.   That's you and Mr. Iribe, right?

12   A.   Yes.

13   Q.   Yes.  Did you ever ask Mr. Iribe about anything regarding

14   the lawsuit with ZeniMax?

15   A.   I don't remember, and if I did, it was probably while we

16   were meeting with lawyers discussing the case.

17   Q.   Okay.  Isn't it true that the night before I was to sit

18   down with you for a deposition, Mr. Iribe texted you that he

19   wanted to sync before your deposition; isn't that right?

20   A.   Yeah.  I think he messaged me that he wanted to call me

21   quickly, which is pretty normal.  We talk fairly frequently.

22   Q.   Mr. Iribe texts you that he wants to sync before your

23   deposition, before you sit down with me under oath at a

24   deposition, and then you had a call with him the morning of

25   your deposition where I'm asking you questions.

```
 1                Do I have that right?
 2   A.   Yes.
 3   Q.   Okay.  And on that call Mr. Iribe told you that even
 4   though John Carmack has some stuff, Oculus never used it.  Is
 5   that what Mr. Iribe told you?
 6   A.   Well, I definitely remember him telling me that -- I think
 7   he wanted me to know before the deposition that he had looked
 8   into this as the CEO of Oculus and had determined that none of
 9   this was used in Oculus technology.
10   Q.   Okay.  How about in that phone call, the morning of your
11   deposition where I was talking to you about three, four hours
12   later, did Brendan Iribe mention to you the NDA that Palmer
13   Luckey had signed?
14   A.   I don't think so.
15   Q.   You don't think so.
16                You left that out?
17                MS. WILKINSON:  Objection.
18                MR. SAMMI:  Withdrawn.
19   BY MR. SAMMI:
20   Q.   Let's go to slide 22.
21                That's you, sir, Mr. Iribe, and that's Mr. Nate
22   Mitchell on the right side, right?
23   A.   Yes.
24   Q.   You work with Mr. Mitchell from time to time, right?
25   A.   Yes.
```

```
 1   Q.   Are you aware that Mr. Mitchell -- let me ask it this way.
 2        Have you ever asked Mr. Mitchell, "where did the
 3   desktop computer go that you took to id?"
 4   A.   No.
 5        MS. WILKINSON:  Objection, foundation.
 6        THE COURT:  Sustained.
 7   BY MR. SAMMI:
 8   Q.   Mr. Zuckerberg, it's -- it's being suggested here that --
 9   that -- and I think you are a visionary, but it's being
10   suggested here that you're a visionary specifically related to
11   virtual reality, right?
12   A.   Who is suggesting that?
13   Q.   Your lawyers.
14   A.   I haven't been here for the rest of the trial.
15   Q.   Got it.
16        Would you agree with me that a visionary is a person
17   who invests in something before it's successful?
18   A.   You could say that.
19   Q.   Okay.  Would you agree with me that one could think about
20   a visionary as someone who pursues the opportunity -- an
21   opportunity before the whole world recognizes its potential?
22   A.   Sure.
23   Q.   Is a visionary someone who comes in after another company
24   has demonstrated that something is a success and then goes to
25   buy it?
```

1    A.    I don't know.

2    Q.    Okay.  Is your vision -- was your vision regarding virtual

3    reality not how to create it in the first instance in 2014 but

4    to acquire it from someone who had done it already and use it

5    in your business?

6    A.    No.  You know, we've talked about this a couple of times

7    already.  I don't think that good virtual reality is fully

8    there yet.  You know, it's going to take five or ten more years

9    of development before we get to where we all want to go, where

10   there's -- both that great experience that is affordable enough

11   for everyone to be able to use and where you have the software

12   experiences, like the social experiences we talked about

13   earlier, that people want to use.

14          Right now there may be either a few demos, there are

15   a few games that people might like, but it is certainly not a

16   mature ecosystem in the way that mobile is.

17          So we made this decision around the time that we

18   decided to buy Oculus, the realization that we had was that it

19   would now be possible to start building some of these things,

20   not that they had something that was fully formed.

