```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF TEXAS

 3                        DALLAS DIVISION

 4

 5  ZENIMAX MEDIA INC. and ID     )      3:14-CV-1849-K
    SOFTWARE LLC                  )
 6              Plaintiffs,       )
                                  )
 7                                )
    VS.                           )
 8                                )      DALLAS, TEXAS
                                  )
 9  OCULUS VR, LLC, PALMER        )
    LUCKEY, FACEBOOK, INC.,       )
10  BRENDAN IRIBE and JOHN        )
    CARMACK,                      )
11              Defendants.       )      January 17, 2017

12

13           TRANSCRIPT OF JURY TRIAL, VOLUME 6

14            BEFORE THE HONORABLE ED KINKEADE

15              UNITED STATES DISTRICT JUDGE

16

17  A P P E A R A N C E S:

18

    FOR THE PLAINTIFFS:         MR. P. ANTHONY SAMMI
19                              Skadden, Arps, Slate,
                                  Meagher & Flom LLP
20                              Four Times Square
                                New York, New York  10036
21                              (212) 735-2307
                                anthony.sammi@skaddden.com
22

23                              MR. PHILLIP B. PHILBIN
                                Haynes and Boone LLP
24                              2323 Victory Avenue, Suite 700
                                Dallas, Texas  75219
25                              (214) 651-5000
                                phillip.philbin@haynesboone.com
```

1

2                    **MR. KURT WILLIAM HEMR**
                     Skadden, Arps, Slate,
3                       Meagher & Flom LLP
                     Four Times Square
4                     New York, New York  10036
                     (617) 573-4833
5                     kurt.hemr@skaddden.com

6                    **MR. CHRISTOPHER A LISY**
                     Skadden, Arps, Slate,
7                       Meagher & Flom LLP
                     500 Boylston Street
8                     Boston, Massachusetts  02116
                     (617) 573-4800
9                     christopher.lisy@skaddden.com

10

11                   **MR. MICHAEL R. WALSH**
                     Skadden, Arps, Slate,
12                    Meagher & Flom LLP
                    500 Boylston Street
13                    Boston, Massachusetts  02116
                    (617) 573-4862
14                    michael.walsh@skadden.com

15                   **MR. JAMES Y. PAK**
                     Skadden, Arps, Slate,
16                    Meagher & Flom LLP
                    Four Times Square
17                   New York, New York  10036
                    (212) 735-2546
18                    james.pak@skaddden.com

19

20                   **MR. MICHAEL DALEY KARSON**
                     Haynes and Boone LLP
21                    2323 Victory Avenue
                     Suite 700
22                    Dallas, Texas  75219
                    (214) 651-5000
23                   michael.karson@haynesboone.com

24

25



**MS. RACHEL R. BLITZER**
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-3000
rachel.blitzer@skaddden.com


**MR. WILLIAM J. CASEY**
Skadden, Arps, Slate,
  Meagher & Flom LLP
525 University Avenue
Palo Alto, California  94301
(650) 470-4500
william.casey@skaddden.com


**MR. SCOTT MICHAEL FLANZ**
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-3000
sflanz@skaddden.com


**MS. EMILY WHITCHER**
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-3605
emily.whitcher@skaddden.com


**MS. JENNIFER H. DOAN**
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, Texas  75503
(903) 255-1000
jdoan@haltomdoan.com

```
 1
                                  MR. JOSH R. THANE
 2                                Haltom & Doan
                                  6500 Summerhill Road, Suite 100
 3                                Texarkana, Texas  75503
                                  (903) 255-1000
 4                                jthane@haltomdoan.com

 5

 6   FOR THE DEFENDANTS:          MS. BETH A. WILKINSON
                                  Wilkinson Walsh & Eskovitz LLP
 7                                1900 M Street NW
                                  Suite 800
 8                                Washington, DC  20036
                                  (202) 847-4000
 9                                bwilkinson@wilkinsonwalsh.com

10
                                  MR. BRANT W. BISHOP
11                                Wilkinson Walsh & Eskovitz LLP
                                  1900 M Street NW
12                                Suite 800
                                  Washington, DC  20036
13                                (202) 847-4000
                                  bbishop@wilkinsonwalsh.com
14

15                                MS. CALI COPE-KASTEN
                                  Wilkinson Walsh & Eskovitz LLP
16                                1900 M Street NW
                                  Suite 800
17                                Washington, DC  20036
                                  (202) 847-4000
18                                ccope-kasten@wilkinsonwalsh.com

19
                                  MS. KIRSTEN NELSON
20                                Wilkinson Walsh & Eskovitz LLP
                                  1900 M Street NW
21                                Suite 800
                                  Washington, DC  20036
22                                (202) 847-4000
                                  knelson@wilkinsonwalsh.com
23

24

25
```

MS. RUTH VINSON
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
rvinson@wilkinsonwalsh.com


MR. MAX WARREN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
mwarren@wilkinsonwalsh.com


MR. HAYTER WHITMAN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
hwhitman@wilkinsonwalsh.com


MR. KOSTA S. STOJILKOVIC
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4050
kstojilkovic@wilkinsonwalsh.com


MS. HEIDI L. KEEFE
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
hkeefe@cooley.com

MR. BRETT DeJARNETTE
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
bdejarnette@cooley.com


MS. ELIZABETH LEE STAMESHKIN
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
lstameshkin@cooley.com


MR. RICHARD A. SMITH
Richard Smith, PC
Campbell Centre I
8350 N. Central Expressway
Suite 1111
Dallas, Texas  75206
(214) 242-6484
richard@rsmithpc.com


MR. RAGESH KUMAR TANGRI
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, California  94111
(415) 362-6666
rtangri@durietangri.com


MR. BENJAMIN B. AU
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, California  94111
(415) 362-6666
bau@durietangri.com


MR. MARK RANDOLPH WEINSTEIN
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
mweinstein@cooley.com



MR. JOSEPH B. WOODRING
Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, California  90401
(310) 883-6400
jwoodring@cooley.com


MR. MATTHEW D. CAPLAN
Cooley LLP
101 California Street
5th Floor
San Francisco, California  94111
(415) 693-2000
mcaplan@cooley.com


MR. PHILIP MAO
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
pmao@cooley.com


MR. DANIEL TEIMOURI
Cooley LLP
1700 Seventh Avenue
Suite 900
Seattle, Washington  98101
(206) 452-8791
dteimouri@cooley.com


MS. JULIE B. RUBENSTEIN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
jrubenstein@wilkinsonwalsh.com

```
1                              MS. ELIZABETH Y. RYAN
                               Lynn Pinker Cox & Hurst, LLP
2                              2100 Ross Avenue
                               Suite 2700
3                              Dallas, Texas   75201
                               (214) 981-3821
4                              eryan@lynnllp.com

5
                               MS. CHRISTEN DUBOIS
6                              Facebook, Inc.
                               1601 Willow Road
7                              Menlo Park, California  94025
                               (650) 862-5980
8                              cdubois@fb.com

9
                               MR. PAUL GREWAL
10                             Facebook, Inc.
                               1601 Willow Road
11                             Menlo Park, California  94025
                               (650) 814-3157
12                             paulgrewal@fb.com

13
   COURT REPORTER:            MR. TODD ANDERSON, RMR, CRR
14                             United States Court Reporter
                               1100 Commerce St., Rm. 1625
15                             Dallas, Texas  75242
                               (214) 753-2170
16

17

18

19

20

21

22

23       Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                 JURY TRIAL - JANUARY 17, 2017
 2                   P R O C E E D I N G S
 3            THE COURT:  Okay.  Here we go.  Everybody get a good
 4   lunch?
 5            MS. WILKINSON:  Yes.
 6            MR. SAMMI:  Yes, sir.
 7            THE COURT:  We did?  Okay.  We did, too.
 8            If y'all haven't been to that off-site kitchen, it's
 9   a good place, for y'all out-of-towners.  It's kind of a --
10   well, what's that little area?
11            What's that area called we go to over there, you
12   know, that has all those experimental --
13            THE CLERK:  Trinity Groves.
14            THE COURT:  The Trinity Groves area.  It's really
15   good.  I think they have free rent, where they are, but it's
16   good.  It's a good place.
17            Okay.
18            MR. SAMMI:  Your Honor, I'd like to put something on
19   the record.
20            THE COURT:  What?
21            MR. SAMMI:  Just very briefly.
22            THE COURT:  Go ahead, Mr. Sammi.
23            MR. SAMMI:  Thank you, sir.
24            We'd like to put on the record Plaintiffs' continuing
25   objection to the Court's prior ruling excluding PX81.  That is
```

```
 1    an indemnity agreement that's --

 2              THE COURT:  Oh, yeah.  And I do remember all of your

 3    objections --

 4              MR. SAMMI:  Yes, sir.

 5              THE COURT:  -- that you've made for purposes -- and

 6    that you have timely made those, and you have requested on

 7    numerous occasions, and I told you to keep -- if you wanted to

 8    keep trying, trying, that maybe it would get opened up.  But I

 9    don't think so yet.

10              MR. SAMMI:  Your Honor, we have --

11              THE COURT:  But you have another reason you think

12    it's opened up?

13              MR. SAMMI:  We do.

14              The indemnity agreement discredits the testimony of

15    both Mr. Carmack and Mr. Zuckerberg.  In that regard,

16    Mr. Carmack was aware of the agreement and Mr. Zuckerberg

17    testified at his deposition that he was aware of that

18    agreement.

19              THE COURT:  Okay.

20              MR. SAMMI:  And that agreement, the indemnity relates

21    directly to ZeniMax's concerns -- claims regarding virtual

22    reality technology.

23              THE COURT:  Okay.  I'm not changing my ruling yet,

24    but be persistent.

25              MR. SAMMI:  I am, Your Honor.  I am.
```

```
1              THE COURT:  I know.  I've noticed.  It's okay.
2              All right.  Are you ready?
3              Did you figure out your microphone thing?
4              MS. WILKINSON:  I did, Your Honor.
5              THE COURT:  Okay.
6              MS. WILKINSON:  Thank you.
7              THE COURT:  All right.  Let's bring the jury in.
8              Did you get lunch, Mr. Zuckerberg?
9              THE WITNESS:  I did.
10             THE COURT:  Okay.  Do you have water still?
11             THE WITNESS:  I do.
12             THE COURT:  Okay.  Good.
13             (Pause)
14             THE COURT:  David, hold up a sec.  Hold it one sec.
15             No, it's okay.  Go ahead and bring them in.  I'm
16    ready.  It's all right.
17             SECURITY OFFICER:  All rise for the jury.
18             (Jury panel in)
19             THE COURT:  Y'all be seated.  Hope you enjoyed that
20    barbecue.  Sammy's really good, isn't it?  I knew it.  I knew
21    it.
22             Okay, Ms. Wilkinson.
23             MS. WILKINSON:  Thank you, Your Honor.
24             THE COURT:  Thank you.
25             Good afternoon, everyone.
```

```
 1   BY MS. WILKINSON:
 2   Q.   Mr. --
 3           THE COURT:  I don't think you're on.  You were into
 4   the second verse of your song.  You didn't have your microphone
 5   on, Ms. Carey.
 6           MS. WILKINSON:  Oh.
 7           THE COURT:  Oh.  That's not nice.  I'm sorry.
 8           MS. WILKINSON:  It's still not working.
 9           THE COURT:  Did you get it turned on now?
10           MS. WILKINSON:  I may need assistance.  There we go.
11           THE COURT:  You're good.
12           MS. WILKINSON:  Ms. Nelson keeps me straight.  All
13   right.
14           THE COURT:  Pull it down just a hair.  There you go.
15   There you go.  That's fine.
16           MS. WILKINSON:  Good?  Sorry.
17   BY MS. WILKINSON:
18   Q.   Mr. Zuckerberg, before we broke this morning, we were just
19   about to turn to how you first found out about Oculus.
20           Do you recall getting an email sometime in November
21   of 2013 from Mr. Andreessen?
22   A.   Yes, I think we discussed this earlier.
23   Q.   Okay.  Take a look at Plaintiffs' Exhibit 1288, if you
24   could.
25           We're going to put it up on the screen.  It was one
```

 1  Mr. -- I don't know if Mr. Sammi gave you a copy, but I will

 2  give you a copy.

 3          MS. WILKINSON:  Your Honor, may I approach?

 4          THE COURT:  Sure.

 5          (Pause)

 6  BY MS. WILKINSON:

 7  Q.   Now, just so we can get the timeline right for everybody,

 8  at this time, November 5, 2013, was Mr. Andreessen on the face

 9  board -- Facebook board?

10  A.   Yes.

11  Q.   All right.  And had he invested at Oculus at this time?

12  A.   No.

13  Q.   All right.  Go down to the bottom of this email to the

14  section you weren't shown during your testimony.

15          Read that last sentence --

16  A.   I don't think so.  He -- there may have been a seed round,

17  but I'm not sure.

18  Q.   Okay.  Take a look at the last sentence that says "I

19  might."  If you could, just read that out loud if you wouldn't

20  mind.

21  A.   Sure.

22          "I might ask you for a quick reference call/email

23  with the CEO.  We are proposing investing, but beyond that, you

24  would really enjoy seeing it.  It was a new experience."

25  Q.   All right.  Can you explain to us what a reference call is

1  in this context?

2  A.   Sure.  So Marc Andreessen was on the Facebook board of

3  directors, and he was -- he is a valuable director to the

4  company.  He provides good advice.  He helps us govern and run

5  the company.  And as part of investing, you know, a company

6  like Oculus that is perceived to be a good option for investors

7  has a lot of options for -- a lot of investors are going to

8  want to try to invest in a company like that.

9           So Andreessen was trying to see if I could talk to

10  Brendan to tell Brendan about my experience with Marc on

11  Facebook's board, because he thought that would help Brendan

12  choose Marc as the investor in Oculus over others.

13  Q.   Okay.  So does this refresh your recollection of whether

14  Mr. Andreessen was an investor at this time in November of

15  2013?

16  A.   Again, I don't think he was.  I mean, this is a factual

17  thing that we can check otherwise, but frequently these

18  companies have multiple rounds of funding.  It's possible that

19  they did a small round up front, but my -- my guess from this

20  and my understanding and what I remember is that he had not

21  invested at this point and certainly hadn't made the big

22  investment that they did after this.

23  Q.   Okay.  When he's asking you if you'll do a reference call,

24  first of all, did you agree to do that?

25  A.   Yes.

1    Q.    All right.  And is this like a tryout?  Could Mr. Iribe

2    have said, "We don't want your money.  We'll take someone

3    else's money"?  Is that the idea?

4    A.    Yes.  I mean, he and the company have whatever choice they

5    want of who they wanted to invest, and as a good company, I

6    think that they had a lot of options for investors, including a

7    lot of people who were Andreessen's competitors who were also

8    good investors.

9    Q.    When you say Mr. Andreessen was on your board, was that

10   his full-time job in November of 2013?

11   A.    No.

12   Q.    What was his full-time job?

13   A.    He runs an investment firm called Andreessen Horowitz with

14   his partner Ben Horowitz, and they've invested in a lot of

15   companies.  And he is on the board of, I think, probably five

16   companies.

17   Q.    Has he ever formed a company himself?

18   A.    Yes.  Earlier in his career he created Netscape, which was

19   the first internet browser, right?  So what -- you know, you

20   might use Chrome or Apple Safari or Internet Explorer today.

21   Netscape was, you know, one of the first of those as a company.

22   Q.    Do you find him to be a knowledgeable source about

23   technology and technology investments?

24   A.    Yes.

25   Q.    Let's take a look at DX448, if you could.  That should be

1    in your binder up there.  The index will tell you where it is.

2    It is DX448.

3    A.   Okay.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   Is that an email from you?

7    A.   It is.

8    Q.   On what date?

9    A.   November 19.

10   Q.   To whom?

11   A.   To Andreessen.

12   Q.   And what do you tell Mr. Andreessen in this email?  You

13   can just -- we can focus on the second paragraph, if we could.

14   A.   I'm telling him that I did the reference call with

15   Brendan.

16   Q.   All right.

17   A.   And that on the call Brendan seemed convinced that

18   Andreessen would be a helpful and a good investor.

19   Q.   So in November of 2013, were you considering to be an

20   investor -- you, Facebook -- at that time, or just

21   Mr. Andreessen?

22   A.   No, we were not.

23   Q.   Okay.  So I'm going to use MA for Mr. Andreessen, the

24   investor.  Okay?

25           Did Mr. Iribe invite you to come see their

 1  technology?

 2  A.    I think so, and I think what we discussed was that I would

 3  see it the next time he came to the San Francisco Bay area.

 4  Q.    Okay.  Did there come a time when he did set up a meeting

 5  with you to show off the Oculus Rift?

 6  A.    Yes.  I think it was the next time that he was in the

 7  area.

 8  Q.    All right.  And do you recall what -- what time period

 9  that was?  Was it in January of 2014 or February?

10  A.    Yes.  I think it was January, a couple of months after

11  this.

12  Q.    All right.  And -- do you remember the demonstration

13  itself, where it was at Facebook and what happened?

14  A.    I remember some things about it.  It was --

15  Q.    Let's start with where -- where it was.

16         Just tell the jury a little bit about how Facebook is

17  set up.

18         Do y'all have private offices or how do you have it

19  laid out?

20  A.    Sure.  So we're set up so that everyone sits at a desk out

21  in the open, including me.  So no one has a private office that

22  they work in.  Although we -- we do have meetings room, right,

23  because people need to have meetings that are private.  And

24  since I'm in meetings a lot of the time and Sheryl Sandberg,

25  our COO, was in meetings all the time, some of the senior

```
 1   executives have rooms that are reserved for meetings.  And I
 2   think that the first meeting that we had with Brendan we did --
 3   I don't remember why this was, but I think it was in Sheryl's
 4   conference room.
 5   Q.   Do you recall who else was at the meeting?
 6   A.   I remember being -- after I saw the first couple of demos,
 7   thinking that this was so important for some other folks to
 8   see, that I remember pulling in our chief technology officer.
 9   Q.   Who is that?
10   A.   Mike Schroepfer and our chief product guy, Chris Cox.  And
11   I remember at least trying to go pull them in, and I think that
12   they were both there.  One of them might have been out of town
13   that day, but I remember them both coming in.
14           There's also a person named Cory Ondrejka, who I
15   don't know if he was there for that specific meeting, but he
16   was pretty key in doing all of the technical diligence that we
17   started doing and trying to learn about the virtual reality
18   field which that meeting really kicked off and started for us.
19   Q.   Do you recall what you saw in the Oculus headset, what
20   content was in there when you were getting the demonstration?
21   A.   There were a few things.  One of the demos that really
22   made an impression was there was this demo of a villa in
23   Tuscany in Italy, and I remember thinking that this was really
24   neat because I was sitting in a chair.  And you can move
25   around, and as you move around, it like -- I'm just like in
```

1    real life.  When you move, you see a different thing.

2          In this situation when you moved around with this

3    headset on, it -- you really felt like you were there.  It

4    moved around exactly naturally how your head would move.  And I

5    just remember feeling from that, okay, this is really cool.

6    I'm clearly not in Italy right now.  I'm in this conference

7    room and I'm in California.  But I almost have to convince

8    myself that I'm not in Italy because everything that I'm seeing

9    just makes it feel like I'm there, which is a really new

10   experience, right, if you think about that.

11         It sounds -- you know, a lot of times if you're

12   watching, you know, a basketball game on TV or a football game

13   or you're playing some video game, it's on a screen and you're

14   trying to convince yourself that it's real or you're a part of

15   it, but because it's on this 2D screen, you kind of have to

16   project and put yourself into that scene.

17         This was the opposite experience, right?  You kind of

18   know that you're wearing this headset, and it's a screen, but

19   everything in your body tells you that it's real and you're

20   there, which is a pretty magical and cool experience.

21         Now, it wasn't perfect, but there were clear things

22   that needed to get worked out.  You know, the early demos,

23   because it wasn't -- it didn't move around perfectly, you would

24   kind of feel motion sickness after using it for a little while.

25   So there was a lot of technology that needed to get built.

```
 1          But I remember from that initial demo thinking, hey,
 2   I have been thinking about VR for a long time, and I just
 3   didn't realize -- I wasn't sure when it was going to be
 4   possible to build something like this, and this seems to be
 5   close enough that it's worth trying to look into whether we
 6   should do more and invest in this now.
 7          And that's what kicked off this process when I pulled
 8   together Schroepfer and Chris Cox and Cory and Amin, our head
 9   of our corporate development, to say, hey, this is something
10   that we should look into, go out there, see who is out there,
11   go get more demos, see what this company is doing, meet the
12   people, see who the best people are in this field, and see if
13   it is time for us to go do something here.
14   Q.   Okay.  Did you look over some slides and ask us to prepare
15   some demonstratives you've given, some demonstratives that you
16   saw?
17   A.   Did I do that?
18   Q.   Or review before we came to court?
19   A.   It depends on which ones they are.
20          THE COURT:  Wait, wait, wait.  Mr. Sammi.
21          MR. SAMMI:  Objection, Your Honor.  I think the
22   witness has already said that he's not sure what -- I've never
23   seen this.  May I see -- see a copy --
24          THE COURT:  Sure.
25          MR. SAMMI:  -- at least?
```

```
 1              MS. WILKINSON:  You can have the copy.  I just wanted
 2   to show Mr. --
 3              MR. SAMMI:  Sure.  Sure.  I would like one too.
 4              MS. WILKINSON:  -- Mr. Zuckerberg here.  I have
 5   another one.
 6         Your Honor, may I approach and give this to
 7   Mr. Zuckerberg?
 8              THE COURT:  Yes.
 9         Let me know what your objection is.
10              MR. SAMMI:  Yes, I will, once I --
11              MS. WILKINSON:  Your Honor, I thought we weren't
12   going to show the 3D version, so these are just stills of what
13   he just described.
14              MR. SAMMI:  Okay.
15              THE COURT:  Are these demonstratives?  Are you
16   offering them in evidence?
17              MS. WILKINSON:  Just demonstratives, Your Honor.
18              MR. SAMMI:  Your Honor, may I maintain a relevancy
19   objection to the issues in the case?
20              THE COURT:  Wait.  I missed that.  I'm sorry.
21              MR. SAMMI:  Maintain a relevance objection.
22              THE COURT:  Relevance.
23              MR. SAMMI:  Yes.
24              THE COURT:  Okay.  Overrule your objections.
25              MR. SAMMI:  Okay.
```

```
 1              THE COURT:  It is admitted for demonstrative purposes
 2   only, ladies and gentlemen.
 3   BY MS. WILKINSON:
 4   Q.   Mr. Zuckerberg, did you just describe for us the scene you
 5   saw in the Oculus Rift headset?
 6   A.   Yes.  And I mean, these are shots that are taken from it,
 7   but it really doesn't do it justice.  I think you have to
 8   experience it in VR to get a sense of -- because you can look
 9   around and it feels like you're there, and that's -- there is
10   something to that experience that you can't quite capture on a
11   2D screen like this, but I do think these are screens that are
12   taken from that experience.
13   Q.   Okay.  So in January you had a demonstration, including of
14   this Tuscany scene.
15              Would that be fair to say that's one of first times
16   you considered actually investing or buying Oculus?
17   A.   Yeah, I think that's right.
18              (Pause)
19   Q.   All right.  Let's talk about what you did after you -- I
20   think you told us after this demonstration, you called in the
21   other guys.  And did they get to do a demonstration as well?
22   A.   Those who were there that day.
23   Q.   All right.  What was the next step that you took after you
24   saw this demonstration?
25   A.   So after talking to the team and caucusing on that, you
```

1   know, Brendan brought a demo to Facebook, which is where this

2   demo was, but it wasn't the most up-to-date, state-of-the-art

3   experience that they were building, and in order to get that,

4   we had to go down to their headquarters because what they had

5   they couldn't transport yet.

