

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF TEXAS

 3                       DALLAS DIVISION

 4

 5   ZENIMAX MEDIA INC. and ID     )      3:14-CV-1849-K
     SOFTWARE LLC                  )
 6               Plaintiffs,       )
                                   )
 7                                 )
     VS.                           )
 8                                 )      DALLAS, TEXAS
                                   )
 9   OCULUS VR, LLC, PALMER        )
     LUCKEY, FACEBOOK, INC.,       )
10   BRENDAN IRIBE and JOHN        )
     CARMACK,                      )
11               Defendants.       )      January 18, 2017

12

13            TRANSCRIPT OF JURY TRIAL, VOLUME 7

14            BEFORE THE HONORABLE ED KINKEADE

15               UNITED STATES DISTRICT JUDGE

16

17   A P P E A R A N C E S:

18
      FOR THE PLAINTIFFS:        MR. P. ANTHONY SAMMI
19                               Skadden, Arps, Slate,
                                   Meagher & Flom LLP
20                               Four Times Square
                                 New York, New York  10036
21                               (212) 735-2307
                                 anthony.sammi@skaddden.com
22

23                               MR. PHILLIP B. PHILBIN
                                 Haynes and Boone LLP
24                               2323 Victory Avenue, Suite 700
                                 Dallas, Texas  75219
25                               (214) 651-5000
                                 phillip.philbin@haynesboone.com
```

MR. KURT WILLIAM HEMR
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(617) 573-4833
kurt.hemr@skaddden.com


MR. CHRISTOPHER A LISY
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800
christopher.lisy@skaddden.com


MR. MICHAEL R. WALSH
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4862
michael.walsh@skadden.com


MR. JAMES Y. PAK
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-2546
james.pak@skaddden.com


MR. MICHAEL DALEY KARSON
Haynes and Boone LLP
2323 Victory Avenue
Suite 700
Dallas, Texas  75219
(214) 651-5000
michael.karson@haynesboone.com

1

2                                         **MS. RACHEL R. BLITZER**
                                          Skadden, Arps, Slate,
3                                            Meagher & Flom LLP
                                          Four Times Square
4                                         New York, New York  10036
                                          (212) 735-3000
5                                         rachel.blitzer@skaddden.com

6                                         **MR. WILLIAM J. CASEY**
                                          Skadden, Arps, Slate,
7                                            Meagher & Flom LLP
                                          525 University Avenue
8                                         Palo Alto, California  94301
                                          (650) 470-4500
9                                         william.casey@skaddden.com

10

11                                        **MR. SCOTT MICHAEL FLANZ**
                                          Skadden, Arps, Slate,
12                                           Meagher & Flom LLP
                                          Four Times Square
13                                        New York, New York  10036
                                          (212) 735-3000
14                                        sflanz@skaddden.com

15                                        **MS. EMILY WHITCHER**
                                          Skadden, Arps, Slate,
16                                           Meagher & Flom LLP
                                          Four Times Square
17                                        New York, New York  10036
                                          (212) 735-3605
18                                        emily.whitcher@skaddden.com

19

20                                        **MS. JENNIFER H. DOAN**
                                          Haltom & Doan
21                                        6500 Summerhill Road, Suite 100
                                          Texarkana, Texas  75503
22                                        (903) 255-1000
                                          jdoan@haltomdoan.com

23

24

25



```
 1
 2                                    MR. JOSH R. THANE
                                      Haltom & Doan
 3                                    6500 Summerhill Road, Suite 100
                                      Texarkana, Texas  75503
 4                                    (903) 255-1000
                                      jthane@haltomdoan.com
 5

 6   FOR THE DEFENDANTS:             MS. BETH A. WILKINSON
                                      Wilkinson Walsh & Eskovitz LLP
 7                                    1900 M Street NW
                                      Suite 800
 8                                    Washington, DC  20036
                                      (202) 847-4000
 9                                    bwilkinson@wilkinsonwalsh.com

10
                                      MR. BRANT W. BISHOP
11                                    Wilkinson Walsh & Eskovitz LLP
                                      1900 M Street NW
12                                    Suite 800
                                      Washington, DC  20036
13                                    (202) 847-4000
                                      bbishop@wilkinsonwalsh.com
14

15                                    MS. CALI COPE-KASTEN
                                      Wilkinson Walsh & Eskovitz LLP
16                                    1900 M Street NW
                                      Suite 800
17                                    Washington, DC  20036
                                      (202) 847-4000
18                                    ccope-kasten@wilkinsonwalsh.com

19
                                      MS. KIRSTEN NELSON
20                                    Wilkinson Walsh & Eskovitz LLP
                                      1900 M Street NW
21                                    Suite 800
                                      Washington, DC  20036
22                                    (202) 847-4000
                                      knelson@wilkinsonwalsh.com
23

24

25
```

1

2      MS. RUTH VINSON
       Wilkinson Walsh & Eskovitz LLP
3      1900 M Street NW
       Suite 800
       Washington, DC  20036
4      (202) 847-4000
       rvinson@wilkinsonwalsh.com

5

6      MR. MAX WARREN
       Wilkinson Walsh & Eskovitz LLP
7      1900 M Street NW
       Suite 800
8      Washington, DC  20036
       (202) 847-4000
9      mwarren@wilkinsonwalsh.com

10

11     MR. HAYTER WHITMAN
       Wilkinson Walsh & Eskovitz LLP
       1900 M Street NW
12     Suite 800
       Washington, DC  20036
13     (202) 847-4000
       hwhitman@wilkinsonwalsh.com

14

15     MR. KOSTA S. STOJILKOVIC
       Wilkinson Walsh & Eskovitz LLP
16     1900 M Street NW
       Suite 800
17     Washington, DC  20036
       (202) 847-4050
18     kstojilkovic@wilkinsonwalsh.com

19

20     MS. HEIDI L. KEEFE
       Cooley LLP
21     3175 Hanover Street
       Palo Alto, California  94304
22     (650) 843-5000
       hkeefe@cooley.com

23

24

25



```
 1
 2                    MR. BRETT DeJARNETTE
                      Cooley LLP
                      3175 Hanover Street
 3                    Palo Alto, California  94304
                      (650) 843-5000
 4                    bdejarnette@cooley.com

 5
                      MS. ELIZABETH LEE STAMESHKIN
 6                    Cooley LLP
                      3175 Hanover Street
 7                    Palo Alto, California  94304
                      (650) 843-5000
 8                    lstameshkin@cooley.com

 9
                      MR. RICHARD A. SMITH
10                    Richard Smith, PC
                      Campbell Centre I
11                    8350 N. Central Expressway
                      Suite 1111
12                    Dallas, Texas  75206
                      (214) 242-6484
13                    richard@rsmithpc.com

14
                      MR. RAGESH KUMAR TANGRI
15                    Durie Tangri LLP
                      217 Leidesdorff Street
16                    San Francisco, California  94111
                      (415) 362-6666
17                    rtangri@durietangri.com

18
                      MR. BENJAMIN B. AU
19                    Durie Tangri LLP
                      217 Leidesdorff Street
20                    San Francisco, California  94111
                      (415) 362-6666
21                    bau@durietangri.com

22
                      MR. MARK RANDOLPH WEINSTEIN
23                    Cooley LLP
                      3175 Hanover Street
24                    Palo Alto, California  94304
                      (650) 843-5000
25                    mweinstein@cooley.com
```

MR. JOSEPH B. WOODRING
Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, California  90401
(310) 883-6400
jwoodring@cooley.com


MR. MATTHEW D. CAPLAN
Cooley LLP
101 California Street
5th Floor
San Francisco, California  94111
(415) 693-2000
mcaplan@cooley.com


MR. PHILIP MAO
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
pmao@cooley.com


MR. DANIEL TEIMOURI
Cooley LLP
1700 Seventh Avenue
Suite 900
Seattle, Washington  98101
(206) 452-8791
dteimouri@cooley.com


MS. JULIE B. RUBENSTEIN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
jrubenstein@wilkinsonwalsh.com

```
 1                                   MS. ELIZABETH Y. RYAN
                                     Lynn Pinker Cox & Hurst, LLP
 2                                   2100 Ross Avenue
                                     Suite 2700
 3                                   Dallas, Texas   75201
                                     (214) 981-3821
 4                                   eryan@lynnllp.com

 5
                                     MS. CHRISTEN DUBOIS
 6                                   Facebook, Inc.
                                     1601 Willow Road
 7                                   Menlo Park, California  94025
                                     (650) 862-5980
 8                                   cdubois@fb.com

 9
                                     MR. PAUL GREWAL
10                                   Facebook, Inc.
                                     1601 Willow Road
11                                   Menlo Park, California  94025
                                     (650) 814-3157
12                                   paulgrewal@fb.com

13
     COURT REPORTER:                 MR. TODD ANDERSON, RMR, CRR
14                                   United States Court Reporter
                                     1100 Commerce St., Rm. 1625
15                                   Dallas, Texas  75242
                                     (214) 753-2170
16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1              JURY TRIAL - JANUARY 18, 2017
 2                 P R O C E E D I N G S
 3          THE COURT:  Okay.  Are we ready?
 4          Mr. Philbin, are you ready?
 5          MR. PHILBIN:  I am, Your Honor.
 6          THE COURT:  Mr. Luckey, did we give you fresh water
 7   or did we give you backwash again?
 8          THE WITNESS:  No backwash, Your Honor.
 9          THE COURT:  What do we need?
10          MS. WILKINSON:  Good morning, Your Honor.  We have a
11   question on the timing.
12          THE COURT:  Okay.
13          MS. WILKINSON:  We didn't hear from Mr. Sammi this
14   morning on when they will finish, and, in fact, they gave us
15   notice that they are going to call Mr. Altman on Friday.
16          I know you told us you thought they should finish up
17   around tomorrow at noon, and, as we count, they still have to
18   finish Mr. Luckey, they have Mr. Iribe, their experts,
19   Mr. Gleicher and Dobkin, Mr. Jackson, now Mr. Altman, and
20   that's if they don't add anyone else they have already noticed,
21   and then we have 10 to 12 witnesses ourselves.
22          THE COURT:  I couldn't hear you.
23          MS. WILKINSON:  10 to 12 witnesses ourselves.
24          THE COURT:  Right, right, right.
25          So how much time do y'all think you still have?
```

```
1              MR. LISY:  Good morning, Your Honor.

2              THE COURT:  Good morning.

3              MR. LISY:  So we've charted it out.  We think we

4    have, with the examination of our witnesses, maybe about seven

5    and a half hours left.  We obviously don't know how much time

6    the Defendants will take cross-examining our witnesses, but I'm

7    assuming that they take the amount of time that we anticipate.

8    We think we're in a position to call our last witness on Friday

9    morning and be done that day.

10             THE COURT:  Uh-huh.  Okay.

11             MS. WILKINSON:  Your Honor, Plaintiffs have already

12   used almost 15 hours, 14 hours and 51 minutes, and I think

13   we -- if they use another seven hours, they're only going to

14   have a few hours left to cross-examine 10 of our witnesses.  So

15   using --

16             THE COURT:  They will have to talk fast, won't they?

17             MS. WILKINSON:  I guess.  But, also, I just don't

18   want the jury to penalize us if the trial has to get extended

19   because they took, you know, more of the time upfront to put on

20   their witnesses.

21             THE COURT:  I won't -- I won't -- you know, whatever.

22   If there is additional time, which I'm not planning on, you

23   know, I'll take the hit.  But, you know, I don't -- I don't

24   think juries view it that way, you know.  I mean, I don't.

25   But, anyway, we will -- we will handle that at the time.
```

```
1              We're going to have a little more heart to heart
2     about your time.  We'll do that over here at the side of the
3     bench, and if we need to put it on the record later, we will do
4     that.  But y'all are going to have to do a little more cutting
5     it looks like to be able to get it -- get it done.
6              And so, you know, you can use your time any way you
7     want to use it, but you can't use the other side's time any way
8     you want to use it.
9              So let me think about it a little bit and see where
10    we are.
11             We're going to have a full day of me reading the
12    charge and y'all arguing and get it to the jury probably late
13    in the day is what I'm sort of expecting.  Maybe we can do that
14    in half a day, but I sort of doubt it.
15             I think y'all will probably want a pretty long time
16    to argue.  So that's all included in your time, and so we have
17    to kind of think through that a little bit.
18             So, anyway, y'all have any response?  Any thoughts
19    about that?  Y'all's attitude is we're going to do what we're
20    going to, we don't care what you say, Judge.  I don't think
21    that's a response.
22             MR. LISY:  We care very much, Judge.
23             THE COURT:  Right.  That's the right response right
24    there.  The last thing you want me to do is cut y'all off, and
25    I don't want to do that, and I'm not interested in doing that,
```

```
 1   so y'all are going to have to massage it some more.
 2             MR. LISY:  Yes, sir.
 3             THE COURT:  Okay.
 4             MR. LISY:  Understand.
 5             THE COURT:  Are you the designated "take the hit" on
 6   this?  I mean, it should be Mr. Sammi.  It really should.
 7             MR. SAMMI:  I'm right here, sir.
 8             THE COURT:  I'm right here.
 9             MR. SAMMI:  I'm trying to prepare --
10             THE COURT:  He is a very formidable-size fellow.
11             MR. SAMMI:  Yeah.  The percipient witness, yes.
12             THE COURT:  And he can take it, you know.
13             And what's happening to Mr. Hemr?  Has he gone home
14   or is he still around?
15             MR. SAMMI:  He's writing.
16             THE COURT:  He's working on the mandamus on this
17   issue.
18             MR. SAMMI:  No, sir.
19             THE COURT:  There we go.
20             MR. SAMMI:  No, sir.
21             THE COURT:  There we go.  Your firm does know how to
22   do that, don't they?  They are very good at that.
23             MR. SAMMI:  Unfortunately.
24             THE COURT:  I have to give you a hard time.
25             ALL right.  We'll work on a little more today.  All
```

```
 1   right?

 2            Yes, I see that --

 3            MS. WILKINSON:  Can I take it off now, Judge?  I

 4   don't want to do it in front of the jury.

 5            THE COURT:  You may.  Is that my wife's?  Looks like

 6   my wife's?

 7            MS. WILKINSON:  No.  My husband got it for me.

 8            THE COURT:  Oh, good man.  That very color -- I wore

 9   a lot of green-gold around a lot of burnt orange last night,

10   and it was -- I gloated a little bit.  I admit it.  I did.  It

11   was good.

12            MS. WILKINSON:  That's so unlike you, Judge.  I can't

13   believe that.

14            THE COURT:  Yeah, I know.  I know.

15            Well, I have bad news for y'all and that's this:  I

16   know y'all love my little anecdotes and my little homilies, but

17   I'm losing my voice and so, you know, there may be fewer and I

18   know that's sad for a lot of y'all out there, but especially

19   for those of y'all that are going back to parts unknown, way

20   outside of Texas.

21            You know, you'll get them again, Mr. Philbin.  You

22   and I both know that, correct, sir?

23            MR. PHILBIN:  I do, Your Honor.  I look forward --

24            THE COURT:  I look forward to seeing you in Waco

25   sometime.
```

```
 1              MR. PHILBIN:  I look forward to it, Your Honor.
 2              THE COURT:  Listen.  Seriously, let's work on the
 3    time.  Y'all are working hard.  I know you are.  I'm not
 4    accusing anybody of not trying hard.  And let me tell you, the
 5    witnesses are -- have all been fast talkers, so that's another
 6    good thing.  You know, everybody talks fast.  Mr. Luckey talks
 7    fast.  Mr. Zuckerberg.  All the witnesses so far.  I mean,
 8    mercy, Mr. Carmack -- we had more pages, I think, than we've
 9    ever had in a day with Mr. Carmack's testimony.  So that's --
10    that will make it go faster.  That will make it go faster.  So
11    that's good.
12              So we're all working hard and we'll keep working
13    hard.  Okay?
14              And let's see.  What else?
15              I can't think of anything else that I'm worried
16    about, y'all.
17              Okay.  Here we go.
18              (Pause)
19              SECURITY OFFICER:  All rise for the jury.
20              (Jury in)
21              THE COURT:  I'm so glad y'all made it back.  Y'all be
22    seated.
23              I'm losing my voice.  I thought about saying one
24    means sustain, two means overruled, but I think I can get my
25    voice out.  I'll do that.
```

```
 1                    So, you know, hang in there.

 2                    Here we go.  Mr. Philbin.

 3                    MR. PHILBIN:  Thank you, Your Honor.

 4                    THE COURT:  You have a new box, Mr. Philbin.  That's

 5   a different box.

 6                    MR. PHILBIN:  In fact I do, Your Honor.

 7                    THE COURT:  Oh, wow.  Okay.  Go ahead.

 8            PALMER LUCKEY, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

 9                       DIRECT EXAMINATION RESUMED

10   BY MR. PHILBIN:

11   Q.   Let's start right there.  Good morning, Mr. Luckey.

12   A.   Good morning.

13   Q.   Is this the right box?

14   A.   It's the same type of box that I used to ship my Rift

15   prototype to Mr. Carmack.

16   Q.   Very good.  So everything that you shipped to Mr. Carmack

17   fit in this box, correct?

18   A.   That's correct.

19   Q.   Outstanding.  Glad we could get that cleared up.

20                    Yesterday you testified that you were an engineer

21   working in a university VR research lab, correct?

