1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4

5    ZENIMAX MEDIA INC. and ID      )        3:14-CV-1849-K
     SOFTWARE LLC                   )
6              Plaintiffs,          )
                                    )
7                                   )
     VS.                            )
8                                   )        DALLAS, TEXAS
                                    )
9    OCULUS VR, LLC, PALMER         )
     LUCKEY, FACEBOOK, INC.,        )
10   BRENDAN IRIBE and JOHN         )
     CARMACK,                       )
11             Defendants.          )        January 25, 2017

12

13          TRANSCRIPT OF JURY TRIAL, VOLUME 17

14          BEFORE THE HONORABLE ED KINKEADE

15             UNITED STATES DISTRICT JUDGE

16

17   A P P E A R A N C E S:

18

     FOR THE PLAINTIFFS:          MR. P. ANTHONY SAMMI
19                                Skadden, Arps, Slate,
                                    Meagher & Flom LLP
20                                Four Times Square
                                  New York, New York  10036
21                                (212) 735-2307
                                  anthony.sammi@skaddden.com
22

23                                MR. PHILLIP B. PHILBIN
                                  Haynes and Boone LLP
24                                2323 Victory Avenue, Suite 700
                                  Dallas, Texas  75219
25                                (214) 651-5000
                                  phillip.philbin@haynesboone.com



1                              MR. KURT WILLIAM HEMR
                               Skadden, Arps, Slate,
2                                 Meagher & Flom LLP
                               Four Times Square
3                              New York, New York  10036
                               (617) 573-4833
4                              kurt.hemr@skaddden.com

5

                               MR. CHRISTOPHER A LISY
6                              Skadden, Arps, Slate,
                                  Meagher & Flom LLP
7                              500 Boylston Street
                               Boston, Massachusetts  02116
8                              (617) 573-4800
                               christopher.lisy@skaddden.com
9

10                             MR. MICHAEL R. WALSH
                               Skadden, Arps, Slate,
11                                Meagher & Flom LLP
                               500 Boylston Street
12                             Boston, Massachusetts  02116
                               (617) 573-4862
13                             michael.walsh@skadden.com

14

                               MR. JAMES Y. PAK
15                             Skadden, Arps, Slate,
                                  Meagher & Flom LLP
16                             Four Times Square
                               New York, New York  10036
17                             (212) 735-2546
                               james.pak@skaddden.com

18

19                             MR. MICHAEL DALEY KARSON
                               Haynes and Boone LLP
20                             2323 Victory Avenue
                               Suite 700
21                             Dallas, Texas  75219
                               (214) 651-5000
22                             michael.karson@haynesboone.com

23

24

25

1                          MS. RACHEL R. BLITZER
                           Skadden, Arps, Slate,
2                             Meagher & Flom LLP
                           Four Times Square
3                          New York, New York  10036
                           (212) 735-3000
4                          rachel.blitzer@skaddden.com

5

                           MR. WILLIAM J. CASEY
6                          Skadden, Arps, Slate,
                             Meagher & Flom LLP
7                          525 University Avenue
                           Palo Alto, California  94301
8                          (650) 470-4500
                           william.casey@skaddden.com
9

10                         MR. SCOTT MICHAEL FLANZ
                           Skadden, Arps, Slate,
11                            Meagher & Flom LLP
                           Four Times Square
12                         New York, New York  10036
                           (212) 735-3000
13                         sflanz@skaddden.com

14

                           MS. EMILY WHITCHER
15                         Skadden, Arps, Slate,
                             Meagher & Flom LLP
16                         Four Times Square
                           New York, New York  10036
17                         (212) 735-3605
                           emily.whitcher@skaddden.com
18

19                         MS. JENNIFER H. DOAN
                           Haltom & Doan
20                         6500 Summerhill Road, Suite 100
                           Texarkana, Texas  75503
21                         (903) 255-1000
                           jdoan@haltomdoan.com
22

23

24

25

```
1                              MR. JOSH R. THANE
                               Haltom & Doan
2                              6500 Summerhill Road, Suite 100
                               Texarkana, Texas  75503
3                              (903) 255-1000
                               jthane@haltomdoan.com
4

5

    FOR THE DEFENDANTS:        MS. BETH A. WILKINSON
6                              Wilkinson Walsh & Eskovitz LLP
                               1900 M Street NW
7                              Suite 800
                               Washington, DC  20036
8                              (202) 847-4000
                               bwilkinson@wilkinsonwalsh.com
9

10                             MR. BRANT W. BISHOP
                               Wilkinson Walsh & Eskovitz LLP
11                             1900 M Street NW
                               Suite 800
12                             Washington, DC  20036
                               (202) 847-4000
13                             bbishop@wilkinsonwalsh.com

14

                               MS. CALI COPE-KASTEN
15                             Wilkinson Walsh & Eskovitz LLP
                               1900 M Street NW
16                             Suite 800
                               Washington, DC  20036
17                             (202) 847-4000
                               ccope-kasten@wilkinsonwalsh.com
18

19                             MS. KIRSTEN NELSON
                               Wilkinson Walsh & Eskovitz LLP
20                             1900 M Street NW
                               Suite 800
21                             Washington, DC  20036
                               (202) 847-4000
22                             knelson@wilkinsonwalsh.com

23

24

25
```

1                                    MS. RUTH VINSON
                                     Wilkinson Walsh & Eskovitz LLP
2                                    1900 M Street NW
                                     Suite 800
3                                    Washington, DC  20036
                                     (202) 847-4000
4                                    rvinson@wilkinsonwalsh.com

5

                                     MR. MAX WARREN
6                                    Wilkinson Walsh & Eskovitz LLP
                                     1900 M Street NW
7                                    Suite 800
                                     Washington, DC  20036
8                                    (202) 847-4000
                                     mwarren@wilkinsonwalsh.com

9

10                                   MR. HAYTER WHITMAN
                                     Wilkinson Walsh & Eskovitz LLP
11                                   1900 M Street NW
                                     Suite 800
12                                   Washington, DC  20036
                                     (202) 847-4000
13                                   hwhitman@wilkinsonwalsh.com

14

                                     MR. KOSTA S. STOJILKOVIC
15                                   Wilkinson Walsh & Eskovitz LLP
                                     1900 M Street NW
16                                   Suite 800
                                     Washington, DC  20036
17                                   (202) 847-4050
                                     kstojilkovic@wilkinsonwalsh.com

18

19

                                     MS. HEIDI L. KEEFE
20                                   Cooley LLP
                                     3175 Hanover Street
21                                   Palo Alto, California  94304
                                     (650) 843-5000
22                                   hkeefe@cooley.com

23

24

25

1          **MR. BRETT DeJARNETTE**
           Cooley LLP
2          3175 Hanover Street
           Palo Alto, California  94304
3          (650) 843-5000
           bdejarnette@cooley.com
4

5          **MS. ELIZABETH LEE STAMESHKIN**
           Cooley LLP
6          3175 Hanover Street
           Palo Alto, California  94304
7          (650) 843-5000
           lstameshkin@cooley.com
8

9          **MR. RICHARD A. SMITH**
           Richard Smith, PC
10         Campbell Centre I
           8350 N. Central Expressway
11         Suite 1111
           Dallas, Texas  75206
12         (214) 242-6484
           richard@rsmithpc.com
13

14         **MR. RAGESH KUMAR TANGRI**
           Durie Tangri LLP
15         217 Leidesdorff Street
           San Francisco, California  94111
16         (415) 362-6666
           rtangri@durietangri.com
17

18         **MR. BENJAMIN B. AU**
           Durie Tangri LLP
19         217 Leidesdorff Street
           San Francisco, California  94111
20         (415) 362-6666
           bau@durietangri.com
21

22         **MR. MARK RANDOLPH WEINSTEIN**
           Cooley LLP
23         3175 Hanover Street
           Palo Alto, California  94304
24         (650) 843-5000
           mweinstein@cooley.com
25

```
 1                         MR. JOSEPH B. WOODRING
                           Cooley LLP
 2                         1333 2nd Street, Suite 400
                           Santa Monica, California  90401
 3                         (310) 883-6400
                           jwoodring@cooley.com
 4

 5                         MR. MATTHEW D. CAPLAN
                           Cooley LLP
 6                         101 California Street
                           5th Floor
 7                         San Francisco, California  94111
                           (415) 693-2000
 8                         mcaplan@cooley.com

 9
                           MR. PHILIP MAO
10                         Cooley LLP
                           3175 Hanover Street
11                         Palo Alto, CA 94304
                           (650) 843-5000
12                         pmao@cooley.com

13
                           MR. DANIEL TEIMOURI
14                         Cooley LLP
                           1700 Seventh Avenue
15                         Suite 900
                           Seattle, Washington  98101
16                         (206) 452-8791
                           dteimouri@cooley.com
17

18                         MS. JULIE B. RUBENSTEIN
                           Wilkinson Walsh & Eskovitz LLP
19                         1900 M Street NW
                           Suite 800
20                         Washington, DC  20036
                           (202) 847-4000
21                         jrubenstein@wilkinsonwalsh.com

22

23

24

25
```

```
 1                              MS. ELIZABETH Y. RYAN
                               Lynn Pinker Cox & Hurst, LLP
 2                             2100 Ross Avenue
                               Suite 2700
 3                             Dallas, Texas   75201
                               (214) 981-3821
 4                             eryan@lynnllp.com

 5
                               MS. CHRISTEN DUBOIS
 6                             Facebook, Inc.
                               1601 Willow Road
 7                             Menlo Park, California  94025
                               (650) 862-5980
 8                             cdubois@fb.com

 9
                               MR. PAUL GREWAL
10                             Facebook, Inc.
                               1601 Willow Road
11                             Menlo Park, California  94025
                               (650) 814-3157
12                             paulgrewal@fb.com

13
       COURT REPORTER:         MR. TODD ANDERSON, RMR, CRR
14                             United States Court Reporter
                               1100 Commerce St., Rm. 1625
15                             Dallas, Texas  75242
                               (214) 753-2170
16

17

18

19

20

21

22

23          Proceedings reported by mechanical stenography and

24     transcript produced by computer.

25
```

1              JURY TRIAL - JANUARY 25, 2017

2                    P R O C E E D I N G S

3         THE COURT:  Y'all need anything before we start?

4         MS. WILKINSON:  Yes, sir.

5         THE COURT:  On the record, off the record?

6         MS. WILKINSON:  On the record, please.

7         THE COURT:  Okay.

8         MS. WILKINSON:  May I hand up a copy of a letter we

9    sent Plaintiffs' counsel?

10         THE COURT:  Absolutely.

11         MS. WILKINSON:  Your Honor, you may recall we asked

12   Mr. Altman on Friday, and then I asked him again on Monday,

13   whether he had any documentation about the value of his company

14   being 4 to 8 billion dollars, and, of course, I didn't ask that

15   because I didn't know the answer to the question, and he said,

16   "No, there are documents," and I said, "You haven't produced

17   any," and he said, "I don't know what's been produced."

18         Well, we bent back to the Court's order, and the

19   Court specifically ordered Plaintiffs to produce all documents

20   reflecting any evaluations of Plaintiffs, meaning id and

21   ZeniMax, from 2006 to present.

22         We have received nothing.  So we ask that either

23   Plaintiffs produce what they have right now or that I be

24   allowed to call Mr. Altman back to the stand in our case so I

25   can impeach him with his failure to produce any documents.

1      THE COURT: And who is going to respond for y'all?

2  Mr. Hemr?

3      MR. HEMR: Yes, Your Honor.

4      Your Honor, a couple of things about that. Number

5  one, the suggestion that we failed to produce documents is

6  false. We've produced financial statements that can be used to

7  derive valuations to the company.

8      In terms of value --

9      THE COURT: He said they didn't.

10     MR. HEMR: Pardon?

11     THE COURT: Your witness said they didn't. He said

12  it about five times.

13     MR. HEMR: I disagree with that, Your Honor.

14     THE COURT: It doesn't really matter what you think.

15  It's what I think. He said that over and over that that was

16  not the proper valuation.

17     MR. HEMR: And Ms. Wilkinson was referring to a

18  particular line item on the statement. The way that you would

19  derive a value for the company from the financial statement is

20  either -- excuse me -- is a multiple of revenues, a multiple of

21  cash flows. Ms. Wilkinson didn't refer to that.

22     There are other documents other than documents that

23  reflect value -- that reflect a valuation --

24     THE COURT: Yes, sir.

25     MR. HEMR: -- that Mr. Altman would rely on to form

 1   his own opinion of the market value of his company.  For

 2   instance, if he were to receive an inquiry from someone outside

 3   the company saying would you be interested in selling for "X"

 4   amount of money, he could rely on that.

 5            This was raised -- the order that's referred to here

 6   happened in April 2016 before Mr. Altman was deposed.  He was

 7   never asked about it.

 8            This issue could have been raised eight months ago.

 9   I think our production is complete in this regard.

10            THE COURT:  It isn't if you haven't produced them

11   all.

12            MR. HEMR:  The --

13            THE COURT:  Go look.

14            Look, you come in with, in my opinion, unclean hands.

15   Y'all didn't produce something earlier this week after I

16   ordered it.

17            I'm going to give you till noon today to find

18   everything there is and produce noon tomorrow, and if you don't

19   produce something, I'm going to make a statement to the jury,

20   I'm going to let her recall him.  You have got to find it.

21            MR. HEMR:  Understood, Your Honor.

22            THE COURT:  Mr. Hemr, you're a good lawyer.  I

23   appreciate you fighting hard and saying you don't agree with

24   me.  I want you to understand I do appreciate your opinion.

25   It's not that I don't value your opinion.  It's just ultimately

1    I have to make these decisions, and this has nothing to do with
2    my respecting you.  I do respect you, and I respect your
3    company, but he went over and over again about -- about what he
4    thought and was all over the place and all those things.  She
5    needs a document, and you have got to produce it.  Okay?
6              I don't -- I don't know what all that is.  He said
7    there was something.  So, you know, we will find out.
8              You can value private companies --
9              MR. HEMR:  You can --
10             THE COURT:  -- all kinds of ways.  If it's real
11   estate, you can look at the cap rate and all kind of things
12   like that.  I don't know what all this company owns.  I don't
13   have -- I don't know that.  But there are evaluations.
14             He has to go to -- I'm assuming he borrows money,
15   goes to the bank, and he produces documents.  There is bound to
16   be things.
17             MR. HEMR:  I'm thinking of two categories of things,
18   sir, number one, the financial statements, and other than the
19   line item on the financial statements that Ms. Wilkinson
20   pointed to, there are various points in there, as I said, the
21   revenues, cash flows, there is a place where there's an implied
22   value of the stock.  He can look at that.
23             THE COURT:  He said the stock is not -- you know,
24   that's not the value.  We went over and over about that.
25             MR. HEMR:  Yeah, and then, secondly, there is what he

1    hears from outside of the company, but he doesn't get the
2    valuation with that.
3            THE COURT:  Okay.  The financial statements aren't
4    going to cut it.
5            MR. HEMR:  I understand, Your Honor.  Yeah.  And we
6    will make a production.
7            THE COURT:  He could if he said that's the value.  He
8    doesn't.  He doesn't say that.  I understand that.  I think he
9    is right about that.  But there is a value.  There is a value.
10           MR. HEMR:  Understood, Your Honor.  And we'll go
11    back, and we will gather things up, and they will be produced
12    by tomorrow morning.
13           THE COURT:  Yeah.  Even if it wasn't -- thank you.
14    That is really what I wanted to hear.
15           I mean, if it was a big not for profit, like a bit
16    health care system, there are ways to value it.  Yes, there are
17    alternative ways.  I get that.  I understand that.  But this is
18    just so all over the place, it's as if there is really no
19    value.  And I get because it's a private company.  I get all
20    that.  I understand that.  And he did give a range for that.  I
21    agree with that.  He did do that.
22           MR. HEMR:  I would just say one additional thing,
23    sir.  With regard to the -- with regard to the company itself,
24    it's not as if the company sits down and calculates what its
25    own marketed value is, and that would be a document that I

1   agree would be responsive to this analysis -- to this request,

2   and there aren't such documents, and that's why they have not

3   been produced.

4            THE COURT:  There are not?

5            MR. HEMR:  Yes.

6            THE COURT:  There is not -- you're going to produce

7   anything?

8            MR. HEMR:  No.  The kind of document I'm imagining

9   where like a company might sit down and say, hey, what are we

10  worth, what is our market value, that's -- that's not a kind of

11  document that exists, and so it wasn't produced.

12           Mr. Altman was relying on other kind of things.

13           THE COURT:  Well, okay.  What is it Mr. Sammi is

14  saying?

15           MR. HEMR:  He -- this is the point that I made just a

16  moment ago, which is that there are documents which you can

17  infer valuation.  One of those is the financial statements, and

18  there are other things like sales figures.

19           THE COURT:  If you say financial statement one more

20  time, Mr. Hemr, you're going to be in trouble with me because

21  you and I both agree he says that's not the value.  He says

22  that's not the value.

23           You know, I want him to point -- I'm fine with him

24  getting back if they're saying I'm wrong, here's the value,

25  boom.  That's okay.  That's okay.

```
 1              MR. HEMR:  Your Honor, I'm not an investment banker
 2    and --
 3              THE COURT:  Yeah, you've represented plenty of them.
 4              MR. HEMR:  I have.
 5              THE COURT:  Oh, I'm shocked that I knew that.
 6              MR. HEMR:  And here is what I learned from
 7    representing investment bankers.  The way you look at a
 8    financial statement to value a company is not at the line item
 9    that Ms. Wilkerson was pointing to -- Wilkinson.  Excuse me.  I
10    did that twice.  I am sorry.
11              MS. WILKINSON:  That's okay.
12              MR. HEMR:  -- is you look at things like a discounted
13    cash flow analysis, you look at multiples of cash flow,
14    multiples of revenue, and you can look at other pieces of the
15    financial statement to give you an idea what the company is
16    worth.  That's not what she asked him about, and that's one way
17    that you could --
18              THE COURT:  She asked about it whichever way you
19    could ask it.  I mean, I may be wrong.  I could be wrong about
20    that.  And the court reporter is going to have it all down.
21              MR. HEMR:  I'm not saying that we're not going to
22    make a production, Your Honor, believe you me.
23              THE COURT:  Look, I understand.
24              MR. HEMR:  We will go back and see what --
25              THE COURT:  Because the consequences of not doing
```

1    that are grave.

2              MR. HEMR:  I understand, Your Honor.

3              THE COURT:  Okay.  So -- let's just get it settled.

4    Whatever it is, it is.  And get that settled and let's go on.

5    Okay?

6              MR. HEMR:  All right.  Thank you, Your Honor.

7              THE COURT:  All right.  Do you want to make any more

8    motions about the -- let's see.  This is the first morning we

9    haven't had anything about the --

10              MR. HEMR:  The agreement, sir?

11              THE COURT:  The indemnification.

12              MR. HEMR:  Would you like me to, sir?

13              THE COURT:  I'm just -- this is the first morning

14    when you haven't, Mr. Hemr, and I thought maybe something else

15    had been raised that I missed in the expert.

16              MR. HEMR:  I don't think there's anything new since

17    yesterday, Your Honor.

18              THE COURT:  I'm giving you a hard time.  That's okay.

19    But I am serious about the other.  I really am and I mean what

20    I say.  It's grave.  It is grave.  The consequences are --

21              MR. HEMR:  Understood, Your Honor.

22              THE COURT:  You just can't keep dancing around.

23    There are a number of ways to evaluate.

24              MR. HEMR:  Uh-huh.

25              THE COURT:  To value a business.  You're a -- you

1    represent these kind of folks that do this all the time,

2    correct?

