1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4

5  ZENIMAX MEDIA INC. and ID      )        3:14-CV-1849-K
   SOFTWARE LLC                   )
6              Plaintiffs,        )
                                  )
7                                 )
   VS.                            )
8                                 )        DALLAS, TEXAS
                                  )
9  OCULUS VR, LLC, PALMER         )
   LUCKEY, FACEBOOK, INC.,        )
10 BRENDAN IRIBE and JOHN         )
   CARMACK,                       )
11             Defendants.        )        January 26, 2017

12

13           TRANSCRIPT OF JURY TRIAL, VOLUME 19

14            BEFORE THE HONORABLE ED KINKEADE

15              UNITED STATES DISTRICT JUDGE

16

17  A P P E A R A N C E S:

18

    FOR THE PLAINTIFFS:         MR. P. ANTHONY SAMMI
19                              Skadden, Arps, Slate,
                                  Meagher & Flom LLP
20                              Four Times Square
                                New York, New York  10036
21                              (212) 735-2307
                                anthony.sammi@skaddden.com
22

23                              MR. PHILLIP B. PHILBIN
                                Haynes and Boone LLP
24                              2323 Victory Avenue, Suite 700
                                Dallas, Texas  75219
25                              (214) 651-5000
                                phillip.philbin@haynesboone.com

1                         **MR. KURT WILLIAM HEMR**
                          Skadden, Arps, Slate,
2                           Meagher & Flom LLP
                          Four Times Square
3                         New York, New York  10036
                          (617) 573-4833
4                         kurt.hemr@skaddden.com

5

                          **MR. CHRISTOPHER A LISY**
6                         Skadden, Arps, Slate,
                            Meagher & Flom LLP
7                         500 Boylston Street
                          Boston, Massachusetts  02116
8                         (617) 573-4800
                          christopher.lisy@skaddden.com
9

10                        **MR. MICHAEL R. WALSH**
                          Skadden, Arps, Slate,
11                          Meagher & Flom LLP
                          500 Boylston Street
12                        Boston, Massachusetts  02116
                          (617) 573-4862
13                        michael.walsh@skadden.com

14

                          **MR. JAMES Y. PAK**
15                        Skadden, Arps, Slate,
                            Meagher & Flom LLP
16                        Four Times Square
                          New York, New York  10036
17                        (212) 735-2546
                          james.pak@skaddden.com

18

19                        **MR. MICHAEL DALEY KARSON**
                          Haynes and Boone LLP
20                        2323 Victory Avenue
                          Suite 700
21                        Dallas, Texas  75219
                          (214) 651-5000
22                        michael.karson@haynesboone.com

23

24

25

1                          MS. RACHEL R. BLITZER
                           Skadden, Arps, Slate,
2                            Meagher & Flom LLP
                           Four Times Square
3                          New York, New York  10036
                           (212) 735-3000
4                          rachel.blitzer@skaddden.com

5

6                          MR. WILLIAM J. CASEY
                           Skadden, Arps, Slate,
                             Meagher & Flom LLP
7                          525 University Avenue
                           Palo Alto, California  94301
8                          (650) 470-4500
                           william.casey@skaddden.com

9

10                         MR. SCOTT MICHAEL FLANZ
                           Skadden, Arps, Slate,
11                           Meagher & Flom LLP
                           Four Times Square
12                         New York, New York  10036
                           (212) 735-3000
13                         sflanz@skaddden.com

14

15                         MS. EMILY WHITCHER
                           Skadden, Arps, Slate,
                             Meagher & Flom LLP
16                         Four Times Square
                           New York, New York  10036
17                         (212) 735-3605
                           emily.whitcher@skaddden.com

18

19                         MS. JENNIFER H. DOAN
                           Haltom & Doan
20                         6500 Summerhill Road, Suite 100
                           Texarkana, Texas  75503
21                         (903) 255-1000
                           jdoan@haltomdoan.com

22

23

24

25

```
 1                                 MR. JOSH R. THANE
                                   Haltom & Doan
 2                                 6500 Summerhill Road, Suite 100
                                   Texarkana, Texas  75503
 3                                 (903) 255-1000
                                   jthane@haltomdoan.com
 4

 5
      FOR THE DEFENDANTS:          MS. BETH A. WILKINSON
 6                                 Wilkinson Walsh & Eskovitz LLP
                                   1900 M Street NW
 7                                 Suite 800
                                   Washington, DC  20036
 8                                 (202) 847-4000
                                   bwilkinson@wilkinsonwalsh.com
 9

10                                 MR. BRANT W. BISHOP
                                   Wilkinson Walsh & Eskovitz LLP
11                                 1900 M Street NW
                                   Suite 800
12                                 Washington, DC  20036
                                   (202) 847-4000
13                                 bbishop@wilkinsonwalsh.com

14
                                   MS. CALI COPE-KASTEN
15                                 Wilkinson Walsh & Eskovitz LLP
                                   1900 M Street NW
16                                 Suite 800
                                   Washington, DC  20036
17                                 (202) 847-4000
                                   ccope-kasten@wilkinsonwalsh.com
18

19                                 MS. KIRSTEN NELSON
                                   Wilkinson Walsh & Eskovitz LLP
20                                 1900 M Street NW
                                   Suite 800
21                                 Washington, DC  20036
                                   (202) 847-4000
22                                 knelson@wilkinsonwalsh.com

23

24

25
```



MS. RUTH VINSON
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
rvinson@wilkinsonwalsh.com


MR. MAX WARREN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
mwarren@wilkinsonwalsh.com


MR. HAYTER WHITMAN
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4000
hwhitman@wilkinsonwalsh.com


MR. KOSTA S. STOJILKOVIC
Wilkinson Walsh & Eskovitz LLP
1900 M Street NW
Suite 800
Washington, DC  20036
(202) 847-4050
kstojilkovic@wilkinsonwalsh.com



MS. HEIDI L. KEEFE
Cooley LLP
3175 Hanover Street
Palo Alto, California  94304
(650) 843-5000
hkeefe@cooley.com

```
1                              MR. BRETT DeJARNETTE
                               Cooley LLP
2                              3175 Hanover Street
                               Palo Alto, California  94304
3                              (650) 843-5000
                               bdejarnette@cooley.com
4

5                              MS. ELIZABETH LEE STAMESHKIN
                               Cooley LLP
6                              3175 Hanover Street
                               Palo Alto, California  94304
7                              (650) 843-5000
                               lstameshkin@cooley.com
8

9                              MR. RICHARD A. SMITH
                               Richard Smith, PC
10                             Campbell Centre I
                               8350 N. Central Expressway
11                             Suite 1111
                               Dallas, Texas  75206
12                             (214) 242-6484
                               richard@rsmithpc.com
13

14                             MR. RAGESH KUMAR TANGRI
                               Durie Tangri LLP
15                             217 Leidesdorff Street
                               San Francisco, California  94111
16                             (415) 362-6666
                               rtangri@durietangri.com
17

18                             MR. BENJAMIN B. AU
                               Durie Tangri LLP
19                             217 Leidesdorff Street
                               San Francisco, California  94111
20                             (415) 362-6666
                               bau@durietangri.com
21

22                             MR. MARK RANDOLPH WEINSTEIN
                               Cooley LLP
23                             3175 Hanover Street
                               Palo Alto, California  94304
24                             (650) 843-5000
                               mweinstein@cooley.com
25
```



1          **MR. JOSEPH B. WOODRING**
           Cooley LLP
2          1333 2nd Street, Suite 400
           Santa Monica, California  90401
3          (310) 883-6400
           jwoodring@cooley.com
4

5          **MR. MATTHEW D. CAPLAN**
           Cooley LLP
6          101 California Street
           5th Floor
7          San Francisco, California  94111
           (415) 693-2000
8          mcaplan@cooley.com

9

10         **MR. PHILIP MAO**
           Cooley LLP
           3175 Hanover Street
11         Palo Alto, CA 94304
           (650) 843-5000
12         pmao@cooley.com

13

14         **MR. DANIEL TEIMOURI**
           Cooley LLP
           1700 Seventh Avenue
15         Suite 900
           Seattle, Washington  98101
16         (206) 452-8791
           dteimouri@cooley.com

17

18         **MS. JULIE B. RUBENSTEIN**
           Wilkinson Walsh & Eskovitz LLP
19         1900 M Street NW
           Suite 800
20         Washington, DC  20036
           (202) 847-4000
21         jrubenstein@wilkinsonwalsh.com

22

23

24

25

```
 1                              MS. ELIZABETH Y. RYAN
                                Lynn Pinker Cox & Hurst, LLP
 2                              2100 Ross Avenue
                                Suite 2700
 3                              Dallas, Texas   75201
                                (214) 981-3821
 4                              eryan@lynnllp.com

 5
                                MS. CHRISTEN DUBOIS
 6                              Facebook, Inc.
                                1601 Willow Road
 7                              Menlo Park, California   94025
                                (650) 862-5980
 8                              cdubois@fb.com

 9
                                MR. PAUL GREWAL
10                              Facebook, Inc.
                                1601 Willow Road
11                              Menlo Park, California   94025
                                (650) 814-3157
12                              paulgrewal@fb.com

13
     COURT REPORTER:            MR. TODD ANDERSON, RMR, CRR
14                              United States Court Reporter
                                1100 Commerce St., Rm. 1625
15                              Dallas, Texas   75242
                                (214) 753-2170
16

17

18

19

20

21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                 JURY TRIAL - JANUARY 26, 2017
 2                   P R O C E E D I N G S
 3          THE COURT:  Mercy, you know the charge is too thick
 4   when even our big stapler won't go through it.  It wouldn't go
 5   through it, but it's okay.
 6          All right.  Let's get -- we're down to the charge.
 7   Y'all have conditionally closed.  Let's make sure that we are
 8   now really closed and that I deal with all of those issues at
 9   this point that you might -- are still there.
10          I think I have resolved this issue with regard to the
11   financial statements from ZeniMax with regard to that.
12          Do you understand what I told you, Mr. Sammi, about
13   that?
14          MR. SAMMI:  Yes, sir.
15          THE COURT:  And you're going to follow my instruction
16   regarding that?
17          MR. SAMMI:  I will, sir.
18          THE COURT:  Okay.  And you understand that issue,
19   too?
20          MS. WILKINSON:  I do, Your Honor.  I would like to
21   put it on the record whenever you want me to that --
22          THE COURT:  Put whatever you want to put in the
23   record.
24          MS. WILKINSON:  Yes, I understand your instruction.
25          THE COURT:  No, I mean put anything else on the
```

```
 1    record you want too.

 2              MS. WILKINSON:  Your Honor, as you know, we asked

 3    Mr. Altman under oath about the financial value of his company

 4    and he claimed that there were documents showing that the

 5    valuation of his company was anywhere between $4 and 8 billion,

 6    and despite a court order and a motion to compel to produce

 7    financial documents on that valuation, they haven't done so.

 8    You ordered them to do so.

 9              And only at 6:30 this morning did we get about 60

10    pages of heavily redacted documents including things that were

11    all created very recently, some private placement which isn't

12    actually -- it just shows it's a proposal for a billion dollar

13    valuation.

14              And then there is an email from Mr. Vlatko Andonov,

15    who works directly for Mr. Altman, and it was actually written

16    while Mr. Altman was here in the courtroom on January 18, 2017,

17    purporting to say that some other company wanted to purchase --

18    had called.  There is no documentation of the call.  He's just

19    saying to Mr. Altman that some other company wanted to call and

20    that Mr. Andonov, who is at ZeniMax, gave him guidance about $8

21    to 10 billion, not that anyone else said that.

22              And then a stock purchase agreement that is heavily

23    redacted and an investor -- investment banking debt from a

24    company called Cyndx, C-Y-N-D-X, which gives some purported

25    valuations, although when we looked it up this morning,
```

 1    Mr. Altman himself is on the board of Cyndx.

 2            So I did not have sufficient time to review these,

 3    talk to any financial experts, so that I could cross-examine

 4    him, and I would like him to be precluded, Mr. Sammi, from

 5    being precluded to argue about the value but also the jury to

 6    be instructed that they failed to produce the documents in a

 7    timely basis.

 8            THE COURT:  I'm not going to instruct the jury that,

 9    but I am going to preclude him from arguing that they had

10    sufficient funds and could have, would have, should have

11    invested in VR other than what they just normally were doing

12    and whatever evidence there was with regard to that in the

13    normal course of business.

14            Does that cover the issues you were most concerned

15    about?

16            MS. WILKINSON:  Yes.  That they can't --

17            MR. SAMMI:  I think --

18            THE COURT:  Stop, stop.

19            MS. WILKINSON:  That they can't say that when I say

20    they didn't have sufficient money to make the kind of

21    investment was necessary like Facebook did, you know,

22    $5 billion, that they can't get up and say, oh, yeah, our

23    company was worth it, we could have done it, we just didn't.

24    They can't say that, they can't respond, because they don't

25    have any evidence in the record other than the evidence he used

1   producing the documentation that their company is actually

2   worth that.

3          So there is two ways I want to argue the valuation.

4   One is that they -- they never would have had the ability nor

5   did they want to invest in VR and have what it takes to make

6   those investments in VR, but also that it's absurd to suggest

7   they had a $2 billion asset when they are a company that's, you

8   know, their stock equity shows they are less than a billion

9   dollar company and they had a $2 billion asset that they didn't

10  take care of, they didn't, you know, confront Oculus when

11  Oculus sold its product out into the public, and that makes no

12  sense.  It would be more valuable than the entire company.

13          THE COURT:  Okay.

14          MR. HEMR:  Your Honor, if I may respond briefly to

15  that just so I can put some things on the record and also to

16  respond to the last thing Ms. Wilkinson said.

17          The first thing, we disagree these were outside --

18  that these were within the scope of the prior discovery

19  requests and the Court's prior order.

20          Mr. Altman was deposed in April of 2016.  He was

21  never asked about these issues.  We never received any further

22  follow up from Defendants' counsel about these issues.

23          He was put up on the stand on what I believe was

24  January 20.  All of the documents we produced -- and we

25  produced about 120 pages of documents -- addressed -- they were

1    all dated prior to Mr. Altman's appearance on the stand.  The

2    email that she referenced was from January 18, two days before

3    Mr. Altman took the stand, and, of course, Mr. Altman had no

4    knowledge of what Ms. Wilkinson was going to ask him about.

5              I would further say that with regard to the last

6    point about whether the company was -- the market value of the

7    company as Ms. Wilkinson has argued it, that, you know, for --

8    Mr. Altman's understanding is what his understanding is.  It

9    was accurate.  It was confirmed by the documents.

10             And to say, well, actually, this is a couple hundred

11   million dollar company when there is no evidence in the record,

12   there is certainly no, you know -- nothing has been proffered

13   in terms of expert testimony on that, so to suggest that that's

14   what the record establishes, we disagree with that.

15             With regard to Your Honor's point about investment,

16   we understand that instruction, and, you know, we will abide by

17   it.

18             THE COURT:  Yeah.  How you going to make an

19   argument -- where was the evidence as to what you're going to

20   say what the value was?

21             I'm not letting them argue the other way.  Help me.

22             MS. WILKINSON:  The testimony I wrote on the board of

23   what he said, Your Honor.  I wrote it down when he said it.  I

24   have two on here.  Sorry.

25             THE COURT:  Oh, sorry.

```
 1            MS. WILKINSON:  I wanted to cover that up while
 2   Mr. Sammi speaks so he doesn't have the jury looking at it.
 3            THE COURT:  We'll fix it.
 4            MS. WILKINSON:  This one.  When we were comparing and
 5   he said the shareholder value was 788 and it had no market
 6   value, and he said this is what he said, and he has no
 7   documentation for that, which is true.  This is all from his
 8   testimony.
 9            THE COURT:  You're going to argue that he said 4 to
10   8?
11            MS. WILKINSON:  Yeah, but he hasn't provided any
12   support for that, there is nothing in the record for that, and
13   this is the financials that he gave us.  There is no market
14   value, this is no evidence, and then we have his own expert
15   saying they didn't value it.  We have the expert saying there
16   is no evidence that they were ready to spend $3 billion on VR.
17            THE COURT:  And how do you want to respond to that,
18   Mr. Sammi?
19            MR. SAMMI:  Your Honor, there's ample evidence in the
20   record.  For example, not based on a valuation number but
21   evidence in the record from Mr. Altman himself that ZeniMax
22   puts out and its studios put out games that are AAA blockbuster
23   games that make billions of dollars.
24            This should not be unrebutted in argument that
25   ZeniMax is a company that can't afford any given dollar value
```

1    number.

2          That's different from saying that we would come in

3    and argue that ZeniMax has a valuation of X or Y, but

4    Mr. Altman's testimony is supported.

5          MS. WILKINSON:  Did he say in the record that his

6    games made billions of dollars?  I don't remember that, so I

7    would like to check that, because he may have, Your Honor.  I

8    mean, I'm not -- I would just like to check.

9          Can someone look and check?

10         MR. SAMMI:  We can check that.  But --

11         THE COURT:  So help me understand what your

12   argument -- what you want to argue.  I don't want to cut you

13   off in front of the jury.

14         MR. SAMMI:  Sure.  We would want to argue that

15   ZeniMax has a history of creating the world's best leading

16   video games, and that is not --

17         THE COURT:  You can argue that.

18         MR. SAMMI:  And that it is not an inexpensive

19   proposition, and we invest millions and millions of dollars,

20   hundreds of millions of dollars in research and development to

21   develop our video games.

22         Mr. Carmack tweeted the entire genre of first-person

23   shooter games is an attempt at virtual reality.  All of the

24   research and development that ZeniMax has made through the

25   first-person genre games that we have gone through, Doom, Quake

```
 1   et cetera, et cetera, are all directed towards virtual reality,

 2   as said by their own Defendant.

 3           To be precluded from arguing all this work that is

 4   done by this company is all aimed as investment into VR --

 5           MS. WILKINSON:  Judge, I don't have any problem with

 6   anything he said.

 7           THE COURT:  I didn't hear anything there that --

 8           MS. WILKINSON:  If it's just the billions of dollars

 9   or hundreds of millions, if that's in the record, other than

10   that, he can say all that.

11           THE COURT:  Yeah, I didn't see any problem there.

12           MR. SAMMI:  Okay.

13           THE COURT:  Okay.  Do you understand where the

14   problem is going to be?

15           MR. SAMMI:  Yeah.  I just want to be clear what the

16   problem is going to be so I don't run afoul.

17           THE COURT:  Tell me what you think.

18           MR. SAMMI:  I understand that in response to an

19   argument that ZeniMax cannot say that it is a company that

20   was -- would be able to spend $3 billion.

21           THE COURT:  Yeah, you can't say that.

22           MR. SAMMI:  Okay.

23           THE COURT:  I'm not going to let you say it because

24   you didn't produce the records until the very last minute, and

25   it is not really that clear.  There are some things in there,
```

 1   but I ordered that done way before now, and I'm not blaming

 2   Mr. Hemr, but he got it at 6:30 this morning.

 3         What that tells me is Mr. Hemr was up all night, and

 4   I appreciate him working hard, but that's just too little too

 5   late.  Okay.

 6         MR. SAMMI:  Your Honor, just one point of

 7   clarification.

 8         The argument that I think counsel made during -- or

 9   the questions counsel was asking of Mr. Altman on the stand was

10   making a disparity between, for example, Facebook has

11   $350 billion in marketing capital and then on their balance

12   sheet they have 50 billion.  But are they allowed to argue that

13   ZeniMax, based on our financial statements --

14         THE COURT:  That's a public company.  You had all

15   kinds of access to their records, that sort of thing.  This is

16   a private company, and you-all didn't produced all that.  I'm

17   sorry.  That's the way it is.

18         MR. SAMMI:  One final point.

19         THE COURT:  Yes, sir.

20         MR. SAMMI:  Am I allowed to argue the fact that there

21   is nothing untowards with not putting value on your financials?

22   We did have that testimony about the Facebook's market cap.

23         THE COURT:  What do you want to say now?  I'm not

24   sure.

25         MR. SAMMI:  Sure.

1              That if there is a suggestion or argument that there

2     is something untoward about what ZeniMax is doing if it hasn't

3     put its -- in a shareholder value line in its financial

4     statements billions of dollars, that's -- that's not unusual.

5              Facebook itself has a market cap of 350 billion, and

6     yet on its financials it only shows 5000 -- 50 billion in

7     shareholder value.

8              This is the example of Mr. Dan Jackson on the stand

9     talking about Coca-Cola.  Coca-Cola doesn't value its trade

10    secrets on its balance sheet.  GAAP principles actually don't

11    allow it.  It's one of the most valuable trade secrets in the

12    world.

13             The problem is we can't leave this jury with the

14    impression that based upon a financial report, generally

15    accepted accounting principles, that there is something wrong

16    going on here that ZeniMax didn't put it on the books.

17             MS. WILKINSON:  Your Honor, I don't have any problem

18    with that generally.  I'm not arguing that.  I'm arguing that

19    they put no evidence in the record, period, whether it's in

20    their financials or anywhere else to show that they could -- or

21    would have --

22             THE COURT:  You mean to back up what Mr. Altman said.

23             MS. WILKINSON:  He said, and he's self-serving, he

24    has a financial interest, and he didn't produce anything.