21          And I think that's pretty clear because at the time

22   that we bought them, they had no consumer product in the

23   market.  They had some technology, they had sold a lot of

24   development kits, so we they were doing quite well at that, but

25   it wasn't until, you know, I think a year or more after they

1    joined us that the first consumer product actually got shipped.

2            So that's not something -- I don't think that you

3    would characterize that as a case where we bought something

4    that was fully formed and then the industry was ready to blow

5    up and become huge.

6            I think it's quite clear that this was -- what we

7    were trying to do was assemble the best team of people, which

8    an acquisition was one way to do that because, you know, we

9    didn't have a lot of people working on virtual reality at

10   Facebook.  We're a social networking company.

11           And we wanted to have a base of the technology, which

12   Oculus had built, and that was the foundation on top of which

13   over, you know, the next five or ten years we planned to build

14   this, but all the work is in the future, ahead.

15   Q.   Okay.  Let me ask you this.

16           Mr. Andreessen saw Oculus, and he told you that the

17   key was Carmack and that it blew his brain wide open after

18   25 years of being in R&D.  Right?  You saw that, right?

19   A.   Yes, that was in his email.

20   Q.   Okay.  And if this jury finds that Oculus stole virtual

21   reality technology from ZeniMax, improving on that technology

22   doesn't make it yours, does it?

23   A.   I don't know.  I mean, if they find that we -- I disagree

24   with the premise of your question, so it is kind of hard to get

25   on top of that.

```
1  Q.   All right.  Let's make it real simple.  If you steal my
2  bike and you paint it and put a bell on it, does that make it
3  your bike?
4  A.   No.
5  Q.   Right?
6       What if there is a guy like me running down the
7  street after you saying, "You stole my bike"?  That doesn't --
8  you should know that it's not your bike, right?
9  A.   Of course.
10 Q.   Okay.  Are you aware that all of the work that
11 John Carmack did as a ZeniMax employee is owned by ZeniMax?
12       MS. WILKINSON:  Objection, foundation.
13       THE COURT:  If he knows.  He may or may not know.
14       THE WITNESS:  I don't specifically know that, but it
15 wouldn't surprise me.  I think most companies have agreements
16 like that.
17 BY MR. SAMMI:
18 Q.   Facebook has agreements like that, doesn't it?
19 A.   I hope so.
20 Q.   Good.
21       Are you aware that Luckey, Iribe, and Carmack all
22 knew about the NDA that we all looked at before Facebook
23 acquired Oculus?
24 A.   No.
25 Q.   You're not aware of that.
```

```
 1              Are you aware that Iribe, Luckey, in the fall of
 2    2012, kept asking John Carmack for help on virtual reality?
 3              Are you aware of that?
 4              MS. WILKINSON:  Objection, asked and answered.
 5              THE COURT:  Sustained.
 6    BY MR. SAMMI:
 7    Q.   I had forgotten your answer.  I apologize.  Was it that
 8    you don't remember or you don't know?
 9    A.   I don't remember.
10    Q.   Okay.  Now, you said that our claims are without merit,
11    right?
12    A.   I think you said that.
13    Q.   Well, I think earlier you were like, "well, we looked into
14    it, and I don't think there is anything here," something of
15    that sort?
16    A.   Something of that sort.
17    Q.   Okay.  And you say that even though you haven't even seen
18    one of the operative documents in this case, the NDA.  Do I
19    have that right?
20    A.   Yes, that's correct.
21    Q.   Okay.
22    A.   We have a team -- our legal team, our HR team, our deal
23    team -- that will look into this, and in some cases Brendan
24    looked into a bunch of this directly.
25              And, you know, when you're building something, you
```

```
1    know, like you say, it's really important to make sure that the
2    foundation that you're building upon is -- is something that
3    you owned.
4            And in this case, after doing -- you know, looking
5    into this and taking this really seriously -- and I think the
6    key summary that I would want you to take away is that we
7    are -- we know -- we are highly confident that Oculus products
8    are built on Oculus technology and that the idea that Oculus
9    technology is based on someone else's work is -- is just wrong.
10   Q.  Okay.  I understand you think it's wrong.  That's what
11   we're here for in this trial.
12           Mr. Zuckerberg, even when employees of Facebook admit
13   to doing illegal acts like copyright infringement, you still
14   haven't taken any action to -- to fire them?
15           MS. WILKINSON:  Objection, mischaracterizing
16   testimony, foundation, and asked and answered.
17           THE COURT:  He's already been over all this.
18           MR. SAMMI:  Okay.
19           THE COURT:  Mr. Sammi.
20   BY MR. SAMMI:
21   Q.  Facebook's motto is "Move fast and break things"?
22   A.  It's an old motto.  We have retired it.
23   Q.  You've retired it.
24   A.  Our new motto is "Move fast by building stable
25   infrastructure," which does not have quite the same ring to it.
```

```
1    Q.   Doesn't roll off the tongue, does it?
2    A.   But it's more reflective of our engineering strategy at
3    this point.
4    Q.   When did you change that motto?
5    A.   Maybe five years ago.
6    Q.   Five years ago?  Would it surprise you that you changed it
7    right around the time of the Oculus acquisition?
8    A.   Yeah.  I thought it was earlier.
9    Q.   Okay.
10   A.   I think it actually was earlier.  We may have not talked
11   about it until -- until three years ago, or something like
12   that, but we got to this point where -- I mean, I can -- I'm
13   happy to talk about this stuff if it's helpful, but --
14   Q.   But it's not -- it's not your official motto today, right?
15   A.   It was never our official motto.
16   Q.   Got it.
17   A.   One of the values of the company -- we have, you know,
18   five or six core values, and one of them is move fast, and, you
19   know, when you are building technology, it is important to move
20   fast, and the idea is that you can't just tell people to move
21   faster, right?  You have to -- that doesn't work, right?
22        You have to be willing to trade something to move
23   faster.  So what we traded early on was giving our engineers
24   the flexibility that, you know, hey, if they broke something
25   every once in a while but if they introduced a bug into code
```