6           And it was pretty clear after seeing this that this

7   is pretty neat, but there were also a bunch of issues with it.

8   So it was worth seeing what the most state-of-the-art thing

9   that they built was.

10          We planned a trip -- I think it was pretty soon --

11  within a week or two, to go down to, I think, Irvine where the

12  headquarters were for Oculus to go see the most recent

13  prototype that they built.

14  Q.   Did you go yourself?

15  A.   Yes.

16  Q.   Who else went with you, if you recall?

17  A.   Cory and Amin, and I don't know if anyone else went.

18  Q.   Do you recall if you also shared a meal with Mr. Iribe and

19  other folks after the demonstration that day?

20  A.   We were in Oculus's headquarters, so there may have been

21  some food around, but we didn't -- it wasn't a long meal, if it

22  was a meal.

23  Q.   All right.  And can you describe for us the demonstration

24  that you saw down in Irvine?

25  A.   Sure.  So that was a much higher fidelity, more accurate

1   experience.  So what's the best way to describe this?

2           So the demos themselves, I mean, the content, there

3   were a few different things.  They had a demo where there was a

4   T. Rex.  It was pretty cool.  The T. Rex is walking around and

5   it kind of looks at you and roars at you, all right, and you

6   kind of actually tremble a little bit and think -- you know, in

7   your mind, you are like, all right, there is clearly not a

8   T. Rex here, I know that, but it really just -- you know, it

9   feels very real, and the sound is very real.

10          You know, there's a demo where you're standing on the

11  edge of a building, and you can take steps over to the edge,

12  and, again, you know this is -- this is obviously not real, it

13  is just in a computer, but you actually feel -- I don't know --

14  what's that -- vertigo when you step to the side because it

15  feels so real that it's, like, all right -- this is -- this is

16  kind of a different experience than anything you would have

17  with normal TV or anything like that.

18          So there were a few demos like this.

19          But in order to give you this feeling of presence,

20  like you're really there, it has to be a high fidelity

21  experience.  It can't be jittery, you know, it can't be slow,

22  it can't be that when you look around stuff lags, all right,

23  because all that stuff breaks the illusion that this is a real

24  virtual reality, right?

25          And all that stuff -- all those errors just kind of

1   help make you snap out of it and go this isn't actually a real

2   experience.

3          So the difference between the first demo that I saw

4   and what I saw down at Oculus headquarters was, it was faster,

5   it made you less motion sick, it felt more real, but it also

6   wasn't perfect yet.  So, I mean, that wasn't the exact thing

7   that we ended up shipping.

8          You know, I think it took another couple of years

9   from that point to actually get to a product that we ended up

10   shipping as a consumer product because there was a lot more

11   that needed to work.  And, again, that was just, like, the

12   first product that we shipped, right, kind of like the earliest

13   version of a BlackBerry smartphone.  It's not, you know, the

14   iPhone version that we want to get towards building.

15          But through all these experiences, I basically came

16   away with the belief that now it was possible to build a good

17   VR experience over the next five years or ten years if we

18   invested a lot in that, whereas, before I had seen these, I

19   wouldn't have known whether it was, like, 50 years away.  I

20   mean, it wasn't clear what the -- you know, what technology

21   needed to be built before this could be something that -- that

22   you could then go take into building something that would be an

23   affordable product that people could get and be happy with.

24   Q.   Did you and Mr. Zoufonoun talk about proposing a deal to

25   Oculus at some point around the time of this demonstration down

1   in Irvine?

2   A.   Yes.

3   Q.   All right.  Did you --

4   A.   Part of what we wanted to do was -- you know, different

5   entrepreneurs and founders think about their companies in

6   different ways.  You know, some aren't willing to sell their

7   companies under, you know, any circumstances.  I didn't.  A lot

8   of companies wanted to buy Facebook early on.  And then some

9   are open to it if it's a good deal, and some really want to

10  sell their companies.

11          And then there is --

12  Q.   Where would you put Mr. Iribe and the folks at Oculus on

13  that scale back in January?

14  A.   They definitely weren't in the "really want to sell our

15  company," which is why I think it took awhile to come to terms

16  and it ended up being so expensive.

17          But they also clearly were not in the "we would never

18  sell."  So they were closer to that.

19          This team, which I think you can probably get from

20  their testimony -- I don't actually know which ones have

21  testified yet and which ones will to come -- I mean, they

22  really care about virtual reality.  This is going to be, like,

23  their life's work.  When you look back 10, 20 years from now, I

24  think that that's going to be the thing that they are most

25  proud of in their lives is they built this experience and

1    contributed to this.

2              So, you know, I think that they were open to

3    considering a deal but only if we could convince them that this

4    was actually going to be really good for VR and not just a good

5    deal for their company.

6              All right.  So if it was just going to be money they

7    were going to get but then they were going to have to walk away

8    from their dream of building this, I don't it couldn't have

9    happened.  And you can, of course, ask them about this when

10   they -- when they testify.

11             But that -- that, I think, ended up being -- most of

12   what we actually talked about was not the price of the deal but

13   how was Facebook, this social networking company that, frankly,

14   people really did not think about VR before -- before we

15   started talking to these guys, how were we going to help them

16   realize their dream of building virtual reality.

17             And that was the conversation over the next couple of

18   months that eventually led to the deal coming together.

19   Q.   Let's take a look at DX489, which is also in your

20   notebook, and start at the back if we could.

21             MS. WILKINSON:  First of all, let's go up to the top.

22   I'm sorry.  Sorry, Dave.  Can we go back?  Just to lay the

23   foundation up at the top.

24   BY MS. WILKINSON:

25   Q.   Who is this email from?

1   A.   Amin.

2   Q.   And, again, tell the jury who he is.

3   A.   He was the head of corporate development.  So he worked on

4   these kind of deals for us.

5   Q.   You call him the -- you called him the deal guy?  He helps

6   get deals done if you --

7   A.   Sure.

8   Q.   Okay.  What date is this email?

9   A.   January 31, 2014.

10  Q.   All right.  And who's on the cc line?

11  A.   Andrea Besmehn.

12  Q.   Who is she?

13  A.   She is my executive assistant.

14  Q.   Great.

15       And it says "Project Inception."  What does that

16  mean?

17  A.   That was the code word for the project that, I think, Amin

18  and the team has chosen.

19       Whenever we are doing projects, the team always comes

20  up with code words.  So that way, you know, we're not talking

21  about Oculus.  If something leaked, for example, then, you

22  know, people wouldn't know that -- you know, that we were

23  talking about Oculus, the company.  It would just be some code

24  word that people wouldn't know what it was.

25  Q.   Explain to us why would you care.  You are thinking about

1   buying Oculus, right?  This is when you are starting to think

2   about putting together a strategy.

3         Why would you care if somebody out in the public

4   found out you were trying to buy Oculus or any other company?

5   A.   Oh.  Because these deals are competitive.  Right?  We

6   talked a second ago about how when Marc Andreessen wanted to

7   invest, he was up against other competitive investors who

8   wanted to invest.  There is a similar dynamic if a company like

9   us is to buy another company.

10        So, you know, I gave some testimony before around why

11  we moved so quickly during the deal, and part of that is

12  because when you're doing -- when you're making deals and it is

13  a competitive situation, you often don't have a lot of time.

14  Right?

15        I mean, some of the bigger acquisitions that we have

16  done, like Instagram and WhatsApp, which were each more than a

17  billion dollars, we had to move very quickly because other

18  companies -- whether it was Google or, you know, Twitter or

19  Apple, or whatever the companies were -- were also trying to

20  talk to those companies and buy them.  And, often, if a company

21  knows that we're offering something, they will offer more, so

22  being able to move quickly not only increases our chance of

23  being able to get a deal done if we want to, but it makes it so

24  we don't end up having to pay a lot more because the process

25  drags out.  So that's a really important thing.  I mean, you

1    want to make -- you want to take the time to evaluate this

2    carefully and meet all the people involved and come to a clear

3    understanding that this is a company and these are people that

4    we want to work with.  But you want to do that as quickly as

5    possible so it doesn't get taken from -- out from under you by

6    a competitor.

7    Q.   Got it.

8              Now, Mr. Zoufonoun is forwarding you this email.

9              MS. WILKINSON:  Can we go to the bottom, please,

10   where the email starts?

11             I think it is the second page, Dave.

12             So start from the bottom.  His Honor has noted that

13   maybe if you could change the way emails are read, we would all

14   appreciate it.  It's hard for us to start at the bottom and

15   read up.

16             So go down to the bottom, please.

17             THE COURT:  I'm going to invent that.

18             MS. WILKINSON:  It is hard.  Well, you have him here.

19   Maybe he can do something about it.

20             THE COURT:  Okay.

21             MS. WILKINSON:  Keep going down, please.  Keep going.

22   There we go.  Thanks, Dave.

23   BY MS. WILKINSON:

24   Q.   Right there.  This first email, are your folks talking

25   about a strategy of how to get Oculus to do the deal with you?

1   A.   So I want to be clear that I'm not on this email.

2   Q.   Right.  This is forwarded to you at the end, and I

3   think -- doesn't Mr. Zoufonoun tell you at the beginning for

4   you to read it yourself from the bottom of the thread?

5   A.   Sure.

6   Q.   Look at the front.

7   A.   So -- yes.  So Amin is involved in both making these deals

8   and then also making sure that they are successful, which is

9   why I pushed back a little bit on the characterization of him

10   just as a deal guy because that makes it sound like he's just

11   trying to get something done, whereas he also is deeply

12   involved in actually making them work once -- once the

13   companies join Facebook.

14          Yeah, I think what he's saying here is basically what

15   I was saying a few minutes ago, that, you know, getting -- if

16   this is going to happen, it is not going to be because we just

17   offer a lot of money, although we're going to have to offer a

18   fair price for the company that is more than -- than what they

19   potentially could -- felt like they could do on their own.  But

20   they also would need to feel like this was actually going to

21   help their mission -- right? -- and help virtual reality get

22   built in the world and that if -- if coming to Facebook was

23   going to jeopardize that, then they were weren't going to do

24   that.

25          So, you know, he felt after his interactions with

1    them, which I agreed with even though I wasn't on this thread,

2    that the most important thing was aligning and getting excited

3    about a shared vision about how we were going to work together

4    or if they built the hardware and we built the experiences, how

5    that could be better than either of us working separately.

6    Q.   Did you also share the belief that you should instill fear

7    or trepidation in them about staying independent?

8    A.   Yeah.  That's less my thing, but -- but I think if you are

9    trying to get -- if you are trying to help convince people that

10   they want to join you, helping them understand all the pain

11   that they would have to go through to build it out

12   independently is a valuable tactic.  But that's, I think, a

13   little less what I focused on than just what we could just do

14   together.

15           MS. WILKINSON:  Let's go back to the top of that

16   document, the first page, please.

17           And does Mr. Zoufonoun share his strategy there, what

18   he thinks is the best strategy in the second paragraph there,

19   "I still think"?

20           MR. SAMMI:  Objection, calls for speculation.

21           THE COURT:  Let's see.  What you're saying is you

22   think his answer calls for speculation?

23           MR. SAMMI:  Yes.

24           THE COURT:  On the deal?

25           MR. SAMMI:  Yes, sir.  She's asking the witness what

```
 1  he means.  She can ask his understanding, but --
 2          MS. WILKINSON:  I'll rephrase it, Your Honor.  I
 3  don't mind.
 4          THE COURT:  Okay.  Good.  It saves me from having to
 5  make a ruling.
 6  BY MS. WILKINSON:
 7  Q.   Mr. Zuckerberg, what's your understanding of this
 8  expression of strategy from Mr. Zoufonoun?
 9  A.   Well, this looks like, just from reading it now, very
10  similar to the last email that you showed me where he's arguing
11  that the only way that this ends up happening is if the Oculus
12  team is so excited about what we could do together beyond what
13  they could do independently that it would be better for VR.  At
14  that point, we could discuss numbers and financials around the
15  deal, but we weren't going to -- you know, the thing that was
16  going to get this done wasn't have it be a -- only have it be a
17  big number.  It was really a lot about the alignment of the
18  vision and what we're trying to build together.
19  Q.   Okay.  We're going to go down to the next email.
20          Can you tell us the name of the person who wrote this
21  email, this part of the email?
22  A.   Anantha Kancherla.
23  Q.   Okay.  And what does he do at Facebook?
24  A.   I don't think he's at Facebook now, but he -- at the time
25  he was an engineer there.
```

1  Q.   All right.  And do you rely on some of the other people

2  who work for you to assess the technical issues associated with

3  deals including the one technical issues associated with

4  Oculus?

5  A.   Yes.

6  Q.   All right.  Take a look down where it says "their key

7  technical folks."

8          Is he giving you-all an assessment -- what did you

9  understand him to be saying there about who were the key

10 technical folks at Oculus?

11 A.   Well, he seems to be listing out who some of the key

12 technical leaders are.

13 Q.   Do you know who Nirav is?

14 A.   Yes.

15 Q.   Did you meet with him before you closed this deal?

16 A.   Yes.

17 Q.   Do you know who Michael is?

18 A.   Yes.

19 Q.   Did you meet with him before you closed this deal?

20 A.   Yes.

21 Q.   And Mr. Carmack, you've already told us about, right?

22 A.   Yes.

23 Q.   Do you know what he means by "a couple of vision Ph.D.'s

24 worth preserving"?

25 A.   Yes.

1   Q.   What does he mean?  What did you understand him to mean?

2   A.   Ph.D. -- right? -- so people who had gotten an advanced

3   degree in computer vision, right?  So that's --

4   Q.   What is computer -- it's obvious to you, but again, to us,

5   what is Ph.D. in computer vision --

6   A.   It's --

7   Q.   -- or what is computer vision?

8   A.   It's software that helps a computer see things.  It's --

9   Q.   Oh, that's obvious.

10   A.   I'm sorry.  For example, like face recognition, right?

11   It's -- you know, when you upload a photo to Facebook and we

12   can suggest whether it's a friend of yours in it, because we

13   understand that it's their friend by looking at it, that's an

14   example of computer vision.

15        In the case of this, computer vision is really

16   important, because you have this headset on and you're looking

17   around the room, and one of the key things that you're doing is

18   you have to track what the person's head position is.  And one

19   of the ways that you can do that accurately is by having a

20   camera in front of the person that then looks at them and tries

21   to determine when they're moving around in space, right?

22        That's much more accurate than just having a

23   gyroscope or something on the device itself, so that is a

24   computer vision problem.  And we needed the best computer

25   vision Ph.D.'s and experts in the world to build this

1  technology.

2  Q.   All right.  Go down to -- two bullets down where it says

3  "The hardest" -- you've just described tracking.  It says, "The

4  hardest nontracking work they're doing is what Carmack is doing

5  with the Android."

6        What do you understand that to mean?  What is

7  nontracking work?

8  A.   So tracking -- sorry.  Tracking is what I was just

9  referring to, so basically knowing as you move your head around

10  and as you walk through space, what your position is, because,

11  you know, what the world is that you see is, of course, going

12  to be dependent on what your position is, right?  So if I'm

13  looking this way, I'm going to see this.  If I looking this

14  way, I'm going to see this and all the variants in between.

15        The rest of the work is -- you could call it systems

16  work.  So it's -- so imagine this technical problem, right?  So

17  you turn your head 10 degrees, right?  And now you're looking

18  at a different place.  And your eyes get a new image --

19  right? -- like, in the real world, within 5 or 10 milliseconds,

20  right?  So really quickly.

21        So that means that in order for virtual reality to

22  work, we need to build software that can know that you moved,

23  know what the image should be, and then send it to the screen

24  within 5 or 10 milliseconds or else you're going to get motion

25  sick -- right? -- and it's not going to be a good experience.

 1          So that just requires a lot of optimization and

 2    making that go quickly, and that, if you follow Carmack's work,

 3    is one of the things that he is a world expert at, among other

 4    things.

 5    Q.    And --

 6    A.    So that was one of the hardest problems here, is not just

 7    doing the tracking of knowing where the person is in space, but

 8    also being able to then go render that image really quickly for

 9    the person.

10    Q.    It says, "Carmack is doing Android."  We've heard

11    testimony that Mr. Carmack worked on mobile when he came to

12    Oculus.

13          Was that what you understood when you spoke to him?

14    A.    Yes.

15    Q.    And is doing work on mobile different than doing work on

16    the computer Rift headsets that we've seen introduced in this

17    case?

18    A.    Yeah.  We --

19    Q.    Why?

20    A.    -- talked about this a bit earlier.

21          You know, for example, when we're building a Facebook

22    app, we have to build a different thing, whether we're building

23    an iPhone app versus our website, for example.  I mean, they're

24    different experiences to some degree, so they're a different

25    code.

```
 1              And similarly, if you're building -- so we've got a
 2    mobile version of VR, which is good because you can take it
 3    with you anywhere that you go.  You basically -- you have your
 4    phone.  You can snap it in.  It doesn't -- you don't have to
 5    have a wire to a big computer.  There's all these advantages of
 6    that, but a phone is generally not as strong of a computer as
 7    like the big thing that you might have at your desk.
 8              So Carmack had to do specific optimization for that.
 9              We also have a version which is tied to -- you know,
10    you have a wire from your headset to a really powerful computer
11    that you'd have at your desk and that allows for a higher
12    quality experience because those -- because that computer is
13    bigger and more powerful and you can do more with it.  But
14    they're basically completely different platforms, and just like
15    when we at Facebook make our website differently from our
16    iPhone app, you know, the mobile version of VR is a pretty
17    different thing from the computer version of VR.
18    Q.   So the code Mr. Carmack would write for mobile would not
19    be code that would work on the -- on the computer Rift headset?
20    A.   Most of it, no.  And some of it you might be able to
21    adapt, but there would be work.
22    Q.   Okay.  And that's what you call optimization or is it
23    broader than that?
24    A.   I was referring to something different, but yeah, it would
25    be a lot of work to take the code from mobile and make it work
```

1   on a computer.

2   Q.   All right.

3        Did there come a point in time when you were talking

4   to Oculus that you spoke to Mr. Iribe about potential deal

5   terms?

6   A.   Yes.

7   Q.   And do you recall when that was, the first time you

8   discussed -- started discussing that with him?

9   A.   Well, we started early because I wanted to get a sense of

10  whether he was even open to selling and at what price, and so I

11  started -- so you want to ask a bunch of questions around what

12  their other options are in the market.  So if they were trying

13  to raise more money, because you're trying to manufacture

14  stuff, they were going to need to build all these facilities

15  and do this and get a lot more investment than just what

16  Andreessen had put in.

17       So I started asking them, "Well, what price do you

18  think you'll raise money at," right?  So just to get a sense of

19  is the valuation here reasonable, how would they think about

20  this, and I think that that happened the first time that I went

21  down there.  But that was more -- it was less us making an

22  offer and more me just trying to understand how they thought

23  about the market around that.

24       I also had a number of conversations with other

25  companies and other investors, including Marc Andreessen, about

1   the market and other investors in VR and, you know, when they

2   were bid ding to invest, who else was bidding to invest and at

3   what prices, to try to get a sense of what the price that we'd

4   need to offer would be to eventually make a deal work.

5   Q.   Do you remember the value that Mr. Iribe first put out for

6   a possible purchase of Oculus?

7   A.   There were a few, but, I mean, I remember 4 billion was

8   what they felt like they were going to -- was -- you know,

9   typically, if you're looking to raise investment for your

10  company, you know, they felt at the time that investors would

11  invest at valuing the company at around $2 billion, which I

12  checked out with Andreessen and a few other people and

13  ultimately came to the conclusion that that was a reasonable

14  ballpark for where people might invest.

15          You know, I got some early signals, which I think

16  were in some of the texts earlier that suggested that that

17  might be too high.  After doing some more checks, I think I

18  came to the conclusion that that was actually a reasonable

19  price.

20          Now, when you're thinking about buying a company, it

21  is typical to -- typically, if you're buying a company, to get

22  control of the company, you end up having to pay a premium over

23  what you would just invest to buy a small piece of the company

24  but have the other team stay in control.  So that premium is --

25  you know, can be as much as 2x, which I think, is where Brendan

1    had gotten to this figure of 4 billion.  2 billion was what

2    people would invest in and then to have control of the company,

3    a premium of 4 billion, which I think reflected that they

4    really weren't looking to sell the company.  I mean, they just

5    wanted to build this thing and stay independent, so they were

6    only going to sell if we made a financial offer that was really

7    good.

8    Q.   All right.  Let's take a look at DX1531.

9         As we're getting that up and as you can find it, you

10   don't recall the exact date when you started talking to

11   Mr. Iribe about possible financial terms, do you?

12   A.   Not a Facebook offer, but I do think that I started asking

13   some questions about the financials around the company that

14   first time that I went down to visit the Oculus headquarters

15   and get that demo.

16   Q.   So that would have been in January of 2014?

17   A.   I think that's right.

18   Q.   All right.  Okay.  Take a look at this email, if you

19   could, and start back on the -- where it starts with your email

20   on Saturday, February 1, 2014.

21   A.   I'm sorry.  Where are we?

22   Q.   The second page, the middle of the page where -- is that

23   your email?

24   A.   Over on the next -- sorry.  What document are you on?

25   Q.   Document DX1531.

1   A.   Okay.  Okay.

2   Q.   The second page, is that your email address that you're

3   writing to Mr. Iribe on February 1st, 2014?

4   A.   Yes.

5   Q.   All right.  And before we go into this, can you just take

6   a look at it, and does this suggest to you whether you had had

7   conversations with Mr. Iribe about potential financial terms

8   before Saturday, February 1 or after?  Or the valuation?

9   A.   Yeah, we had a few conversations, like I said.  I mean,

10  this suggests that, potentially, Brendan's price for -- at

11  which he would do the deal increased, which I do remember, I

12  think, happened at some point.  I don't remember what -- at the

13  beginning of the negotiation where he was, but I do remember

14  towards the end they were trying to get to 4 billion.

15  Q.   All right.  And in this -- we're not going to go through

16  the whole email, but if we could go to the next page at the

17  very bottom, the last paragraph that says "strategically."