22   A.   ICT, the Institute For Creative Technologies is an

23   army-affiliate research lab at the University of Southern

24   California where virtual reality is one of several things that

25   are studied.
```

1    Q.    You don't have a degree in electrical engineering, do you,
2    sir?
3    A.    I didn't say I was an electrical engineer.  But no, I
4    don't have a degree in electrical engineering.
5    Q.    In fact, you don't have any engineering degree at all, do
6    you, sir?
7    A.    I do not.
8    Q.    In fact, you don't have a degree at all, do you, sir?
9    A.    No.  I dropped out partway through to start my company.
10    Q.    All right.  Let me take you to May 2012.
11            And on May 21st, 2012, you asked Mr. Carmack if it
12    would be possible for him to share some of his demo code that
13    ran on the prototype as he modified it, correct?
14    A.    I would have to see the document, but I believe John --
15    John was the one who offered to send it to me, yeah, not that I
16    requested it from him.
17            MR. PHILBIN:  Mr. Frank, could we see PX181, please,
18    sir?
19            I believe that's been preadmitted, Your Honor.
20            If you would blow up that paragraph at the top?
21    BY MR. PHILBIN:
22    Q.    This is a Meant to Be Seen message between you and
23    Mr. Carmack, correct, Mr. Luckey?
24    A.    Yes, it is.
25    Q.    So on Monday, May 21st, at 8:07 p.m., you, PalmerTech,

1    write to Mr. Carmack, correct, sir?

2    A.   Yes, I did.

3    Q.   And you said, "You mentioned before that you might be able

4    to share some of your demo code," and you asked, "will that end

5    up being possible?"  Correct, sir?

6    A.   Yes.  This was in response to a message that John had sent

7    asking me if I would be interested in having some of his demo

8    code.

9    Q.   And I was just asking you if you asked the question.

10   Okay?

11   A.   Yep.  I just want to make clear the context since we're

12   only showing this one message and not the rest in the long

13   chain between John and myself.

14   Q.   The demo code you were referring to was the VR testbed

15   software, correct, sir?

16   A.   I was referring to the VR testbed executable, which I

17   think was in one of the other messages that you can't see right

18   now.

19   Q.   And the next day Mr. Carmack told you that you would need

20   to sign a nondisclosure agreement before he could send you

21   anything, correct, sir?

22   A.   He said something like that.  I believe he said he needed

23   to check with corporate and see -- see -- see about an NDA.

24           MR. PHILBIN:  Mr. Frank could we see PX1066, please?

25           Would you highlight those first two sentences at the

```
 1    top of the page there?
 2    BY MR. PHILBIN:
 3    Q.    And Mr. Carmack -- I'm sorry, Mr. Luckey, if there is any
 4    part of these messages that you need to explain, your lawyer
 5    has access to all of them and she can show you everything in
 6    there.  Okay?
 7    A.    I understand that.  I just want to make sure that I
 8    accurately describe the context of my replies so that they're
 9    not taken to mean something that they do not mean, which is
10    easy to do when there is only one line there.
11    Q.    So next day after you wrote on May 22, 2012, Mr. Carmack
12    writes you back.  First thing he says is "Unsurprisingly,
13    ZeniMax would like to get you sign an NDA before I send you
14    anything," correct?
15    A.    I'm not sure if that's first thing he said in response.  I
16    think that might be a message or two later, but I'm not sure.
17    Q.    Okay.
18    A.    He did say this at some point in the chain.
19    Q.    That's the first thing in this message.  Can we agree on
20    that?
21    A.    Yes.  That's first thing in this message.
22    Q.    And then he said, If you don't mind, send me your direct
23    email address, and I'll have ZeniMax's legal counsel send you
24    an NDA, correct?
25    A.    That's right.
```

1    Q.    All right.  And then three days later -- two days later --

2    two days later, Mr. Carmack sent you an email indicating some

3    of the information ZeniMax would need to prepare the

4    nondisclosure agreement, correct?

5    A.    That sounds right.

6    Q.    Okay.

7          MR. PHILBIN:  Could we see PX2?  If we could look at

8    the second page, Mr. Frank.

9    BY MR. PHILBIN:

10   Q.    So starting here in the middle of the page, on Thursday,

11   May the 24th at 7:33 a.m., Carmack wrote, "Palmer's email

12   address is PalmerTech@gmail.com.  I'm copying him on this

13   email."  Correct?

14   A.    Yes.

15   Q.    So he sent you Mr. Lesher's email below, correct?

16   A.    I don't think that he sent me his email.  I am cc'd on the

17   email that he sent to Grif Lesher.  So I think John was

18   emailing Grif Lesher and I was cc'd on that email.

19   Q.    Understood.

20          And you understood that Mr. Lesher was looking for

21   your name; address, city, state, ZIP; telephone; email; and if

22   you have a company, the state of incorporation and contact for

23   notices, correct?

24   A.    That's right.

25   Q.    And in response, you sent back -- if we scroll up -- you

1    sent back information:  Palmer Luckey, 6301 East Seaside Walk,

2    Long Beach, California, with your email address, correct?

3    A.   I did.

4    Q.   You did not provide any information about a company, did

5    you, sir?

6    A.   No, I did not.

7    Q.   But yesterday you testified that you had publicly

8    announced that you had founded Oculus as early as March 2012,

9    correct?

10    A.   That is actually not what I said.  I said that I had

11    started using the name Oculus in March.  I didn't say that I

12    was -- I didn't say what it was that you said.  But I did

13    actually establish it as a limited liability corporation, I

14    think, in June of 2012.

15            MR. PHILBIN:  Mr. Frank, could we put up the trial

16    testimony from yesterday at page 127, lines 9 through 20,

17    please, sir?

18            I asked you yesterday:  "By April 2012, you were

19    holding yourself out as the founder of Oculus, correct?"

20            And do you remember you argued with me and said, no,

21    it wasn't April 2012, it was as early as March 2012, right

22    here, your sworn testimony from yesterday, correct?

23    A.   Yes.  And like I explained, I first publicly started using

24    the name Oculus in March of 2012.

25            I was just disagreeing with the idea that I had --

Todd Anderson, RMR, CRR       (214) 753-2170

1    that I was holding myself out as maybe the founder, that I

2    founded Oculus.

3    Q.   Yesterday you testified you publicly announced you had

4    founded Oculus -- that would be founded, right? -- as early as

5    March 2012?

6    A.   It says April 2012, but yes.

7    Q.   The second sentence is when we moved it back to March when

8    you corrected me?

9    A.   Sorry.  I'm only -- I thought you were talking about

10   something on the screen.

11   Q.   I was.  I'm talking about what's on the screen right

12   there.  You're welcome to read it.

13   A.   I thought you were talking -- it says "by April 2012, you

14   were holding yourself out as founder of the Oculus."  I'm just

15   saying that isn't March.

16          Later I said, "I first publicly started using it -- I

17   think it was March 2012, not April."

18          I'm just trying to be clear.

19   Q.   Okay.  Despite your testimony, you didn't tell ZeniMax

20   about any company named Oculus when you responded to

21   Mr. Carmack's email forwarding you Mr. Lesher's request for

22   that information, correct?

23   A.   No, I did not.

24   Q.   Okay.  Now, let's look at the --

25          MR. PHILBIN:  Could we scroll on up, Mr. Frank, in

1    Exhibit 2 to the very first email at the top?

2    BY MR. PHILBIN:

3    Q.   On Sunday, June 3rd, 2012, you sent back a countersigned

4    copy of the nondisclosure agreement, correct?

5    A.   Yes, I did.

6    Q.   And that's when you had signed the nondisclosure agreement

7    and forwarded it back to ZeniMax, correct?

8    A.   That's correct.

9    Q.   Okay.  And in the nondisclosure agreement, you were going

10   to be provided highly confidential and proprietary information,

11   correct?

12   A.   That was one of the things that the NDA covered.

13   Q.   And it covered all of ZeniMax's proprietary computer

14   entertainment software, correct?

15   A.   Not exactly.  It covered those things pursuant to a list

16   of other conditions, such as not being publicly disclosed, not

17   being public knowledge.  It didn't cover all of those things;

18   it covered things specifically that fell under those terms in

19   the NDA.

20   Q.   Okay.

21        MR. PHILBIN:  Mr. Frank, could we see PX2 at page 3,

22   please, sir?

23        Could we highlight the first "whereas" provision?

24   BY MR. PHILBIN:

25   Q.   "The disclosing party has or may provide certainly highly

```
 1    confidential and proprietary information to the receiving party
 2    regarding disclosing party" -- that's ZeniMax's -- "proprietary
 3    computer entertainment software," correct?
 4    A.   Yes, that's what that lines says.
 5    Q.   And then it says, "also including virtual reality testbed
 6    software," correct?
 7    A.   Yes.
 8    Q.   Okay.
 9           MR. PHILBIN:  Mr. Frank, could we scroll down to the
10    proprietary information paragraph, paragraph 1?
11    BY MR. PHILBIN:
12    Q.   And the definition of proprietary information is all
13    information and know-how, regardless of whether it is in
14    writing, of a private, secret or confidential nature that
15    relates to business, technical or financial affairs of ZeniMax,
16    correct?
17    A.   Yes, I see that.
18    Q.   Okay.  Now, the provision that you're relying on is
19    proprietary information shall not include information that,
20    one -- correct?
21    A.   Well, one, two, three, and four.
22    Q.   Okay.
23    A.   But yes.
24    Q.   Let's talk about four.
25    A.   Sure.
```

1   Q.   "Proprietary information shall not include information

2   that is independently developed by the receiving party" -- that

3   would be you, Oculus, correct?

4   A.   Yes.

5   Q.   -- "without reference to or use of the proprietary

6   information."

7           So when Oculus refers to ZeniMax information, it

8   doesn't fall into that exclusion, does it, sir?

9   A.   Sorry, could you repeat the question?

10  Q.   Sure.  When Oculus refers to ZeniMax's confidential

11  information in developing its information, paragraph Number 4

12  of what's excluded doesn't apply, correct, sir?

13  A.   Well, I mean, not necessarily.  It could fall under one of

14  the other disclosures.  And also if we make something, that

15  doesn't necessarily make it covered by the NDA.  It doesn't

16  make our developments covered by the NDA.  It just means that

17  your things are also still covered.

18  Q.   Right.

19          And when you refer to your information or use our

20  information, that doesn't mean it's independently developed

21  pursuant to the agreement you signed, correct, sir?

22  A.   I mean, it still would be independently developed.  It may

23  be independently developed with reference to things, but you

24  wouldn't say it is independently developed especially given

25  that the document says it would be independently developed

 1   using reference.

 2   Q.   Let's look at your duties under the nondisclosure

 3   agreement that you signed on the next page.

 4        Up at the top says duties under Maintenance of

 5   Confidentiality.  You read and understood that, correct, sir?

 6   A.   Yes, I did.

 7   Q.   And the receiving party -- on the second line --

 8   "Receiving party shall secure and keep such proprietary

 9   information strictly confidential."  Correct?

10   A.   That's right.

11   Q.   That was one of your duties under this agreement, correct,

12   sir?

13   A.   Yes, it was.

14   Q.   Another one of your duties there, paragraph 1, you were to

15   "protect and safeguard the proprietary information against any

16   unauthorized use, disclosure, report, transfer, or

17   publication," correct, sir?

18   A.   That's right.

19        MR. PHILBIN:  Now, let's scroll down, Mr. Frank, to

20   ownership.

21   BY MR. PHILBIN:

22   Q.   "All proprietary information," that refers back to that

23   definition, correct, sir?

24   A.   I assume so.

25   Q.   And then it says, if we skip down three lines, all

1    proprietary information is and at all times shall be the

2    exclusive property of ZeniMax, correct, sir?

3    A.    That's right.

4              MR. PHILBIN:  So could we go to the next paragraph,

5    Mr. Frank, "no rights or licenses granted"?

6    BY MR. PHILBIN:

7    Q.    In this paragraph, you, the receiving party, do not

8    acquire pursuant to this agreement any right whatsoever in the

9    proprietary information, correct?

10   A.    That's right.

11   Q.    You don't -- you don't acquire any right in any trademark,

12   copyright, or trade secret, any other right now or later

13   recognized, correct?

14   A.    I mean, you used a bunch of legal terms, and I don't want

15   to try to say yes or no to all of them all in one question, but

16   I understand I think generally what you're saying.

17   Q.    They're right there in that paragraph you read,

18   understand, and signed, correct, sir?

19   A.    No.  I mean, you used a lot of words like you don't have

20   any rights to trade secrets which -- no, you're right.  That is

21   there.  My apologies.  Yes.

22   Q.    "Trademark, copyright, trade secret, and any other right

23   now or later recognized."

24              That's all language out of the agreement you read and

25   signed, correct, sir?

```
 1    A.    That language is, yes.

 2    Q.    And then it goes so far as to say "of any jurisdiction

 3    throughout the universe."

 4    A.    I do see that, yes.

 5    Q.    You understood what that meant when you signed it,

 6    correct?

 7    A.    Yes, I did.

 8    Q.    Okay.

 9          MR. PHILBIN:  Let's turn to the next page and look at

10    the term of this agreement.

11    BY MR. PHILBIN:

12    Q.    The term of the agreement shall commence on the effective

13    date, and the effective date was May 24, 2012; is that correct?

14    A.    That sounds right.

15    Q.    Okay.  "And it shall continue in perpetuity."

16          That's forever, correct, sir?

17    A.    Yes.

18    Q.    Okay.  Now, to the extent this agreement can be amended,

19    it had to be in writing, right, sir?

20    A.    I'm not sure about that.  That wouldn't surprise me if

21    this were in here.

22    Q.    Okay.

23    A.    I think that there was a section about defining the proper

24    term or the proper use by writing, but I don't remember the

25    exact details.
```

 1              MR. PHILBIN:  Mr. Frank, could we see the very next

 2   paragraph, paragraph G?

 3   BY MR. PHILBIN:

 4   Q.   "Amendments in writing."  No amendment or modification of

 5   any term of this agreement shall be valid or binding unless

 6   it's in writing and executed on behalf of each party, correct?

 7   A.   Yes, I see that.

 8   Q.   So to the extent there is any amendment or modification to

 9   the nondisclosure agreement, you understood when you signed it,

10   it had to be in writing and signed by ZeniMax, correct, sir?

11   A.   I did.

12              MR. PHILBIN:  Let's go to the last section about

13   export.

14   BY MR. PHILBIN:

15   Q.   That means you can't take the information you received out

16   of the country.  Did you understand that correct, sir?

17   A.   I think you're representing it as something different than

18   just that, but we can take a look.

19   Q.   Okay.  Let's look.

20              Export.  Paragraph N.  "The receiving party" on the

21   third line, that's you, right?

22   A.   Yep.

23   Q.   "Agrees not to import, export or re-export any proprietary

24   information of ZeniMax," correct?

25   A.   Yes, I see that.

1    Q.    "Without first obtaining express permission to do so from

2    ZeniMax," correct?

3    A.    Well, you skipped the line "where restricted and/or

4    controlled by law or regulation."

5    Q.    I did.  And I published to the jury right up there.

6    A.    I just wanted to make clear, what you said is that the

7    export clause means that you can't export, which means taking

8    it to another country.

9            I'm just pointing out that the line you skipped right

10   there, where you jumped from one part of the sentence to the

11   other says "where restricted by and/or controlled by law or

12   regulation."

13           I just -- it didn't just say that I can't export it

14   without permission.  It says to any country, what's regulated.

15           For example, clauses like this are often used to make

16   sure that we don't export things to our enemies.  I don't want

17   to name any, but there's a lot of countries where certain

18   things, exports are regulated, and the Government says you

19   can't send such and such there.  There's laws saying you can't

20   send such and such there.

21           So I just want to make that distinction, that the

22   part of the sentence you've left out there is actually really

23   critical to understanding what the one sentence we're talking

24   about says.

25   Q.    And you don't have a law degree, right, sir?

```
 1   A.   No, I definitely do not.  I'm just explaining my

 2   understanding of it and pointing out that, you know, I can't

 3   answer your question accurately leaving out just seven or eight

 4   words --

 5   Q.   Okay.

 6   A.   -- of a sentence.

 7   Q.   Understood.

 8           And we can agree that ZeniMax owns all the

 9   proprietary information covered by the nondisclosure agreement,

10   correct, sir?

11   A.   Yes, we can.

12   Q.   You agreed that your relationship with ZeniMax was one of

13   trust and confidence, correct, sir?

14   A.   That sounds right.

15   Q.   And ZeniMax trusted you, right, sir?

16           MS. WILKINSON:  Objection, foundation.

17           THE COURT:  I'll -- if he knows.

18           Excuse me.

19           THE WITNESS:  I don't really have any knowledge of

20   whether or not ZeniMax trusted or not.  I mostly worked with a

21   few people at id Software.  I wasn't really in touch with their

22   parent company.

23   BY MR. PHILBIN:

24   Q.   Okay.

25           MR. PHILBIN:  Can we go back, Mr. Frank, to PX2?  The
```

 1    third page, please, sir.  The second whereas provision, first
 2    line.
 3    BY MR. PHILBIN:
 4    Q.    The parties understand that their relationship is one of
 5    trust and confidence, sir, correct?
 6    A.    I see it says that.
 7    Q.    And by both sides signing this agreement, they were
 8    agreeing that it was a relationship of trust and confidence,
 9    correct?
10    A.    Yes.
11    Q.    ZeniMax trusted you to secure and keep its confidential
12    information and software strictly confidential, correct?
13    A.    I assume so, based on this document.
14    Q.    Now, let's talk about who you told about the nondisclosure
15    agreement.  Okay?  The nondisclosure agreement I'm referring to
16    is the one we just went through.  Do you understand?
17    A.    Of course.
18    Q.    Okay.  Now, you told Mr. Iribe about the nondisclosure
19    agreement you signed with ZeniMax before he came onboard with
20    Oculus, correct?
21    A.    I told him about it at some point.  If it was before he
22    signed on, that sounds right.
23    Q.    Do you remember being asked that question in your
24    deposition?
25    A.    No, not particularly.