3            MR. HEMR:  That's true, Your Honor.

4            THE COURT:  They properly asked for this, and it

5    hasn't been produced.  He says there are documents.  Whatever

6    there are, there are.  So let's -- you know, y'all figure it

7    out.

8            And if you find something earlier, if you're

9    struggling with it or whatever, come to me and say, Judge, this

10   is where we are.  This is what we've got.

11           I'm not trying to be unreasonable.  I'm trying to be

12   firm.

13           MR. HEMR:  Understood, Your Honor.

14           THE COURT:  Okay.  How come you had to fade the heat

15   today, Mr. Hemr?

16           MR. HEMR:  Pardon?

17           THE COURT:  How come you were you the one that got

18   picked to fade the heat with me today?

19           MR. HEMR:  I wasn't in the room when they made the

20   decision, Your Honor.

21           THE COURT:  Mr. Hemr, you -- you are too honest with

22   me.  If that can be -- are you sure you didn't go to Baylor?  I

23   mean, come on.

24           MR. HEMR:  I do have that distinction, Your Honor.

25           THE COURT:  Mr. Hemr, you're a good man.  I like you.

```
 1  Okay.  We'll figure it out.
 2            MS. WILKINSON:  Your Honor, Mr. Hemr is being a nice
 3  guy.
 4            I just want to -- can we have it be 9:00 tomorrow
 5  morning instead of noon because we are probably going to be
 6  closing, we hope.  I mean, if they have them, unless it's
 7  impossible.
 8            THE COURT:  Let's see tomorrow --
 9            MS, WILKINSON:  First thing in the morning, Thursday.
10            THE COURT:  -- is Thursday.
11            MS. WILKINSON:  First thing, 8:00, if you could.
12            MR. HEMR:  If we don't have them by --
13            THE COURT:  Try to get it today or by 9:00 tomorrow.
14            MS. WILKINSON:  Thank you.
15            THE COURT:  Yes.
16            MS. WILKINSON:  Thank you, Your Honor.
17            MR. HEMR:  Thank you, Your Honor.
18            THE COURT:  Anything else?
19            MS. WILKINSON:  That's all from us.
20            THE COURT:  This is actually for Ms. Keefe --
21            MS. WILKINSON:  She's busy today.
22            THE COURT:  -- this letter?
23            MS. WILKINSON:  Yes.
24            THE COURT:  Okay.  How many witnesses have we got
25  today that we've got to go through?
```

```
 1              MS. KEEFE:  One, two, three, four, five, six.  One is
 2   video.
 3              THE COURT:  Can we play it like at 78 RPMs?
 4              How long is the video?
 5              MR. STOJILKOVIC:  19 and a half minutes, Your Honor.
 6              THE COURT:  Okay.  Is that your witness, the TV
 7   thing -- I mean, video?
 8              MR. STOJILKOVIC:  Yes, Your Honor.
 9              THE COURT:  Okay, Mr. Stojilkovic.  There will come a
10   time when you get to question live witnesses, I promise.
11              MS. KEEFE:  He has a live witness today.
12              MR. STOJILKOVIC:  I think I have three today, Your
13   Honor.
14              THE COURT:  Oh, wow.  There we go.  Okay.  Good.
15              I do want to say on the record all the -- all the
16   great -- I know certainly Ms. Wilkinson and Mr. Sammi are great
17   lawyers and so are all -- all the others.  I just like to see
18   more and more lawyers, and I would like to see law firms,
19   especially big ones, using the younger lawyers more in court.
20   They need to be in court, not pulling documents and not getting
21   coffee and making -- doing stuff.
22              Send that message back, will you, Mr. Sammi?
23              MR. SAMMI:  I will, sir.
24              THE COURT:  And you were in a big firm at some point,
25   weren't you?
```

```
 1              MS. WILKINSON:  I was, Your Honor, until last

 2    January.

 3              THE COURT:  Well, call whoever you know that's in

 4    that big firm.

 5              MS. WILKINSON:  That's why I left.  Now all these

 6    folks get to appear in court.

 7              THE COURT:  Well, they do.  I just -- you know, I

 8    don't want to lose this skill and this craft of being in court

 9    and, you know, struggling with an irascible person like me.

10    It's an important tool, and these lawyers need to be able to do

11    it.

12              Okay.  I was young once.

13              Mr. Philbin, are you all right?

14              SECURITY OFFICER:  All rise for the jury.

15              (Jury in)

16              THE COURT:  Y'all be seated.

17              Okay.  We're going to call our next witness.

18              I may be a little bit testy today because I'm not

19    going to get to go the Baylor basketball game tonight because

20    I'm going to be working on this case.  So I'm going to work on

21    getting a better attitude, as my mother would say.  Usually

22    what she would say is are you happy, and I would say yes.  And

23    that wouldn't make -- and she'd say, well, tell your face about

24    it.  So I'm going to work on it.

25              Here we go.
```

```
 1                I'll be fine.  I hope y'all are all right.

 2                Okay.  We've got six witnesses we need to go through.

 3                MS. KEEFE:  Yes, Your Honor.

 4                THE COURT:  Ms. Keefe, you're up.

 5                MS. KEEFE:  Good morning, Your Honor.

 6                THE COURT:  Good morning.

 7                MS. KEEFE:  The Defendants would like to call

 8    Dr. Robert Howe to the stand, please.

 9                THE COURT:  There he is.

10                (Pause)

11                THE COURT:  Dr. Howe, if you'll raise your right hand

12    and be sworn.

13                (The witness was sworn)

14                THE COURT:  If you'll take a seat next to me.

15                I've seen you in the courtroom.  You're a pretty

16    recognizable fellow, so you know about how to talk and the

17    water and all your documents.

18                THE WITNESS:  I will -- I will do my best.

19                THE COURT:  All right.  Thank you.

20                MS. KEEFE:  Thank you.

21                  ROBERT HOWE, DEFENDANTS' WITNESS, SWORN

22                        DIRECT EXAMINATION

23    BY MS. KEEFE:

24    Q.   Dr. Howe, could you please introduce yourself to the jury?

25    A.   Sure.  My name is Robert Howe.
```

1   Q.   And where do you work?

2   A.   I'm a professor at Harvard University.  I'm the Abbott and

3   James Lawrence Professor of Engineering at the Harvard School

4   of Engineering and Applied Sciences.

5   Q.   And what area do you teach or research in?

6   A.   Well, I teach classes in mechanical engineering, robotics,

7   and product design, and I run the BioRobotics Lab at Harvard

8   where we work in robotics, human machine interfaces, and

9   biomechanics.

10  Q.   And I helped you put together a slide deck so that we

11  could go through this more quickly; is that right?

12  A.   That's right.

13  Q.   And could you, please, just briefly, walk through your

14  educational background for us?

15  A.   Sure.  I got a bachelor's degree in physics in 1979.  Then

16  I worked for a few years before I went to grad school at

17  Stanford.  And I got a master's and then Ph.D. in mechanical

18  engineering, and I finished up in 1990.

19  Q.   And what work did you do?

20  A.   Well, before I went to grad school I was an engineer, a

21  design engineer in Silicon Valley.  I worked for a company that

22  made equipment for flight simulators.

23  Q.   And what are flight simulators?

24  A.   Well, this is how you train pilots.  These were the

25  high-end flight simulators used by airlines and military

1   pilots, and they have a layout that looks just like the cockpit

2   of a big airplane.  And we made the equipment for the

3   out-the-window view, so they're looking out the window and they

4   see a scene that looks like you're flying an airplane.

5   Q.   Is there anything related to VR with that?

6   A.   Yeah.  Flight simulators are actually an early and very

7   successful version of VR, so with VR you want to make the user

8   feel like they're in a different place, and they really are.

9   And that's the whole idea behind the flight simulator.  You

10  feel as if you're flying an airplane, so when the pilot turns

11  the controls to bank right, then the view out of the window

12  corresponds.

13        So it gives the pilots a realistic feeling that

14  they're flying, and they can, you know, learn how to recover

15  from problems without crashing a real airplane.

16  Q.   Do you work in virtual reality today?

17  A.   Yes, we do.  We've had a lot of projects across the years.

18  I can mention one that we finished up recently, which is a

19  virtual environment for training heart surgeons.

20        So repairing heart valves can be very tricky.  It's a

21  difficult skill to learn, and so in this system the trainee

22  sees an image of a heart valve.  They can spin it around, look

23  at it from different directions, and they come in with virtual

24  instruments, scalpels and sutures and all, so they can do the

25  repair on this valve.  And then, we have a mechanical simulator

```
 1    that tests how well the new valve will work and then give
 2    feedback to the surgeon so they can get better at doing these
 3    repairs.
 4    Q.   Have you ever published your work?
 5    A.   Oh, yeah.  We have over 200 publications.
 6    Q.   Have you previously appeared as an expert witness?
 7    A.   I have.  I believe this is the third trial in Federal
 8    court where I've appeared as a witness.
 9    Q.   How much of your time do you spend working on expert
10    witness matters?
11    A.   Well, this is an interesting part of my professional life,
12    but it's not a large part.  Maybe 5 percent on average across
13    the years.
14    Q.   Do you generally work for Plaintiffs, Defendants, or both?
15    A.   Both.
16    Q.   Have you ever been retained by Facebook, Oculus, or any of
17    the Defendants in this case?
18    A.   No.
19    Q.   Have you ever been retained by any of the law firms
20    representing the Defendants in this case?
21    A.   No.
22    Q.   Did you write a report in this case?
23    A.   Yes, I did.
24    Q.   Did anyone help you write the report in this case?
25    A.   Yes.  So --
```

```
 1   Q.   And who was that?

 2   A.   Keystone Strategy.

 3   Q.   And how did they help you?

 4   A.   Well, in the report, I needed to review the state of the

 5   art, collect documents, put together references, and so on, so

 6   they helped me with all that, just as when I work in my

 7   research lab at Harvard, I have graduate students, postdocs and

 8   all who work with me.

 9        They helped assemble the references, form some of

10   thoughts.  I asked them, for instance, to put together some

11   timelines for me and helped me put together the final version

12   of the report.

13   Q.   Do you know Dr. Balakrishnan?

14   A.   I do.

15   Q.   And do you know if they assisted Dr. Balakrishnan with his

16   report as well?

17   A.   I believe they did.

18   Q.   And you were here in court yesterday; is that right?

19   A.   That's right.

20   Q.   And you heard that there were three or four paragraphs in

21   both reports that were the same?

22   A.   That's right.

23   Q.   Why is that?

24   A.   Well, our reports are supposed to reflect our opinions and

25   so Dr. Balakrishnan and I have, you know, many same opinions so
```

1   it's not very surprising that the text is the same.

2   Q.   And who wrote the text in those three or four paragraphs

3   that you saw displayed on the screen?

4   A.   I wrote those.

5   Q.   And do you have any problem with the fact that

6   Dr. Balakrishnan used the same language?

7   A.   No, not at all.

8          They're mostly about the history of virtual reality,

9   you know, describing how the technology got where it is today.

10  We can't rewrite history, so it makes sense for Keystone to

11  help put that report together quickly to use the same

12  recounting of history in my report and in the other report.

13  Q.   How many paragraphs are in your report?

14  A.   I believe it's about 350, 350 paragraphs in my report.

15  Q.   And how many paragraphs were in Dr. Balakrishnan's report?

16  A.   I believe it's over 500.

17  Q.   Dr. Howe, are you being paid for your work here today, for

18  your time?

19  A.   Yes, I am.

20  Q.   And how much is that?

21  A.   It's my usual rate for this work, $600 an hour.

22  Q.   And is the amount that you're paid in any way dependent on

23  the outcome of this case?

24  A.   No, it's not.

25          MS. KEEFE:   Your Honor, we'd offer Dr. Howe as an

 1    expert in virtual reality especially as it relates to the
 2    physicality of robotics.
 3            MR. SAMMI:  No objection.
 4            THE COURT:  No objection?
 5            MR. SAMMI:  No objection.
 6            THE COURT:  Then he is admitted as an expert in that
 7    area.
 8            Doc, I've got a couple of questions.
 9            THE WITNESS:  Uh-huh.
10            THE COURT:  If I understand, the flight simulators
11    are different than virtual reality in that that simulation is
12    based upon a capsule.  That's where the pilot sits.  And below
13    it are hydraulic arms that simulate moving up and down and back
14    and forth.
15            THE WITNESS:  That's correct.
16            THE COURT:  So it's a little different than
17    virtual -- it gives you that virtual reality feeling, can get
18    you sick, but it's not based upon tricking your brain.  It's --
19    well, I guess it is still based on tricking your brain, isn't
20    it?
21            THE WITNESS:  Yeah.
22            THE COURT:  But it's in a different style than doing
23    it just through a lens?
24            THE WITNESS:  That's right.  It's not exactly the
25    same in the hardware and mode of interaction, but if you think

1    of virtual reality as making you feeling like you're in a

2    synthetic environment, you're in a place that's -- that doesn't

3    really exist that the computer generates, then it's exactly the

4    same.  You move the controls, you move in the environment, just

5    like you turn your head with a head-mounted display and you

6    move in the environment.

7              THE COURT:  I get it.  Okay.  Thanks.

8    BY MS. KEEFE:

9    Q.   And, Doctor, you've also worked with head-mounted

10   displays; is that right?

11   A.   I have.

12   Q.   And with respect to what the surgeons were working on,

13   what type of displays were they using?

14   A.   We used a number.  We used stereoscopic monitors, so you

15   wear 3D glasses, like going to a 3D movie, and you'd see the

16   heart valve in 3D.  And you can move it around or spin around

17   and see the shape change.

18   Q.   Doctor, you were asked to give opinions in this case

19   regarding whether or not the technology that ZeniMax believes

20   to be trade secrets were, in fact, trade secrets; is that

21   right?

22   A.   That's correct.

23   Q.   And you focused on two of the alleged trade secrets.  Are

24   these those two secrets?

25   A.   Yes, they are.

```
 1    Q.   And what were the alleged trade secrets that you focused
 2    on?
 3    A.   The first one is gravity orientation and sensor drift
 4    correction and the second one is predictive tracking.  And
 5    that's also been referred to here as extrapolative orientation
 6    prediction, but it's the same secret.
 7    Q.   And can we use the exact same format to go through the
 8    technologies that you looked at that we did with
 9    Dr. Balakrishnan yesterday?
10    A.   Yes, I have slides for exactly that purpose.
11    Q.   And so for each alleged trade secret, we'll talk first
12    about what is that technology, right?
13    A.   That's right.
14    Q.   And then we'll move on to what ZeniMax claimed
15    specifically to be its trade secret?
16    A.   Yes.
17    Q.   Then we'll move on to whether or not ZeniMax's claimed
18    steps were known before 2012; is that right?
19    A.   Yes.
20    Q.   We'll go to whether or not ZeniMax made its alleged trade
21    secret public?
22    A.   Yes.
23    Q.   And finish off with whether or not Oculus does it the same
24    way?
25    A.   Correct.
```

1   Q.   Okay.  So for the very first one, gravity orientation and

2   sensor drift correction, what is that problem?

3   A.   Okay.  So the problem is sensor drift, and we use

4   gravity -- or the idea is to use gravity orientation to correct

5   for that.  So let me start out by talking a little about sensor

6   drift.  So here we see someone wearing a virtual reality

7   headset.

8            And if we could, start the animation, please.

9            So as you move your head back and forth, the view

10  that the user sees tips back and forth to match, so it looks

11  like you're really looking out at this room that only exists in

12  the computer.

13           However, these sensors, which track the head motion,

14  have tiny errors to them, and so by the time you add that all

15  up across a little time, things are not oriented straight.  So

16  here you can see the door's a little crooked and the drapes are

17  a little crooked.  And that error can be a problem because if

18  what you see with your eyes and what you feel with your body

19  don't agree that is the direction that's down, the direction of

20  gravity, it can make you feel like you're not really present in

21  that virtual world.  And in addition, it can actually make you

22  feel sick, just like seasickness or sitting in the back of a

23  car for some people make you feel sick.

24  Q.   So --

25  A.   And so it's very important to make sure this kind of

```
 1   disconnect between what you see and what you feel doesn't
 2   occur.
 3   Q.   And so how would one naturally think to correct for that?
 4   A.   Well, we can use sensors to measure gravity.
 5            If I could have the next slide, please.
 6            And so here is an analogy that should help make this
 7   clear.  So you have a picture hanging on the wall, and you hang
 8   it up straight.  But after a while, a few trucks go by, the
 9   kids slam the door and pretty soon the picture isn't hanging
10   straight anymore.
11   Q.   And so then how do you make it straight?
12   A.   Well, we can use a plumb bob here.
13            I'm sorry.  Can we go back?
14            We can use a plumb bob here, and this is just a
15   string with a weight on the end, and it's the same thing that
16   people have been using for hundreds of thousands of years to
17   make sure that carpenters or builders get their structures
18   straight up and down.
19            We can use that to sense the straight up and down,
20   the gravity direction, and then we can use that to reorient the
21   picture so that we get rid of that error and now it is hanging
22   straight.
23   Q.   So I know it sounds silly, but what do you mean
24   "reorient"?
25   A.   Oh, just change the tilt so that it is back to straight.
```

1  Q.   So all you mean is measure the angle, figure out how far

2  off of straight it is and then move at that angle; is that

3  right?

4  A.   Exactly correct.

5        THE COURT:  So if I move my head and it's -- and it's

6  this drift, the door is at the back and appears to angle one

7  way or another?

8        THE WITNESS:  Correct, a little bit off.

9        THE COURT:  Okay.

10 BY MS. KEEFE:

11 Q.   And is it easy to walk in a virtual world if you're

12 tilted?

13 A.   No.  It can be confusing, and, again, it can actually make

14 you sick if the -- if your sense of balance says one way is up

15 and your eyes say another way is up.

16 Q.   So can you show us how you actually would use this concept

17 of a plumb bob in virtual reality in an HMD?

18 A.   Sure.  Next slide, please.

19        So here we've got the tilted situation.  And if we

20 can start the animation here.

21        Now we can have a sensor like a plumb bob in the real

22 world.  That will tell us which way is down.

23        Now, in the virtual world, we know which way is down

24 because it is in the computer, and then we can adjust the

25 computer version of which way is down so it matches the sensor

1   in the real world.

2   Q.   And which -- which sensor acts as the plumb bob in the

3   head-mounted display?

4   A.   So in the head-mounted displays, they are called inertial

5   sensors.  There are a number of sensors that can be used, an

6   inclinometer, it can be an accelerometer, and we have these,

7   for instance, in cell phones.

8        So this is the sensor that reorients the screen.  You

9   know, when you flip your phone from one way to the other, the

10  screen snaps around so that it's not sideways, exactly the same

11  sensor that's used in the head-mounted displays nowadays.

12       MS. KEEFE:  Can we go to the next slide?

13  BY MS. KEEFE:

14  Q.   Dr. Howe, are these the steps that Dr. Dobkin identified

15  as being in his opinion what ZeniMax's trade secrets were?

16  A.   Yes, that's correct.

17  Q.   Now, you didn't create these trade secret allegations, did

18  you?

19  A.   No.  Dr. Dobkin studied the ZeniMax source code and came

20  up with these as his description of what that alleged trade

21  secret consists of.

22  Q.   And we're going to walk through very quickly.  In step

23  one, obtain the most recent measurements from the head-mounted

24  inertial sensor, what does that mean?

25  A.   Well, that just says read the sensor, get a value from our

1    sensor.

2    Q.    Step two, test whether the HMD is relatively still using

3    inertial sensor measurements, what does that mean?

4    A.    So the idea here is you can only use the sensors to tell

5    you which way is down when they're holding still.  So if I'm

6    moving the head around with a head-mounted display, you know,

7    the direction of down is changing, and so if you were to read

8    it at that time, it might not be correct.