25             THE COURT:  And you can say he said.

```
 1              MS. WILKINSON:  Right.

 2              THE COURT:  He said --

 3              MR. SAMMI:  I can say he said --

 4              THE COURT:  He said this, this.

 5              MR. SAMMI:  That ZeniMax is worth 4 to 8 billion

 6    dollars.

 7              THE COURT:  I mean, obviously.  That's in evidence.

 8              MR. SAMMI:  Great.

 9              THE COURT:  But there's no -- but she is going to say

10    there are no documents, and there aren't.

11              MR. SAMMI:  Okay.

12              THE COURT:  And y'all have the charge, and let me go

13    over the things that y'all -- that I remember that you wanted

14    in from the Defendants' perspective and maybe from the

15    Plaintiffs too.

16              Y'all wanted me to put some more instructions in

17    there, and you can put it in writing.  I have seen it, and you

18    have timely made that request, that I put if you answer no, go

19    to this question and this page, and you showed me that page.

20    You can put that in there.

21              And everything you said in there I am considering and

22    I'm overruling it.

23              MR. STOJILKOVIC:  Yes, Your Honor.

24              THE COURT:  Okay.

25              MR. STOJILKOVIC:  And do you want us to put our other
```

1    objections on the record?

2            THE COURT:  Sure.

3            MR. STOJILKOVIC:  Your Honor, Defendants believe, A,

4    there should be a curative instruction on spoliation because

5    the evidence that has come in does not satisfy the factors

6    under Federal Rule of Civil Procedure 37(e) as to prejudice or

7    as to bad faith, and because of that, the issue shouldn't go to

8    the jury, and the jury should be instructed that there was no

9    bad faith destruction of evidence in this case.

10           THE COURT:  Okay.  Yeah, and I agree that you timely

11   objected to that, and I'll allow you to think a little bit

12   about that and put something in there with regard to that,

13   because it doesn't matter what you put, I'm not going to put it

14   in there.

15           That's about as clear for the Fifth Circuit to

16   reverse me, isn't it?  Okay.

17           MR. STOJILKOVIC:  Thank you, Your Honor.

18           And we also object on the record to the instruction

19   that is in the charge about the jury considering the evidence

20   on this.

21           THE COURT:  On the spoliation issue?

22           MR. STOJILKOVIC:  Yes.

23           THE COURT:  Yes.  Okay.  Overruled.

24           MR. STOJILKOVIC:  And we also object to the use of

25   unjust enrichment language to be used within the damages

1    instructions and trade secret, tortious interference with

2    contract, and unfair competition.  We believe under the case

3    law that that language should not be in there.

4              THE COURT:  Overruled.

5              MR. STOJILKOVIC:  And we also object to lack of

6    language in the abstraction-filtration comparison test.  We

7    respectfully request that it also include language not

8    currently in there.

9              "The task of abstraction must be undertaken

10   conscientiously and systematically in order to separate ideas

11   from expression.  Plaintiffs must introduce evidence that

12   conscientiously and systematically documents each level of

13   abstraction at which Plaintiffs have claimed there is

14   infringement."

15             We would like that added to the

16   abstraction-filtration comparison instruction.

17             THE COURT:  Okay.  I will overrule that too.

18             MR. STOJILKOVIC:  That's all we have on that, Your

19   Honor.

20             THE COURT:  That's it?  You stayed up all night for

21   just that little bit?

22             MR. STOJILKOVIC:  I stayed up all night for a variety

23   of reasons, Your Honor.

24             THE COURT:  Okay.

25             MR. STOJILKOVIC:  And I'm sure I will be addressing

```
 1    some of those shortly.

 2              THE COURT:  All right.  Mr. Hemr?

 3              MR. HEMR:  Your Honor, we have put our objections to

 4    the extent that they differ from Your Honor's proposed charge

 5    in writing, and I would just propose -- and I have handed the

 6    document to defense counsel.  I propose to hand it to

 7    Mr. Jacobson.

 8              THE COURT:  That's great.

 9              MR. HEMR:  Do it that way, and I understand you'd be

10    overruling those.

11              THE COURT:  I am overruling those, and I think we

12    have got those already, and you already told me those orally,

13    and I appreciate you putting them in writing.  That's great.

14              And you can put yours in writing too that you

15    haven't, Mr. Stojilkovic.

16              MR. STOJILKOVIC:  We will, Your Honor.  We are making

17    one tweak and we will submit those today.

18              THE COURT:  You will make it what?

19              MR. STOJILKOVIC:  There is one thing that I addressed

20    orally that's not still in our draft.

21              THE COURT:  Right.  Just add that in there.

22              MR. STOJILKOVIC:  Yeah.

23              THE COURT:  I just want you to make sure you-all got

24    your objections in the record the way you want to make them.

25    Okay?
```

1              Everybody fine with that?

2              MR. HEMR:  We're fine, Your Honor.  We prefer that we

3    file it, but Mr. Jacobson is going to file it.

4              THE COURT:  No, that's fine.  That's great.

5              Yes, sir, Mr. Sammi.

6              MR. SAMMI:  One more point, Your Honor.  We'd like

7    to -- plaintiffs respectfully move this Court to confirm that

8    the ZeniMax and Oculus source code contained in Exhibits PX132,

9    PX301, PX1162, PX1429, and PX1492 are in evidence,

10   understanding the difficulties that it can --

11             THE COURT:  I am going to -- do you have any

12   objection?

13             MS. WILKINSON:  Yes.

14             MR. STOJILKOVIC:  Yes, Your Honor.  These are the

15   ones we've been objecting to, and there has been no resolution

16   of that.

17             The bases of our objections --

18             THE COURT:  Okay.

19             MR. STOJILKOVIC:  -- are the following.  One, these

20   documents were not presented or used with Mr. Dobkin.  They are

21   simply, as Plaintiffs assert, underlying the analysis that he

22   offered.  They were not used in court.

23             These are not individual documents.  They're

24   compilations of source code, and they are compilations that

25   take -- they are also not the entire source code.  They take

1   bits and pieces, but they don't really overlap with the Dobkin

2   analysis.

3          There's, you know, thousands of lines of code here

4   that -- that, you know, were not featured by Mr. Dobkin, so

5   it's neither -- neither are they excerpts that actually map on

6   to what Mr. Dobkin testified about, nor are they in some sense

7   comprehensive.

8          We also object beyond that, and there's two sets

9   of -- from the ZeniMax code files and two sets from the Oculus

10  code files.

11         We also object on the grounds -- so they weren't

12  moved in.  They weren't used.  They're not in evidence.  Beyond

13  that, they're going to be very confusing, theirs -- these are

14  all marked on this yellow paper as if it's all confidential and

15  they're more confidential, but we know that large portions of

16  what's in the ZeniMax code is identical to what's in the open

17  source in Doom 3 BFG.

18         There are also portions in what is called the ZeniMax

19  code that are actually Oculus code because when Oculus sent

20  Mr. Carmack the SDK, he took some of it and worked with it and

21  then when Plaintiffs were on their way to the copyright office,

22  which they stopped off a day and a half before they filed this

23  suit, they actually copyrighted part of Oculus code or

24  attempted to.  So it is not really all ZeniMax code in here.

25         It's confusing and, in our view, it is just not in

 1   the record.  It was not admitted, and on those bases, we

 2   believe it does not come in and I'll let Mr. Sammi address it.

 3           MR. SAMMI:  Yes, Your Honor.

 4           Exhibits PX132, PX301, PX1162, and PX1492 were

 5   examined by Dr. Dobkin and described to the jury during his

 6   discussion of ZeniMax's screen optics and image quality

 7   technology including stereoscopic distortion precompensation

 8   and stereoscopic chromatic aberration precompensation.

 9           PX301 and PX1429 were examined by Dr. Dobkin and

10   described to the jury during his discussions of ZeniMax's

11   positional tracking technology, including HMD gravity

12   orientation and drift correction and HMD head and neck

13   model-based point-of-view adjustment.

14           Finally, Your Honor, PX132, PX301, PX1162, PX1429,

15   and PX1492 were examined by Dr. Dobkin and described to the

16   jury during his discussion of ZeniMax's latency reduction

17   technologies, including extrapolative orientation prediction,

18   HMD view bypass, and time warp.

19           In addition, Your Honor, this code was reviewed by

20   Professor Frederiksen-Cross as well as part of the bases of her

21   entire testimony of her abstraction filtration and comparison.

22           Furthermore, the copyright issue, ZeniMax's

23   copyrights affix in their code the moment it is put into a

24   tangible medium, which is when it is entered into the

25   repository.  The date of the copyright registrations is

```
 1    immaterial, and in addition, ZeniMax in its copyright

 2    registrations, excluded previously authored material and is not

 3    trying to claim any ownership in Oculus code.

 4             THE COURT:  Okay.  Here's -- so you're not claiming

 5    that the whole code was stolen, are you?

 6             MR. SAMMI:  No, Your Honor.

 7             THE COURT:  Not everything in that book is dastardly,

 8    correct?  Not everything.

 9             MR. SAMMI:  Your Honor, first of all, the source code

10    of ZeniMax is much larger than what these excerpts are.

11             THE COURT:  Yeah, I'm sure.

12             MR. SAMMI:  And we've tried to take these excerpts --

13    and we've talked about them throughout trial for three weeks:

14    ZeniMax VR testbed, ZeniMax VR implementation code, ZeniMax

15    Doom 3 BFG code.  These are the code bases upon which our trade

16    secrets have been misappropriated and copyrights have been

17    infringed.  They have been discussed by both experts in detail,

18    Your Honor, both copyright experts doing their abstraction

19    filtration comparison tests.  The jury should be able to view

20    the evidence for itself.

21             MR. STOJILKOVIC:  Your Honor, if I could respond to

22    that.  I agree this is not the entire source code.  That much

23    we agree.  But these excerpts are far, far in excess of what

24    has been commented on by either Mr. Dobkin or Mr. -- or

25    Ms. Frederiksen-Cross.
```

1          Just to give an example of one of these

2     subpartitions, eight lines of code were cited in Mr. Dobkin's

3     analysis, the subpartition contains about 11,000 lines of code.

4     So it just -- it's not -- these aren't little snippets that

5     kind of map on to what we saw in these slides.  This is a much

6     larger collection.

7          And on the point, the jury heard testimony from the

8     experts and I'm -- I have every confidence they will weigh it

9     and assess it.  We just don't think these were used or moved

10    into evidence and they shouldn't come in now.

11         MR. SAMMI:  My last response on this, Judge.

12         THE COURT:  Sure.

13         MR. SAMMI:  First of all, as we know, Judge, these

14    are part of a computer program and we cannot look at lines of

15    code in isolation.  We must understand how those lines of code

16    relate into the entire module that fits into the entire

17    program.  We have separated out selections.  We can't put lines

18    of code in a vacuum in front of the jury.

19         And lastly, Your Honor, this code, there is no real

20    good argument as to why the jury can't see it.  We have been

21    talking about it for three weeks.

22         THE COURT:  Well, I mean, the concern is that you're

23    showing them this document that is really long and we're only

24    talking about portions of it.  That's the concern, really.

25    It's not all and there is not something -- there is a lot of

 1   pages where there is nothing in dispute.  There is a lot of

 2   pages like that.

 3            MR. SAMMI:  Your Honor --

 4            THE COURT:  That's my concern.

 5            MR. SAMMI:  That concern is alleviated by Professor

 6   Dobkin taking and describing to the jury the fact that this is

 7   not 4 terabytes of the code.  But this is the code that relates

 8   to and contains the code itself that has been copied,

 9   nonliterally, and when he testified, Dr. Dobkin presented the

10   fact that this nonliterally copied code is in several versions

11   of Oculus's SDK and is found in several different iterations of

12   ZeniMax code.

13            THE COURT:  And he didn't testify about every --

14   every line of code, did he?

15            MR. SAMMI:  He didn't have time, Your Honor.  I mean,

16   we had one hour for him to present his evidence, and he

17   presented an example of each of the seven trade secrets.

18            THE COURT:  I didn't ask you about taking a cheap

19   shot at me.

20            MR. SAMMI:  I didn't mean that like that, Your Honor.

21            THE COURT:  I'm just saying has he -- whatever he

22   testified to, I'm happy for them to see that.  That's fine.

23            MR. SAMMI:  And that is Doom 3 BFG, VR implementation

24   code, and VR testbed.

25            THE COURT:  I'm talking about what was up here and he

 1 │ said look at this, that's copied from this.  That's literal,

 2 │ that's nonliteral, and all that.  And there were pages and

 3 │ pages and pages of that.

 4 │         Anything that she testified to,

 5 │ Ms. Frederiksen-Cross -- is she a doctor?  I forgot.  Is she a

 6 │ doctor?

 7 │         MS. KEEFE:  No.

 8 │         THE COURT:  Ms. Frederiksen-Cross.  I don't have any

 9 │ problem with that.  The problem is look at all of this is

10 │ stolen.  Even under your theory, it's not all that.  It's some

11 │ of it, but not all of it.

12 │         I'm happy to give them anything that you think that

13 │ was stolen.  You can pull that out.  They can see that.  I'm

14 │ happy for them to see that.  Otherwise, you're like taking --

15 │ if I wrote a plagiarized War and Peace, it wouldn't be the

16 │ whole book, it would be -- maybe it would be if I did write the

17 │ whole thing.

18 │         MR. SAMMI:  Your Honor, that is a very good point,

19 │ because the third prong of the abstraction filtration

20 │ comparison test is to compare the programs themselves to see if

21 │ they are substantially similar.  We can't just compare the

22 │ lines of code, and I know there's a disagreement between the

23 │ Defendants, they just want to look at the codes.  We have to

24 │ interpret those lines of code in the context of the entire

25 │ program, because the copyright itself extends to the entire

1   program.

2          We're happy to see if -- to confirm that what code is

3   in these exhibits is code that's in the programs that is

4   related to the code that is alleged to be copied by ZeniMax,

5   Judge.

6          MR. STOJILKOVIC:  Your Honor.

7          THE COURT:  Yeah, I guess that's right.  Maybe you

8   would have to look at the whole book that I wrote.  So maybe.

9          MR. STOJILKOVIC:  Your Honor, this is our objection.

10  No -- Mr. Dobkin, who is the witness they're relying on to get

11  this in, did not testify about --

12         THE COURT:  You mean Doctor?

13         MR. STOJILKOVIC:  Dr. Dobkin did not testify about

14  this kind of volume.  He testified from his slides.  You know,

15  it's maybe 12 pages.  And to suggest that this is the heft of

16  what has been stolen is clearly prejudicial and it is just

17  not -- he didn't -- I mean, if they tried to offer this with

18  him and he said, I reviewed all this, I based all my opinions

19  on this, he didn't say that.  And they did not move it in, and

20  it is clearly prejudicial not to argue, you know, here's the

21  volume of what's been stolen when the analysis presented in

22  those slides was, you know, maybe 10 sheets, maybe 12 sheets of

23  code.

24         MR. SAMMI:  Your Honor, again, two points.

25  Dr. Dobkin clearly testified that he spent two years going

 1   through 4 terabytes of code and then identified on his slides

 2   by name VR testbed code, VR implementation code, and Doom 3 BFG

 3   code.  And which lines -- which trade secrets match up to

 4   those -- that is contained in that code.

 5          Now, we have then separated out that code into its

 6   smallest constituent parts that you can read as a program for

 7   that third step in the abstraction filtration comparison test.

 8          Again, the law says we cannot look at the lines of

 9   code in a vacuum.  They must be compared to see if they are

10   substantially similar.  That is the entire basis of

11   Dr. Dobkin's argument.

12          THE COURT:  Anything else?

13          MR. STOJILKOVIC:  You know, if they had used this

14   with him, we would have crossed him and crossed him effectively

15   of, oh, you said you spent two years of looking at this, so how

16   come the only thing you are testifying about is this little

17   snippet here and this little snippet here.

18          We didn't get a chance to do it and we didn't because

19   it wasn't admitted with him.

20          MR. SAMMI:  Your Honor, I made attempts to admit this

21   throughout the case and they have done that by putting it on

22   the ELMO and saying through their own expert there are only

23   eight lines.  The jury is well aware of the argument.  They've

24   made it many, many times.  There are only this many lines of

25   source code.

 1          How many lines -- they asked their own expert, how

 2    many lines of source code are there in the computer program?

 3    There are this many.

 4          MR. STOJILKOVIC:  And just the last thing I'll say,

 5    Your Honor, the only thing they started trying to move this in

 6    was after the witness they said is the reason this should come

 7    in was already off the stand.

 8          THE COURT:  Okay.  Here's what I'm going to do.

 9    Y'all can hold it up and make argument this was part of, you

10    know -- that this was part of this, what they stole.  We want

11    you to consider it as a whole and blah, blah, blah, whatever

12    you want to say, you may make those arguments with regard to

13    that.  But I'm only going to let you send back to the jury the

14    part that he marked and that sort of thing.  And I will note

15    your exception to that.

16          But you can still make your argument that this thing

17    as a whole.  I'll still allow you to make that argument.  I'm

18    just not going to let you send it back there because I don't

19    think it all came in.  I really don't.

20          But anyway -- so you've got all those red and green

21    and purple and pink sheets.  That comes in clearly.  Okay.

22          MR. SAMMI:  I understand.  Yes, Your Honor.  May I

23    make one more objection on the record just to place it?

24          THE COURT:  Sure.

25          MR. SAMMI:  Thank you.

1            The copyrights themselves that are at issue in this

2    case cover the entire program, and those are the bases for the

3    copyright infringement claim and the jury should be able to see

4    that -- and we cannot put 4 terabytes in front of them, we

5    can't put a hard drive in front of them, but we have to show

6    them that this is protectable information from ZeniMax.

7    ZeniMax actually has copyrights on the computer programs.

8            It's as if we're talking about a book has been

9    nonliterally copied, but they say you can only show five pages

10   of the book.  The book itself has a copyright on it as a work,

11   and that third prong of the abstraction filtration comparison

12   test requires those works of authorship to be compared as a

13   whole.  And I understand we can't compare them as a whole, but

14   we have got to compare them in some form that incorporates

15   those lines into the modules of code that work in the program.

16           And Ms. Frederiksen-Cross also discussed that.  She

17   said, well, this code calls other code --

18           THE COURT:  Any of the code you talked about, send

19   back there, any of it, either side.  Y'all can send all that

20   back there.  Okay?  All right.

21           MR. STOJILKOVIC:  Only what was shown, Your Honor --

22   right? -- and what he actually talked, not -- I think it's

23   different things.  And that's what we -- obviously, the

24   copyrights have come in and we're not saying that the

25   copyrights are not in evidence, but the code that we understand

1   your ruling that goes back is the particular portions that were

2   analyzed and testified to by the experts.

3           THE COURT:  Yes.

4           MR. STOJILKOVIC:  Thank you, Your Honor.

5           Unless you want to put more on the record.

6           MR. SAMMI:  If I may.  Sorry, Your Honor.  Just --

7           THE COURT:  Yes.

8           MR. SAMMI:  Professor Dobkin:  "I reviewed software

9   that has been produced by ZeniMax consisting of ZeniMax VR

10  testbed code, the Doom 3 BFG code, the VR implementation code."

11          This is the code that is copyrighted.  And if he can

12  only have time to discuss on the stand -- not time, Your Honor,

13  but if he makes the argument to the jury using slides of seven

14  trade secrets found in various programs, he was asked and he

15  did testify and he was crossed on how many places did you find

16  this, and he said he found it in many different places.

17  There's a chart that we cannot just take a page from --

18          THE COURT:  Does this chart show everywhere that he

19  found --

20          MR. SAMMI:  It shows, yes, Doom 3 BFG, VR

21  implementation code, which trade secrets match up to which one.

22          THE COURT:  You can send that back there.

23          MR. STOJILKOVIC:  Your Honor, I think that was -- I

24  think that -- there's a difference between --

25          THE COURT:  Is there a chart?

```
 1              MS. WILKINSON:  Yes.
 2              MR. STOJILKOVIC:  There's a difference --
 3              (Pause)
 4              THE COURT:  You don't think the chart came in?
 5              MR. STOJILKOVIC:  No --
 6              THE COURT:  Or it is a summary?
 7              MR. STOJILKOVIC:  No, I think this was just in a
 8    demonstrative.
 9              Your Honor, the point I want to make is there a
10    difference between asking an expert what have they reviewed.  I
11    mean, if we start admitting into evidence everything experts
12    have reviewed --
13              THE COURT:  No, not what they reviewed.  What they
14    reviewed and found to be stolen and bad stuff.
15              MR. STOJILKOVIC:  What Mr. Dobkin found in his
16    analysis --
17              THE COURT:  Dr. Dobkin.
18              MR. STOJILKOVIC:  Dr. Dobkin.
19              -- to be literally copied is just what was featured
20    on those slides.
21              MR. SAMMI:  Your Honor --
22              THE COURT:  Well, let me see it.
23              MS. WILKINSON:  Your Honor, we have a notebook --
24              THE COURT:  No, no, one lawyer at a time.
25              MR. SAMMI:  May I approach, Your Honor?
```

```
 1              THE COURT:  Yes.
 2              MR. STOJILKOVIC:  What page are you on?
 3              MR. SAMMI:  I'm sorry, I just handed it to the Judge.
 4              MS. WILKINSON:  Which page?
 5              MR. SAMMI:  I just handed it to the Judge.
 6              MR. STOJILKOVIC:  Your Honor, what page did Mr. Sammi
 7  show you?
 8              THE COURT:  He's given me this chart.
 9              MR. STOJILKOVIC:  And we have a copy of it now, but I
10  wanted to know what page he directed you to.
11              THE COURT:  He's talking about this right here.
12              MR. SAMMI:  This is I believe the last -- the second
13  to last page.
14              THE COURT:  Where he says --
15              (Pause)
16              MR. STOJILKOVIC:  That's not an explanation of what
17  he looked at in all those things.  That's just saying he looked
18  at large volumes of code.
19              MR. SAMMI:  This is not saying what he looked at.
20  This is saying what he found in the copyrighted works, which
21  are listed, three of them, VR testbed, Doom 3 BFG, and VR
22  implementation.
23              MR. STOJILKOVIC:  And what he found was seven trade
24  secrets and seven alleged copyrights -- copyright violations on
25  those specific bits of code, not the vast oceans of code
```

1    surrounding it.