1    but they were able to move faster and deliver product to our

2    community faster, then that was a tradeoff that we were willing

3    to make.

4           Eventually we got to the point where the system is

5    pretty complicated at this point.  A lot of people use

6    Facebook, and people trying to move quickly was introducing so

7    many different bugs that it was actually slowing us down to

8    have to go back and fix all of those things.  So we adopted a

9    new strategy for moving fast which was to, instead, try to

10   build really good infrastructure on top of which our engineers

11   could do work.

12          So now, you know, an engineer coming in from another

13   company or, you know, whether they are coming from Google or

14   they're joining us as an acquisition through Oculus or a new

15   college grad, they can come and probably do work faster at

16   Facebook than they would be able to anywhere else because of

17   the infrastructure that we built.

18          So although it doesn't sound cool, "move fast and

19   build stable infrastructure" is an important part of what we

20   do.

21   Q.   Good.  Good.

22          Would it surprise you, then, that last Friday while

23   we were sitting in this courtroom that a Facebook employee

24   emailed a ZeniMax employee trying to recruit them for virtual

25   reality work and wrote to them that every day we encourage our

```
 1  engineers to break things and move fast?
 2              MS. WILKINSON:  Objection, relevance, foundation.
 3              THE COURT:  Sustained.
 4              MR. SAMMI:  That was last Friday.
 5              THE COURT:  Sustained.
 6  BY MR. SAMMI:
 7  Q.   You moved fast in the Oculus deal, didn't you?
 8  A.   Yeah, yes.
 9  Q.   Yeah.  And you broke some things, didn't you?
10  A.   I wouldn't say that.
11  Q.   Okay.  That's what we're here to find out.
12              Thank you for your time.  I may have some more
13  questions for you later.
14              Thank you.
15              THE COURT:  Ms. Wilkinson, you ready?
16              MS. WILKINSON:  Yes, sir.
17              THE COURT:  Okay.
18              MS. WILKINSON:  I need to put on my microphone.
19              THE COURT:  Okay.  You and Mr. -- you and Janet
20  Jackson take a little while to get wired up.
21              MS. WILKINSON:  I wish.
22              (Pause)
23              THE COURT:  Do you have a good battery in there
24  today?
25              MS. WILKINSON:  They changed it for me this morning.
```