18          Let me read this to you.

19          You say to him, "Strategically, it seems like you

20  have a three-year head start on the rest of the industry, and

21  this is your opportunity to cement Oculus as the standard VR

22  system people will use for decades."

23          What did you mean by that at the time?  And then we

24  can talk about whether you still agree with it.

25  A.   So they were ahead in technology.  They built this headset

1   that was better than what others had, and we had looked at the

2   other headsets that were on the market and were coming on the

3   market at the time, including one from Sony that they -- it

4   wasn't a consumer product yet, but they had a developer kit

5   like Oculus.  And the Oculus one, we thought, was clearly

6   better.

7           So we thought that they had a good head start, but

8   you know, when -- I think what can frequently happen is that a

9   lead -- if you have a hardware advantage, other companies can

10  catch up to that, right?  So if you look at phones, for

11  example, you know, when the iPhone first came out, there was

12  nothing else like it.  And now, you know, I think a lot of

13  people would argue that there are other phones that have just

14  as many features and are just as good as the iPhone in

15  different ways.

16          So for a lot of people the reason why they like

17  either the iPhone or Samsung phones at this point, or whatever

18  it is that they use, is not just because the phone is better,

19  but because there is a whole developer community and different

20  apps around those different devices.

21          So that's, I think, what we needed to do, was just

22  take -- you know, just like how Apple originally, I think, had

23  a key, had a big advantage where the iPhone was clearly better

24  than everything before it, Apple then went and built the app

25  store in the community that I think solidified a lead that they

1    had.  And that's what I think the Oculus team had to go do, was

2    turn the hardware advantage that they had at the beginning into

3    a sustainable app ecosystem.

4    Q.   I understood what you said.  But after that, explaining

5    this, "Within three to five years, some of the technical

6    challenge you've solved will become easier to solve because

7    hardware will improve."

8         Is that what you were just saying to us -- explaining

9    to us?

10   A.   Yes.

11   Q.   "So others will be able to replicate them.  If you have

12   any success, then other companies will definitely enter the

13   space.

14        "If you haven't solidified your ecosystem with the

15   most important killer apps yet, then you will likely be

16   fighting a war against Microsoft, Google, or someone else where

17   you are outresourced."

18        Is that consistent with the explanation that you just

19   gave the jury?

20   A.   Yes.

21   Q.   Now, when you say "killer apps," what do you mean by that?

22   A.   It's an industry term.

23        So the basic idea is that for every computing

24   platform, like the iPhone, for example, or a computer with

25   Windows on it, you know, people don't want to have an iPhone to

```
 1    have an iPhone.  They want to have it because there's a few
 2    things that they do on it that are critical to them.
 3            So for phones, text messaging was a really important
 4    one or being able to use a web browser or to look things up or
 5    an app store at this point to get access to a lot of different
 6    apps.
 7            So the question is, you know, what are the -- what
 8    are the killer apps for VR going to be?  What are going to be
 9    the things that people buy a VR system in order to get access
10    to those?
11            And the most important platforms and businesses that
12    I think have gotten built over the last few decades are ones
13    where those come together, where one company builds both the
14    platform and the killer app, and I think our argument was
15    social communication, and a lot what Facebook does is, I think,
16    one of the killer apps of all computing.  Right?
17            It is certainly one of the big things that people do
18    on phones, and I think it is going to be one of the big things
19    that people do in VR too.
20            So we were on track to building that.  They were on
21    track to try to build this platform but had no killer apps.  If
22    we came together, then -- just like Microsoft had done with
23    Office during the '90s where they both -- they were both --
24    there was Windows in the computer and there was Microsoft
25    Office, the productivity suite that people really wanted to
```

```
 1   use, and, you know, different communication products on phones,
 2   we felt like we could build that experience for VR, and that
 3   would be the most valuable thing that we could do together.
 4   Q.   After explaining this to Mr. Iribe, did you offer to
 5   continue your discussions with him?
 6             Look down to the bottom.
 7             MS. WILKINSON:  If we could go down to the last
 8   paragraph, please, Dave.
 9             Take a look at "if you're still open."
10   A.   Yes.
11   Q.   Did Mr. Iribe, in fact, take you up on your offer?
12   A.   I think later.
13   Q.   All right.  Did there come -- was there some other deal or
14   something else going on during this time while you were
15   beginning your discussions with Oculus that took you away from
16   the negotiating table?
17   A.   Well, we were building a lot of things at the time, but we
18   also -- between this, which I think was in late January, early
19   February and, I think, mid-to-late March when we actually
20   agreed to the Oculus transaction, we did also buy this company
21   WhatsApp, which was a much larger transaction than this.  It
22   was $19 billion.
23   Q.   19 billion?
24   A.   Yeah.  It was a big -- it's expensive.  I mean, there are
25   more than a billion people around the world who use WhatsApp
```

```
 1  now.  Almost a billion people use it every day.

 2         So it is a big thing, and it fits right with

 3  Facebook's core ethos.  It is a communication product for

 4  texting and communicating with groups and, similarly, I mean, I

 5  knew that they would just be much better and be able to build

 6  better services as part of Facebook, and their founder agreed.

 7         But we had a whole kind of parallel process to this

 8  where I was talking to -- to their founder about that.  And as

 9  you can imagine, this takes a bunch of focus to do -- so -- you

10  know, doing multiple multibillion dollar deals at the same time

11  is hard.

12  Q.   Did this WhatsApp deal move at a pretty rapid clip like

13  your negotiations with Oculus?

14  A.   Yes.  But I want to add some -- I want to make sure that

15  the testimony on this is complete.  So I think that this is

16  being characterized as if we suddenly just decided one day, we

17  woke up and decided we were going to do this and then looked at

18  some documents over a few days and then did the deal.

19         In reality what is happening in all of these, in

20  Instagram and WhatsApp and Oculus, they are kind of things that

21  we've been thinking about for a long time -- right? -- and I've

22  been building relationships, at least in Instagram and the

23  WhatsApp cases, for years with the founders and the people that

24  are involved in these companies, which made it so that when it

25  became time or when we thought it was the right time to move,
```

 1   we felt like we had good amount of context and had good

 2   relationships so we could then move quickly, which was

 3   competitively important and why we've been able to -- why a lot

 4   of these acquisitions, I think, came to us instead of our

 5   competitors and ended up being very good acquisitions over time

 6   that a lot of competitors wished that they had gotten instead.

 7           So I want to make sure we're clear on this.  It's not

 8   like I just woke up one day and decided that we were going to

 9   do this and then a week later we did it.  I mean, that's not

10   how billion dollar projects come together.  I mean, these were

11   all things that I think we've been thinking about for a while.

12   But when it came time to actually pull the trigger and say,

13   okay, we've been talking about and thinking about this for a

14   while, but now let's move forward and try to do this, we put

15   all the pieces in place so we could move pretty quickly.

16   Q.   All right.  Do you -- I asked you about a dinner in --

17   with Mr. Iribe sometime in late January.

18           Take a look at DX1532 and just see if this refreshes

19   your recollection about when that dinner occurred.

20           MS. WILKINSON:  Can you take it down until -- thanks.

21   Just so he can look at it.  Thanks, Dave.

22           THE COURT:  It isn't already in evidence?

23           MS. WILKINSON:  1532 -- 1532, no.

24           THE COURT:  It's not on the list either?

25           MS. WILKINSON:  No.  It's -- well, I don't know

```
 1   what --
 2            (Pause)
 3            THE COURT:  Wait a minute.  Let me see if it's on the
 4   list.
 5            1342?
 6            MS. WILKINSON:  1532, Your Honor.
 7            THE COURT:  Oh, excuse me.
 8            (Pause)
 9            MS. WILKINSON:  No objection?
10            MR. SAMMI:  No objection.
11            MS. WILKINSON:  He doesn't object, Your Honor.
12            THE COURT:  It's not on the list.  You're right.
13            You're offering it into evidence?
14            MS. WILKINSON:  Yes, and Mr. Sammi doesn't object.
15            THE COURT:  That document is admitted into evidence.
16            (Defendants' Exhibit No. 1532 received)
17   BY MS. WILKINSON:
18   Q.   Now we can do it.  Now we're going to start in the middle
19   just to make it confusing because --
20            Is this the email --
21            MS. WILKINSON:  Go to the middle, please.
22            -- from Mr. Iribe --
23            No.  Yeah, right there.  There we go.
24            -- to you forwarding something from Mr. Carmack?
25   A.   Yes, it looks like it.
```

```
 1   Q.   What's the date of the email?

 2   A.   January 31.

 3   Q.   And what does he say in the first sentence?

 4   A.   "Thanks for an amazing dinner."

 5   Q.   And the next one?  Sorry.

 6   A.   "Really enjoyed the discussion and the endless duck."

 7   Q.   What is "endless duck"?

 8   A.   I don't know.  That must have been what we ate that night.

 9   Q.   All right.  So does that refresh your recollection that

10   you had a dinner around the end of January with Mr. Iribe?

11   A.   Sure.

12   Q.   And he forwarded you this email from Mr. Carmack, right?

13   A.   Yes.

14        MS. WILKINSON:  If you could show that just for a

15   minute, please.

16   BY MS. WILKINSON:

17   Q.   And then let's go back up, if we could, to your response.

18        And who are you writing to on Sunday, February 1st,

19   2014?

20   A.   It looks like Brendan and cc'ing Amin and Nate, who is

21   Brendan's co-founder at Oculus.

22   Q.   Okay.  And what do you tell him?

23   A.   Do you want me to read this?

24   Q.   You can or you can just describe your purpose of this.

25   I'm going to ask you to explain the second paragraph, but --
```

1   A.   Sure.

2        Well, we're summarizing what we talked about at

3   dinner, which is basically the vision of why it made sense for

4   Oculus and Facebook to work together on building this future

5   platform instead of us trying to build it from scratch or them

6   continuing as a separate company.

7   Q.   And I think you've explained a bit of this to us just a

8   few minutes ago, but the second sentence or second paragraph,

9   when you say, "The OS Plus killer app strategy has much more

10  potential than what either of us can do on your own."

11       What did you mean by that?

12  A.   Sure.  This is what we were talking about a few minutes

13  ago, that if you look at the major computing platforms over the

14  last few decades, right?  So computers with, you know, Windows

15  on them and Microsoft Office, they were very important for

16  productivity in -- in the work space, mobile phones with

17  different communication apps and the ability to access the

18  internet on them.

19       What you want in defining a new category for

20  computing is to both be able to build the platform, which in

21  this case is the headset and all the experience around that,

22  and then also have not just a big ecosystem of content, but you

23  need to have, like, the key things that half of the people are

24  going to want to use, right?

25       And if you don't have that key thing, then, you know,

1  people aren't going to want to go buy a headset if there is not

2  a key thing that they want to go use with that.

3         In order for VR to really work, we need both the OS,

4  operating system or the platform that I'm referring to, and the

5  killer app, which is the key experience that a lot of people

6  really want.

7  Q.   All right.  Just one other thing in there.  In the next

8  paragraph you talk about accelerating growth, and you say, "We

9  can add more great engineers to your team and lower your

10 prices.  If you can get to 10 million units a couple of years

11 sooner, we can get every developer and studio in the world

12 building just for Oculus before any big competitor even

13 exists."

14        Why is the lowering the price important in terms of

15 building up the developer community and getting ahead of the

16 competition?

17 A.   Well, people are more likely to buy something if it's more

18 affordable, right?  So if the device is, you know, $400.00

19 instead of $1,000.00, that is going to make it affordable for

20 more people and the more people that can afford it are going to

21 decide it is a good deal and want to buy it.

22        The reason why Facebook can help Oculus do this is

23 that we already have a big business from Facebook, so we don't

24 need to make money on this for a long time.  So, whereas, if

25 Oculus were a separate company and they can build this for

1  $400.00, they would need to sell it for 500.00 or $600.00 in

2  order to make a profit to pay for all their people and sustain

3  the company, whereas, at Facebook, we don't have to do that.

4  Right?

5          I mean, we can make enough money from our -- from

6  Facebook that we can just fund this for ten years or a long

7  period of time, however long it would take to develop this new

8  thing, and make it more affordable for people in the world to

9  get access to virtual reality.

10          So that's just a thing that on day one, you know,

11  them joining us makes this better for people who would consider

12  buying virtual reality.

13  Q.   All right.  Let's move on to March, if we could, of 2014.

14          I believe counsel asked you about Mr. Andreessen and

15  his investment that he made between November and January into

16  Oculus.

17          Because he was on your board, were you trying to

18  overpay for Oculus to help out Mr. Andreessen?

19  A.   No.

20  Q.   Okay.  Did you have different concerns about

21  Mr. Andreessen and whether he would be happy about Facebook

22  buying Oculus?

23  A.   Yes.  I was worried that he was going to try to convince

24  the Oculus team not to sell.

25  Q.   Okay.  That's a little hard for us to understand.  So

1    explain.  He's invested -- how much did you tell us? --

2    73 million?

3    A.    Yes.  This is counterintuitive.

4    Q.    So he puts money into this company.

5    A.    Yeah.

6    Q.    You're about to offer them $2 billion, and you're afraid

7    that Mr. Andreessen is going to be mad?

8              MR. SAMMI:  Objection, leading the witness.

9              THE COURT:  I'm going to let her do it on that little

10    part because it is complicated.

11             MR. SAMMI:  Thanks, Judge.

12             THE COURT:  I should sustain you, but I'm going to

13    overrule you.

14             MR. SAMMI:  Thank you.  I will take that.

15             THE COURT:  You should have won, but you didn't.

16    BY MS. WILKINSON:

17    Q.    So we just want you to explain.  We don't understand that,

18    so explain that to us.

19    A.    Sure.  The venture capital business model -- you know, I

20    think most people, you would be happy if you invest a dollar

21    and you make $2.00 back.  I mean, that's good.  And, you know,

22    he's not -- he wasn't sad about the outcome.

23             But what venture capitalists are really focused on

24    is, they invest in 20 companies, and the expectation is that,

25    you know, maybe 15 of them won't go anywhere, and they might

1    lose money on those, and they might go bankrupt.

2            And what they try to do is have one really good

3    company, right?  So one, you know, Google or Apple or, you

4    know, whatever -- whatever you think of as a great technology

5    company, and if you can do that, then that more than makes up

6    for all the other ones that fail.

7            So when I talked to Andreessen earlier, he told me

8    that he was more optimistic about Oculus being Andreessen

9    Horowitz's breakout investment than any of the other 20 that

10   they had done.

11           That didn't necessarily mean that it was necessarily

12   going to work, but it meant that of the ones that he thought

13   had a chance of being the next huge company that this had a

14   good shot, which -- you know, that was before we were really --

15   that was pretty early on and all this, and that just made me

16   think that, rather than being happy that we were going to buy

17   them and that he would make some money in the short term, what

18   was actually more likely was he would be kind of be a little

19   bit disappointed that it didn't get to play out and see if it

20   could become a massive, massive company on the scale of the

21   biggest technology companies in the world.

22           And from his perspective, he is more than willing to

23   take that risk, and he would almost rather take that risk and

24   hope it becomes huge and have it blow up along the way and end

25   up not being anything than selling before that.

```
 1   Q.   Why?  What happens if it does become the biggest
 2   technology company in the long term?
 3   A.   Then that's how they do the best at their firm.
 4   Q.   They make more money that way?
 5   A.   Yeah.  And it's -- and their reputation and the change
 6   that they feel like they contributed to in the world is bigger.
 7   Q.   Did you raise these concerns with your team at Facebook?
 8   A.   Yeah, I think so.
 9   Q.   All right.  Take a look at what's Plaintiffs' Exhibit 146,
10   but you have it in your book as Defense Exhibit 1440, and it is
11   going to be at 25892.
12           MS. WILKINSON:  Your Honor, this is a long exhibit.
13   Mr. Sammi and I agreed we're only putting in the ones that were
14   actually -- we're only agreeing to the ones we've discussed.
15           THE COURT:  This one is real little bitty that we
16   couldn't read.
17           MR. SAMMI:  Yes.
18           THE COURT:  Unless you blow it up.
19           MS. WILKINSON:  Yes.
20           THE COURT:  He highlighted them in yellow?  Is that
21   the same document?
22           MR. SAMMI:  Yes.
23           MS. WILKINSON:  Yeah, so there's the message.  And
24   then, if we could, just put it on slide Number 9, David,
25   because then the jury -- well, there we go.  That's fine.
```

```
 1   BY MS. WILKINSON:
 2   Q.   Okay.  Mr. Zuckerberg --
 3              THE COURT:  You've got the number so you can find it?
 4              MR. SAMMI:  Yes, Your Honor.
 5              THE COURT:  Thank you.
 6              MR. SAMMI:  Thank you.
 7   BY MS. WILKINSON:
 8   Q.   That's the number over there on the left -- right? --
 9   Mr. Zuckerberg, of your text, 25892?
10              Do you see that on the screen, the number on the
11   left?
12   A.   Yes.
13   Q.   And then that says, "Mark Zuckerberg at WhatsApp."
14              Is that the company you were just telling us that you
15   purchased?
16   A.   Yes.
17   Q.   All right.  And tell us what -- this is -- I don't think
18   it shows there, but this was to Mr. Zoufonoun.  Read to us what
19   you told him, please.
20   A.   "I think we just need to keep them excited.  Otherwise, I
21   worry that even if we meet their price demand, they may decide
22   not to do it or Andreessen might convince them not to at the
23   last minute, and that would set up a terrible dynamic where
24   we've caved on price once, and they'll think we'll do it again
25   in the future."
```

```
 1   Q.   Who are you talking about?  Who's the "they"?
 2   A.   The Oculus team.
 3   Q.   And "keep them excited," what do you mean by that?
 4   A.   It's -- this gets -- again, I don't remember this exactly,
 5   but I think it's referring to this dynamic around talking about
 6   the shared vision for what we would build together, right?
 7   Because without -- those were the pillars that we agreed to
 8   when we decided to come together as companies, was this shared
 9   perspective on what we wanted to build in the world and what
10   everyone perceived was a fair -- a fair, quite expensive, price
11   for the company.
12   Q.   All right.  Were you also concerned about whether other
13   companies might come in and try and purchase Oculus out from
14   underneath you?
15   A.   Yes.
16   Q.   Did you share those concerns with your team?
17   A.   Yes.
18        MS. WILKINSON:  All right.  Let's go to the same
19   exhibit but to 2600.  And if you could blow up that up for us,
20   Dave, I would appreciate it.
21        (Pause)
22   BY MS. WILKINSON:
23   Q.   All right.  What are you reporting up there in the first
24   message?
25   A.   Do you want me to read it?
```

1    Q.   Yes, please.

2    A.   "He said someone from Google recently expressed interest."

3    Q.   And what did you say next?

4    A.   "He prefers to work with us, but his board might make him

5    check with Google and Microsoft first."

6    Q.   Who is he?

7    A.   I assume it's talking about Brendan.

8    Q.   All right.  And what did this tell you about whether you

9    needed -- or what did this tell you about the status of your

10   deal and what you wanted to do?

11   A.   Well, Google is a big competitor for us when we're

12   thinking about doing these kinds of deals, so, for example, --

13   and there are other companies as well -- right? -- Microsoft

14   and others.  You know, we've talked a little bit about

15   WhatsApp, which was another deal that we did around this time

16   horizon.

17          And just to give you a flavor for this, you know,

18   that kind of happened on a similar timeframe.  I had been

19   talking to Jan, the founder of WhatsApp for, in their case,

20   years -- right? -- in terms of getting to know each other, and

21   then we decided we wanted to do it and actually worked out the

22   deal terms over a couple-week period, I think.

23          And during that period, even though that deal was

24   much bigger, $19 billion, during the two weeks that we were

25   negotiating, another company actually came in and said that

 1   they were willing to offer more money to buy that company.  And
 2   the reason in that case why I think he -- he -- he went with us
 3   is because, again, this belief in the shared vision of what we
 4   could do together and the relationship that we'd built over a
 5   few years of getting to know each other and what the companies
 6   and our values were all about.
 7          So -- but it's the kind of thing -- it's really --
 8   there's a lot of anxiety in these deals, right?  I mean, this
 9   is something -- you know, if you're going to pay $19 billion
10   for a company or $2 billion for a company, you clearly have to
11   really believe in it.  I mean, those are very large amounts of
12   money.
13          And the idea that one of your competitors might --
14   that there's this thing that you think is awesome that would --
15   that you want to be a part of building and that you think would
16   really help our business and our community, but that then a
17   competitor might get that, I mean, and that's doubly bad.
18   Then, not only do we not have it, but a competitor who would be
19   using it to compete against us has it.
20          So there's this general push where you want to -- you
21   want to move as quickly as is reasonable to move, and that
22   doesn't -- I mean, of course, we're not going to want to make a
23   deal if we don't have all the knowledge that we think we need
24   to have, but we also don't want to dilly-dally, right?  And if
25   we -- you know, I think some companies might just take many

 1   weeks or months to review some of the stuff, and I think one of

 2   the things we've always prided ourselves on and one of the

 3   things that has always worked well about Facebook is that we've

 4   just been able to be flexible and move quickly on important

 5   things.  And that's served us very well.

 6   Q.   Did there come a time when you decided to go forward with

 7   the deal or were close and briefed your board about the terms

 8   of the deal?

 9   A.   I think multiple times.

10   Q.   Okay.  And did you tell them what you thought the cost of

11   the deal would be?

12   A.   Yes, of course.

13   Q.   All right.  I believe you've already told Mr. Sammi

14   $2 billion to purchase the company itself; is that right?

15   A.   Yes.

16   Q.   And then you said $700 million for paying the people.

17        Can you just explain to the jury what you mean by

18   that?

19   A.   Sure.  So you can think about -- there's the company

20   itself, which has the technology that they've built and all the

21   assets of the company, and then there are the key people who

22   are doing the work.  And in our assessment here, a huge amount

23   of what -- of what the value of Oculus was going to be wasn't

24   in what they already built but what they were going to do going

25   forward.

 1          So we wanted to make sure that out of what we were
 2   paying as much as possible went towards the people who were
 3   actually going to be going and building stuff over the next
 4   five or ten years -- right? -- not -- you know, not some people
 5   who might have built something, you know, at the beginning of
 6   the company or, you know, folks like Andreessen who invested
 7   and helped them but weren't actually going to be involved in
 8   building the company going forward because the belief is that,
 9   you know, most of the value and most of what needed to get done
10   was still ahead.
11          So we structured this deal similar to how we
12   structure a lot of other ones where a large percent of what we
13   were paying didn't actually go to the company itself but went
14   to the key people over a long period of time to incentivize
15   them to keep working on this over a long period of time to keep
16   on building out what we knew needed to get built.
17   Q.   So the day you close on the deal, did you write a
18   $2.7 billion check or a $2 billion and $700,000.00 check?
19          THE COURT:  $700 million.
20          MS. WILKINSON:  780.  Thank you.
21          THE WITNESS:  No.  All the key folks who were
22   involved have -- their consideration is what we call vesting,
23   right.  They will earn it over a five-year period, and then we
24   also had some part of the deal that was tied to achieving
25   specific milestones.  So once they sold a certain number of

 1  headsets and, you know, reached a certain amount of activity of

 2  people using them, then they unlocked part of the deal with

 3  Facebook as well.

 4         I'm sorry.  Is that me?

 5         MS. WILKINSON:  You may be moving around just a

 6  little bit.