```
 1    Q.    Okay.
 2    A.    Sorry.
 3              MR. PHILBIN:  Mr. Frank, could we see Mr. Luckey's
 4    deposition on January 26, 2016, page 355, line 21 through 356,
 5    line 2?
 6              MS. WILKINSON:  Your Honor, I'm going to object to
 7    the improper impeachment.
 8              My understanding is you can show it to the witness or
 9    read it but not put it up on the screen.
10              THE COURT:  Yeah.  Let him see it first to make sure
11    you set it up right.
12              MR. PHILBIN:  May I approach, Your Honor?
13              THE COURT:  Yes, sir.
14              MR. PHILBIN:  Thank you.
15    BY MR. PHILBIN:
16    Q.    There you are, sir.  I believe that's your sworn testimony
17    in this case.
18              Would you look at page 355, towards the end of the
19    page?
20    A.    Sure.  Give me just a moment.
21    Q.    Certainly.
22              (Pause)
23    A.    All right, sir.  I'm on page 355.
24    Q.    Okay.  Line 21.
25    A.    Yep, I see this.
```

```
 1   Q.   You were asked under oath, "Who is the first person at
 2   Oculus you told that you had an NDA?"
 3            And your answer was, "I think I probably -- Brendan
 4   and Nate and Michael."
 5            Correct?
 6   A.   It was actually I think probably Brendan, Nate, and
 7   Michael, but yes.
 8   Q.   Okay.  And Brendan is Brendan Iribe, correct?
 9   A.   Yes.
10   Q.   Nate is Nate Mitchell, correct?
11   A.   That's right.
12   Q.   Michael is Michael Antonov?
13   A.   Yes.
14   Q.   And then you were asked, "And when did you tell them
15   that?"
16   A.   Yes.
17   Q.   And your answer was, first, "I have no idea.  I think it
18   was -- I think it was before they came onboard with the
19   company."
20   A.   I just want to be clear.  You said -- when -- you saying
21   "and first" is not part of my testimony.  That's just you
22   saying that.
23   Q.   You said -- just read for the jury what you said.
24   A.   That would be easier.
25            "I have no idea.  I think -- I think it was before
```

```
 1   they came -- I think it was -- I think it was before they came
 2   onboard with the company."
 3   Q.   So it's your best recollection that you told Mr. Iribe,
 4   Mr. Mitchell, and Mr. Antonov about the nondisclosure agreement
 5   you had signed with ZeniMax before they came onboard with your
 6   company Oculus, correct?
 7   A.   That's my best recollection.
 8              THE COURT:  Stop.
 9              MS. WILKINSON:  I'm going to object.  The
10   impeachment, there's two more lines right there that he didn't
11   answer.
12              THE WITNESS:  Yeah.  I mean, later it says, "Sometime
13   around July 4th?"
14              And I said, "Like I said, I don't remember at all.
15   And when you asked me now, I told you it wouldn't surprise me.
16   That sounds right."
17   BY MR. PHILBIN:
18   Q.   Okay.  Final answer?
19   A.   Yes, that's my final answer.
20   Q.   In fact, you think that everyone at Oculus has seen the
21   NDA you signed with ZeniMax, correct?
22   A.   Well, now that it's part of the case, I'm sure, but I
23   probably wouldn't have said that at any other point.  I mean,
24   Oculus has a lot of people.
25   Q.   Why don't you look at your sworn testimony there on
```

1    January 26, 2016, on page 355, lines 16 and 17, sir.

2    A.    Sure.

3             (Pause)

4    Q.    Weren't you asked the question, "Who at Oculus has seen

5    this NDA?"

6             (Pause)

7    A.    Yes, I do see that.  If that's an accurate transcript,

8    then I probably just misspoke.  I said "I think everyone at

9    Oculus."  I'm not sure what I meant in the context of that

10   conversation.  I don't think I meant literally everyone at

11   Oculus.

12            Oh, it says, "Who at Oculus has seen this NDA?"

13            And I said, "Well, I think everyone at Oculus."

14            I was probably referring to the fact that by the time

15   we took this deposition the NDA was a matter of public record.

16   Q.    Your sworn testimony that contradicts what you just said

17   on the stand on January 26, 2016, was that you think everyone

18   at Oculus had seen this NDA by the date of your deposition,

19   correct, sir?

20   A.    I'm sorry.  What's the contradiction?

21   Q.    Because you just said earlier, before I showed you your

22   deposition, that not everyone had seen it before this trial.

23   A.    Well, that's right.  But you didn't ask me about before

24   this trial.  In this document you said who has seen the NDA and

25   I said, "Well, I think everyone at Oculus."

```
 1              I don't think there is a contradiction there.  You
 2    were asking me here just generally who has seen this NDA.  You
 3    asked very specifically now about who had seen it in time.
 4    There is no contradiction there.
 5    Q.   You think the NDA you signed with ZeniMax was general
 6    knowledge amongst Oculus, correct?
 7    A.   I didn't say general knowledge among Oculus.  I said that
 8    it was a matter of public record at that point, and people in
 9    public could go and see this NDA.  So yeah.
10    Q.   Would you look at your deposition on page 356, lines 8
11    through 16 and see if you didn't testify before that you
12    thought it was general knowledge among the company.
13              (Pause)
14    A.   Again, can we be clear about the date here?  When I
15    responded to that, you were just asking in general.  If we're
16    talking about, you know, at a particular time period, then that
17    answer obviously isn't going to apply.
18    Q.   Well, let's talk about that date.
19              You could only testify at your deposition, January, a
20    year ago, what you knew a year ago, right?
21    A.   That's correct.
22    Q.   So whatever happened in the last year wouldn't have been
23    someone you told and testified about at your deposition a year
24    ago, right?
25    A.   I'm not sure I understand the question.  Sorry.  Could you
```

1    repeat that?

2    Q.    Sure.

3            January of last year, the only thing that you're

4    testifying about is who you had told as of that date, right?

5    A.    Well, no.  I was testifying in general about things I

6    knew.  I didn't say that I had told people about the NDA.

7            You asked who had seen the NDA.

8    Q.    Right.

9    A.    By the time you asked that -- let's be clear.  You asked

10   me who had seen this NDA.  I could be incorrect because this

11   was a year ago, and this has been a long -- a long process, but

12   my understanding is that when you asked me that question, who's

13   seen this NDA, the NDA was a matter of public record.  Anyone

14   could know about it, including all the companies -- employees

15   of Oculus who understandably are following this trial closely.

16           I don't understand how me saying a year ago that I

17   think everyone at Oculus has seen it, at that point,

18   contradicts me saying that nobody except Brendan, Nate, and

19   Michael had seen it at another point.  That was three --

20   three -- I think three-plus years earlier.

21           MR. PHILBIN:  Objection, nonresponsive.

22           THE COURT:  I think he's trying to answer it.

23           Overruled.

24   BY MR. PHILBIN:

25   Q.    You agree that the NDA bound you, Palmer Luckey, correct?

```
 1    A.   Yes, I do.
 2    Q.   And you agree that the NDA bound your officers, directors,
 3    employees, and counsel, correct?
 4              MS. WILKINSON:  Objection, foundation.
 5              THE WITNESS:  That sounds right.
 6              THE COURT:  Overruled.
 7    BY MR. PHILBIN:
 8    Q.   When you signed the nondisclosure agreement, Oculus was
 9    you, correct?
10    A.   I was doing business under the name Oculus.  I didn't
11    actually have any kind of formal entity formed around it yet.
12    Q.   Would it be fair to say that as of the time of the NDA,
13    Oculus was you and you were Oculus?
14    A.   That seems pretty fair.
15    Q.   And just so we're clear on the -- who you told when, we
16    can agree that you told Mr. Mitchell, Iribe, and Antonov in
17    July 2012, correct?
18    A.   Like I said, I'm not sure, but I think probably Brendan
19    and Nate and Michael, but I don't remember doing that.
20    Q.   Okay.  And after signing the NDA and after receiving
21    confidential information from ZeniMax -- you agree with that,
22    right?
23    A.   Yes.
24    Q.   -- one of first things you did with the confidential
25    information you received from ZeniMax was take it to a hotel
```

1    room and demonstrate it, correct?

2    A.    I mean, I signed the NDA in May.  The event you're talking

3    about is in July.  It's several months later.  I just

4    wouldn't -- I just disagree with the description of "one of

5    first things you did."  I did a lot of things related to VR and

6    not related to VR between when I signed and when I made that

7    demonstration.

8    Q.    So it your testimony you did a lot of things with the

9    proprietary information you received from ZeniMax --

10   A.    No, that's not --

11   Q.    -- between the time you received it and the July 4th hotel

12   room meeting?

13   A.    That's not what I said.  I said I did a lot of things with

14   VR and non VR.

15          I was just responding to you question you said --

16   Q.    Now let me be clear --

17   A.    -- "and one of the first things you did" -- excuse me.

18          THE COURT:  One at a time.

19   A.    You said, one of the first things you did after receiving

20   the confidential information was give this demonstration.  I

21   just -- I want to make sure people understand that that was in

22   May and that the event you're talking about is in July.  It

23   wasn't one of the first things I did.

24   Q.    One of the first things you did with the information you

25   received from ZeniMax that you agreed was proprietary was to go

1    show it at a hotel room in July 2012, correct?

2    A.    Again, I don't really agree with the characterization of

3    the first, even if we're just talking about that information.

4    I had been using it.  I had viewed it on several head-mounted

5    displays.  Again, this was May to July.  It's quite a bit of

6    time.

7             I don't disagree there was a demo.  I just don't want

8    to go on the record agreeing with you saying that it was the

9    first thing I did or even one of first things I did.

10   Q.    Without question, you took the confidential code that you

11   received from ZeniMax, in July you took it in a hotel room and

12   you displayed it, correct?

13   A.    Well -- the way you're describing it isn't exactly

14   accurate.  I didn't take confidential code and show it to

15   people.

16            It was an executable application, basically a copy of

17   a game, and that runs on a computer, a PC, which is then

18   plugged in to a headset and you're able to basically play that

19   game using the headset.

20            What I did was I took that executable, I ran it, and

21   I demonstrated it through the headset.

22            I'm just trying to be clear, because it is not really

23   accurate to say I took the code and then I showed it to people

24   in a hotel room.  That's -- it's -- it's a very odd way of

25   looking at showing off an executable through a display.

 1    Q.    The demonstration that you did on Independence Day in 2012

 2    was to potential investors, your first demonstration to

 3    potential investors of Oculus, correct?

 4    A.    By the time that I showed it to Brendan in particular, he

 5    was -- he was already onboard, so I guess I just wouldn't say

 6    potential investor given that he had already started putting

 7    money toward this and was already -- you know, onboard for

 8    working with me.

 9    Q.    Okay.  July 4, 2012, the demonstration was to investors

10    and potential investors, correct?

11    A.    I mean, again, I think Brendan was the investor, I

12    don't -- I think Michael may have invested money in Oculus

13    later.  I don't believe Nate ever did.

14          Anyway, I -- I don't know.  They might have -- you

15    probably could consider them potential investors, I guess.

16    Q.    And the demonstration that you did was utilizing

17    information that you received pursuant to the nondisclosure

18    agreement from ZeniMax, correct?

19    A.    Yes.  The VR testbed.

20    Q.    You know Mr. Altman, correct?

21    A.    I wouldn't say that.

22    Q.    You've never met with Mr. Altman?

23    A.    You know, I don't have any recollection of ever meeting

24    with Mr. Altman.  I know that there is dispute about that.

25          If I have met with him, I don't remember meeting with

1    him.

2    Q.   id invited you to come to QuakeCon in 2012, correct?

3    A.   Yes.  John Carmack wrote to me asking if I would like to

4    come to QuakeCon and show Doom on my virtual reality headset

5    prototypes.

6    Q.   QuakeCon is id's gaming convention right here in Dallas,

7    correct?

8    A.   That's right.

9    Q.   It's a gathering of thousands, sometimes tens of thousands

10   of gamers; is that right?

11   A.   That sounds right.

12   Q.   And in connection with your -- well, let me back up.

13        You came to QuakeCon in 2012, correct?

14   A.   Yes, I did.

15   Q.   And it's your sworn testimony that in August of 2012, you

16   did not meet with Mr. Altman sitting right here; is that

17   correct?

18   A.   That's not what I said.  What I said is if I have met with

19   Mr. Altman, I really just don't remember meeting with him.  It

20   may have happened at some point.  I'm not -- I'm not disputing

21   that here.  I'm just saying that I don't remember.

22   Q.   You don't recall a private meeting with Mr. Altman at the

23   hotel where QuakeCon was taking place in 2012, correct?

24   A.   I recall having a meeting with several people,

25   including -- including id staff at QuakeCon 2012, but I don't

 1    know if Mr. Altman was there.

 2    Q.   So if Mr. Altman takes the stand and testifies that he met

 3    with you in August 2012, is he incorrect or not?

 4    A.   Like I said, I don't know.  I don't remember if he was at

 5    the meeting or not.  I don't have any recollection of

 6    Mr. Altman in particular.

 7    Q.   So you don't recall anything that Mr. Altman told you in a

 8    meeting in August 2012 at QuakeCon, correct?

 9    A.   Like I told you, I don't even remember meeting with

10    Mr. Altman.

11            If he was in the meeting, I probably wouldn't dispute

12    it, because I don't really have a recollection one way or the

13    other.

14    Q.   And you don't recall a meeting in 2012, in August, at

15    QuakeCon where Mr. Altman unequivocally stated, "ZeniMax wants

16    to be paid for your use of our technology."  Is that your

17    testimony?

18    A.   Well, I'll split that into two parts.

19            Again, I don't remember meeting with Mr. Altman.  I

20    don't remember that.  But I do remember unequivocally that

21    there was nobody demanding that we pay them for anything.

22    That's not what the meeting was about.

23    Q.   You don't recall meeting with any executive at ZeniMax in

24    connection with QuakeCon where your nondisclosure agreement was

25    discussed.  Is that your testimony?

1    A.    Well, first -- first of all, I don't remember discussing

2    the nondisclosure agreement, so I don't really agree with your

3    characterization there of a meeting where it was being

4    discussed.

5            And there may have been ZeniMax employees there.    I

6    really don't recall Mr. Altman or anyone else being there.

7            I do remember some of the people who were there, and

8    I remember the things that we discussed, but what you're

9    describing, I have no recollection of.

10   Q.    Do you recall any meeting in 2012 or 2013 where Mr. Altman

11   made clear that ZeniMax needed to be compensated for your use

12   of ZeniMax technology?

13   A.    I mean, no.    That wouldn't be consistent with any of the

14   other discussions that we were having with them at the time.

15   Q.    You don't recall any discussions back and forth about an

16   equity stake that ZeniMax would have; is that correct?

17   A.    No, I didn't say that.    We definitely did have discussions

18   about equity stakes.

19           What you're talking about is, you know, they demanded

20   equity in exchange -- that we owed them something for -- for

21   this.

22           We did discuss equity information at some point.    I

23   don't remember exactly when that started, but at one point we

24   were offering them equity in the company in exchange for John

25   formally joining Oculus in an advisory board role or as a

```
 1   technical advisor, and later we offered him the opportunity to
 2   invest in Oculus at the same terms we were offering to lots of
 3   different investors.
 4   Q.   Is it your testimony in the fall of 2012 you did not know
 5   that ZeniMax thought Oculus owed them for Carmack's past
 6   support?
 7   A.   I'm not sure when fall starts and begins.  That wouldn't
 8   be consistent generally with any of the discussions we were
 9   having with id or id employees.
10          I mean, they were using our hardware to demonstrate
11   their game and we were doing the same thing.  It was
12   essentially co-promotion.
13          They get to promote their game, get a lot of media
14   attention; we get to promote our hardware device, get a lot of
15   media attention.
16          The idea that we owed them for this type of
17   collaboration wasn't discussed -- it never came up for a very
18   long time and then it came out of the blue.
19          MR. PHILBIN:  Mr. Frank, could we see PX833, please,
20   which has been preadmitted?
21          Up top this is an email from you on October 19, 2012,
22   correct?
23   A.   Yes.
24   Q.   That's in the fall, right?
25   A.   Yes, it is.
```

```
 1    Q.   And in Dallas, I think fall -- I just call it football
 2    season.  Okay?
 3    A.   This is probably heresy.  I don't really follow football
 4    much, so -- it does not help me with the start and end dates.
 5    But yes, that would be in fall, I think.
 6              THE COURT:  You're right.  That's heresy.
 7              THE WITNESS:  I'm sorry, Your Honor.
 8              THE COURT:  We're going to have to -- we're going to
 9    have to get you trained.  That's all there is to it.
10    BY MR. PHILBIN:
11    Q.   And this email, PX883, is one that you wrote in response
12    to an email from Mr. Iribe dated October 19, 2012, correct?
13    A.   Yes, it seems to be.
14    Q.   And on October 19, 2012, Mr. Iribe was informing you --
15    that's what FYI is, right?
16    A.   Yes.
17    Q.   "The good news is, they seem motivated to do a deal."
18         "They," ZeniMax, correct?
19    A.   Yes.
20    Q.   The bad news is, they seem to think we owe them for
21    Carmack's past support, which Mr. Iribe says you do not,
22    correct?
23    A.   That's correct.
24    Q.   Then it says, "I'm going to draft a response, staying firm
25    at 2 percent."
```

```
 1  A.   Yes.  That was the offer that we made for John joining as

 2  a technical advisor and potentially doing some other things

 3  like integrating virtual reality support and other titles,

 4  which would help drive excitement for our device and their

 5  games.

 6  Q.   So by at least October 19, 2012, ZeniMax's claims hadn't

 7  come out of the woodwork, right?

 8  A.   I mean, you could argue that this -- did you say

 9  October 12 or was this October 19th?

10  Q.   October 19th, 2012.

11  A.   Got you.

12       I mean, I could say no, they didn't before that date.

13  Q.   They didn't make a claim prior to that date?

14  A.   Well, I mean, if you scroll up to my response, I mentioned

15  that they've never made any claim like this, that there's never

16  any kind of agreement like this.  It's not consistent with any

17  of the discussions we've had with them or the relationship

18  we've had with them.  And that's why Brendan is saying, you

19  know, we don't owe them for the past support.