9            The same is true with the plumb bob.  If I am moving

10   it around, it is going to shake back and forth, it won't point

11   straight down, but if I wait awhile it damps out, and it will

12   tell me the correct direction for gravity.

13   Q.    Step three, compute the error between measured

14   acceleration vector and an up vector, what does that mean?

15   A.    Well, that says we now have our reading from our sensor

16   that tells us what the true down direction is.  And then in my

17   simulation I have been using these -- these orientation sensors

18   all along.  When I have added up, they're no longer quite

19   straight.  This is like my tilted picture frame.  So I now

20   calculate what is the difference between the real down vector

21   and what my sensors have added up to say is the down vector.

22   Q.    Then the final step, if sensor conditions tests pass,

23   apply a correction to the orientation as a function of the

24   measured acceleration and computed error.

25           What's that?

```
 1   A.   Well, that's simply fix the problem.  So now you know
 2   what's the error and get rid of it, tilt the picture frame back
 3   to straight up and down.
 4   Q.   Dr. Howe, were you able to find these exact steps that
 5   ZeniMax alleged to be a trade secret in publications prior to
 6   2012?
 7   A.   Yes.  In quite a few, actually.
 8   Q.   And do you have one of those on the next slide?
 9   A.   Yes.
10   Q.   And what is this?
11   A.   So this is a U.S. patent issued by the U.S. Government.
12   It was issued in 1997, about 20 years ago, although they
13   applied for that patent about three years before, in 1994.  It
14   takes the patent office a little while to issue these things.
15   Q.   And the title here is Inertial Orientation Tracker
16   Apparatus Having Automatic Drift Compensation for Tracking
17   Human Head and Other Similarly Sized Body.
18        What does that mean?
19   A.   Well, that essentially means just what we have been
20   talking about.  So it's how to use the sensors that are in a
21   head-mounted display in order to figure out which way is down.
22   Q.   And was this patent known?
23   A.   Yes, it was.  So --
24   Q.   How do you know that?
25   A.   Well, when you apply for a patent, you have to tell the
```

1  patent office about the prior art, the other work that's been

2  done in the area, so that it is clear what already exists and

3  what's new about your patent because you can only patent

4  something that's new.

5          And so I checked the U.S. patent database, and I

6  found 61 patent that were issued before 2011, before ZeniMax

7  and Oculus started working together, which cite this.

8          So this says there are 61 inventors who say that they

9  know about this work and they're building on it, they're going

10  in the same direction.

11          And so given that there were 61 issued patents, there

12  are clearly a lot of other people who didn't have an invention

13  but knew about this and worked in the field as researchers at

14  companies or whatever.  So I think it is fair to say this was

15  quite well known well before Oculus and ZeniMax got together.

16          MS. KEEFE:  For the record, this is Defendants'

17  Exhibit 0809, the Foxlin, F-O-X-L-I-N patent, and we would

18  offer that into evidence.

19          MR. SAMMI:  No objection.

20          THE COURT:  Don't you usually refer to patents by the

21  last three numbers of the patent or something like that?

22          MS. KEEFE:  You can.

23          THE COURT:  The '077 patent.

24          MS. KEEFE:  You can definitely call it the '077

25  patent.  A lot of people also call it by the name of the

 1  inventor, the Foxlin patent.

 2          THE COURT:  Okay.  I didn't realize that.  Okay.

 3  Good.

 4          MS. KEEFE:  Typically the person who loves the patent

 5  calls it by the inventor's name because it makes it sound like

 6  something great.  So it is the Foxlin patent.

 7  BY MS. KEEFE:

 8  Q.  Did you in this case --

 9          THE COURT:  Okay.  You offered it, and no objection;

10  is that right?

11          MR. SAMMI:  That's correct, Your Honor.

12          THE COURT:  Okay.  Thanks, Mr. Sammi.

13          Admitted into evidence.

14          (Defendants' Exhibit No. 0809 received)

15  BY MS. KEEFE:

16  Q.  And were you able to find each of the four steps that

17  ZeniMax alleged to be its trade secret in the Foxlin patent?

18  A.  Yes, I did.

19  Q.  And can you show us where you found step one in the Foxlin

20  materials?

21  A.  Certainly.

22          So I like this patent for explaining this.  As I

23  said, there are a number of pieces of prior arts like this.

24  This one is great because all the steps are in a single

25  diagram.  So as part of the patent, they provided this

1    flowchart that describes how it works, and each one of those

2    steps corresponds to the boxes that are colored here.

3           So let me start with the first one, step one.

4           And it says generate angular rate signals in body

5    coordinates with drift sensitive sensors.

6           So the drift sensitive sensors are the ones we have

7    been talking about that add up little errors.  They wind up

8    drifted off a little bit.

9    Q.   And what about step two?

10   A.   And step two says has the body been still long enough?

11          So, again, you have to wait for everything to settle

12   down, make sure you are getting the true down vector, a true

13   gravity direction.

14   Q.   And what about the third step of computing the difference?

15   A.   Okay.  This says compare compensating sensor signals to

16   integrating drifting signals to generate error signals.

17          So this is the error.  How much is there a difference

18   between my sensor that tells me what is really down and what my

19   estimate in my virtual environment says is down.

20   Q.   And finally the fourth step of making the correction?

21   A.   So the last box there, increment detriment updated angle

22   signals by fractional error signals.  This says change what my

23   virtual environment is so that it matches the real world.

24   Q.   Dr. Howe, you were in court yesterday, or you have been in

25   court most of the time.  You heard both of Plaintiffs' experts

1  testify; is that right?

2  A.   Yes, I did.

3  Q.   And did you hear them talk about any prior publications?

4  A.   No.  I didn't hear them talk about the state of the art

5  and why ZeniMax's claimed invention is different from what was

6  known before, and in the reports I didn't see this either.

7  Q.   Did ZeniMax itself also make the steps that it alleges to

8  be a trade secret public?

9  A.   Yes, they did.

10  Q.   And how did they do that?

11  A.   If I could have the next slide.

12       So this is an image from a YouTube video that is

13  publicly posted.  It's Mr. Carmack's talk at QuakeCon 2012, and

14  we've heard Mr. Carmack relate that he likes to disclose what

15  he's working on, and that's exactly what he did here.  He

16  disclosed this claimed trade secret publicly.

17  Q.   And what did he say?

18  A.   Well, he says things like you can correct towards a clean

19  gravity vector.  So the clean gravity vector is when you're

20  holding still.

21       He also said so we've got all the stuff in there that

22  measures gravity and knows which way is up, and it corrects

23  toward this.

24       So he explains how to do this clearly and publicly.

25            MS. KEEFE:  And, for the record, those quotes come

1    from DX0133, the John Carmack keynote speech at 116, lines 10

2    through 12.

3    BY MS. KEEFE:

4    Q.   Dr. Howe, was there anything else that led you to

5    believe -- I'm sorry.  Strike that.

6         Did ZeniMax in its performance of spelling out what

7    its trade secret was include any source code?

8    A.   Well, no.  Dr. Dobkin's report and Dr. Gleicher's report

9    simply talk about those steps.  They don't refer to the source

10   code in describing what they claim is a trade secret.

11   Q.   So in order to determine whether or not the trade secret

12   was public, would you have to find source code in these prior

13   publications?

14   A.   No.  That's not my job.

15   Q.   And why not?

16   A.   Well, it's not up to me to decide what ZeniMax calls a

17   trade secret.  That's up to ZeniMax, and their experts do this

18   for them.

19        My job is to look at what they claim is a trade

20   secret, see if, in fact, it is and meets the criteria that the

21   attorneys I work with have explained, in particular, was it

22   already known, did ZeniMax try to keep it secret, or did they

23   tell other people about it, and, in addition, to ask whether

24   Oculus used that or did they do something different.

25   Q.   Did you also have another paper that you wanted to mention

1    regarding the public nature of drift correction?

2    A.   Yes.

3    Q.   And what's that?

4    A.   So this is a paper by Favre and other colleagues, and it

5    is called Quaternion-Based Fusion of Gyroscopes and

6    Accelerometers to Improve 3D Angle Measurements.

7    Q.   So what does that title mean?

8    A.   So this says we're going to use quaternions as a way to

9    represent motion.

10   Q.   And quaternions are what?

11   A.   Quaternions are a four-number sequence that describes, you

12   know, position orientation, that kind of thing.

13   Q.   Okay.  And so we're going to use quaternions to do what?

14   A.   Well, we're going to use it to work with these inertial

15   sensors, gyroscopes and accelerometers, in order to measure

16   things like virtual reality headset orientation.

17   Q.   And what was the date of this paper?

18   A.   It's 2006.

19        MS. KEEFE:  Your Honor, this is Defendants' Exhibit

20   1023, the Favre paper, and we would offer that into evidence.

21        MR. SAMMI:  No objection.

22        THE COURT:  That's admitted into evidence.

23        (Defendants' Exhibit No. 1023 received) ^ |

24   BY MS. KEEFE:

25   Q.   Was there anything about the Favre paper?

1   A.   I spoke with Michael Antonov.  He's the chief software

2   architect, I believe, is his title, at Oculus, and he told me

3   this is where he got the version of this drift correction

4   algorithm that he used.

5         So he said he found this paper by looking in the

6   published literature, and then he went about implementing the

7   algorithm that's described in it.

8   Q.   And, in fact, did you find that Oculus's implementation

9   was different than ZeniMax's implementation?

10  A.   Yes.  So as we've heard before, this implementation uses

11  quaternions, and, in fact, Mr. Antonov after he implemented

12  this sent it on to John Carmack and asked him to contrast and

13  compare it.

14        Mr. Carmack's response is excerpted here from his

15  email in response.  He says, "That looks roughly similar to

16  what I do, but my math is with matrices instead of quats (quats

17  are probably better)."  And quats are quaternions.

18  Q.   And that's at Defendants' Exhibit 224.

19        Was there also trial testimony in this case that

20  confirmed that?

21  A.   Yes.

22        So next slide here.

23        So this is from Mr. Carmack's testimony in my very

24  chair where I'm sitting right now, and he was asked:

25        "That software you wrote to show your testbed on the

 1  prototype, is that different than the software that does

 2  gravity orientation and sensor drift correction in the Oculus

 3  products?"

 4  Q.   And what was his answer?

 5  A.   "Yes.  This is again another piece of Steve LaValle's code

 6  where he did a much more formally rigorous version of a lot of

 7  what I did both for their -- several parts of their sensor

 8  fusion code.  He did just a plain flat-out better job than I

 9  did."

10  Q.   Dr. Howe, did you also do a calculation to determine how

11  long it would take a reasonable engineer in 2012 to implement a

12  correction of sensor drift using gravity knowing what is out in

13  the public domain?

14  A.   Yes.

15  Q.   And what did you find?

16  A.   So it's shown here.  So what I did is, as I said,

17  essentially what Mr. Antonov did, that is, you know what the

18  problem is.  The problem was well understood for decades, and

19  he went out, looked in the literature, found a promising paper,

20  implemented it and tested it.

21        I said we have an engineering team doing this.  We

22  have a senior engineer, a supervisor, a programmer, and a

23  technician, and in total I estimated it would take about

24  28 hours to reproduce that effort.

25  Q.   Do you have a summary slide, Dr. Howe?

1    A.    Let me mention too I did speak with the people who

2    actually did this implementation, both Mr. Carmack from the

3    ZeniMax implementation and Mr. Antonov for Oculus, and they

4    confirmed that this is roughly the amount of time they actually

5    spent doing this.

6    Q.    Thank you, Dr. Howe.

7          Do you have a summary slide?

8    A.    I do.

9    Q.    So in your opinion, Dr. Howe, was what ZeniMax alleges to

10   be a trade secret in terms of the four steps for gravity

11   orientation and sensor drift correction well known in the

12   industry prior to 2012?

13   A.    Yes.

14   Q.    In your opinion, Dr. Howe, for the steps that ZeniMax

15   claims to be a trade secret for gravity orientation and sensor

16   drift correction, did ZeniMax itself make those steps public?

17   A.    Yes, they did.

18   Q.    And finally, did the parties use different methods for

19   gravity orientation and sensor drift correction?

20   A.    Yes, they're different.

21   Q.    And for the last trade secret, which is predictive

22   tracking, what is predictive tracking?

23   A.    Okay.  So once again, this solves a problem, and this

24   problem is latency or delay.  So let me show a few animations

25   here to explain.

```
 1              So if we could, run this animation.

 2              So here, we see a user.  We're looking down on his

 3    head, and as he turns his head, if things were perfect, then by

 4    the time he looked over at another direction, the scene he

 5    would be shown looks different.  It would be what he would see

 6    if he was actually in that environment.

 7    Q.   And so what happens instead in an HMD?

 8    A.   Right.  So in our real world where we have these delays in

 9    the system, as they start to move their head, the sensor is

10    slow.  There's a delay, and so by the time they move their

11    head, they're still seeing this other direction.  Things

12    haven't changed correctly.

13    Q.   And so what are we going to do about that?

14    A.   Okay.  Next slide, please.

15              So now, as they start to move their head, we look at

16    how fast the sensor says things are moving, and we can predict

17    where things will be when we show them the next picture.  So

18    now they're able to see all the way over to where their head

19    should be pointing.

20    Q.   And so how does that function?  How does that work?

21    A.   Okay.  So we have the abstraction, the set of steps that

22    Dr. Dobkin proposes.

23    Q.   And do you have those written down?

24    A.   I do.

25    Q.   And so these are the steps that Dr. Dobkin claims to be
```

1   ZeniMax's trade secret?

2   A.   That's right.

3   Q.   For the first step, "get a variable prediction time

4   parameter," what does that mean?

5   A.   That says how far ahead do I have to look.

6        I know when I have to generate the next picture, so

7   that tells me how far in advance I need to look.

8   Q.   And for the second step, "compute a prediction time

9   interval from the prediction time parameter and time of the

10  last sensor sample," what does that mean?

11  A.   Okay.  So the sensor is telling me where the user's head

12  is pointing at regular intervals, so I look from the time I got

13  one of those a little while ago until the time that I'm going

14  to start drawing the next picture.  And I add those up, and

15  that gives me this step two.

16  Q.   And finally, for the third step, "predict the head-mount

17  display orientation for that interval by rotating the current

18  orientation according to the current measured angular

19  velocity," what does that mean?

20  A.   Well, that's complicated, but it's a very simple idea.

21       So I know where I need to estimate, that is, what

22  time I need to tell you where I am, so I just look at how fast

23  I'm moving.  And I then say, well, if I'm moving this fast,

24  here's where I'll be when I draw that next picture.

25  Q.   And were you able to find all three of these steps that

1    ZeniMax claims to be its alleged trade secret in publications

2    that predate 2012?

3    A.   Yes, I was.

4    Q.   Can we show one of those?

5    A.   Okay.  So this is a paper written in 1994 by Azuma &

6    Bishop, and they're at the University of North Carolina.  And

7    as we've heard, that's one of the hotbeds of VR research for

8    some decades now.

9    Q.   And what's the title of this paper?

10   A.   "Improving Static and Dynamic Registration in an Optical

11   See-through HMD."

12   Q.   Was --

13   A.   And HMD is head-mounted display.

14   Q.   And was this paper well known?

15   A.   Yes, it was.

16   Q.   And how do you know?

17   A.   Well, again, like with patents, when us academics write

18   papers, we have to cite the work that's been done before to

19   give credit to the people who've done work before us and also

20   to make clear what's new.

21          And so since this was published -- and before 2010,

22   again, before Oculus and ZeniMax started working together, this

23   was cited in 390 papers.

24          So clearly a lot of researchers were familiar with

25   this work.

1   Q.   And so were you able to find all three of the steps that

2   ZeniMax alleges to be its trade secret in this paper?

3   A.   Yes.

4   Q.   For step one, where did you find that in the paper?

5   A.   Okay.  So let me try to explain this diagram here.

6           So this is the timeline, so time moves in this

7   direction.  Over here on one edge is when I got the less sensor

8   measurements, so this is when it last told me where I was.

9           Here's where I am right now, and this is where I'm

10  going to start drawing that next picture.

11          So the first thing is to say, well, how far in

12  advance do I need to look in order to draw the right picture?

13  Q.   And for the second step, did you find that?

14  A.   Yeah.  So that's going from the time of that last sensor

15  measurement all the way over here to when I draw the next

16  picture, and so I just add up this time across here.  That's

17  the yellow part.

18  Q.   And the last step of making the prediction?

19  A.   Okay.  So now that I know the timeline I'm looking across,

20  I then use this equation here to modify my quaternion, you

21  know, where I'm going to be.

22          The blue is my angular velocity measurement, so I

23  have to know how fast the head is turning.  I perform this

24  calculation, and then this tells me what direction the head is

25  likely to be pointing when I draw that next picture.

 1              MS. KEEFE:  And just -- I'm not sure if I did this

 2     for the record, the paper that we're talking about is

 3     Defendants' Exhibit 1128, the Azuma paper, and we'd offer that

 4     into evidence.

 5              MR. SAMMI:  No objection.

 6              THE COURT:  That's admitted into evidence.

 7              MS. KEEFE:  Thank you, Your Honor.

 8     BY MS. KEEFE:

 9     Q.   Did ZeniMax itself also make public its alleged trade

10     secret regarding predictive tracking?

11     A.   Yes.

12     Q.   And how did they do that?

13     A.   Well, here's a nice succinct version.

14              So this is an email from John Carmack to a

15     Mr. Merrill Roller at Hillcrest Labs.  So Hillcrest Labs is the

16     company that made these little tracking sensors, and this email

17     was about a year before Mr. Carmack started working with

18     Oculus.

19     Q.   And what did he say?

20     A.   "I'll probably look into predicting ahead to cover the

21     variable 0 to 8 millisecond gap from last sensor update to

22     start of rendering; although, that may give subtle overshoot

23     when coming to a stop."

24              So he's explaining there just the same algorithm.  He

25     says I'm going to look back to when I got the last sensor

1   reading.  I'm going to look to when I render the next image and

2   I'm going to predict that.  So this encapsulates the trade

3   secret very clearly.

4   Q.   Did Oculus do predictive tracking in the same way that

5   ZeniMax did?

6   A.   No, they did not.

7   Q.   How do you know that?

8   A.   Well, first of all, once again, we know that Oculus used

9   quaternion math and ZeniMax used matrix math.

10         In addition, Oculus used a higher level algorithm,

11   that is, they used more complicated mathematical functions in

12   order to get better predictions going forward.

13   Q.   In fact, was John Carmack a fan of the approach that

14   Oculus was using?

15   A.   No.  Just the opposite.

16         So this is an email from John Carmack to engineers at

17   Oculus in which he says "higher order modeling can probably

18   help some, but there are decades of generally wasted academic

19   work in the field trying to work the problem from the wrong

20   direction like that.  Reducing the real latency as much as

21   possible should be the top priority."

22   Q.   And this is Defendants' Exhibit 698?

23   A.   Yeah.

24   Q.   Did you also do an estimate to see how long it would take

25   a reasonable engineer prior to -- in 2012 to figure out what

1   they could do with predictive tracking using the materials in
2   the public domain?
3   A.   Yes.  And --
4   Q.   What's that estimate?
5   A.   Yeah.  Once again, I figured out how long it would take
6   this engineering team to find the solution in the literature,
7   implement it, and test it, and, again, the total turned out to
8   be about 28 hours.  And, again, I asked both the people who did
9   the implementation at Oculus and at ZeniMax how long it took
10  them, and this is in the right ballpark.
11  Q.   Do you have a summary slide?
12  A.   I do.
13  Q.   So in your opinion, Dr. Howe, was the predictive tracking
14  steps alleged by ZeniMax to be its trade secret well known in
15  the industry prior to 2012?
16  A.   Yes.
17  Q.   In your opinion, Dr. Howe, did ZeniMax, itself, make the
18  steps that it alleges to be a trade secret known and public
19  after 2012?
20  A.   Yes.
21  Q.   And did ZeniMax and Oculus use different methods to
22  accomplish predictive tracking?
23  A.   Yes.
24  Q.   And finally, one wrap-up slide.  Dr. Howe, in your
25  opinion, were the trade secrets alleged by ZeniMax in the steps

1    that Dr. Dobkin identified for gravity orientation and sensor

2    drift and predictive tracking known before 2012?