2              MR. SAMMI:  Your Honor, we disagree.

3              THE COURT:  You think he said that he found it

4    throughout that whole big, thick thing?

5              MR. SAMMI:  Yes.  As his last step for comparison,

6    Your Honor, he has to compare the computer programs as a whole,

7    and that is --

8              THE COURT:  Yes, yes, yes, yes, yes.  But that's

9    not -- the whole thing is not -- not stolen.  It's part of it.

10             MR. SAMMI:  But -- okay.  Yes, Your Honor.  If -- if

11   you have lines of code, they must be -- you must look at at

12   least the modules of code if not the entire program in which

13   those -- in which that code is found.

14             Now, we talked about variables and where they call

15   and how these values are generated and used in the code.  That

16   in context must be viewed in the module.

17             MR. STOJILKOVIC:  We believe you've already ruled

18   correctly on this.

19             THE COURT:  Stop.

20             Here's all your sheets in here about where he found

21   it.

22             MR. SAMMI:  Yes, Your Honor.

23             THE COURT:  Okay.  I told you you can put those in.

24   That's already in.  Isn't that in evidence?

25             MS. WILKINSON:  No.

```
 1            MR. SAMMI:  That was a demonstrative.

 2            THE COURT:  Oh, these are demonstratives.

 3            MR. SAMMI:  Yes, sir.

 4            THE COURT:  Okay.

 5            MR. SAMMI:  He's not allowed to put his report in,

 6    it's not evidence and that's --

 7            THE COURT:  No, I agree it's not.

 8            MR. STOJILKOVIC:  If they want the lines of code that

 9    underline those sheets, it's going to be about 10 or 12 pages

10    of those, you know, 5,000-page binders.

11            MR. SAMMI:  That is --

12            THE COURT:  I thought you'd offered that as evidence.

13    It's just demonstrative.  Okay.

14            MR. SAMMI:  That would be severally prejudicial to

15    what the facts are in this case.

16            THE COURT:  What would be?

17            MR. SAMMI:  To cut out lines of code and paste them

18    together into some representation of what the actual

19    copyrighted work is when we know --

20            THE COURT:  Okay.  Okay.  Here's what -- you can put

21    all this up there on there, since it's only demonstrative.  You

22    can put it up there and say, look, here it is.  Here's what he

23    found.  Here's what he -- this is all this.  This is all that.

24    But since it's a demonstrative, it doesn't go back.

25            And you can send any pages back that show the -- that
```

```
 1   are in evidence that show where he found the stolen -- the

 2   stolen lines.

 3          MR. SAMMI:  Okay.  I think there will be a

 4   disagreement with them that if there's lines on a page of

 5   code -- just a page of code, it's even hard to make sense of a

 6   page of code because it is just a printout.

 7          THE COURT:  So how can they make sense of a whole

 8   book of code?

 9          MR. SAMMI:  By module, Your Honor, by module.

10          The code is in a piece of block that is utilized by

11   the program in certain different ways, and that code must be

12   viewed in that module to understand what it is and how to

13   compare it for copyright infringement.

14          THE COURT:  Yeah, I don't buy that.

15          Okay.  So you -- you can make your argument and use

16   all -- all that with regard to what you said, and since it is a

17   demonstrative only, you're going to use it out here, but it

18   doesn't go back.  So I'm sure not putting the whole thing back

19   there since that was a demonstrative itself.  But you can make

20   all those arguments you're going to make.  It just doesn't go

21   back.

22          MR. STOJILKOVIC:  Your Honor, we have two other

23   things that I think --

24          MR. SAMMI:  I'm sorry, just to confirm, if we do --

25   the code, for example -- may I use this?
```

```
 1            MR. STOJILKOVIC:  Yes.
 2            MR. SAMMI:  For example, there is copied code in the
 3    module --
 4            THE COURT:  If he said it was stolen and you offered
 5    it into evidence and he said that's stolen, it can go back.
 6            MR. STOJILKOVIC:  Clarification, Your Honor.  Please,
 7    attorney conference for just one second.  I want to make sure
 8    I'm saying what I need to.
 9            THE COURT:  Okay.
10            (Pause)
11            MR. STOJILKOVIC:  Your Honor, none of it was offered
12    into evidence, and this module idea --
13            So here is a module, Number 13.  We think maybe of
14    this one, if I'm picking the right one, maybe there were 12
15    lines of code put up on the slide.
16            THE COURT:  What did I say?  I said whatever was
17    stolen.  It's not the whole book.  It's what was stolen.
18            MR. STOJILKOVIC:  Mr. Sammi raised the module point.
19            THE COURT:  Pull those lines out and show it if you
20    offered it into evidence.
21            MR. SAMMI:  Yes, sir, we will -- we will do that.
22            THE COURT:  Have you got somebody back there working
23    on that?
24            MR. SAMMI:  We do.
25            THE COURT:  Okay.
```

```
 1          MR. SAMMI:  We do, Your Honor.  Thank you.

 2          THE COURT:  I'm assuming you are going to put it on

 3    the ELMO or show it on the computer and say here's an example

 4    of what was stolen.  This was stolen, this was stolen, this was

 5    stolen.  Right?

 6          MR. SAMMI:  I may even use the book as a

 7    demonstrative in front of --

 8          THE COURT:  You may do that.

 9          MR. SAMMI:  Yes.

10          THE COURT:  But, I mean, you can argue the whole book

11    was stolen.

12          MR. SAMMI:  Well --

13          THE COURT:  And that probably will get an objection

14    and a sustained because it wasn't all stolen.

15          MR. SAMMI:  I understand that, Judge.  But the

16    argument that we've been making constantly is that the VR

17    testbed -- we cannot look at these lines of code in a vacuum.

18    These are --

19          THE COURT:  You can make that argument.  That's fine.

20    I don't have any problem with you making that argument.  It's

21    not because parts of it were stolen.  You are going to argue

22    all of it was stolen.

23          Is that kind of your argument?

24          MR. SAMMI:  Well, if you take those lines out, the

25    program doesn't work.
```

```
 1              THE COURT:  Doesn't work.  Okay.
 2              And so these had -- to make it work, they had to have
 3      these stolen lines, and so the testbed was stolen?
 4              MR. SAMMI:  Yes.
 5              And, Your Honor, this is also a separate issue than
 6      the id Tech 5 code that is based on a conversion claim and not
 7      just a copyright claim, and that is Mr. Carmack testified to it
 8      directly, and so did Professor Dobkin.  90,000 files
 9      identically on the laptop that was found in his closet that has
10      never been -- and there is no argument here, because it has
11      never been released to the public, it has never been licensed
12      outside the ZeniMax family, and Mr. Carmack had it in his
13      possession in violation of his employment agreement, and it is
14      the subject to our conversion claim.
15              MR. STOJILKOVIC:  And they didn't move it into
16      evidence, and it is not VR code, so --
17              MR. SAMMI:  It -- this was an -- they tried to
18      preclude this in the beginning of the trial saying that it is
19      not VR code, and Professor Dobkin had a demonstrative, and he
20      discussed the fact that Rage -- Rage code is related to virtual
21      reality.  Those are the --
22              THE COURT:  Y'all are making jury arguments to me.
23      You are going to make that jury argument, he's going to make
24      his argument, and I don't know who they are going to believe on
25      the conversion deal.  I don't know.  You can make that
```

```
 1    argument.
 2              MR. SAMMI:  Okay.
 3              THE COURT:  He can make that argument.  That's fine.
 4    I don't have a problem with that.
 5              MR. SAMMI:  Thank you, Judge.
 6              THE COURT:  Okay.
 7              MR. STOJILKOVIC:  Your Honor, eight exhibits that we
 8    believe are clearly in evidence but Plaintiffs disagree, they
 9    are exhibits, they are all defense exhibits, they are all just
10    little short documents, and I think the reason our
11    disagreement, what it stems from is, obviously, we had an
12    initial set of preadmits based on what was not objected to.
13    These were not on that list.
14              But these documents were used.  They were shown and
15    previewed to defense counsel, they were used with a witness,
16    they were authenticated, they were read into the record, and
17    our understanding and how trial has been going is that, where
18    there has not been objection and the parties are in agreement
19    that it can be used, then even if it wasn't on the preadmitted
20    list, it got in.
21              I just want to give the Court one example because I
22    think it will --
23              THE COURT:  Stop.  Why do you not think they're in,
24    Mr. Lisy?
25              MR. LISY:  Good morning, Your Honor.  Two reasons.
```

```
 1    First, we never waived the objection to any particular
 2    document.
 3           Second, documents weren't moved into evidence, and as
 4    we understood Your Honor's rulings, documents that are on the
 5    preadmitted list come into evidence without that specific
 6    operation.
 7           THE COURT:  Yes.
 8           MR. LISY:  Documents that were not on the preadmitted
 9    list --
10           THE COURT:  Unless y'all came to some agreement with
11    regard to those documents otherwise, you could add to that
12    list.  I wasn't trying to keep you from doing that.
13           MR. LISY:  Understood.  And with respect to these, we
14    did not.
15           THE COURT:  Did I not say admitted?  Is that the
16    problem on these?
17           MR. STOJILKOVIC:  Yes, Your Honor.  And if I could
18    just show one, if we could have the ELMO, I think --
19           THE COURT:  Give me all eight right now, and I will
20    make my mind up real fast.
21           MR. STOJILKOVIC:  All right.  Do you want me to just
22    walk them up to you, Your Honor?
23           THE COURT:  Yes.
24           MR. STOJILKOVIC:  Let's do it.
25           (Pause)
```

```
1            MR. STOJILKOVIC:  The first one Mr. Altman was
2    crossed about --
3            THE COURT:  The emails?
4            MR. STOJILKOVIC:  He was crossed about this Oculus
5    Rift wins Best Hardware and he said, well, that was --
6            THE COURT:  Stop, stop, stop, stop.
7            MR. STOJILKOVIC:  We --
8            THE COURT:  Stop.
9            MR. STOJILKOVIC:  Sorry, Your Honor.
10           Those are more copies.
11           THE COURT:  Stop.
12           These are all copies of the one?
13           MR. STOJILKOVIC:  Yes, multiple copies in each
14   folder.
15           (Pause)
16           MR. STOJILKOVIC:  You can open that clip, Your Honor.
17   That was so I don't drop them all.
18           (Pause)
19           MR. STOJILKOVIC:  This is the one Mr. Jackson was
20   examined about.
21           MR. LISY:  That was a little bit different.
22           THE COURT:  What's the deal on this last one?
23           MR. LISY:  So that last one -- the last one is the
24   report prepared by KPMG.  It was used with Mr. Jackson.  We
25   made an objection on the record.  It was overruled, Your Honor,
```

 1 | but we would submit that that document was not proper he used

 2 | with Mr. Jackson as the sponsoring witness and that it is

 3 | hearsay.  There is no one from KPMG who can testify to it.

 4 |        To the extent it was used for impeachment with

 5 | Mr. Jackson is one thing, but we would submit that shouldn't go

 6 | back to the jury.

 7 |        MR. STOJILKOVIC:  And our position is, Your Honor --

 8 |        THE COURT:  I think all these come in.

 9 |        MR. STOJILKOVIC:  Thank you, Your Honor.

10 |        THE COURT:  Okay.

11 |        (Pause)

12 |        THE COURT:  All right.  With regard to all of these

13 | exhibits, I remember those exhibits, and if I didn't say they

14 | were admitted, I should have.  They were admitted.  And that

15 | was my fault if I didn't.

16 |        They were clearly talked about in front of the jury,

17 | every one of them.  And with regard to the last document -- and

18 | it's -- it was used with Mr. Jackson I think to impeach him.  I

19 | think that's what it was.  And so I overruled the objection, so

20 | that -- that did come in.

21 |        Okay.  And what else, Mr. Lisy?

22 |        MR. LISY:  I don't think we have anything else.

23 |        MR. SAMMI:  I've got one thing, Judge.  On the --

24 | just for -- it is not really another argument about the code,

25 | but on the code issue, I would ask that the Judge ask the

```
 1   Defendants to confirm on the record that, since they don't want
 2   the source code in evidence, that they can't complain if there
 3   is a finding of infringement that the jury wasn't shown the
 4   full copyrighted --
 5              THE COURT:  You're absolutely right.  They can't
 6   complain about that.
 7              MR. SAMMI:  Okay.
 8              THE COURT:  I agree.
 9              MR. SAMMI:  Okay.
10              THE COURT:  I mean, I --
11              MR. SAMMI:  Will the Defendants confirm it?
12              THE COURT:  That doesn't keep them from doing it.
13   That doesn't keep them from making the complaint.  I agree with
14   you that they can't make the complaint later on.
15              MR. SAMMI:  May I ask if Defendants can confirm that
16   if they're now requesting that this code not be sent back to
17   the jury?  Because if there is a finding of infringement, I
18   fully expect, oh, the jury wasn't shown the code.  How can they
19   reach a finding of infringement?
20              MR. STOJILKOVIC:  Your Honor, I think the record
21   clearly reflects the position we took.
22              THE COURT:  That doesn't answer the question.  That
23   was a really nice -- that was a really nice --
24              MR. STOJILKOVIC:  Thank you, Your Honor.
25              THE COURT:  That was a really nice effort on your
```

```
 1    part not to answer that question.

 2              MR. STOJILKOVIC:  We object to the admission of these

 3    documents because they were not offered, and that is our

 4    position.

 5              THE COURT:  Okay.

 6              MR. STOJILKOVIC:  Just one final clarification, Your

 7    Honor.  I do believe that these two headsets that have been

 8    used repeatedly, DX physical 23 and physical 25 --

 9              THE COURT:  For demonstrative purposes or for

10    evidence?

11              MR. STOJILKOVIC:  We thought that these two had come

12    in, Your Honor.

13              THE COURT:  I don't know.  I don't remember.  I'm

14    sorry.

15              Do y'all think they are in too?

16              MR. LISY:  No, we agree with Your Honor.  We have

17    them for demonstrative purposes only.

18              MR. SAMMI:  That's correct.

19              THE COURT:  Yeah, that's my recollection, unless you

20    can show me they were admitted.  I don't think they were.  I

21    think they are demonstrative only.

22              MR. STOJILKOVIC:  We will leave it at that, Your

23    Honor.  Thank you.

24              THE COURT:  Okay.  Okay.

25              MR. SAMMI:  Judge, I don't believe the answer from
```

```
 1   Defendants was a confirmation or a denial.  They are objecting
 2   to us moving this into evidence, and the answer -- and I
 3   said -- I asked them to --
 4            THE COURT:  They think you didn't do it at the proper
 5   time.  That's their position.
 6            MR. SAMMI:  And -- we disagree.
 7            THE COURT:  You made every effort, you think, to do
 8   that?
 9            MR. SAMMI:  We have made every effort, Judge, that we
10   would do that, but I would like to know on the record that
11   Defendants will not come forward here today and say --
12            THE COURT:  Yeah.  I don't think they're going to say
13   that.
14            MR. SAMMI:  Okay.
15            THE COURT:  That -- you know, I agree with you that
16   it's kind of hard to make that, but if it's their position that
17   you didn't do it timely, I mean, they can make that argument.
18   I can't --
19            MR. SAMMI:  One point on that, Judge.
20            When we move for evidence -- when we moved these
21   repeatedly during the trial into evidence, you -- I believe on
22   the record, you responded it was timely made but we needed to
23   discuss whether it's secure and there are other issues around
24   that.
25            THE COURT:  I think I did say that too.  I'm not
```

 1    debating you about that.

 2            MR. SAMMI:  Okay.

 3            THE COURT:  I mean, whatever I said, I said.

 4            MR. SAMMI:  Thank you, Judge.

 5            THE COURT:  Okay.  I'm not trying to sneak up on you.

 6            MR. SAMMI:  No, no.

 7            THE COURT:  I think I did say that.

 8            Yes?

 9            MS. WILKINSON:  No, Your Honor.  I was just going to

10    say this -- in this specific instance with Dr. Dobkin, he

11    didn't offer one piece of evidence, these are the

12    demonstratives for code, and that was the right person to do it

13    with.  And that's -- I think that was when he was trying to get

14    it in earlier, and the only person who could actually lay the

15    foundation would have been Dr. Dobkin, and he didn't offer one

16    piece of evidence during Dr. Dobkin's testimony.

17            THE COURT:  But he later on did.

18            MS. WILKINSON:  That was after the fact -- the

19    timeliness matters not just to make a record.  It's because we

20    would have done something differently if he had offered it.

21    That's the only reason --

22            THE COURT:  I'm not debating you about that.

23            MS. WILKINSON:  So him saying he did it later, again,

24    robs us of the opportunity to cross-examine Dr. Dobkin to make

25    the points we just made.

```
 1            Point out to which pages you are actually saying are
 2   stolen so we can show the jury and make the argument.
 3            THE COURT:  Yes, I agree.  You may make that
 4   argument.  I'm not debating you about that, but I may have said
 5   what I said which is, yeah, I think you may have made that at
 6   the time.  I can't go back and change that now.
 7            MR. SAMMI:  Sure.
 8            THE COURT:  It is what it is.  That kind of hurts
 9   both of you.
10            MR. SAMMI:  Regarding -- regarding Defendants' cross
11   of Professor Dobkin, nothing was preventing them from using
12   what has been in this courtroom for three weeks and what we
13   have done been discussing to cross Professor Dobkin on it, as
14   well as Professor Frederiksen-Cross who relies upon the code
15   itself and admitted to reviewing the code to conduct her
16   analysis of her own abstraction.
17            THE COURT:  Yes, I heard all this debate.
18            The bottom line is I will let you put in anything
19   that shows -- that you have anybody testify to that shows this
20   was copied, that document, but not the whole thing.  It wasn't
21   all copied.  Nobody said it was all copied.
22            MR. SAMMI:  Understood, Your Honor.  Thank you.
23            THE COURT:  Okay.  So you can do that, for the Fifth
24   Circuit's help when they're reviewing this.
25            Okay.  Anything else?
```

```
 1                 Are y'all ready?

 2                 Any other objections to the charge?

 3                 MS. WILKINSON:  No.  We put those in writing, as we

 4     said --

 5                 THE COURT:  All right.

 6                 MS. WILKINSON:  -- and sent them to you, Your Honor.

 7                 THE COURT:  Anything else, Mr. Hemr?

 8                 MR. HEMR:  No, Your Honor.

 9                 THE COURT:  Okay.  So over all your other objections,

10     the Court's charge is what it is.

11                 Off the record.

12                 (Discussion off the record)

13                 THE COURT:  Have we got copies for all them and y'all

14     have got copies?

15                 MS. WILKINSON:  Yes, Your Honor.

16                 THE COURT:  Sorry.  Had administrative problems.

17     Okay.  Probably just time for me to read the charge.

18                 Bring them in.

19                 On the record, both sides rest and close, correct?

20                 MR. SAMMI:  Yes, Your Honor.

21                 (Plaintiffs rest and close)

22                 MS. WILKINSON:  Yes, Your Honor.

23                 (Defendants rest and close)

24                 THE COURT:  Okay.  And you have made all your

25     objections to the charge, and you almost agree to everything,
```

 1    except there was a few little changes.

 2            SECURITY OFFICER:  All rise for the jury.

 3            (Jury in)

 4            THE COURT:  Y'all be seated.  Okay.

 5            Y'all turn to page 5 of the jury charge and follow

 6    along with me.

 7            Members of the jury, you've heard all the evidence in

 8    the case.  I will instruct you on the law that must apply.

 9            General Instructions.

10            It is your duty to follow the law as I give it to you

11    in this charge.  On the other hand, you, the jury, are the

12    judges of the facts.  Do not consider any statement that I have

13    made in the course of trial or make in these instructions as an

14    indication that I have any opinion about the facts of the case.

15            After I instruct you on the law, the attorneys will

16    have an opportunity to make their closing arguments.  Remember

17    that any statements or arguments made by the lawyers are not

18    evidence and are not instructions on the law.  They are

19    intended only to assist you, the jury, in understanding the

20    evidence and the parties' contentions.

21            Answer each question from the facts as you find them.

22    Your answers and your verdict must be unanimous.  Many of the

23    claims and defenses in this case must be proven by a

24    preponderance of the evidence.  The Plaintiffs must prove each

25    essential part of their claim by a preponderance of the

1  evidence.

2         Defendants must also prove each essential part of its

3  defenses by a preponderance of the evidence.  Mr. Carmack must

4  prove each essential part of his counter claim by a

5  preponderance of the evidence.

6         The Plaintiffs must prove each essential part of its

7  defenses to Mr. Carmack's counterclaims by a preponderance of

8  the evidence.  The preponderance of the evidence means the

9  greater weight and degree of credible evidence before you.  In

10  other words, to establish a claim or defense by a

11  "preponderance of the evidence" means to prove that the claim

12  is more likely so than not so.  In determining whether any fact

13  has been proved by a preponderance of the evidence in the case,

14  you may, unless otherwise instructed, consider the testimony of

15  all witnesses, regardless of who may have called them, and all

16  exhibits received in evidence, regardless of who may have

17  produced them.  If the proof fails to establish any essential

18  part of the plaintiffs' claims by a preponderance of the

19  evidence, you should find for the defendants as to that claim.

20         The Plaintiffs have also asked for an award of

21  exemplary damages in relation to some of their claims in this

22  lawsuit.  This must be decided under a higher standard of proof

23  than the preponderance of the evidence.  This higher burden of

24  proof is "clear and convincing," which means the measure or

25  degree of proof that produces a firm belief or conviction of

1   the truth of the allegations sought to be established.

2           You are the sole judges of the "credibility" or

3   believability of each witness and the weight to be given to the

4   witness's testimony.  In determining the weight to give to the

5   testimony of a witness, you should ask yourself whether there

6   was evidence tending to prove that the witness testified

7   falsely concerning some important fact, or whether there was

8   evidence that at some other time the witness said or did

9   something, or failed to say or do something, that was different

10  from the testimony the witness gave during the trial.