 1               THE COURT:  They did, okay.

 2               Have you still got water down there, Mr. Zuckerberg?

 3               THE WITNESS:  I do, Your Honor.

 4               THE COURT:  Okay.  Good.

 5               MS. WILKINSON:  I need a little help, Your Honor.  I

 6    can't do it.

 7               THE COURT:  Well, I help y'all with a lot of things,

 8    but your husband is sitting back there.  I'm not going to help

 9    you with that part.

10               (Pause)

11               THE COURT:  Pull it down a little bit.

12               MS. WILKINSON:  Yes, sir.

13               How's that?

14               THE COURT:  That's better.

15               MS. WILKINSON:  Let me take my earring off.  All set.

16               THE COURT:  Okay.

17                         CROSS-EXAMINATION

18    BY MS. WILKINSON:

19    Q.   Good morning, Mr. Zuckerberg.

20    A.   Good morning.

21    Q.   If we could, I'd like to just go in a bit of a

22    chronological order so the jury can understand a little bit

23    about you and the company, but more of what actually happened

24    in this deal.

25               Is that all right with you?

```
 1   A.   Yes.
 2   Q.   All right.
 3            MS. WILKINSON:  Kosta, would you mind just pulling
 4   that out?
 5   BY MS. WILKINSON:
 6   Q.   Mr. Zuckerberg, tell the jury where you were born.
 7   A.   I was born in New York, in a little city called White
 8   Plains.
 9   Q.   Did you go to college?
10   A.   It's a sore spot.  Yes, I went to college for two years.
11   Q.   You dropped out?
12   A.   I did.
13   Q.   That's a sore spot?
14   A.   I did.
15   Q.   What did you do --
16   A.   Not my parent's preference.
17   Q.   Okay.  They're still not proud of you because you didn't
18   graduate?
19   A.   I think they wanted me to graduate.
20   Q.   Okay.
21            THE COURT:  No, they wanted him to go to Baylor.
22   BY MS. WILKINSON:
23   Q.   You couldn't get into Baylor -- right? -- so you went to
24   Harvard; is that right, Mr. Zuckerberg?
25   A.   I never tried to get into Baylor.
```

```
 1   Q.   Oh, that's not the right answer.
 2   A.   I was intimidated.
 3   Q.   That was not the right answer.
 4            THE COURT:  Sustain the objection.
 5            MS. WILKINSON:  Exactly.
 6   BY MS. WILKINSON:
 7   Q.   Tell the jury what you did when you left Harvard.
 8   A.   I started the Facebook company.  I started writing it when
 9   I was at Facebook, and when I left and moved out to Palo Alto,
10   that's when we really started working on it as a company and
11   started building it.
12   Q.   What year was that?
13   A.   2004.
14   Q.   All right.  I think you told us that was the year before
15   mobile --
16   A.   The year after.
17   Q.   The year after?
18   A.   Yeah, for smartphones -- the BlackBerry and Palm Treo were
19   introduced in 2003, so that kicked off the big smartphone wave.
20   Q.   Some of these questions may seem basic to you, but for us
21   to understand, what was the goal of Facebook when you first
22   started writing the software and forming the company?
23   A.   Well, when I started working on it at Harvard, I had a
24   pretty simple goal, which was just to build a service to help
25   connect the community at Harvard.
```

1              At the time I thought that someone was going to build

2     a version of this for the world, but I just didn't think it was

3     going to be us, because we were just college students.

4     Q.   And when you went to Palo Alto to form the company, you

5     said that was 2004?

6     A.   Yes.

7     Q.   Would you have called yourself a software or a hardware

8     company at that time?