 7         THE COURT:  Is it touching your cheek?

 8         THE WITNESS:  Maybe.  I'll -- I'll bend it.

 9  BY MS. WILKINSON:

10  Q.   Did you also -- sorry.

11         Did you also talk to the board about a future

12  investment you would have to make in Oculus if you decided to

13  go through with the deal?

14  A.   Yes.

15  Q.   What did you tell them?

16  A.   So we told them that we expected that on top of what we

17  would be committing to pay up front, we should also expect to

18  have to invest at least $3 billion more in building up the team

19  further, investing in the developer community, and all of the

20  other content that was around that, which is not a dissimilar

21  amount to what I think, you know, Microsoft paid when they were

22  building -- or invested when they were building Xbox, for

23  example, when you build the initial platform, and then you

24  continue paying to employ a lot of people to continue working

25  on the platform and to build out the developer community around

```
 1   that.
 2            So it's a lot of money, but there are comps --
 3   comparables that other companies have built when they're
 4   building other computing platforms that suggest that that would
 5   be a reasonable amount, so we discussed that with the board.
 6   Q.   Did your prediction come true, that you had to invest
 7   billions of dollars in the company in addition to what --
 8   A.   Yes.
 9   Q.   -- you paid?
10   A.   Yes.  But I think, as with a lot of things, these things
11   end up being more complex than you think upfront.  If anything,
12   we probably have to invest even more money to realize the goal
13   that we had than we had originally thought.
14            So, you know, if we bought the company for $2 billion
15   and had these, you know, packages that we -- that we offered to
16   key employees that the sum came out close to $3 billion upfront
17   and we were planning on investing another $3 billion, now I
18   think we'll actually have to invest somewhat more than
19   $3 billion over the next ten years in order to reach this goal
20   of, you know, hundreds of millions of people having a good VR
21   experience.
22   Q.   In addition to getting the technology, I think you
23   mentioned you were excited about the people that you were
24   getting when you purchased the company, right?
25   A.   Yeah.  I mean, that's a key part of it.
```

 1          Since most of the work was ahead, it wasn't something

 2   that we could just buy and have it be done, right?  I mean,

 3   most of the work actually hadn't happened yet.  Having the best

 4   team was actually probably the most important part of the deal.

 5          And, you know, again, because Facebook is a social

 6   networking company, we didn't have a lot of people before who

 7   worked on VR, so we needed to build up that base of talent who

 8   could build that from scratch.  And that could take a long

 9   time, and, again, you know, moving quickly, you know, those few

10   years of head start and advantage was pretty important, so

11   having this team, which is clearly the best team in the field,

12   working on this as the seed just gave us a big advantage there.

13          And then, you know, of course, it's one of these

14   examples where really great people attract more great people

15   who want to work with them, so, you know, I think the day or

16   the week after we announced that we were going to do this,

17   another really key person in the field of VR decided to join

18   them because it was like oh, wow, now Facebook and Oculus are

19   coming together.  This is going to be clearly the best place to

20   go work on VR, so I want to join you.

21          So that's a lot of what we were trying to do, just

22   build the dream team of people to work on virtual reality,

23   knowing that it was going to be a five- to ten-year investment

24   and that those people, after the acquisition, were going to be

25   the people actually building out virtual reality.

```
 1   Q.   So we heard you say that you, of course, met with
 2   Mr. Carmack over the few months you negotiated.
 3          And you met with Mr. Luckey?
 4   A.   Yes.
 5   Q.   And you met with Mr. Iribe?
 6   A.   Yes.
 7   Q.   Did you also meet with Mr. Patel, Nirav Patel?
 8   A.   Yes.
 9   Q.   And the man you just mentioned, did you -- were you
10   talking about Michael Abrash?
11   A.   Yes.
12   Q.   And were there other technical -- it was suggested there
13   was only one technical person you were interested in; is that
14   correct?
15   A.   I'm sorry.  You asked me --
16   Q.   You suggested --
17   A.   I talked about Abrash.  I didn't talk to Abrash --
18   Q.   Right.
19   A.   -- until after --
20   Q.   Was that the person you were mentioning?
21   A.   That was the person that I was mentioning.
22   Q.   But it was suggested by counsel that somehow you were only
23   really interested in getting Mr. Carmack; is that true?  He was
24   the only key person?
25   A.   Is it true that he was the key person or --
```

```
 1    Q.    The only key person.
 2    A.    I certainly think they were trying to suggest that.  I
 3    don't think that's true.
 4    Q.    Okay.  All right.  Thank you.
 5          Do you know someone named Mr. Atman?
 6    A.    Yes.
 7    Q.    And did he -- was he part of the Oculus team?
 8    A.    Yes.  He's the chief architect of the computer kind of
 9    desktop product that we talked about a few minutes ago.
10    Q.    And what about Mr. Romaine, a Google guy?
11    A.    Yeah.  I don't know that he ever joined.
12    Q.    Okay.  Did you and others talk about who the key
13    technology people were, the key team at Oculus was?
14    A.    Yes.
15    Q.    All right.  And when you talked to the board and you told
16    them about the deal, did it include describing who the team was
17    and why assembling a team, as you call it the dream team, was
18    an important part of this deal?
19    A.    I don't remember specifically, but I'm sure we did,
20    because, I mean, that's such an important part of this, in any
21    deal.  Not just in this case, but, I mean, you're -- you invest
22    in people.
23    Q.    In addition, did you talk to the board about due
24    diligence, what you were doing and what you were going to have
25    people continue to do to make sure that this was a good deal
```

1  for you?

2  A.  Yes, a lot.

3  Q.  Okay.

4  A.  And -- you know, this is another thing where I think it's

5  important to give -- to complete the testimony, because I think

6  there was a timeline that we showed earlier for legal

7  diligence.  And what we -- what that means is just going

8  through the, you know, technical and legal documents of the

9  company to understand everything that's there.

10       I think the most important diligence or things to

11  understand when you're looking at a company are, are the

12  products good -- right? -- is the technology good, what are

13  competitors doing, are they -- is this company ahead of

14  competitors, are the people good, are they talented, are they

15  good people, are they the kind of people that you want to work

16  with, right.  So you will be working with them for years, so,

17  you know, they better be people that you like working with and

18  that you feel like share your values.

19       That, I think, is the most important diligence.  And

20  in this case, you know, it was done over months.  In some of

21  the cases of the other deals that we've done over years, even

22  though the actual deal itself came together pretty quickly at

23  the end, technically.

24  Q.  All right.  Let's take a look at -- first of all, do you

25  or people who work for you put together board materials, you

```
 1   know, so you can show the board members a summary of what
 2   you're telling them about deals --
 3   A.   Yes.
 4   Q.   -- and other matters you bring before the board?
 5   A.   Yes.
 6   Q.   All right.  Let's take a look at DX544 at 352, please.
 7            All right.  Is this part of a board presentation on
 8   the Oculus deal?
 9   A.   I think so.  Sorry.  What was the number?
10   Q.   It is --
11   A.   425?
12   Q.   544.
13   A.   544, okay.  Got it.
14   Q.   At 352.
15   A.   Yeah.
16   Q.   And do you see there on the front there it says, "Project
17   Inception"?  This is not the front page.
18            MS. WILKINSON:  Dave, you were going to show that,
19   and I should have had you keep it up there.
20   BY MS. WILKINSON:
21   Q.   Let's look at the first page just to identify.
22            What does this say?
23   A.   This says, "Project Inception, directors only; privileged
24   and confidential."
25   Q.   And what's the date?
```

1    A.    March 23.

2    Q.    So was this the presentation that you gave to the board

3    about the Oculus deal that you said was named Project

4    Inception?

5    A.    I would have to read it, but I have no reason to believe

6    it's not.

7    Q.    Okay.  Let's take a look then.  Now go to 352, if you

8    could.

9          And this says, "Due diligence review - key area of

10   focus:  Samsung relationship."

11         Would that be something you would want to explore in

12   considering the Oculus deal?

13   A.    Yes.

14   Q.    Why -- briefly -- briefly, why would the Samsung

15   relationship be important in this particular deal?

16   A.    Because Samsung was the key technology partner.  They

17   built the screens, and they built a special kind of screen that

18   could make it so that you could -- you know, we were talking

19   before about how you turn your head and it needs to render

20   quickly.  That at the time was only possible on Samsung

21   screens, and we were working with them.

22   Q.    All right.

23   A.    So they were an important technology product for us on two

24   fronts, and it was important to us that -- that that was a good

25   relationship.

```
 1  Q.   There's a list here.  Were you doing all this work
 2  yourself or do you have folks at Facebook who do this
 3  diligence?
 4  A.   We have teams of folks who are dedicated to this, so, I
 5  mean, for the important questions, people will raise the
 6  material to me or sometimes I will even be the person asking
 7  the question and asking the team to look into it, but, in
 8  general, you know, we have a lot of projects going on at a
 9  time, and we have a dedicated, you know, legal group and deal
10  group for each effort that we're working on.
11  Q.   So did you ask people to look into not only the Samsung
12  relationship but intellectual property, license, and open
13  sources -- open source?
14  A.   I don't think I needed to.  Those are automatic things
15  that you would look into.
16  Q.   The supply chain?
17  A.   Yes.
18  Q.   Litigation?
19  A.   Yeah.  These are just kind of standard things.
20  Q.   And all the rest of those.
21       So this work would have been done before you closed
22  the deal with Oculus?
23  A.   Yes.
24  Q.   All right.  Now, after you announced the deal -- and I
25  believe Mr. Sammi said -- and you didn't disagree -- was
```

```
 1   March 25th -- right? -- did you continue to look at some of the
 2   issues and talk to some other folks about your concerns and
 3   your, you know, your expectations about Oculus?
 4   A.   Sorry, can you say that again?
 5   Q.   Yeah.  Did you discuss with people -- after you announced
 6   the deal, did you just let it go once you announced it, but
 7   were you still involved once you announced the deal before it
 8   closed?
 9   A.   No.  I mean, I'm -- not only then, but I'm still very
10   involved in it.
11   Q.   All right.  And we've heard during this trial suggestion
12   that Oculus had some special software as well as hardware.
13        Did you consider Oculus a hardware company or a
14   software company?
15   A.   It was mostly a hardware company.
16   Q.   All right.  Let's take a look at DX1928, please.
17        And this is an email chain from the end of April into
18   May.
19        Let's go down to --
20   A.   I'm sorry, where was this?
21   Q.   DX1928.
22   A.   I don't have it.
23   Q.   Okay.  Then I will give you a copy.  Sorry about that.
24        (Pause)
25   A.   Thank you.
```

1   Q.   Sure.

2        So look down at the bottom where the email starts

3   from you, if we could.

4        And are you writing to a whole bunch of folks at

5   Facebook on Tuesday, April 29th.

6   A.   Yes.

7   Q.   All right.  What's the subject of the email?

8   A.   Oculus.

9   Q.   Now, go down, if you could, and read the second paragraph,

10  at least the first -- one, two -- three sentences, if you

11  could.

12  A.   Sorry.  Do you want me to read the first three sentences?

13  Q.   Please.

14  A.   "One important strategy point that we will really need to

15  work through with them is shifting them to become a software

16  business.  As an independent company, their goal was to sell

17  their devices at a premium and run everyone's software.  But

18  with us, our goal is to own the key software and use their

19  hardware as a vehicle to deploy it."

20  Q.   All right.  And why was this a concern of yours at the

21  time?

22  A.   Well, it goes back to this point around building the

23  platform and the most important apps on top of it.  You know,

24  so far, they had built the headsets and the systems to run

25  that, but what I think is going to end up being important over

1    time are what are the social experiences, the different gaming

2    and other experiences that you can actually deliver?

3            People aren't buying this to have a headset.  They

4    are buying it to have those experiences, and that's the thing

5    that we need to deliver, and we needed to shift Oculus's

6    culture to some degree and the strategy and the focus towards

7    that.

8    Q.   All right.  Let's take a look at PX425.

9            Tell me if you have that in your notebook, please.

10           (Pause)

11   A.   I do.

12   Q.   All right.  Let's go down to your -- this is -- there is a

13   response from Mr. Andreessen, but let's go down to your email

14   that starts on Tuesday, May 27, 2014.

15           Do you see that?

16   A.   Yes.

17   Q.   And can you review the email.  Is this also about Oculus?

18   Does it say "Re Oculus integration"?

19   A.   Yes.

20   Q.   All right.  And you tell Mr. Andreessen that you --

21   there's a bunch of management issues that have come up, and

22   then you say, "The biggest other set of questions is around how

23   they build platform network effects."

24           Right?  That first sentence.

25           MS. WILKINSON:  Can you highlight that, Dave.

```
 1   A.   Yes, I see it.

 2   Q.   All right.  Can you read the next sentence, please.

 3   A.   "I'm currently worried that they're just hardware, and

 4   someone could replicate their work relatively easily in a

 5   couple of years."

 6   Q.   And the next one, please?

 7   A.   "We need to move from a hardware tech advantage to a

 8   software platform network effect advantage."

 9   Q.   Is this consistent with the other emails and the

10   explanation that you gave about them being concerned that they

11   were a hardware company and not an experienced software

12   company?

13   A.   Yes.

14   Q.   All right.  Let's wrap up the timeline, if we could, and

15   go to slide Number 19.

16        You announced the deal on March 25th.  Did Oculus

17   have to make any disclosures to you to show you what

18   information you might want to know about the company before you

19   closed the deal?

20   A.   I'm sure.

21   Q.   Okay.  And you said, I think, already that --

22        MS. WILKINSON:  Sorry, I may have the wrong number,

23   but it's this one.  Sorry about that.

24   BY MS. WILKINSON:

25   Q.   You had to reply to government agencies to determine if
```

1  they had any objections; is that right?

2  A.   Yes.

3  Q.   And so would that include the Department of Justice?

4  A.   Yes.

5  Q.   Okay.  And these other agencies listed here, the FCC?

6  A.   I guess so.

7  Q.   All right.  And did the deal close on July 21st, 2014?

8  A.   I don't know the exact date, but that sounds about right.

9  Q.   All right.  Now, going forward, once you purchased Oculus,

10  was the company or has the company been divided up into

11  different divisions?

12  A.   There are different product teams.  I don't think we call

13  them divisions.

14  Q.   What are those product teams?  What are they

15  responsible --

16  A.   There is a mobile group.  There is desktop or computing

17  group for -- sorry.  Desktop computer -- the Rift product.

18  Those are the two approaches we talked about, and then there

19  are other teams working on the software experiences.

20  Q.   All right.

21  A.   And platform.

22  Q.   So when you refer to the Rift, that's the desktop Rift,

23  right?  That's -- you need a desktop computer --

24  A.   Yes.

25  Q.   -- to experience the Rift?

```
 1   A.   Yes.
 2   Q.   Mobile is a different product?
 3   A.   Yes.
 4   Q.   All right.  And are you familiar with -- since you said
 5   you've been involved -- the innovations Oculus has done since
 6   you purchased them in 2014?
 7   A.   Some of them.
 8   Q.   Okay.  Let's take a look at demonstrative Number 21.
 9        MS. WILKINSON:  Next one.  Sorry.  22.  There you go.
10   BY MS. WILKINSON:
11   Q.   Up here we have DK1.  You said they had this developer
12   model out before you purchased them, right?
13   A.   Yes.
14   Q.   And then what about the DK2, what is that?
15   A.   That was the second developer kit.
16   Q.   And what about Crescent Bay?  What is that?
17   A.   It's their third developer kit.
18   Q.   All right.
19   A.   And each of these, I think, sold tens or hundreds of
20   thousands of units.  They are kits for developers to use.  They
21   are not the final consumer product, but there are a lot of
22   them.
23   Q.   So when you were asked by Mr. Sammi whether this was --
24   you know, you had bought something that was fully done, when
25   was the first time that Oculus actually put out a consumer
```

1   product?

2   A.   Well, November 2015 was when our collaboration with

3   Samsung -- and they put out Gear VR.  That was that product.

4          And then it wasn't until last year, March 2016, that

5   Oculus shipped the first, you know, all Oculus-built product,

6   Oculus Rift.

7   Q.   So that was almost two years from when you purchased them

8   until they put out a consumer product?

9   A.   Yes.

10  Q.   And what is Touch?  It looks like they came out in

11  December.

12  A.   Touch are the hand controllers, because a lot of what

13  we've talked about so far is just looking around and being able

14  to see the world as if you're in another scene.  But, you know,

15  of course, you want to actually be able to change stuff in

16  that.

17          So, you know, we talked about the ping pong

18  experience where you have a paddle and, you know, the touch

19  controller.  It is basically this little circle that goes

20  around your wrist with some buttons, and you can kind of pick

21  things up in real life and move it around, and, you know, it's

22  talking about how the -- you have a camera that can track what

23  your position is in the world.  It can also track where your

24  hands are.  So you can feel like you're in VR and that there is

25  a ping pong paddle there, and you can move your hand to it and

 1 │ pick it up and move it and actually interact in virtual

 2 │ reality.

 3 │        So before Touch, you know, there hadn't been a great

 4 │ experience to do this.  Other companies had built these kind of

 5 │ clunky wand products, but the thing about Touch is because it

 6 │ is just a band, you could go actually pick things up with that.

 7 │ If you are holding on to a wand in physical life, then you

 8 │ can't actually go and, like, try to pick something up because

 9 │ you would drop the wand, so that isn't that good.

10 │        So Touch, I think, is the first, I think, really good

11 │ VR hand controller.  That's, like, the key part of this

12 │ experience.  And, you know, that's something that, you know,

13 │ Palmer was working on it when I first met him.  He was pretty

14 │ key to the eventual design and what ended up going into that,

15 │ and this is a real innovation.  It is one of the big steps

16 │ forward.

17 │        When I keep saying that, you know, there are -- there

18 │ are five or ten years of work to do, you know, adding hands to

19 │ the VR experience is one of the key things that just came after

20 │ the acquisition happened but was really key to the development.

21 │ I think there are going to be, you know, three or four more big

22 │ things like that over the next five years that are going to

23 │ enable this to be a great experience.

24 │ Q.   Let's end on that.  What is the next headset set that you

25 │ see, you and Oculus see in the future of virtual reality?

Todd Anderson, RMR, CRR      (214) 753-2170

```
 1   A.    Well, the one that I'm excited about next is what we call

 2   standalones.  So right now you have this mobile experience,

 3   which is kind of snap your phone into -- into a headset, and

 4   it's cool because you can take it out in the world because it

 5   is mobile, but it's a little -- the computing isn't quite as

 6   strong, the graphics don't look quite as real as when you have

 7   a full computer powering it.

 8         But the downside of having a full computer power it

 9   is that you can't take a full computer with you, right?  So it

10   is just physically there, and you have this wire that's

11   attached to your headset, and that's kind of clunky.  So you

12   are moving around in the world, and we want to minimize things

13   that are reminding you that you're not actually in the place

14   that you feel like you're in and having a wire that you might

15   kind of trip over or something gets in the way.

16         So the next product that we're working on that we

17   call the standalone is basically all the computing or as much

18   as we can get from the -- from having a big computer but having

19   it be in a form factor that is similar to the mobile device so

20   you can take it anywhere you want in the world; there are no

21   wires.

22         That's going to be a real big breakthrough in the

23   experience that people can have.  It will be much better than

24   what the mobile experience is today, and you won't have the

25   downside of having to stay in your living room and have these
```

```
 1    wires around.  So it's one thing.  I mean, it's --
 2    Q.   Any idea when you are going to have that available to us
 3    as a commercial product?
 4    A.   You know, I'm going get it wrong if I say it, and that's
 5    competitive information, so --
 6    Q.   All right.  We will end it on that.
 7    A.   -- I wouldn't want to say it.
 8              MS. WILKINSON:  Thank you very much.
 9              THE COURT:  Take a break about ten minutes.  Don't
10    talk about the case.
11              SECURITY OFFICER:  All rise.
12              (Jury out)
13              THE COURT:  Okay.  Anything before we --
14              MR. SAMMI:  No.  Thank you.
15              MS. WILKINSON:  No.
16              THE COURT:  All right.
17              (Recess at 2:30)
18              MR. LISY:  We do have one small housekeeping matter,
19    Your Honor, before the jury comes in.
20              THE COURT:  What is it?
21              MR. LISY:  After Mr. Zuckerberg's testimony,
22    Plaintiffs are going to play a short -- about a 15-minute video
23    clip from an Oculus program.
24              Ms. Keefe has something she wants to say about it.
25              THE COURT:  Do you have an objection?
```

```
 1            MS. KEEFE:  A very small one, Your Honor, yes.
 2            THE COURT:  Small or big, they are all objections.
 3            MS. KEEFE:  I have an objection, Your Honor.
 4            THE COURT:  Y'all sit down for a minute.  I've got to
 5     stand up.  My back is kind of -- you can sit down.
 6            MS. KEEFE:  Your Honor, the objection to the
 7     portion -- to a portion of the testimony that Plaintiffs have
 8     designated for Mr. Giokaris relates to the exact same issue
 9     that we talked about yesterday with respect to ripping DVDs.
10            I want to lodge my objection that, again, we think
11     that any of these conversations have nothing to do with the
12     issues in this case, so it's 401, 402, 403, because it's
13     copyrights owned by other individuals that are not alleged in
14     the case, and so they are actually character evidence, bad
15     acts, and don't belong here.
16            THE COURT:  Yeah, I get that, and I understand that.
17     I knew at the time that it's -- I think it's a reasonably close
18     question, and y'all lose and I get reversed on that, I don't
19     mind saying that I think it's a reasonably close question.  But
20     I think I have got to give them, you know, some latitude in
21     showing that, so I overrule your objection.
22            MS. KEEFE:  Thank you, Your Honor.
23            MR. LISY:  Thank you.
24            THE COURT:  But I don't think it was yesterday.
25            MS. KEEFE:  Well, the videos were played yesterday,
```

```
 1    but the objections made were two days ago.

 2              THE COURT:  No, no.  Do you think it was yesterday?

 3              MS. KEEFE:  Oh, good Lord, Your Honor, no, it was not

 4    yesterday.

 5              THE COURT:  Oh, look, I like being called "good

 6    Lord," but I'm not.  I promise you.  You and I both know that.

 7              MS. KEEFE:  Thank you, Your Honor.

 8              THE COURT:  Your Holiness will be fine.

 9              MS. KEEFE:  Thank you, Your Honor.

10              THE COURT:  Okay.  All right.  Mr. Sammi, are you

11    ready?

12              MR. SAMMI:  I am, sir.

13              THE COURT:  Do we have kind of a time?  Oh, mercy.

14              MR. SAMMI:  Not -- 20 minutes.

15              THE COURT:  How much?

16              MR. SAMMI:  20 minutes?

17              THE COURT:  I mean, is that a question?

18              MR. SAMMI:  It is a question.  It a bit of a

19    question.

20              THE COURT:  Around about that?

21              MR. SAMMI:  I think so.

22              THE COURT:  Okay.  That's fine.  That's fine.  That's

23    fine.  Whatever it is, it is.  It's your time.

24              MR. SAMMI:  Thank you, Judge.

25              THE COURT:  Okay.  Let's bring them in.
```

```
 1                 (Pause)
 2                 THE COURT:  David?
 3                 Tell David to hold on one second.  I have got to
 4       answer this.
 5                 (Pause)
 6                 THE COURT:  Here we go.  Thank you.
 7                 Let's bring them in, David.
 8                 (Pause)
 9                 SECURITY OFFICER:  All rise for the jury.
10                 (Jury in)
11                 THE COURT:  Y'all be seated.  Thank y'all very much.
12                 Okay.  Mr. Sammi.
13                 MR. SAMMI:  Thank you, Judge.
14                           REDIRECT EXAMINATION
15       BY MR. SAMMI:
16       Q.   Hello again.
17       A.   Hey.
18       Q.   Hi.  I have a few questions for you, Mr. Zuckerberg.
19                 Now, you felt that Oculus, when you met them, were
20       about three to four years ahead, right?
21       A.   I think I wrote in one of the emails I thought they were
22       about three years ahead.
23       Q.   Okay.  About three years ahead, right?
24                 And getting started in VR first has an advantage,
25       doesn't it?
```

1  A.   Yes.  I think, in general, getting started first in

2  anything has an advantage.