20       The deal was that we were co-promoting and this was a

21  mutually beneficial activity we're participating in.  The

22  2 percent we're talking about isn't us saying, yeah, we think

23  we owe them 2 percent for their past work.  If you go through

24  the rest of the email chains and the documents, you'll see that

25  it's for -- the 2 percent is a proposal for John joining and
```

```
 1    doing work in the future as a technical advisor and helping
 2    port id and ZeniMax and Bethesda software to our headset.
 3               MR. PHILBIN:  Mr. Frank, can we scroll up in this
 4    PX883?
 5    BY MR. PHILBIN:
 6    Q.   Let me ask you, Mr. Luckey, do you tell the truth when you
 7    write emails to your fellow Oculus founders?
 8    A.   Yes, I do.
 9    Q.   So is it your testimony that the statements you made to
10    your founders in PX883 were true and correct at the time?
11    A.   Yes.
12    Q.   Okay.  ZeniMax never suggested to you that they were some
13    sort of charity, giving away their work, did they?
14    A.   No.  They're in the business of selling video games.
15    Q.   ZeniMax made clear at least by the fall of 2012 that they
16    wanted a satisfactory business arrangement in return for
17    ZeniMax helping Oculus, correct?
18    A.   They -- they wanted -- they wanted -- there were terms
19    they were offering.  I wouldn't describe them as satisfactory
20    or reasonable, but they were looking for some kind of
21    compensation.
22    Q.   And from August 2012 for the next five or six months,
23    ZeniMax was consistently and continually demanding to be paid
24    for its VR work and its past support of Oculus, correct?
25               MS. WILKINSON:  Objection, foundation.
```

```
 1                    THE WITNESS:  No, I wouldn't agree with that.
 2                    THE COURT:  Overruled.
 3                    THE WITNESS:  I mean, we started working with
 4       ZeniMax -- I mean, depending on the way you look at it, but if
 5       we just want to go with the August timeline, no, I wouldn't say
 6       they were continuously demanding compensation from August for
 7       the next six months.
 8                    We just saw this email.  This was the first time they
 9       had ever asked for any kind of compensation for past work.
10       That was -- was it October 29th?  That was the very end of
11       October, so I definitely can't agree that they were
12       continuously asking for compensation.  This was something that
13       came down from ZeniMax corporate out of the blue and they, I
14       believe, were trying to list all these expenses, for example,
15       that they had spent on their booth at E3 and somehow saying
16       that we were responsible for that, and that -- that was a new
17       thing, not a continuous demand.
18       BY MR. PHILBIN:
19       Q.    ZeniMax's demands for payment led to friction in the
20       relationship between Oculus and ZeniMax, correct, sir?
21       A.    You could say that.
22       Q.    And when, ultimately, no business arrangement was reached
23       between Oculus and ZeniMax, that relationship ended, correct,
24       sir?
25       A.    That's right.
```

Q.   But yet you continued to use everything you had received
from ZeniMax, didn't you, sir?

A.   I mean, by the time -- you're talking about friction in
the relationship and it falling apart.  By the time -- by the
time that things fell apart, no, we weren't using anything that
id had ever sent us.

At this point Doom 3 BFG Edition had come out
already, so promoting it wasn't really a top proprietary on
their end, and on our end we had honestly much better software
to show.  I don't think we were still showing it at the point
that the relationship kind of broke apart.

Q.   Let's go back to PX883 that you just testified was
truthful.

Do you see in the second paragraph the parenthetical
at the end of it?

A.   Yes, I do.

Q.   What did you say in truth to your fellow founders of
Oculus on Friday, October 19th, 2012?

A.   I said, "which was shown at E3 without me even knowing."

Q.   That means that the headset that you sent to Mr. Carmack
and that he modified you told your partners was shown at E3
without you even knowing, correct?

A.   Yes.  That's within this email.  If you show some of the
other messages that give context around this, because, you
know, this is one email quickly describing it -- I'm not trying

```
 1   to speak ill of John in here at all.  I mean, I'm just pointing
 2   out the situation.
 3          John had said that he was going to be showing it in a
 4   few private demos during E3, and, you know, as we all know, it
 5   kind of blew up and turned into something much bigger.  He
 6   showed it to a ton of press.  He stayed an extra day to keep
 7   showing it to the press.
 8          So I understand what you're getting at.  You could
 9   say strictly speaking that this is not the best way to describe
10   that, but probably the better way would be to say that he
11   showed it at E3 in a way that I didn't expect without --
12   without knowing.
13          I didn't know it was going to blow up like that until
14   basically my friends started texting me while I was at another
15   trade show.
16   Q.   When you said "without me even knowing," that wasn't
17   exactly true, was it?
18   A.   No.  Like I said, I probably could have described that
19   better.  To the people who are on this chain who are familiar
20   with this situation and knew the context, I -- I think they
21   knew what I meant.
22   Q.   Mr. Carmack told you before you even sent him a headset
23   that he was going to demo it at E3, correct, sir?
24   A.   Yes, that's right.  He said that he was going to do a few
25   private demos at E3.
```

1  Q.   And then when you sent the headset to Mr. Carmack, he told

2  you it should be good for getting your E3 stuff -- I'm sorry --

3  you told him it should be good for getting your E3 stuff

4  running, correct?

5  A.   Yes, referring to those same memos.

6  Q.   Okay.  And then after you sent him the headset,

7  Mr. Carmack again told you that he would be doing showings on

8  Monday at E3, correct, sir?

9  A.   Yes, he did.

10 Q.   So he told you he was going to be -- showing demos at E3

11 before you sent him the headset, after you sent him the

12 headset, and prior to E3, correct?

13 A.   Again, I'm not disputing that.  He told me that he would

14 be giving a few private demos.

15        I probably could have described it better, but, you

16 know, but for the people in the chain -- there is only, what,

17 three or four people -- all of them knew the context of this

18 stuff.

19        And this was responding to ZeniMax saying, you know,

20 we had -- oh, you know, we should be compensated for this.  You

21 know, we are the reason that this happened.  And we're saying

22 wait a sec.

23        I mean, there's -- you guys were showing our thing in

24 a way that, you know, we never agreed to.  We didn't have any

25 problem with that.  I'm not speaking ill of John or anyone else

```
 1    at id.  The point is that there was no kind of agreement or
 2    communication about how that went down.
 3            But I agree that probably wasn't the best way to
 4    communicate that, especially to someone without all of the
 5    context.  But if you go through all the other email chains, the
 6    three or four people on that chain knew exactly what I was
 7    talking about, and there is a reason nobody came and said
 8    "What?  John never had permission?"  That was not what I was
 9    trying to get across to them at all.
10            MR. PHILBIN:  Your Honor, I have a housekeeping
11    matter.  We're going to finish, but let me get back to that.
12    BY MR. PHILBIN:
13    Q.   On January 30, 2013, towards the end of the relationship
14    with ZeniMax and Oculus, you wrote to Mr. Carmack, correct?
15    A.   That wouldn't surprise me.  I'm not sure which
16    communication you're referring to.
17    Q.   Sure.
18            MR. PHILBIN:  Mr. Frank, could we see Defendants'
19    Exhibit 1506, please, sir?
20            (Pause)
21    BY MR. PHILBIN:
22    Q.   If we go down to Mr. Luckey's -- this is an email from you
23    dated January 30, 2013, to Mr. Carmack, correct?
24    A.   Yes.
25    Q.   In which you say thanks for all the help, correct?
```

```
 1    A.   Yes.
 2    Q.   And in the body of the email you say, "I want to thank you
 3    for all the help you have given me."
 4         Correct?
 5    A.   That's right.
 6    Q.   And without Mr. Carmack's help, it was your belief on
 7    January 30, 2013, you would still be tinkering away on your
 8    own, correct?
 9    A.   Yes.  The words speak for themselves.
10    Q.   And you were fairly certain on January 30, 2013, that none
11    of this would have happened without Mr. Carmack at ZeniMax's
12    involvement, correct?
13    A.   That is what I said.
14              MR. PHILBIN:  Pass the witness.
15              Oh, and, Your Honor, I would move to admit PX8831066
16    and 181, which are all preadmitted.
17              MS. WILKINSON:  No objection.
18              THE COURT:  Okay.  They're all admitted into
19    evidence.
20              Did you make reference to them?
21              MR. PHILBIN:  I did.
22              Thank you, Your Honor.
23              (Plaintiffs' Exhibits Nos. 8831066 and 181 received)
24              THE COURT:  If you make reference to them and they're
25    already preadmitted, y'all don't have to do anything else, but
```

```
 1    I'm happy to do this if you want me to.  It's just to make sure
 2    you make reference to them during your -- during your
 3    questioning.
 4              Okay.  Here we go.
 5              MS. WILKINSON:  Your Honor, can I have just a minute
 6    to set a few things up?
 7              THE COURT:  You need a break?
 8              MS. WILKINSON:  No.  Just a minute, if you don't
 9    mind.
10              THE COURT:  Yes.
11              MS. WILKINSON:  May I approach, Your Honor?
12              THE COURT:  Sure.
13              (Pause)
14              MS. WILKINSON:  Mr. Luckey, can you see this board?
15              THE WITNESS:  Yes, I can.
16              (Pause)
17                        CROSS-EXAMINATION
18    BY MS. WILKINSON:
19    Q.   Mr. Luckey, I want to go back to the beginning, how it all
20    started, but I do want to clear up some language I think that
21    you weren't allowed to read, and counsel said I can show it to
22    you, so let's do that.
23              Let's --
24              MS. WILKINSON:  If we could have the ELMO, please.
25    BY MS. WILKINSON:
```

```
 1   Q.   And we're going to look at PX2, the nondisclosure
 2   agreement.
 3            Do you recall talking about that with counsel?
 4   A.   Yes.
 5   Q.   All right.  Let's take a look.  You said that some of the
 6   information would not qualify as proprietary information under
 7   these clauses, right?
 8   A.   Yes.
 9   Q.   And Mr. Philbin I think only read you the last one, right?
10   A.   I think he -- yes.  I think that he just jumped straight
11   to the fourth one.
12   Q.   Okay.  So let's use this if we could.
13            It specifically says proprietary information shall
14   not be included as information protected, right, if it had
15   become public -- it has public knowledge through legal means
16   without fault by the receiving party, right?
17   A.   If you could shift it over a little bit.
18   Q.   Sorry.
19   A.   I think -- we can't see the start of the document.  Maybe
20   zoom out a little bit.
21            MS. WILKINSON:  This is probably why I should have
22   Dave do it.
23            Dave, do you think we can pull it up on the --
24            THE COURT:  Well, you can make that thing --
25            MS. WILKINSON:  A little smaller.
```

```
 1              THE COURT:  -- reduce down a little bit.
 2              MS. WILKINSON:  All right.  Let me try that.
 3   BY MS. WILKINSON:
 4   Q.   How's that?  Can you see that?
 5   A.   Yep, now I can see it.
 6   Q.   All right.  So that's number one, right, that if it has
 7   become public knowledge, right?
 8   A.   Yes.
 9   Q.   And you were given the Doom VR testbed, right?
10   A.   I was -- it was a VR --
11   Q.   Not Doom.  The VR testbed -- sorry -- of Rage, right?
12   A.   Yes.  Those are separate applications.
13   Q.   Okay.  And did Mr. Carmack show that at the QuakeCon
14   convention publicly that Mr. Philbin was talking to you about
15   in August of 2012?
16   A.   I believe so, but you would have to ask Mr. Carmack.
17   Q.   Okay.  And did he show Doom 3 BFG at E3 convention and at
18   QuakeCon?
19              MR. PHILBIN:  Objection, foundation.  I believe the
20   witness has testified he wasn't even at E3.
21   BY MS. WILKINSON:
22   Q.   If you know.  Do you know?
23              THE COURT:  If he knows.
24   BY MS. WILKINSON:
25   Q.   You saw publicity -- did you see publicity about the
```

1    headset and their game?

2    A.    Yes.  There was a wide range of media outlets posting

3    videos of their experiences playing Doom 3 BFG at E3 using my

4    headset.

5    Q.    And did ZeniMax make Doom 3 BFG public through Mr. Carmack

6    when they showed it at E3?

7    A.    Yes.

8    Q.    And did they do it again at QuakeCon?

9    A.    Yes.  At QuakeCon we were showing it in our booth on my

10   headsets.

11   Q.    You were there, right?

12   A.    Yes.

13   Q.    All right.  Now, so did you consider the VR testbed and

14   Doom 3 BFG showing it, did you consider that public information

15   or proprietary information?

16   A.    They were public information.

17   Q.    All right.  And Number 2 says, "is already public

18   knowledge," in contrast if it ever becomes public.  This means

19   was it already public, right?  That's a different phrase,

20   number 2?

21   A.    Yes, that's a separate cause.

22   Q.    Okay.  So it either can become public in the future or it

23   was already, right?

24   A.    Yes.

25              For example, John had been posting about some of his

1    stuff before -- some of it actually before we ever started

2    talking and then some other parts of it before this NDA.  So

3    that would be separate from things that later become public.

4    Q.   So we're going to take a look at that, but he made a lot

5    of things public on the message board that you all were

6    communicating through, that public message board?

7    A.   On that message board, on his Twitter, other means as

8    well, but primarily those.

9    Q.   All right.  And what does it say in number 3?  Can you

10   read Number 3?

11   A.   "Is rightly known to the receiving party free of any

12   obligation of confidentiality prior to the disclosing party's

13   disclosure of the same pursuant to this agreement."

14   Q.   So had you received some information from ZeniMax through

15   Mr. Carmack, through his Twitter, and your posts on the Meant

16   to Be Seen message board before you ever signed this agreement?

17   A.   I mean, I think those would probably fall under 2, which

18   would be, you know, already public knowledge.

19   Q.   Okay.  So at any time did you think you were violating

20   this nondisclosure agreement?

21   A.   No.

22   Q.   And when ZeniMax was working with you-all to show that

23   your game at -- their game and your headset at QuakeCon, did

24   they say this is a violation of the nondisclosure agreement

25   that we take so seriously?

```
 1   A.    No.
 2         The idea that I had violated the NDA was never
 3   mentioned, even when ZeniMax started to talk about wanting
 4   money for -- for things.  And, you know, they wanted money for
 5   compensation basically for -- for marketing, which wasn't
 6   anything we had agreed on.
 7         Even at that point it was never suggested even
 8   casually or in passing that I may have violated the NDA or that
 9   I violated the NDA.
10   Q.    So if Mr. Altman was at QuakeCon, are you aware of him
11   ever saying to you or to anyone else that was working on the
12   demonstration that we cannot show this Doom 3 BFG because it's
13   proprietary, confidential information?
14   A.    Again, I don't remember ever meeting with Altman
15   specifically.  If he was in a meeting, I probably couldn't
16   dispute it, because I wouldn't remember, but I do remember that
17   nobody had ever said that I had violated the NDA.  It was never
18   hinted or suggested or ever brought up as any kind of idea in
19   all the time that we were working with them to promote their
20   games and our hardware.
21   Q.    And did you and other folks at Oculus go off and
22   demonstrate your headset, the Rift, and their Doom 3 BFG game
23   in other places after QuakeCon?
24   A.    Yes, often with the assistance of id employees.
25   Q.    And at that time did any of the id or ZeniMax employees
```

1    ever say to you we can't make this demonstration because this

2    is proprietary, confidential information?

3    A.   No.

4         The closest thing would be they were concerned at

5    some point whether or not we could demonstrate it properly and

6    wanted to make sure that, you know, their game looked good and

7    that the experience was good and that, you know, the demo

8    overall was good, but -- and we did.  You know, we always had a

9    really good -- good working relationship there.

10        But it was never suggested that what we were doing

11   was a violation of the NDA.  It was never suggested that

12   anything we had done was a violation of this NDA.  It was not

13   brought up for I think years.

14   Q.   Okay.  Let's take a look at -- if you could turn around

15   and look at our timeline, we haven't talked about before June

16   2012, and we will.

17        But starting in May when you sent your prototype to

18   Mr. Carmack and throughout 2012 when Oculus and ZeniMax were

19   working together, did any individual from ZeniMax or id

20   Software ever tell you or advise you that you were breaching

21   your nondisclosure agreement?

22   A.   No.

23   Q.   Did you ever get a letter from the general counsel of

24   ZeniMax?

25   A.   No.

```
 1    Q.    You know that Mr. Altman is a lawyer, right?
 2    A.    I know he used to be.  I don't know if he still is.
 3    Q.    All right.  And Grif Lesher, who sent you the
 4    nondisclosure agreement, he says he's a lawyer on that
 5    document, right?
 6    A.    Yes.
 7    Q.    All right.  Who did you work with on a regular occasion
 8    other than Mr. Carmack when Oculus and Rift were working
 9    together in 2012?
10    A.    The two people that I was primarily in touch with were
11    John Carmack and Todd Hollenshead, the president of id at the
12    time.
13    Q.    All right.
14    A.    We also met occasionally with other people, other people
15    from id Software, public relations and from their development
16    teams, but primarily those were the two people I worked with.
17    Q.    And you have email that shows that you and Mr. Hollenshead
18    were in touch, correct?
19    A.    Yes.  We spoke -- we spoke over email and phone and in
20    person.
21    Q.    All right.  And we have some of those emails we can show a
22    bit later in your testimony, but did Mr. Hollenshead ever tell
23    you when you advised him that you were going to demonstrate
24    your headset with Doom 3 BFG that there was a problem with
25    doing that?
```

1    A.    No.   It was never even suggested that that might be a

2    possibility.

3    Q.    All right.   Now, Mr. Hollenshead, do you know if he was

4    involved with the negotiations with ZeniMax and Oculus when you

5    were talking about whether they would invest in your company?

6              MR. PHILBIN:   Objection, calls for speculation, lacks

7    foundation.

8              THE COURT:   If he knows.   Overruled.

9              THE WITNESS:   Yes, I was aware that he was -- that he

10   was part of the negotiations on ZeniMax's side.

11   BY MS. WILKINSON:

12   Q.    All right.   Now, after the negotiations stopped in

13   January or February of 2013, do you know whether

14   Mr. Hollenshead left the company?

15   A.    I'm not sure -- I'm not sure when he left the company, but

16   I've heard that he did leave at some point.

17   Q.    All right.   Has Mr. Hollenshead ever worked for Oculus?

18   A.    No.

19   Q.    So would Mr. Hollenshead have information about the

20   negotiations and what ZeniMax was really trying to get from

21   Oculus?

22             MR. PHILBIN:   Objection, Your Honor.   Again, she's

23   asking for him to speculate what Mr. Hollenshead knows, and it

24   lacks foundation and it calls for speculation.

25             THE COURT:   Yeah.   Just tell us what you know.

```
 1                THE WITNESS:  Sure.
 2                THE COURT:  I'll stop you if I think you're getting
 3     going too far.  Okay?
 4                MR. PHILBIN:  Thank you, Your Honor.
 5                THE WITNESS:  I mean, these were things that we had
 6     discussed with -- with Mr. Hollenshead.  We had discussed with
 7     Mr. Hollenshead.  I really don't have personal knowledge of
 8     those negotiations, but in talking with Mr. Hollenshead, I was
 9     familiar with -- I was familiar with what they were -- what
10     they were hoping for.
11     BY MS. WILKINSON:
12     Q.   Okay.  Great.
13                All right.  Let's go back, if we could, to just your
14     start to give the jury a little bit of a sense of who you are.
15                Start with telling them where you were born and
16     raised.
17     A.   I was born in Long Beach, California, near the port.
18     Q.   Do you have brothers or sisters?
19     A.   Yes.  I have three younger sisters.
20     Q.   What did your folks do for a living?
21     A.   My mother is -- is a stay-at-home mom.  She describes
22     herself as "my kids' mom" and my dad is a car salesman.
23     Q.   Okay.  I think counsel is making fun of you that you don't
24     have a college degree.  That's true, right?
25     A.   I don't know if he was making fun of me for it, but he was
```

1    pointing out that I have not completed -- I have not completed

2    any degree.  I did drop out of college.

3    Q.    All right.  And when you were younger in school, were you

4    a great student when you were a little kid?

5    A.    It depends on the way you look at it.  When I was younger,

6    I was disruptive and had a very hard time focusing.  I think

7    that's a common problem, but for me, it was especially a

8    problem.  And my mom decided to home school me, which worked

9    very well and throughout the rest of my -- my middle and high

10   school career, I maintained high standardized testing scores

11   and I think was a much better student when I was able to do

12   self-guided work and not be in a -- in a traditional classroom

13   environment.  It worked -- it worked very well for me.  It's

14   not for everybody, but it worked well for me.

15   Q.    Did you and your parents come to an agreement about how

16   much time you would spend on school and how much time you would

17   spend on your extracurricular activities that interested you?

18   A.    It wasn't exactly time.  It was more results.

19   Q.    What was -- what was the agreement?

20   A.    The agreement was, roughly speaking, if I could keep my

21   grades up and I basically -- even though I was home schooled, I

22   took -- I took standardized testing every year that is in line

23   with what they use in public and high schools and if I was able

24   to keep my grades up, then I was allowed to spend my time

25   mostly as I wanted.