3    A.   Yes, they were.

4    Q.   Were they made public by ZeniMax?

5    A.   Yes, they were.

6    Q.   And does Oculus do it differently?

7    A.   Yes, they're different.

8              MS. KEEFE:  I'll pass the witness.

9              THE COURT:  I've got a question I want to ask you.  I

10   can understand that you can have math that would predict where

11   my head would go.  I get that.  I'm not sure -- I certainly

12   couldn't calculate it, but I can get that you can have math.

13             What I don't understand is does it have a stored

14   photograph?  How does that help if you don't know that that's

15   what's going to be when you get to that point?  I don't get

16   that.

17             THE WITNESS:  Yeah.

18             THE COURT:  Does that make any sense?

19             THE WITNESS:  It does.  I understand.  And the trick

20   is it takes a little while to generate that image, and you want

21   it to be the image they'll be looking at.

22             THE COURT:  Right.

23             THE WITNESS:  So I say -- I'm turning -- let's see.

24   He'll be over there.  I'll start drawing it now so when he gets

25   there, I'll have it ready to show him.

```
 1            THE COURT:  How can it start drawing if it hasn't
 2   seen it yet?
 3            THE WITNESS:  Well, it's a made-up computer
 4   simulation, and so the computer knows everything about that
 5   world.
 6            THE COURT:  Oh, Oh, oh.  I keep forgetting this isn't
 7   a real world.
 8            THE WITNESS:  No.  Welcome to my world.
 9            THE COURT:  Oh.  See, you couldn't do that if it was
10   in a real world situation, right?
11            THE WITNESS:  No.  You'd have to wait until the
12   camera pointed that way.
13            THE COURT:  Okay.
14            MS. KEEFE:  Thank you, Your Honor.  We pass the
15   witness.
16            THE COURT:  Sorry.  Mr. Sammi, are you ready?
17            MR. SAMMI:  Yes, sir.
18                     CROSS-EXAMINATION
19   BY MR. SAMMI:
20   Q.   Good morning, Professor.
21   A.   Good morning.
22   Q.   Good morning.
23            So Professor Howe, you are getting paid $600 an hour,
24   right?
25   A.   Correct.
```

1  Q.   Just like Mr. -- Professor Balakrishnan and other experts

2  in this case?

3  A.   That's right.

4  Q.   You were here yesterday when Professor Balakrishnan

5  testified?

6  A.   That's right.

7  Q.   And you know I put some slides up about his report and

8  your report?

9  A.   That's correct.

10  Q.   I think you previewed some of that in your direct

11  testimony with the lawyers, right?

12  A.   Yes.

13  Q.   Okay.  Let's put up slide 3, if you can.

14       That's one of them.

15       Now, the -- Dr. Balakrishnan didn't know about your

16  report when I mentioned this to him at his deposition.

17       Did you know about Professor Balakrishnan's report,

18  that there were sections that were copied in there?

19  A.   I did not.  I knew he was writing a report, obviously.

20  Q.   Right.  But when I deposed you, you didn't know that there

21  were large sections of your report that were copied into his?

22  A.   Well, there weren't large sections.  There are four

23  paragraphs out of 800, I believe.

24  Q.   Okay.  But the paragraphs contain citations to some of the

25  prior art that you claim are underlying your reasoning as to

```
 1   why ZeniMax's trade secrets are public, right?
 2   A.   No.  I don't believe so, no.
 3   Q.   Okay.  Let's take a look at -- so there are references
 4   there like mine, 1993.
 5           Let's go the next slide.
 6           There are references to Emura and Tachi, a national
 7   security agency, that's the history of VR that you're citing as
 8   part of the entire information about VR and why the things that
 9   ZeniMax claims are publicly known, right?
10   A.   Oh, I see.  So I thought you were asking is the prior art
11   that I cite as specifically describing these alleged trade
12   secrets --
13   Q.   Right?
14   A.   -- cited here.
15           And the answer to that, of course, is no.  These are
16   general references that describe the history of VR, not that
17   specifically anticipate the alleged trade secrets.
18   Q.   Okay.  So did you write those sections of your report?
19   A.   Yes.
20   Q.   Okay.  Did you have any assistance with writing it?
21   A.   I believe I wrote those myself, and is an area I'm very
22   familiar with.
23   Q.   Okay.  And how do you --
24   A.   Let me be clear.  I had other people edit it.  I'm lousy
25   with spelling and little typos and that kind of stuff, so I
```

```
 1   certainly had people clean it up.  I also had people come in
 2   and do the references, so I specified what should be cited, but
 3   I didn't put in the brackets and the numbers and all those
 4   details.
 5   Q.   Got it.
 6            Did you know that -- did you know it was being used
 7   in Mr. -- in Professor Balakrishnan's report?
 8   A.   No.
 9   Q.   Okay.  You're an independent expert, right?
10   A.   Yes.
11   Q.   And you mentioned -- did you mention -- did you work with
12   someone -- some folks associated with Keystone?
13   A.   Yes, I did.
14   Q.   Okay.  Do you know if Professor Balakrishnan worked with
15   some folks named Keystone?
16   A.   I was aware he was working with them, yes.
17   Q.   Were you and Professor Balakrishnan both working with the
18   same group of people helping your with your opinions and called
19   Keystone?
20   A.   I believe so, yes.
21   Q.   Were the lawyers working with those people called
22   Keystone?
23   A.   Yes.
24   Q.   Okay.  Were the lawyers working with you and the
25   lawyers -- I mean, the lawyers for Facebook and Oculus?
```

```
 1   A.   Yes.  I mean, I'm obviously not a lawyer, so I relied on
 2   them to explain the law around trade secrets and that sort of
 3   thing.
 4   Q.   Sure.
 5            Other than the legal framework section of your
 6   report, lawyers were helping you with other sections of your
 7   report, right?
 8   A.   I don't recall.
 9   Q.   Okay.  Now, let's take a -- let's talk about your opinions
10   in this case.
11            Isn't it your opinion that all of the functions of
12   current VR headsets were present in the Sutherland system in
13   the -- in 1968?
14   A.   That's correct.
15   Q.   Okay.  So you said all the functions of current VR
16   headsets were present in Sutherland, and that was the picture
17   we saw yesterday of the fellow that -- with a big thing on his
18   head, the black and white picture.
19   A.   Let me clarify.  The key functions, you know --
20            MR. SAMMI:  Your Honor, can you please instruct the
21   witness to answer the question?  I just want to know yes or no.
22            THE COURT:  Well, whether it's yes or no, I don't
23   remember the question, but only answer the questions that
24   you're asked, Doc.  Your lawyer can get back up here and ask
25   you if you want to clarify something.
```

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  You bet.

3  BY MR. SAMMI:

4  Q.    Professor Howe, the Sutherland system was 1968, if I

5  remember.  I think we have a slide, slide 8?

6  A.    Uh-huh.

7  Q.    Okay.  It's a pretty large device?

8  A.    It is.

9  Q.    It wasn't lightweight?

10  A.    I don't think we can call that lightweight.

11  Q.    One of the functions that are used by VR in the Oculus

12  Rift and the E3 prototype is sensor drift correction, right?

13  A.    That's correct.

14  Q.    And Sutherland doesn't have sensor drift correction, does

15  it?

16  A.    Let's see.  So I don't know about the ultrasound sensing

17  technology.  That may have had some drift correction.

18  Q.    I asked you, "Does Sutherland have sensor drift

19  correction?"

20          Answer:  "Let's see.  So Sutherland used positional

21  trackers that were absolute and, thus, no, it does not have

22  sensor drift correction"; is that right?

23  A.    I'm guessing you're quoting from my deposition.  You

24  didn't explain that.

25  Q.    I am quoting from your deposition, so I can read it to you

1  again.

2  A.   No, no.  That's fine.

3  Q.   But you agree with your testimony?

4  A.   Yes.

5  Q.   Okay.  So this doesn't have all of the functions of VR

6  systems today, correct?

7  A.   No.  It has the key functions but not the specific one you

8  mentioned.

9  Q.   You wrote in your report, "It has all of the functions of

10  current VR headsets," and now the quote is, "All of the

11  functions of current VR headsets were present in Sutherland's

12  system."

13         So it is not really all the functions, is it?

14  A.   Well, in my report I had listed functions, and that's what

15  I'm referring to, the key functions, the ones that make a VR

16  headset a VR headset.

17  Q.   I didn't find the word "key" there, but you're saying you

18  wanted to refer to the "key" instead of "all"?

19  A.   I believe in my report I refer to them as "key functions."

20  Q.   Not in the quote that I have, and we can show it to you.

21  A.   No.  You excerpted a piece from later in the report.

22         MS. KEEFE:  Objection, argumentative.

23         THE COURT:  Overruled.

24  BY MR. SAMMI:

25  Q.   In order to arrive at your opinion, you had -- in this

```
 1   case, you had to review some materials, right?
 2   A.   Yes.
 3   Q.   You've heard about the 3515 USB device?
 4   A.   I have heard of it, yes.
 5   Q.   Yes.
 6            And that was a device used by John Carmack to steal
 7   10,000 documents and code, and he plugged it into an Oculus
 8   computer and then also a laptop, right?
 9   A.   I'm not familiar with the details, but I believe I've
10   heard words along those lines.
11            THE COURT:  Stop.
12            MS. KEEFE:  Objection, lacks foundation.
13            THE COURT:  If he's heard.
14            Overruled.
15   BY MR. SAMMI:
16   Q.   You were in court, right?
17   A.   I wasn't here for all of Dr. Carmack's testimony, no.
18   Q.   Okay.  You don't know what's on that USB, right?
19   A.   No.
20   Q.   You never analyzed the contents of what's on that USB?
21   A.   No.
22   Q.   So as far as you know, the USB might contain other files
23   of ZeniMax that relate to the trade secrets in this case or it
24   might not, but you don't know?
25            MS. KEEFE:  Objection, relevance, beyond the scope.
```

```
 1              THE COURT:  You mean speculation?
 2              MS. KEEFE:  And speculation.
 3              THE COURT:  Sustain speculation.
 4    BY MR. SAMMI:
 5    Q.   It's fair to say you don't know what's on the USB, right?
 6    A.   That's correct.
 7    Q.   You would agree on that?
 8              MS. KEEFE:  The same objection, Your Honor.
 9              THE COURT:  The same ruling.
10    BY MR. SAMMI:
11    Q.   Did the Defendants ever ask you to look at that?
12    A.   No.
13    Q.   You've heard about ZeniMax VR testbed code, correct?
14    A.   Yes.
15    Q.   And we've talked about it, and you've seen me hold it up.
16    I'm referring to PX132, PX1162, PX1492, PX1429, right?
17              Those are the exhibit numbers.  You know what I'm
18    talking about when I say VR testbed code of ZeniMax, correct?
19    A.   I believe so.
20    Q.   Okay.  And Plaintiffs allege that stereoscopic distortion,
21    precompensation, HMD gravity orientation, and drift correction,
22    head/neck model, face point-of-view adjustment, and
23    extrapolative orientation prediction, among other trade
24    secrets, are embodied in the code of ZeniMax.
25              You understand that, right?
```

1    A.    Not sure, no.

2    Q.    You don't understand that that's what the Plaintiffs are

3    saying in this case?

4    A.    Listen -- I'm sorry.  Let me explain, as I did in my

5    direct testimony, that my job that I was asked to do was to

6    consider what ZeniMax has claimed as trade secrets.

7             MR. SAMMI:  Objection, nonresponsive.

8             THE COURT:  Sustained.

9    BY MR. SAMMI:

10   Q.    Professor, I'm asking you whether you understand that

11   Plaintiffs are alleging that their trade secrets, two of which

12   you've reviewed, seven in total, are embodied in the specific

13   source code of VR testbed as well as VR implementation code in

14   this case?

15   A.    I understand there is a -- that ZeniMax claims it's

16   embodied in source code.  You have named a specific

17   instantiation.  I will take your word for it that that's the

18   claim.

19   Q.    Okay.  Do you have any reason to dispute that we're not

20   claiming that?

21   A.    No.

22   Q.    Okay.  And you have never analyzed this code.  I think you

23   said that on direct, right?

24   A.    Of course not, no.

25   Q.    And you were here yesterday when I asked Dr. Balakrishnan

 1 | the same question, right?
 2 | A.   Yeah.
 3 | Q.   Okay.  So you have no analysis of your own of the source
 4 | code of ZeniMax, yes or no?
 5 | A.   No.
 6 | Q.   Okay.  Now, have you -- you have reviewed other materials
 7 | in this case, right?
 8 | A.   Yes.
 9 |         MR. SAMMI:  Let's take a look at slide 9.
10 |         Now, that's from PX1089, page 6.
11 | BY MR. SAMMI:
12 | Q.   This is a slide deck from Oculus.  And you've seen this,
13 | where Oculus says "The magic's in the software," right?
14 | A.   I don't know if I have.
15 |         MR. SAMMI:  Okay.  Let's look at slide 10.
16 | BY MR. SAMMI:
17 | Q.   This is a slide from Dr. Dobkin, Professor Dobkin's
18 | analysis, and on the left is Doom 3 BFG code that's in here,
19 | and on the right is Oculus SD code -- SDK code, and Dr. Dobkin
20 | does a nonliteral comparison.  You do understand that, right?
21 | A.   Yes.
22 | Q.   Okay.  But you did not analyze any of the code on the left
23 | or on any of the code on the right, yes or no?
24 | A.   I did not.
25 | Q.   Okay.  Let's talk about orientation prediction.

```
 1              Now, we -- you talked about that.  That's one of the
 2    two that you reviewed, correct?
 3    A.    You're referring to predictive tracking?
 4    Q.    Yes.  Extrapolative orientation prediction or predictive
 5    tracking, if you would like me to call it that.
 6    A.    Yes.
 7    Q.    All right.  Predictive tracking.
 8              You testified that it would take 28 hours to create
 9    predictive tracking, right?
10    A.    That's right.
11    Q.    Okay.  Let's take a look at -- I think this is a document
12    that your counsel used, PX720, on the screen.
13              Let's go to the second page where this is -- at the
14    bottom of the first page, this is from John -- sorry.
15              This is PX720, right?
16              That's right.
17              That's from Jack McCauley.  You see there an email,
18    and this is to John Carmack.
19              And if we go to the second page, it says, "One other
20    issue" -- there you go -- "One other issue, I've been thinking
21    about the latency, and would it not make sense to be able to
22    predict where the head will be in the future two or three
23    frames?"
24              Do you see that?
25    A.    I do.
```

```
 1   Q.   That's a concept in predictive tracking, right?

 2   A.   Yeah.

 3   Q.   We've heard the analogy of throwing a football in

 4   predictive tracking.  Have you been in court when that analogy

 5   has been used by witnesses as well as lawyers?

 6   A.   Yes.

 7   Q.   Okay.  Now, you cited the Azuma reference for predictive

 8   tracking --

 9   A.   Yes.

10   Q.   -- in your direct and the Azuma reference was you said was

11   cited many times?

12   A.   That's correct.

13   Q.   And could Oculus engineers have just found the Azuma

14   reference?

15   A.   Yes.

16   Q.   Okay.  And if they found it, it would just take them

17   28 hours to solve this?

18   A.   Yes.

19   Q.   Okay.  Let's take look at a document that is September,

20   October, November, December -- three months later.  This is

21   PX2010.

22        I believe this is already in evidence.

23        This is from Steve LaValle at the top, and there's an

24   embedded email from Mr. Palmer Luckey.

25        This is dated December 19th.
```

```
 1              And Mr. Luckey, who is the putative inventor of
 2   virtual reality writes, "Prediction can also be very useful,
 3   but it will need improvement.  Several companies have spent a
 4   lot of time working with predictive tracking and have figured
 5   out how to use it in a nonuniform way that minimizes unwanted
 6   actions.  I don't know very much about this topic.  We will
 7   need to talk to outside people on this."
 8              Do you see that?
 9   A.    I do.
10   Q.    So how many hours between September and December in three
11   months?  I won't make you do the math, but that's many, many
12   more times hours than 28, right?
13   A.    Yes.
14   Q.    Okay.  And I have a board, if we could get it up, and I
15   could put that on the board.  I believe when I used the board
16   with Professor Balakrishnan, you came around and you saw the
17   board?
18   A.    I certainly couldn't read the board.
19   Q.    Okay.  But you saw what I was doing there?
20   A.    There was a board, yes.
21   Q.    Okay.  Now, why wouldn't Oculus developers just go look at
22   the Azuma reference and solve predictive tracking?
23              You used the word "simple" in your direct.  If it's
24   so simple, they can just solve it.
25   A.    Well, my understanding from speaking with them is that
```

 1   they did.  They implemented it in fairly short order.  I asked

 2   Mr. Antonov how long it took him, and, as I recall, he said one

 3   to two weeks to implement, find it, implement and -- no, I'm

 4   sorry.  That was gravity and drift correction.

 5        For predictive tracking, I believe he said it took

 6   him a couple of days.

 7   Q.   He said it took him a couple of days for predictive

 8   tracking?

 9   A.   Yes.

10   Q.   Okay.  Let's see here.  Predictive tracking.

11   December 28th.  November 18th.

12        Why would it take -- I'm going to mark it in just a

13   second -- why would it take two months for Oculus engineers to

14   still be working with predictive tracking if he did it in a

15   couple of days?  Do you know?