11  You should keep in mind, of course, that a simple mistake by a

12  witness does not necessarily mean that the witness was not

13  telling the truth as he or she remembers it, because people may

14  forget some things or remember other things inaccurately.  So,

15  if a witness has made a misstatement, you need to consider

16  whether that misstatement was an intentional falsehood or

17  simply an innocent lapse of memory; the significance of that

18  may depend on whether it has to do with an important fact or

19  with only an unimportant detail.

20          The weight of the evidence is not necessarily

21  determined by the number of witnesses testifying as to the

22  existence or nonexistence of any fact.  The testimony of a

23  single witness may be sufficient to prove any fact, even if a

24  greater number of witnesses may have testified to the contrary,

25  if after considering all the other evidence you believe that

1  single witness.

2        When knowledge of technical subject matter may be
3  helpful to the jury, a person who has special training or
4  experience in that technical field -- he or she is called an
5  expert witness -- is permitted to state his opinions on those
6  technical matters.  However, you are not required to accept
7  that opinion.  As with any other witness, it is up to you to
8  decide whether to rely upon it.

9        In deciding whether to accept or rely upon the
10  opinion of an expert witness, you may consider any bias
11  evidence that the expert witness has been or will be paid for
12  reviewing the case and testifying, or from evidence that he
13  testifies regularly as an expert witness and his income from
14  such testimony represents a significant portion of his income.

15        While you should consider only the evidence in this
16  case, you are permitted to draw such reasonable inferences from
17  the testimony and exhibits as you feel are justified in the
18  light of common experience.  In other words, you may make
19  deductions and reach conclusions that reason and common sense
20  lead you to draw from the facts that have been established by
21  the testimony and evidence in the case.

22  There are two types of evidence you may consider in properly
23  finding the truth as to the facts in the case.  One is direct
24  evidence.  A fact is established by direct evidence when proved
25  by witnesses who saw the act done or heard the words spoken or

1   by documentary evidence.  The other is indirect or

2   circumstantial evidence, the proof of a chain of circumstances

3   indicating the existence or nonexistence of certain other

4   facts.  Direct proof of a state of mind is almost never

5   available and is not required.  As a general rule, the law

6   makes no distinction between direct and circumstantial

7   evidence, but simply requires that you find the facts from a

8   preponderance of all the evidence, both direct and

9   circumstantial.

10       You have heard conflicting evidence in this case that

11  certain electronically stored information may have been deleted

12  or lost and therefore not available for use as evidence at

13  trial.  If you find that any of these Defendants caused any of

14  these actions to occur, you may, but you are not required to,

15  infer that the information was unfavorable to those Defendants.

16  Do not let bias, prejudice or sympathy play any part in your

17  deliberations.  A corporation and all other persons are equal

18  before the law and must be treated as equals in a court of

19  justice.  This case should be considered and decided by you as

20  an action between persons of equal standing in the community,

21  of equal worth, and holding the same or similar stations in

22  life.

23           Now I will turn to the requirements of each of the

24  legal claims and defenses that the parties have brought in this

25  case.

A. Common Law Misappropriation of Trade Secrets

    1.   Common Law Misappropriation of Trade Secrets:  Liability

    Plaintiffs ZeniMax and id Software contend that Defendants misappropriated what Plaintiffs regard as their trade secrets. In this action, Plaintiffs have asserted that the following of their technologies are trade secrets:

1. Distortion correction technology;

2. Chromatic aberration correction method;

3. Gravity orientation and sensor drift correction technology;

4. Head and neck modeling technology;

5. HMD view bypass technology;

6. Predictive tracking technology; and

7. Time warping methodology.

    To be successful on a claim for trade secret misappropriation against Defendants, ZeniMax and id Software must prove each of the following elements:

        1.  The existence of a trade secret;

        2.  That Defendants acquired the trade secret through the breach of a confidential relationship or by improper means;

        3.  That Defendants made commercial use of the trade secret in their business without authorization; and

        4.  That Plaintiffs suffered damages as a result.

        A trade secret is defined as a formula, pattern, device or compilation of information used in a business which gives its owner an opportunity to obtain an advantage over his

1  competitors who do not know or use it.

2         A trade secret differs from other secret information

3  in a business in that it is not simply information as to

4  single, ephemeral, short lived, or transitory events in the

5  conduct of the business.  A trade secret is a process or device

6  for continuous use in the operation of the business.

7         You should consider the following factors in

8  determining whether the information claimed by ZeniMax and id

9  Software is a trade secret:

10         (1) the extent to which the information is known

11  outside their business;

12         (2) the extent to which it is known by employees and

13  others involved in their business;

14         (3) the extent of measures taken to safeguard the

15  secrecy of the information;

16         (4) the value of the information to Plaintiffs and to

17  their competitors;

18         (5) the amount of effort or money expended in

19  developing the information;

20         (6) the ease or difficulty with which the information

21  could be properly acquired or duplicated by others.

22         Because trade secrets do not fit neatly into each

23  factor every time, all six factors need not be satisfied,

24  rather, you should weigh these factors.

25         Matters of general knowledge in an industry cannot be

1  appropriated by one as his trade secret.  Moreover, a former

2  employee may use the general knowledge, skills, and experience

3  acquired during his prior employment to compete with a former

4  employer and even do business with the former employer's

5  customers.

6        The subject matter of a trade secret must be secret

7  and must not be public knowledge in the trade or business.

8  Information that is generally known in the industry, readily

9  ascertainable by inspection or independent investigation, or

10  publicly disclosed is not a trade secret.  Trade secret

11  protection is lost if one voluntarily discloses information to

12  another who has no obligation to keep the information secret or

13  if one otherwise fails to take reasonable precautions to ensure

14  its secrecy.  A trade secret is not required to be novel or

15  unique and it may consist of a combination of simple and

16  otherwise known components.  But if a process or idea is so

17  common, well known, or readily ascertainable that it lacks all

18  novelty, uniqueness, and originality, then it lacks the

19  necessary privacy of a trade secret.

20        If you find that ZeniMax owned any valid trade

21  secrets, you must determine whether ZeniMax has proven by a

22  preponderance of the evidence that Defendants acquired any of

23  those trade secrets as a result of a breach of a confidential

24  relationship between the parties or other improper means.

25        A person discovers another's trade secret through

1   "improper means" when he acts below the generally accepted

2   standards of commercial morality and reasonable conduct.  To

3   discover a trade secret by "improper means" requires that the

4   Defendant have notice of the fact the information is a trade

5   secret.  It is not improper to obtain knowledge of a trade

6   secret where the owner of the alleged trade secret voluntarily

7   discloses it or fails to take reasonable precautions to ensure

8   its secrecy.

9          To find a confidential relationship existed between

10  ZeniMax and one or more Defendants, you must find an express or

11  implied agreement existed between the parties in which they

12  both understood or ought to have understood the terms of the

13  agreement.  You may find such a relationship was implied by the

14  business relationship or by the circumstances surrounding the

15  dealings between the parties.  A breach of a confidentiality

16  agreement can establish a breach of a confidential

17  relationship.

18         A person "makes commercial use" of a trade secret

19  when he seeks to profit from the use of the secret.  As a

20  general matter, any exploitation of the trade secret that is

21  likely to result in injury to the trade secret owner or

22  enrichment to a Defendant is commercial use of that trade

23  secret.  Marketing goods that embody a trade secret, employing

24  a trade secret in manufacturing or production, relying on a

25  trade secret to assist or accelerate research or development,

1   or soliciting customers through the use of information that is

2   trade secret all constitute use of a trade secret.

3          2.   Common Law Misappropriation of Trade Secrets:

4   Defenses

5          Defendants John Carmack and Brendan Iribe assert as a

6   defense that the statute of limitations bars ZeniMax and id

7   Software's claim for Mr. Carmack's and Mr. Iribe's alleged

8   misappropriation of trade secrets.

9          A statute of limitations is a law that provides that

10   a suit is barred if a plaintiff does not bring it within a

11   prescribed period of time.  The time period within which a

12   lawsuit for alleged misappropriation of a particular trade

13   secret must be brought begins when ZeniMax and id Software

14   first discovered, or by the exercise of reasonable diligence

15   should have discovered, the facts that form the basis of its

16   alleged claim that a particular trade secret was

17   misappropriated.  The question is whether the plaintiffs have

18   knowledge of facts which would cause a reasonable person to

19   diligently make inquiry to determine his or her legal rights.

20          The applicable statute of limitations period for

21   Plaintiffs' misappropriation claim is three years.  For the

22   purposes of the statute of limitations, you may consider the

23   suit against Mr. Carmack and Mr. Iribe as being filed on March

24   31, 2016.

25          Defendants Mr. Carmack and Mr. Iribe have the burden

 1   of proving the statute of limitations defense.  In other words,

 2   Mr. Carmack and Mr. Iribe must prove by a preponderance of the

 3   evidence that ZeniMax and id Software did not bring their claim

 4   for misappropriation of a trade secret within the applicable

 5   time period.

 6           Defendants assert that the defense of laches bars

 7   Plaintiffs' misappropriation of alleged trade secrets.  Laches

 8   is an equitable defense with three elements: (1) delay in

 9   asserting a right or claim; (2) the delay was not excusable;

10   and (3) there was undue prejudice to the party against whom the

11   claim is asserted.

12           Two kinds of prejudice may support a defense of

13   laches: (1) the delay has resulted in the loss of evidence; or

14   (2) the defendant has changed his position in a way that would

15   not have occurred if the plaintiff had not delayed.  Defendants

16   have the burden of proving the laches defense by a

17   preponderance of the evidence.

18           A party asserting the defense of laches must have

19   "clean hands":  That is, the party must have acted fairly and

20   without fraud or deceit as to the controversy in issue.  If you

21   find that a Defendant has unclean hands, then you should not

22   find that Defendant has established the defense of laches.

23   Defendant Mr. Carmack contends that he is not liable for

24   trade secret misappropriation because of a doctrine called

25   estoppel by contract.  Estoppel by contract prevents a party

1   from denying the terms of a valid of fully executed contract.

2   Estoppel by contract applies when a party to a contract

3   attempts to take a position inconsistent with the contract's

4   provision, to the prejudice of another.  Here, Mr. Carmack

5   claims that ZeniMax should be prevented from denying the terms

6   of Mr. Carmack's 2009 employment agreement with ZeniMax and

7   that the position that the Plaintiffs have taken in this

8   litigation is inconsistent with the terms of that agreement.

9   Mr. Carmack must prove this defense by a preponderance of the

10  evidence.

11          3.   Common Law Misappropriation of Trade Secrets:

12  Damages

13          If you find that the Plaintiffs have proved their

14  claim against any Defendant by a preponderance of the evidence,

15  you must determine the damages to which the Plaintiffs are

16  entitled.  You should not interpret the fact that I am giving

17  instructions about the Plaintiffs' damages as an indication in

18  any way that I believe the Plaintiffs should, or should not,

19  win this case.  It is your task to decide whether any Defendant

20  is liable.  I am instructing you on damages only so that you

21  will have guidance in the event you decide that any Defendant

22  is liable and that the Plaintiffs are entitled to recover money

23  from any Defendant.

24  If you find that any Defendant is liable to the Plaintiffs,

25  then you must determine an amount that is fair compensation for

1    the Plaintiffs' damages.  These damages are called compensatory

2    damages.  The purpose of compensatory damages is to make

3    ZeniMax and id Software whole -- that is, to compensate them

4    for the damage that they have suffered.

5          You may award compensatory damages only for injuries

6    that ZeniMax and id Software prove were proximately caused by

7    Defendants' allegedly wrongful conduct.  Proximate cause means

8    a cause that was a substantial factor in bringing about an

9    event, and without which cause such event would not have

10   occurred.  In order to be a proximate cause, the act or

11   omission complained of must be such that a person using the

12   degree of care required of him would have foreseen that the

13   event, or some similar event, might reasonably result

14   therefrom.  There may be more than one proximate cause of an

15   event.

16         The damages that you award must be fair compensation

17   for all of ZeniMax and id Software's damages, no more and no

18   less.  You should not award compensatory damages for

19   speculative injuries, but only for those injuries which ZeniMax

20   and id Software have actually suffered or that ZeniMax and id

21   Software are reasonably likely to suffer in the future.

22         If you decide to award compensatory damages, you

23   should be guided by dispassionate common sense.  Computing

24   damages may be difficult, but you must not let that difficulty

25   lead you to engage in arbitrary guesswork.  On the other hand,

1    the law does not require that ZeniMax and id Software prove the

2    amount of their losses with mathematical precision, but only

3    with as much definiteness and accuracy as the circumstances

4    permit.

5            You must use sound discretion in fixing an award of

6    damages, drawing reasonable inferences where you find them

7    appropriate from the facts and circumstances in evidence.

8            You may impose damages on a claim solely upon a

9    Defendant or Defendants that you find are liable on that claim.

10   Although there are multiple Defendants in this case, it does

11   not necessarily follow that if one is liable, all or any of the

12   others are also liable.  Each Defendant is entitled to a fair,

13   separate, and individual consideration of its case without

14   regard to your decision as to the other Defendants.  If you

15   find that only one Defendant is responsible for a particular

16   injury, then you must award damages for that injury only

17   against that Defendant.  If you find that any Defendant is

18   liable to the Plaintiffs, bear in mind that ZeniMax is only

19   entitled to be made whole once, and may not recover more than

20   it has lost.

21           In an action for trade secret misappropriation,

22   Plaintiffs can recover actual damages based on the value of

23   what has been gained by the Defendants by their

24   misappropriation.  The value of what the Defendants have gained

25   as a result of the misappropriation can be measured by a number

1  of methods:

2          1.  One of the ways used to measure this value is the

3  actual profits resulting from the use or disclosure of the

4  trade secrets;

5          2.  Damages may also be measured by the amount that a

6  reasonably prudent investor would have paid for the trade

7  secrets at the time the trade secrets were misappropriated;

8          3.  Damages may also be measured by the costs saved by

9  the Defendants; and

10          4.  Damages may be measured by a reasonable royalty,

11  which would be an amount of money that would have been agreed

12  to, at the time the trade secrets were misappropriated, in a

13  hypothetical arm's-length negotiation between a willing

14  licensor and a willing licensee for the trade secrets.  In

15  determining the amount of a reasonable royalty, you may

16  consider evidence of any of the following factors:

17          (1) the resulting and foreseeable changes in the

18  parties' competitive posture;

19          (2) prices past purchasers or licensees may have paid;

20          (3) the total value of the secret to ZeniMax and id

21  Software, including Zenimax and id Software's development cost

22  and the importance of the secret to Zenimax and id Software's

23  business;

24          (4) the nature and extent of the use Defendants

25  intended for the trade secrets; and

1          (5) whatever other unique factors that might have been

2     affected by the parties' agreement.

3          Plaintiffs also contend that the Defendants were

4     unjustly enriched in connection with their act of

5     misappropriation.  Unjust enrichment is an equitable principle

6     holding that one who unjustly receives benefits should make

7     restitution for those benefits, and is typically found where

8     one person has obtained a benefit from another by fraud,

9     duress, or taking of an undue advantage or has passively

10    accepted benefits that it would be unjust for that person to

11    retain.

12         If you find the Defendants were unjustly enriched by

13    their act of misappropriation and should make restitution for

14    any property or benefits they may have received, you should

15    award that amount of money against Defendants and in favor of

16    Plaintiffs.

17         4.   Common Law Misappropriation of Trade Secrets:

18    Jury Questions.

19    QUESTION 1:

20         Did ZeniMax prove, by a preponderance of the

21    evidence, that any Defendant misappropriated the trade secrets

22    claimed by ZeniMax and id Software?

23         Answer "Yes" or "No" for each Defendant.

24         Then their names are listed and a blank.

25         Oculus: _____

1          Facebook: _____

2          Palmer Luckey: _____

3          Brendan Iribe: _____

4          John Carmack: _____

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   QUESTION 2:

 2         If you answered "yes" to Question 1 for Brendan Iribe

 3   or John Carmack, answer this question for each of these

 4   Defendants that you answered "yes" in Question 1.  Otherwise,

 5   do not answer this question and skip to Question 3.

 6         Do you find that the statute of limitations bars

 7   ZeniMax and id Software's claim for trade secret

 8   misappropriation against John Carmack and/or Brendan Iribe?

 9   Answer "yes" or "no" for each Defendant.

10         Brendan Iribe and John Carmack.

11         Blanks for where you put the answer "yes" or "no."

12   QUESTION 3:

13         If you answered "yes" for Question 1 for John

14   Carmack, answer this question.  Otherwise, do not answer this

15   question and skip to Question 4.

16         Do you find that the doctrine of estoppel by contract

17   bars ZeniMax and id Software's claim for trade secret

18   misappropriation against John Carmack?

19         Answer "yes" or "no."

20         John Carmack and a blank for you to put "yes" or

21   "no."