9     A.   More software.

10    Q.   Okay.  And, again, this may be basic for you, but can you

11    explain to us when you say that, what's the difference between

12    Facebook as a software company and, let's say, Samsung as a

13    hardware company?

14    A.   Well, you know, a company like Samsung or Apple produces a

15    physical device.  The Facebook service is -- it's a digital

16    service, but it's mostly -- it's code that you access through

17    your phone or computer.  It's not a physical device itself.

18    Q.   You mentioned earlier in Mr. Sammi's questioning that you

19    had "missed out" on that platform.

20              Can you tell us, first, what a platform is or what

21    you mean by a platform?

22    A.   Sure.  So in technology there tend to be devices that then

23    different developers can build applications on top of, right,

24    so Facebook is an app that people can use mostly on their

25    phones today.  So you could think of the phone as a platform

1   that Apple or Google or Samsung have built, and then Facebook

2   and other companies, maybe Amazon or different other companies

3   or developers that are building apps that go on top of those

4   platforms like a phone.

5   Q.   Okay.  Oculus's virtual reality headset, do you call that

6   hardware or software?

7   A.   Well, the headset is hardware.

8   Q.   All right.  And over the years, as you've been growing

9   Facebook, approximately how many employees do you have today?

10   A.   I think it's about 17,000.

11   Q.   Are they located just in the United States, around the

12   world?

13   A.   It's mostly in the United States, but there's -- most of

14   engineering is in the United States, and we have sales offices

15   and partnership offices all around the world, because we have a

16   global community.  And we need to meet our partners where they

17   are.

18   Q.   All right.  And when your engineers are writing software

19   for Facebook, do they have to adapt it to different platforms

20   that folks like us use your products on?

21   A.   Yes.

22        So the code for the Facebook app for iPhone, for

23   example, is quite different from the code for the Android app

24   that you might run on a Samsung device, and that's going to be

25   quite different from the version of the website that you might

1    use on a computer or the version that you might use on an iPad.

2    So there are some similarities that we can use.  Obviously, you

3    know, you can log in to any of them, so it accesses -- you

4    know, your friends are the same across all of them, but a lot

5    of the code for each of those platforms has to be unique to the

6    platform.

7    Q.    All right.  Over the years have you talked about wanting

8    to be involved with the creation of the next platform?

9    A.    Yes.

10   Q.    Tell us why and then tell us -- well, tell us why.  Start

11   with that.

12   A.    Well, so when you're building a mobile app, for example,

13   you know, you -- we're following rules that are set by Apple

14   or, you know, the iPhone or Samsung, and that means that there

15   are certain things that we can do and build and there are

16   certain things that we can't because we have to fit in with

17   those -- the lines that they've drawn.

18          And, you know, one thing that's always struck me,

19   when I was in college -- and I studied psychology and computer

20   science, right?  So a lot of the work that I do was trying to

21   build at the crossroads of the intersection of those two

22   things, try to connect to people and build products the way

23   that, like, people actually think about stuff, right?

24          I think a lot of the time the technology industry

25   gets stuff wrong, and it's just too complicated.

1          So when I think about apps today on the phones, I

2     think it's a little weird that your phones are organized around

3     apps and not around, like, the people that you interact with,

4     right?

5          Because I think in our lives that's what's actually

6     most important to us, are our friends and our family.  And, you

7     know, that's the kind of service that we've tried to build, and

8     I would hope that future computing platforms, whether it's

9     virtual reality or whatever it is, are more organized around

10    people and our social and emotional connections than apps.

11         So, of course, we can't do that unless we are playing

12    a role in influencing the development of the future computing

13    platforms, which is why it's really important, you know, both

14    to me in terms of helping to shape that part of how technology

15    develops and I think for the company to be able to develop

16    these experiences for the future, to not only be building the

17    social experiences on top of whatever the VR platform is but to

18    start investing really early to help shape what -- how VR

19    develops.

20    Q.   Have you put together a video that you've used outside the

21    courtroom about kind of the evolution of platforms and the

22    potential of virtual reality?