3  Q.   But you don't know how Oculus got started, do you?

4  A.   I think I have a good sense.

5  Q.   Do you?  Let's see.  Do you know that the demos that were

6  given in 2012 at E3 in the ZeniMax booth by Oculus -- by John

7  Carmack used id Software?  Do you know that?

8  A.   I'm not aware of that.

9  Q.   Do you know that after that NDA that we looked at was

10 signed, Palmer Luckey was transmitted VR technology from id and

11 the very first demo after demo after demo that Oculus gave to

12 anyone was that VR technology of id's?  Did you know that?

13 A.   I haven't heard that, and I don't believe that's true.

14 Q.   You don't -- you don't believe it's true that Oculus was

15 using -- VR testbed is what we call it in this trial --

16 software from id to demo and build a business after June 2012

17 for months?  You don't know that?

18 A.   I'm not aware of that.

19 Q.   Okay.  We saw the Tuscany demo that you were talking about

20 with your lawyer, right?

21 A.   Did we see it?

22 Q.   I think we saw pictures of it.

23 A.   Yes.

24 Q.   Okay.  Now, have you ever seen the Rage or Doom 3 BFG demo

25 of id Software at ZeniMax that started Oculus?

1   A.   I don't think so.

2   Q.   Okay.

3   A.   And I also try to push back on the characterization that

4   that started Oculus.

5   Q.   Well, I just asked you, you didn't know what software

6   Oculus had to use in the first place, did you?

7   A.   What do you mean?  I mean, they wrote it.

8   Q.   No, they didn't.  We just went over this.

9          You don't know that whether Oculus, after receiving

10  software from id and ZeniMax under that NDA, used only that

11  software to go around and do demos and build their business.

12  You don't know that, right?

13  A.   I'm not aware that that's true.

14  Q.   Okay.  So how do you know the origins of Oculus?

15  A.   Because I spent time with the team, and our team has done

16  technical diligence, and we have looked at the code and the

17  lineage of the code, and we have a good sense that this is

18  authentic code that was built from scratch by this team, and,

19  you know, we know, of course, now since they've joined

20  Facebook, that everything going forward is done with all the

21  processes that we have at the company.

22  Q.   In all the years at Facebook since you've bought Oculus,

23  since you've been working with these three gentlemen, it never

24  came up that they were using our demos to build their business

25  in 2012 after signing that NDA?  That never came up?

```
 1    A.    Why would it?
 2    Q.    How did it begin?  Great startup you guys got here.  Where
 3    did you get the software?
 4          We know you started in your dorm at Harvard.  We all
 5    know that story.  Wouldn't you ask Oculus how they got started?
 6    A.    We did talk about that.
 7    Q.    Apparently you didn't talk about VR testbed, Rage, Doom 3
 8    BFG, E3, the months that Oculus took that software around; you
 9    didn't talk about that?
10    A.    No.  I mean, we talked about the parts of the founding of
11    Oculus and the start of VR that were relevant, and I think that
12    your client in this case probably has an inflated view of the
13    importance or relevance of anything that they have to VR.
14          So I'm -- I'm not sure what you want me to say.
15    Q.    Okay.
16    A.    But, I mean it's --
17    Q.    I just want you -- I just want to know if you know, so I'm
18    going to ask you another question.  Okay?
19          Three gentlemen:  Brendan Iribe, Palmer Luckey, and
20    Nate Mitchell -- I'm sorry, four gentlemen.  Brendan Iribe,
21    Palmer Luckey, Nate Mitchell, and Michael Antonov.
22          Do you know who those four gentlemen are?
23    A.    Yes.
24    Q.    Okay.  They were very early on Oculus founders, right?
25    A.    Yes.
```

1   Q.   And --

2   A.   Say the -- say the names again so I can confirm.

3   Q.   Brendan?

4   A.   Yes.

5   Q.   Iribe.

6        Nate Mitchell?

7   A.   Yes.

8   Q.   Palmer Luckey?

9   A.   Yes.

10  Q.   Michael Antonov?

11  A.   Yes.

12  Q.   Okay.  Let's take those four individuals.  They were

13  Oculus in the beginning, right?  Along with Palmer -- and

14  Palmer Luckey started at Oculus.  They were Oculus in the very

15  beginning, right?

16  A.   Yes.

17  Q.   Okay.  Now, do you know whether those four individuals in

18  the months after E3 June 2012 had any software of their own

19  that could even make the Oculus Rift work?  Do you know?

20  A.   I wasn't there at the time, so it's hard for me to give a

21  definitive answer as if I were, but, you know, the facts would

22  suggest that they clearly did, because, first of all, the demo

23  worked.  And then, second of all, once we've done technical

24  analysis backward looking, you know, we, I think, are pretty

25  confident that they wrote the code, and that if you look at the

1    lineage of the code, that that's where it came from.

2    Q.    You're talking about the demo that you saw, right?

3    A.    No.  I'm just --

4    Q.    Is that the one you're talking about?

5    A.    No.  I'm just answering your question.

6    Q.    Okay.  You've never seen the demos that Oculus used with

7    people like Valve, Epic, Unity?  They took it to Copenhagen.

8    They took it to Korea.  You've never seen those demos, that

9    software that was written by John Carmack at id and transferred

10   under the NDA.  You've never seen those demos?

11   A.    No.  I'm not aware of anything that you're talking about.

12   Q.    Okay.

13   A.    And, you know, I think that there are a lot of demos that

14   a lot of different parties probably built on Oculus.  It was a

15   developer platform, after all, and there's no reason why I

16   would have seen all of them, including the ones before I

17   started getting interested in Oculus overall.

18   Q.    So you suggest, sir -- you said that -- you talked a lot

19   with your lawyer about diligence, right?  Diligence?

20   A.    Yes.

21   Q.    You talked a lot with your lawyer about diligence, and

22   it's important, right?

23   A.    Yes.  For any deal, you want to make sure you understand

24   what is going on with the company, so you want to make sure

25   that you understand who the team is, who the key people are,

1    what they are like, their talent, their values.  You want to

2    make sure that you understand what's technically there and what

3    the product is that's there and you want to make sure that the

4    company is financially sound and set up and you want to make

5    sure that you understand the legal infrastructure and legal

6    documents around the company as well as a handful of other

7    things that I think that we discussed before the break.

8    Q.   Okay.  Let's hold on diligence for just a second.  I need

9    to go back to your understanding, if any, of the real origin of

10   Oculus.

11          We talked about the fact that you don't know about

12   the Doom 3 BFG demo, the Rage demo that was transferred to

13   Palmer Luckey under the NDA.  You will agree with me that you

14   didn't know about that, right?

15   A.   Yeah, I mean, I'm not aware if what you're saying is true.

16   Q.   Now -- sure.

17          Do you -- you don't know about technical information,

18   emails, solutions, from id Software, John Carmack, for months

19   after that NDA was signed that went into Oculus and was used by

20   Oculus.  You don't know anything about that?

21   A.   To the contrary, I mean, I've received reports from

22   Brendan and others that we're quite confident that there is no

23   other code that is used in the product.

24   Q.   Just set code aside.  We read that NDA, right?  It's got

25   other things besides code, and there's code.  And we'll get to

1    that in a second, but there were other things in the NDA

2    besides code, right?

3    A.    Yes.

4    Q.    Remember the long list?

5    A.    Yes.

6    Q.    Yeah.

7          Okay.  When you worked with these gentlemen for years

8    after you bought their company, you guys never talked about,

9    hey, those early days and how, you know, I needed help on this,

10   and I asked John Carmack, and I got this solution, and it was

11   fun working on stuff with id.

12         That never came up?

13   A.    I don't think so.

14   Q.    Okay.  Would it surprise you that there's something called

15   interrogatories in this litigation where we ask the other side

16   questions, your Facebook, Oculus, and the individuals, and they

17   write these answers back that are answers from the party, okay.

18         Would it surprise you that there's a whole chart

19   listing the very first demo E3 from Oculus and everywhere

20   Oculus took id Software's VR testbed and Doom 3 BFG around the

21   world?

22         Would it surprise you that a list like that exists?

23   A.    I certainly haven't seen that, and I'm not aware of it.

24   Q.    But you come in here today, sir, and you say you think our

25   claims are meritless, but you don't know that?

1  A.   Well, if you're asking if I know every single detail of

2  the case, the answer is, of course, no.

3          And I have a legal team and a deal team, and they're

4  really good people.  And I trust them to be in the details of

5  this, and I trust their assessment of this.

6          I, of course, have been very involved with the Oculus

7  team and the product, so I have a good sense of the people that

8  we're dealing with here.  And when my legal team says that

9  we've looked into this and we're confident, then that

10  definitely fits my own impression from the work that I've done

11  with these folks.

12  Q.   Okay.  Let's talk about diligence.  Okay?  You said that

13  the most important thing in due diligence is to make sure that

14  the product is good.

15          Isn't the most important thing in diligence to make

16  sure that the technology that you're buying is actually owned

17  by the people you're buying it from?

18  A.   I mean, I think you could say that these are all important

19  things and parts of diligence.

20  Q.   Okay.

21  A.   I mean, certainly we, I don't think, would have gotten to

22  the point of evaluating IP ownership if we didn't think that

23  the product and technology were good.

24          So, you know, that's what I was talking about there,

25  is, you know, we'd spent -- we had a bunch of demos, spent a

1   lot of time talking to the team and looking at demos and the

2   technology to understand that before even getting to the point

3   of doing any legal or financial diligence.

4   Q.   You talked about diligence, and I think you said you

5   wanted to be clear that it wasn't that you just woke up one day

6   and decided to buy this company, right?

7        Do you remember saying that?

8   A.   Yes.

9   Q.   Okay.  Now, what I can't figure out is if you were doing

10  your diligence before you announced the deal, why does Facebook

11  tell us that the first time Facebook ever saw the NDA -- not

12  you, Facebook -- was on the day we sued Oculus?

13       You never found it in any of the diligence?

14  A.   I don't know, but I guess that's the case.

15  Q.   Okay.  I'm going to buy a company for $3 billion, and the

16  founder signed by his hand an NDA that covers virtual reality

17  technology coming from a third party and the essence of the

18  business itself is virtual reality technology.

19       Wouldn't that be an important document to find?

20       MS. WILKINSON:  Your Honor, I'm going to object to

21  the mischaracterization of the evidence and the testifying

22  from --

23       THE COURT:  Well, it's cross.  I'll let him -- I'll

24  let him answer that.

25       Overruled.

```
 1              THE WITNESS:  You know, in general, it's the Oculus
 2   team's responsibility to produce all relevant documents.   I
 3   can't speak to why they didn't in this case.
 4   BY MR. SAMMI:
 5   Q.   Wait.  Are you saying that Oculus didn't tell you?  They
 6   hid it from you?
 7   A.   Yeah.  I mean, I'm not saying they hid it, but I'm saying
 8   that in general, the way that this will work, as I'm sure you
 9   know, is that whether you're doing an investment or other kind
10   of acquisition, that the company will open up some kind of room
11   with all of their documents in it, so that way an investor or
12   an acquirer can go in and look at all the documents.
13              So one of two things was the case, right?  I would
14   assume, right, either our team missed it or it wasn't in there.
15   Q.   Okay.
16   A.   I don't know for a fact.  You can ask plenty of other
17   people in this -- in this -- in this -- in this litigation, but
18   my guess is it probably wasn't in there, and it's probably
19   because it wasn't an Oculus document but it was because
20   something that Palmer did separately.  But, you know, I'm
21   really just speculating at this point.
22   Q.   I think so.
23              You've told us that legal diligence is "going through
24   all the legal documents to understand everything that's there,"
25   right?  That's important to diligence, isn't it?
```

```
 1  A.   Of course it is.
 2  Q.   Yeah.
 3       Okay.  Do you remember the slide that your lawyer put
 4  up on Project Inception?
 5       First of all, the name Inception, is that from the
 6  movie with Leonardo DiCaprio about corporate espionage, that
 7  one?
 8  A.   I would assume that when Amin came up with that name, he
 9  was more talking about the reference to the movie where they
10  create a reality for a person.
11  Q.   A reality.
12       MR. SAMMI:  Okay.  Let's see if I can get that slide
13  up.  It's DX544, and we'll go to Mr. Frank.  I'll identify it
14  to you by Bates number if I can.  It's FB2352.  Just take a
15  second.
16       (Pause)
17       MR. SAMMI:  There it is.  This is -- this is the --
18  this is from the board slides that --
19       THE COURT:  What's the number?
20       MR. SAMMI:  Your Honor, this is DX5444.
21       THE COURT:  Oh, DX?
22       MR. SAMMI:  Yes, sir.
23       THE COURT:  Okay.  Go ahead.
24  BY MR. SAMMI:
25  Q.   This is from the slide deck that you gave to the board of
```

1    directors of Facebook, I think, on Sunday night before the deal

2    was to be announced on Monday?

3    A.   I think that's probably true, except I don't think we

4    announced the deal on Monday, as you know.

5    Q.   That's right.  They announced it on Tuesday.

6         Okay.  Due diligence review, we went through a couple

7    of these.

8         Do you see that one, Litigation, there?

9    A.   Yes.

10   Q.   Isn't it true that id Software or ZeniMax never came up in

11   any discussions of intellectual property on the call that you

12   had with the board?

13   A.   I don't remember, but I assume that's true.  As I

14   testified earlier, I had never even heard of ZeniMax at this

15   point.

16   Q.   Okay.

17   A.   And, you know, when we had looked at -- and when we had

18   gone out and done our analysis of who else was in the field

19   and, you know, might have a claim to this, ZeniMax was nowhere.

20        So this is pretty standard.  I mean, whenever you're

21   doing some kind of deal, you know, part of the diligence is you

22   want to understand the litigation that a company that you're

23   investing in or buying might be a part of.

24        So, you know, it's good that we reviewed that with

25   the board, but from my perspective, it makes complete sense

```
 1    that this wouldn't have come up then.
 2    Q.   It's also true that nobody -- you don't remember anyone
 3    else bringing it up, do you, on the board call?
 4    A.   I don't.
 5    Q.   Got it.  Okay.
 6              Now, we sued Oculus before you closed the
 7    transaction, right?
 8    A.   Yes.
 9    Q.   Okay.  Now, did you tell the board of Facebook before you
10    closed the transaction and the money changed hands that -- I'll
11    take it in parts -- that you got a letter from ZeniMax and id
12    saying they have claims to VR property?
13    A.   I did not personally, and I don't know if we did.  But I
14    assume that our legal team would have given that as part of a
15    normal course, legal update on our business.
16    Q.   But you don't know for a fact, right?
17    A.   I do not.
18    Q.   Now, after we sent you the letter, then you know who we
19    are, right?
20    A.   Once our legal team told me.
21    Q.   Okay.  How about after we sued you -- we sued Oculus but
22    before you closed the deal?  Did you tell the board that
23    Oculus, the company you're trying to buy, has been sued by
24    ZeniMax claiming that it owns their fundamental technology?
25    A.   I think I just answered that question.
```

```
 1   Q.   You didn't -- you answered the question about the letter.
 2   Now I'm asking you about the lawsuit that came after the
 3   letter.
 4   A.   Oh, yeah, I'm actually not sure if we would have
 5   communicate -- even communicated to the board a letter, but
 6   we -- I assume we communicated a lawsuit.
 7   Q.   Do you know that you communicated the lawsuit to the
 8   board?
 9   A.   I mean, I don't have specific knowledge of when that
10   happened, but I would assume that that's part of what the
11   company does, is it updates the board on litigations that the
12   company is a part of.
13   Q.   That's your assumption, but as the chairman of the board,
14   you can't tell us one way or the other?
15   A.   I know that in every board meeting we have a session where
16   we talk about the legal update of the company, and this is part
17   of it, of litigations overall.
18   Q.   Let me talk to you for a minute, sir, about a topic of
19   conversation that you talked about with your lawyer, and that
20   was Facebook trying to turn Oculus in -- from a hardware
21   company into a software company.
22        Do you remember that?
23   A.   Yes.
24   Q.   You talked about killer apps, right?
25   A.   Yes.
```

```
 1  Q.   Let me get this straight.  Let me use an example.
 2          Apple sells iPhones, right?
 3  A.   Yes.
 4  Q.   Apple has a lot of people who write software to make the
 5  phone work, correct?
 6  A.   Yes.
 7  Q.   That's different than software like apps that you put on
 8  the phone that help you sell it as well, right?
 9  A.   Yes, they do both.
10  Q.   Yeah.  One software makes the thing work -- right? -- and
11  the other software is an app or content, right?
12  A.   Yeah.  And there other kinds of software too.  Probably
13  most of what Apple is doing is building the operating system,
14  so the UI that you use when you open up your -- when you start
15  your --
16  Q.     Exactly.  So that my iPhone, which, according to Your
17  Honor, I didn't want it to ring, so I left it back in the
18  room -- my iPhone --
19          THE COURT:  Do you want to look at this one?
20          MR. SAMMI:  No, that's -- I don't want to touch the
21  Judge's iPhone.
22  BY MS. SAMMI:
23  Q.   Here's one.  So if -- I need software to make this into a
24  phone, otherwise, it is just a nice expensive kind of deck of
25  cards, isn't it?
```

1    A.    Yes.  You need both.

2    Q.    Right.  You need both.

3          Now, aren't you, in that email that we saw, talking

4    about turning Oculus into a company that you can leverage with

5    applications to play on a headset, virtual reality headset, or

6    use, but you're not talking about the software that makes the

7    Rift work itself, right?

8    A.    That's right.

9          And I think there's an important distinction here.  I

10   think people would typically always call Apple a hardware

11   company even if there is some software that goes into running

12   what they do.

13         Similarly, I think most people think about Facebook

14   as a software company or a company with software services even

15   though we also design hardware, right?  We design our own

16   servers.  We design a lot of physical stuff.

17         So -- so, yes, I -- I'm mostly referring to the thing

18   that the company does, which, you know, in the case of what

19   Oculus did, was -- the vast majority of it was hardware.

20   Q.    Okay.  And that hardware is a nice expensive brick unless

21   it has software that makes it actually work?

22   A.    I think you're mischaracterizing what I'm saying --

23   Q.    Okay.

24   A.    -- because what you're kind of asserting is that the

25   software is the key thing and the hardware doesn't do much, and

1    my point is that I think a lot of companies build both software

2    and hardware, but the key thing that they are doing could be

3    one or the other, and the other could just be supporting.

4           When we bought Oculus, they were clearly primarily a

5    hardware company.  Was there some software there?  Yes.  But

6    what we needed to do was turn them into primarily a software

7    company for the strategy to work.

8           Similarly, I do think you would say that Apple, even

9    though they write some software, they are primarily a hardware

10   company.  They sell hardware.

11   Q.   You said when you bought Oculus there was some software

12   there, right?

13   A.   Yeah, of course.

14   Q.   What if there was no software there?

15   A.   Then we -- it wouldn't work, and we wouldn't have bought

16   the company.

17   Q.   Precisely.

18          And as we just covered before, you don't know what

19   software Oculus did or didn't have in June, July, August,

20   September, October of 2012, right?

21   A.   I don't think that's what I said.

22   Q.   Do you know what software they had in June, July, August,

23   September, October of 2012?

24   A.   I mean, you're asking me if I was there at the time.  No.

25   But, I mean, have we done analyses after the fact about the --

1   the lineage of where it came from?  Yes.

2   Q.   Okay.  And I see your lawyer took down all the stuff I had

3   on the board.

4        We know that when you try to look at the lineage, you

5   can compare a lot of things, but you will agree with me that

6   you can't compare things that have been wiped from computers,

7   right?

8   A.   No, I didn't say that.

9   Q.   No, I'm saying you will agree with me that you can't

10  compare things that have been wiped from computers, right?

11  A.   I mean, if it's gone, then it is gone.  It is hard to

12  compare.  But there are often ways that you can go back and

13  look at how something came together.

14  Q.   And if a Court-appointed expert in this case says

15  irretrievably gone, that means gone's gone, right?

16  A.   Yes.  And I guess what I'm saying, although, you know, I'm

17  not the expert on this, but because you're asking me I want to

18  make sure to give a complete answer, is that even if some part

19  of code or some system is missing, you can often still tell the

20  lineage of where it came from.