```
 1              If my grades went down, as they sometimes did,
 2    particularly in -- in things like math and Spanish, then I
 3    really had to get my act together, and they would get on -- get
 4    on for me a little bit until I was able to bring my grades up
 5    in those subjects.
 6    Q.   Did you have other interests outside of school?
 7    A.   Yes.
 8    Q.   Did they start at a young age?
 9    A.   Yes.
10    Q.   Can you tell the jury what were your main interests
11    outside of school?
12    A.   When I was young, I wanted to be an astronaut, but that
13    ended quickly.  After I realized that I could not be an
14    astronaut, I really became interested in electronics and
15    technology, particularly laser systems, high voltage systems,
16    and display systems.
17    Q.   Okay.  Did you develop an interest in those topics pretty
18    early on or at least earlier than most of us would imagine one
19    might?
20    A.   I really became interested in electronics around eight or
21    nine.  That is when I wanted to learn and understand how things
22    worked and how to make new things, and so I started to do as
23    much research as I could and self-teach myself about
24    electronics and hardware and engineering.
25    Q.   How did you started self-teaching yourself?
```

1  A.    Well, it was a different time.  The internet was not

2  commonplace and even if it was, nine-year-olds are usually not

3  on the internet.

4          So I started by working with a lot of the reference

5  materials that were at my local library, so checking out

6  magazines that related to robotics and electronics and lasers,

7  reading books about the same.  Later on when I was in my teens,

8  reading academic articles and journals that published a lot of

9  the most cutting-edge research on some of these topics, just

10  keeping up to date on what the state of the art in the industry

11  was.

12  Q.    And tell me the name of the magazine you told me you

13  remember reading when you were a bit younger.

14  A.    One of the ones that I mentioned, and I think what you're

15  holding, is Nuts & Volts --

16  Q.    Slow down, please, because it is a little hard for us to

17  hear if you're going too fast.

18  A.    Sorry.  I believe the one that you're holding is called

19  Nuts & Volts, which was one of my favorite magazines that I

20  started subscribing to when I was pretty young.

21          It's a magazine for electronics enthusiasts of all

22  kinds, so robotics, lasers, ham radio enthusiasts.  They have

23  got a lot of writers from all those different communities who

24  write articles about the projects they do, why they did them,

25  the science behind them, and that was one of my -- one of my

1    favorite publications.

2            MS. WILKINSON:  Your Honor, I would like to show for

3    demonstrative purposes only DX1899 and DX1900.

4            MR. PHILBIN:  Your Honor, I have not been provided

5    any prior notice of this and I would need to confer with my

6    colleagues.  Had I known this was coming.  They are certainly

7    hearsay.

8            MS. WILKINSON:  I'm sorry, they are on notice.  We

9    did provide notice.

10           MR. PHILBIN:  You just didn't tell me last night

11   about what was coming.

12           MS. WILKINSON:  There you go.  There's copies.  I'm

13   just going to show the front.

14           MR. PHILBIN:  You're just going to show the front

15   cover?

16           MS. WILKINSON:  Yes.

17           MR. PHILBIN:  Sure, that is fine.

18           MS. WILKINSON:  All right.

19           THE COURT:  So has she satisfied your consternation?

20           MR. PHILBIN:  If she's only going to show the front

21   cover from there and not get into any of the hearsay contained

22   within that, I don't have an objection to her for demonstrative

23   purposes only, just showing the front cover, at least two of

24   them.

25           THE COURT:  Okay.  And if she's going to show some

```
 1    articles, I will give you a chance to look at it.
 2              MR. PHILBIN:  Thank you, Your Honor.
 3              THE COURT:  All right.
 4              MS. WILKINSON:  I'm just going to show the cover,
 5    Your Honor.
 6    BY MS. WILKINSON:
 7    Q.   Mr. Luckey, did I ask you or did we ask to go find these
 8    to make sure the magazines existed?
 9              THE COURT:  Those covers are admitted for
10    demonstratives purposes.
11    BY MS. WILKINSON:
12    Q.   Let's take a look at it.  All right?
13    A.   Sure.
14              MS. WILKINSON:  Let me have back, if I could, the
15    ELMO.
16    BY MS. WILKINSON:
17    Q.   I don't want to make everyone sick.
18              There is the title.  What does it say?
19    A.   Nuts & Volts.
20    Q.   And what are the words up there at the top above the
21    title?
22    A.   Those are the topics that are generally covered in Nuts &
23    Volts which happen to align pretty closely to the interests I
24    developed as I got older, and that's probably no coincidence:
25    Robotics, microcontrollers, computer control, lasers.
```

1    Q.   All right.  And let's just take another one, for example,

2    1900.

3             What does this have on the cover?

4    A.   This has an image of a space satellite.

5    Q.   All right.  And what does it say is the title of that

6    article?

7    A.   "Near space:  Houston, we have a competitor."

8             If I remember correctly, this was about using space

9    balloons to bring cameras up to -- near space, not an orbital

10   flight pattern but something just really high up in the

11   atmosphere at the edges of where there is any gas.

12   Q.   All right.  I have a bunch more of these that we're not

13   going to go through, but did you read these magazines, more

14   than just the two that I showed?

15   A.   I read every issue going back -- my library was a very

16   well-stocked library.  I was blessed to have access to it, and

17   they had many, many back issues of Nuts & Volts going back for

18   quite a few years.  And so I read through all those --

19   Q.   What else did you do?

20   A.   In terms of reading material?

21   Q.   Uh-huh.  Yes.

22   A.   I read lots of books on the topic.  Like I said, I started

23   reading -- I started reading scientific journals so to keep up

24   with the latest developments in the field, and my goal that I

25   kind of set for myself was to pick a few things that I could

1    become very knowledgeable in and then stay well-informed and on

2    the leading edge of at least understanding a lot of these

3    topics, even if I couldn't necessarily stay on the leading edge

4    of participating in them, given that I lacked a lot of the

5    sophisticated lab equipment I would have needed even if I had

6    been able to do some of the stuff.

7    Q.   Were you permitted to do some experiments at your home?

8    A.   Permission is -- people often say it is better to beg

9    forgiveness than ask for permission, and that applied to many

10   of the things I worked on in my garage.

11   Q.   In your garage.  Of your parents' home?

12   A.   Yes.  We had a two-car garage, but I had an arrangement

13   with my dad where one side of the garage was his and one side

14   of the garage was mine, so we -- we respectively worked on

15   our -- on our projects and we shared a lot of tools, but he --

16   he would work on cars and I would work on cars too sometimes,

17   but mostly I would work on computers and lasers and display

18   systems.

19   Q.   Did you work on high voltage electronic projects?

20   A.   There was a period of time I was very interested in them,

21   yes.

22   Q.   Give us just examples of what those are?

23   A.   Things like Tesla coils, things like making high voltage

24   spark gaps, making all the cool stuff you see in sci-fi.  I

25   want to have a really big spark gap.  I want to shoot a bunch

1    of sparks in a lot of different directions.  I made something

2    known as a coil gun, which is -- it's a type of electromagnetic

3    weapon that uses magnetic fields to accelerate a steel slug

4    basically.

5            And I was very interested in high voltage electronics

6    for a few years and I -- I stopped -- I stopped working with

7    them after I hurt myself pretty badly working on one of my

8    projects.

9    Q.   All right.  What other kind of things did you work on?  I

10   think you said computers and phones.  Did you say phones?

11   A.   Phones, I was -- I was -- I was sort of interested in.  I

12   primarily got interested in phones as a money making venture.

13   Q.   Explain that to the jury.  What did you do with phones?

14   A.   So today if you break your phone, there is -- like let's

15   say you drop it and crack the screen and it is not under

16   warranty, there is a whole -- there is a bunch of people out

17   there, like on Craigslist that you can bring the phone to them

18   and they'll replace the screen.

19           That wasn't the case in the early days of the

20   smartphone, you know, 2005, '6, '7, '8, '9.  Those services

21   weren't really commonplace and it was pretty hard to track down

22   replacement parts.  I realized that I could make quite a bit of

23   money fixing people's phones for them, so people would say, "I

24   need my phone fixed," I would put in new replacement parts,

25   whether it was water damage or a cracked screen or something

```
 1   else.
 2           Later I realized it was much more efficient rather
 3   than seeking out people's phones to fix one by one, it would be
 4   cheaper to just go online and buys lots of -- I don't mean
 5   lots -- I mean like a lot, you could buy packages of just many
 6   broken iPhones or many broken BlackBerries and then I could fix
 7   them all up and resell them on the internet for profit.
 8   Q.   All right.  Did there come a time when you became
 9   interested in virtual reality?
10   A.   Yes.
11   Q.   Do you recall when that was approximately?
12   A.   It was -- I had already -- always been interested in
13   virtual reality, just purely like it was an idea, because it is
14   part of science fiction.
15   Q.   You're a big science fiction fan?
16   A.   Yes.
17           When I watched The Matrix, I was like seven or eight
18   years old, and that really blew my mind, so I loved the idea of
19   virtual reality, but I didn't start actually seriously working
20   on it until I was 15 or 16.
21   Q.   What got you interested in working on it at that age?
22   A.   By the time I was 15 or 16, I was really into PC gaming.
23   I had built a lot of computers.  I had set up basically the
24   best computer gaming rig that I could.
25           At one point I had a desktop that had six monitors
```

```
 1    and dual graphics cards and just really a top-of-the-line
 2    setup.
 3            I basically wasted all of the money that I earned on
 4    computers.
 5            And so I started thinking, well, what's the end --
 6    what's the end game here?  I mean, I have probably one of the
 7    best PC gaming rigs that you can buy.  There's no way to make
 8    it significantly better even if you spend a lot more money, so
 9    what's -- what's beyond this?  What is really the end game?
10    And it certainly wasn't going to be eight monitors or 24
11    monitors.
12    Q.   So what did you do?
13    A.   I knew it was going to be virtual reality.  And so I
14    decided that that was going to be one of my new goals was to
15    become knowledgeable in the field of virtual reality and try
16    to -- try to make virtual reality gaming a thing, not -- I
17    wasn't out to make something new.  Originally I just wanted to
18    become knowledgeable and I thought there would be something I
19    could buy.
20    Q.   What did you do to become knowledgeable?
21    A.   I started -- I did what I had done with all the other
22    topics.  I started reading through the academic literature.
23    Virtual reality has been around primarily in the high medical
24    research, military research, industrial applications.  VR has
25    been used for decades.  And so I was able to go back and read a
```

```
 1    lot of the literature going back to the '80s on what people had
 2    done in the past, what had worked, what had not.
 3            I also started to collect all the books that were
 4    related to virtual reality and read through those, and then,
 5    finally, I actually started collecting old virtual reality
 6    hardware, basically buying old headsets that had been created
 7    mostly in the late '80s and mid-'90s.
 8            THE COURT:  Stop.  Let's take a break.  15 minutes.
 9            Don't talk about the case.
10            SECURITY OFFICER:  All rise.
11            (Jury out)
12            (Recess at 10:34)
13            THE COURT:  Okay.  Are you ready?
14            SECURITY OFFICER:  All rise for the jury.
15            (Jury in)
16            THE COURT:  Y'all be seated.  Thank you very much.
17            Go ahead, ma'am.
18    BY MS. WILKINSON:
19    Q.   Mr. Luckey, right before the break you were talking about
20    how you started to buy some virtual reality headsets; is that
21    right?
22    A.   Yes.
23    Q.   And tell us the purpose of that.
24    A.   Originally -- basically it was to learn what other people
25    had done in the past, so learn what had worked and what hadn't.
```

1    Q.   All right.  And did you intend to build your own headset
2    at that time?
3    A.   Not -- not when I first started getting into virtual
4    reality, no.
5    Q.   What did you think you would do?
6    A.   I thought that I would be able to either buy something
7    that existed off the shelf or potentially upgrade an old unit
8    with some more modern components.
9    Q.   Over time how many headsets made by other folks have you
10   collected?
11   A.   I have almost 70 now.
12   Q.   All right.  Did you bring one to show the jury and explain
13   some of the differences between technology that was already in
14   place and what you did?
15   A.   Yes, I did.
16   Q.   All right.  I'm going to try and show you, if I can lift
17   it up, defense physical Exhibit 39.  I need my glasses.  Hold
18   on a second.  I'm sorry.  Yeah, 39.
19            Are you familiar with this device?
20   A.   Yes.
21   Q.   All right.  Tell us first generally, what is it?
22   A.   That is a Visionics LVES, which is a head-mounted display
23   made by a now-defunct company, Visionics, in the 1990s.
24   Q.   What was it used for in the 1990s?
25   A.   It was used for a variety of things, but its primary use

1    was a medical trial that was part of a collaboration between

2    the Office of Veterans Affairs and NASA.

3    Q.    All right.  Let's go through the components if we could.

4          Any idea how heavy this is?

5    A.    Perhaps -- perhaps -- perhaps 8 pounds.

6    Q.    And how heavy was your Rift prototype?

7    A.    About 1 pound.

8    Q.    All right.  Let's start maybe back here.

9          What is this that I'm pointing to?

10   A.    That would be the head mount.

11   Q.    All right.

12   A.    Basically the thing you use to hold it on to your head.

13   Q.    And what about this front part?  What is that?

14   A.    The front part in this unit is a set of complex optics.

15   There's lenses and multiple mirrors in the front of the device

16   and also some control electronics that allow it to accept the

17   video -- the video signal.

18   Q.    What about this thing on the top?

19   A.    The top is -- the top is a camera, basically.

20   Q.    Do you know what the camera was used for?

21   A.    It was used for a variety of things, but the main thing is

22   that it was able to take in images, either from an external

23   camera or that camera, and then basically boost the contrast on

24   them, so that people with macular degeneration could see things

25   more easily.  So if your eyes are going bad and you have

1    cataracts, it was able to take the image and compress it to to

2    be smaller so you could see it or make it higher contrast so

3    you could see things that would have been invisible to you

4    otherwise.

5    Q.    What about the things on the side of the head mount?

6    A.    Those are, believe it or not, CRT displays, the same type

7    that you use to see an old television.  They are basically

8    teeny, tiny CRTs that are in each of those tubes and the image

9    is directed forward into the optics, into the viewing optics

10   assembly.

11   Q.    It comes out from here and goes up to the front where the

12   viewer can see?

13   A.    Right.  The protrusions on the side house it.  It's kind

14   of long and narrow like this water bottle, which is unusual

15   shape for a CRT because, you know, most people are used to the

16   large televisions, but these are much smaller so they are

17   differently shaped.

18   Q.    All right.  It's a little difficult to see, but can you

19   explain to the jury what is inside?  You put that on your eyes,

20   what is that you're seeing right there?

21   A.    So those are -- that's the final objective eyepiece.

22   Basically when you put it on and you look through there, you

23   saw a black-and-white image that came from the CRTs through a

24   complex series of optics, which it was magnified, collimated,

25   and reprojected on to your eyes through that lens system.

1  Q.   Do you have any idea what the field of view was on this

2  device?

3  A.   It was about 70 degrees horizontally which was very wide

4  for the time.

5  Q.   Okay.  And then it's attached to something.  What is this?

6  A.   That is the -- basically the video control box.  That's

7  the thing that can -- that basically processes all of the video

8  signals whether they are coming from an external source or from

9  the onboard camera.

10 Q.   All right.  And why was it that you couldn't just use this

11 to do virtual reality gaming, this device?

12 A.   You could -- you could.  It just wasn't anything close to

13 what you would kind of imagine after seeing a movie like The

14 Matrix.

15      I mean, it was a low resolution, black-and-white

16 70-degree image and it was very, very bulky, very heavy, and

17 honestly, pretty uncomfortable.

18 Q.   Was it expensive to develop this headset?

19 A.   I don't have any particular knowledge, but based on --

20 based on what I know about the kind of systems that are inside,

21 yes, that would have been a very expensive multimillion dollar

22 project.

23 Q.   Was it ever commercially available?

24 A.   No.  Only --

25 Q.   To consumers, not hospitals and things like that?

1    A.    As far as I know, only 100 units were created as part of

2    the trial.  I don't think that they ever made it into a

3    consumer product.

4    Q.    After you had done your research and examined some of

5    these head-mounted devices, did you decide to try to

6    manufacture -- or make your own prototype?

7    A.    Yes.

8    Q.    And what was it that you were trying to create -- let's

9    say in contrast to this device that we've been looking at?

10   A.    I wanted to fix all of the problems for my application.  I

11   wanted something that was wide field of view.  I wanted

12   something that was low latency and needed to be pretty high

13   resolution compared to these things that I had been using, and

14   it needed to be affordable to manufacture so that it wasn't

15   something that -- some of these systems costs tens or even

16   hundreds of thousands of dollars.  Obviously, that wasn't a

17   reasonable cost for something that I wanted to make.

18   Q.    When did you make your first prototype headset?

19   A.    I started working on my first prototype in 2009.

20   Q.    All right.  And did you market it and label it and take a

21   picture of it?

22   A.    I did.  I think I completed that one in 2010 and I

23   documented it like I do many of my projects and posted it

24   online.

25   Q.    Okay.