16        MS. KEEFE:  Objection, lacks foundation.

17        THE COURT:  Sustained.

18   BY MR. SAMMI:

19   Q.   You spoke to Mr. Antonov, right?

20   A.   I did.

21   Q.   Now, has Oculus ever used a clean room?

22   A.   I don't know.

23   Q.   Did you ask?

24   A.   No.

25   Q.   Do you know what a clean room is?

```
 1    A.    I heard it described in court.
 2    Q.    Okay.  And that's the only time you've ever heard about
 3    the concept of a clean room was in court?
 4    A.    Well, except for this concept of a semiconductor
 5    fabrication or medical device fabrication facility.
 6    Q.    Sure, except for that one.  The concept of a software
 7    clean room?
 8    A.    That's correct.
 9    Q.    Okay.  So this case has been pending for how many years?
10    A.    I gather two years.
11    Q.    Yeah.  Two and a half years.
12          So if a company like Oculus, Mr. Antonov and those
13    working at Oculus get sued by ZeniMax, in two and a half years,
14    they could have just had somebody rewrite it who has no
15    exposure to Carmack or no exposure to ZeniMax's code, right?
16          Would that make sense?
17          THE COURT:  Stop.
18          MS. KEEFE:  Objection, Your Honor.  Incomplete
19    hypothetical, calls for speculation.
20          THE COURT:  Sustained.
21    BY MR. SAMMI:
22    Q.    In your expert opinion, sir, wouldn't one way to avoid an
23    allegation of trade secret misappropriation would be to just
24    clean room the code?
25          MS. KEEFE:  Same objection, Your Honor.
```

```
 1              THE COURT:  I'll let him answer that.
 2              Overruled.
 3              THE WITNESS:  Yes.
 4    BY MR. SAMMI:
 5    Q.   Okay.  And do you know whether Oculus has ever done a
 6    clean room?
 7    A.   I don't know.
 8    Q.   And did you inquire?
 9    A.   No.
10    Q.   Okay.  By the way, I asked you -- we were talking about
11    predictive tracking.  I asked you, "Can you name" -- and this
12    is at your deposition -- "a single VR system today" -- this was
13    at your deposition -- "that uses predictive tracking
14    technology?"
15              Okay?
16              And your answer was, "I think I may need to amend my
17    previous response.  I'm not certain that there are current
18    systems."
19              Do you remember that?
20              THE COURT:  Are you trying to impeach him with his
21    deposition?
22              MR. SAMMI:  Let me ask the question this way.
23    BY MR. SAMMI:
24    Q.   Do you recall whether you were able to identify any
25    current virtual reality system that uses predictive tracking
```

```
 1   when I asked you the question at your deposition?
 2   A.   Yes.
 3            THE COURT:  Stop.
 4            MS. KEEFE:  I'm going to object, Your Honor, to the
 5   way he's doing this.  If he's going to read quotes from the
 6   deposition, I need to know the --
 7            THE COURT:  He hasn't read the quotes yet.  He's
 8   asking questions.
 9            Overrule that.  He's answered.  It's in.
10            Okay.  Next question.
11            MR. SAMMI:  Sure.
12   BY MR. SAMMI:
13   Q.   Are you -- do you recall not being able to mention any VR
14   system currently that uses predictive tracking?
15   A.   Yes.
16   Q.   You recall not being able to, right?
17   A.   Yes.
18   Q.   Okay.  Let's talk about gravity for a second.  We talked
19   about gravity.  What's the total time for gravity?  Do you
20   recall?
21   A.   I believe the estimate was about 28 hours.
22   Q.   28 hours.
23            Okay.  So that's another 28 hours.
24            That's half a week if you have more than one person
25   or even one person?
```

```
 1   A.   Sure.
 2   Q.   Okay.  Now, let's take a look at some documents.
 3            I want to start with PX489.  We have seen this
 4   before.  I can use this on the ELMO unless we have a slide.
 5            And we talked a lot about this in the direct where
 6   you said this is the plumb bob and, you know, thousands of
 7   years people have known just the plumb bob will fix -- you just
 8   have to find out where gravity is.
 9            Do you remember that?
10   A.   Yes.
11   Q.   Okay.  Now, this is -- this is Mr. Antonov writing, "Can't
12   get the damn gyro and gravity data to merge."
13            Do you see that?
14   A.   Yes.
15   Q.   So Mr. Antonov could have just looked at the YouTube
16   video, right?  That's -- you cite the YouTube video as
17   disclosing the secret of how to reorient gravity in code
18   specific to virtual reality, right?
19   A.   Yes.
20   Q.   So Mr. Antonov could have just gone to YouTube and watched
21   John Carmack say that one sentence and then be able to do it in
22   the code?
23   A.   Yes.
24   Q.   Okay.  So then a couple of lines down, Mr. Iribe says "why
25   don't you email Carmack?"
```

1          Do you see that?

2   A.   Yes.

3   Q.   And then Mr. Antonov writes back, "Basically at this point

4   I'd need his code.  I've been determined to figure it out

5   myself."

6          Do you see that?

7   A.   I do.

8   Q.   So Mr. Antonov, someone who is determined to figure it

9   out, didn't bother going to YouTube, do you know?

10          MS. KEEFE:  Objection, Your Honor, calls for

11   speculation.

12          THE COURT:  Sustained.

13   BY MR. SAMMI:

14   Q.   Did you ask Mr. Antonov if he went to YouTube and watched

15   the video?

16   A.   No.  He told me he got this from a paper.

17   Q.   Got it from the paper.  That's right.

18          Let's start from the patent first.  You had a patent,

19   the Foxlin patent, right?

20   A.   Yes.

21   Q.   Okay.  First of all, is there any allegation, do you know,

22   that ZeniMax's technique that's for gravity orientation

23   infringes this patent in any way?

24   A.   Well, the patent has expired, so it can't be infringed.

25   Q.   How about when it was in play?  You said all the steps are

```
 1    found in the patent, so wouldn't that mean ZeniMax's gravity
 2    orientation infringes this patent?
 3               MS. KEEFE:  Objection, Your Honor, calls for legal
 4    collusion.  We didn't talk about the claims.
 5               THE COURT:  Sustained.
 6    BY MR. SAMMI:
 7    Q.   Didn't you say in your direct that every element of
 8    gravity correction trade secret, as ZeniMax claims, is found in
 9    the Foxlin patent?
10    A.   Yes.
11    Q.   And the Foxlin patent was cited how many times?  61?
12    A.   61, yes.
13    Q.   61.
14               Now, did Mr. Antonov just go and look at the Foxlin
15    patent?
16    A.   No.  He used the Favre reference.
17    Q.   That's the -- is that the one -- the Favre paper, the
18    quaternion based fusion, right?
19    A.   Correct.
20    Q.   Is there any source code in the Favre paper?
21    A.   No.
22    Q.   And how long is it?  A page and half?
23    A.   Yes.
24    Q.   Okay.  So Mr. Antonov could have used this -- you said
25    that Mr. Antonov told you he used this?
```

1    A.    Yes.

2    Q.    Okay.  Let's take a look at PX1509.

3          This is another email from Mr. Antonov after he's

4    asked for the code.  Let's go down to "I have a question."

5          "I have a question about orientation adjustment in

6    Doom 3.  How do you decide where up and down is?"

7          That is September 8th, right?

8          I'll -- take a look at the date.

9          That's September 8th, okay?

10   A.    Yes.

11   Q.    Okay.  Do you know if Mr. Antonov found the Favre paper at

12   that point?

13   A.    I'm unfamiliar with the timeline, if that's what you're

14   asking.

15   Q.    Yeah.  That's exactly what I'm asking.  You had

16   conversations with Mr. Antonov, and he told you that he used

17   the Favre paper.  When?

18   A.    Well, you showed a text which indicates he was

19   implementing the Favre paper at that time, so on that date I

20   presume.

21   Q.    So you think the texts that we saw was him implementing

22   the Favre paper?

23   A.    Yes.

24   Q.    So why would he ask to get Carmack's code and say,

25   basically, I need Carmack's code?  I've been trying to figure

 1   it out myself.

 2         He didn't say basically I need the Azuma reference or

 3   I need to go to the library.

 4         MS. KEEFE:  Objection.  Misstates document and

 5   testimony.

 6         THE COURT:  Overruled.

 7         THE WITNESS:  I'm sorry.  Can you repeat the

 8   question, please?

 9   BY MR. SAMMI:

10   Q.   Sure.

11         He said, he being Mr. Antonov, said "Basically at

12   this point I need Carmack's code."  He didn't say I need the

13   Favre paper or I need to go to the library, correct?

14   A.   Correct.

15   Q.   Okay.  Let's take a look at a November 26 document,

16   PX1747.

17         Now, this is November 26th, which is -- that was

18   September 8th.  November 26th, that's almost two months later.

19   Mr. Iribe to Mr. Carmack "We're tweaking gravity correction and

20   wanted to know how you implemented it in the Rage/Doom demo.

21   Can you describe what you're doing?"

22         Do you see that?

23   A.   I do.

24   Q.   Okay.  Well, they got the Favre paper.  They don't need to

25   know how -- know what -- how Carmack does it in his code, do

1  they?

2  A.    Let's see.  So I believe that it had already been

3  implemented by this time.

4  Q.    Okay.  So -- and they're asking for no reason?

5  A.    Well, you can always make things better.  And, in fact,

6  they did go on to use a much more sophisticated technique in

7  their future implementations.

8  BY MR. SAMMI:

9  Q.    Okay.  But do you know if Oculus was in a hurry trying to

10  get its SDK out at this point?

11  A.    I'm sure they were.

12  Q.    Okay.  Now, let me ask you about E3.  Do you know what E3

13  is?

14  A.    Yes.

15  Q.    Okay.  E3 was in 2012, correct?

16  A.    I don't recall the date.

17  Q.    Okay.  I'll let you know that it was in June 2012.  I

18  think that counsel will agree that was the date, okay?

19        So I asked -- I'm going to ask you before the middle

20  of 2012, let's say 2011, are you aware of any HMD headsets that

21  were on the market that had significantly reduced latency and

22  that were commercially viable?

23  A.    Well, by commercially viable, let me get a clarification.

24  I take it you mean you can make money selling them to

25  consumers.

```
 1   Q.   Well, let's talk about that for a second.

 2        The Sutherland is not commercially viable, right?

 3   Because that was in a lab and it was the size of a room, right?

 4   A.   Correct.

 5   Q.   How about you and me going to a store and next to a

 6   PlayStation, there's something on the shelf that we could buy,

 7   let's call that commercially viable.  Is that --

 8   A.   So commercially available.

 9   Q.   Isn't that viable, too, because it's selling?  Otherwise,

10   it wouldn't be on the shelf.

11   A.   Well, people lose a lot of money selling things, and

12   it's -- the jury's still out, if you'll excuse me, about

13   whether you can make money selling VR headsets.

14   Q.   Okay.  So what term do you want to use?  Do you want to --

15        I'm just trying to ask you if we can agree on some

16   term where it's VR that's not in a lab.  It's not a flight

17   simulator that costs $100,000.  It doesn't have scaffolding

18   that has cameras all around.  It's something that you can walk

19   into a store and buy reasonably.

20        What word do you want to use?

21   A.   Commercially available.

22   Q.   Commercially available.

23        Okay.  So before the middle of 2012, say the year

24   2011, are you aware of any HMD headsets on the market that had

25   significantly reduced latency and were commercially viable --
```

1   or available I should say?

2   A.   I am not aware of any.

3   Q.   You're not aware of any?  You're not aware of any?

4   A.   I'm sorry.  Could you repeat the question?

5   Q.   Sure.

6           Are you aware of any virtual reality headsets before

7   the middle of 2012 -- it could be 2011, it could be 2010, it

8   could be 2009 -- that were -- that had significantly reduced

9   latency and were commercially available?

10  A.   Well, I'm not sure what significantly reduced means.

11  Certainly everybody who's built these tries to reduce latency.

12  Q.   Can you think of any?

13  A.   Well, as I say, in going back to the 1990s, I used a

14  headset, the EyePhone, which was commercially available, and I

15  had, you know, moderate latency, not too bad.

16          So I need more information to, you know, answer the

17  question.

18  Q.   Okay.  Do you -- do you read any documents about the

19  acclaim that happened at E3 after the prototype was debuted at

20  ZeniMax's booth?

21  A.   Yes.

22  Q.   Okay.  Do you know if that any sort of acclaim accompanied

23  the thing you just described?  And when you said EyePhone, it's

24  not one of these?

25  A.   No.  Sorry.  It is called an EyePhone.  It's called E-Y-E

1    phone.  In the 1990s, nobody had ever heard of Apple iPhones at

2    that point.

3    Q.    And you don't remember any acclaim like that?

4    A.    Huge press.

5    Q.    Okay.  And are you --

6    A.    A gigantic splash.

7    Q.    Did it survive?

8    A.    No.  It was not commercially viable.

9    Q.    Okay.

10   A.    Yeah.

11   Q.    So other than -- so it's not commercially viable.  So

12   that's a no, right?

13   A.    That's a no.

14   Q.    Got it.  Okay.  Let me just wrap up here for second, sir.

15         Did Oculus -- didn't Oculus have a team of engineers,

16   not just Mr. Antonov?

17   A.    Well, they started small.  Now, I understand they have a

18   very large team.

19   Q.    Right.  And we've heard from some folks, like Mr. LaValle,

20   Mr. Nirav Patel, and others.

21         Who else did you talk to at Oculus?

22   A.    Well, let's see.  I'd need to look at my report to give

23   you an exhaustive list.  I spoke with Mr. Carmack.  I spoke

24   with Mr. Antonov.  I can't recall -- I'm sorry.  I can't recall

25   off the top of my head.  I can consult my report, if that would

1   help.

2   Q.   But the ones you can recall, and Mr. Carmack, who's

3   sitting here today, and Mr. Antonov, who's not here?

4   A.   That's right.

5   Q.   Okay.

6          MR. SAMMI:  Pass the witness.

7          Before I do, Your Honor, I apologize.  Let me just

8   move some documents into evidence, if we can.

9          I'd like to move the documents into evidence referred

10  to that were on the preadmitted list PX1509, PX2010, and

11  PX1747.

12         THE COURT:  They need to know what they are.

13         MS. KEEFE:  I need to see it so I know.

14         MR. SAMMI:  Yes.  I'll give you copies right now.

15         We can put it on the record later, Your Honor, or

16  would you want to do it right now?  These are -- were on the

17  preadmitted list.  I apologize.

18         THE COURT:  You mean they've already been agreed to?

19         MS. KEEFE:  No objection.  I --

20         MR. SAMMI:  They're on the preadmitted list, and I

21  mentioned them.

22         THE COURT:  Preadmitted agreed to?

23         MR. SAMMI:  Yes.

24         MS. KEEFE:  I just want to -- just -- if I can just

25  see them, Your Honor, I'm sure we can wrap this up real

```
 1   quickly.
 2            THE COURT:  Well, if they're already agreed to, all
 3   you do is make a reference to them and they're in.
 4            MR. SAMMI:  Okay.
 5            MS. KEEFE:  It looks like they are all preadmitted,
 6   yes.
 7            THE COURT:  Then, they're in.
 8            MR. SAMMI:  Thank you, Judge.
 9            THE COURT:  That's all you needed to do.
10            (Plaintiffs' Exhibit Nos. PX1509, PX2010, and PX1747
11            received)
12            MR. SAMMI:  Thank you.
13            THE COURT:  Okay.  Ms. Keefe, how long is your
14   redirect?
15            MS. KEEFE:  I have two questions.
16            THE COURT:  Long questions, short questions?
17            MS. KEEFE:  Short questions.
18            THE COURT:  Okay.
19                   REDIRECT EXAMINATION
20   BY MS. KEEFE:
21   Q.   Dr. Howe, did ZeniMax's descriptions of its alleged trade
22   secrets as presented by Dr. Dobkin include any mention of
23   source code?
24   A.   No.
25   Q.   Is there actually another expert in this case who did
```

1    analyze ZeniMax's source code and compare it directly to
2    Oculus's source code for the Defendants?
3    A.   Yes.  My understanding is Barbara Frederiksen-Cross did
4    that analysis.
5    Q.   And she'll be testifying later?
6    A.   My understanding.
7             MS. KEEFE:  Thank you.
8             MR. SAMMI:  No further questions.  Thank you,
9    Professor.
10            THE WITNESS:  Thank you.
11            THE COURT:  Thanks, Doc.  You can step down.
12            Take a 10-minute break.
13            We're going to really try to -- everybody go to the
14   bathroom fast.
15            Don't talk about the case.
16            SECURITY OFFICER:  All rise.
17            (Jury out)
18            (Recess at 10:28)
19            THE COURT:  Okay.  Here we go.  Next.
20            Mr. Lisy, you're up.
21            MR. LISY:  Good morning, Your Honor.
22            THE COURT:  It's great to see you.
23            MR. LISY:  It's good to see you as well.  Thank you.
24            THE COURT:  Is Mr. Hemr still alive back there?
25            MR. LISY:  I think he is.

```
 1                    THE COURT:  Okay.  Let's bring them in.

 2                    And you've got your witness here in the courtroom?  I

 3     see him.

 4                    MR. LISY:  Yes.

 5                    THE COURT:  Just kind of turn this way.  You can look

 6     at the jury and then, in a minute, Ronnie will swear you in,

 7     okay?

 8                    MR. WILLITS:  Yes, Your Honor.

 9                    THE COURT:  And you're going to have to talk right

10     into the microphone right here when you get up there, okay?

11                    MR. WILLITS:  Yes, Your Honor.

12                    (Pause)

13                    SECURITY OFFICER:  All rise for the jury.

14                    (Jury in)

15                    THE COURT:  Sorry.  That break went longer than I

16     thought.  Y'all be seated.

17                    Thank you.

18                    Mr. Willits, raise your right hand.

19                    (The witness was sworn)

20                    THE COURT:  All right.  Take a seat next to me.

21                    And, for the record, call your next witness.

22                    MR. LISY:  Plaintiffs call Timothy Willits.

23                    THE COURT:  Okay.

24                    THE WITNESS:  Good morning.

25                    THE COURT:  Have you got water?
```

```
 1              THE WITNESS:  Yes, Your Honor.
 2              THE COURT:  Okay.  Good.
 3              (Pause)
 4              THE COURT:  It's on.
 5              MR. LISY:  Great.
 6               TIMOTHY WILLITS, DEFENDANTS' WITNESS, SWORN
 7                        DIRECT EXAMINATION
 8   BY MR. LISY:
 9   Q.   Good morning, Mr. Willits.
10   A.   Good morning, sir.
11   Q.   Would you introduce yourself to the jury, please?
12   A.   Hello.  My name is Tim Willits.
13              THE COURT:  Whoa, whoa, whoa.  We're going to have to
14   train you, Mr. Willits, about how to work on the microphone.
15              You're going to have to do it kind of across like
16   this, like Bruce Springsteen would, okay?
17              THE WITNESS:  Got it, Your Honor.
18              THE COURT:  Okay.
19              THE WITNESS:  Sorry about that.
20              THE COURT:  All right.  Here we go.
21   BY MR. LISY:
22   Q.   Do you want to give it another shot?
23   A.   Hello.  My name is Tim Willits, and I am the studio
24   director at id Software.
25   Q.   Mr. Willits, how long have you been working at id Software
```

```
 1   for?
 2   A.    I have been at id Software since 1995, so like 21 years.
 3   It's very exciting.
 4   Q.    Is that the first job that you had after college?
 5   A.    Yes, yes, yes, I was -- right out of college I came to id
 6   Software and, you know, I'm very blessed to, you know, work in
 7   the same company for so long.
 8   Q.    Okay.  And were you working at id, Mr. Willits, at the
 9   time that ZeniMax acquired it in 2009?
10   A.    Yes.  Yes, I was.
11   Q.    Could you give the jury a sense of what was happening at
12   id around the time of the acquisition and what the culture at
13   id was like after the acquisition?
14   A.    Okay.  So in 2008, 2009, we wanted to expand the studio,
15   because we had, you know, more franchises, game franchises than
16   really people.
17            THE COURT:  We're still not able to hear you very
18   well.
19            THE WITNESS:  Oh, I'm sorry, Your Honor.  There we
20   go.
21   A.    So there we go.
22            So, yes.  So in 2008, 2009, we wanted to expand the
23   studio, and, you know, growing is very difficult, so, you know,
24   we looked for publishers that we could partner with that could
25   help us grow our studio that would help us with our business
```

1    and that would be a culture fit.

2    BY MR. LISY:

3    Q.   And can you tell us about what the culture at id was like

4    after ZeniMax acquired the company?

5    A.   So one of the reasons why we decided to work with ZeniMax

6    is that, you know, we felt that, you know, they were aligned

7    with us, not only how they did business but also our culture.

8           So id Software, we're always -- we've always been

9    really small, and we have a small team mentality.  So for us

10   it's -- you know, it's the people first.  We work long hours

11   together, so it's like a family.  So when we were looking for

12   publishers, you know, we -- we were very happy that ZeniMax,

13   you know, their culture fit with ours.

14          Like, for instance, I'm not sure if you already know

15   this or not, but you know that square in the ZeniMax logo,

16   well, part of the ZeniMax motto is that we turn right corners

17   or square corners, sorry.  And that's because, you know, the

18   company tries to do the right thing.  We try to have integrity

19   with our employees, and we felt that was a good fit for us.