22   QUESTION 4:

23         If you answered "yes" to any part of Question 1 for

24   any Defendant, answer this question for each of the Defendants

25   that you answered "yes" in Question 1.  Otherwise, do not
```

1   answer this question and skip to Question 7.

2          Do you find that doctrine of laches bars ZeniMax and

3   id Software's claim for trade secret misappropriation?

4          Answer "yes" or "no" for each Defendant.

5          Oculus, _____, "yes" or "no."

6          Facebook, _____, "yes" or "no."

7          Palmer, _____, "yes" or "no."

8          Brendan Iribe, _____, "yes" or "no."

9          John Carmack, _____, "yes" or "no."

10  QUESTION 5:

11          Answer this question if you answered "yes" in

12  Question 1 for any Defendant and "no" in Question 2,

13  Question 3, and Question 4 for that Defendant.  Otherwise, do

14  not answer this question and skip to Question 7.

15          What amount of damages, if any, did ZeniMax and id

16  Software prove were proximately caused by Defendants'

17  misappropriation?

18          Answer in dollar and cents, if any.

19          And then there is a blank for any damages you find.

20  QUESTION 6:

21          Answer this question if you assessed damages in

22  Question 5.  Otherwise do not answer this question and skip to

23  Question 7.

24          For each person you found caused or contributed to

25  cause the damages to Plaintiffs, find the percentage of

1   responsibility attributable to each.  Assign percentages of

2   responsibility only to those Defendants you found caused or

3   contributed to cause the damages for misappropriation of trade

4   secret.  The percentages you find must total 100 percent.  The

5   percentages must be expressed in whole numbers.  The percentage

6   of responsibility attributable to any one is not necessarily

7   measured by the number of act or omissions found.

8           Oculus, _____, and percentage.

9           Facebook, _____, percentage, if any.

10          Palmer Luckey, _____, percentage, if any.

11          Brendan Iribe, _____, percentage, if any.

12          John Carmack, _____, percentage, if any.

13          And the total would have to be 100 percent, if you

14   find any.

15   B.  Copyright Infringement:  Liability

16          The Plaintiffs have also asserted claims of copyright

17   infringement against the Defendants.  Plaintiffs' claims of

18   copyright infringement are based on their allegation that

19   Defendants copied some of Plaintiffs' computer code.

20   Plaintiffs do not assert a copyright infringement claim based

21   on any other type of copyright work or any use of copyrighted

22   works by Defendants in promotional materials, such as the

23   Oculus Kickstarter.

24          Copyright is the name for the protection that the law

25   extends to an author of original work against the unauthorized

1    appropriation of that work by others.  "Author" is a term we

2    use in copyright law for the creator of an original work.

3            This case involves computer programs.  A "computer

4    program" is a set of statements or instructions to be used

5    directly or indirectly in a computer in order to bring about a

6    certain result.  A computer program can be a copyrightable

7    work.  ZeniMax and id Software own a copyright in a particular

8    computer program if they created the work, or received the

9    copyright from someone else who owned it.

10           In no case does copyright protection for an original

11   work of authorship extend to any idea, procedure, process,

12   system, method of operation, concept, principle, or discovery,

13   regardless of the form in which it was described, explained,

14   illustrated, or embodied in such work.

15           Accordingly, you must filter out all of those

16   elements of computer program which unprotectable.  Filtration

17   should eliminate from the comparison the unprotectable elements

18   of ideas, processes, facts, public domain information, merger

19   material, scenes a faire material, and other unprotectable

20   elements suggested by the particular facts of the computer

21   program under examination.

22           Under the merger doctrine, copyright protection is

23   denied to expression that is inseparable from or merged with

24   the ideas, processes, or discoveries underlying the expression.

25           Under the scenes a faire doctrine, a protection is

1    denied to those expressions that are standard, stock, or common

2    to a particular topic or that necessarily follow from a common

3    theme or setting.  Furthermore, where a particular expression

4    is common to the treatment of a particular idea, process, or

5    discovery, it is lacking in the originality that is necessary

6    for copyright protection.

7            Copyright protection automatically exists in a work

8    the moment it is fixed in any tangible medium of expression.

9    The owner of the copyright may register the copyright by

10   delivering to the copyright office of the Library of Congress a

11   copy of the proprietary work after examination and determine

12   that the material deposited constitutes copyrightable subject

13   matter and that legal and formal requirements are satisfied,

14   the register of copyrights registers the work and issues a

15   certificate of registration to the copyright owner.

16           The evidence in this case includes certificates of

17   the copyright registration for ZeniMax and id Software's

18   computer software from the copyright office.  If you find with

19   respect to a particular certificate that the certificate was

20   issued within the five years after first publication of ZeniMax

21   and id Software's software program referenced in that

22   certificate, you are instructed that certificate is itself

23   evidence of the facts stated in the certificate.

24           To succeed on their claim, ZeniMax and id Software

25   must prove the following things:

1  (1)  The computer program in question is the subject of a valid

2  copyright;

3  (2)  ZeniMax and id Software own the copyright; and

4  (3) Defendants copied protected expression contained in ZeniMax

5  and id Software's copyrighted work.

6          Plaintiffs' certificates of registration of

7  Plaintiffs's copyrights are what is called prima facie evidence

8  of the element of ownership.  In other words, if there is no

9  evidence against ZeniMax and id Software as to that element,

10  the registration certificate alone is sufficient to establish

11  ownership.

12          To be eligible for copyright protection, a work must

13  be original and in a form that can be seen, heard, reproduced,

14  or communicated, either directly or with the aid of a machine

15  or device.  A work is original if it was created independently,

16  as opposed to being copied from another work.  It must contain

17  at least some minimal degree of creativity.  The work need not

18  be completely new.  A work can be original even if it

19  incorporates elements that are not original to the author.

20  However, only the original elements added by the author are

21  protected by copyright.

22          Plaintiffs' certificates of registration of

23  Plaintiffs' copyrights are what is called prima facie evidence

24  that ZeniMax and id Software's copyrights are valid.

25  Relatedly, those registrations are prima facie evidence that

1    those registered works are original.  In other words, if there

2    is no evidence against ZeniMax and id Software as to the

3    originality of the registered works, the registration

4    certificates alone are sufficient to establish originality.

5         Copyright protection extends not only to the literal

6    elements of a computer program, for example, its source code,

7    but also to its nonliteral elements, such as the program

8    architecture, structure, sequence and organization, operation

9    modules and computer-user interface.

10        To determine if Defendants infringed any of ZeniMax

11   and id's Software copyrights, you must consider two separate

12   questions.  The first is whether the Defendants actually copied

13   from any of ZeniMax and id's Software's copyrighted computer

14   programs.  This is known as factual copying and may be proved

15   by the direct evidence of copying or by circumstantial

16   evidence.

17        Circumstantial evidence may support an inference of

18   copying if ZeniMax and id Software proves that Defendants had

19   access to any of ZeniMax and id Software's copyrighted computer

20   programs when Defendants created their own programs and that

21   the two works are so similar that a reasonable person would

22   conclude that the similarities could only be due to copying.

23        Such an inference of copying may be rebutted, i.e.

24   countered, by evidence that the accused work was created

25   independently.  If Defendants offer evidence of independent

1   creation, ZeniMax and id Software have the burden of proving

2   that Defendants in fact copied protected material from ZeniMax

3   and id Software.

4         If you find that actual copying occurred, however,

5   that does not by itself show copyright infringement.  ZeniMax

6   and id Software also must prove that the work they claim is an

7   infringement is "substantially similar" to its copyrighted

8   work.  To do this, ZeniMax and id Software must prove that the

9   copying of protected material was so extensive that it renders

10  the accused work and the copyrighted work substantially

11  similar.  A quantitatively small amount of copied material may

12  justify a finding of substantial similarity, or may be so small

13  as to not justify a finding of substantial similarity.  To make

14  this determination, you must make a side-by-side comparison

15  between the two works, including literal and nonliteral

16  elements, and determine whether you find them, on the whole, to

17  be substantially similar.

18        Establishing substantial similarity for non-literal

19  elements of a computer program is a three-part analysis that

20  involves:

21  (1)    breaking down ZeniMax and id Software's computer

22  program into its constituent parts;

23  (2)    examining each of the constituent parts for such things

24  as incorporated ideas, expression that is necessarily

25  incidental to those ideas, and elements that are taken from the

1  public domain, to sift out all non-protectable material; and

2  (3)    comparing this material with the Defendants' program to

3  determine whether the protectable elements of the programs are

4  substantially similar as to warrant a finding of infringement.

5        This is known as the "abstraction-filtration-

6  comparison" test, which I will explain in more detail in a

7  moment.

8        In making this determination, you must remember that

9  not all similarities give rise to copyright infringement.

10  Copyright protection does not extend to any of the ideas,

11  procedures, methods of operation, concepts, or principles

12  embodied in a work, but only to the particular form in which

13  those ideas, procedures, etc., are expressed.  Thus, while the

14  original expression of an idea may be protected, the idea

15  itself is not.  Anyone is free to copy the idea, so long as

16  they do not copy the author's original way of expressing that

17  idea, but develop their own form of expression.

18        Likewise, similarities that serve a functional

19  purpose or that are due to external factors do not give rise to

20  a claim of infringement.  In the area of computer programs,

21  these external factors include hardware standards and

22  mechanical specifications, software standards and compatibility

23  requirements, computer manufacturer design standards, target

24  industry practices and demands, and computer industry

25  programming practices.  Thus, for example, similarities

 1    resulting from the fact that two works perform the same

 2    function, or that are dictated by industry requirements or

 3    programming standards, will not support a claim of copyright

 4    infringement.

 5            The term used for describing the operations of a

 6    computer at higher and higher levels is "abstraction."  For a

 7    computer program, there are generally six levels of

 8    abstraction.

 9            (1) the main purpose; (2) the program structure or

10    architecture; (3) modules; (4) algorithms and data structures;

11    (5) source code; and (6) object code.

12            At the level of object code, there is no abstraction,

13    because the object code controls each smallest step of the

14    computer.  As we go to higher levels we abstract from, that is,

15    leave out more and more detail of the procedures that the

16    program performs, until we reach the highest level of

17    abstraction, at which we simply describe the ultimate purpose

18    of the program, such as calculating the Dow Jones average, or

19    for a word-processing program, creating a document.

20            Abstraction is the first part of the three-part test

21    for infringement.  When we are determining whether a computer

22    program has been infringed, we have to take into account the

23    fact that, just as a program can be described at various

24    levels, it can be copied at various levels.  If someone wants

25    to copy another's program, he might simply copy the program's

1    object code or source code.  But he might also, without copying

2    the literal object code or source code itself, copy the

3    substance of each instruction that the code gives the computer,

4    perhaps paraphrasing the source code (just as one might

5    paraphrase a standard literary work), or perhaps using a

6    different programming language.  Or he might copy the program

7    at higher levels of abstraction by, for example, copying the

8    way in which the low-level procedures prescribed by the program

9    are organized and work together so as to carry out higher-level

10   procedures.  Since a typical commercial computer program

11   contains thousands of procedures, which are written and

12   organized so as to operate in certain sequences and

13   combinations, there are many ways in which parts of a program

14   can be copied so that another programmer does not have to

15   create his work anew.  Just as someone may infringe the

16   copyright in a short story if he copies the story but

17   paraphrases each paragraph, someone may infringe the copyright

18   in a computer program by copying at some level of abstraction,

19   the procedures that it causes the computer to carry out, or the

20   sequence or organization of those procedures.

21           The abstraction-filtration-comparison test is

22   necessary in order to detect infringement at levels of

23   abstraction above that of object code or source code.  In the

24   abstraction part of the test, we can describe a computer

25   program at various levels of abstraction, from the levels of

 1    object code all the way up to the program's ultimate purpose.

 2    However, in this case it is necessary for you to consider the

 3    program only at levels of abstraction at which Plaintiffs have

 4    claimed there is infringement.

 5           The second part of the three-part test is filtration.

 6    Computer programs, like standard literary works, contain

 7    unprotected as well as protected matter, and it is only the

 8    copying of protected matter that counts toward infringement.

 9    Therefore, at each level of abstraction that you consider, it

10    is necessary to "filter out" unprotected matter.  As in the

11    case of standard literary works, ideas are unprotectable

12    matter.  However, computer programs can also contain other

13    types of unprotected matter.  Just as we want to leave ideas

14    unprotected by copyright so that they are available for use by

15    others, we do not want copyright protection to extend to a

16    computer program's functionality.  The purpose of a computer

17    program is its function.  For example the function of a word

18    processor program is to create documents.  Although a

19    programmer may have written a program that adequately performs

20    a certain function, we want other programmers to be able to

21    write other programs that perform the same function.  The

22    functions performed by a program are therefore unprotectable

23    matter.

24           In addition, at a certain level of abstraction, the

25    procedures that a program uses to carry out its functions are

1    also unprotected.  Just as copyright protection does not extend

2    to the idea or function of creating a document, it does not

3    extend to the procedure of putting letters onto the computer

4    monitor or to the other procedures that it is necessary for a

5    word processor to perform.

6              Therefore, at a certain level of abstraction, similar

7    to the level of ideas, another person can copy the procedures

8    that a program causes a computer to carry out because they are

9    unprotected matter.  Standard procedures, methods, and

10   programming techniques that programmers regularly use are not

11   protected by copyright.

12             There are also other aspects of a computer program

13   that are not protected by copyright.  Each computer must have

14   an operating system program, which controls its basic

15   operations such as the computer's use of its memory, accepting

16   input, creating files, or producing output to a monitor.

17   Application programs, such as word processing or spreadsheet

18   programs, are designed to run on particular operating systems.

19   Those aspects of an application program that are necessary in

20   order for it to be able to run on a certain operating system,

21   or are necessary for it to be able to operate with other

22   programs are unprotected matter.  There are also

23   characteristics that a program may not be required to have in

24   order to run at all, but which it must have if it is to operate

25   reasonably efficiently.  Those characteristics are also

1  unprotected matter.  In general, acts of a program that are

2  reasonably required in order for the program to accomplish the

3  functions for which it was designed, or that are reasonably

4  required by external factors such as hardware or other

5  software, or for reasonably efficient operation, are not

6  protected by copyright.

7       However, where there are reasonable alternatives to

8  elements of a program that do not involve a significant loss of

9  functionality or efficiency, you may find such elements to be

10  protected matter.

11       The third part of the abstraction-filtration-

12  comparison test is comparison.  Here, at each level of

13  abstraction that you are considering, you must compare the

14  protected matter in the Plaintiffs' programs the parts that

15  have not been filtered out with the code used by the

16  Defendants.  When you make that comparison, you should take

17  into account any relevant expert testimony presented by the

18  Plaintiffs or Defendants.

19       You must decide whether, taking into account copying

20  at all levels of abstraction, the Plaintiffs have proven by a

21  preponderance of the evidence that Defendants copied

22  substantial protected matter.

23       A copyright may also be infringed by vicariously

24  infringing.  A person is liable for copyright infringement by

25  another if the person has a financial interest and the right

 1   and ability to supervise the infringing activity, whether or

 2   not the person knew of the infringement.

 3        In order to prove vicarious copyright infringement,

 4   Plaintiffs have the burden of proving by a preponderance of the

 5   evidence that:

 6   1. One of the Defendants infringed Plaintiffs' copyrights, as

 7   defined in the instructions I have already given you;

 8   2. Another Defendant profited from that initial infringement;

 9   and

10   3. That other Defendant had the right and ability to stop or

11   limit the initial infringement but failed to do so.

12        A copyright may also be infringed by contributory

13   infringement.  With certain exceptions, a person is liable for

14   copyright infringement by another if the person knows or should

15   have known of the infringing activity and induces, causes, or

16   materially contributes to the activity.

17        In order to prove contributory copyright

18   infringement, Plaintiffs have the burden of proving by a

19   preponderance of the evidence that:

20   1. One of the Defendants infringed Plaintiffs' copyrights, as

21   defined in the instructions I have already given you; and

22   2. Another Defendant knew or should have known of that initial

23   infringement; and

24   3. That other Defendant induced, caused, or materially

25   contributed to the initial infringement.

1            (Pause)

2            THE COURT:  Okay.  I'm going to change under 3 on

3    page 32, the first 3 and the second 3 from "other" to "another"

4    unless y'all object.  Any -- is that okay?  Instead of saying

5    that "other Defendant," should be "another," I think.

6            (Pause)

7            THE COURT:  Oh wait.  It's on page 31.  Mine is off.

8            THE CLERK:  I apologize.

9            THE COURT:  Okay.  So let me see where we are.  Yeah,

10   y'all are flipping different than I was.  Okay.

11           See where it says "other Defendant" on the bottom of

12   page 30 and "other" on page 31?  I'm going to change that to

13   "another."

14           Any objection?

15           MR. STOJILKOVIC:  Your Honor, I believe the "other"

16   in paragraph 3 refers to the other Defendant in paragraph 2 and

17   that's why it says that.

18           THE COURT:  You think "other" is right?

19           MR. STOJILKOVIC:  Yep.

20           MR. HEMR:  I agree.

21           THE COURT:  Y'all want me to leave "other"?

22           MR. HEMR:  I agree, Your Honor.

23           THE COURT:  Well, I will leave "other."

24           We will fight about the grammar later.

25           Oh, "that other Defendant."  Okay.  You're right.  I

1   kind of had it -- think of it differently.

2          Okay.

3          "That other -- that other Defendant induced, caused,

4   or materially contributed to the initial infringement."

5          I hate to admit y'all were right.

6          2.  Copyright infringement:  Defenses

7          And this is page 31 on y'all's and how I got off, I

8   don't know.

9          Defendants claim that they are not liable for

10   copyright infringement because they hold a license to use the

11   Plaintiffs' copyrighted works.  A license is essentially a

12   promise by the licensor not to sue the licensee.  A license

13   authorizing the use of copyrighted material can be express or

14   implied.  An express license could take the form of a written

15   or oral agreement.  An implied license is one which may be

16   inferred from the circumstances surrounding the use of the

17   copyrighted material and the behavior of the licensor regarding

18   use of the copyrighted material, including for example,

19   knowledge of the use and lack of any objection to use.  In

20   considering whether an implied license existed, you may

21   consider what the parties said and did in light of the

22   surrounding circumstances, including any earlier course of

23   dealing.  If you find by a preponderance of the evidence that

24   Defendants had an express or implied license to use the

25   Plaintiffs' copyrighted material, your verdict must be for

 1  Defendants.

 2          Defendants also contend that they are not liable for

 3  copyright infringement because any use they made of the

 4  Plaintiffs' copyrighted work was de minimis.  For an

 5  unauthorized use of a copyrighted work to be actionable, the

 6  use must be significant enough to constitute infringement.

 7  This means that even where the fact of copying is conceded, no

 8  legal consequences will follow from that fact unless the

 9  copying is substantial.

10          A use is considered de minimis if it is so meager and

11  fragmentary that the average audience would not recognize the

12  appropriation.  Copying might also be considered de minimus

13  when the use of the work is so fleeting or trivial that it is a

14  trifle with which the law should not be concerned.  Sometimes

15  even copying the entire work or much of the work can be de

16  minimus under this definition.

17          Defendants must prove by a preponderance of the

18  evidence that any protected material that they might have

19  copied was de minimus.

20          Defendants John Carmack and Brendan Iribe assert as a

21  defense that the statute of limitations bars ZeniMax and id

22  Software's copyright infringement claim.  As we have discussed,

23  a statute of limitations is a law that provides that a suit is

24  barred if Plaintiffs do not bring it within a prescribed period

25  of time.  The time period within which the copyright

 1    infringement suit must be brought begins when ZeniMax and

 2    id Software first knew, or by the exercise of reasonable care

 3    should have known, of the facts that form the basis of their

 4    copyright infringement claim.  The applicable statute of

 5    limitations period for a claim of copyright infringement is

 6    three years.  For these purposes you can consider that this

 7    suit against Defendants Mr. Carmack and Mr. Iribe was filed on

 8    March 31, 2016.

 9            For copyright infringement, each act gives rise to a

10    discrete claim with its own statute of limitations period.  So,

11    when a person has engaged in a series of discrete infringing

12    acts, the copyright holder's suit may be timely with respect to

13    more recent acts of infringement, but untimely with respect to

14    prior acts of the same or similar kind.

15            Defendants Mr. Carmack and Mr. Iribe have the burden

16    of proving the statute of limitations defense by a

17    preponderance of the evidence.

18            Defendants also assert that the defense of laches

19    bars Plaintiffs' claim of copyright infringement.  Laches is an

20    equitable defense with three elements: (1) delay in asserting a

21    right or claim; (2) the delay was not executable; and (3) there

22    was undue prejudice to the party against whom the claim is

23    asserted.

24            Two kinds of prejudice may support a defense of

25    laches: (1) the delay has resulted in the loss of evidence; or

1    (2) the defendant has changed his position in a way that would

2    not have occurred if the plaintiff had not delayed.  Defendants

3    have the burden of proving the laches defense by a

4    preponderance of the evidence.

5          A party asserting the defense of laches must have

6    "clean hands":  That is, the party must have acted fairly and

7    without fraud or deceit as to the controversy in issue.  If you

8    find that a Defendant has unclean hands, then you should not

9    find that Defendant has established the defense of laches.

10         3.  Copyright Infringement:  Damages

11         If you find that the Plaintiffs have proved their

12   claim against any Defendant by a preponderance of the evidence,

13   you must determine the damages to which the Plaintiffs are

14   entitled.  You should not interpret the fact that I am giving

15   instructions about the Plaintiffs' damages as an indication in

16   any way that I believe the Plaintiffs should, or should not,

17   win this case.  It is your task to decide whether any Defendant

18   is liable.  I am instructing you on damages only so that you

19   will have guidance in the event you decide that any Defendant

20   is liable and that the Plaintiffs are entitled to recover money

21   from any Defendant.

22         ZeniMax and id Software must prove damages by a

23   preponderance of the evidence.  ZeniMax and id Software may

24   recover for any actual losses they suffered because of the

25   infringement, plus any profits that Defendants made from the

1    infringement to the extent not taken into account in

2    Plaintiffs' losses.  I will define these terms in the following

3    instructions.

4         Examples of actual losses from copyright infringement

5    can include the profits that ZeniMax and id Software prove they

6    would have made without the infringement.  Profits are the

7    revenue ZeniMax and id Software would have made on sales they

8    would have made without the infringement, less any additional

9    expenses ZeniMax and id Software would have incurred in making

10   the sales.

11        Actual losses can also be measured by determining a

12   "reasonable royalty."  With respect to their copyright

13   infringement claim, a "reasonable royalty" would measure the

14   royalty that would have resulted from a hypothetical arm's

15   length negotiation between a willing buyer and ZeniMax and

16   id Software to obtain a license to copy and use ZeniMax and id

17   Software's copyrighted works.

18        Determining a reasonable royalty from a hypothetical

19   license price requires an objective, not a subjective, analysis

20   of the fair market value of the license, and excessively

21   speculative claims must be rejected.  An objective

22   non-speculative license price could be established through

23   objective evidence of Benchmark transactions.

24        In addition to recovering for its actual losses, if

25   any, ZeniMax and id Software are entitled to recover the

1   profits that Defendants made because of the infringement.

2   Defendants' profits are recoverable, however, only to the

3   extent that you have not taken them into account in determining

4   ZeniMax and id Software's actual losses.

5           Defendants' profits are revenues that Defendants made

6   because of the infringement minus their expenses in developing,

7   producing, distributing, marketing, and selling their computer

8   programs.

9           ZeniMax and id Software need only prove Defendants'

10  revenues.  Defendants must prove their own expenses and any

11  portion of their profits that resulted from factors other than

12  infringement of ZeniMax and id Software's copyrights.

13          4.  Copyright Infringement:  Jury Questions

14  QUESTION 7:

15          Did any of the following Defendants directly infringe

16  upon any of ZeniMax or id Software's copyrights?

17          Answer "Yes" or "No" for each Defendant:

18          Oculus: _____

19          Facebook: _____

20          Palmer Luckey: _____

21          John Carmack: _____

22          Put yes or no beside each, whatever you find.

23  QUESTION 8:

24          Did any of the following Defendants vicariously

25  infringe upon any of ZeniMax or id Software's copyrights?