23    A.   I don't know if you'd call it a video.  I have spoken

24    about it at a couple of our developer conferences, right, these

25    events where we get the developer community for Facebook

1    together or for Oculus together to explain what we're building

2    and help people develop games and different applications that

3    can run on the platform.

4    Q.   All right.  Let me put up --

5              THE COURT:  Let me stop you.

6              MS. WILKINSON:  Yes.

7              THE COURT:  I'm not a social network guy.  I hate to

8    confess that part of it, but tell the jury what a developer

9    community is.  That's something that's kind of foreign to a lot

10   of us.

11             THE WITNESS:  Sure.  So let's say you're Oculus or

12   you're Apple, right, trying to get people to build apps for

13   your app store.  That doesn't just happen automatically, right?

14             So there's a lot of work that a company needs to do

15   both in building technology and in building the community, like

16   any kind of community that would be in the world, to make sure

17   that the developers, the engineers in the companies that might

18   build apps for Oculus or for the iPhone or whatever it is have

19   the resources they need, can make money to sustain themselves,

20   have people that they can ask questions to, so we think about

21   that as a community.

22             And there are already, I think, many thousands of

23   engineers and developers who are doing this for virtual

24   reality.  I think for mobile there are many millions of

25   developers, so one of the things that we're going to need to do

```
 1    over the next five to ten years is grow that developer
 2    community.
 3            Because here's another way to think about it, just
 4    buying a headset or virtual reality product isn't that useful
 5    if there isn't good content -- right? -- if there aren't games
 6    you want to play, if there aren't good social experiences, so
 7    someone needs to go build those.  And we're not going to build
 8    all of those, so that's what the developer community is going
 9    to do.
10            THE COURT:  I get it.  So someone is out there
11    developing the future Pong.
12            THE WITNESS:  Exactly.
13            THE COURT:  which is going to be a really complicated
14    Pong or something like that.
15            THE WITNESS:  We actually have a version of Pong
16    which is in 3D.
17            THE COURT:  Oh, wow.
18            THE WITNESS:  And you can -- you can -- basically,
19    you're at a table in virtual reality with someone else who can
20    be anywhere else in the world, but they feel like they're right
21    there across the table with you, and you can pick up a paddle
22    and hit the ping pong ball back and forth with them and it
23    feels like they're there in real life.
24            And now, what really starts to get cool is you can
25    change gravity, so you can make it so that there's no gravity.
```

1   So it's like you're playing ping pong in outer space where you

2   hit it and the ball doesn't go down, or you can change it so

3   that it feels like you're playing ping pong underwater, so it's

4   like everything just goes down much faster.

5           So, yeah, a lot of the mission of virtual reality,

6   what we're trying to do, is give people the tools to experience

7   anything or to go anywhere, even if they can't travel to a

8   place, to be able to go see, you know, the pyramids in Egypt or

9   go to the surface of Mars.  Most of us aren't going to go to

10  the surface of Mars, but you can -- you can experience that as

11  if you're there.  And that's -- you know, the developers have

12  to build those experiences.

13          THE COURT:  Okay.

14          THE WITNESS:  Yeah.

15          THE COURT:  Does that make that little ding noise

16  that it always made?  I kind of liked that.  When I would hit

17  it, it had that little blink.  I don't know if it made a bonk

18  noise, but I remember it.

19          Does yours make more fancy noises, too?

20          THE WITNESS:  It sounds like a real ping pong.

21          THE COURT:  Oh, it does?

22          THE WITNESS:  Yeah.

23          THE COURT:  Like you're hitting a little ping pong

24  ball?

25          THE WITNESS:  And part of the development here is --

 1   because the experience is 3D, right, so the table can be here,

 2   and I could turn around and not see the table and then look

 3   back and see the table.  And the sound that you hear when the

 4   ping pong ball gets hit is -- you know, if you're facing away,

 5   it needs to sound like it's behind you; whereas, if you're

 6   looking at it, it needs to sound like it's in front of you.  So

 7   the 3D audio is actually a very important part of the

 8   technology platform that we're building.