21       So, I mean, you will want to have someone specific to

22  testify about that who is more of an expert on that than me,

23  but I just want to make sure that your characterization isn't

24  an oversimplification about not being able to trace where this

25  came from.

```
 1   Q.   Okay.  I understand that, and we're going to get to that
 2   testimony in this case.  Thank you.
 3             Now, isn't this case, Mr. Zuckerberg, about whether
 4   Oculus was built on stolen technology?  Isn't that why we're
 5   here?
 6             MS. WILKINSON:  Objection, asked and answered.
 7             THE COURT:  Sustained.
 8   BY MR. SAMMI:
 9   Q.   In your testimony today, you said, "It is really important
10   to make sure the foundation you're building on is something you
11   own."
12             I think we have a slide for that.
13             I made this over the -- not me.  My very talented
14   team.
15             It's from the transcript.
16             "And, you know, when you're building something, you
17   know, like you say, it's really important to make sure that the
18   foundation that you're building upon is something that you
19   own," right?
20             You said that?
21   A.   Right.
22   Q.   Do you remember saying it?
23             And what you mean by that is that if the foundation
24   you're building on is technology you don't own, then you don't
25   own the foundation, right?  Doesn't that make sense?
```

1    A.   I -- yeah, I agree with the point that you're making even
2    if I disagree with the underlying assumption that you are
3    saying that we don't own the foundation.
4    Q.   Got it.
5         I'm saying if -- if this jury finds that the
6    foundation of Oculus is stolen from ZeniMax and id, anything
7    you're building on it, you don't own that, right?
8    A.   I think you need a more nuanced legal analysis of that.
9    I'm not sure -- I would imagine that in that case there would
10   be -- that would be a serious issue, but I'm not sure whether
11   that implies that everything that's built on top of that is not
12   owned by you.
13   Q.   Okay.
14   A.   Because there is additional intellectual property and
15   contributions that are made, so --
16   Q.   That's like the paint and the bell on the bike, right?
17   You paid for the paint, you paid for the bell, but it's still
18   my bike?
19   A.   I mean, I think that the analogy to a bike is extremely
20   oversimplistic here.
21   Q.   Probably.
22   A.   This would be like someone --
23   Q.   I agree with you.
24   A.   -- who created a piece of like a bar that might go on a
25   bike and then someone built a spaceship out of it.

```
1    Q.   Right.
2    A.   So, I mean, yes -- and we're kind of -- we're sitting here
3    talking about whether the bar was -- was taken from someone
4    else, and I'm saying it wasn't, but what you are saying is,
5    even if it was, does that mean that someone else now owns the
6    spaceship?  Probably not, but there would be need to be a legal
7    discussion about where the ownership would be there.
8    Q.   Yes.  And I think that's why -- one of the reasons we're
9    here.
10            But it is really important, right?  The foundation is
11   really important?
12   A.   Yes.
13   Q.   And in order to know about the foundation of Oculus,
14   wouldn't you need to go back to those early days of Oculus to
15   figure out its foundation?
16   A.   You'd certainly want to look there.
17   Q.   Okay.  And we looked at one of those documents, which is
18   the NDA, right?  Isn't that part of the foundation of Oculus?
19            MS. WILKINSON:  Objection, foundation.
20            THE COURT:  I'm sorry?
21            MS. WILKINSON:  Objection, foundation.
22            THE COURT:  Sustained.
23   BY MR. SAMMI:
24   Q.   You know what NDAs are, right?
25            MS. WILKINSON:  Objection, asked and answered.
```

```
 1                THE COURT:  He has answered that.  Sustained.

 2                MR. SAMMI:  Okay.

 3   BY MR. SAMMI:

 4   Q.   I think we've asked some questions in the case, and we've

 5   talked about whether something was used or not.  Do you

 6   remember that?  We were talking about the call you had with

 7   Brendan and, you know, whether something was used, right?

 8   A.   Yes.

 9   Q.   I want to talk to you about that concept for a second.

10   Okay?

11                Do you have an explanation as to why Oculus would

12   want to enter into a nondisclosure agreement that allows them

13   to get virtual reality software from id and ZeniMax and they

14   not want to use it?

15                MS. WILKINSON:  Objection, foundation.

16                THE COURT:  Sustained.

17   BY MR. SAMMI:

18   Q.   Mr. Zuckerberg, I think you've said you're also confident

19   that Oculus's technology and Facebook's technology is its own.

20   I understand your position there, and I understand that.

21                That's your position, right?

22   A.   Yes.  And that's -- I take this case seriously, and that's

23   why I wanted to come and testify in person, and that's the main

24   message that I want to communicate, is that Oculus products are

25   built on Oculus technology, and the --
```

```
 1   Q.   Okay.  If you're confident, sir, that Oculus was built on
 2   technology that you own, how do you explain the intentional
 3   destruction of evidence in this case?
 4          MS. WILKINSON:  Objection, Your Honor.  Argumentative
 5   and foundation.
 6          THE COURT:  Sustained.
 7          MR. SAMMI:  Pass the witness, Your Honor.
 8          MS. WILKINSON:  No questions, Your Honor.
 9          THE COURT:  All right.  You can step down, sir.
10          Thank you.  Appreciate it.
11          THE WITNESS:  Thank you.
12          (Pause)
13          THE COURT:  Y'all need a break or no?  Yes?  Maybe?
14          MS. WILKINSON:  I'm just going to walk him out, Your
15   Honor.
16          THE COURT:  Okay.
17          (Pause)
18          THE COURT:  Don't take pictures in the hall, y'all.
19          Okay.
20          MS. WILKINSON:  Let me clean up my podium, sir.
21   Sorry about that.
22          THE COURT:  It's okay.  All right.  Are you ready?
23          MR. SAMMI:  Yes.
24          THE COURT:  You're going to play a movie right now?
25          MR. SAMMI:  I'm going to play a short movie.
```

```
 1                Plaintiffs' call by video Mr. Peter Giokaris, a
 2    programmer at Facebook.
 3                THE COURT:  Okay.
 4                (Pause)
 5                MR. SAMMI:  It's coming, Your Honor.
 6                THE COURT:  Okay.
 7                MS. WILKINSON:  Can you lower the temperature, Your
 8    Honor?
 9                THE COURT:  I will if that's what you're asking me
10    to.
11                MS. WILKINSON:  No, thank you.
12                THE COURT:  In my last trial, one of the jurors wore
13    a Russian hat and gloves, so -- it does keep you alert.
14    Frostbite.  We have had very few jurors die of frostbite but a
15    few.
16                MR. SAMMI:  I'm being told about 20 seconds, Your
17    Honor.
18                THE COURT:  It's okay.
19                MR. SAMMI:  20, 30 seconds.
20                THE COURT:  It's technology.  As great it is, it is
21    still technology.
22                MR. SAMMI:  We don't have Mr. Zuckerberg on our side
23    or John Carmack anymore for that matter.
24                THE COURT:  What we really need is -- what is it? --
25    the 20- or 30-second clock?
```

```
 1              MR. SAMMI:  Yes, sir.

 2              THE COURT:  That we now have in basketball.

 3              MR. SAMMI:  The shot clock?

 4              THE COURT:  It has that huge (indicating) that goes

 5    to the other side.  That would be great.

 6              (Pause)

 7              MR. SAMMI:  It -- the computer, I think, is having

 8    some issues.  It crashed.  It will just take a few minutes.

 9              THE COURT:  Do you want to call a live witness?  Do

10    you want to call your live witness?

11              MR. SAMMI:  We would play the video first, Your

12    Honor.  If you will just indulge us for just a minute or two,

13    maybe we could --

14              THE COURT:  Are we going to have prayer?  What are we

15    going to do here?

16              MR. SAMMI:  We can tell some jokes.

17              THE COURT:  I'm all out of those.  I'm out of them.

18              (Pause)

19              (Video played as follows:)

20              (The witness was sworn)

21    Q.   Could you please state your full name --

22              (Video stopped)

23              MR. SAMMI:  Thank you, Your Honor, for the

24    indulgence.  We're sorry about that.

25              THE COURT:  Sure, Mr. Sammi.
```

```
 1              (Video played as follows:)
 2              VIDEO DEPOSITION OF PETER GIOKARIS
 3              (The witness was sworn)
 4   Q.   Could you please state your full name?
 5   A.   Yes.  Peter Giokaris.
 6   Q.   Mr. Giokaris, where do you work today?
 7   A.   I work at Facebook.
 8   Q.   Before you worked at Oculus, did you ever see demos of the
 9   Oculus Rift?
10   A.   Yes, I had.
11   Q.   In what context?
12   A.   I saw -- they were actually at a Unity conference in
13   Amsterdam, which I was at.  So I was able to hear Palmer and
14   Nate talk about the Oculus Rift, and I saw their video that
15   they used for their Kickstarter campaign at the time.
16              That was the first time I saw anything concrete about
17   Oculus, even though I had known about them prior to because of
18   just reading about them.
19   Q.   Got it.
20   A.   The first time I saw a demo of something on the Rift was
21   when I went in and talked to them.
22   Q.   And so when was this meeting?
23   A.   October 31st of 2012.
24   Q.   And so what did you see -- did you try on a Rift?
25   A.   Yes.
```

1    Q.   What did you see?

2    A.   I saw Rage, the demo Rage.

3    Q.   Okay.

4    A.   And I also saw Doom.

5    Q.   So what did you think when you tried on the Rift as

6    compared to what you were working on?

7    A.   I was very impressed with it.

8    Q.   Okay.  Why?

9    A.   The graphics were very sharp.  The field of view was

10   amazing, and the latency was very low.  And it was very light.

11   Q.   And so when you say the graphics were sharp, that was on

12   Doom?

13   A.   The graphics were great.  Yeah, they --

14   Q.   On Doom?

15   A.   I wouldn't say "sharp."  They were actually beautiful.

16   Q.   On Doom?

17   A.   No.

18   Q.   On what?

19   A.   On Rage.

20   Q.   On Rage?

21   A.   Yes.

22   Q.   Okay.  How was the distortion?

23   A.   The distortion looks really good.

24   Q.   Okay.

25   A.   As far as -- there wasn't -- like, as far as lack of, it

1   really, you know, blew my mind how -- you know, how good it

2   was, and, you know, depend -- based on the fact that the field

3   of view was so large.

4   Q.   Did you have an understanding at that time as to whether

5   Mr. Luckey was a software developer?

6   A.   I did not.

7   Q.   Okay.  Do you have any understanding about whether

8   Mr. Luckey today is a software developer?

9   A.   I do know that he's not a software developer.

10  Q.   Was John Carmack ever discussed during your four-hour

11  meeting at Oculus on October 31, 2012?

12  A.   Seeing that I was playing Doom as a demo, I don't recall

13  if his name came up, but if it did, it would have been in the

14  context of the demo.

15  Q.   Did you mention the name John Carmack?

16  A.   If I did, it would've been because of the demo that I had

17  seen.

18  Q.   Okay.  And what would you have said?

19  A.   I'm not sure exactly what I would've said, except his name

20  would've come up if I was playing a game of Doom, knowing that

21  Doom was John Carmack.

22  Q.   And you knew that Doom was John Carmack?

23  A.   Yes.

24  Q.   Okay.  What about Rage?  You know that Rage is John

25  Carmack?

1    A.   At the time, I didn't know until I was told.

2    Q.   Okay.  Did you have to sign any NDA or anything prior to

3    your meeting?

4    A.   No.

5    Q.   So let's talk about some of your work that you did at

6    Oculus when you started there.

7    A.   Okay.

8    Q.   You were a coder, right?

9    A.   Yes.

10   Q.   So did you ever work on a fisheye shader for Unity

11   integration?

12   A.   Yes.

13   Q.   Okay.  And can you tell me what that is?

14   A.   Sure.

15        So a fisheye shader or a barrel distortion, lens

16   correction shader, would be something that would correct the

17   distortions that become evident when looking through a lens at

18   a flat screen.

19   Q.   Okay.  And so what -- what was your role in -- in that at

20   Oculus?

21   A.   I needed to integrate a lens correction into Unity in

22   order for it to work properly.

23   Q.   Did you wind up doing that?

24   A.   Yes.

25   Q.   Did you write code to integrate a lens correction into

1  Unity?

2  A.  I did.

3  Q.  I'm going to hand you what's been marked as Giokaris 1,

4  which is a file called fisheyeshader.shader produced from a

5  production called Oculus-production-Perforce.TC.

6        Do you recognize this?

7  A.  I do.

8  Q.  Can you tell me generally what it is?

9  A.  This is a source code in text file for doing a fisheye

10  shader for the Unity integration of the Rift.

11  Q.  Okay.  So if you can help me, can you --

12  A.  Sure.

13  Q.  -- help me understand what Giokaris 1 does?

14  A.  Sure.

15        So this is a lens shader code, which is meant to

16  correct the distortion lens of the Rift.

17  Q.  And all of this does that?

18  A.  Not all of it.

19  Q.  What portion is primarily directed towards correcting that

20  which you described?

21  A.  The portion that -- this is a -- so this is the first

22  check-in, I believe, or a first check-in of the code.  It shows

23  two different warp functions, HMD warp and HMD warp 2.

24  Q.  And can you tell me what that portion of code is doing?

25  A.  This is a function that will -- it's actually a function

1    that will correct the lens -- correct for the lens distortion

2    of -- of a render buffer, which is what a flat -- which is a

3    flat pixel -- or, sorry, a flat square that gets rendered to in

4    traditional graphics.

5    Q.    So we were just talking about HMD warp 1, which is around

6    line 31 to 42?

7    A.    Yes.

8    Q.    And can you tell me about HMD warp 2, where that is?

9    A.    So HMD warp 2 is -- has the same functionality as HMD

10   warp 1, or is meant to have the same functionality.  They're

11   just different implementations.

12   Q.    And what lines is HMD 2?  What lines --

13   A.    Oh, line --

14   Q.    -- are directed toward HMD warp 2?

15   A.    Line 44 to line 59.

16   Q.    Why are there two?

17   A.    One of them is a derived version of code that was seen

18   within a -- the -- I believe the Rage demo.  There was a shader

19   file there, and that was used.  And I believe I looked at it

20   and played with it to see what the outputs would be on it.

21   Q.    What --

22   A.    The other one is an internal one that was written

23   internally.

24   Q.    So which is which?

25   A.    I don't recall now.  I believe the first one is ours, as

1    far as within Oculus, and the other one is the derived version

2    from what I was looking at when I was looking at some of the --

3    when I was looking at the source that was within Rage.

4    Q.   And do you know where this source that was within Rage

5    came from?

6    A.   Well, I would -- the source came from the creator of Rage,

7    which would be John Carmack.

8    Q.   And how did you get ahold of that?

9    A.   I was given access to it from Oculus.

10   Q.   By whom?

11   A.   I believe it would've been Michael Antonov.

12   Q.   What part of Giokaris 1 did you write?

13   A.   What part of Giokaris 1 did I write?  I wrote everything.

14   I wrote all this code.

15   Q.   How about the comment on line 49, did you write that

16   comment?

17   A.   I do not recall.

18   Q.   But you -- you still -- you wrote everything in Giokaris

19   1?

20   A.   Well, being that I had -- actually was playing with the

21   source that was already there and trying to fit into Unity, it

22   might have been a copy and paste.

23   Q.   Okay.  What might have been a copy and paste?

24   A.   Those -- those lines that you just pointed to.

25   Q.   So the lines that I'm discussing, for example, in HMD 2 --

1    HMD warp 2 could have been a cut and paste from Rage code into

2    this code in Giokaris 1, which was checked into Oculus

3    Perforce?

4    A.   Yes.

5    Q.   Can you tell me why you cut and pasted HMD warp 2 into

6    Giokaris 1?

7    A.   Sure.

8            Basically, I saw the file within Rage, which was

9    given to me to use as a testbed for the work that I was work --

10   that I was doing.  And looking at the code, I thought it would

11   be great to see if I could get that to work, as a means of

12   exercise to understand different types of distortion.

13   Q.   Okay.  I'm going to hand you what's been marked as

14   Giokaris Exhibit 3.

15           (Video stopped)

16           MS. WILKINSON:  Objection.

17           Your Honor --

18           THE COURT:  Oh, there's something besides what was --

19           MS. WILKINSON:  Yeah, there's two things, Your Honor.

20   And I don't think you told the jury that both their

21   designations of the deposition get played and ours, and the one

22   of ours that said it didn't work, they didn't play.

23           MR. SAMMI:  First of all, there's no implication of

24   intentionality.

25           THE COURT:  No, no, I agree with that.  There is not

```
 1   any of that, but are we going to play theirs?
 2           MR. SAMMI:  Yeah.  We're playing theirs, right?
 3           (Video played)
 4   BY MR. SAMMI:
 5   Q.   And did -- did you get it to work?
 6   A.   I believe I did not.
 7   Q.   You did not.
 8           And do you know why you didn't get it to work?
 9   A.   The output was just not correct.
10           (Video stopped)
11           MR. SAMMI:  I'm trying.  I'm trying my best.
12           THE COURT:  Stop it.  Stop it.
13           MS. WILKINSON:  Can I ask you to go back to the
14   question before this?
15           MR. SAMMI:  If you can just read the line number,
16   we'll go back to any question.
17           MS. KEEFE:  Go back to page 83, line 2.
18           MR. SAMMI:  Page 83, line 2.
19           (Video played)
20   BY MR. SAMMI:
21   Q.   Can you tell me why you cut and pasted HMD warp 2 into
22   Giokaris 1?
23   A.   Sure.  Basically I saw the file within Rage, which was
24   given to me to use as a testbed for the work that I was work --
25   that I was doing.  And looking at the code, I thought it would
```

1   be great to see if I could get that to work as a means of

2   exercise to understand different types of distortion.

3   Q.   And did -- did you get it to work?

4   A.   I believe I did not.

5   Q.   You did not.

6           And do you know why you didn't get it to work?

7   A.   The output was just not correct.  I was not getting -- I

8   was not getting the values that I wanted to -- or I just wasn't

9   getting the output that I expected, and I ended up using a

10  different source base, which did work.

11  Q.   And what was that other source base?

12  A.   It was a source that -- that was within the Oculus SDK

13  that was given to me.

14  Q.   Okay.  And what was that?

15  A.   It was a source code that was used to do lens distortion

16  at the C++ level.

17  Q.   And what was it?  From where did that come?

18  A.   From where?  From the Oculus SDK that Michael Antonov

19  provided me.

20  Q.   And do you know if Michael Antonov wrote that?

21  A.   I don't know if he wrote that.

22  Q.   Do you know who is the author of that?

23  A.   I would speculate this would have been either Michael

24  and/or Andrew Reisse, who was our graphics expert at the time.

25  Q.   I'm going to hand you what's been marked as Giokaris

```
 1   Exhibit 3, which is a file -- a source code file entitled
 2   OVRlenscorrection.shader@366.
 3            Do you see that?
 4   A.   I do.
 5   Q.   So can you tell me what generally Giokaris 3, the code in
 6   Giokaris 3, is directed towards?
 7   A.   So this code is a rename of -- of the fisheye shader.
 8   It's a further iteration down the line of this shader, and it
 9   includes three different HMD warp functions.
10   Q.   Let's start with the third one.
11   A.   Okay.
12   Q.   The third one is the same code from the Rage demo as is
13   found in Giokaris 1, correct?
14   A.   I believe it is.  I'm just looking through it just to make
15   sure.
16            (Pause)
17   A.   Yes, it's the same code.
18   Q.   Why did you leave it in?
19   A.   Well, it's been, you know, a form of reference just to
20   have different ways of looking at the same functionality.
21   Q.   At any of the companies that you were working at, did any
22   of your bosses ever send you forwards of emails that contained
23   source code from outside the company?
24   A.   When I first started, there was potentially email --
25   emails of that nature.
```

1   Q.   And what's the culture of start-ups, to your

2   understanding?

3   A.   Faster, just more loose, I guess is the term, but --

4   Q.   Do you think it's appropriate to use another company's

5   source code for the benefit of the company you're employed at?

6   A.   I feel if the code was given to the company to use, then

7   it would be okay.

8   Q.   Have you ever ripped intellectual property for Oculus --

9   A.   I have not ripped property for Oculus.

10         I'd like to mention --

11   Q.   Sure --

12   A.   -- YouTube.

13   Q.   Uh-huh.

14   A.   And borrowing or taking video from there in order to use

15   that.

16   Q.   Okay.

17   A.   So --

18   Q.   And in what capacity did you take video from YouTube and

19   use it?

20   A.   That was to be used in an application that I was working

21   on.