```
 1              MS. WILKINSON:  Your Honor, may I have just a second
 2    with counsel?
 3              THE COURT:  Sure.
 4              (Pause)
 5              MS. WILKINSON:  Here's another copy, guys.
 6              (Pause)
 7    BY MS. WILKINSON:
 8    Q.   Mr. Luckey, while we're -- while I'm showing counsel the
 9    exhibit that I want to show you, I'm going to show you a copy
10    so I can ask you some foundational questions.  All right?
11    A.   Sure.
12    Q.   Take a look at that photograph.
13              Do you recognize it?
14    A.   Yes, I do.
15    Q.   Does it have a date on it?
16    A.   The document or the headset?
17    Q.   The headset?
18    A.   Yes, it does.
19    Q.   Does it have a name on it?
20    A.   Yes.
21    Q.   Do you recognize that name?
22    A.   Yes, I do.
23    Q.   Is it your name?
24    A.   Yes.
25    Q.   All right.
```

```
 1              MS. WILKINSON:  Your Honor, I would offer that into
 2    evidence.
 3              MR. PHILBIN:  Which one?
 4              MS. WILKINSON:  The photographs.
 5              MR. PHILBIN:  What is --
 6              MS. WILKINSON:  1401 into evidence.
 7              THE COURT:  It's not on the list.  It's one we've got
 8    to just deal with?
 9              MS. WILKINSON:  Yes.
10              MR. PHILBIN:  It's objected to, Your Honor.
11              THE COURT:  Yes, sir.  And it is 14 -- what?
12              MR. PHILBIN:  1401.
13              MS. WILKINSON:  1401.
14              THE COURT:  Let me look at the objection.
15              (Pause)
16              THE COURT:  I may not have the objections to that.
17              MS. WILKINSON:  Would you like me to show you a
18    copy -- give you a copy of the exhibit?
19              THE COURT:  Just a second.  Let me look here.  Let's
20    see if I have got it up here.
21              (Pause)
22              THE COURT:  I don't think I've got it.  I may -- no.
23              I don't see it, Ronnie.
24              I don't think I have got it.  I don't think I have
25    got it.
```

```
 1                 MR. PHILBIN:  The objections were hearsay,
 2    foundation, and relevance, Your Honor, and it was also subject
 3    to the motion in limine.
 4                 MS. WILKINSON:  No, this is not.  This is the
 5    actual -- it is not from his collection.  It's what he actually
 6    made.
 7                 I can ask him additional foundational questions if
 8    you -- if I need to.
 9                 THE COURT:  I don't think you need to.
10                 Overrule your objection.
11                 And you are offering it for all purposes?
12                 MS. WILKINSON:  Yes.  I'm offering the photograph,
13    DX1401.
14                 THE COURT:  DX1401 is admitted into evidence.
15                 (Defendants' Exhibit No. 1401 received)
16                 MS. WILKINSON:  All right.  Can we show 1401 on the
17    screen, please.
18    BY MS. WILKINSON:
19    Q.   Mr. Luckey, tell the jury what this is a photograph of.
20    A.   This is a photograph of the first, basically, from the
21    ground up design that I completed, PR 1, which stands for
22    prototype 1.
23    Q.   All right.  What does it say at the top left-hand corner?
24    A.   It says Palmer Luckey.
25    Q.   What does it say underneath that?
```

1  A.    PalmerTech.

2  Q.    Is that the email or address you used to communicate with

3  Mr. Carmack and others on the message board?

4  A.    PalmerTech is the -- it is the name that I use online for

5  all of my projects or did at the time.

6  Q.    All right.  And what's the date on there?

7  A.    8-7-2010.

8  Q.    Does that mean you completed this prototype on that date,

9  by that date?

10  A.    Yes.

11  Q.    And what does it say down there at the bottom left-hand

12  corner?

13  A.    It says PR 1, prototype 1.

14  Q.    So did you make this prototype almost two years before you

15  even met with Mr. Carmack or heard from him about wanting one

16  of your prototypes?

17  A.    Yes.

18  Q.    And tell us the key features of your prototype number 1.

19  A.    The key features were high resolution, 1280 by 800, a wide

20  field of view, 90 degrees.  It had a built-in haptic actuator

21  that basically gave you force feedback and a low latency video

22  controller.

23  Q.    Was it heavy or lightweight?

24  A.    This particular unit was pretty heavy, maybe -- maybe

25  six -- six pounds or so.

1    Q.    And would it have been expensive to put together or --
2    A.    It would have been about $1,000 to put together.
3    Q.    All right.  After you built this prototype, did you test
4    it out with some software?
5    A.    Yes.
6    Q.    And whose software did you use?
7    A.    I was mostly using a variety of existing games.
8    Q.    All right.  Did you try and improve upon this prototype?
9    A.    Yes.
10   Q.    What did you -- what was the next prototype that you
11   built?
12   A.    The next prototype was an entirely new design that I
13   called PR 2, prototype 2.
14   Q.    What were the key features of prototype 2?
15   A.    An even wider field of view and a native stereoscopic 3D
16   display without any color distortion, using a single panel and
17   wide field of view optics.
18   Q.    Did you also test that out with various software?
19   A.    Yes, I did.
20   Q.    All right.  And were you able to have a virtual reality
21   experience using that headset?
22   A.    Yes, I was.
23   Q.    Were you with the prototype number 1?
24   A.    Say that again.
25   Q.    Were you able to have a virtual reality experience with

1  prototype Number 1?

2  A.   Yes, I was.

3  Q.   Did you build a third prototype?

4  A.   I did.

5  Q.   What improvements did you include in that prototype?

6  A.   PR --

7  Q.   Changes?

8  A.   PR 3, prototype 3, was largely the same as PR 2 with the

9  addition of a wireless video interface.

10         Basically you could use this device without being

11  plugged into a computer.  It ran off batteries and wirelessly

12  transmitted the video signal from the computer to the headset.

13  Q.   Right.  Do you recall about when you put together your

14  third prototype, prototype 3?

15  A.   I don't remember exactly, but it was sometime in 2011.

16  Q.   Again, over a year before Mr. Carmack reached out to you?

17  A.   It might have been over a year.  It was in the year

18  before.

19  Q.   All right.  Then did you make prototype -- a fourth

20  prototype?

21  A.   Yes, I did.

22  Q.   And what were the key features of the fourth prototype?

23  A.   PR 4 was largely the same -- same design.  It was still

24  wide field of view, it was still low latency, it still had

25  native stereoscopic 3D, but it was lighter weight, it was more

```
 1    robustly constructed, it was more comfortable, and it did not
 2    have wireless video functionality.
 3    Q.   Did PR 4 -- did you also use a sensor yourself with PR 4?
 4    A.   I used multiple sensors.
 5    Q.   Did you use the Hillcrest sensor that Mr. Carmack later
 6    used on your Rift prototype?
 7    A.   No, I did not.
 8    Q.   Was there a difference between the sensor you used on PR 4
 9    and the Hillcrest sensor that Mr. Carmack put on your first
10    Rift prototype?
11    A.   Yes.  There were differences between all of the different
12    sensor solutions that I had.
13    Q.   All right.  Let's take a look at a picture of that, if we
14    could.
15             Did you take PR4 and use it anywhere --
16    A.   Yes.
17    Q.   -- in public?
18    A.   Yes.
19    Q.   Let's just start in early 2012, January 2012, were you
20    working at the USC lab?
21    A.   Yes.
22    Q.   What were you doing there?
23    A.   I was working as a lab technician in the mixed reality
24    laboratory, primarily working on virtual reality hardware
25    systems.
```

1    Q.   Did you work with someone who was creating content for

2    virtual reality headsets, including movies?

3    A.   I worked with many people who were creating virtual

4    reality content, including movies.

5    Q.   Do you recall a specific movie that was shown on your

6    virtual reality headset before you ever were in touch with

7    Mr. Carmack about providing a headset to him?

8    A.   Yes.

9    Q.   Who was that?

10   A.   Her name was Nonny de la Pena.  She was a -- she was a

11   student at USC who created basically a virtual reality movie.

12   It's -- it's like a realtime rendered movie in 360 degrees

13   called Hunger in Los Angeles.

14   Q.   Did you show her movie on your headset PR 4?

15   A.   Yes.

16   Q.   When was that?

17   A.   We publicly demonstrated it in -- sometime in January of

18   2012.

19   Q.   Were pictures taken of that demonstration?

20   A.   Yes.

21           MS. WILKINSON:  And, Your Honor, we would -- I

22   think it's already admitted -- but move in 824.

23           THE COURT:  It's already in?

24           MS. WILKINSON:  Yes, I believe so.

25           THE COURT:  Okay.

```
 1                  MS. WILKINSON:  Because it was subject to the
 2       opening.
 3                  Can we put up 824?
 4                  MR. PHILBIN:  Your Honor, could I have just a minute?
 5                  THE COURT:  Sure.
 6                  MS. WILKINSON:  Here it is right here.
 7                  I need to give the specific page.  It is 824 at 14.
 8                  Here you go.  I showed it in opening.  Here you go.
 9                  MR. PHILBIN:  No objection, Your Honor.
10                  THE COURT:  All right.  I think it's already in,
11       though, isn't it?
12                  MS. WILKINSON:  It is.
13                  THE COURT:  Okay.  It's in evidence.
14                  MS. WILKINSON:  Would you put up DX824 at 14, please,
15       Dave?
16       BY MS. WILKINSON:
17       Q.   Mr. Luckey, did you actually -- while Dave is pulling that
18       up, did you actually attend the Sundance Film Festival when
19       this demonstration was taking place?
20       A.   Yes, I did.
21       Q.   Did you assist with it?
22       A.   Yes.
23       Q.   Did you see the reactions of the people who put on your
24       headset?
25       A.   Yes.
```

1    Q.   Did you hear the reactions that they described to you what
2    they thought about the headset?
3    A.   Yes, they did.
4    Q.   And without telling us what they said, did they appear to
5    be satisfied with the experience?
6    A.   They were satisfied.
7    Q.   All right.
8          MS. WILKINSON:  Dave, would it be easier for me just
9    to put it on the ELMO?
10         IT TECH:  Sure.
11         MS. WILKINSON:  All right.  Let's try that.  Sorry
12   about that.
13   BY MS. WILKINSON:
14   Q.   Okay.  What does that say down there at the bottom?
15   A.   It says, "PR 4 HMD," which stands for prototype 4
16   head-mounted display.
17   Q.   All right.  Let's see if we can get it a little -- it is a
18   little hard to see.
19         Can you see what it says underneath that?
20   A.   Yes.
21   Q.   What does it say?
22   A.   It's my signature.  It says Palmer Luckey.
23   Q.   All right.  And is that your headset?
24   A.   Yes.
25   Q.   And where is this headset being used?

1    A.    It's being used at the Sundance Film Festival in Utah.

2    Q.    Go down to the bottom.  What does it say in the bottom of

3    this photograph?

4    A.    It says, "Hunger in Los Angeles,

5    www.immersivejournalism.com."

6    Q.    Was that someone Ms. de la Pena was associated with?

7    A.    Yes.  That was her website.

8    Q.    And what's on top of the headset?

9    A.    The top of the -- the thing coming out of the top of the

10   headset is part of the face space motion tracking system that

11   we used to track the motion of the headset through space and to

12   track how you move your head.

13   Q.    So would that be a sensor?

14   A.    Yes.  Well, it's part of a sensor system.  You -- you

15   wouldn't describe it on its own as a sensor, but yes.

16   Q.    So when you were asked before could you, you know -- could

17   you move and still see the virtual reality experience, with

18   this head set and your sensor system, could you do that?

19   A.    Yes.

20   Q.    And what's the difference between what type of movement

21   the headset could sense with your sensor system here on PR 4

22   and the one that Mr. Carmack, the Hillcrest sensor that he put

23   on your Rift prototype?

24   A.    Sure.

25          The sensor that was on -- the Hillcrest sensor is

1    only a 3 degree of freedom sensor.

2    Q.    That's the one Mr. Carmack used?

3    A.    Yes, the one that Mr. Carmack was using.

4         It can only track basically how you rotate your head.

5    So you can see, you look up, you look to the side, you can tilt

6    your head side to side, but it cannot track your movement

7    through space.  So if you were to, you know, lean this way or

8    lean this way or lean forward or even to walk around the room,

9    it just can't track that.

10   Q.    What about your sensor system on your PR 4 prototype?

11   A.    This system can track basically -- it's called 6 degrees

12   of freedom.  It can track location, where you're looking, but

13   also your actual absolute position in space.

14        So if you lean to the right, lean to the left, it

15   will accurately reflect that in the virtual world.  In fact,

16   you could even walk across the room, and it will move you

17   through the virtual world as if you're walking through the real

18   world.

19        It basically fully tracks any motion you can make

20   with your head, not just a limited -- limited setup.

21   Q.    Included in this hardware and the software, the movie that

22   was Ms. de la Pena's, was there distortion correction?

23   A.    Yes, there was.

24   Q.    And where was that?

25   A.    It was part of the software experience which was running

1  on the computer that was plugged into my head-mounted display.

2  Q.  So you had done distortion correction for your headset

3  before you met Mr. Carmack?

4  A.  I was not the one that had created it, but it was part of

5  that software and other software.

6      It was basically implemented as part of the software

7  that was running on the computer.

8  Q.  Great.

9      And you already told us you had a sensor, right?

10  We've just been talking about that?

11  A.  Yes.

12  Q.  What about predictive tracking?  Did your headset and with

13  the software, was it able to do predictive tracking?

14  A.  Yes, it did.

15  Q.  All right.

16  A.  Well, the software that was running on the computer did.

17  My headset itself did not perform the prediction.

18  Q.  All right.  Now, if we took Ms. de la Pena's movie and the

19  software and we tried to show that on the --

20      MS. WILKINSON:  Do you still have the Rift prototype

21  here?

22      MR. SAMMI:  Yes.  It's somewhere.

23      MS. WILKINSON:  Yeah.  If you guys could find it.

24  I'm sorry.  I should have asked earlier.

25  BY MS. WILKINSON:

1   Q.   If we try to play her movie, software, on the Rift

2   prototype, would it -- would it have shown the way it did on

3   your prototype here?

4   A.   To a certain degree.

5   Q.   All right.  And the testbed that Mr. Carmack made, would

6   that have shown properly on your headset here with the

7   different sensor?

8   A.   No, it would not.

9   Q.   All right.  So Mr. Carmack had to write different software

10  for your particular Rift prototype; is that right?

11  A.   Exactly.

12  Q.   And the software that he wrote --

13           MS. WILKINSON:  Thank you.

14           MR. PHILBIN:  You're welcome.

15  BY MS. WILKINSON:

16  Q.   The software that he wrote for this prototype, the Rift

17  prototype, did that software work on the Rift developmental

18  headset that you did -- you and the folks at Oculus did?

19  A.   No.

20  Q.   Did it work on the consumer version of the headset that

21  you and the folks at Oculus did?

22  A.   No, it did not.

23  Q.   Now, you told us that you did various postings on this

24  Meant to Be Seen message board, right?

25  A.   Yes, I did.

```
 1    Q.   Let's take a look at a few of those, if we could.
 2              MS. WILKINSON:  Can we have DX776, please?
 3    BY MS. WILKINSON:
 4    Q.   Is this the first contact you received on April 10th from
 5    Mr. Carmack about your prototype?
 6    A.   Yes, it is.
 7    Q.   Does he use the word high field-of-vision prototype when
 8    he's talking to you about it?
 9    A.   Yes, he does.
10    Q.   He doesn't say just send me a bunch of lenses or cheap
11    lenses, right?
12    A.   No.
13    Q.   And did you send him an actual prototype?
14    A.   Yes, I did.
15    Q.   All right.
16              MS. WILKINSON:  Now, let's look at 777, please,
17    DX777.
18    BY MS. WILKINSON:
19    Q.   Did you respond to him?
20    A.   Yes, I did.
21    Q.   And did you offer to give it to him, not sell it, just
22    give it to him outright?
23    A.   Yes.
24    Q.   Why did you do that?
25    A.   John Carmack is well known in the game industry, he makes
```

1    a lot of cool stuff, and I wanted him to have access to my

2    device because he was interested in making software that would

3    run on it.  And that was -- he was certainly the highest

4    profile person I knew that was really interested in what I was

5    working on.  I was flattered.

6    Q.    Did this happen before or after January 2012 when you

7    showed your headset and Ms. de la Pena's movie?

8    A.    After.

9    Q.    Did you ever suspect that he was going to try and claim

10   that this Rift prototype belonged to ZeniMax?

11   A.    No.  To my knowledge, he never has.

12   Q.    Now, let's look at the next exhibit, 778, please.

13            MR. PHILBIN:  Your Honor, each of these has an

14   objection.  It would be nice if counsel would confer before

15   publishing them to the jury.

16            MS. WILKINSON:  They are preadmitted, 777.

17            MR. PHILBIN:  I show objections to both.  I'm happy

18   to confer and I'm happy to on these two, but I would appreciate

19   it before you publish them to the jury if you'd let me know.

20            THE COURT:  777.

21            MR. PHILBIN:  777 and 778.  We'll withdraw our

22   objections but I'm just asking --

23            THE COURT:  You said it twice.  You don't need to say

24   it again.

25            (Pause)

1          THE COURT:  777 is preadmitted.  778, I don't have.

2          MS. WILKINSON:  Okay.  No objection, Your Honor.

3          So can we show Exhibit 787, please.

4          THE COURT:  Well, now.  787 is not preadmitted.  But

5     there is no objection, correct?

6          MS. WILKINSON:  That is not 787.  That is 778.  787.

7          MR. PHILBIN:  787, I do not have an objection, Your

8     Honor.

9          THE COURT:  But that's not the one you're trying to

10    show or is it?

11         MS. WILKINSON:  It is, Your Honor.

12         THE COURT:  787.

13         MS. WILKINSON:  Yes, sir.  I might have said it wrong

14    and so Dave --

15         THE COURT:  No, no.  I may have said it wrong.

16         Okay.  787 is admitted into evidence with no

17    objection.

18         (Defendants' Exhibit No. DX787 received)

19    BY MS. WILKINSON:

20    Q.   All right.  Now, can you read the second sentence there

21    for us from May 1st to Mr. Carmack to you?  What does that say?

22    A.   It says, "I'll have to clear it with corporate, but I can

23    probably let you have some of my demo code after E3 if you are

24    interested."

25    Q.   You've already testified that Mr. Carmack did give you the

```
 1    VR testbed, right?
 2    A.    Yes.
 3    Q.    After you signed the nondisclosure agreement?
 4    A.    Yes.
 5    Q.    Is the VR testbed actually code?
 6    A.    I mean, there is a version of it that is code.  The one
 7    that I was sent was just an executable.  Basically, the
 8    application that you run on your PC.  There's -- that's not
 9    really -- like, you can't get code from that.
10    Q.    Okay.  So you were showing the same version that they
11    had -- the VR testbed Rage that they were showing at QuakeCon,
12    the testbed version?
13    A.    I don't know which version they were showing necessarily,
14    but it was certainly the one that we were showing at our booth.
15    Q.    Okay.  And did you ever show anyone actual code from the
16    VR testbed?
17    A.    No.
18    Q.    All right.  Did you ever leave a copy of the VR testbed
19    with anyone?
20    A.    No.
21    Q.    All right.  Did you ever leave VR -- did you ever actually
22    receive the code for the VR testbed?
23    A.    No.
24    Q.    Did you ever receive the actual code for Doom 3 BFG?
25    A.    No.
```

```
 1   Q.   Was it also an executable?
 2   A.   Yes, that was also an executable.
 3            THE COURT:  Okay.  For those of us that aren't
 4   computer -- what does "executable" mean?
 5            MS. WILKINSON:  Go ahead.
 6            THE WITNESS:  So an executable is basically the final
 7   compiled file.  It's the thing that you would, you know, have
 8   on your thumb drive, drag on to your desktop and click "Run,"
 9   which is different from source code, which is basically the
10   human readable form of what's going on under the hood.
11            So when we're talking about an executable, we're
12   basically talking about a piece of software or an application,
13   which is different from the code underlying it.
14            THE COURT:  So an executable is the sort of thing I
15   get when I buy something and they let me have something and
16   download it on my computer?
17            THE WITNESS:  Exactly.
18            THE COURT:  Okay.
19            THE WITNESS:  If you were to buy Microsoft Word and
20   put the CD in your computer and install that, that would be an
21   executable that is installed on your machine, not the source
22   code.
23            THE COURT:  But if I called up Bill Gates and said,
24   "Hey, I want to know how this really runs," and I talk him into
25   giving it to me or selling it to me, he -- he could give me the
```