20   Q.   And do you know Mr. Altman?

21   A.   Yes, sir.

22   Q.   Do you have a relationship with Mr. Altman?

23   A.   Yes, yes.  I feel that I have a very good relationship

24   with Robert.  I worked with a number of different publishing

25   companies, big companies, and, you know, I feel that I have

 1  direct access to Robert, which is very unique with other CEOs,

 2  and I think that the other employees also feel that way as

 3  well.

 4  Q.  Did you work with Mr. Carmack as well?

 5  A.  Yes, yes, yes.  So John was always at the company.  He was

 6  the founder, so I have worked with John the whole time that he

 7  was there.

 8  Q.  Did you ever see Mr. Carmack working on virtual reality at

 9  id?

10  A.  Yes, yes.  And that's a big -- that's a big question.

11  Yes.  So I saw John working on -- you know, we have the three

12  kind of pieces, the three foundations of what modern VR is, you

13  know, which, of course, is the hardware.  Then there's the

14  system, the platform that makes it work, and then we have our

15  game content.

16          So during, you know, 2010, 2011, you know, I saw John

17  working with different components, different pieces.  I walked

18  by, I witnessed John working on solving some really difficult

19  problems, and then, of course, the game content.  You know,

20  that's something that we definitely worked very closely

21  together on.

22  Q.  Did there come a time when it seemed to you that

23  Mr. Carmack had made a breakthrough on virtual reality?

24  A.  Yes.  So, as you probably already know, there's some very

25  complex issues, and, you know, John is very good at solving

```
 1   problems.
 2           And from what I witnessed, you know, really in the
 3   spring of 2012, that timeframe, you know, some of those really
 4   difficult problems, you know, he cracked, and it was -- it was
 5   really cool.
 6   Q.   And during the timeframe that you're mentioning, had
 7   Mr. Carmack, to the best of your knowledge, been contacted or
 8   have any contact with Mr. Luckey?
 9   A.   Yes.  So it's -- my understanding is that, you know, John
10   first contacted Palmer Luckey in May, May, which was obviously
11   after -- after the spring.
12   Q.   And was there a time prior to that when you felt that
13   Mr. Carmack had achieved the breakthrough that we talked about
14   a moment ago?
15   A.   Yes, yes, yes.  Like I said, very, very complex problems.
16   And, you know, John had solved, you know, a lot -- many of the
17   issues.  I mean, he just -- he brought something that was so
18   difficult to life, and there's actually -- there's a picture of
19   me.  I'm not sure if you've seen it.  It was tweeted from us.
20   It was in March.  And you can see me, and I have -- I have one
21   of John's mad scientist headsets on.  So, yes, it was around
22   that time.
23   Q.   Okay.  And are you generally familiar with the work that
24   Mr. Carmack was doing on virtual reality at the time in 2012?
25   A.   Yes, yes.  So, again, I worked closely with John.  We've
```

1   always been a small group.  So, again, I saw John, you know,

2   working with, you know, numerous pieces of hardware.

3          You know, when John solves a problem, he gets very

4   excited, and he says, "Hey, you guys have got to come check

5   this out."

6          So there are many times when he would show us new

7   things, and I worked closely with him on the game content as

8   well.

9   Q.   And at that time -- so in the spring of 2012 -- did you

10  have a view as to who owned the contributions and the work that

11  Mr. Carmack was doing on virtual reality?

12  A.   Yes, yes, yes.  So the stuff that we do at id we own, and

13  I witnessed John working, you know, on doing amazing things,

14  and it was my belief that, yes, we own that work.

15  Q.   Did you ever have a different belief between that time and

16  as you're sitting here right now?

17  A.   No, sir, no.

18  Q.   Did you think that the work that John was doing on virtual

19  reality was known outside of id Software at that time?

20  A.   So early -- so a lot of the work that, you know, John had

21  done at that time was -- was proprietary, was stuff that we did

22  internally.  But once he started to, you know, unlock a lot of

23  these problems and solve these issues, we were very excited.

24          So we would tease stuff to the press, like that, like

25  that Twitter picture was definitely something where, you know,

1    it made our fans kind of very excited about, you know, what we

2    were working on.

3    Q.   And the jury has heard a lot of testimony over the last

4    couple of days about the negotiations that id has had with

5    Oculus.

6              Are you generally familiar with those discussions?

7    A.   Yes.  So just let me explain real quick.

8              You know, I -- I deal with the creative side of the

9    business, so I wasn't necessarily in those discussions, but --

10   but I was definitely very, you know, aware of it, yes.

11   Q.   And who, to your knowledge, was the point of contact at id

12   for those discussions?

13             MS. KEEFE:  Objection, Your Honor.  He just said he

14   wasn't involved in them, so any testimony about them is going

15   to be hearsay.

16             THE COURT:  Sustained.

17   BY MR. LISY:

18   Q.   Even if you weren't involved with them, did you have

19   personal knowledge of the fact of discussions happening?

20             MS. KEEFE:  The same objection, Your Honor.  He just

21   said he wasn't involved.  Hearsay.

22             THE COURT:  Sustained.

23   BY MR. LISY:

24   Q.   Okay.  Mr. Willits, can you tell us, generally, is

25   intellectual property important to id Software?

1   A.   Yes.  So -- so we create technology, and we create games,

2   and that's our -- that's our crown jewels.  You know, our

3   business, you know, the people that work at id Software, that's

4   our job.

5           So, you know, everything we do from technology to our

6   game design is -- is really important to us.

7   Q.   Okay.  And does id Software have policies and procedures

8   around checking in source code to id's source code repository?

9   A.   Yes.  So one of the things that we asked of our employees

10  is that every day -- at the end of the day they check in their

11  work.  So that's our coders and our artists.  So we ask that

12  we -- so we know where it is.  We can keep it safe.  And so

13  people can regularly check in what they do.

14  Q.   And earlier you said that you worked with Mr. Carmack.  Do

15  you know whether Mr. Carmack would run afoul of those policies

16  and procedures?

17           MS. KEEFE:  Objection, lacks foundation.

18           THE COURT:  Sustained.

19           MR. LISY:  Okay.

20  BY MR. LISY:

21  Q.   Are you familiar with Mr. Carmack's work writing source

22  code for id?

23  A.   Yes, sir.

24  Q.   Could you tell the jury how you know about that?

25  A.   So, again, I worked with John for, you know, almost 20

1   years, and it's a very small team.  And, you know, John is our

2   principal architect.  He's -- he's the guy that really, you

3   know, invented the first-person game and all the technology.

4          And because I'm one of the senior leaders in the

5   studio, we have meetings, and we go over what people are

6   working on.  John, you know, talks about code.  And in college

7   I was a computer science major, so I don't necessarily code

8   now, but I have an understanding of, you know, the basic

9   technologies.

10  Q.   Okay.  And in terms of Mr. Carmack's checking source code

11  in and out, is that something that you have personal knowledge

12  of?

13  A.   Yes, yes.

14  Q.   Okay.  And could you tell us about Mr. Carmack's

15  policies -- excuse me -- could you tell us about Mr. Carmack's

16  practices in that regard?

17  A.   Yes.

18          MS. KEEFE:  Objection, lacks foundation.

19          THE COURT:  Sustained.

20  BY MR. LISY:

21  Q.   Okay.  If Mr. Carmack were to have created source code on

22  a laptop owned by id and did not check that source code into

23  the id repository, is there any way for you at id to know what

24  that source code was?

25          MS. KEEFE:  Objection.

```
 1              THE COURT:  Sustained.
 2   BY MR. LISY:
 3   Q.   Okay.  There's been some evidence in the case,
 4   Mr. Willits, that leading up to his departure at id Mr. Carmack
 5   took about 10,000 emails with him over -- after he left id.
 6              And what I'm going to ask you is, are you familiar
 7   with Mr. Carmack's practice of using email at id?
 8   A.   Yes.  Yes, I am.
 9              MS. KEEFE:  Objection.  Lacks foundation, calls for
10   speculation.
11              THE COURT:  Sustain that.
12              The jury is instructed to disregard the last answer.
13   BY MR. LISY:
14   Q.   Is it something that would be concerning to you if
15   Mr. Carmack took 10,000 emails from id after he left?
16              MS. KEEFE:  Objection.
17              THE COURT:  Sustained.
18              MR. LISY:  I'll move on.
19   BY MR. LISY:
20   Q.   Who at id would be best positioned to review any software
21   development kit that may have been sent from Oculus?
22   A.   The best person would be John Carmack.
23   Q.   Okay.  Is there anybody else at id in the 2012-2013 time
24   period who would be as adept as Mr. Carmack in doing that?
25   A.   Because John created the technology, obviously, he would
```

```
 1   be the best person to -- to evaluate that, yes.
 2   Q.   Okay.  Now, during the time that Mr. Carmack was at id,
 3   did he have discussions with hardware manufacturers?
 4   A.   Yes, yes, he did.
 5   Q.   Okay.  And do you do project planning at id?
 6   A.   Yes, sir, I do.
 7   Q.   And could you give the jury just a brief description of
 8   what project planning is?
 9   A.   So when we start out -- sorry.  So when we start out on a
10   new project, as studio director and creative director before
11   that, it is my job to work with the individual teams, you know,
12   the programmers, artists, and designers, on creating the
13   roadmap for, you know, how we're going to go from the
14   technology to the game design to -- and then, you know, which
15   departments and people would work on things.  It is very
16   standard, and it is a way that we kind of plan our game
17   development.
18   Q.   And does id release games on multiple platforms?
19   A.   Yes, yes, we do.
20   Q.   Is that done at the same time or at different times?
21            MS. KEEFE:  Objection, Your Honor.  Lacks foundation.
22            THE COURT:  He may know that.
23            Overruled.
24            THE WITNESS:  Yes, yes.  So we -- so when we launch
25   our new games, they are multi-platform.  So, for instance, last
```

1  year we shipped the newest Doom game, and it was Xbox One,

2  PlayStation 4, NPC, and we do that at the same time.

3  BY MR. LISY:

4  Q.   And can you tell the jury very briefly what the process is

5  for making a game work on the Xbox One as opposed to making it

6  work on the PlayStation One?

7  A.   Yes, yes.  Without going into too much detail, the

8  foundation, the core technology is -- works across all

9  platforms.  That's the real hard part.

10          And then at the end of the project, then, you know --

11  we will assign someone to make it work on the Xbox and the

12  PlayStation and the PC and those types of platforms.  It is not

13  difficult.

14  Q.   Okay.  Now, Mr. Willits, earlier I asked you a couple of

15  questions about the negotiation between Oculus and id.

16          Is your understanding of those negotiations based on

17  your personal knowledge?

18          MS. KEEFE:  Objection, Your Honor.  Asked and

19  answered, lacks foundation.

20          THE COURT:  Sustained.  And your time is up.

21          MR. LISY:  All right.  May I ask one more question,

22  Your Honor?

23          THE COURT:  If it's short.

24  BY MR. LISY:

25  Q.   Could you tell us how you felt when you heard that

```
 1  Mr. Carmack left id?
 2  A.   Yes.  When I -- when I found out that John left, it was
 3  like a kick in the gut.  You know, I worked with him for my
 4  whole career, right out of college.  And, you know, his wife
 5  sent the email, that he was resigning, and, you know, he didn't
 6  come into work to say goodbye, he didn't reach out to me, and,
 7  you know, it was just -- it was really sad.  I mean, literally,
 8  today, it's the first time that I have seen John in three and a
 9  half years since he left.
10            MR. LISY:  Thank you very much, Mr. Willits.
11            THE WITNESS:  You're welcome.
12            THE COURT:  Thank you, sir.
13            Ms. Keefe?
14            MS. KEEFE:  Thank you, Your Honor.
15                     CROSS-EXAMINATION
16  BY MS. KEEFE:
17  Q.   Mr. Willits, you have never written a single line of code
18  at id; isn't that correct?
19  A.   Yes.
20  Q.   Was there anyone at ZeniMax or id in the 2012-2013 who
21  could have reviewed the SDK that Oculus had sent other than
22  John Carmack?
23  A.   John Carmack would be in the best position.
24            MS. KEEFE:  Can I have the ELMO, please?
25            (Pause)
```

1   BY MS. KEEFE:

2   Q.   So you said he was the best.  Was there anyone else that

3   could -- was there anyone else at the company at that time that

4   could have reviewed the SDK?

5   A.   I would have to state John would be the best -- the best

6   person to do that.

7           MS. KEEFE:  Your Honor, motion -- sorry.  Your Honor,

8   objection, nonresponsive.  Can you instruct the witness to

9   answer, please?

10          THE COURT:  Yes.  She is asking was there anybody

11  else, not who was the best.

12          THE WITNESS:  I'm sorry.  You know, I would have to

13  say out of the programmers like Robert Duffy, maybe.

14  BY MS. KEEFE:

15  Q.   Were they working on VR at the time?

16  A.   Again, I -- John managed the programming department, so

17  specifically who was working on VR, that wasn't really

18  something that I would --

19  Q.   So you don't know if anyone else was working on VR in the

20  entire company at the time; isn't that correct?

21  A.   My understanding is that John was working on VR and that

22  he directed the other programmers.

23          MS. KEEFE:  Your Honor, objection, nonresponsive.

24  Can you please instruct the witness to answer?

25          THE COURT:  Sustained.

```
 1   BY MS. KEEFE:
 2   Q.   You don't know whether there was anyone else working on VR
 3   other than John Carmack; isn't that correct?
 4   A.   I knew people were helping John with -- with some things,
 5   yes.
 6            MS. KEEFE:  Your Honor, move to strike as
 7   nonresponsive.  Can you instruct the witness to answer the
 8   question?
 9            THE COURT:  Answer -- really listen and answer her
10   question, not what you're thinking.
11   BY MS. KEEFE:
12   Q.   You don't know whether there was anyone else at id working
13   on VR other than John Carmack, right?
14   A.   No.
15   Q.   At the time -- you were talking about how you felt at the
16   time Mr. Carmack left.  There was actually a press release that
17   went out at the time that Mr. Carmack left, and that was
18   Defendants' Exhibit 452.  In fact, you told the world that
19   "John's work on id Tech 5 and the technology for the current
20   development work at id is complete, and his departure will not
21   affect any current projects."
22            Isn't that true?
23   A.   That is the press release.
24   Q.   And that's your statement.  That's your name right there;
25   isn't that true?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Just one more document, Mr. Willits.
 3            In August of 2013, you sent an email to Mr. Graham
 4   Fuchs, and this is Defendants' Exhibit 403.
 5            You said "Ha, ha.  I think the whole Oculus thing is
 6   silly.  It's like eating at McDonald's, fun for a quick meal,
 7   but eat too much and you'll throw up."
 8            Is that your statement?
 9   A.   I wrote that, yes.
10            MS. KEEFE:  Thank you.  No further questions, Your
11   Honor.
12            MR. LISY:  Your Honor, I would have one question and
13   one question alone, if you'd permit me.
14            THE COURT:  You bet.  You bet.
15            MR. LISY:  Thank you, sir.
16            THE COURT:  While you're coming, is your real
17   expertise in being an artist?  Is that your thing?
18            THE WITNESS:  Yes, Your Honor.  Well, I'm a creative
19   director, so like game design and, you know, how the technology
20   works and how we can leverage that game design.  Does that --
21            THE COURT:  You don't draw the weird figures and all
22   that stuff?
23            THE WITNESS:  I -- Your Honor, I do draw some, yes,
24   yes, but unfortunately, I'm not very artistic, but I do come up
25   with those things.
```

```
 1              THE COURT:  I thought maybe you were more of a
 2    graphic design guy.  I didn't know what kind of your role was.
 3              THE WITNESS:  I'm sorry, Your Honor.
 4              THE COURT:  Go ahead.
 5              MR. LISY:  Thank you, sir.
 6                         REDIRECT EXAMINATION
 7    BY MR. LISY:
 8    Q.   Mr. Willits, I just have one question.  With respect to
 9    the document that you were just shown about "the whole Oculus
10    thing is silly, it's like eating at McDonald's, fun for a quick
11    meal, but eat too much and you'll throw up".
12              Could you tell the jury what you meant by that,
13    please?
14    A.   Yes, yes, yes.  So on the whole Oculus thing is silly,
15    around that time when John was working with us, id and Oculus,
16    there was -- there was people on the internet saying oh, you
17    know, what's going to happen to the company?  You know, is this
18    the end of id?
19              So that was -- it was just -- it was so much noise
20    that I thought it was very silly.
21              And then the whole McDonald's thing is, yeah, you
22    know, sometimes, when people put the Oculus on, the VR, they --
23    they can get sick.  Like, this week -- I'm sorry.  This month,
24    the first week of this month, three weeks ago, Intel did a
25    demonstration with Oculus --
```

```
 1              MS. KEEFE:  Objection, Your Honor.
 2              THE WITNESS:  -- and they passed out barf bags.
 3              THE COURT:  What's your objection?
 4              MS. KEEFE:  Objection, Your Honor.  He's interpreting
 5     an email.  He's talking about something that just happened last
 6     week, and he's rambling on.  Nonresponsive.
 7              THE COURT:  Yeah.  I do think it was nonresponsive.
 8              You can ask another question, if you want to, to try
 9     to clear this up.
10              MR. LISY:  Thank you, sir.
11     BY MR. LISY:
12     Q.   Mr. Willits, when you wrote the email that you were just
13     talking about, were you intending to be derogatory towards
14     Oculus?
15     A.   Oh, no, no, no, no, sir.
16     Q.   Okay.
17              MR. LISY:  No further questions.  Thank you.
18              THE COURT:  Anything else?
19              MS. KEEFE:  Just to move DX0403 into evidence,
20     please.  It was not on the agreed list, but there were no
21     objections this morning.
22              MR. LISY:  No objections.
23              THE COURT:  Then it's admitted into evidence.
24              (Defendants' Exhibit No. DX0403 received)
25              THE COURT:  You can step down.  Thank you.
```

```
1              MS. KEEFE:  Thank you, Your Honor.

2              MR. STOJILKOVIC:  Your Honor, the Defendants call

3    Gloria Kennickell.

4              THE COURT:  Kendall?

5              MR. STOJILKOVIC:  Kennickell.

6              THE COURT:  Kennickell.

7              (Pause)

8              THE COURT:  We're going to get you sworn in, ma'am,

9    okay?  Are you ready?

10             (The witness was sworn)

11             THE COURT:  If you'll take a seat next to me, ma'am.

12             THE WITNESS:  Thank you.

13             THE COURT:  I don't know if they got you a new bottle

14   of water or not.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  They're going to get you one.

17             MS. KEEFE:  Right here, Your Honor.

18             THE COURT:  Does she need any papers or anything?

19             MS. KEEFE:  I don't believe so, Your Honor.

20             THE COURT:  Okay.

21             THE WITNESS:  Thank you.

22             THE COURT:  Okay.  Did y'all get all shifted around

23   in your seats?  Later today I'm going to take one chair out,

24   and it's going to be -- what was that game we use to -- do you

25   remember musical chairs?  I just want to see who will win.
```

```
 1    I've got a suspicion Mr. Hemr will.
 2              MR. STOJILKOVIC:  May I proceed, Your Honor?
 3              THE COURT:  Are you ready?
 4              MR. STOJILKOVIC:  I am.
 5              THE COURT:  Let's go.
 6              GLORIA KENNICKELL, DEFENDANTS' WITNESS, SWORN
 7                        DIRECT EXAMINATION
 8    BY MR. STOJILKOVIC:
 9    Q.   Good morning.  Can you please introduce yourself to the
10    jury?
11    A.   Hi.  My name is Gloria Kennickell.
12    Q.   Ms. Kennickell, what do you do for a living?
13    A.   I am a software engineer.
14    Q.   Where do you work?
15    A.   I work at Oculus.
16    Q.   And what are your basic responsibilities as a software
17    engineer at Oculus?
18    A.   Right now, I work on the mobile SDK for Gear VR.
19    Q.   What is Gear VR?
20    A.   So Gear VR is a virtual reality headset that's
21    manufactured by Samsung, and you have a high-end Samsung phone
22    that you dock to the headset.  And when you do that, the Oculus
23    software runs in your VR.
24    Q.   Where are you from originally?
25    A.   Dallas, Texas.
```

```
 1   Q.   How did you first become interested in programming?
 2   A.   This is a fun story.  So I didn't actually have a computer
 3   until I was 20.  And I happened to run into a fellow named Jan
 4   Paul van Waveren who had told me that he hadn't learned a
 5   program until three years prior, and so I thought, well, if
 6   this guy can do it, so can I.  So I switched my major to
 7   computer engineering, and then I didn't realize that he was
 8   like a super genius at the time, so it was very easy for him to
 9   do.
10   Q.   Where did you go to college?
11   A.   The University of North Texas.
12   Q.   And what did you graduate in?
13   A.   I have a bachelor of science in computer engineering.
14   Q.   Did you go right from college into computer programming?
15   A.   I did.
16   Q.   And where have all the jobs you've held been?
17   A.   They've been here in North Texas.
18   Q.   Did there come a time when you joined id Software?
19   A.   Yes, there was.
20   Q.   When was that?
21   A.   June of 2007.
22   Q.   How did you come to work for id Software?
23   A.   So my husband Christian Antkow worked at id Software, and
24   he told me that they were looking for a junior engineer to work
25   on graphics with John Carmack.
```

1  Q.   When you were interviewing at id Software, did you get to
2  meet with John Carmack?
3  A.   Yes, I did.
4  Q.   What was it like to be interviewed by John Carmack?
5  A.   Terrifying and amazing all at the same time.
6  Q.   Did you get the job?
7  A.   I did, yeah.
8  Q.   What was your job title?
9  A.   I believe it was just programmer.
10  Q.   When you started at id, were there any other female
11  programmers working there?
12  A.   No.
13  Q.   And over time did more female programmers start working at
14  id?
15  A.   No.
16  Q.   You were the only one?
17  A.   Yes, I was.
18  Q.   What was the work environment like at id in your first
19  couple of years there?
20  A.   It was a really small team.  We were all very focused and
21  just had a lot of passion for making great games and working
22  really hard.  I felt like we were a team that could just
23  accomplish anything.
24  Q.   Were you at id when ZeniMax took it over?
25  A.   Yes, I was.