```
 1     Answer "Yes" or "No" for each Defendant:
 2             Oculus: _____
 3             Facebook: _____
 4             Palmer Luckey: _____
 5             Brendan Iribe: _____
 6             John Carmack: _____
 7             Yes or no for each of those and there are blanks
 8     there.
 9     QUESTION 9:
10             Did any of the following Defendants contributorily
11     infringe upon any of ZeniMax or id Software's copyrights?
12     Answer "Yes" or "No" for each Defendant:
13             Oculus: _____
14             Facebook: _____
15             Palmer Luckey: _____
16             Brendan Iribe: _____
17             John Carmack: _____
18             Yes or no beside each name, whatever the appropriate
19     answer.
20     QUESTION 10:
21             If you answered "Yes" to Question 7, 8, or 9 for
22     Brendan Iribe and/or John Carmack, answer this question for
23     each of these Defendants that you answered "Yes" in Question 7,
24     8, or 9.  Otherwise, do not answer this question and skip to
25     Question 12.
```

 1          Do you find that of all ZeniMax and id Software's

 2   claims for copyright infringement against John Carmack and/or

 3   Brendan Iribe are barred by the statute of limitations?

 4          Answer "Yes" or "No" for each Defendant:

 5          Brendan Iribe:  Yes or no.

 6          John Carmack:  Yes or no.

 7   QUESTION 11:

 8          If you answered "No" to Question 10 for Brendan Iribe

 9   and/or John Carmack, answer this question for each of these

10   Defendants that you answered "No" in Question 10.  Otherwise,

11   do not answer this question and skip to Question 12.

12          Do you find that of a portion of ZeniMax and id

13   Software's claims for copyright infringement against John

14   Carmack and/or Brendan Iribe is barred by the statute of

15   limitations?

16          Answer "Yes" or "No" for each Defendant:

17          Brendan Iribe: _____

18          John Carmack: _____

19   QUESTION 12:

20          If you answered "Yes" to any part of Questions 7, 8,

21   or 9 then answer this question for each Defendant that you

22   answered "Yes" in Question 7, 8, or 9.  Otherwise, do not

23   answer this question and skip to Question 15.

24          Do you find that the doctrine of laches bars ZeniMax

25   and id Software's claim for copyright infringement?

1      Answer "Yes" or "No" for each Defendant:

2      Oculus: _____

3      Facebook: _____

4      Palmer Luckey: _____

5      Brendan Iribe: _____

6      John Carmack: _____

7      Answer yes or no beside each, whichever is the right

8    answer.

9    QUESTION 13:

10     If you answered "Yes" to any part of Questions 7, 8,

11   or 9 then answer this question for each Defendant that you

12   answered "Yes" in Question 7, 8, or 9.  Otherwise, do not

13   answer this question and skip to Question 15.

14     Do you find that either of the defenses of license or

15   de minimis use bars ZeniMax's claim for copyright infringement.

16     Answer "Yes" or "No" for each Defendant:

17     Oculus: _____

18     Facebook: _____

19     Palmer Luckey: _____

20     Brendan Iribe: _____

21     John Carmack: _____

22     Yes or no beside each appropriately.

23   QUESTION 14:

24     Only answer this question for each Defendant that you

25   answered "Yes" in Questions 7, 8, or 9 and also answered "No"

1  in Questions 10, 12, or 13.  For Brendan Iribe and John

2  Carmack, if you answered "Yes" to Question 11 for these

3  Defendants, only include actual damages and/or profits, if any,

4  that are based on the portion of ZeniMax and id Software's

5  copyright infringement claims that are not barred by the

6  statute of limitations.

7         1.  What amount of actual damages, if any, did

8  ZeniMax and id Software suffer as a result of the infringement

9  by each of the Defendants that you found in response to

10  Questions 7, 8, or 9?

11         Answer in dollars and cents, if any, in those

12  appropriate lines.

13         2.  What amount of profits, if any, do you find that

14  Defendants earned as a result of that infringement that was not

15  taken into account in computing any of ZeniMax and id

16  Software's actual damages?

17         Answer in dollar and cents, if any.

18         Oculus: $ _____

19         Facebook: $ _____

20         Palmer Luckey: $ _____

21         Brendan Iribe: $ _____

22         John Carmack: $ _____

23  C. ZeniMax and id Software's Breach of Contract Claim

24    1.  Breach of Contract:  Liability

25         ZeniMax and id Software also allege that they had a

1   contract - the Nondisclosure Agreement - with Defendants Palmer

2   Luckey and Oculus.

3        To succeed on their breach of contract claim, ZeniMax

4   and id Software must prove the following things by a

5   preponderance of the evidence:

6        1.  The existence of a valid, enforceable contract

7   between Plaintiffs and Defendant Mr. Luckey and/or Oculus;

8        2.  Plaintiffs performed their obligations under that

9   contract;

10       3.  Defendant Mr. Luckey and/or Oculus breached that

11   contract; and

12       4.  Plaintiffs sustained damages as a result of that

13   breach.

14       ZeniMax and id Software must first prove by a

15   preponderance of the evidence that such a contract existed and

16   who are the parties to the contract.  In deciding whether the

17   parties reach an agreement, you may consider what they said and

18   did in light of the surrounding circumstances, including any

19   earlier course of dealing.  You may not consider the parties'

20   unexpressed thoughts or intentions.

21       You must also consider who is a party to the

22   contract, if any.  In particular, Oculus disputes that it is a

23   party to the Nondisclosure Agreement.  There are a number of

24   ways by which you might find that Oculus is a party to that

25   agreement:

```
 1            1.  Oculus will be bound to the Nondisclosure

 2    Agreement if you find that Oculus is a "mere continuation" of

 3    Luckey's prior business.  A business that takes over assets

 4    from a prior business, whether that prior business be a

 5    corporation or sole proprietor, may succeed to the prior

 6    business's rights and obligations when the new business is a

 7    mere continuation of the prior business.  In determining

 8    whether Oculus is a mere continuation of Palmer Luckey's

 9    business you may consider two factors.  First, if Palmer Luckey

10    was fully paid for the assets of his prior business, that would

11    tend to show that the new business was not a mere continuation.

12    If, however, you find that Mr. Luckey was not fully paid for

13    the assets of his prior business that would tend to show that

14    Oculus was a mere continuation.  Second, if you find that one

15    or more persons were officers, directors, or key employees of

16    both Mr. Luckey's prior business and Oculus, that would also

17    tend to show that the new business was a mere continuation.

18            1.  Oculus will be bound to the Nondisclosure

19    Agreement if you find that Oculus is a "mere continuation" of

20    Luckey's prior business.  A business that takes over assets

21    from a prior business, whether that prior business be a

22    corporation or sole proprietor, may succeed to the prior

23    business's rights and obligations when the new business is a

24    mere continuation of the prior business.  In determining

25    whether Oculus is a mere continuation of Palmer Luckey's
```

1   business you may consider two factors.  First, if Palmer Luckey

2   was fully paid for the assets of his prior business, that would

3   tend to show that the new business was not a mere continuation.

4   If, however, you find that Mr. Luckey was not fully paid for

5   the assets of his prior business that would tend to show that

6   Oculus was a mere continuation.  Second, if you find that one

7   or more persons were officers, directors, or key employees of

8   both Mr. Luckey's prior business and Oculus, that would also

9   tend to show that the new business was a mere continuation.

10          2.  Oculus will be bound to the Nondisclosure

11  Agreement if you find that Oculus manifested acceptance of the

12  Nondisclosure Agreement through its conduct.  By this we ask:

13  Was there an implied agreement between Oculus and Plaintiffs

14  that Oculus would be bound to the Nondisclosure Agreement?  An

15  implied agreement is one whose existence and terms are shown by

16  conduct rather than by words.  Such an agreement may arise from

17  the parties' conduct and course of dealing if it demonstrates

18  that their minds met on the terms of the agreement.  A contract

19  implied from the facts and circumstances in evidence is as

20  binding as would be an expressed one.  Accordingly, in deciding

21  whether the parties reached an agreement through their conduct,

22  you may consider their conduct in light of the surrounding

23  circumstances, including any course of dealing.  You may not

24  consider the parties' unexpressed thoughts or intentions.

25          3.  Oculus will be bound to the Nondisclosure

1    Agreement if you find that Mr. Luckey assigned his obligations

2    under that agreement under a theory of quasi-estoppel.  This

3    principle prevents a party from asserting, to another's

4    disadvantage, a right inconsistent with a position previously

5    taken by that party.  The doctrine applies where it would be

6    unconscionable to allow a party to maintain a position

7    inconsistent with one in which they acquiesced, or of which

8    they previously accepted a benefit.

9         ZeniMax and id Software must lastly prove by a

10   preponderance of the evidence that Luckey and/or Oculus

11   breached the Nondisclosure Agreement and that Plaintiffs

12   suffered damages as a result.

13        2.  Breach of Contract:  Defenses

14        Defendants assert that if they failed to comply with

15   the contract then this failure is excused.  Failure to comply

16   with a term in an agreement is excused if the parties agreed,

17   verbally or through their course of performance, that a new or

18   different term would take its place.  In making this

19   determination, you may consider whether the contract involved

20   repeated occasions for performance of the term by one party and

21   whether the other party, with knowledge of the nature of the

22   party's performance, accepted or otherwise acquiesced in the

23   performance by the party.  You may also consider whether the

24   parties had a common basis of understanding for interpreting

25   their expressions and other conduct.

1          Defendants Mr. Luckey and Oculus also contend that

2    they are not liable for breach of contract because of the

3    doctrine of laches, which we have already discussed.  Laches is

4    an equitable defense with three elements: (1) delay in

5    asserting a right or claim; (2) the delay was not excusable;

6    and (3) there was undue prejudice to the party against whom the

7    claim is asserted.

8          Two kinds of prejudice may support a defense of

9    laches: (1) the delay has resulted in the loss of evidence; or

10   (2) the defendant has changed his position in a way that would

11   not have occurred if the plaintiff had not delayed.  Defendants

12   have the burden of proving the laches defense by a

13   preponderance of the evidence.

14         A party asserting the defense of laches must have

15   "clean hands":  That is, the party must have acted fairly and

16   without fraud or deceit as to the controversy in issue.  If you

17   find that a Defendant has unclean hands, then you should not

18   find that Defendant has established the defense of laches.

19         Defendants Mr. Luckey and Oculus also assert as a

20   defense that they were excused from technical compliance with

21   the Nondisclosure Agreement because Zencia waived its rights

22   under the Nondisclosure Agreement.

23         Waiver is an intentional surrender of a known right

24   or intentional conduct inconsistent with claiming the right.

25   If you find by a preponderance of the evidence that ZeniMax

 1   intentionally surrendered its rights under the Nondisclosure

 2   Agreement or intentionally conducted itself in ways that were

 3   inconsistent with claiming the rights that ZeniMax asserts it

 4   held under the Nondisclosure Agreement, then your verdict

 5   should be for Defendants Mr. Luckey and Oculus on this claim.

 6           3.  Breach of Contract:  Damages

 7           Should you find that ZeniMax and id Software have

 8   proven their breach of contract claim, you must compensate them

 9   with a sum of money, if paid now in cash, that would fairly and

10   reasonably compensate Plaintiffs for their damages that were

11   proximately caused by Mr. Luckey's and/or Oculus's breach of

12   any agreement they had with Plaintiffs relating to the

13   Nondisclosure Agreement.

14           You should not interpret the fact that I am giving

15   instructions about damages as an indication in any way that I

16   believe the Plaintiffs should, or should not, prevail on this

17   claim.  It is your task to decide whether Defendants Mr. Luckey

18   and/or Oculus are liable.  I am instructing you on damages only

19   so that you will have guidance in the event you decide that

20   either Defendant is liable and that ZeniMax and id Software are

21   entitled to recover money.

22           If you decide so, the Plaintiffs are entitled to

23   recover their direct damages, which are those damages which

24   naturally and necessarily flow from the breach, if any, and

25   consequential damages, which are those damages that are the

1  natural, probable, and foreseeable consequence of the breach,

2  if any.  If you award any contract damages, those damages

3  should be measured at the time of the breach and not at the

4  time of trial.

5          Damages awarded must be proximately caused by the

6  Defendants' failure to comply with the Nondisclosure Agreement.

7  Proximate cause means a cause that was a substantial factor in

8  bringing about an event, and without which cause such event

9  would not have occurred.  In order to be a proximate cause, the

10  act or omission complained of must be such that a person using

11  the degree of care required of him would have foreseen that the

12  event, or some similar event, might reasonably result

13  therefrom.  There may be more than one proximate cause of an

14  event.

15          4.  Breach of Contract:  Jury Questions

16  QUESTION 15:

17          Did Palmer Luckey fail to comply with the

18  Nondisclosure Agreement?

19          Answer "Yes" or "No." _____

20  QUESTION 16:

21          Only answer this question if you answered "Yes" to

22  Question 15.  Otherwise, do not answer this question and skip

23  to Question 19.

24          Do you find that the doctrine of laches bars ZeniMax

25  and id Software's breach of contract claim against Palmer

1  Luckey?
2          Answer "Yes" or "No": _____
3  QUESTION 17:
4          Only answer this question if you answered "Yes" to
5  Question 15.  Otherwise, do not answer this question and skip
6  to Question 19.
7          Do you find that the doctrine of waiver bars ZeniMax
8  and id Software's breach of contract claim against Palmer
9  Luckey?
10         Answer "Yes" or "No": _____
11 QUESTION 18:
12         Only answer this question if you answered "Yes" to
13 Question 15.  Otherwise, do not answer this question and skip
14 to Question 19.
15         Do you find that Palmer Luckey's failure to comply
16 was excused?
17         Answer "Yes" or "No": _____
18 QUESTION 19:
19         Do you find that Oculus is a party to the document
20 entitled "Nondisclosure Agreement" dated May 24, 2012 because
21 Oculus is a mere continuation of Palmer Luckey?
22         Answer "Yes" or "No." _____
23 QUESTION 20:
24         Do you find that Oculus is a party to the document
25 entitled "Nondisclosure Agreement" dated May 24, 2012 because

1  Oculus manifested its acceptance of that agreement through its

2  conduct?

3          Answer "Yes" or "No." _____

4  QUESTION 21:

5          Do you find that Oculus is a party to the document

6  entitled "Nondisclosure Agreement" dated May 24, 2012 because

7  Palmer Luckey assigned his obligations under that agreement to

8  Oculus under a theory of quasi-estoppel?

9          Answer "Yes" or "No." _____

10  QUESTION 22:

11          Only answer this question if you answered "Yes" to

12  Question 19, 20, or 21.  Otherwise, do not answer this question

13  and skip to Question 26.

14          Did Oculus fail to comply with the Nondisclosure

15  Agreement?

16          Answer "Yes" or "No." _____

17  QUESTION 23:

18          Only answer this question if you answered "Yes" to

19  Question 22.  Otherwise, do not answer this question and skip

20  to Question 26.

21          Do you find that the doctrine of laches bars ZeniMax

22  and id Software's breach of contract claim against Oculus?

23          Answer "Yes" or "No: _____

24  QUESTION 24:

25          Only answer this question if you answered "Yes" to

1   Question 22.  Otherwise, do not answer this question and skip

2   to Question 26.

3           Do you find that the doctrine of waiver bars ZeniMax

4   and id Software's breach of contract claim against Oculus?

5           Answer "Yes" or "No": _____

6   QUESTION 25:

7           Only answer this question if you answered "Yes" to

8   Question 22.  Otherwise, do not answer this question and skip

9   to Question 26.

10          Do you find that Oculus' failure to comply was

11  excused?

12          Answer "Yes" or "No": _____

13  QUESTION 26:

14          Only answer this question if you answered "Yes" to

15  Question 15 and "No" to Question 16, Question 17, and Question

16  18.  Otherwise, do not answer this question and skip to

17  Question 27.

18          What sum of money, if paid now in cash, would fairly

19  and reasonably compensate ZeniMax and id Software for their

20  injuries that resulted from Palmer Luckey's failure to comply

21  with the Nondisclosure Agreement?

22          Do not add any amount for interest on damages, if

23  any.

24          Answer in dollars and cents as to damages, if any,

25  that were sustained by ZeniMax and id Software in the past:

```
 1                  Answer: $ _____
 2                  Answer in dollars and cents as to damages, if any,
 3      that ZeniMax and id Software, in reasonable probability, will
 4      sustain in the future:
 5                  Answer: $ _____
 6      QUESTION 27:
 7                  Only answer this question if you answered "Yes" to
 8      Question 22 and "No" to Question 23, Question 24, and Question
 9      25.  Otherwise, do not answer this question and skip to
10      Question 28.
11                  What sum of money, if paid now in cash, would fairly
12      and reasonably compensate ZeniMax and id Software for their
13      injuries that resulted from Oculus's failure to comply with the
14      agreement?
15                  Do not add any amount for interest on damages, if
16      any.
17                  Answer in dollars and cents as to damages, if any,
18      that were sustained by ZeniMax and id Software in the past:
19                  Answer: $ _____
20                  Answer in dollars and cents as to damages, if any,
21      that ZeniMax and id Software, in reasonable probability, will
22      sustain in the future:
23                  Answer: $ _____.
24      D. Tortious Interference with Contract.
25                  1.  Tortious Interference with Contract:  Liability
```

1          ZeniMax and id Software have made a claim that

2     Facebook has tortiously interfered with its Nondisclosure

3     Agreement with Mr. Luckey and/or Oculus.

4          In order to establish a tortious interference with

5     contract claim, the Plaintiffs must prove by a preponderance of

6     the evidence:

7          1) a contract existed between ZeniMax and id Software

8     on the one hand and Mr. Luckey and/or Oculus on the other that

9     was subject to interference;

10          2) Defendant Facebook willfully and intentionally

11     interfered with the contract;

12          3) the act of interference was a proximate cause of

13     damage to ZeniMax and id Software; and

14          4) ZeniMax and id Software suffered actual damage or

15     loss.

16          Interference is "intentional" if committed with the

17     desire to induce the breach of the contract or with the belief

18     that interference is substantially certain to result.

19     Interference can include conduct that prevents performance of a

20     contract or makes performance of a contract impossible, more

21     burdensome, or more difficult or of less or no value to the one

22     entitled to performance.

23          The Defendant's intentional making of a contract with

24     a party and proceeding to carry out such contract, knowing that

25     the party's performance of its contract with the Defendant

 1   would be contrary to and in violation of the party's contract

 2   with the Plaintiffs, may be used to show the Defendant's

 3   inducement of the breach.

 4            2.   Tortious Interference with Contract:  Defenses

 5            Defendant Facebook contends that it is not liable for

 6   breach of tortious interference with contract because of the

 7   doctrine of laches, which we have already discussed.  Laches is

 8   an equitable defense with three elements: (1) delay in

 9   asserting a right or claim; (2) the delay was not excusable;

10   and (3) there was undue prejudice to the party against whom the

11   claim is asserted.

12            Two kinds of prejudice may support a defense of

13   laches: (1) the delay has resulted in the loss of evidence; or

14   (2) the defendant has changed his position in a way that would

15   not have occurred if the plaintiff had not delayed.  Defendant

16   has the burden of proving the laches defense by a preponderance

17   of the evidence.

18            A party asserting the defense of laches must have

19   "clean hands":  That is, the party must have acted fairly and

20   without fraud or deceit as to the controversy in issue.  If you

21   find that a Defendant has unclean hands, then you should not

22   find that Defendant has established the defense of laches.

23            3.   Tortious Interference with Contract:  Damages

24            If you find that Facebook tortiously interfered with

25   ZeniMax's Nondisclosure Agreement with Mr. Luckey and/or

1   Oculus, then you must determine whether such interference

2   proximately caused ZeniMax's damages, and, if so, what sum of

3   money would fairly and reasonably compensate ZeniMax for their

4   damages.  The measure of damages for tortious interference with

5   contract is the same as for breach of contract.

6           Damages awarded must be proximately caused by the

7   Defendants' failure to comply with the Nondisclosure Agreement.

8   Proximate cause means a cause that was a substantial factor in

9   bringing about an event, and without which cause such event

10  would not have occurred.  In order to be a proximate cause, the

11  act or omission complained of must be such that a person using

12  the degree of care required of him would have foreseen that the

13  event, or some similar event, might reasonably result

14  therefrom.  There may be more than one proximate cause of an

15  event.

16          Plaintiffs also contend that the Facebook was

17  unjustly enriched in connection with its act of tortious

18  interference with contract.  Unjust enrichment is an equitable

19  principle holding that one who unjustly receives benefits

20  should make restitution for those benefits, and is typically

21  found where one person has obtained a benefit from another by

22  fraud, duress, or taking of an undue advantage or has passively

23  accepted benefits that it would be unjust for that person to

24  retain.

25          If you find that Facebook was unjustly enriched by

1  its act of tortious interference with contract and should make

2  restitution for any property or benefits they may have

3  received, you should award that amount of money against

4  Facebook and in favor of Plaintiffs.

5       4.  Tortious Interference with Contract:  Jury

6  Questions

7  QUESTION 28:

8       Did Facebook tortiously interfere with ZeniMax and id

9  Software's contract with Palmer Luckey and/or Oculus?

10      Answer "Yes" or "No." _____

11 QUESTION 29:

12      Answer this question if you answered "Yes" to

13 Question 28.  Otherwise, do not answer this question and skip

14 to Question 31.

15      Do you find that the doctrine of laches bars ZeniMax

16 and id Software's claim for tortious interference against

17 Facebook?

18      Answer "Yes" or "No." _____

19 QUESTION 30:

20      Answer this question if you answered "Yes" to

21 Question 28 and "No" to Question 29.  Otherwise, do not answer

22 this question and skip to Question 31.

23      What sum of money, if paid now in cash, would fairly

24 and reasonably compensate ZeniMax and id Software for their

25 damages, if any, proximately caused by such interference?

1    Do not add any amount for interest on damages, if

2    any.

3    Answer in dollars and cents as to damages that were

4    sustained by ZeniMax and id Software in the past:

5    Answer: $ _____

6    Answer in dollars and cents as to damages that ZeniMax and id

7    Software, in reasonable probability, will sustain in the

8    future:

9    Answer: $ _____

10   E. Unfair Competition

11   1.  Unfair Competition:  Liability

12   ZeniMax and id Software claim that Defendants Oculus

13   and Facebook engaged in "unfair competition" with respect to

14   ZeniMax and id Software's contracts, copyrights, trademarks,

15   and/or trade secrets.  "Unfair competition" is a form of

16   unlawful business injury arising out of business conduct which

17   is contrary to honest practice in industrial or commercial

18   matters.  That is, while the law protects and encourages

19   competition between businesses, that competition must be fair

20   and must not run contrary to accepted business ethics.  A claim

21   of unfair competition requires that the Plaintiffs show an

22   illegal act by the Defendants that interfered with the

23   Plaintiffs' ability to conduct their business.  The illegal act

24   need not necessarily violate criminal law, but must at least be

25   an independent wrong.

1          In order to prove that Oculus committed an "illegal

2     act" for purposes of Plaintiffs' unfair competition claim,

3     ZeniMax and id Software must prove one of the following:  That

4     Oculus (1) misappropriated Plaintiffs' trade secrets; (2)

5     infringed Plaintiffs' copyrights; (3) infringed Plaintiffs'

6     trademarks; or (4) breached a contract it had with Plaintiffs.

7          In order to prove that Facebook committed an "illegal

8     act" for purposes of Plaintiffs' unfair competition claim,

9     ZeniMax and id Software must prove one of the following:  That

10    Facebook (1) misappropriated Plaintiffs' trade secrets; (2)

11    infringed Plaintiffs' copyrights; or (3) tortiously interfered

12    with the Nondisclosure Agreement.

13         In order to prevail on its unfair competition claim,

14    ZeniMax and id Software must then prove by a preponderance of

15    the evidence that Oculus' or Facebook's illegal act interfered

16    with ZeniMax and id Software's ability to conduct their

17    business.

18              2.  Unfair Competition:  Defenses

19         Defendants Facebook and Oculus contend that they are

20    not liable for unfair competition because of the doctrine of

21    laches, which we have already discussed.  Laches is an

22    equitable defense with three elements: (1) delay in asserting a

23    right or claim; (2) the delay was not excusable; and (3) there

24    was undue prejudice to the party against whom the claim is

25    asserted.

 1          Two kinds of prejudice may support a defense of

 2   laches: (1) the delay has resulted in the loss of evidence; or

 3   (2) the defendant has changed his position in a way that would

 4   not have occurred if the plaintiff had not delayed.  Defendants

 5   have the burden of proving the laches defense by a

 6   preponderance of the evidence.

 7          A party asserting the defense of laches must have

 8   "clean hands":  That is, the party must have acted fairly and

 9   without fraud or deceit as to the controversy in issue.  If you

10   find that a Defendant has unclean hands, then you should not

11   find that Defendant has established the defense of laches.

12          3.  Unfair Competition:  Damages

13          If you find that Defendants are liable to Plaintiffs

14   ZeniMax and id Software under Plaintiffs' unfair competition

15   claim, then you must determine an amount that is fair

16   compensation for all of Plaintiffs' damages.  These damages are

17   called compensatory damages.

18          The purpose of compensatory damages is to make

19   Plaintiffs whole that is, to compensate Plaintiffs for the

20   damage that they have suffered.  Compensatory damages are not

21   limited to expenses that Plaintiffs may have incurred because

22   of their injury.

23          The fact that I am giving you instructions concerning

24   damages relating to ZeniMax and id Software's unfair

25   competition claim does not mean that I think ZeniMax and id

1    Software have established the elements of that claim or that I

2    believe that ZeniMax and id Software should or should not

3    prevail on this claim.

4         You should not award damages for ZeniMax's unfair

5    competition claim that you already took into account with

6    regard to ZeniMax's other claims.  You may award compensatory

7    damages only for injuries that Plaintiffs prove were

8    proximately caused by Defendants' allegedly wrongful conduct.

9    Proximate cause means a cause that was a substantial factor in

10   bringing about an event, and without which cause such event

11   would not have occurred.  In order to be a proximate cause, the

12   act or omission complained of must be such that a person using

13   the degree of care required of him would have foreseen that the

14   event, or some similar event, might reasonably result

15   therefrom.  There may be more than one proximate cause of an

16   event.

17        The damages that you award must be fair compensation

18   for all of Plaintiffs' damages, no more and no less.  You

19   should not award compensatory damages for speculative injuries,

20   but only for those injuries that Plaintiffs have actually

21   suffered.

22        If you decide to award compensatory damages, you

23   should be guided by dispassionate common sense.  Computing

24   damages may be difficult, but you must not let that difficulty

25   lead you to engage in arbitrary guesswork.  On the other hand,

 1   the law does not require that Plaintiffs prove the amount of

 2   their losses with mathematical precision, but only with as much

 3   definiteness and accuracy as the circumstances permit.  You

 4   must use sound discretion in fixing an award of damages,

 5   drawing reasonable inferences where you find them appropriate

 6   from the facts and circumstances in evidence.  Do not add any

 7   amount of interest on damages, if any.

 8          If you find the Facebook and Occulus were unjustly

 9   enriched by their act of unfair competition and should make

10   restitution for any property or benefits they may have

11   received, you should award that amount of money against

12   Facebook and Occulus and in favor of Plaintiffs.

13          4.  Unfair Competition:  Jury Questions

14          Oculus have one "C" or two?

15          MS. WILKINSON:  One.

16          THE COURT:  One.

17          MS. WILKINSON:  Yes, sir.

18          THE COURT:  We misspelled it.  I'm going to correct

19   it.

20          I assume nobody has any objection to me doing that?

21   Hello?

22          MR. SAMMI:  No.

23          MS. WILKINSON:  No objection.

24          MR. SAMMI:  No objection.

25          THE COURT:  Thank you.