 9           THE COURT:  All right.  Enough about my early life

10   with Pong.

11           THE WITNESS:  Well, this is more fun for me than the

12   rest of the testimony, so --

13           THE COURT:  It's okay.

14           MS. WILKINSON:  That's an honest answer, Your Honor.

15           THE WITNESS:  He asked all the questions why I -- why

16   I was focused on certain things.  This is what I do, right?

17   This is -- this is what I'm really excited about building.

18   BY MS. WILKINSON:

19   Q.   So have you put together a simple example of how people

20   have recorded events about, for example, their child's first

21   step and how they might do it in the future with virtual

22   reality?

23   A.   Yeah.  I mean, that was --

24   Q.   Can we -- can I put it up first, and then --

25   A.   Sure.

```
1    Q.   -- you can tell the jury about it?
2              MS. WILKINSON:  Can we put up slide Number 5, please?
3              You can have that.
4              All right.  Let me make sure this isn't in the way.
5    BY MS. WILKINSON:
6    Q.   Why don't you start on the left side and just tell the
7    jury what you're trying to show here.
8    A.   So the mission of Facebook is to give people --
9              MR. SAMMI:  Is this an exhibit?
10             MS. WILKINSON:  It's a demonstrative.  Just a
11   demonstrative.
12             MR. SAMMI:  Okay.
13             THE COURT:  Do you have any objection as a
14   demonstrative?
15             MR. SAMMI:  I don't even know what it is yet, but --
16             THE COURT:  Well --
17             MR. SAMMI:  It looks like baby pictures, but -- no
18   objection right now.
19             THE COURT:  Okay.  Okay.  Well, let me know.
20             THE WITNESS:  It is baby pictures, which is a lot of
21   what people share on Facebook.
22             MR. SAMMI:  Okay.  Then let me object to relevance as
23   what this has to do with the claims in the case.
24             THE COURT:  Well, we're going to find out here.
25             MR. SAMMI:  Okay.
```

```
 1              THE COURT:  I'm going to overrule that at least at
 2     this point, but stay ready.
 3              MR. SAMMI:  I'm ready.
 4     BY MS. WILKINSON:
 5     Q.   Mr. Zuckerberg, if you could, start at the left and just
 6     tell the jury how you're talking about history versus -- and
 7     moving into virtual reality using technology.
 8     A.   Sure.  Is that the date of my first step?  I didn't know
 9     that.
10              So, you know, a lot of what Facebook tries to do is
11     give people the tools to share their experiences in more vivid
12     and richer ways.
13              So if you go back 10 or 15 years ago, on the
14     internet, most of what you probably saw and read was text,
15     right?  And then, you know, things got more graphical, right?
16     So now, here we have phones that have cameras and, you know, a
17     lot of what we share and see on the internet is visual now, or
18     it's images.
19              And as the networks get better, now we can watch more
20     and more video, so these are just getting to be more kind of
21     vivid depictions and people have the power to share in more
22     detail their experiences.
23              And we think that's a good trend, right, and that
24     giving people the power to share what they're experiencing and
25     feeling with more -- more detail is -- is valuable.
```

1          So to me, virtual reality goes even further than

2    videos, right, because instead of just a little, you know, 2D

3    little rectangle where you can maybe capture a little glimpse

4    of what's going on in motion, in VR you can capture the whole

5    scene.

6          So one of the points that I've made at a few of our

7    developer conferences is that as time goes on, we get these

8    richer tools to share.

9          So when I took my first steps -- I don't know if

10   that's actually the right date or where you got that from -- my

11   parents, they just had a baby book, right, I think, you know,

12   and they just wrote down the date.  And that's how they

13   recorded it.

14         My sister, who is a few years older than me, when her

15   first child took her first step, she took a photo.  when her

16   second child took her first step, she took a video of that, and

17   that was kind of a cool moment, and when Max, who is my

18   daughter, took her first step just a few months ago, I recorded

19   the whole scene in virtual reality so I could send that to my

20   parents and share that with the world, and people could just

21   experience that as if they were in our living room with us.