22   Q.   Okay.  What type of videos did you take from YouTube?

23   A.   Basically trailers from movies.

24   Q.   Okay.  And did you -- did -- who told you to do that?

25   A.   I did it because I was required to -- I needed data in

```
 1    order to use it for the application that I was working on.
 2    Q.   And did anybody else know that you were doing that at
 3    Oculus?
 4    A.   Yes.
 5    Q.   Who did?
 6    A.   Brendan Iribe would know.
 7    Q.   Brendan Iribe?
 8    A.   Yes.
 9    Q.   Anyone else?
10    A.   Nate would have known that I was also getting content from
11    YouTube.
12    Q.   Okay.  Anyone else?
13    A.   At that time, I think they were the two main -- Palmer
14    Luckey probably knew as well.  I'm sure I talked to him about
15    what I was doing -- what I was working on at the time.
16    Q.   Okay.  Do you recall the names of any of that type of
17    software that allows you to get videos off of YouTube?
18    A.   I'm trying to think.  At this point, I don't recall.
19    Q.   Did you pay for that software?
20    A.   No.
21              (End of video)
22              THE COURT:  Do you-all have some more to play?
23              MS. WILKINSON:  Yes, Your Honor.
24              MR. SAMMI:  Yes, lines -- at the very end?
25              MS. WILKINSON:  Yeah.
```

```
 1              MR. SAMMI:  Can we play -- I apologize for this --
 2    236:16 to 17 and 236:19.
 3              (Pause)
 4              MR. SAMMI:  It's the two -- can I have the line
 5    numbers again?
 6              MS. WILKINSON:  Sure.
 7              MR. SAMMI:  Can I borrow this for a second?
 8              MS. WILKINSON:  Sure.
 9              MR. SAMMI:  This.
10              (Pause)
11              MR. SAMMI:  236, lines 16 through 17, and 236,
12    lines 19 through to 237, line 1.
13              (Pause)
14              MR. SAMMI:  I wish I could play some elevator music
15    right now, Judge.
16              Can you explain -- Your Honor, may Mr. Lisy explain?
17              MR. LISY:  I think there's just a question about
18    whether these designations were made, Your Honor.  We don't
19    have an objection to them, so we will play them now.
20              THE COURT:  Just play them.
21              (Video played as follows:)
22    Q.   Why did you need 3D trailers for the Oculus Rift Cinema
23    project?
24    A.   I required 3D content in order to view movies in 3D on the
25    Rift.
```

```
 1    Q.   For what purpose?

 2    A.   It was part of a cinema application that was actually

 3    within Unity that was built in Unity, and it was -- it required

 4    content to be driven in 3D in order to -- proof of concept of

 5    how it worked.

 6    Q.   Okay.

 7              (End of video)

 8              THE COURT:  Is that it?

 9              MR. SAMMI:  Yes, Your Honor.

10              THE COURT:  Everything on the video?

11              MR. SAMMI:  Everything is on the video, Your Honor.

12              And may I move to enter two exhibits, PX1015 and

13    PX1074.

14              MS. WILKINSON:  No objection.

15              THE COURT:  All right.  That are admitted into

16    evidence.

17              (Plaintiffs' Exhibit No. 1015 and 1074 received)

18              MR. SAMMI:  Thank you, Your Honor.

19              THE COURT:  Is that it?  Do you have another movie?

20              MR. SAMMI:  We have a live witness, Your Honor.

21              THE COURT:  You do?

22              MR. SAMMI:  We do.  No technical difficulties there.

23              THE COURT:  I don't know about that.  We will see.

24    You never know.

25              Is this a long, short witness?
```

```
 1              MR. SAMMI:  I believe it's a longer witness, a long

 2   witness, yes, sir.

 3              THE COURT:  A long witness?

 4              MR. SAMMI:  A long witness.

 5              THE COURT:  I will let you go another 40 minutes.

 6              MR. SAMMI:  Okay.

 7              THE COURT:  Call your next witness.

 8              MR. PHILBIN:  Your Honor, the Plaintiffs call

 9   Mr. Palmer Luckey to the stand.

10              THE COURT:  Okay.

11              (Pause)

12              THE COURT:  Thank you.

13              MR. KARSON:  Thank you, Your Honor.

14              (Pause)

15              THE COURT:  Just a second, Mr. Luckey.

16              Mr. Jacobson.

17              THE CLERK:  Raise your right hand.

18              (The witness was sworn)

19              THE COURT:  All right.  Mr. Luckey, take a seat right

20   there next to me.

21              Do you have any fresh water?

22              THE WITNESS:  There's a water there.  I will just use

23   that.  I'm sure it will be fine.

24              THE COURT:  Wait, wait, wait.  We're not going to

25   have you do, you know, backwash.  No, I'm not doing that.  Give
```

```
 1   me that.
 2            THE WITNESS:  Thank you, Your Honor.
 3            THE COURT:  Gosh.  Mr. Sammi.
 4            MR. SAMMI:  It wasn't planned.
 5            THE COURT:  Come on.
 6            MR. SAMMI:  Of course, there is plenty of water.
 7            THE WITNESS:  Let me pre-break the cap so it is
 8   ready.
 9            THE COURT:  Mr. Philbin, are you ready?  Are you
10   going to need that screen?
11            MR. PHILBIN:  Perhaps, Your Honor.  I believe so.
12            THE COURT:  We will turn it up just a little bit
13   until you get to that.
14            Okay.  Go ahead, Mr. Philbin.
15            MR. PHILBIN:  Thank you, Your Honor.
16             PALMER LUCKEY, PLAINTIFFS' WITNESS, SWORN
17                        DIRECT EXAMINATION
18   BY MR. PHILBIN:
19   Q.   Mr. Luckey, would you introduce yourself to the jury,
20   please?
21   A.   My name is Palmer Luckey.  I'm the founder of Oculus and
22   the designer of the Rift.
23   Q.   You're Palmer Freeman Luckey, right?
24   A.   Yes.  I don't usually use that as part of my name, but it
25   is my middle name.
```

```
 1   Q.   You're one of the defendants in this case, correct?

 2   A.   Yes, I am personally named in this case.

 3   Q.   You founded Oculus in April 2012, correct, sir?

 4   A.   I started using the name internally sometime in late 2011,

 5   and I started publicly using it in March of 2012, I think, and

 6   I incorporated the company formally as a limited liability

 7   corporation in June in preparation for the launch of my

 8   Kickstarter.

 9   Q.   By April 2012, you were holding yourself out as the

10   founder of Oculus, correct?

11   A.   I was the founder of Oculus.

12   Q.   As early as April 2012, correct?

13   A.   Like I said, I had been using it internally and privately

14   earlier.  I first publicly started using it -- I think it was

15   of March 2012, not April, but it was around that time.

16   Q.   Understood.

17        So we can move that date to when you publicly

18   announced you had founded Oculus as early as March 2012,

19   correct?

20   A.   Yeah, that sounds right.

21   Q.   And Oculus is another one of the defendants in this case,

22   correct?

23   A.   Yes.

24   Q.   And as you sit here today, you work for Facebook, correct?

25   A.   That's right.
```

```
 1   Q.   And Facebook is another defendant in this case, correct?
 2   A.   Yes.
 3   Q.   And Facebook --
 4           THE COURT:  Stop.  Stop, stop, stop.  Turn his
 5   microphone down.
 6           Are you on?
 7           THE CLERK:  He's on.
 8           THE COURT:  He's just not loud enough.
 9           MR. PHILBIN:  Do I need to talk louder?
10           THE COURT:  No.
11           Who controls -- do we control his?
12           THE CLERK:  I do.
13           MR. PHILBIN:  Is that better?
14           THE COURT:  That is a little too loud.  There we go.
15           Okay.  Keep going.  We will work on it.
16   BY MR. PHILBIN:
17   Q.   All right.  Facebook acquired your company Oculus in 2014,
18   correct, sir?
19   A.   That's correct.
20   Q.   And as the founder of Oculus, you personally stand to make
21   over $200 million as a result of Facebook's acquisition of
22   Oculus, correct, sir?
23   A.   The amount of money depends on -- it's dependent on
24   whether I stay employed for several more years.  There is also
25   a certain amount that gets paid out if we hit certain
```

1    milestones, and then it depends on what the Facebook stock

2    price is.

3         But it will probably end up being in the hundreds of

4    millions, assuming I continue to be employed and we hit all of

5    our milestones.

6    Q.   Let's say you just stay employed.  How much money do you

7    stand to receive as a result of the Facebook acquisition of

8    Oculus?

9    A.   I'm not sure.  I'm not sure exactly what the breakdown is.

10   Some of it was in cash.  Most of it was in Facebook stock, and

11   the price goes up and down.  I'm not exactly sure what it would

12   end up being, but it is in the hundreds of millions.

13   Q.   In the hundreds of millions of dollars?

14   A.   Yes.

15   Q.   And you can't be any more accurate than in the hundreds of

16   millions of dollars?

17   A.   Well, I mean, you're talking about if I was employed.

18   I'll have to be employed for several more years before this

19   hypothetical could play out, and so, yeah, I can't be more

20   accurate.  I mean, Facebook stock has -- has gone up and down

21   significantly in the time since the acquisition, and it's even

22   longer until I hit all of my earnouts and vesting agreements.

23   Q.   And can you tell the jury how much money you've made today

24   as a result of Facebook's acquisition of your company Oculus?

25   A.   It's in the tens of millions.

1  Q.   That's as accurate as you can guess, within 10 or

2  $20 million?

3  A.   So I got about 40 or $50 million close to when the

4  acquisition occurred.  I have gotten several tens of millions

5  more since then, much of which was in Facebook stock.  I can't

6  be really accurate.  I think it's -- it's in the tens of

7  millions.  It's over -- it's over $50 million for sure.

8  Q.   And you stand to make hundreds of millions of dollars

9  more, correct?

10  A.   Yes, I do.

11  Q.   In 2012, you sent a headset to Mr. Carmack, correct?

12  A.   Yes, I did.

13  Q.   Was it on May 10, 2012?

14  A.   That sounds like it's probably correct.  I'm not sure if

15  that's the exact date.

16  Q.   And you packaged your headset into a United States Postal

17  Service medium-sized box, flat rate Priority, correct?

18  A.   That's not an accurate representation of the box.

19        USPS actually makes several different medium-sized

20  boxes in different shapes.  Some are longer, some are boxier.

21  There are actually several different sizes, but they are all

22  USPS flat rate boxes.

23        That is a USPS flat rate box, but I guess my point is

24  that's not actually the same shape or size as the box that I

25  used, but it's pretty similar.  I just wanted -- I just want my

1   testimony to be completely accurate.

2   Q.   And we asked you under oath if you put what you sent to

3   Mr. Carmack in a USPS regular mailbox, and you answered United

4   States Postal Service flat rate Priority box, correct?

5   A.   And what I'm saying is there is more than one USPS medium

6   Priority box.  There are actually several different shapes and

7   sizes of box that are all classed under the medium flat rate

8   fee.  There's also a small one, there's also a large one.

9         For example, I believe that there is a long and flat

10  wide mailer that is small.  There is another that is kind of a

11  cube that is small.  So just for the sake of being accurate, I

12  just want to point out that box is not an accurate

13  representation, but it is also a USPS Priority flat rate

14  medium -- medium-scale box.

15  Q.   The box too tall?

16  A.   It's actually just much too narrow.  The box that I used

17  was one of the more squared ones.  The headset wouldn't have

18  begun to fit into that particular box.

19  Q.   So your box was wider and shorter?

20  A.   Yeah.  It was similar in size to the box that -- that the

21  prototype is currently housed in.

22  Q.   We can agree that what you sent to Mr. Carmack was, in

23  fact, in a box, right?

24  A.   Yes.  I had to put it into a box so that I could send it

25  through the postal service and get it to him, because, well,

1  that's the best way to move physical goods.

2  Q.  You were in the courtroom when Mr. Carmack testified about

3  what was in the box, correct?

4  A.  Yes, I was.

5  Q.  Did Mr. -- and Mr. Carmack testified about what was in the

6  box when he received it, right?

7  A.  Yes, he did.

8  Q.  Now, you know what was in the box when you sent it, right?

9  A.  I do.

10  Q.  So does Mr. Carmack's testimony about what was in the box

11  when he received it, does it match with what you understand was

12  in the box when you sent it?

13       MS. WILKINSON:  Objection, Your Honor.  He can ask

14  him what he thought was in the box.  Characterizing somebody

15  else's testimony, I don't think, is appropriate.

16       THE COURT:  Unfortunately, I had a little hard time

17  following all that.  I'm sorry.

18       MR. PHILBIN:  All right.  Let me see if I can break

19  it down, Your Honor.

20       THE COURT:  Try to simplify that a little bit for me.

21       MR. PHILBIN:  Sure.

22  BY MR. PHILBIN:

23  Q.  You were sitting in this courtroom when Mr. Carmack

24  testified what came out of the box?

25  A.  Yes, I was.

1   Q.   Okay.  Now, when Mr. Carmack testified about what came out

2   of the box, does that match your understanding of what went in

3   the box?

4   A.   Generally speaking.  There were some things that weren't

5   discussed because you didn't ask about it.  For example, the

6   thing that came to mind was that I had some packaging in there

7   and some shockproofing and things to make sure it didn't get

8   damaged.

9          Those weren't discussed because you didn't ask about

10  it.  But, generally speaking, I think we're aligned on what was

11  inside of the box as far as things of significance go.

12  Q.   So we're missing bubble wrap; is that right?

13  A.   So bubble wrap -- also I believe I made some cardboard

14  spacers.  If you've ever gotten a laptop in the mail, for

15  example, inside the box might be cardboard assemblies that kind

16  of go on the edge to make sure that it doesn't get crushed or

17  rattle around inside the box.

18         Bubble wrap, I don't think was one of the things that

19  I used, but it serves the same purpose, to protect the unit

20  from damage during transit.

21  Q.   Did you put anything else in the box that Mr. Carmack

22  didn't testify came out of the box?

23  A.   I'm not sure.  I don't really remember all of

24  Mr. Carmack's testimony, but I don't think that there's

25  anything that we disagree on.

```
 1   Q.   Okay.  And the substance of what you've put in the box was
 2   your prototype, correct?
 3   A.   That is correct.
 4   Q.   And your prototype was basically a rectangular device,
 5   correct?
 6   A.   Some parts of it were rectangular.  It was actually
 7   multiple rectangles that were put together.  But, yeah, the
 8   main housing was mostly rectangular with some rounded edges.
 9   Q.   And the rectangular with the rounded edges had a display
10   inside it, correct?
11   A.   Yes, it did.
12   Q.   In addition to the display in the rectangular box, there
13   was also a VGA control board; is that correct?
14   A.   There was a display controller that basically takes the
15   video signals that come out of your graphics card and turn them
16   into the type of signaling that the display itself can use.
17          So you -- you could call it a VGA controller.  More
18   technically speaking, it is a card that takes a VGA video input
19   and then converts it into an LVDS video signal that is able to
20   drive the panel directly.
21   Q.   Did you invent any part of that?
22   A.   I certainly didn't invent, you know, the concept of video
23   driver boards.  The one that I was using was an off-the-shelf
24   board that you could flash with various firmwares that allowed
25   it to drive different displays.
```

1          So you could use this to drive a small display like I

2     did or you could also use it to drive a very large display

3     panel like is used in television.  You just have to flash it

4     with the right firmware, with the right timings to drive it

5     over the LVDS link.

6          The one that I was using, I had flashed with the

7     proper firmware and also made quite a few modifications to it

8     to reduce the size and weight and also to make it more power

9     efficient because it was not really designed to be USB-powered.

10    It was designed to be powered originally off of a much higher

11    voltage power supply.

12         I -- just that I want to be clear.  I don't -- I'm

13    not saying I invented it, but it certainly was not just a

14    generic off-the-shelf part.  It had quite a few modifications

15    and things of my own design that I added.

16    Q.   You trimmed down the size of some of the pins; correct?

17    A.   That's one of the things I did, yes.

18    Q.   And that's -- the chip inserts through a card, and there's

19    pins that stick out on the other side, correct?

20    A.   That's one of -- that's one of the things on the board.

21         Basically, they're called through-hole components,

22    and there were some components -- one of the things I did to

23    reduce the size and weight was basically trim the leads of

24    components that stuck through the boards.  So before they put

25    them through the board, you soldered them in place, and there

 1  were bulges on the bottom of the board.  I was able to trim all

 2  of those off which made for a lower profile system.

 3  Q.   And the Rift prototype in this box had two lenses that

 4  were mounted to the front faceplate, correct?

 5  A.   Yes, they were 7X aspheric magnifiers that were made out

 6  of acrylic.

 7  Q.   And the prototype you put in the box also had neoprene

 8  foam light covers on the outside to block out the light from

 9  the outside world, correct?

10  A.   Yes, that's correct.

11  Q.   You put cabling in the box as well, correct?

12  A.   It's not so much that it was cabling in the box.  The

13  cabling was actually integrated with the head-mounted display.

14  The way that I designed, you didn't have a cable that you

15  plugged into the head-mounted display and then into your

16  computer.  It was actually hardwired on one end directly to the

17  display control board, so you can think of it kind of like a

18  television or a monitor that has a cable that is permanently

19  built into it which allows it to be lighter and more

20  comfortable and ergonomic and also just saves the weight and

21  complexity of having a connector that can go bad.

22  Q.   A cabling plugged into the display, correct?

23  A.   Well, not -- not plugged -- not -- if it had had -- had

24  it, then yes.  My point is there was no plug for any cabling on

25  the head-mounted display.  Basically it was a plug on one end

1    of your graphics card.  The cable then ran to the head-mounted

2    display where the cable was wired directly to the display

3    controller board.

4    Q.   Understood.

5         And the display on the headset that was in this box

6    was a generic 5.6-inch LCD display, correct?

7    A.   I wouldn't describe it as generic.  I mean, you -- it was

8    a 5.6-inch display that was originally designed for the

9    ultra-mobile PC market.  It was designed by BOE Hydis for use

10   in the Fujitsu U810 ultra-mobile PC which was essentially a

11   very small laptop.  And at the time it was a very high

12   resolution, high refresh rate display with really high color

13   depth for something of that size and weight.

14        But I wouldn't call it a generic display.  I'm not

15   sure what would be generic about it.

16   Q.   You didn't build the display, did you?

17   A.   No.

18   Q.   You bought it off the shelf, didn't you?

19   A.   Yes.  Display fabrication is something that -- well, the

20   costs usually go in -- at least in the tens of millions and

21   often up into the billions to build a fabrication line.  Very

22   few people can claim that they have made a display themselves.

23   Samsung would be one of the very few exceptions, for example.

24   Q.   You didn't alter the latency characteristics of the

25   display panel, did you, sir?

1   A.   I mean, no, the display panel itself didn't have any

2   latency characteristics altered.  The display controller is

3   actually usually where latency is introduced in a video display

4   system.  The panel itself is kind of a known quantity.  What

5   you get is what you get.

6        You can overdrive it using -- you can basically tell

7   your graphics card to overdrive it and try to get it to switch

8   values faster, but there's not much you can do to a panel to

9   actually make it switch faster.  You can modify it to be

10  lighter or to have higher brightness or to be stronger, which I

11  did do on this particular panel, but there's not really much

12  you can do in most cases to modify a panel to be lower latency.

13  Q.   So the answer to my question is no, you didn't modify the

14  latency characteristics, correct?

15  A.   Yes.  I just wanted to give background.

16       Just to make clear, it's not the type of thing that

17  you really can modify on a display.  Like, the display is made

18  with -- the display is made to be driven and switched at a

19  given speed.  Generally speaking, you can't modify a display to

20  make it go faster.  There are, of course, exceptions.

21  Q.   You didn't build the VGA card either, did you, sir?

22  A.   No.  I purchased a -- I purchased the display controller

23  from a vendor online and then performed my modifications on it.

24  Q.   It was a general purpose card, correct?

25  A.   I would say it was more of a universal card than general

1   purpose, in that it can -- it can only provide one purpose

2   based on which firmware you have flashed on it at any given

3   moment.  Once you do that, it is specialized, but you're able

4   to make it work with a lot of different things.

5   Q.   In this case didn't you testify that you didn't build the

6   VGA card.  It was a generic general purpose card?

7   A.   I could imagine myself describing it that way if the

8   question were asked in a certain way.

9   Q.   When you were asked, did you build the VGA card -- would

10  you like to see it?

11  A.   I don't need to see it.  I'm very familiar with what it is

12  and what it looks like.

13  Q.   No, I'm talking about your deposition.  Would you like to

14  see your prior sworn testimony where you were asked, "Did you

15  build the VGA card?"

16          And you first answered, "The what?"

17          And then the question was, "The VGA card."

18          And then your answer was, "I did not build the VGA

19  card.  It was the generic general purpose card."

20          Would you like to see that testimony or is that --

21  A.   No, no.  I believe it.  Like I just said, I did not

22  build it.

23          THE COURT:  Stop.

24          MS. WILKINSON:  Your Honor, just for proper purposes,

25  I think if we could have a page and line number --

```
 1              MR. PHILBIN:  Sure.

 2              MS. WILKINSON:  -- to follow along.

 3              MR. PHILBIN:  It's Mr. Luckey's deposition from

 4   January 26, 2016, starting on page 90 at line 10 through

 5   line 14 and 15.

 6              MS. WILKINSON:  Thank you.

 7              MR. PHILBIN:  You're welcome.

 8   BY MR. PHILBIN:

 9   Q.   Do you stand by that testimony, sir?

10   A.   Yes, I do.

11   Q.   And the lenses -- the lenses that you put in the box cost

12   you less than $10.00 a piece, correct?

13   A.   I'm not -- I'm not sure, but I -- that's in the right --

14   that's in the right ballpark.

15   Q.   One of the problems with using cheap lenses is that there

16   is significant geometric distortion, correct, sir?

17   A.   It's not a problem with cheap lenses.  It's a problem with

18   high magnification lenses in general.  Like, whether they're

19   cheap or not, expensive or not, if you only have a single

20   element -- an element is an -- an element is just basically a

21   single lens component, not, you know, multiple lenses in a

22   stack.

23              It's not the expense that determines it.  If you only

24   have one lens element and you want to have high magnification,

25   which you need to reproject a wide field of view image, you're
```

 1   generally going to have a lot of geometric distortion.  But I
 2   just want to be clear it's not a matter of the cost.  It's a
 3   matter of how much magnification you want to try to give -- get
 4   out of a lens, and you can change that slightly depending on
 5   the materials that you use for the lens.  But it's not -- it's
 6   not a matter of the cost of the lens.  It's more a matter of
 7   that particular type of lens using a single high magnification
 8   optic.
 9   Q.   Are you finished?
10   A.   Yes, I am.
11   Q.   Okay.  Let's ask it this way.
12        Using the lenses that you put in the box that you
13   sent to Mr. Carmack, was one of the problems with using those
14   lenses that there was significant geometric distortion?
15   A.   I mean, you -- you could describe it as a problem.  It's
16   more that that's the fundamental aspect of the design.  I mean,
17   optics is basic -- optical design is essentially a matter of
18   trade-offs.  You have to decide between things like wide field
19   of view, low weight and geometric distortion, chromatic
20   aberration.  And it wasn't so much a problem that these lenses
21   had distortion that needed to be solved, that was the intent of
22   the design.
23        The intent of the design was to optimize the hardware
24   to be high performing -- high performing in the things that
25   could only be solved in hardware, so high field of view, low

1  cost, lightweight and then to solve for other problems like
2  geometric distortion in software.
3       It -- it's not really a problem as much as just an
4  innate characteristic of that design.
5  Q.   And that's a characteristic that needed to be solved using
6  software, correct?
7  A.   Well, it had been solved using software.  I mean, like I
8  said, that was an innate part of the design.  I designed the
9  headsets to -- explicitly to trade off having that distortion
10  against having high field of view and low cost.
11  Q.   That trade-off resulted in significant geometric
12  distortion, correct?
13  A.   Well, I mean, that -- it's not that the trade-off resulted
14  in that.  That is the trade-off.  The trade-off is distortion
15  and these other characteristics all competing with each other
16  in one design.
17  Q.   Another problem with the lenses you chose to put in the
18  device that went in the box was that those lenses had
19  significant chromatic aberration, correct?
20  A.   They were actually pretty good.  They were -- they were --
21  they were actually asphere optics with pretty minimal chromatic
22  aberration.  I mean, that's why when we actually used the same
23  lenses later for Gear VR prototypes, we never really bothered
24  correcting for it because it wasn't a huge factor in those
25  lenses.

1          So chromatic aberration was actually pretty good in

2     those lenses, but again, it's not a problem with them so much

3     as just the trade off against the other -- other -- other

4     aspects of the design.

5     Q.   And is it your testimony in this case that the geometric

6     distortion in the chromatic aberration problems were not

7     corrected using software that Mr. Carmack wrote?

8     A.   I mean, his -- his software did implement the correction

9     required to view properly through the Rift.  I'm not testifying

10    otherwise.  I don't think anyone is.

11    Q.   So you would agree with me, then, that the software that

12    Mr. Carmack wrote to turn what was in the box into virtual

13    reality solved geometric distortion and chromatic aberration,

14    correct?

15    A.   Well, I would say that he implemented, not that he solved

16    it.  Many other people had done this and not just

17    hypothetically.  Even running on my headsets many people had

18    done this, so I wouldn't say that he solved the problem and

19    made it work.  This was a working device.  It had certain

20    characteristics you needed to write to and his software did

21    implement those -- those particular characteristics, but I

22    would not say that it was, you know, the thing that solved it

23    and made it work.  It was something that other people -- it's

24    hard to say that you've solved the problem when you've

25    basically written a piece of software to work a certain way to

1    work on something.

2           Like, if you had an iPhone and it required that you

3    use a certain line of code to initialize your application on

4    the iPhone, you would not say, ah, you wrote an application

5    that solved the problem of launching on an iPhone.  You would

6    say you implemented the code that you needed in order to run on

7    an iPhone, and that's what -- not just John but other people

8    also had done.

9    Q.   You didn't write any software to correct, one, geometric

10   distortion; or two, chromatic aberration using the device that

11   was put in the box, correct?

12   A.   No.  I'm not a software engineer, but I had worked with

13   teams that did implement those things, and we used third party

14   utilities to correct for distortion as well.

15   Q.   Well, were you here when Mr. Carmack testified about

16   massive fisheye distortion?

17   A.   Yes, I was.

18   Q.   And the massive fisheye distortion that Mr. Carmack was

19   talking about was the distortion that existed when the device

20   came out of the box, correct?

21   A.   Yes, that's correct.

22   Q.   And the solution to the massive fisheye distortion was

23   what Mr. Carmack added while he was at id, correct?