```
 1   secret sauce that makes the executable work, which is something
 2   called source code; is that right?
 3              THE WITNESS:  Yes.  The source code is what's
 4   written -- it's what you build the application in before it's
 5   compiled.  I think you would have to be very persuasive to get
 6   Mr. Gates to send you a copy of it.
 7              THE COURT:  Okay.  Okay.
 8              THE WITNESS:  I have no doubts in you, Your Honor.
 9              THE COURT:  You never know what I might be able to
10   do.
11              But anyway, that's the -- that's the secret stuff,
12   right?  Or can be or not be or --
13              THE WITNESS:  It can be secret.
14              THE COURT:  Explain all that.
15              THE WITNESS:  Some people -- some people's source
16   code is available for others to look at.  Sometimes it's what's
17   called open source.  And some people keep it, yeah, secret to
18   themselves and they don't publish it.
19              THE COURT:  Okay.
20   BY MS. WILKINSON:
21   Q.   But Mr. Carmack did give you that secret sauce or the
22   source code for the testbed?
23   A.   No.  Regardless of what license they had it on, I never
24   had access to it.
25   Q.   The same for Doom 3 BFG, to follow His Honor's analogy
```

```
 1   which is helping us all to understand, you got the name, the
 2   executable, but did you ever get access from Mr. Carmack to the
 3   underlying source code for all of Doom 3 BFG that they were
 4   demonstrating?
 5   A.   No, we did not.
 6   Q.   Okay.  Did you and Mr. Carmack, once you got in touch,
 7   have discussions about -- back and forth about what your
 8   prototype could and couldn't do and what he was interested in
 9   seeing?
10   A.   Yes.
11   Q.   Is there an example of that down here at the bottom of his
12   email, Exhibit 787?
13   A.   Yes.
14   Q.   All right.  Let's take a look at another example.
15            MS. WILKINSON:  Now, let's look at 797, if we could.
16            Before you put it up, let me give it to counsel,
17   please.
18            (Pause)
19            MS. WILKINSON:  You can have my copy.
20            MR. PHILBIN:  Thank you.
21            (Pause)
22            MS. WILKINSON:  No objection, Your Honor.  We would
23   like to move in 797.
24            THE COURT:  All right.  That's admitted into
25   evidence.
```

```
 1                    (Defendants' Exhibit No. DX797 received)
 2               MS. WILKINSON:  All right.
 3    BY MS. WILKINSON:
 4    Q.   Let's take a look at this.  Who is this email from?
 5    A.   This is a private message on the MTBS board from me to
 6    John Carmack.
 7    Q.   I didn't mean to say that.
 8               What date?
 9    A.   May 16th, 2012.
10    Q.   Now, I want to read this and then can you explain to us as
11    simple as you can what this actually means once I read it?
12    A.   I'll try.
13    Q.   Okay.  "If you have any trouble with it, let me know.  The
14    VGA controller has issues with some computers, no need to go
15    into detail if it works fine for you, though.  The DVI/VGA
16    boards I'll be using in the final HMD don't have those
17    compatible problems."
18               What were you trying to convey to Mr. Carmack?
19    A.   When I say VGA controller, I'm referring to the display
20    control board I had in the head-mounted display that had a VGA
21    video input; that is, you plugged it into the VGA output from a
22    computer graphics card.
23               I was telling him that -- that this particular
24    control board has issues on some computers, compatibility
25    issues.  It worked on most computers, but there were some where
```

1    it had issues displaying the image properly.

2           I'm telling him in advance that I don't need to go

3    into the detail of why the problem exists if he doesn't have

4    it.  There is a -- there are ways to fix it, but there is no

5    reason for me to list them unless needed.  And I'm saying the

6    control boards I'm using in the final head-mounted display, the

7    one that I was putting on Kickstarter, which had DVI and VGA

8    input, did not have the compatibility issues.  I had already

9    gotten some of those boards.  They weren't in the prototype I

10   sent to John.  But I had prototypes I had made that did not

11   have those compatibility issues.

12          So I wanted to let him know that he didn't need to

13   basically make a bug report or figure out exactly what the

14   problem was if he saw it, because it was something that's

15   already been solved.

16   Q.   So if we are looking at this Rift prototype over here on

17   Plaintiffs' counsel's desk, the panel you used in this, that he

18   wrote a software for, was not the panel you ended up using in

19   your -- the first HMD that you sent out to developers?

20   A.   That's correct.  It's different.

21   Q.   Would that mean the software would have to be different to

22   be compatible with the different panel?

23   A.   Yes.

24   Q.   So whatever code -- or whatever code Mr. Carmack wrote in

25   his software to make Rage and Doom 3 BFG compatible with this

1   Rift prototype would not have been compatible with your first
2   developer Rift Oculus headset?
3   A.   No, it would not.
4   Q.   Now, do you recall Mr. Carmack talking about writing on
5   the Meant to Be Seen message board "a day with the Oculus
6   Rift"?
7   A.   Yes, I think so.
8   Q.   Do you remember back in 2012 when you saw this on the
9   message board?
10  A.   Yes, I do.
11  Q.   What did you think when you saw that Mr. Carmack had given
12  a long description the day or the day after you had sent him
13  your Rift prototype?
14  A.   I was very excited.
15  Q.   Why?
16  A.   Because he had good things to say about it.
17  Q.   All right.  And --
18          (Pause)
19          MR. PHILBIN:  No objection, Your Honor.
20          THE COURT:  All right.  Then that is admitted into
21  evidence.
22          (Defendants' Exhibit No. DX1041 received)
23  BY MS. WILKINSON:
24  Q.   All right.  Let's take a look at DX1041, if we could.
25          And right up here at the top that's the Meant to Be

1    Seen message board we've been discussing?

2    A.    Yes, it is.

3    Q.    Who is the author of this post?

4    A.    John Carmack.

5    Q.    Is this a public post or a private post?

6    A.    This is a public post.  It is viewable to anybody who goes

7    to this web address.

8    Q.    All right.  And the date?

9    A.    The date is May 17, 2012.

10    Q.    And Mr. Carmack, what does he say the subject of his post

11    is?

12    A.    "A day with an Oculus Rift."

13    Q.    The first paragraph, he says, "I am going to be giving

14    several demos in the next month, and Palmer graciously loaned

15    me one of his test HMDs to go with the other things I have to

16    show.  Here are my impressions."

17            Now, we could read through this and he gave detailed

18    comments on your prototype; is that right?

19    A.    Yes.

20    Q.    Let's go to the second page where he gets to bottom line,

21    if we could.

22            And can you read that first paragraph there under

23    "bottom line"?

24    A.    He says, "Bottom line:  After dialing everything in, this

25    is by far the most immersive HMD of the five I have here.  If

```
1    Palmer comes close to his price target, it will also be the
2    cheapest.  I will be including full support for this in the
3    next new PC title we release."
4    Q.   And what was your price target at that time?
5    A.   I was targeting about $500.
6    Q.   All right.  And in the next paragraph, he says, "The
7    problem is that most people won't have a custom code base that
8    they can freely modify for the HMD."
9         What did you understand him to mean by that?
10   A.   He's saying that there is basically -- there's basically
11   not a code base that you can use to add support to your
12   software easily and quickly without having to write directly to
13   the hardware, without having to make something to work
14   specifically for the HMD.
15   Q.   Did you and the folks at Oculus eventually develop an SDK
16   that made it easier for people to write their games to show on
17   your headsets?
18   A.   Yes, we did.
19   Q.   All right.  Would that have addressed some of these
20   issues?
21   A.   That would address the issue.
22   Q.   All right.  And can you read the next sentence for me,
23   please?
24   A.   Sure.
25         "Someone is going to have to write an intercept
```

1    driver that can capture mono or side-by-side stereo game output

2    and warp it appropriately to make it useful for anyone other

3    than developers."

4    Q.   All right.  Now, did Mr. Carmack ever write an intercept

5    driver that could be -- for your Rift products at Oculus when

6    he was at id and ZeniMax that could be used for any other

7    developers in all their games?

8    A.   I'm not aware of him ever writing anything like that.

9    Q.   Who did write your SDK at Oculus?

10   A.   It was a team effort, but it was led by Michael Antonov.

11   Q.   Who is Michael Antonov at the time or what was his job at

12   Oculus?

13   A.   You know, I don't know exactly what his title was, but he

14   was basically the head of software, the chief -- the chief of

15   software.

16   Q.   And was he employed at Oculus in the fall of 2012?

17   A.   Yes, he was.

18   Q.   And we'll get to the ultimate software and the code in a

19   minute.

20            You were shown PX1066.

21            MS. WILKINSON:  If we can put that up, please.  And

22   if we could blow that up.

23   BY MS. WILKINSON:

24   Q.   I think you were just showing the second sentence saying

25   you didn't send them all your information.

1          Do you see that?

2          "If you don't mind, send me your direct email

3    address"?

4    A.   Yes.

5    Q.   Now, right below that --

6          MS. WILKINSON:  Can you pull it down a little bit,

7    please?

8    BY MS. WILKINSON:

9    Q.   Who is this -- I'm sorry.  Who is this post or message

10   from?

11   A.   This is from John Carmack.

12   Q.   All right.  To whom?

13   A.   To me.

14   Q.   All right.  On what date?

15   A.   May 22, 2012.

16   Q.   Is this right around the time that you sent him the Rift

17   prototype?

18   A.   Yes, this is around that time.

19   Q.   And after he wrote "a day with the Oculus Rift" on

20   May 17th?

21   A.   Yes.

22   Q.   All right.  What does he say BTY [sic], by the way -- what

23   does he say?  Can you read that paragraph for us?

24   A.   Sure.

25          He said, "By the way, I started actually playing some

1   of the Doom 3 with the Rift and headphones on, and it really

2   does throw you into the game like nothing before.  However, to

3   make it a good gaming experience, I am going to have to make

4   more changes to the game."

5   Q.   Does that make sense that he's changing the gaming and not

6   the headset?

7   A.   Yes.

8   Q.   Why?

9   A.   When you take an existing game that was designed to be

10  played on a traditional monitor or television and modify it and

11  want to play it in the VR headset, you have to make

12  modifications to it or it won't work properly and it's not

13  going to be a comfortable or usable experience.

14  Q.   And did Ms. de la Pena have to make her own changes to her

15  software to make it comparable with your prototype Number 4?

16  A.   She did.  And in that case it was software that was built

17  from the ground up for virtual reality, so it was -- it was a

18  lot easier for her to make that happen.

19  Q.   Okay.  Now, did you continue to correspond with

20  Mr. Carmack after you sent him the headset?

21  A.   Yes, I did.

22  Q.   Were you able to attend E3 when he was going to do what

23  you thought were private demonstrations?

24  A.   Unfortunately not.

25  Q.   All right.  Why couldn't you attend?

1    A.    I was at -- I was at something called SID Display Week in

2    Boston.   It is a display conference where lots of display and

3    optics vendors go to show off their stuff.   I was there for

4    work.   I was sent there to be the representative of the Mixed

5    Reality Lab and meet with several of the vendors we worked with

6    and try out some of their latest technology.

7    Q.    I believe you said that you started to receive texts from

8    friends and you saw media articles about the demonstration; is

9    that right?

10   A.    Yes.

11   Q.    Did you see media articles from folks like CNN?

12   A.    I don't remember CNN particularly, but there was some

13   mainstream media coverage as well as tech and gaming coverage.

14   Q.    All right.   And do you recall whether they always gave you

15   credit for the headset or not?

16   A.    It depended on the media outlet.   Some of them wrote

17   factually accurate stories, and some of them were not quite as

18   careful.

19   Q.    Did Mr. Carmack write to you specifically about this issue

20   and whether you would get the credit you deserved?

21   A.    Yes.

22   Q.    All right.   Let's see if we can find that exhibit.

23          (Pause)

24          MS. WILKINSON:   Thanks to Ms. Rubenstein we found it.

25          Can we look at DX1461?   I believe this is in

 1    evidence.

 2              (Pause)

 3              MR. PHILBIN:  No objection, Your Honor.

 4              THE COURT:  All right.  That's admitted into

 5    evidence.

 6              (Defendants' Exhibit No. 1461 received)

 7    BY MS. WILKINSON:

 8    Q.   Let's take a look at DX1461.

 9              Who is this email from?

10    A.   Mr. Carmack.

11    Q.   On what date?

12    A.   May 30, 2012.

13    Q.   And is that before E3, do you know?

14    A.   Yes.  This is several days before E3.

15    Q.   All right.  And why don't you read the first paragraph to

16    the jury, please.

17    A.   Sure.

18              He says, "I hope you liked The Verge presentation; I

19    made sure they got the HMD name right, and they dug up the MTBS

20    link themselves for the text."

21    Q.   Stop there just because there's acronyms.  HMD the

22    head-mounted device?

23    A.   Head-mounted display.

24    Q.   All right.  And MTBS?

25    A.   Stands for Meant to Be Seen, which is the name of the

1    message board where he had been posting.

2    Q.    Keep going.  Sorry about that.

3    A.    "I am doing my best to not let anyone mistake the Rift as

4    my work, but I'm sure someone is going to get it confused next

5    week.  I am sensitive to the fact that the press has a tendency

6    to over-attribute things to me because 'genius inventor' is

7    such a convenient story hook."

8    Q.    Setting aside the press, did anyone at ZeniMax ever tell

9    you that the Rift was Mr. Carmack's invention?

10   A.    No.

11   Q.    Let's look at the next paragraph.  He says, "I really do

12   think this is going to have an impact, and I am a little

13   concerned that you may come out of it somewhat shortchanged.

14   At the very least, you need to make sure you collect a little

15   profit from the kits.  Enthusiasm for progress will run low

16   after you have packaged up dozens and dozens of them."

17         What is he talking about when he said "the kits"?

18   A.    At the time I planned on selling a virtual reality

19   head-mounted display kit, essentially all of the parts that you

20   needed, including ones that I was manufacturing myself, to make

21   your own virtual reality head-mounted display.

22         The idea was that I would do a Kickstarter where

23   people who were technically savvy and game developers could get

24   these kits, put them together, and use them to create virtual

25   reality -- to create and play virtual reality software.

```
 1   Q.   All right.  And did your plan eventually change?
 2   A.   Yes, it did.
 3   Q.   Read the next sentence if you could.
 4              THE COURT:  Let me stop right there and make sure I
 5   understand something, the jury understands it.
 6              So you were going to send out -- it was going to have
 7   some executable software with it?
 8              THE WITNESS:  The plan at this point was basically
 9   the hardware.  It was a kit to have the display, to have the
10   motion tracker, to have the optics, the assembly, the head
11   mount.  The idea was that it would go out without any software
12   executable and that game developers would write games for it.
13   That was the purpose of it.
14              THE COURT:  All right.
15              THE WITNESS:  It was not for me to distribute my
16   software.  It was for them to make software that worked on the
17   device.
18              THE COURT:  So they would have to do their own
19   writing, whatever software that would include an executable
20   where they could play their new invented game on your headset?
21              THE WITNESS:  Yeah.  Newly invented game or old games
22   that already existed that they modified for virtual reality,
23   anything like that.  It was for people to work with, and then
24   some people wouldn't create their own software, they would get
25   my headset and then download software that other people had
```

```
 1   made, basically download their games to play them.  So some
 2   would be creating and some would be consuming.
 3               THE COURT:  And there can be a whole lot of different
 4   executables that could play on your headset?
 5               THE WITNESS:  Yes.  The idea was that it would turn
 6   into a wide collection of different games that you could play,
 7   you know, not just one thing.
 8               With any game system or computing platform, you need
 9   lots of different things that you can play in order to justify
10   the cost of buying the device.
11               THE COURT:  Yeah, I get all that.
12               What I'm asking is, I'm a consumer, I buy something
13   out there, and it's going to have an executable in it that
14   would work on your -- on your -- if I bought whatever they
15   produced and -- and they -- they're going to have something in
16   there that would make it work on your headset.
17               THE WITNESS:  I'm not sure I fully --
18               THE COURT:  Okay.
19               THE WITNESS:  I'm sorry.
20               THE COURT:  Let me ask it again.
21               THE WITNESS:  Sorry, Your Honor.
22               THE COURT:  No, that's okay.  You and I come from
23   different worlds.  I like football.
24               THE WITNESS:  I'm sorry, Your Honor.
25               THE COURT:  I'm not good at it.  I'm not good at it.
```

```
1    I just like to watch.  I play a little basketball.  You don't
2    like basketball either, I'm guessing.
3              THE WITNESS:  I do like basketball.
4              THE COURT:  Okay.  Good.  You're almost there.
5              All right.  So here's my -- I don't understand.
6    Whatever the -- and what the fight about it is here, they
7    wouldn't have to have any of the things that we're fighting
8    about here.  They would have your headset, and they could do
9    whatever they wanted to do with that headset to make it work?
10             THE WITNESS:  Yes, you have that correct.
11             THE COURT:  Okay.  That is what I was trying to get
12   to.
13             Sorry, Ms. Wilkinson.
14             MS. WILKINSON:  No.  That was helpful, Your Honor.  I
15   know you're helping.
16             THE COURT:  You have to remember I'm not you or
17   Mr. Sammi or Mr. Philbin or Mr. Stojilkovic or Mr. Hemr or the
18   lovely gentleman over here that is my -- what's the word?
19             MR. LISY:  Percipient.
20             THE COURT:  Percipient attorney over here.  All
21   right.  Go ahead.
22   BY MS. WILKINSON:
23   Q.   All right.  Now, when you were going to put together these
24   kits that you and Your Honor were just discussing, you weren't
25   going to go through the manufacturing process yourself.
```

```
 1              Is that fair?
 2   A.    I was -- you have to --
 3   Q.    Big manufacturing, you know --
 4   A.    It was going to be small scale manufacturing of the
 5   components that you could not buy off the shelf.  Some of these
 6   would be components that you could go out and buy, but it was
 7   cheaper to buy them all together.
 8              Others were ones that I was going to manufacture on a
 9   small scale using a laser cutter and a milling machine, and
10   those would go out with the kits.  But it was certainly not a
11   mass-produced product even in concept at that point.
12   Q.    When you met Mr. Iribe and the other founders of Oculus,
13   did you-all take a different path and decide you were going to
14   go into the manufacturing business?
15   A.    Yes.
16   Q.    All right.  And why was it beneficial for you to start
17   manufacturing these headsets?
18   A.    The more headsets that you can make and the more you can
19   send out to game developers, the more games will get made, and
20   the more games that get made, the more people want to buy your
21   device.  It's a virtue of cycle.
22              And so the thinking was the best way to get lots of
23   game developers to create VR games was to make it as easy and
24   as cheap as possible for them to do it, and that meant not
25   putting together a kit where they would have to assemble it but
```

1    making something in a factory that was very affordable so we

2    could sell not just a hundred of them but thousands of them to

3    game developers all over the world, and that was -- that was

4    what we were trying to shift to.

5    Q.    So to His Honor's point, once you had that manufactured

6    headset, then lots of different developers could write their

7    games, and they would be compatible with that headset?

8    A.    Exactly.

9    Q.    So as a parent, then, I'm more willing to buy the headset

10   because the kids can play all their different games on there?

11   A.    As a parent or a gamer or anybody else, anyone who wants

12   to play --

13            THE COURT:  Wait, wait, wait, wait.

14            MR. PHILBIN:  Your Honor, I think it calls for

15   speculation for Mr. Luckey to testify about Ms. Wilkinson's

16   tendencies as a parent, to say the least.

17            THE COURT:  Well, if you were a parent.  Change that

18   around.

19            Sustain the objection.

20   BY MS. WILKINSON:

21   Q.    You're not a parent yet, are you, Mr. Luckey?

22   A.    No.

23   Q.    Okay.  Just tell us what you think, how it would help --

24   A.    I don't think so.  Sorry.

25            THE COURT:  And do you call these development -- do