1    Q.   Do you recall roughly when that was?

2    A.   That was June 2009.

3    Q.   How did you find out that ZeniMax had bought id?

4    A.   So one morning we were instructed to meet at a hotel, and

5    we noticed that some people -- you don't really dress up at

6    game programming jobs.  And they were wearing really nice

7    clothes, and so we thought something was up.  And we went into

8    the hotel, and they announced that id had been acquired.

9    Q.   And when you say "we," who is we?

10   A.   The whole company.

11   Q.   Okay.  So you were just told to go to a hotel and then an

12   announcement was made?

13   A.   Yes.

14   Q.   Was anyone from ZeniMax there at the hotel that morning?

15   A.   Yes, they were.

16   Q.   Who do you recall being there?

17   A.   Mr. Altman and I believe Ernie Del.

18   Q.   Now, when you guys were all asked to go to this hotel and

19   you were informed that ZeniMax had bought id, was there some

20   discussion then of your employment situation going forward at

21   ZeniMax?

22   A.   Yes.  We were instructed to kind of line up for employment

23   packets.

24   Q.   Okay.  And can you take a look at what's been marked as

25   Plaintiffs' Exhibit 1943?  I think it's in your binder there.

1          MR. STOJILKOVIC:  And I don't believe there's an

2     objection to this one, though, it's not preadmitted.

3     BY MR. STOJILKOVIC:

4     Q.   Can you just take a look at it first?  Do you recognize

5     this?

6     A.   Yes, I do.

7     Q.   What is it?

8     A.   This is an employment agreement.

9     Q.   Okay.  And is this the packet you got when you lined up

10    that morning?

11    A.   Yes, it is.

12         MR. STOJILKOVIC:  Okay.  May I move it in?

13         MR. PHILBIN:  You may.  No objection.

14         THE COURT:  The document is admitted into evidence.

15         (Plaintiffs' Exhibit No. 1943 received)

16         MR. STOJILKOVIC:  And can I have the ELMO?

17    BY MR. STOJILKOVIC:

18    Q.   So is the first thing we see there the employment offer

19    that you got in line that morning?

20    A.   Yes.

21    Q.   Okay.  And just turning to the second page, is that your

22    signature there?

23    A.   Yes, it is.

24    Q.   And who else signed it?

25    A.   Mr. Altman.

1   Q.   Okay.  Now, did you get the impression when you guys were

2   told to line up and handed these out that morning that this was

3   something negotiable or did you understand it to be a

4   take-it-or-leave-it offer?

5   A.   Take it or leave it.

6   Q.   Now, was this employment offer better, equal, or worse

7   than your employment package had been at id before ZeniMax took

8   over?

9   A.   It was worse.

10  Q.   How was it worse?

11  A.   So at id, before ZeniMax, we had our health insurance paid

12  for us, and then also we had an SEP contribution from the

13  company for our retirement.

14  Q.   Okay.  Were you happy about this contract offer?

15  A.   No.

16  Q.   So why did you sign it?

17  A.   Because I needed a job and, you know, I would lose out

18  working with some of the people that I love most in the world.

19  Q.   And was your husband, Mr. Antkow, also presented with a

20  similar offer that morning?

21  A.   He was.

22  Q.   Okay.  And so both of your livelihoods were at issue?

23  A.   Yes.

24  Q.   Did you guys have debts at that time?

25  A.   Yes, we did.

1   Q.   What kind, generally speaking?

2   A.   So house, cars, some credit card, and then I think I still

3   had some student loans outstanding.

4   Q.   Okay.  And if I can direct your attention to the portion

5   of this letter that says at-will --

6          MR. STOJILKOVIC:  And, Dave, could we shift over to

7   the slide, because it will be easier to read, slide number 3.

8   BY MR. STOJILKOVIC:

9   Q.   You can read the paper or you can read what's up there.

10          Can you read just what's been highlighted from this

11   employment letter?

12   A.   Yes.

13          "At-will employment.  ZeniMax is an 'at-will'

14   employer.  This means your employment is not for any definite

15   period of time and either you or ZeniMax may terminate such

16   employment for any reason, at any time, with or without cause

17   and with or without notice."

18   Q.   What did you understand that to mean?

19   A.   That ZeniMax could fire me at any time and that I could

20   leave at any time.

21          MR. STOJILKOVIC:  Okay.  Could we go back to the

22   ELMO, please?

23   BY MR. STOJILKOVIC:

24   Q.   There's another part of this document that goes on for

25   several pages, and it's titled, do you see there, "Agreement on

1    Ideas, Inventions, and Confidential Information"?

2    A.   Yes.

3    Q.   Are you familiar with this document that goes on for about

4    six pages?

5    A.   Yes, I am.

6    Q.   Okay.  And is it your -- does your signature appear at the

7    end of it?

8    A.   Yes, it does.

9    Q.   Okay.  What did you understand this document generally to

10   relate to?

11   A.   So there's a lot of legalese to get through, but pretty

12   much talking about if I were to try to do anything in my spare

13   time, then it could possibly be owned by ZeniMax and that like

14   any kind of confidential information should remain

15   confidential.

16   Q.   Okay.  You understood it also even applied to things you

17   did in your spare time that they would still claim ownership of

18   it?

19   A.   Yes, they could.

20   Q.   And what, if anything, was your understanding about

21   whether you could tell people you worked on stuff at ZeniMax

22   even if it was true?

23   A.   So from one of the clauses, it looks like I couldn't even

24   claim attribution for something that I had worked on.

25   Q.   Okay.  How did you feel about this agreement?

1    A.   It felt pretty draconian.

2    Q.   And what's draconian for those of us who don't know Greek

3    history?

4    A.   So, like, the penalty for everything is death.

5    Q.   And you don't mean that literally?

6    A.   No, not literally.  Sorry.

7    Q.   So why did you sign it?

8    A.   I needed a job.

9    Q.   What was it like to work at id after ZeniMax bought the

10   company?

11   A.   So after the acquisition, we were supposed to be growing

12   the teams up to, you know, pipeline multiple projects, and we

13   grew really quickly.  And the culture wasn't kind of

14   maintained, so we ended up with lots of groups who are kind of

15   pitted against each other.  It was very them versus us.  You

16   know, there was really bad communication issues and, you know,

17   things just felt overall more corporate.

18           MR. STOJILKOVIC:  Okay.  Dave, could we have slide

19   number 6, please?

20   BY MR. STOJILKOVIC:

21   Q.   Ms. Kennickell, Mr. Altman testified earlier in this trial

22   and he told this jury our motto is "we turn square corners,"

23   and he went on to explain it.

24           And Mr. Willits this morning came in and told the

25   jury that's the ZeniMax motto.

```
 1            Have you ever heard Mr. Altman use the phrase "We
 2   turn square corners"?
 3   A.   No.
 4   Q.   Have you ever heard those words come out of Mr. Willits'
 5   mouth?
 6   A.   No.
 7   Q.   Have you ever heard anyone at ZeniMax or id use that
 8   phrase?
 9   A.   No.  And I'm not sure what it means.
10   Q.   Okay.  Is it posted anywhere?
11   A.   Not that I know of.
12   Q.   So if this was a motto, it was some kind of secret motto
13   you didn't know about?
14   A.   Potentially, yes.
15   Q.   Mr. Altman also said speaking of his company, "We don't
16   take shortcuts when it comes to our culture, our belief in
17   integrity, our belief in respect, our belief in loyalty, our
18   dedication to each other."
19            Do you agree with that characterization of how
20   ZeniMax runs its business?
21   A.   No.
22   Q.   We'll get into that a little bit.
23            MR. STOJILKOVIC:  We can put that one down.
24   BY MR. STOJILKOVIC:
25   Q.   Now, did you work on virtual reality while you were at id?
```

```
 1    A.    No.
 2    Q.    Were you aware of anyone working on VR at id?
 3    A.    Yes.
 4    Q.    Who?
 5    A.    John Carmack.
 6    Q.    And, briefly, what were you aware of Mr. Carmack -- what
 7    were you aware that he was doing back when he was at id?
 8              MR. PHILBIN:  Objection, foundation.
 9              MR. STOJILKOVIC:  I'll rephrase.
10              THE COURT:  Do what?
11              MR. STOJILKOVIC:  I can rephrase.
12              THE COURT:  Okay.
13    BY MR. STOJILKOVIC:
14    Q.    All right.  Did you have any knowledge of -- first of all,
15    whether or not Mr. Carmack was working on VR?
16    A.    Yes.
17    Q.    Okay.  And what was the source of that knowledge?
18    A.    So John had been working with various headsets and trying
19    to incorporate one of our Rage demo levels into it.
20    Q.    Okay.  And did you know that in part by observing it?
21    A.    Observing, yes.
22    Q.    Okay.  Now --
23              MR. STOJILKOVIC:  Dave -- actually, never mind.
24    BY MR. STOJILKOVIC:
25    Q.    Mr. Altman told this jury that he thought other people at
```

1  id were working on VR besides John Carmack.  Do you recall any
2  other people at id working on VR?
3  A.   No, I don't.
4  Q.   Would you have known if someone at id besides John Carmack
5  worked on VR?
6          MR. PHILBIN:  Objection, calls for speculation.
7          THE COURT:  I'll sustain that.
8  BY MR. STOJILKOVIC:
9  Q.   Did you work with John Carmack at id?
10 A.   Yes, I did.
11 Q.   And do you know of other people who worked with John
12 Carmack at id?
13 A.   Yes, I did.
14 Q.   Okay.  Were you -- describe the team you worked on just
15 very briefly.
16 A.   So I worked on the core technology team, and we were
17 responsible for, like, the game engines, physics engines,
18 things like that.
19 Q.   Do you know what other people at the core technology team
20 were doing in 2011 and 2012?
21 A.   Yes.
22          MR. PHILBIN:  Objection, calls for speculation.
23          MR. STOJILKOVIC:  I asked does she.
24          THE COURT:  Just what you know.
25          Obviously, she doesn't know everything.  Just -- you

```
 1   can ask just what she does know.
 2            MR. STOJILKOVIC:  Okay.
 3            THE COURT:  So I partially sustain the objection.
 4   BY MR. STOJILKOVIC:
 5   Q.   Okay.  To your knowledge, was anybody from the core tech
 6   team working on VR?
 7   A.   To my knowledge, no.
 8            MR. STOJILKOVIC:  Dave, can we have slide Number 7?
 9   BY MR. STOJILKOVIC:
10   Q.   Mr. Altman told the jury "We, ZeniMax, saw the opportunity
11   of VR before the rest of the world.  We're the ones who
12   invented it."
13            Is that the truth?
14            MR. PHILBIN:  Objection, calls for speculation, lacks
15   foundation.
16            THE COURT:  Just what does she know about that.  I'll
17   let her answer that.
18   BY MR. STOJILKOVIC:
19   Q.   What do you know about that?
20   A.   So when I was working at ZeniMax, the first time that I
21   saw VR was when John Carmack was working on it.
22   Q.   Okay.  Did you ever have an understanding that he invented
23   it?
24   A.   No.
25            MR. STOJILKOVIC:  Can we go to Number 8, please,
```

1    Dave.

2    BY MR. STOJILKOVIC:

3    Q.   Mr. Altman told this jury, we -- I think he was talking

4    about other people, not himself, but we actually had looked at

5    VR technology for a long time, going back into the 1990s.

6            To your knowledge, do you know of anything about

7    ZeniMax looking into VR for a long time?

8    A.   To my knowledge, the first time that I heard about VR at

9    ZeniMax was when John Carmack was working on it.

10   Q.   Okay.  Now, we've heard a lot of testimony --

11           MR. STOJILKOVIC:  You can put that down, Dave.

12   Sorry.  Excuse me.

13   BY MR. STOJILKOVIC:

14   Q.   -- about clean rooms in this case?

15           Do you know what a clean room is as it relates to

16   software?

17   A.   So when I was working at L3 Communications, we had the

18   concept of a clean room, yes.

19   Q.   Okay.  That's one of the jobs you had before id?

20   A.   Yes.

21           I'm sorry.  L3 Communications.  L3.

22   BY MR. STOJILKOVIC:

23   Q.   And would I be -- just to make sure that what you're

24   thinking of and what I'm asking you are the same thing, is this

25   clean room kind of we're talking about is where programmers are

1    isolated and they write code without kind of contact with the

2    outside world?

3            MR. PHILBIN:  Objection, leading.

4            THE COURT:  Yeah, I'm going to let him lead that.  I

5    don't know how he can get into it without that, so overrule.

6            THE WITNESS:  Sorry.  I'm answering?  Sorry.

7            THE COURT:  Yeah, you can answer.

8            THE WITNESS:  Okay.  My bad.

9            So you wouldn't bring in your cell phone or internet

10   connection or you wouldn't have anything like data drives to

11   bring in with you.

12   BY MR. STOJILKOVIC:

13   Q.   In all the years you worked there, did id Software ever

14   use a clean room?

15   A.   Not that I know of.

16   Q.   Did ZeniMax use a clean room, to your knowledge?

17   A.   Not that I know of.

18   Q.   Do you know of clean rooms being used in any other ZeniMax

19   subsidiaries?

20   A.   I have not heard of it, no.

21   Q.   While you were working at id, did you ever hear of the

22   Oculus Rift?

23   A.   Yes, I did.

24   Q.   What was your understanding back then when you were at id

25   of what the Oculus Rift was?

1   A.   It was a headset that was being developed by Palmer

2   Luckey.

3   Q.   Did you ever hear anyone at ZeniMax or id refer to the

4   Rift as ZeniMax's technology?

5   A.   No.

6   Q.   Did ZeniMax hold end-of-year events in the D.C. area?

7   A.   Yes.

8   Q.   And did you ever attend those?

9   A.   I did.

10  Q.   Who would address the assembled folks at those events?

11  A.   So Mr. Altman would do the -- would do the overall

12  addressing and the different studios would present what they

13  were working on for the year.

14  Q.   Did you attend any of Mr. Altman's addresses?

15  A.   I did.

16  Q.   Okay.  Generally speaking, what kind of things would he

17  talk about?

18  A.   So overall company vision and kind of, like, you know,

19  focusing on AAA games and like a Wild Killer, like Steam Killer

20  type stuff.

21  Q.   Okay.  And then just to be clear, we're not suggesting

22  Wild Killer or Steam Killer, those are like competing apps or

23  platforms, right?

24  A.   Yes, yes.

25  Q.   Okay.  And did he ever talk about virtual reality in any

```
 1    of the talks you attended?
 2    A.    I didn't hear anything about virtual reality when I was
 3    there.
 4    Q.    Did he ever talk about the Rift or about the E3 prototype?
 5    A.    Not that I am aware of.
 6    Q.    We've heard some testimony in this case about one time
 7    that you checked in VR code at id.
 8          Do you remember doing that?
 9    A.    I don't remember, no.
10    Q.    Can you take a look at, in your notebook, what's been
11    marked PX132, and it's already in evidence.
12          MR. STOJILKOVIC:  If I could have the ELMO.
13          MR. PHILBIN:  Your Honor, lacks foundation.  She just
14    said she doesn't remember.
15          THE COURT:  We'll just see what she knows.
16    BY MR. STOJILKOVIC:
17    Q.    Okay.  Why don't you look at it first.  I won't put it on
18    the ELMO yet.
19          Do you recognize this document?
20    A.    I do.
21    Q.    What is it?
22    A.    It is a P-4 check-in.  Perforce check-in.
23    Q.    Who did this check-in?
24    A.    That was me.
25          MR. STOJILKOVIC:  May I examine the witness about it?
```

```
 1              THE COURT:  Let's see.  Have you got the -- I
 2   don't -- PX132.  Okay.
 3              Any objection to that document?
 4              MR. STOJILKOVIC:  I believe it's already in.
 5              MR. PHILBIN:  I don't object to the document.  I
 6   object to the lack of foundation when she said she didn't
 7   remember checking in.
 8              THE COURT:  I thought she just said she did.  Maybe I
 9   missed something.  Clear that up for me.
10              MR. STOJILKOVIC:  Okay.
11   BY MR. STOJILKOVIC:
12   Q.   You don't remember specifically that you checked this
13   document in five years ago?
14   A.   Correct.  I don't remember specifically, but it's from me.
15   Q.   But looking at this document, you recognize it to be
16   something you checked in?
17   A.   Yes.
18   Q.   Okay.
19              MR. STOJILKOVIC:  She doesn't have a perfect memory,
20   but I believe she can testify about it.
21              THE COURT:  Okay.  I want to make sure I'm clear how
22   much -- how do you know you did it?
23              THE WITNESS:  Because the username and computer were
24   mine.
25              THE COURT:  Could somebody else have done that and
```

1    not be yours?

2             THE WITNESS:  If they had logged into my PC and did

3    it.

4             THE COURT:  Okay.

5             MR. STOJILKOVIC:  Your Honor, I just also note for

6    the record that Plaintiffs have repeatedly put forth evidence

7    in this case saying that Ms. Kennickell did this.  If they are

8    backing away from that, I'm happy to move on.

9             THE COURT:  I'm trying to ask a couple of questions

10   here, if you will let me think through it for just a second.