```
 1              4.  Unfair Competition:  Jury Questions
 2    QUESTION 31:
 3              Did Defendants Facebook and/or Oculus engage in
 4    unfair competition against ZeniMax and id Software?
 5              Answer "Yes" or "No" for each Defendant:
 6              Facebook: _____
 7              Oculus: _____
 8    QUESTION 32:
 9              If you answered "Yes" to any part of Question 31,
10    then answer this question for each Defendant that you answered
11    "Yes" in Question 31.  Otherwise, do not answer this question
12    and skip to Question 35.
13              Do you find that the doctrine of laches bars ZeniMax
14    and id Software's claim for unfair competition?
15              Answer "Yes" or "No" for each Defendant:
16              Facebook: _____
17              Oculus: _____
18    QUESTION 33:
19              Answer this question if you answered "Yes" to
20    Question 31 for any Defendant and also answered "No" to
21    Question 32 for that Defendant.  Otherwise, do not answer this
22    question and skip to Question 35.
23              What amount of damages, if any, did Zenimax and id
24    Software prove were proximately caused by Defendants' unfair
25    competition?
```

```
 1              Answer in dollars and cents, if any.

 2              $ _____

 3   QUESTION 34:

 4              Answer this question if you assessed damages in

 5   Question 33.  Otherwise do not answer this question and skip to

 6   Question 35.

 7              For each person you found caused or contributed to

 8   cause the damages to Plaintiffs, find the percentage of

 9   responsibility attributable to each.  Assign percentages of

10   responsibility only to those Defendants you found caused or

11   contributed to cause the damages for unfair competition.  The

12   percentages you find must total 100 percent.  The percentages

13   must be expressed in whole numbers.  The percentage of

14   responsibility attributable to any one is not necessarily

15   measured by the number of acts or omiisions --

16              We misspelled "omissions." Let's see.  Omissions

17   is -- are there two "M's" or one "M" in omissions?

18              And one "I" and then another "I."

19              Okay.  I am making that correction.  I am making that

20   correction even if y'all object.  I got to get it right.

21              And I'm assuming you don't object, correct?

22              MR. SAMMI:  No objection.

23              MS. WILKINSON:  No objection.

24              THE COURT:  And then Facebook and Oculus, a

25   percentage of that, and then total 100 percent.
```

1    F. Conversion.

2              1.  Conversion:  Liability

3              Plaintiffs ZeniMax and id Software also contend that

4    Defendant John Carmack converted ZeniMax and id Software's

5    property.  The term "converted" generally means that one

6    wrongfully exercised control over another's property.  Here,

7    ZeniMax and id Software contend that Mr. Carmack converted

8    their property.

9              To prevail on their conversion claim, ZeniMax and id

10   Software must prove, by a preponderance of the evidence, each

11   of the following:

12             1) Plaintiffs owned, had legal possession of, or were

13   entitled to possession of the property;

14             2) Mr. Carmack, unlawfully and without authorization,

15   assumed and exercised dominion and control over the property to

16   the exclusion of, or inconsistent with, Plaintiffs' rights;

17             3) Plaintiffs made a demand for the property; and

18             4) Mr. Carmack refused to return the property.

19             2.  Conversion:  Defenses

20             Mr. Carmack asserts as a defense that the statute of

21   limitations bars ZeniMax and id Software's claim for Mr.

22   Carmack's conversion.

23             A statute of limitations is a law that provides that

24   a suit is barred if a plaintiff does not bring it within a

25   prescribed period of time.  The time period within which a

1   lawsuit for alleged conversion must be brought begins when

2   ZeniMax and id Software first discovered, or by the exercise of

3   reasonable diligence should have discovered, the facts that

4   form the basis of its alleged conversion claim.

5          The applicable statute of limitations period for

6   conversion is two years.  For the purposes of the statute of

7   limitations, you may consider the suit against Mr. Carmack as

8   being filed on March 31, 2016.  Mr. Carmack must prove by a

9   preponderance of the evidence that ZeniMax and id Software did

10  not bring their claim for conversion within the applicable time

11  period.

12         Mr. Carmack contends that he is not liable for

13  conversion because of the doctrine of laches, which we have

14  already discussed.  Laches is an equitable defense with three

15  elements: (1) delay in asserting a right or claim; (2) the

16  delay was not excusable; and (3) there was undue prejudice to

17  the party against whom the claim is asserted.

18         Two kinds of prejudice may support a defense of

19  laches: (1) the delay has resulted in the loss of evidence; or

20  (2) the defendant has changed his position in a way that would

21  not have occurred if the plaintiff had not delayed.  Defendants

22  have the burden of proving the laches defense by a

23  preponderance of the evidence.

24         A party asserting the defense of laches must have

25  "clean hands":  That is, the party must have acted fairly and

1  without fraud or deceit as to the controversy in issue.  If you

2  find that a Defendant has unclean hands, then you should not

3  find that Defendant has established the defense of laches.

4          3.  Conversion:  Jury Questions

5  QUESTION 35:

6          Did Defendant John Carmack convert ZeniMax and id

7  Software's property?

8          Answer "Yes" or "No" for each item:

9          ZeniMax's documents on USB drive: _____

10         RAGE code: _____

11 QUESTION 36:

12         If you answered "Yes" to any part of Question 35,

13 answer this question for the items for which you answered "Yes"

14 in Question 35.  Otherwise, do not answer this question and

15 skip to Question 38.

16         Do you find that the statute of limitations bars

17 ZeniMax and id Software's claim for conversion against John

18 Carmack?

19         Answer "Yes" or "No" for each item:

20         ZeniMax's documents on USB drive: _____

21         RAGE code: _____

22 QUESTION 37:

23         If you answered "Yes" to any part of Question 35,

24 answer this question for the items for which you answered "Yes"

25 in Question35.  Otherwise, do not answer this question and skip

1  to Question 38.

2          Do you find that the doctrine of laches bars ZeniMax

3  and id Software's claim for conversion?

4          Answer "Yes" or "No" for each item:

5          ZeniMax's documents on USB drive: _____

6          RAGE code: _____

7  G. Trademark Infringement and False Designation

8          1.  Trademark Infringement and False Designation:

9  Liability

10          Plaintiffs ZeniMax and id Software also claim that

11 Defendants Oculus, Mr. Luckey, and Mr. Iribe have infringed

12 Plaintiffs' trademarks.  A trademark is a word, symbol, or

13 combination of words or symbols used by a person to identify

14 his product, to distinguish his product from those manufactured

15 or sold by others, and to indicate the source of his product.

16 I will sometimes refer to a "trademark" simply as a "mark."

17          The purpose of trademark law is to prevent confusion

18 among consumers about the source of products and to permit

19 trademark owners to show ownership of their products and

20 control their product's reputation.

21          In order to establish trademark infringement, ZeniMax

22 must prove by a preponderance of the evidence that:

23          1) ZeniMax owned legally protectable trademarks; and

24          2) Defendants Oculus, Mr. Luckey, and/or Mr. Iribe

25 used one or more of the ZeniMax's trademarks, without ZeniMax's

 1    consent, in connection with the offer of products in a manner
 2    that was likely to cause confusion as to the source,
 3    affiliation, or sponsorship of the products.
 4          The parties do not dispute that ZeniMax owned legally
 5    protectable trademarks.  In this case ZeniMax asserts the
 6    following trademarks:
 7          1) The "DOOM" name,
 8          2) The "DOOM 3" name,
 9          3) The "DOOM II" name and design
10          4) The "ID" name,
11          5) The "RAGE" name and design -- and there's the
12    design,
13          6) The "SKYRIM" name,
14          Likelihood of confusion means a probability of
15    confusion, which is more than a mere possibility of confusion.
16    It is not necessary that the mark used by Defendants be an
17    exact copy of Plaintiffs' marks.  Rather, Plaintiffs must
18    demonstrate that, when viewed in its entirety, the marks used
19    by Defendants are likely to cause confusion in the minds of
20    reasonably prudent purchasers or users as to the source of the
21    product in question.
22          In evaluating whether or not there is a likelihood of
23    confusion, you are to consider various factors, including:
24          1) Strength or weakness of Plaintiffs' mark.  Strong
25    marks receive a broad level of protection under the trademark

1    laws; weak marks receive a narrower range of protection.  In

2    evaluating the strength of Plaintiffs' mark, you should not

3    rely solely on the fact that Plaintiffs have a registered

4    trademark as an indicator of strength.  A mark's strength is

5    measured by both its inherent strength (how distinctive it is)

6    and by its acquired strength (the degree of consumer

7    recognition it has obtained in the marketplace).  The more that

8    purchasers or users associate Plaintiffs' trademark uniquely

9    with a single source of a product, then the stronger

10   Plaintiffs' mark.

11            2) Degree of similarity or dissimilarity between the

12   two marks.  In evaluating the similarity or dissimilarity of

13   the respective marks, each mark must be considered as a whole.

14   Likelihood of confusion cannot be based on dissection of a

15   mark, that is, on only part of a mark.  Although there is

16   nothing improper in giving more or less weight to a particular

17   feature of a mark, the ultimate conclusion as to the similarity

18   or dissimilarity of the marks must rest on consideration of the

19   marks in their entireties.  You should consider the overall

20   impression created by the marks, keeping in mind all the things

21   that the general buying public will likely perceive and

22   remember about the marks, including their similarities in

23   sight, sound, and meaning, as well as designs, fonts, colors,

24   and other elements.

25            3) Similarity of the parties' products.  If both

1   Plaintiffs and Defendants use their marks to market the same,

2   related, or complementary types of products, then the

3   likelihood of confusion increases.  If the parties' respective

4   products are unrelated, then the likelihood of confusion

5   decreases.

6           4) Outlet and Purchaser Identity.  If purchasers and

7   purchasing outlets for the Defendants' and Plaintiffs' products

8   are the same, there may be a greater likelihood of confusion

9   about the source of goods than otherwise.

10          5) Advertising Media Identity.  If Defendants and

11  Plaintiffs advertise, market, and publicize their products over

12  the same media, there may be a greater likelihood of confusion

13  about the source of goods than otherwise.

14          6) Actual confusion.  Actual confusion is not

15  required for you to find a likelihood of confusion.  However,

16  if Defendants' use of Plaintiffs' marks has led to instances of

17  actual confusion among relevant consumers, this may be a strong

18  indication that confusion is likely.  Even if there are

19  instances of actual confusion, you may conclude that there is

20  no likelihood of confusion if, for example, the instances of

21  actual confusion were rare and infrequent.

22          7) Defendants' intent.  In other words, Defendants'

23  good or bad faith in adopting and using their mark.  Proof of

24  Defendants' intent to confuse or deceive consumers by adopting

25  and using a mark that is the same or similar to Plaintiffs'

1    mark is not necessary to establish a likelihood of confusion,

2    but is relevant to determining whether or not confusion is

3    likely.  If Defendants intended to cause confusion, it may be

4    more likely that confusion will occur.  Conversely, if

5    Defendants used Plaintiffs' marks in good faith and without and

6    intent to cause confusion, then likely confusion decreases.

7              That should be "an intent."  I'm changing that.

8              Any objection?

9              MR. SAMMI:  No objection.

10             MS. WILKINSON:  No objection.

11             THE COURT:

12             8) Sophistication of buyers.  More sophisticated

13    buyers, or purchasers of more sophisticated products, are

14    likely to be more careful and discriminating when purchasing

15    those products.  Consequently, such purchasers may be less

16    likely to be confused by Defendants' use of Plaintiffs' marks.

17    Conversely, if the potential buyers of the products in question

18    are less sophisticated, or if the products in question are

19    commodity items, the likelihood of confusion may increase.

20             These factors are simply a guide to help you

21    determine whether confusion is likely to result from

22    simultaneous use of the Plaintiffs' and Defendants' marks.  No

23    single factor or consideration is dispositive, and Plaintiffs

24    need not prove that all, or even most, of the factors are

25    present in any particular case to be successful.  Nor are you

 1   limited to consideration of only these factors.  You must

 2   consider and weigh all of the relevant evidence in determining

 3   whether there is a likelihood of confusion.

 4          Plaintiffs ZeniMax and id Software also bring a claim

 5   for false designation against Oculus, Mr. Luckey, and Mr.

 6   Iribe.  Any person who makes commercial use of any word, term,

 7   name, or symbol, or combination thereof that is likely to cause

 8   confusion as to that person's affiliation, connection, or

 9   association with another person, or that misrepresents in

10   advertising the nature, characteristics, quality, or geographic

11   origin of that person's goods or services is liable to any

12   person who is or is likely to be damaged by the false

13   designation of origin.  A person may recover for false

14   designation of origin even though the person is not the owner

15   of a trademark for the word, term, name, symbol, or combination

16   used by another person.

17          2.  Trademark Infringement and False Designation:

18   Defenses

19          Defendants Oculus, Mr. Luckey, and Mr. Iribe claim

20   that they are not liable for trademark infringement or false

21   designation because they had a license to use ZeniMax's

22   trademarks.  A license is essentially a promise by the licensor

23   not to sue the licensee for use of the marks.

24          A license authorizing the use of trademarks can be

25   express or implied.  An express license could take the form of

a written or oral agreement.  An implied license is one which
may be inferred from the circumstances surrounding the use of
the marks and the behavior of the licensor regarding the use of
the marks, including for example, knowledge of the use and lack
of any objection to the use.  The burden is on the Defendants
to prove the existence of a license by a preponderance of the
evidence.  If the Defendants satisfy this burden then, in order
for ZeniMax to prevail, ZeniMax must prove by a preponderance
of the evidence that Defendants' copying was not authorized by
the license.

Defendants Oculus, Mr. Luckey, and Mr. Iribe also
claim that they are not liable for trademark infringement or
false designation because ZeniMax has acquiesced in their use
of any ZeniMax trademark.  The acquiescence defense requires
Defendants to establish the following:

1) Assurance by ZeniMax, which may be express or
implicit, that Defendants could use the ZeniMax trademarks;

2) Reliance by the Defendants upon that assurance;
and

3) Undue prejudice to Defendants.

If you find by a preponderance of the evidence that
Defendants Oculus, Mr. Luckey, and/or Mr. Iribe have
established the above elements, your verdict must be for
Defendants on this claim.

An unlicensed owner is unduly prejudiced when the

1   user makes major business investments or expansions that depend

2   on the use of the marks; these investments and expansions would

3   suffer appreciable loss if the marks were enforced; and this

4   loss would not have been incurred had the trademark owner not

5   given assurance that the Defendants could use the mark.

6          Defendants also assert that they are not liable for

7   trademark infringement or false designation under a doctrine

8   called "nominative fair use."  A defendant makes nominative

9   fair use of a mark when the defendant uses it as other than a

10  trademark, to accurately describe the Plaintiffs' goods or

11  services.

12         The Defendants have the burden of proving its

13  nominative fair use of the mark by a preponderance of the

14  evidence.  Defendants make nominative fair use of trademarks

15  when they:

16         1) Use the mark in connection with the Plaintiffs'

17  product or services, which was not readily identifiable without

18  use of those marks;

19         2) Used only so much of the trademarks as was

20  reasonably necessary to identify the product or services in

21  question; and

22         3) Did not do anything that would in connection with

23  the trademarks to suggest sponsorship or endorsement of the

24  Defendants' product or service by the Plaintiffs.

25         The fact that any use by Defendants of a ZeniMax

1    trademark may bring Defendants a profit does not mean the use

2    was not a fair use.

3            Defendants Oculus, Mr. Luckey, and Mr. Iribe contend

4    that they are not liable for trademark infringement because of

5    the doctrine of laches, which we have already discussed.

6    Laches is an equitable defense with three elements: (1) delay

7    in asserting a right or claim; (2) the delay was not excusable;

8    and (3) there was undue prejudice to the party against whom the

9    claim is asserted.

10           Two kinds of prejudice may support a defense of

11   laches: (1) the delay has resulted in the loss of evidence; or

12   (2) the defendant has changed his position in a way that would

13   not have occurred if the plaintiff had not delayed.  Defendants

14   have the burden of proving the laches defense by a

15   preponderance of the evidence.

16           A party asserting the defense of laches must have

17   "clean hands": That is, the party must have acted fairly and

18   without fraud or deceit as to the controversy in issue.  If you

19   find that a Defendant has unclean hands, then you should not

20   find that Defendant has established the defense of laches.

21           3.   Trademark Infringement and False Designation:

22   Damages.

23           If you find for Plaintiffs ZeniMax and id Software on

24   their infringement or false designation claims, you must

25   determine their damages.  ZeniMax and id Software have the

burden of proving damages by a preponderance of the evidence.

In order for Plaintiffs ZeniMax and id Software to recover damages on their trademark claim, Plaintiffs have the burden of proving by a preponderance of the evidence that the Defendants had either statutory or actual notice that the Plaintiffs' trademarks were registered.  Defendants have statutory notice if any of the following factors are satisfied:

1) Plaintiffs displayed with the trademark the words "Registered in U.S. Patent and Trademark Office" or,

2) Plaintiffs displayed with the trademark the words "Reg. U.S. Pat & Tm. Off.", or

3) Plaintiffs displayed the trademarks with the letter "R" enclosed within a circle.  Display of these statutory words or symbols are immaterial, or unnecessary, if the Defendants had actual notice of the trademarks being registered.  Actual damages means the amount of money that will reasonably and fairly compensate ZeniMax and id Software for any injury you find was proximately caused by the Defendants' infringement of Plaintiffs' registered trademarks or by Defendants' false designation.  Proximate cause means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would not -- would have foreseen that the event, or some

1   similar event, might reasonably result therefrom.  There may be

2   more than one proximate cause of an event.

3           You should consider whether any of the following

4   exists, and if so to what extent, in determining ZeniMax and id

5   Software's damages:

6           1) Any injury to their reputations;

7           2) Any injury to their goodwill, including any injury

8   to their general business reputations;

9           3) Any loss of their sales as a result of the

10  Defendants' infringement or false designation;

11          4) Any loss of their profits;

12          5) Any expense of preventing customers from being

13  deceived;

14          6) Any cost of future corrective advertising

15  reasonably required to correct any public confusion caused by

16  the infringement or false designation; and

17          7) Any other factors that bear on their actual

18  damages.

19          When considering damages, you must not

20  over-compensate.  Any award should not exceed the actual damage

21  to the value of ZeniMax and id Software's marks at the time of

22  the infringement or false designation by the Defendants.

23  Plaintiffs are not entitled to recover the same damages for

24  trademark infringement and false designation — that is,

25  Plaintiffs may not recover twice for the same injury.

1          In addition to actual damages, ZeniMax is entitled to

2    any profits earned by Defendants Oculus, Mr. Luckey, and/or

3    Mr. Iribe that are attributable to the trademark infringement

4    or false designation.  However, you may not include in any

5    award of profits any amount that you included in determining

6    actual damages.  In assessing the Defendants' profits the

7    Plaintiffs are only required to prove the Defendants' sales.

8          I'm putting in an apostrophe after the first

9    "Defendants."  It should have been there, making it possessive.

10          The Defendants must prove all costs or deductions

11    that they claim reduced their profits.  An award of the

12    Defendants' profits, if any, should be attributable to the

13    unlawful use of the Plaintiffs' marks.

14          In addition, in determining whether an award of

15    profits is appropriate and the appropriate amount of an award,

16    you may consider the following factors:

17          1) Whether the Defendants had the intent to confuse

18    or deceive;

19          2) Whether sales have been diverted;

20          3) The adequacy of other remedies;

21          4) Unreasonable delay by ZeniMax in asserting its

22    rights;

23          5) Public interest in making the misconduct

24    unprofitable;

25          6) Whether it is a case of palming off (that is, to

 1    pass off one's products as products of another).

 2           If you find Defendants have infringed ZeniMax and id

 3    Software's trademarks or otherwise engaged in false

 4    designation, you must also determine whether Defendants did so

 5    intentionally and with knowledge of that infringement or false

 6    designation.

 7           4. Trademark Infringement and False Designation:

 8    Jury Questions.

 9           QUESTION 38:  Did ZeniMax prove, by a preponderance

10    of the evidence, that Defendants Brendan Iribe, Palmer Luckey,

11    and/or Oculus infringed any of ZeniMax's trademarks?

12           Answer "Yes" or "No" for each Defendant:

13           Oculus: _____

14           Palmer Luckey: _____

15           Brendan Iribe: _____

16           QUESTION 39:  If you answered "Yes" to any part of

17    Question 38, answer this question for each Defendant which you

18    answered "Yes" in Question 38.  Otherwise, do not answer this

19    question and skip to Question 43.

20           Do you find that any of the defenses of license,

21    acquiescence, or nominal fair use bars ZeniMax's claim for

22    trademark infringement?

23           Answer "Yes" or "No" for each Defendant:

24           Oculus: _____

25           Palmer Luckey: _____

```
 1              Brendan Iribe: _____

 2              QUESTION 40:  If you answered "Yes" to any part of

 3    Question 38, answer this question for each Defendant which you

 4    answered "Yes" in Question 38.  Otherwise, do not answer this

 5    question and skip to Question 43.