22         So that's just an example, I think, of how the

23   technology will proceed, and I don't think this is the end of

24   the line.  I think that there will continually be more and more

25   tools that let us capture a more vivid and realistic impression

1  of what's going on in our lives as much as we would want to

2  share, but this is, to me, how virtual reality is powerful and

3  fits into what we're doing at Facebook.

4  Q.   All right.  And without going into lots of examples, do

5  you and the folks at Facebook and Oculus have other visions

6  about how you see virtual reality as a platform being used in

7  the future?

8          MR. SAMMI:  Objection, Your Honor.  I'm going to

9  object to relevance about past misappropriation and theft of IP

10  is what we're here for, and we can talk about vision, and I

11  like VR too, but it is not relevant to the case.

12          THE COURT:  Overruled.

13          MR. SAMMI:  Okay.

14          THE WITNESS:  Sorry.  Can you ask the question again?

15  BY MS. WILKINSON:

16  Q.   Yes.  Do you have a few examples of the way you and the

17  Oculus team and the folks at Facebook see using virtual reality

18  as a platform other than this one example that you've given us

19  of, you know, being able to bring the grandparents in to watch

20  a child take its -- or grandchild take his or her first step?

21  A.   Sure.  I think giving people the ability to travel

22  anywhere, you know, without having to physically go, both to

23  anywhere that's another space, like we talked about the

24  pyramids in Egypt a moment ago or the mountains in Italy, you

25  could go to someplace that's both -- that's historical that it

1    would be impossible to go to today that someone could build a

2    reconstruction of, or you could be, you know, courtside at a

3    basketball that you couldn't actually attend in person.  You

4    could feel like you are really there and have the sound be the

5    right fidelity and be able to look around and feel like you're

6    there.  I think that would be an awesome experience.

7           You could be able to do that with people who are your

8    friends who also aren't physically there with you.  So if

9    there's -- you know, my sister lives across the country from me

10   and I want to see her, I can go into a space where I feel like

11   I'm physically there with her, whether it's playing ping-pong

12   like we just talked about or going to watch something together,

13   and it is like you feel like you're there.

14          There's something that's much more powerful about

15   that than, you know, just a phone call or even a video call,

16   which are good technologies, and they are better than nothing,

17   but the feeling like you are physically there with someone is,

18   you know, just a visceral thing that I think we as people feel.

19          And that's what I think of this is -- even though

20   it's technology and, you know, you need to do all this

21   engineering to enable this, it is fundamentally a human

22   experience and a social experience of being there with people,

23   which is what I care about, right?  That's what I work on, and,

24   you know, that's the -- that's been my -- all my work at

25   Facebook and what I hope to continue doing going forward.

```
 1   Q.   All right.
 2             THE COURT:  Stop.
 3             MS. WILKINSON:  Yes.
 4             THE COURT:  Your lunch is here.  It's Sammy's, one of
 5   the best barbecue places around.  If y'all don't like that, I
 6   don't know.  I can't help you.
 7             All right.  Don't talk about the case.
 8             Thank y'all.
 9             SECURITY OFFICER:  All rise.
10             (Jury out)
11             THE COURT:  You can step down.
12             Let me see y'all real quick before you leave.
13             (Bench Conference held off the record)
14             THE COURT:  Be back at 1:00.  Everybody back at 1:00,
15   maybe a little after.
16             (Recess at 11:52)
17
18
19
20
21
22
23
24
25
```

```
 1                            INDEX

 2                                                    Further
                   Direct   Cross   Redirect   Recross   Redirect
 3
      WITNESS FOR THE
 4    PLAINTIFFS

 5    MARK ZUCKERBERG       13      113

 6

 7    PLAINTIFFS' EXHIBIT                              Received

 8       658       Email                                 62

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 17th day of January, 2017.

7

8

9                              /s/Todd Anderson
10                             TODD ANDERSON, RMR, CRR
                               United States Court Reporter
11                             1100 Commerce St., Rm. 1625
                               Dallas, Texas  75242
12                             (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25