24   A.   Again, you know, that's the whole point of the design.

25   It's designed specifically to have wide field of view, low cost

1   and low weight, at the expense of high distortion.  This was

2   not a problem that was solved.  It's an innate characteristic

3   of the device.

4   Q.   Perhaps you didn't understand my question.

5        The solution to the massive fisheye distortion was a

6   solution that Mr. Carmack added while he was at id to your

7   device that came out of the box, correct?

8   A.   I mean, if you want to ask it that way, no, it's not the

9   solution.  There's many ways to implement it -- implement

10  geometric distortion correction.  His software did have

11  geometric distortion correction in it, and he did implement it

12  in his own way.  But you -- I would not say that is the

13  solution to the problem.

14       Again, this is something that people had been doing

15  for years with my devices.  It was well known, well understood.

16  What he did was -- I guess you could call it a solution, but

17  you would not call it the solution to the problem, if I'm

18  understanding you correctly.

19  Q.   The only solution that was in the prototype that went to

20  E3 was a solution to massive fisheye distortion that

21  Mr. Carmack wrote while he was employed at id, correct?

22  A.   As far as I know, the only thing that he was using in his

23  game was his code.  I mean, he was at E3 showing off his game.

24  I would assume that he used his code and not the distortion

25  correction that had been done by other people.

1  Q.   HMD stands for head-mounted device, correct?

2  A.   No, it does not.

3  Q.   What does HMD stand for?

4  A.   It generally stands for either head-mounted display or, in

5  some military applications, helmet-mounted display.

6  Q.   Okay.  The headset that you sent to Mr. Carmack in the box

7  didn't even have a strap, did it?

8  A.   No, that unit did not.

9  Q.   And it didn't have anything that mounted the display or

10  the device to the head, did it?

11  A.   Well, the -- I mean, the neoprene foam on there was part

12  of the facial interface, and it was designed to have a strap on

13  it.  That particular unit just didn't have one on it, so no, I

14  wouldn't say it didn't have anything to attach it to the head.

15  It just didn't actually have a head mounting device on that

16  particular unit.

17  Q.   So if we took what came out of the box and held it up to

18  our face and turned loose of it, it wouldn't be mounted to my

19  head, would it?  It would fall on the floor?

20  A.   That's correct.

21  Q.   And there was no head tracker in the head-mounted display

22  in the box that you sent to Mr. Carmack, right?

23  A.   Right.

24  Q.   And a head tracker is what's used to sense when your head

25  moves, right?

1    A.    Yes.

2    Q.    So if I have a head tracker and I move to the right, that

3    senses that my head has moved to the right, correct?

4    A.    Yes.  And that could be rotationally to the right or, you

5    know, translationally to right.

6    Q.    And by translationally, that would be like if I did a step

7    to the side; is that correct?

8    A.    Yes.  And -- the sensor that John was using couldn't

9    detect translation, but I just want to be clear there's two --

10   moving to the right could mean one of two things, and there are

11   sensors that are able to do both.

12   Q.    And let's be clear.  You said the sensor that John was

13   using, correct?

14   A.    Yes.

15   Q.    That's Mr. Carmack, right?

16   A.    Yes.  I believe the Hillcrest Labs sensor.

17   Q.    And the sensor that you had in the box was none, correct?

18   A.    No, I did not have a sensor on the -- on the unit that I

19   sent him.

20   Q.    Okay.  So if we plugged in the unit that you put in the

21   box and we got, say, the screen from your computer to show up,

22   correct?

23   A.    It would show up.  It would be split between both eyes.

24   The Rift wasn't designed to be used with a standard desktop or

25   standard applications.  You have to make applications that are

1   written specifically for it in order view them correctly.

2   Q.   And then if the user using the device as it came out of

3   the box turned their head to the right, what would happen?

4   A.   That entire -- that depends entirely on the application

5   you would have attached and any -- and the sensor, if any, that

6   you had attached.

7   Q.   Oh, but since there is no sensor -- I'm talking about as

8   it came out of the box from you.  Using what came out of the

9   box from you, if I'm looking at something on my screen and I

10  turn my head to the right, does anything change?

11  A.   It would depend on the application, but, you know,

12  generally no.  If you hooked up an application that was not

13  hooked up to any kind of other motion tracker and it was just

14  running on the display, it would remain static.

15  Q.   And so using your device as it came out of the box when

16  the user turns their head either to the right or to the left,

17  nothing changes because there is no sensor, correct?

18  A.   Well, that is the case.  I mean, you could say that about

19  most virtual reality displays.  I mean, most virtual reality

20  displays are sold without a head tracker.  I worked in

21  professional virtual reality before I --

22  Q.   I'm not asking about most virtual reality displays.  I'm

23  talking about your display in the box.

24  A.   Again, if you will give me just a moment.

25          My point is that you say when this head-mounted

1    display is hooked up, nothing happens.  I'm saying that is very

2    typical of a head-mounted display.  Typically, it does have to

3    be hooked up to two things.  It needs a motion tracker, and it

4    needs an application that is designed to run on the

5    head-mounted display.

6           If you don't have either of those things, then it's

7    not going to do anything when you move your head.

8    Q.   Okay.  Are you finished?

9    A.   Yes, I am.

10   Q.   Okay.  Now, I would like to focus you on the device you

11   put in the box and you sent to Mr. Carmack.  Using just what

12   was in your prototype, can we agree that when you move your

13   head, nothing changes?

14   A.   Yes.

15   Q.   And can't we also agree that a fundamental principle in

16   order for something to be considered virtual reality is when

17   you move your head, what you see changes?

18   A.   If you're referring to the overall concept, yes.  If

19   you're referring to, say, a virtual reality display or

20   head-mounted display, I just want to be clear that, no, that is

21   not necessarily part of it.

22          But as a system, including the software, the

23   hardware, the motion tracking, yes, virtual reality requires

24   some form of head tracking.

25   Q.   Otherwise, it is just a monitor mounted close to your

1  face, isn't it?

2  A.   Not exactly.  I mean, you still have a very wide field of

3  view.  You still have the ability to display stereoscopic

4  images that are the same size and scale of the real world, and,

5  of course, you are blocking out the outside world.  So without

6  a head tracker you may not be able to call it virtual reality,

7  but it's certainly more full-featured than a monitor, which is

8  why so many companies have sold head-mounted displays without

9  head tracking.  They are not VR devices, but they are much more

10  than just a monitor.

11  Q.   And you mentioned field of view.  Let's talk about that

12  for a minute.  Okay?

13       If I'm standing here and watching my television over

14  there on the wall, my field of view is calculated from where

15  I'm standing to where the television is, correct?

16  A.   Yes.  Usually in degrees.

17  Q.   So let's say I'm 20 feet away from my television.  I would

18  have a certain degree of field of view, correct?

19  A.   Sure.  Like if you had a regular-size television on that

20  wall where you're standing, you might be seeing a 10- or

21  20-degree field of view horizontally.

22  Q.   If I wanted to increase the field of view from 10 or

23  20 degrees up to 40 or 50 degrees, I could just walk toward the

24  TV, correct?

25  A.   Yes, you could.

```
 1   Q.    And if I wanted to increase it up to 170 degrees, even
 2   though I encourage my children not to do this, I could walk all
 3   the way up to TV, correct?
 4   A.    There are other practical limitations, like viewing
 5   angles, that would make that probably not practical.  Like, if
 6   you stand right next to a display, the angle that the panel can
 7   display proper colors is going to be off, so it wouldn't work.
 8   But, generally speaking, yeah.  Not all the way up to 170 but
 9   maybe up to -- maybe, let's say 90 degrees or 100 degrees or
10   something like that it would work.
11   Q.    So when we talk about field of view, another way of
12   thinking about that is how close we are to the TV, right?
13   A.    Not exactly.  Getting closer to the TV doesn't just make
14   it larger.  It also means that you're having to focus much
15   closer.
16         So with a virtual reality device, you're generally
17   collimating the light and refocusing it in a certain plane.  So
18   with the TV that you are standing right next to -- let's say
19   you are standing right next to a small TV and getting a
20   100-degree field of view, your eyes are going to be converging
21   on the TV up close and also focusing on the TV up close.
22         With a virtual reality device, generally speaking,
23   that's not the case.  The -- the image is reprojected out at
24   least a few meters, sometimes out to infinity.  So that's
25   really the big difference.
```

```
 1              Like, in terms of just the degrees of field of view,
 2   yes, you will get more degrees, but all of the other
 3   characteristics of vision, there is a big difference between a
 4   head-mounted display and just standing close to a TV.
 5   Q.   So if we're just talking about a field of view, we could
 6   increase our field of view by walking closer to the TV,
 7   correct?
 8   A.   Yes.
 9   Q.   Thank you.
10              Now, were you at E3 when what was in the box was
11   displayed after Mr. Carmack's modifications?
12   A.   No, I was not.
13   Q.   Do you have any knowledge about what was displayed at E3?
14   A.   I do.
15   Q.   Mr. Carmack's presentation at E3 took what you sent him in
16   the box, added hardware, correct?
17   A.   Yes.  He attached a Hillcrest sensor and also a Scott ski
18   goggle strap, I believe.
19   Q.   He also added software, correct?
20   A.   I wouldn't say he added software to the device I sent
21   them.  I would say he ran that software on that device.  I
22   understand it's semantic, but it's important.
23   Q.   And the software that Mr. Carmack ran in connection with
24   the device used the input from the sensors that he had added to
25   change what you saw when you moved your head, correct?
```

1  A.   Exactly.

2  Q.   So the device that you sent in the box wouldn't change

3  when you moved your head, and Mr. Carmack fixed that, correct?

4  A.   He -- again, it's not a problem with a head-mounted

5  display that you fix, it not having a motion sensor.  This is

6  why I took pains earlier to point out that most of the

7  head-mounted displays, you have to have a motion sensor.

8         You keep saying this is a problem he fixed.  What I'm

9  saying is he wrote a piece of software that used head tracking

10  and HMD.  That's not fixing a problem with the HMD.  That's

11  choosing to display software with head tracking, which, again,

12  I did not have a head tracker on the unit that I sent to John

13  in that box.

14  Q.   Let me try it a different way.  If you quibble with the

15  word "problem," let's call it feature.  A feature of what you

16  put in the box was when you moved your head, nothing changed,

17  correct?

18  A.   Well, no, you wouldn't say that either.  If something

19  doesn't do something, you don't call it a feature.  It's not a

20  quibble with the term "problem"; it is problem and then fixing.

21  I'm saying it is not a problem that was fixed.

22         You know, if -- if you were to make a rectangular

23  image that displayed on a TV and you wanted to show a certain

24  thing, you wouldn't say that it solved the problem of showing a

25  rectangular image.  You would say, oh, well, you know, you did

1  it the way you wanted to do it.

2          John wanted to show a piece of software that utilized

3  head tracking, and so he attached a head tracker, but that was

4  not a problem that was fixed with my device.

5  Q.   I understand.

6          Mr. Carmack added the feature of tracking head

7  movement and changing what you see in the display based on the

8  head movement, correct?

9  A.   Yes, I would agree with that.

10  Q.   Because your device didn't have it, correct?

11  A.   The one that I sent in the box did not have it, that's

12  correct.

13  Q.   You had no input on the choice of head trackers that

14  Mr. Carmack used, did you, sir?

15  A.   No, I was aware that he was using the Hillcrest tracker.

16  I don't think I ever gave him any feedback that he should use

17  anything else.  But we did discuss head tracking on the MTBS3D

18  forums on several other things.

19  Q.   You didn't tell Mr. Carmack which head tracker to choose

20  on the device he used at E3, did you, sir?

21  A.   No, I did not.

22  Q.   And Mr. Carmack wrote software code for head and neck

23  model for the device that was shown at E3, correct?

24  A.   Well, a head and neck model was more related -- it is in

25  the software, and it is relating to actually, basically, the

1    relationship between your neck, your head, and how you move

2    than anything with the HMD.

3         So his software did have a head and neck model, but I

4    wouldn't say that it was for the HMD.

5    Q.   There was no head and neck modeling software in the box

6    when you sent it to Mr. Carmack, correct?

7    A.   That's correct.

8    Q.   And at E3 there was head and neck modeling software used

9    with the demonstration at E3, correct?

10   A.   That's correct.

11   Q.   So from the time he received the box till the time it got

12   to E3, any head and neck modeling was done by Mr. Carmack,

13   correct?

14   A.   I mean, in his software.  I don't want to say that he was

15   the only one doing -- that any head and neck modeling was done

16   by him.  It's a concept that has been well understood and used

17   in the virtual reality industry for decades, but in his

18   particular demo, as far as I know, he was the only one

19   implementing head and neck modeling.

20   Q.   And there was also distortion correction software in the

21   demonstration at E3, correct?

22   A.   Yes.

23   Q.   And there was no distortion correction software code in

24   your box when you sent it to Mr. Carmack, correct?

25   A.   That's correct.

1   Q.   So any distortion correction source code that was used in

2   the demonstration at E3 came from Mr. Carmack while he was at

3   id, correct?

4   A.   I assume so.

5   Q.   You don't have any reason to testify any other way, do

6   you?

7   A.   No, I don't.

8   Q.   And you didn't write any of the distortion correction code

9   that Mr. Carmack used at E3, did you, sir?

10  A.   No, I did not.

11  Q.   In fact, you didn't give Mr. Carmack any software that he

12  used when demonstrating a headset at E3 in 2012 other than what

13  may have been on the video card when you bought it, correct?

14  A.   The display control board, yes.

15  Q.   And would you agree with me, sir, that it was only with

16  the additions from Mr. Carmack, including motion sensing and

17  software, did the headset at E3 actually provide a virtual

18  reality experience?

19  A.   Yes.

20  Q.   The E3 demonstration was shown in ZeniMax's booth,

21  correct, sir?

22  A.   It was either a booth or a meeting room.  I'm not sure.

23  Q.   And is it your understanding that the E3 demonstration was

24  shown by special appointments only?

25  A.   I was -- I was told that he would be showing -- that he

1  had a few private demos that he wanted to give.  My
2  recollection is that it's by appointment, but I don't really
3  know one way or the other.
4  Q.   Because you weren't there, right?
5  A.   That's right.
6  Q.   But you knew ahead of time that Mr. Carmack was going to
7  show a demonstration of the headset that he had written
8  software for and modified at E3, correct?
9  A.   He told me that he was going to be giving a few private
10  demonstrations, and he had given one or two to outlets actually
11  before E3 as well, so I was aware.
12  Q.   Would you agree that Mr. Carmack's demonstration of the
13  headset that he added hardware and software to while he was at
14  id garnered widespread media attention?
15  A.   Yes, I would.
16  Q.   Would you agree with "that demonstration was a
17  breakthrough moment in virtual reality technology"?
18  A.   Not necessarily.  I guess you could call it a breakthrough
19  moment maybe in awareness.  I don't -- I don't know if it would
20  be properly considered a breakthrough moment in the technology.
21  Q.   Now, prior to E3, you hadn't met Mr. Iribe, had you?
22  A.   No.
23  Q.   And you hadn't met -- hang on -- any of the other founders
24  of Oculus; is that correct?
25  A.   That's correct.

1    Q.    You didn't arrange for any of the press interviews with

2    Mr. Carmack leading up to E3, correct?

3    A.    No.

4    Q.    And prior to E3, you hadn't met Nate Mitchell or

5    Mr. Antonov, correct?

6    A.    That's correct.

7    Q.    You didn't pay for any of the booth space at E3 that

8    Mr. Carmack demonstrated the headset as he had modified it,

9    correct?

10   A.    No.  That was their booth.

11   Q.    And you didn't discuss with Mr. Carmack in advance how the

12   demonstration should be run at E3 in 2012, did you, sir?

13   A.    I mean, we did discuss it.  Not in any kind of, you know,

14   detail, but we -- we did discuss what he was going to be doing

15   and how they would be given.  I -- I was certainly not telling

16   him how to show off his game.

17   Q.    Can we agree that you didn't write any of the software on

18   the device that Mr. Carmack demonstrated at E3 that garnered so

19   much media attention?

20   A.    Just to be clear, there wasn't -- there was software that

21   was viewed through the device.  It was not software necessarily

22   on the device, but --

23   Q.    All right.

24   A.    -- but I just want to make sure we understand each other.

25          But, no, I did not write any of the software that was

1    being shown on the device at E3.

2    Q.    Let me rephrase.

3          Mr. Carmack did a demonstration at E3, correct?

4    A.    Yes.

5    Q.    And in order to do that demonstration, it required

6    software, correct?

7    A.    I mean, the demonstration was of software, so yes.

8    Q.    And you didn't write any of the software that was used in

9    the demonstration at E3, correct?

10   A.    That is correct.

11   Q.    And you would agree with me, wouldn't you, sir, that

12   Mr. Carmack demonstrated something at E3 in 2012 that did not

13   come exclusively from you, correct?

14   A.    Yes, that's correct.

15   Q.    You would agree with me, wouldn't you, sir, that software

16   was the most difficult aspect of the Rift to implement at that

17   time?

18   A.    That phrase regarding the context really depends.  I mean,

19   if you're talking about creating a game, then certainly.  If

20   you're talking about making a product, I would take issue with

21   that.  I would say the hardware side is very difficult if

22   you're talking about actually making a product that you can get

23   to people.

24         I would have to know the context of that to know

25   whether I agreed with it or not.

```
 1   Q.   You're not a software guy, are you?
 2   A.   No.  I think of myself as a hardware guy.
 3   Q.   And, in fact, you would never call yourself a software
 4   person, correct?
 5   A.   You know, again, that would depend on who I'm talking to.
 6   To my friends and family, I'm very much the software guy.  I'm
 7   the computer guy.  I'm the guy who knows all about software.
 8   But in relation to people like John Carmack, no, I'm definitely
 9   not a software guy.  My focus is very much on the hardware side
10   of things even though I do know a bit about software.
11   Q.   Have you publicly stated that you're not a software guy?
12            MS. WILKINSON:  Your Honor -- objection, asked and
13   answered.
14            THE COURT:  Sustained.
15   BY MR. PHILBIN:
16   Q.   You don't consider yourself a programmer, do you, sir?
17   A.   No, I do not.  My -- my -- I've done some programming, but
18   I definitely would not consider myself a programmer.  And it's
19   not my passion.
20   Q.   And programming is not even one of your core competencies,
21   correct?
22   A.   No, it is not.
23   Q.   You'd consider yourself more of a hardware person,
24   correct?
25   A.   That's right.
```

1   Q.   And, in fact, before Mr. Carmack saw your work, you

2   considered yourself a hobbyist working on your own stuff,

3   correct?

4   A.   I was a hobbyist.  I was also an engineer working at a

5   university VR research lab, but, I mean, it is true that I'm a

6   hobbyist.  I just want to make sure that we're not

7   characterizing that as the only thing I thought of myself as.

8   I was also working professionally on virtual reality hardware.

9   Q.   And haven't you characterized it as you felt blessed to

10  hear from John Carmack at id to use what you put in the box?

11  A.   I'm not sure if I said "blessed" in relation to that, but

12  generally, yes, I -- that sounds like something I might've

13  said.

14  Q.   All right.  You signed an NDA in this case, didn't you,

15  sir?

16  A.   I signed an NDA independently of this case.  It's now part

17  of this case, yes.

18       MR. PHILBIN:  Okay.  Can we pull up PX2, Mr. Frank?

19  Can we go to page 3?

20  BY MR. PHILBIN:

21  Q.   Start right here.  This is a nondisclosure agreement,

22  correct?

23  A.   Yes.

24       MR. PHILBIN:  And can we scan down to the bottom,

25  Mr. Frank?  I believe it's page 6.

```
 1   BY MR. PHILBIN:
 2   Q.   Is that your signature there on the right of page 6 of
 3   PX2?
 4   A.   Yes, it is.
 5   Q.   No one signed that on your behalf, correct?
 6   A.   No, it was me.
 7   Q.   And prior to signing PX2, you read it and understood it,
 8   correct?
 9   A.   I did.
10        MR. PHILBIN:  Mr. Frank, could we go back up to the
11   top on the recitals?
12   BY MR. PHILBIN:
13   Q.   While we're doing that, you understood the purpose of the
14   NDA was to call things out as confidential and keep them
15   protected as confidential, correct?
16   A.   That's correct.
17   Q.   And you understood the purpose of a nondisclosure
18   agreement at the time you signed it, didn't you, sir?
19   A.   I did.
20   Q.   And the first purpose is in the name, nondisclosure,
21   correct?
22   A.   Yes.
23   Q.   And the very purpose of entering into a nondisclosure
24   agreement is to get someone's agreement that you're going to
25   share information with that they promise not to disclose it,
```

1    correct?

2    A.    Yes.

3    Q.    And you take NDA or nondisclosure agreements seriously,

4    don't you, sir?

5    A.    I take them very seriously.

6    Q.    And you understood at the time you signed Exhibit 2, the

7    nondisclosure agreement in this case, that it was a binding

8    contract with ZeniMax, didn't you, sir?

9    A.    Yes, I did.

10   Q.    And in entering into a binding contract, it's very

11   important to understand what you're signing, correct, sir?

12   A.    Yes.

13   Q.    And did you treat the nondisclosure agreement that you

14   signed with ZeniMax with the same scrutiny and seriousness that

15   you've treated other NDA's you've signed?

16   A.    I don't know if I treated it with the same -- for example,

17   I've signed nondisclosure agreements to get access to, like,

18   beta testing for video games online, and, you know, you don't

19   generally read those.  You just scroll through, click okay, and

20   you don't share with anybody.

21          I'd say I treated this one probably more seriously

22   than other NDAs that I had signed in the course of, you know,

23   clicking the terms of service on stuff in the past.

24   Q.    Would you agree that the nondisclosure agreement you

25   signed in this case was one you treated with the highest level

```
 1   of sincerity?
 2   A.   Yes, I was completely sincere.
 3             THE COURT:  All right.  This is a good stopping
 4   point.
 5             Don't talk about the case.
 6             Be back at 9:00.
 7             See y'all in the morning.
 8             SECURITY OFFICER:  All rise.
 9             (Jury out)
10             (Recessed for the day at 4:37)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                           INDEX
2                                              Further
              Direct  Cross  Redirect  Recross  Redirect
3
    WITNESSES FOR THE
4   PLAINTIFFS

5   MARK ZUCKERBERG                    84

6   PETER GIOKARIS     110
    (Videotape depo)
7
    PALMER LUCKEY      126
8

9
    PLAINTIFFS' EXHIBITS                       Received
10
        1015                                     124
11
        1072                                     124
12
13  DEFENDANTS' EXHIBIT                         Received

14     1532      Email                            49

15

16

17

18

19

20

21

22

23

24

25
```

1    I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6    WITNESS MY HAND on this 17th day of January, 2017.

7

8

9
                                /s/Todd Anderson
10                              TODD ANDERSON, RMR, CRR
                                United States Court Reporter
11                              1100 Commerce St., Rm. 1625
                                Dallas, Texas  75242
12                              (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25