```
 1    you call them development or something, didn't you, development
 2    kits or --
 3             THE WITNESS:  We call them a development kit, a
 4    developer kit or a development kit.
 5             THE COURT:  It's a developer kit.
 6             THE WITNESS:  Yes.
 7             THE COURT:  Okay.
 8             THE WITNESS:  And that doesn't actually mean you put
 9    it together.  It's confusing how there is multiple terms.  It's
10    basically --
11             THE COURT:  For the developer to go write the
12    software so that there is a whole bunch of more games so you
13    can sell a whole bunch of more headsets if there is more games?
14             THE WITNESS:  Exactly.
15             THE COURT:  Okay.
16             THE WITNESS:  Like there is an Xbox development kit
17    that is an early version of the new Xbox that they send out to
18    people to make games with.
19             THE COURT:  And I can do that just before I go see a
20    football game.
21             Never mind.  Never mind.  Go ahead.
22    BY MS. WILKINSON:
23    Q.   All right.  And down at the bottom, what does Mr. Carmack
24    ask you for?  Where it says "would," can you read that?
25    A.   Yes.
```

 1          He says, "Would it be possible to get a couple more
 2   display sets with the DVI interfaces put together in the next
 3   month or so?  Someone here has expressed interest in doing some
 4   3D printer-based prototypings for housings, and I would like to
 5   have some solid units together for QuakeCon in early August."
 6   Q.   Did Mr. Carmack ever suggest to you he was going to make
 7   more of the Rift headsets or was he relying on you for the
 8   hardware?
 9   A.   He was relying on me for -- for -- he was relying on me,
10   for the most part, for the hardware.
11   Q.   All right.  Now, you told Mr. Philbin, I think, that
12   eventually that you eventually incorporated your company,
13   right?
14   A.   Yes.
15          MS. WILKINSON:  Let's look at DX1700, please.
16   BY MS. WILKINSON:
17   Q.   Do you recognize this?
18   A.   Yes, I do.
19   Q.   And what is it up there on the left-hand corner?
20   A.   The seal of -- oh, the seal of the State of California,
21   Secretary of State.
22          It says, "Limited Liability Company.  Articles of
23   Organization."
24   Q.   What date was it filed in California?
25   A.   It was filed on June 12, 2012.

```
 1    Q.   What was the name of the company that you formed?
 2    A.   Oculus LLC.
 3    Q.   Was it necessary for you to actually go through this
 4    formal process to make this company an organization that you
 5    could represent and hire and fire and do other things you
 6    wanted to do on behalf of the company?
 7    A.   Yes, it was.
 8    Q.   Did you do this after you signed the NDA or before?
 9    A.   After.
10    Q.   Now, I want to take a look at some other emails that
11    Mr. Carmack sent you.
12              MS. WILKINSON:  If we could look at DX89.
13    BY MS. WILKINSON:
14    Q.   After E3 you told us you continued to correspond with him,
15    right?
16    A.   Yes.
17    Q.   Did he tell you a little bit more about what he had done
18    about the executable, the VR testbed?
19    A.   Yes, he did.
20    Q.   All right.  This email is from Mr. Carmack on June 15th to
21    you, right?
22    A.   Yes, it is.
23    Q.   What's the subject?
24    A.   "HMD test executable."
25    Q.   And is that what you were telling the jury and His Honor
```

1    that is not code, it's the actual executable that you would try
2    to play on your headset?
3    A.    Yes.  HMD test was actually the file name of the VR
4    testbed.
5    Q.    All right.  And what does the first sentence say?
6    A.    He said, "I tidied up my research and development
7    executable a bit so it works without a head tracker, but it is
8    so much less cool without it."
9    Q.    Does that mean that even though you didn't put a head
10   tracker on this particular Rift prototype, his testbed could be
11   shown on this without a tracker?
12           MR. PHILBIN:  Objection, calls for speculation as to
13   what Mr. Carmack knew.
14           MS. WILKINSON:  If you know.
15           THE COURT:  Whoa, whoa, whoa.
16           MR. PHILBIN:  Calls for speculation as to what
17   Mr. Carmack knew and speculated what Mr. Carmack could do.
18           THE COURT:  Just what you know.  I sustain that.
19   BY MS. WILKINSON:
20   Q.    I asked what do you know, whether Mr. -- the executable
21   you received from Mr. Carmack, could you show that on here
22   without a head tracker based on what he's telling you that he
23   did to the software?
24           MR. PHILBIN:  Objection, leading.
25           THE COURT:  I'm going to let her lead just because it

```
 1    will save time.
 2              Overruled.
 3              THE WITNESS:  Yes.  And I had actually done so.
 4    BY MS. WILKINSON:
 5    Q.   Now, down at the bottom of this email, if we could, does
 6    he talk about his Hillcrest sensor?
 7    A.   Yes, he does.
 8    Q.   Does he say he could send it to you?
 9    A.   Yes.  He says that he has an extra Hillcrest sensor that
10    he can send to me.
11    Q.   Did you ever need that sensor?
12    A.   The -- I would have needed it to run his software with
13    head tracking because his software only worked with that
14    particular head tracker.  It wouldn't have worked with any of
15    the other head tracking systems that I already owned.
16    Q.   Did you need it for the Oculus developer kit headset that
17    we've been looking at that you released in May of 2013?
18    A.   No.
19    Q.   All right.  Now, in June, after you had been talking to
20    Mr. Carmack, did you meet Mr. Iribe?
21    A.   Yes, I did.
22    Q.   Do you recall about when that was?
23    A.   It was sometime in June of 2012.
24    Q.   All right.  And where did you-all meet?
25    A.   I met him at a restaurant in Los Angeles.
```

```
 1   Q.    What was the purpose of your meeting?
 2   A.    We had been introduced by a mutual friend who said we
 3   needed to talk.  He thought Brendan would be interested in what
 4   I was up to and that Brendan would be able to give me some good
 5   advice on challenges that I was having at the time, so it was
 6   kind of just to meet each other and introduce ourselves and
 7   talk about virtual reality.
 8   Q.    All right.  And at that time did you show Mr. Iribe your
 9   headset?
10   A.    No, I did not.
11   Q.    All right.  Did Mr. Iribe and you come to any agreement at
12   that meeting?
13   A.    We -- we came to -- we came to a kind of agreement.  He --
14   he basically -- at the time I was considering working for some
15   other people.  Brendan was the one who convinced me that I
16   should really stay true to my heart and start my own company
17   and do -- do things on my own.
18   Q.    Did he agree to invest in your company that day?
19   A.    I don't know if it was that day, but it was sometime in
20   that time period --
21   Q.    All right.
22   A.    -- in one of the many discussions we had.
23   Q.    Did he give you something to invest?
24   A.    He -- I think he did that at a meeting -- it was around
25   the time -- it was at another meeting where we met at a
```

```
 1   Starbucks and then a pizza place.
 2   Q.   All right.  And was that in June?
 3   A.   Yes, that was in June.
 4   Q.   All right.  Let's take a look at DX766.
 5            What did he give you to invest in that day?
 6   A.   He wrote a check for a few thousands dollars.  I forget
 7   the exact amount.  It's on this bank statement.  But he gave me
 8   a check for several thousands dollars that I used to
 9   purchase -- purchase more parts for the next generation Rift
10   prototypes.
11   Q.   So just to get this right, we'll go down to the entry
12   on --
13            Is this your bank account statement?
14   A.   Yes, it is.
15   Q.   All right.  With your account number blacked out?
16   A.   Yes.
17   Q.   At this time did you have a little less money in there
18   than you do today?
19   A.   Yes.
20   Q.   Let's go down, if we could --
21            THE COURT:  Who is Julie Luckey?
22            THE WITNESS:  Julie Luckey is my mother.  I opened
23   this account when I was a minor so she had to be listed on it.
24   I was an adult by this time, but she had not been taken off of
25   the account because I trust my mom.
```

```
 1                THE COURT:  Okay.
 2                MS. WILKINSON:  That's a good question, though.
 3                THE COURT:  I thought maybe there was a mom -- a wife
 4     by now.  I didn't -- I didn't know.  Okay.
 5     BY MS. WILKINSON:
 6     Q.   In July -- June and July of 2012, how old were you?
 7     A.   I was -- I was 18 or 19.
 8     Q.   How old are you today?
 9     A.   I'm 24 years old.
10     Q.   Now, let's go down to the record of June 28th, please.
11                Now, June 28th, that would have been before or after
12     the July 4th demonstration you did for Mr. Iribe and others?
13     A.   This was before.
14     Q.   So you didn't have the headset to show Mr. Iribe?
15     A.   No.  Well, I did, but I had not showed it to him.  We had
16     mostly been meeting in Los Angeles, but we had not been able to
17     arrange a time to show him my systems.
18     Q.   Sorry.  That was a poorly worded question.
19                You had one but hadn't shown it to him?
20     A.   I hadn't shown it to him, exactly.
21     Q.   This deposit said -- this says deposit was made for
22     $3,500.
23                Do you remember if that was the check amount or if
24     you took any cash out?
25     A.   I don't remember -- I don't remember very clearly.  I
```

1    remember -- I remember that I deposited the check at a local

2    Wells Fargo in Long Beach.  I might have withdrawn some cash on

3    it, but I don't really remember one way or the other.

4    Q.    And is that about the amount of money you recall getting

5    from Mr. Iribe?

6    A.    Yes.

7    Q.    All right.  Now, after you did that, did you and Mr. Iribe

8    decide to invite others to either invest or work with you at

9    Oculus?

10    A.    Yes.

11    Q.    Who was that?

12    A.    The first people were Nate Mitchell and Michael Antonov.

13    Q.    All right.  And when did you first meet with them?

14    A.    I think the first time I met them was either late June or

15    early July.

16    Q.    Is that when you did the -- well, was that before the

17    July 4th demonstration?

18    A.    I think the July 4th demonstration might have been the

19    first time I met them.  I don't clearly recall.

20    Q.    All right.  At that demonstration did you show any code or

21    did you show the executable testbed?

22    A.    Well, I -- I basically ran the executable on my computer,

23    which was then plugged in to the headset.  And you could

24    view -- view the game.  So you were basically view ing the

25    software that the executable was, you know, running.

```
 1    Q.   So the executable is actually inside the computer?
 2    A.   It's inside the computer.
 3    Q.   So all they are seeing in the headset is what -- or not
 4    all but what were they seeing in the headset then?
 5    A.   They were seeing -- I believe it was a -- it was a room
 6    that was -- it was a room that was taken from the game Rage,
 7    and you could basically look around in this room and view it.
 8    There wasn't game player or anything, but you could move
 9    through this space and look around inside of it.
10    Q.   All right.  So if I use my own analogy, when you used to
11    have to buy disks for the game, it would be like you plugged
12    the disk in to the computer, they're not looking at the disk,
13    they are just looking at the headset?
14    A.   Right.  That's what I meant by, you know -- I didn't show
15    them the executable exactly.  I was running the executable on
16    the computer, which was then, you know, plugged in to my
17    headset, which they were looking into it.
18    Q.   All right.  And did Mr. Mitchell and Mr. Antonov and
19    others decide to work with you after that?
20    A.   Yes, they did.
21    Q.   All right.  Did you end up hiring other folks at Oculus?
22    A.   Yes, we did.
23    Q.   Did you hire engineers?
24    A.   Many.
25    Q.   Vision Ph.D.'s like we heard about?
```

A.    Quite a few.

Q.    All right.  And did you take Mr. Carmack up on his offer
to go speak at QuakeCon later that summer --

A.    Yes.

Q.    -- 2012?

A.    Yes, I did.

Q.    And at some point were you introduced to Mr. Hollenshead,
the president of id?

A.    I had talked to him on the phone and emailed with him, but
that was the first time I had met him in person.

        MS. WILKINSON:  Let's take a look at DX112, please.

BY MS. WILKINSON:

Q.    So now we're at July 19, 2012.  So the summer of 2012.
This is an email from you to Mr. Hollenshead?

A.    Yes.

Q.    And it's about what subject?

A.    QuakeCon.

Q.    Okay.  Let's go down to the bottom, see who this was from.

        What is that -- a little -- there we go -- it says
Wednesday, July 18th, from Mr. Hollenshead.

        Is that the same Mr. Hollenshead we've been talking
about?

A.    Yes.

Q.    And he was a ZeniMax employee?

A.    I believe he was the president of id Software.

1   Q.   And id was part of ZeniMax at the time, right?

2   A.   Right.

3   Q.   All right.  So what does he say to you, there?  Read it

4   after, "Hey, Palmer."

5   A.   He said, "We would like to have you out for QuakeCon for

6   part of a panel with John and Michael Abrash (Valve) to discuss

7   VR/HMD, AR, and related cool techy stuff.  It would work well

8   for our schedule to have the panel on the evening of Friday

9   August 3rd."

10  Q.   All right.  Did you agree to do that?

11  A.   Yes, I did.

12  Q.   Did he also ask you whether they could live stream the

13  panel?  Do you recall?

14  A.   I -- that sounds familiar.  I don't specifically remember

15  that.

16          MS. WILKINSON:  All right.  Let's take a look at

17  DX1874, please.

18  BY MS. WILKINSON:

19  Q.   And do you see that on this July 24, 2012, email from you

20  to Mr. Hollenshead that he asked you whether you would agree

21  whether they could live stream the panel?

22  A.   Yes.

23  Q.   And what do you say?

24  A.   I say, "It is cool with me!"

25  Q.   And did you see the cameras there that were recording your

```
 1    panel discussion with Mr. Carmack and Mr. Abrash and
 2    Mr. Hollenshead at QuakeCon?
 3    A.   Yes, I did.
 4    Q.   All right.  Did you continue to stay in touch with
 5    Mr. Hollenshead after this time when you were working with
 6    ZeniMax?
 7    A.   Yes, I did.
 8    Q.   Okay.  And did others from Oculus stay in touch with
 9    Mr. Hollenshead and advise them of what you all were doing?
10            MR. PHILBIN:  Objection, calls for speculation.
11            MS. WILKINSON:  If you know.
12            THE COURT:  Just you.
13            THE WITNESS:  Yeah.
14    BY MS. WILKINSON:
15    Q.   Were you on some of the emails where Mr. Hollenshead was
16    talking to other folks at Oculus?
17    A.   Yes, I was.
18    Q.   All right.  Let's take a look at DX1331, please.
19            All right.  Is this an email from Mr. Mitchell?
20    A.   Yes.
21    Q.   He was at Oculus in the summer of 2012?
22    A.   Yes.
23    Q.   Who's he talking to?
24    A.   Todd Hollenshead.  Cc'd on the email is John Carmack and
25    myself, Palmer Luckey.
```

```
 1    Q.   And what is the subject matter?
 2    A.   Subject is "Rift and Doom 3 BFG demos."
 3    Q.   And had you and Mr. Mitchell been talking to
 4    Mr. Hollenshead about the demonstrations you were doing of
 5    their game on your headset?
 6    A.   Yes, we had.
 7    Q.   All right.  Let's take a look at DX167, please.
 8              Did you continue to do that after QuakeCon?
 9    A.   Yes.
10    Q.   All right.  And this email is from Mr. Iribe, right?  He's
11    at Oculus by this time?
12    A.   Yes.
13    Q.   We're now at September 3, 2012?
14    A.   Yes.
15    Q.   And who are you-all in touch with from id and ZeniMax
16    then?
17    A.   On this email is John Hollenshead and John Carmack.
18    Q.   Todd Hollenshead, right?  Did you say John?
19    A.   Sorry.  Todd Hollenshead and John Carmack.
20    Q.   What's the subject matter?
21    A.   Subject is "Oculus PAX schedule."
22    Q.   All right.  And it says, "Thought you'd enjoy seeing the
23    final day of Oculus PAX schedule.  Over 70 meetings, all very
24    positive, even NASA's VR team was blown away."
25              What were you talking about the Oculus PAX schedule?
```

```
 1                MR. PHILBIN:  Again, it calls for speculation.  This
 2    isn't something that he wrote.
 3                THE COURT:  Right.  I agree with that.  Sustain that
 4    objection.
 5    BY MS. WILKINSON:
 6    Q.   All right.  And during this time period, in the summer and
 7    the fall, did you go to other companies and make demonstrations
 8    of your headset using the VR Rage testbed?
 9    A.   Yes.
10    Q.   What other companies did you go do demonstrations for?
11    A.   Unity 3D, Epic Games, Valve.
12    Q.   All right.  We have heard the name Michael Abrash.  Was
13    Mr. Abrash an employee of a different company back in 2012?
14    A.   Yes.
15    Q.   What company?
16    A.   He worked for Valve.
17    Q.   All right.  Did you visit him once or several times?
18    A.   We visited several times.  We -- we had an ongoing
19    relationship with him.
20    Q.   All right.  When was first time or approximately the first
21    time you remember going to visit him as Oculus or his company
22    Valve?
23    A.   The first time that I visited Valve was in July of 2012.
24    Q.   All right.
25                THE COURT:  Stop.
```

1        All right.  We're going to break till 1:15.

2        Your lunch is here.

3        Don't talk about the case.

4        SECURITY OFFICER:  All rise.

5        (Jury out)

6        (Recess at 12:01)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            INDEX

2                                                  Further
                  Direct  Cross  Redirect  Recross  Redirect
3
     WITNESS FOR THE
4    PLAINTIFFS

5    PALMER LUCKEY        15       55

6

7    PLAINTIFFS' EXHIBITS                           Received

8        181       Email                               54

9        8831066                                       54

10
     DEFENDANTS' EXHIBITS                            Received
11
         787       MTBS message                        97
12
         797       Email                              101
13
         1041      Photograph                          83
14
         1401      MTBS message                       104
15
         1461      Email                              111
16

17

18

19

20

21

22

23

24

25
```

Todd Anderson, RMR, CRR        (214) 753-2170

1        I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 18th day of January, 2017.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25