11            So having seen that, does it bring back that you

12   worked on this?

13            THE WITNESS:  That I made a check-in.  I checked in a

14   lot of codes, so it's hard to remember every single one.

15            THE COURT:  I don't even know what that means.  I

16   checked something in.  I mean --

17            THE WITNESS:  So --

18            THE COURT:  Like when I played basketball, I checked

19   in my uniform at the end of the year.  That's what I'm talking

20   about.  Or I would give it to the guy, and they would wash it

21   that day.

22            THE WITNESS:  So --

23            THE COURT:  So what does that relate -- relate that.

24   Help me.

25            THE WITNESS:  So Perforce is -- I guess in the basic

1   sense, it is like a server, and it allows developers to

2   collaborate.  So what I would do if I made a change, I would

3   submit it to the server and then other developers could grab

4   those changes.

5           THE COURT:  So does this indicate you had done

6   something to it and then you put it on the server?

7           THE WITNESS:  Yes.

8           THE COURT:  Wow.  I can't believe I got that.

9           Okay.  You still have an objection?

10          MR. PHILBIN:  I think you've established, Your Honor.

11   I don't have an objection now, but I think we had one "I don't

12   remember" and now answers to your questions.

13          THE COURT:  Do you want to object to my questions?

14   Okay.

15          MR. PHILBIN:  I do not.

16          THE COURT:  Okay.  All right.  We can go ahead.

17   BY MR. STOJILKOVIC:

18   Q.   All right.  Ms. Kennickell, I'm just going to ask you some

19   very basic questions about this.

20          Under your name there, there is a line that says

21   Tech4x research, and it reads, "From John:  Time warp render

22   reprojection with experimental NVIDIA extension."

23          What is that line?

24   A.   So that's a comment that you can apply to any check-in.

25   Q.   Who wrote that comment?

```
 1  A.   I did.
 2  Q.   And when you say "from John," what is the significance of
 3  that?
 4  A.   It means the code was John's.
 5  Q.   Okay.  And where did you get the rest of this comment or
 6  title?
 7  A.   It must have been from John because at the time I wouldn't
 8  understand what that meant.
 9  Q.   Okay.  My only other question about this thing that you're
10  checking in, did you write or work on any of this code that you
11  checked in?
12  A.   No.
13  Q.   Why did you check it in if you're not the one who wrote it
14  or worked on it?
15  A.   Because I found out the one thing I'm better at John than
16  John, and that's Perforce, so --
17           THE COURT:  Is what?
18           THE WITNESS:  Perforce.  That's source control.
19           THE COURT:  Perforce?
20           THE WITNESS:  Perforce.
21  BY MR. STOJILKOVIC:
22  Q.   Perforce.
23           And I believe -- Ms. Kennickell, is that where this
24  gets checked into, that repository?
25  A.   Yes.  I was helping him get code change put into the
```

```
 1   repository.
 2              THE COURT:  What the heck is the Perforce?
 3              THE WITNESS:  It's like the source control system,
 4   so, like, you have a server in Perforce is what manages all the
 5   revisions and edits and, like, adds metadata.
 6              THE COURT:  That's the name of some program?
 7              THE WITNESS:  Yes, yes.
 8              THE COURT:  Okay.
 9   BY MR. STOJILKOVIC:
10   Q.   When did you leave id and ZeniMax to work for Oculus?
11   A.   That was February of 2014.
12   Q.   Was it a sudden decision for you to leave?
13   A.   No.
14   Q.   Did you leave by yourself?
15   A.   I did not.
16   Q.   Who else left at the same time?
17   A.   So it was myself, Jan Paul van Waveren, Jason Kim,
18   Jonathan Wright, and my husband Christian Antkow.
19   Q.   Had all of you worked together at id?
20   A.   Yes.
21   Q.   All of you on the same basic team?
22   A.   We were working on the Rage team.
23   Q.   Why did you guys want to leave together?
24              MR. PHILBIN:  Objection, calls for speculation as to
25   anybody other than her.
```

```
 1              THE COURT:  I agree.  Sustained.
 2   BY MR. STOJILKOVIC:
 3   Q.   Okay.  Did you want to go work with those people, you
 4   yourself, that group?
 5              Let's aside what's in their minds.  In your mind, are
 6   those people you wanted to work with even after you left id?
 7   A.   Yes.  I mean, we were liking a family.  It's not often
 8   that you find a group of people that you can work so well with
 9   and that you feel like you can accomplish anything with.
10   Q.   Okay.  And from my remaining questions I would just like
11   you to tell me what you are thinking and your reasons as we go
12   through the timeline.
13              When did you first start thinking about leaving id
14   seriously?
15   A.   So when my Matt Hooper was fired.  Matt Hooper.
16   Q.   Okay.  And do you remember roughly the time that Matt
17   Hooper was fired?  When was that?
18   A.   That was January of 2013.
19   Q.   So more than a year before you left?
20   A.   Yes.
21   Q.   Why did Matt Hooper getting fired make you think about
22   leaving id?
23   A.   Because John didn't have a say in his firing.
24   Q.   John who?
25   A.   John Carmack.
```

1    Q.   Why did John not having a say in Matt Hooper's firing make

2    you want to leave id?

3    A.   Because Matt Hooper was someone who had -- he had been

4    with the company a long time, and he's a great worker, and, you

5    know, if he could be fired without any say from John, then any

6    of us could have been.

7    Q.   Were you the only person, according to what you know and

8    saw, were you the only person who was upset when Matt Hooper

9    was fired?

10   A.   No, I was not.

11   Q.   And how do you know that?

12   A.   Because several people left that day after Matt was fired.

13   Q.   Okay.  Now, moving forward in 2013, do you recall a time

14   that summer when John Carmack started working part-time at id

15   and part-time at Oculus?

16   A.   Yes.

17   Q.   And how did that make you feel?

18   A.   I didn't feel very good about it, because, I mean, this

19   was a company that he had invested a lot of time in, and so if,

20   you know, he had felt like he had to work part-time, that

21   meant, you know, things weren't probably good.

22   Q.   What understanding, if any, did you have about whether

23   Mr. Carmack was allowed to work on VR at id in 2013?

24            MR. PHILBIN:  Objection, calls for speculation.

25   Lacks foundation.

```
 1              THE COURT:  Sustained.
 2  BY MR. STOJILKOVIC:
 3  Q.   Do you have any understanding of whether John Carmack was
 4  allowed to work on VR at id in 2013?
 5  A.   Yes.
 6  Q.   What is the basis of that understanding?
 7  A.   What he told me.
 8  Q.   Was Mr. Carmack happy, according -- from what you
 9  understood in your conversations, at id in 2013?
10              MR. PHILBIN:  Objection, calls for speculation.
11  Lacks foundation.
12              THE COURT:  Sustained.
13  BY MR. STOJILKOVIC:
14  Q.   When Mr. Carmack was working part-time at id and part-time
15  at Oculus, did you have a conversation with him about you
16  leaving id?
17  A.   I had a conversation with him that I wasn't happy at id.
18  Q.   Okay.  And did he attempt to recruit you over to Oculus at
19  that time?
20  A.   No.
21  Q.   What did he attempt to do?
22  A.   He tried to encourage me and say that, you know, there's
23  always new and interesting problems to solve.
24  Q.   Where?
25  A.   At id.
```

```
1   Q.   So you're saying he tried to -- told you to stay at id
2   even when he was splitting time?
3   A.   He encouraged me to stay.
4   Q.   Were other people leaving id during 2013?
5   A.   Yes.
6   Q.   About how many to --
7           MR. PHILBIN:  Objection, Your Honor, again, calls for
8   speculation.  Lacks foundation.
9   BY MR. STOJILKOVIC:
10  Q.   You worked at id, right?
11  A.   I did.
12  Q.   About --
13          THE COURT:  If you know if other people were leaving,
14  but not just what you heard.
15  BY MR. STOJILKOVIC:
16  Q.   Okay.  About how many people were working at id, ballpark,
17  just so we have a sense of how many people are there roughly?
18  A.   I think after the round of layoffs it was maybe 120.
19  Q.   Okay.  And then about how many of those left during 2013,
20  to your recollection, ballpark?
21  A.   I -- it had to be around 35.
22  Q.   Okay.  You remembered that kind of chunk about a quarter
23  of the people leaving?
24  A.   There was a lot of people, yes.
25  Q.   Okay.  How did that affect your experience at id that all
```

1    these other people were leaving?

2    A.    So we had lost some big players on the core tech team,

3    and, you know, in doing so that kind of spreads the work -- you

4    get a lot of the workload added to you.  So we were spread a

5    little thin.

6    Q.    Okay.  Now, let me get back to your process.

7              What options, if any, did you investigate when you

8    were thinking about leaving id?

9    A.    So one of the options was starting a company.

10   Q.    Were you planning on starting a company by yourself or

11   with somebody?

12   A.    With other people.

13   Q.    Which other people?

14   A.    Jan Paul van Waveren, Jonathan Wright, Jason Kim, and then

15   my husband, Christian Antkow.

16   Q.    So that same group we talked about earlier?

17   A.    Yes.

18   Q.    Okay.  And what kind of company were you thinking about

19   starting?

20   A.    We were thinking about starting a game company.

21   Q.    Okay.  Did you end up doing that?

22   A.    We did not.

23   Q.    Okay.  Why not?

24   A.    So it was very difficult to get the kind of funding that

25   you need.  And then, you know, Jan Paul had very specific

1    needs, and we needed to make sure that he was going to be okay.

2    Q.   Without getting into it, were some of those health

3    related?

4    A.   Yes, they were.

5    Q.   Did you investigate any -- going to any companies?

6    A.   We did.

7    Q.   Which one?

8    A.   Nvidia.

9    Q.   And is that something you investigated thoroughly?

10   A.   Yes.  We went so far as to take a look at what their

11   employment agreement was.

12   Q.   Okay.  How did their employment agreement compare to what

13   ZeniMax gave you that morning when they had you line up at the

14   hotel?

15   A.   It was definitely a breath of fresh air.  It looked like

16   we could be able to work on side projects on our own time

17   without the company claiming ownership.

18   Q.   Did you end up going to Nvidia?

19   A.   We did not.

20   Q.   Okay.  Do you remember when was the first time anyone

21   mentioned to you the idea that you should go or might go to

22   Oculus?

23   A.   Yes.

24   Q.   When was that?  You don't have to give me a date, just

25   tell me what you remember.

```
 1   A.    I believe it was like July, August timeframe of 2013 --
 2   Q.    How did that come up?
 3   A.    So it was announced that John and Matt Hooper were both
 4   going to be at Oculus and Robert Duffy, my manager, came into
 5   my office, and he was very mad or angry looking.  And he was
 6   asking me, I heard a rumor that you guys were all going to
 7   Oculus.  This better not be true.  Is this true?
 8              And I said no.
 9              And then he proceeded to say, well, you know, it's
10   not soliciting if you go on the website and apply for a job
11   online, and I thought that that was strange.  The light bulb
12   kind of went off.
13   Q.    So is your testimony the first time it occurred to you to
14   think about Oculus was when somebody wrongly came in and asked
15   you are you leaving Oculus?
16   A.    Yes.
17   Q.    Or Oculus.  Okay.
18              Can we take a look at what's been marked for
19   identification as DX1922?  It's in your binder there.
20              MR. STOJILKOVIC:  This is not on the preadmit.  I'd
21   like to use.
22              MR. PHILBIN:  No objection, Your Honor.
23              MR. STOJILKOVIC:  Thank you.
24              THE COURT:  It's admitted into evidence.
25              Well, are you offering for evidence or just --
```

1    MR. STOJILKOVIC:  I am offering it into evidence,

2    Your Honor.  Thank you.

3    (Defendants' Exhibit No. 1922 received)

4    BY MR. STOJILKOVIC:

5    Q.   All right.  So let's -- can you -- can you read that email

6    on the paper or on the ELMO?

7    A.   Yes.

8    Q.   Okay.  And who's the bottom email from?

9    A.   From me.

10   Q.   Okay.  And is it to this group of people we've been

11   talking about?

12   A.   Yes.

13   Q.   What's the title?

14   A.   "Oh my."

15   Q.   Okay.  And do you write "I was just informed by Duffy that

16   there's a rumor circulating that we're all leaving for Oculus

17   to work for John.  Where do people get this"?

18   A.   Yes.

19   Q.   Does this accurately capture your reaction to Mr. Duffy

20   making this suggestion?

21   A.   Yes.

22   Q.   Okay.  Let's go on up.

23   Mr. Kim, he's another of this group we've been

24   talking about.  What does he reply?

25   A.   He said, "Wow, that's funny, but with so many people

1    leaving already and John's announcement yesterday, I'm sure

2    there are plenty other rumors flying around."

3    Q.   And Mr. Wright, he's another of the group.  What does he

4    say?

5    A.   He says "Nice.  That's news to me."

6    Q.   Okay.  Now, did you ever visit Mr. Carmack while you were

7    still at id and he was at Oculus?

8    A.   I did.

9    Q.   Many times or one time?

10   A.   It was just the once.

11   Q.   Okay.  Do you know how that visit got set up?

12   A.   My husband, Christian Antkow emailed him and asked if, you

13   know, there was a good time to see him.

14   Q.   Okay.  Do you know what the purpose of that visit was?

15   A.   We missed him.

16   Q.   And who went over?  Was it just you or did somebody else

17   come with you for that visit?

18   A.   So it was myself, Christian, and then Jan Paul.

19   Q.   Okay.  And tell me what happened.  What do you remember

20   happening during that visit?

21   A.   So John was just kind of showing us what he was working on

22   because he's always tinkering and doing really cool stuff, so

23   we took a look at some of the stuff he was working on.

24   Q.   Okay.  And was that here in Dallas?

25   A.   It was.

```
 1   Q.   Okay.  And did -- during that visit did John Carmack
 2   attempt to recruit you in any way to come work at Oculus?
 3   A.   No.
 4   Q.   Did anyone over there try to recruit you?
 5   A.   No.
 6   Q.   When did you first start communicating with Oculus about
 7   potentially going to work there?
 8   A.   So I received a communication from Brendan over LinkedIn.
 9   Q.   Who's Brendan?
10   A.   Brendan Iribe.
11   Q.   Okay.  And do you remember roughly when that was?
12   A.   Sorry, November or October of 2013.
13   Q.   Sometime late 2013?
14   A.   Late 2013.
15   Q.   '13?
16   A.   '13.  Sorry.
17           MR. PHILBIN:  Objection.  Leading.  She just
18   testified it was 2015, and he's trying to change her testimony.
19           THE WITNESS:  No, I didn't --
20   BY MR. STOJILKOVIC:
21   Q.   Ms. Kennickell, when did you start working at Oculus?
22   A.   In 2014.
23   Q.   And did you have the use of a time machine that allowed
24   you to contact them in 2015 and go back in time to start
25   working there in 2014?
```

```
 1  A.   No.

 2  Q.   Okay.  Was it 2013?

 3  A.   Sorry.  2013.  I'm nervous.

 4       THE COURT:  The time machine came up, again, though.

 5  I keep trying to tell y'all about that.

 6  BY MR. STOJILKOVIC:

 7  Q.   Okay.  And what happened after -- after this LinkedIn

 8  message from Mr. Iribe?

 9  A.   So he put me in contact with Nate Mitchell.

10  Q.   Did you have any kind of conversations or, you know,

11  communication with Mr. Mitchell?

12  A.   I did.  We had a phone call.

13  Q.   Okay.  What do you remember being discussed?

14  A.   We discussed going out to Irvine to visit the Oculus

15  office.

16  Q.   Okay.  And did you, in fact, go?

17  A.   I did.

18  Q.   Okay.  And do you know if other members of this group of

19  people we've been talking about also went?

20  A.   Yes.

21  Q.   Okay.  Was that your first time going to Oculus's main

22  offices in California?

23  A.   Yes, first time.

24  Q.   Okay.  What happened during that visit?

25  A.   So Brendan showed us around the office.  He kind of took
```

1    us to each station and was able to just very clearly explain

2    all the little technical details, and people were hard at work

3    even though it was Christmas break.  And then we ended up

4    doing -- going to see the Rift demo.

5    Q.   Okay.  What was your impression of Mr. Iribe as the Oculus

6    CEO?

7    A.   He had a lot of charisma, and it was just very impressive

8    that he was able to easily explain technical details.

9    Q.   Okay.  Do all CEOs understand the technology of their

10   companies in your experience?

11   A.   In my experience, I've not met a CEO like Brendan at a

12   technical level.

13   Q.   You also said -- I believe you said you got to demonstrate

14   the Oculus Rift during that visit.

15          What was your impression of the demonstration?

16   A.   I was floored.  The immersion was there.  I mean, you're

17   on a cliff, and you really think that if you step over you're

18   going to fall off.

19   Q.   And when you were -- the content you were watching on the

20   Rift, was there any of that Doom or Rage or any kind of

21   id-related content?

22   A.   No, there was not.

23   Q.   Okay.  Was Mr. Carmack there when you visited the main

24   offices in California?

25   A.   No, he was not.

```
 1   Q.   And during this time, did he try to recruit you in any way
 2   to go to Oculus?
 3   A.   No.
 4   Q.   Okay.  Around this time did you have any contact with
 5   Mr. Carmack's wife?
 6   A.   I did.
 7   Q.   Okay.  And just so we're all clear, Mr. Carmack's wife is
 8   Ms. Anna Kang?
 9   A.   Yes.
10   Q.   Okay.  What kind of contact would you have with Ms. Kang?
11   A.   So she had invited me to a lady's luncheon and then also
12   to a holiday party.
13   Q.   Okay.  Did you go to that holiday party?
14   A.   I did.
15   Q.   Okay.  And do you remember -- were any other members of
16   this group we've been talking present at that party?
17   A.   Yes, there was Jason and Jan Paul.
18   Q.   Okay.  Do you remember what you talked about that night?
19   A.   So we were on one side of the table with Anna, and she was
20   being, you know, like a great hostess and I remember her
21   talking a lot about her childhood in South America, and then we
22   also talked a lot about bitcoins.
23   Q.   What about Oculus?  Did you talk about interviewing with
24   Oculus?
25   A.   No.
```

1  Q.   You had just been out to Irvine shortly before then?

2  A.   I was.

3  Q.   Why not mention that to Mr. Carmack who's working at

4  Oculus or his wife?

5  A.   Because we didn't want to put them in a position where

6  they could get in any trouble.

7  Q.   Why did you think that you talking to them about that

8  might put them in a position where they're in trouble?

9  A.   Because I didn't know what his contract was regarding

10  solicitation.

11        THE COURT:  Stop.  Okay.  We're going to break for

12  lunch.

13        Don't talk about the case.

14        We're only going to take one hour.

15        We're trying to get a lot done today.

16        Thank y'all.

17        SECURITY OFFICER:  All rise.

18        (Jury out)

19        (Recess at 12:01)

20

21

22

23

24

25

```
 1                        INDEX

 2                                            Further
               Direct  Cross  Redirect  Recross  Redirect
 3
      WITNESSES FOR THE
 4    DEFENDANTS

 5    ROBERT HOWE          21     53      81

 6    TIMOTHY WILLITS      84     96     100

 7    GLORIA KENNICKELL   103

 8

 9    PLAINTIFFS' EXHIBITS                        Received

10       1509      Email                            81

11       1747      Email                            81

12       1943      Employment Agreement            107

13       2010      Email                            81

14

15    DEFENDANTS' EXHIBITS                        Received

16       403       Email                           101

17       809       Foxlin Patent                    37

18       1023      Favre paper                      41

19       1922      Email                           132

20

21

22

23

24

25
```

1        I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 25th day of January, 2017.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25