 6              Do you find that the doctrine of laches bars ZeniMax

 7    and id Software's claim for trademark infringement?

 8              Answer "Yes" or "No" for each Defendant:

 9              Oculus: _____

10              Palmer Luckey: _____

11              Brendan Iribe: _____

12              QUESTION 41:  Answer this question for each Defendant

13    for which you answered "Yes" to Question 38 and "No" to both

14    Question 39 and Question 40.  Otherwise, do not answer this

15    question and skip to Question 43.

16              1.  What amount of actual damages, if any, did

17    ZeniMax and id Software suffer as a result of all trademark

18    infringement by each of the Defendants?

19              Answer in dollars and cents, if any.

20              Oculus:  $ _____

21              Palmer Luckey: $ _____

22              Brendan Iribe: $ _____

23              2.  What amount of the Defendants' profits that were

24    not taken into account in computing any of ZeniMax and id

25    Software's damages, if any, do you find that should be awarded
```

```
 1   against each Defendant and to the Plaintiffs for each
 2   Defendants' trademark infringement?
 3           Answer in dollars and cents, if any.
 4           Oculus:  $ _____
 5           Palmer Luckey: $ _____
 6           Brendan Iribe: $ _____
 7           QUESTION 42:  Answer this question for each Defendant
 8   for which you answered "Yes" to Question 38.
 9           Did any Defendant intentionally and knowingly
10   infringe ZeniMax and id Software's rights in their trademarks:
11           Answer "Yes" or "No" for each Defendant:
12           Oculus: _____
13           Palmer Luckey: _____
14           Brendan Iribe: _____
15           QUESTION 43:  Did ZeniMax prove, by a preponderance
16   of the evidence, that Defendants Brendan Iribe, Palmer Luckey,
17   and/or Oculus are liable for false designation?
18           Answer "Yes" or "No" for each Defendant:
19           Oculus: _____
20           Palmer Luckey: _____
21           Brendan Iribe: _____
22           QUESTION 44:  If you answered "Yes" to any part of
23   Question 43, answer this question for each Defendant which you
24   answered "Yes" in Question 43.  Otherwise, do not answer this
25   question and skip to Question 48.  Do you find that any of the
```

```
1  defenses of license, acquiescence, or nominal fair use bars
2  ZeniMax's claim for false designation?
3          Answer "Yes" or "No" for each Defendant:
4          Oculus: _____
5          Palmer Luckey: _____
6          Brendan Iribe: _____
7          QUESTION 45:  If you answered "Yes" to any part of
8  Question 43, answer this question for each Defendant which you
9  answered "Yes" in Question 43.  Otherwise, do not answer this
10 question and skip to Question 48.  Do you find that the
11 doctrine of laches bars ZeniMax and id Software's claim for
12 false designation?
13         Answer "Yes" or "No" for each Defendant:
14         Oculus: _____
15         Palmer Luckey: _____
16         Brendan Iribe: _____
17         QUESTION 46:  Answer this question for each Defendant
18 for which you answered "Yes" to Question 43 and "No" to both
19 Question 44 and Question 45. Otherwise, do not answer this
20 question and skip to Question 48.
21         1.  What amount of actual damages, if any, did
22 ZeniMax and id Software suffer as a result of false designation
23 by each of the Defendants?
24         Answer in dollar and cents, if any.
25         Oculus:  $ _____
```

```
 1              Palmer Luckey: $ _____

 2              Brendan Iribe: $ _____

 3              2.  What amount of the Defendants' profits that were

 4   not taken into account in computing any of ZeniMax and id

 5   Software's damages, if any, do you find that should be awarded

 6   against each Defendant and to the Plaintiffs for each

 7   Defendants' false designation?

 8              Answer in dollar and cents, if any.

 9              Oculus:  $ _____

10              Palmer Luckey: $ _____

11              Brendan Iribe: $ _____

12              QUESTION 47:  Answer this question for each Defendant

13   for which you answered "Yes" to Question 43. Otherwise, do not

14   answer this question and skip to Question 48.

15              Did any Defendant intentionally and knowingly engaged

16   in the false designation?

17              Answer "Yes" or "No" for each Defendant:

18              Oculus: _____

19              Palmer Luckey: _____

20              Brendan Iribe: _____

21              H. Exemplary Damages

22              1. Exemplary Damages:  Standards

23              ZeniMax and id Software have also made a claim for

24   exemplary damages in connection with their claims for

25   misappropriation of trade secrets, tortious interference with
```

1    contract, and unfair competition.

2         The purpose of exemplary damages is to punish and

3    deter, not to compensate.  Exemplary damages serve to punish a

4    defendant and by doing so, to deter others from engaging in

5    similar conduct in the future.  You are not required to award

6    exemplary damages.  If you decide to award exemplary damages,

7    you must use sound reason in setting the amount.  Your award of

8    exemplary damages must not reflect bias, prejudice, or sympathy

9    toward any party.  It should be presumed that the Plaintiffs

10   have been made whole by compensatory damages, so exemplary

11   damages should be awarded only if a Defendant's misconduct is

12   so reprehensible as to warrant imposition of further sanctions

13   to achieve punishment or deterrence.

14        You may also impose exemplary damages against one or

15   more of Defendants and not others.  You may also award

16   different amounts against different Defendants.  Exemplary

17   damages may be awarded only if you are unanimous in regard to

18   finding liability for and the amount of exemplary damages.  You

19   are instructed that, in order for you to find exemplary

20   damages, your answer to the question regarding the amount of

21   damages must be unanimous.

22        "Exemplary damages" means an amount that you may in

23   your discretion award as a penalty or by way of punishment.

24        If you find in favor of ZeniMax and id Software one

25   of these claims, and you find by clear and convincing evidence

1    that the harm to ZeniMax and id Software associated with one of

2    these claims resulted from malice, fraud, or gross negligence,

3    you may assess against Defendants and award to ZeniMax and

4    id Software exemplary damages for Defendants' conduct in

5    connection with those claims.

6           "Clear and convincing evidence" means the measure or

7    degree of proof that produces a firm belief or conviction of

8    the truth of the allegations sought to be established.  This

9    involves a greater degree of persuasion than is necessary to

10   meet the "preponderance of the evidence" standard I provided to

11   you earlier.

12          "Malice" means a specific intent by Defendants to

13   cause substantial injury or harm to ZeniMax and id Software.

14          "Fraud" occurs when (a) a party makes a material

15   misrepresentation, and (b) the misrepresentation is made with

16   knowledge of its falsity or made recklessly without any

17   knowledge of the truth and as a positive assertion, and (c) the

18   misrepresentation is made with the intention that it should be

19   acted on by the other party, and (d) the other party relies on

20   the misrepresentation and thereby suffers injury.

21          "Misrepresentation" means a false statement of fact.

22          Fraud also occurs when (a) a party fails to disclose

23   a material fact within the knowledge of that party, and (b) the

24   party knows that the other party is ignorant of the fact and

25   does not have an equal opportunity to discover the truth, and

 1 | (c) the party intends to induce the other party to take some
 2 | action by failing to disclose the fact, and (d) the other party
 3 | suffers injury as a result of acting without knowledge of the
 4 | undisclosed fact.

 5 |     "Gross negligence" means an act or omission by
 6 | Defendants, which (a) when viewed objectively from the
 7 | standpoint of Defendants at the time of its occurrence involves
 8 | an extreme degree of risk, considering the probability and
 9 | magnitude of the potential harm to others; and (b) of which
10 | Defendants have actual, subjective awareness of the risk
11 | involved, but nevertheless proceed with conscious indifference
12 | to the rights, safety, or welfare of others.

13 |     Factors you shall consider in awarding exemplary
14 | damages, if any, are:

15 |     (A) The nature of the wrong.

16 |     (B) The character of the conduct involved.

17 |     (C) The degree of culpability of Defendant.

18 |     (D) The situation and sensibilities of the parties
19 | concerned.

20 |     (E) The extent to which such conduct offends a public
21 | sense of justice and propriety.

22 |     (F) The net worth of Defendant.

23 |     You may also find that a corporation, here Oculus and
24 | Facebook, are liable for exemplary damages because of the acts
25 | of their agents, if:

1        (A) Oculus or Facebook authorized the doing and the

2   manner of the act; or

3        (B) The agent was unfit and Oculus or Facebook was

4   reckless in employing him; or

5        (C) The agent was employed in a managerial capacity

6   and was acting in the scope of his employment; or

7        (D) Oculus or Facebook or another manager of Oculus

8   or Facebook ratified or approved the agent's act.

9        2.  Exemplary Damages: Jury Questions

10       QUESTION 48:

11       Answer this question for each Defendant for which you

12   answered "Yes" in Question 1 and for which you also answered

13   "No" in Question 2, Question 3, and Question 4.  Otherwise, do

14   not answer this question and skip to Question 50.

15       Do you find by clear and convincing evidence that the

16   harm to ZeniMax and id Software resulting from that

17   misappropriation resulted from malice, fraud, or gross

18   negligence?

19       Answer "Yes" or "No" for each Defendant:

20       Oculus: _____

21       Facebook: _____

22       Palmer Luckey: _____

23       Brendan Iribe: _____

24       John Carmack: _____

25       QUESTION 49:

1    If you answered Yes to Question 48 for any Defendant,

2    then answer this question for those Defendants for which you

3    answered "Yes" in Question 48.  Otherwise, do not answer this

4    question and skip to Question 50.

5    What sum of money, if any paid now in cash, should be

6    assessed against any Defendant and awarded to ZeniMax and

7    id Software as exemplary damages, if any, for the conduct found

8    in response to Question 48?

9    Answer in dollars and cents, if any.

10   Oculus: $ _____

11   Facebook: $ _____

12   Palmer Luckey: $ _____

13   Brendan Iribe: $ _____

14   John Carmack: $ _____

15   QUESTION 50:

16   Answer this question if you answered "Yes" to

17   Question 28 and "No" to Question 29.  Otherwise do not answer

18   this question and skip to Question 52.

19   Do you find by clear and convincing evidence that the

20   harm to ZeniMax and id Software resulting from that tortious

21   interference resulted from malice, fraud, or gross negligence?

22   Answer "Yes" or "No." _____

23   QUESTION 51:

24   Answer this question if you answered "Yes" to

25   Question 50.  Otherwise, do not answer this question and skip

```
1    to Question 52.
2            What sum of money, if any paid now in cash, should be
3    assessed against Facebook and awarded to ZeniMax and
4    id Software as exemplary damages, if any, for the conduct found
5    in response to Question 50?
6            Answer in dollars and cents, if any.
7            Answer: $ _____
8            QUESTION 52:
9            Answer this question for each Defendant that you
10   answered "Yes" to Question 31 and also answered "No" to
11   Question 32 for that Defendant.  Otherwise, do not answer this
12   question and skip to Question 54.
13           Do you find by clear and convincing evidence that the
14   harm to ZeniMax and id Software resulting from that unfair
15   competition resulted from malice, fraud, or gross negligence?
16           Answer "Yes" or "No" for each Defendant:
17           Facebook: _____
18           Oculus: _____
19           QUESTION 53:
20           Answer this question for each Defendant that you
21   answered "Yes" in Question 52.  Otherwise, do not answer this
22   question and skip to Question 54.
23           What sum of money, if any paid now in cash, should be
24   assessed against Facebook and/or Oculus and awarded to ZeniMax
25   and id Software as exemplary damages, if any, for the conduct
```

 1    found in response to Question 52.

 2              Answer in dollars and cents, if any.

 3              Facebook: $ _____

 4              Oculus: $ _____

 5              I. John Carmack's Breach of Contract Claim

 6              1. Breach of Contract:  Liability

 7              Mr. Carmack also alleges that ZeniMax is liable to

 8    him for breach of his 2009 employment contract with ZeniMax.

 9    Specifically, Mr. Carmack alleges that ZeniMax breached section

10    4 and section 16.4(b) of the contract.

11              To succeed on his breach of contract claim,

12    Mr. Carmack must prove the following things by a preponderance

13    of the evidence:

14              1. The existence of a valid, enforceable contract

15    between Mr. Carmack and ZeniMax;

16              2. Mr. Carmack performed his obligations under that

17    contract;

18              3. ZeniMax breached that contract; and

19              4. Mr. Carmack sustained damages as a result of that

20    breach.

21              2. Breach of Contract:  Defenses

22              ZeniMax asserts as a defense that they were excused

23    from technical compliance with the employment agreement because

24    Mr. Carmack waived his rights under the employment agreement.

25              Waiver is an intentional surrender of a known right

1    or intentional conduct inconsistent with claiming the right.

2    If you find by a preponderance of the evidence that Mr. Carmack

3    intentionally surrendered his rights under the employment

4    agreement or intentionally conducted himself in ways that were

5    inconsistent with claiming the rights that Mr. Carmack asserts

6    he held under the employment agreement, then your verdict

7    should be for ZeniMax on this claim.

8            ZeniMax asserts that the defense of laches bars

9    Mr. Carmack's breach of contract claim.  Laches is an equitable

10   defense with three elements: (1) delay in asserting a right or

11   claim; (2) the delay was not excusable; and (3) there was undue

12   prejudice to the party against whom the claim is asserted.

13           Two kinds of prejudice may support a defense of

14   laches: (1) the delay has resulted in the loss of evidence; or

15   (2) ZeniMax has changed its position in a way that would not

16   have occurred if Mr. Carmack had not delayed.

17           THE COURT:  Take out the word "the."

18           Any objection?

19           MR. STOJILKOVIC:  No objection.

20           MR. SAMMI:  No objection.

21           ZeniMax has the burden of proving the laches defense

22   by a preponderance of the evidence.

23           A party asserting the defense of laches must have

24   "clean hands": that is, the party must have acted fairly and

25   without fraud or deceit as to the controversy in issue.  If you

1    find that ZeniMax has unclean hands, then you should not find

2    that ZeniMax has established the defense of laches.

3              ZeniMax also asserts that Mr. Carmack failed to

4    comply with a material term of the employment agreement such

5    that ZeniMax's failure to perform under that agreement, if any,

6    was excused.  Failure to comply by ZeniMax is excused by

7    Mr. Carmack's previous failure to comply with a material

8    obligation of the employment agreement.  To determine the

9    materiality of a breach, you may consider the following:

10             (1) The extent to which the injured party will obtain

11   the substantial benefit which he could have reasonably

12   anticipated;

13             (2) The extent to which the injured party may be

14   adequately compensated in damages for lack of complete

15   performance;

16             (3) The extent to which the party failing to perform

17   has already partly performed or made preparations for

18   performance;

19             (4) The greater or lesser hardship on the party

20   failing to perform in terminating the contract;

21             (5) The willful, negligent, or innocent behavior of

22   the party failing to perform; and

23             (6) The greater or lesser uncertainty that the party

24   failing to perform will perform the remainder of the contract.

25             3.  Breach of Contract:  Damages

 1              Should you find that Mr. Carmack has proven his

 2    breach of contract claim, you must compensate him with a sum of

 3    money, if paid now in cash, that would fairly and reasonably

 4    compensate Mr. Carmack for his damages that were proximately

 5    caused by the ZeniMax's breach of the employment it had with

 6    Mr. Carmack --

 7              Take "the" out again.  Okay.

 8              Any objection?

 9              MR. STOJILKOVIC:  No objection.

10              MR. SAMMI:  No objection.

11              THE COURT:  If you award contract damages, those

12    damages should be measured at the time of the breach and not at

13    the time of the trial.

14              Proximate cause means a cause that was a substantial

15    factor in bringing about an event, and without which cause such

16    event would not have occurred.  In order to be a proximate

17    cause, the act or omission complained of must be such that a

18    person using the degree of care required of him would have

19    foreseen that the event, or some similar event, might

20    reasonably result therefrom.  There may be more than one

21    proximate cause of an event.

22              You should not interpret the fact that I am giving

23    instructions about damages as an indication in any way that I

24    believe Mr. Carmack should, or should not, prevail on this

25    claim.  It is your task to decide whether ZeniMax is liable.  I

1   am instructing you on damages only so that you will have

2   guidance in the event you decide that ZeniMax is liable and

3   that Mr. Carmack is entitled to recover money.

4        If you decide so, Mr. Carmack is entitled to recover

5   his direct damages, which are those damages which naturally and

6   necessarily flow from the breach, if any, and consequential

7   damages, which are those damages that are the natural,

8   probable, and foreseeable consequence of the breach, if any.

9        4.   Breach of Contract:  Jury Questions

10  QUESTION 54:

11       Did ZeniMax fail to comply with its employment

12  agreement with John Carmack?

13       Answer "Yes" or "No": _____

14  QUESTION 55:

15       Answer this question if you answered "Yes" to

16  Question 54.  Otherwise, do not answer anymore questions,

17  including this one.

18       Do you find that the doctrine of waiver bars John

19  Carmack's breach of contract claim against ZeniMax?

20       Answer "Yes" or "No": _____

21  QUESTION 56:

22       Do you find that the doctrine of laches bars John

23  Carmack's breach of contract claim against ZeniMax?

24       Answer "Yes" or "No": _____

25  QUESTION 57:

```
 1              Was ZeniMax's failure to comply excused?

 2              Answer "Yes" or "No: _____

 3   QUESTION 58:

 4              Answer this question if you answered "Yes" to

 5   Question 54 and "No" to Questions 55, 56, and 57.  Otherwise,

 6   do not answer anymore questions, including this one.

 7              What sum of money, if any, if paid now in cash, would

 8   fairly and reasonably compensate John Carmack for his damages,

 9   if any, that resulted from ZeniMax's failure to comply with the

10   employment agreement?

11              Do not add any amount for interest on damages, if

12   any.

13              Answer in dollars and cents.

14              $ _____

15              I will read some more instructions to you, but only

16   three pages, after you hear final argument.

17              First you're going to have lunch, then you're going

18   to hear final arguments, and then I will read those other

19   instructions.  But not now.  Do not begin your deliberations

20   now.

21              So just go back and have lunch.

22              Don't talk about the case.

23              Thank you very much.

24              Be back in an hour.

25              SECURITY OFFICER:  All rise.
```

```
 1            (Jury out)
 2            THE COURT:  Y'all have anything?
 3            MR. SAMMI:  That was impressive, sir.
 4            MS. WILKINSON:  That was a marathon, yeah.
 5            MR. SAMMI:  That was impressive.
 6            THE COURT:  That's all right.  Are y'all ready after
 7    this?
 8            MR. SAMMI:  Yeah.
 9            THE COURT:  Eat real fast.  Do whatever you need to
10    do.
11            MS. WILKINSON:  when do you want us back, Judge?
12            THE COURT:  In one hour.  We really will start in one
13    hour.  I may not start in an hour, but y'all will.
14            (Recess at 12:41)
15
16
17
18
19
20
21
22
23
24
25
```

1                          INDEX

2   Objections to the Charge.................................. 9

3   Plaintiffs rest and close............................... 52

4   Defendants rest and close............................... 52

5   Court's Charge read..................................... 53

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 26th day of January, 2017.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25