1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE NORTHERN DISTRICT OF TEXAS

3                              DALLAS DIVISION

4

5    ZENIMAX MEDIA INC. and ID      )        3:14-CV-1849-K
     SOFTWARE LLC                   )
6                 Plaintiffs,       )
                                    )
7                                   )
     VS.                            )
8                                   )        DALLAS, TEXAS
                                    )
9    OCULUS VR, LLC, PALMER         )
     LUCKEY, FACEBOOK, INC.,        )
10   BRENDAN IRIBE and JOHN         )
     CARMACK,                       )
11                Defendants.       )        January 26, 2017

12

13            TRANSCRIPT OF JURY TRIAL, VOLUME 20

14              BEFORE THE HONORABLE ED KINKEADE

15                UNITED STATES DISTRICT JUDGE

16

17   A P P E A R A N C E S:

18
     FOR THE PLAINTIFFS:          MR. P. ANTHONY SAMMI
19                                Skadden, Arps, Slate,
                                    Meagher & Flom LLP
20                                Four Times Square
                                  New York, New York  10036
21                                (212) 735-2307
                                  anthony.sammi@skaddden.com
22

23                                MR. PHILLIP B. PHILBIN
                                  Haynes and Boone LLP
24                                2323 Victory Avenue, Suite 700
                                  Dallas, Texas  75219
25                                (214) 651-5000
                                  phillip.philbin@haynesboone.com



MR. KURT WILLIAM HEMR
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(617) 573-4833
kurt.hemr@skaddden.com


MR. CHRISTOPHER A LISY
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800
christopher.lisy@skaddden.com


MR. MICHAEL R. WALSH
Skadden, Arps, Slate,
  Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4862
michael.walsh@skadden.com


MR. JAMES Y. PAK
Skadden, Arps, Slate,
  Meagher & Flom LLP
Four Times Square
New York, New York  10036
(212) 735-2546
james.pak@skaddden.com


MR. MICHAEL DALEY KARSON
Haynes and Boone LLP
2323 Victory Avenue
Suite 700
Dallas, Texas  75219
(214) 651-5000
michael.karson@haynesboone.com



1                         **MS. RACHEL R. BLITZER**
                            Skadden, Arps, Slate,
2                             Meagher & Flom LLP
                            Four Times Square
3                             New York, New York  10036
                             (212) 735-3000
4                             rachel.blitzer@skaddden.com

5

6                         **MR. WILLIAM J. CASEY**
                             Skadden, Arps, Slate,
7                             Meagher & Flom LLP
                             525 University Avenue
                             Palo Alto, California  94301
8                             (650) 470-4500
                             william.casey@skaddden.com
9

10                       **MR. SCOTT MICHAEL FLANZ**
                            Skadden, Arps, Slate,
11                          Meagher & Flom LLP
                           Four Times Square
12                         New York, New York  10036
                         (212) 735-3000
13                       sflanz@skaddden.com

14

15                       **MS. EMILY WHITCHER**
                          Skadden, Arps, Slate,
16                          Meagher & Flom LLP
                         Four Times Square
                         New York, New York  10036
17                       (212) 735-3605
                       emily.whitcher@skaddden.com
18

19                       **MS. JENNIFER H. DOAN**
                        Haltom & Doan
20                       6500 Summerhill Road, Suite 100
                       Texarkana, Texas  75503
21                     (903) 255-1000
                       jdoan@haltomdoan.com
22

23

24

25

```
 1                              MR. JOSH R. THANE
                                Haltom & Doan
 2                              6500 Summerhill Road, Suite 100
                                Texarkana, Texas  75503
 3                              (903) 255-1000
                                jthane@haltomdoan.com
 4

 5
       FOR THE DEFENDANTS:      MS. BETH A. WILKINSON
 6                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
 7                              Suite 800
                                Washington, DC  20036
 8                              (202) 847-4000
                                bwilkinson@wilkinsonwalsh.com
 9

10                              MR. BRANT W. BISHOP
                                Wilkinson Walsh & Eskovitz LLP
11                              1900 M Street NW
                                Suite 800
12                              Washington, DC  20036
                                (202) 847-4000
13                              bbishop@wilkinsonwalsh.com

14
                                MS. CALI COPE-KASTEN
15                              Wilkinson Walsh & Eskovitz LLP
                                1900 M Street NW
16                              Suite 800
                                Washington, DC  20036
17                              (202) 847-4000
                                ccope-kasten@wilkinsonwalsh.com
18

19                              MS. KIRSTEN NELSON
                                Wilkinson Walsh & Eskovitz LLP
20                              1900 M Street NW
                                Suite 800
21                              Washington, DC  20036
                                (202) 847-4000
22                              knelson@wilkinsonwalsh.com

23

24

25
```



1          MS. RUTH VINSON
           Wilkinson Walsh & Eskovitz LLP
2          1900 M Street NW
           Suite 800
3          Washington, DC  20036
           (202) 847-4000
4          rvinson@wilkinsonwalsh.com

5

           MR. MAX WARREN
6          Wilkinson Walsh & Eskovitz LLP
           1900 M Street NW
7          Suite 800
           Washington, DC  20036
8          (202) 847-4000
           mwarren@wilkinsonwalsh.com
9

10         MR. HAYTER WHITMAN
           Wilkinson Walsh & Eskovitz LLP
11         1900 M Street NW
           Suite 800
12         Washington, DC  20036
           (202) 847-4000
13         hwhitman@wilkinsonwalsh.com

14

           MR. KOSTA S. STOJILKOVIC
15         Wilkinson Walsh & Eskovitz LLP
           1900 M Street NW
16         Suite 800
           Washington, DC  20036
17         (202) 847-4050
           kstojilkovic@wilkinsonwalsh.com
18

19

           MS. HEIDI L. KEEFE
20         Cooley LLP
           3175 Hanover Street
21         Palo Alto, California  94304
           (650) 843-5000
22         hkeefe@cooley.com

23

24

25

1                                 **MR. BRETT DeJARNETTE**
                                     Cooley LLP

2                                   3175 Hanover Street
                                   Palo Alto, California  94304

3                                   (650) 843-5000
                                   bdejarnette@cooley.com

4

5                                   **MS. ELIZABETH LEE STAMESHKIN**
                                   Cooley LLP

6                                   3175 Hanover Street
                                   Palo Alto, California  94304

7                                   (650) 843-5000
                                   lstameshkin@cooley.com

8

9                                   **MR. RICHARD A. SMITH**
                                   Richard Smith, PC

10                                  Campbell Centre I
                                  8350 N. Central Expressway

11                                  Suite 1111
                                  Dallas, Texas  75206

12                                  (214) 242-6484
                                  richard@rsmithpc.com

13

14                                 **MR. RAGESH KUMAR TANGRI**
                                 Durie Tangri LLP

15                                  217 Leidesdorff Street
                                  San Francisco, California  94111

16                                  (415) 362-6666
                                  rtangri@durietangri.com

17

18                                 **MR. BENJAMIN B. AU**
                                  Durie Tangri LLP

19                                  217 Leidesdorff Street
                                  San Francisco, California  94111

20                                  (415) 362-6666
                                  bau@durietangri.com

21

22                                 **MR. MARK RANDOLPH WEINSTEIN**
                                  Cooley LLP

23                                  3175 Hanover Street
                                  Palo Alto, California  94304

24                                  (650) 843-5000
                                  mweinstein@cooley.com

25



         1                          MR. JOSEPH B. WOODRING
                                    Cooley LLP
         2                          1333 2nd Street, Suite 400
                                    Santa Monica, California  90401
         3                          (310) 883-6400
                                    jwoodring@cooley.com
         4

         5                          MR. MATTHEW D. CAPLAN
                                    Cooley LLP
         6                          101 California Street
                                    5th Floor
         7                          San Francisco, California  94111
                                    (415) 693-2000
         8                          mcaplan@cooley.com

         9
                                    MR. PHILIP MAO
        10                          Cooley LLP
                                    3175 Hanover Street
        11                          Palo Alto, CA 94304
                                    (650) 843-5000
        12                          pmao@cooley.com

        13
                                    MR. DANIEL TEIMOURI
        14                          Cooley LLP
                                    1700 Seventh Avenue
        15                          Suite 900
                                    Seattle, Washington  98101
        16                          (206) 452-8791
                                    dteimouri@cooley.com
        17

        18                          MS. JULIE B. RUBENSTEIN
                                    Wilkinson Walsh & Eskovitz LLP
        19                          1900 M Street NW
                                    Suite 800
        20                          Washington, DC  20036
                                    (202) 847-4000
        21                          jrubenstein@wilkinsonwalsh.com

        22

        23

        24

        25

```
 1                              MS. ELIZABETH Y. RYAN
                                Lynn Pinker Cox & Hurst, LLP
 2                              2100 Ross Avenue
                                Suite 2700
 3                              Dallas, Texas   75201
                                (214) 981-3821
 4                              eryan@lynnllp.com

 5
                                MS. CHRISTEN DUBOIS
 6                              Facebook, Inc.
                                1601 Willow Road
 7                              Menlo Park, California  94025
                                (650) 862-5980
 8                              cdubois@fb.com

 9
                                MR. PAUL GREWAL
10                              Facebook, Inc.
                                1601 Willow Road
11                              Menlo Park, California  94025
                                (650) 814-3157
12                              paulgrewal@fb.com

13
     COURT REPORTER:           MR. TODD ANDERSON, RMR, CRR
14                              United States Court Reporter
                                1100 Commerce St., Rm. 1625
15                              Dallas, Texas  75242
                                (214) 753-2170
16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

|   |   |
|---|---|
| 1 | JURY TRIAL - JANUARY 26, 2017 |
| 2 | P R O C E E D I N G S |
| 3 | THE COURT:  Okay.  I don't know what happened to my |
| 4 | charge. |
| 5 | You got the charge? |
| 6 | THE CLERK:  Yes, sir.  Ronnie is bringing it in. |
| 7 | THE COURT:  Okay.  Timewise, do you want 60 minutes |
| 8 | and then stop you? |
| 9 | MR. SAMMI:  60 to 65. |
| 10 | THE COURT:  I don't care. |
| 11 | MR. SAMMI:  Whatever I don't use will come out of the |
| 12 | rest. |
| 13 | THE COURT:  It's your call. |
| 14 | MR. SAMMI:  How about 65 minutes, sir? |
| 15 | THE COURT:  Do you want a five-minute warning? |
| 16 | MR. SAMMI:  That will be great. |
| 17 | THE COURT:  At 60? |
| 18 | MR. SAMMI:  Yes, sir. |
| 19 | THE COURT:  Do you need any warnings? |
| 20 | MS. WILKINSON:  Ms. Keefe is going to give me my |
| 21 | warnings, Your Honor. |
| 22 | MS. KEEFE:  I have the pink paper for her, Your |
| 23 | Honor. |
| 24 | THE COURT:  Do what? |
| 25 | MS. KEEFE:  I have pink paper for her. |

```
 1              THE COURT:  It's like moot court.  We're back in moot
 2   court.
 3              MS. WILKINSON:  You know how we like our cards.
 4              THE COURT:  "Stop."  I mean maybe you will have more
 5   success than I've had.  Maybe.  I said stop and nobody does
 6   anything.
 7              MR. SAMMI:  As a matter of fact, Judge, I think
 8   Ms. Cohen is going to give me a warning, so you don't need to
 9   do anything.
10              THE COURT:  Ms. Cohen.  Now, when you said Cambridge,
11   you meant Harvard?
12              MS. COHEN:  Yes, I did.
13              THE COURT:  I mean, why are y'all -- be proud of
14   that.  That's great.  You're not bragging to say that.  Some of
15   us wish we had a chance.  They don't even let me go into the
16   town.  I have to have a special visa.
17              MS. COHEN:  I wish I had gone to Baylor, Your Honor.
18              THE COURT:  Verdict for Plaintiff.
19              Okay.  Y'all are all already.  Everybody have what
20   they need?
21              MR. SAMMI:  Yes, sir.
22              THE COURT:  Any of you need throat things?  Do you
23   need any of these?  You got something?  Do you have water?
24              MR. SAMMI:  Water is fine.
25              THE COURT:  You've got water?
```

```
 1              MS. WILKINSON:  Yes, sir.
 2              THE COURT:  Okay.  Okay.  All right.  Here we go.
 3              SECURITY OFFICER:  All rise for the jury.
 4              (Jury in)
 5              THE COURT:  What is this fancy water?  Is our water
 6     not good enough for y'all?
 7              All right.  Y'all be seated.  And I think we're ready
 8     for the arguments, for both lawyers, and then I will make give
 9     you some more instructions after that.
10              Okay.  Go ahead, Mr. Sammi.
11              BY MR. SAMMI:  Thank you, Judge.
12                         CLOSING STATEMENT
13     BY MR. SAMMI:
14              Good morning.  After -- good morning?  Oh my
15     goodness.  Good afternoon.
16              Boy, let me try again.
17              Can I start again, do a do-over, Judge?
18              THE COURT:  It's okay.
19              MR. SAMMI:  Good afternoon.  It's a pleasure to speak
20     with you directly again after three weeks.
21              We're at the end of the case and it's soon going to
22     be turned over to you for a decision.
23              You've patiently heard many witnesses over the last
24     three weeks.  You have had to wrestle with a lot of complicated
25     information.  I'm sure it's been a challenge to keep it all
```

1    straight, and I'm going to try to review that evidence with you

2    this morning.

3            But first, before I begin, I want to thank you on

4    behalf of my client, myself, my entire team, that we have a

5    deep appreciation for your service.

6            We have comfort that you will consider this evidence

7    objectively and reach a fair decision.  We have confidence in

8    your judgment.

9            So what is this case about?  Let's strip away all the

10   talk about the technology just for a moment.  We're here

11   because the Defendant stole something very valuable,

12   breakthrough technology that the Plaintiffs developed that

13   finally made a consumer friendly virtual reality experience

14   possible in the palm of your hand.

15           And as I review the evidence with you, it will become

16   clear this was not a heist that was difficult to see.  It was

17   done boldly, it was done unmistakably, and it was done right

18   before our eyes.

19           And the Defendants' only response has been to try to

20   confuse and misdirect, ultimately destroy the evidence of the

21   heist itself.

22           Defendants in their opening accused us of rewriting

23   history.  There's been rewriting of history, but it is not our

24   fairytale.  It is being told by the Defendants.

25           The Defendants' story is a myth.  It is an attempt to

1  con you with a fantasy that Palmer Luckey, a young man who

2  loved VR but who doesn't code software, single-handedly created

3  virtual reality.

4        One thing that is obvious in this case, the VR

5  technology was developed by John Carmack, a singular

6  programming genius who is everywhere.  His name is on our lips

7  every time we talk technology.  Get it from Carmack.  That is

8  what we hear again and again.

9        You heard from our expert Dr. David Dobkin, a

10  Princeton University Dean and a leading figure in the field in

11  computers.

12        He testified that he studied ZeniMax and Oculus code

13  for two years, 4 terabytes of it, and he found with absolute

14  certainty that our code was copied by Oculus.  He found literal

15  copying as well as massive amounts of nonliteral copying.

16        Now, it is no surprise that yesterday we heard from

17  Defendants' expert Ms. Frederiksen-Cross who said the exact

18  opposite.  She said there had been no copying at all, none.

19        Now, Dr. Dobkin's analysis is sound and

20  well-reasoned, but it's also based upon evidence.  That tech

21  transfer that I keep talking about -- why go back to the

22  well? -- that supports Dr. Dobkin's opinion.

23  Ms. Frederiksen-Cross ignores that.

24        But happily this case is actually far simpler than a

25  battle of the experts.

1          The evidence in this case and our own common sense

2     leads us to no other conclusion than the Defendants have stolen

3     our intellectual property.

4          Why do I say that?  Let's start with the obvious.

5          To believe anything else, you have to conclude that

6     Palmer Luckey, Brendan Iribe, and two friends joined forces at

7     Oculus in July of 2012 to create a VR business with some of the

8     most challenging technical work imaginable, but the three of

9     them, including Mr. Iribe, had no VR experience at all.

10          And the fourth, Mr. Luckey, was a hobbyist who

11     couldn't code software.

12          Do you think they could go from what was in that box

13     to the sophisticated Oculus DK1 with its complicated software

14     on their own?

15          Do you believe that they somehow managed without any

16     use of ZeniMax technology to just hire some engineers and

17     create this highly sophisticated VR product in less than six

18     months from July 2012 to January 2013?  Does that seem

19     probable?  Does that seem possible?

20          The evidence shows that the actual VR breakthrough

21     occurred in March 2012 when Mr. Carmack, after experimentation

22     and research at id -- in id's offices, on id's computers, using

23     id's resources -- created what he called "the best damn VR demo

24     the world has ever seen."  Those are Mr. Carmack's words, not

25     my words.

 1          Mr. Carmack did that before he met any Defendant,

 2    before he met any other Defendant.

 3          And that VR headset was ready to go.  It was ready to

 4    go on the Sony, it was ready to go on a VR 1000.  All that work

 5    is owned by ZeniMax.

 6          Let's not ignore what's clear.  Where was the debut

 7    of this huge technological achievement?  That occurred at an

 8    industry convention called E3 in June 2012 in ZeniMax's booth.

 9    Other than Mr. Carmack, not a single Defendant was even there.

10          It should not go unmentioned that the E3 prototype

11    you've seen in this case, in this courtroom was Plaintiffs'

12    exhibit, because it was in Plaintiffs' possession and

13    Plaintiffs own it.  Plaintiffs developed it.

14          After deciding to go into the VR business but lacking

15    the resources in VR expertise, what did Mr. Luckey, Mr. Iribe,

16    and the two other Oculus founders do?  What does your common

17    sense tell you they would do?

18          They did, as some experts for the defense suggested,

19    just go to the library and look up how to do VR, how to solve

20    those problems, go online.  If it were that simple, how many

21    companies would have been in the VR space so long ago?

22          No, these four went to the one company in the world

23    at that time who had shown that it had already solved the VR

24    challenge, and that was ZeniMax.

25          But before ZeniMax was willing to give Oculus access

1    to any of its valuable information, ZeniMax made Palmer Luckey

2    sign a nondisclosure agreement.  We talked about that document

3    a lot.  It is a legal agreement which provided, among other

4    things, that ZeniMax and ZeniMax alone owned all of the VR

5    technology it was sharing.

6            And if Oculus used that technology and made -- or

7    made reference to it in developing other technology, it was

8    still owned by ZeniMax.

9            Then there's a mountain of evidence showing a

10   continuous transfer of VR technology from ZeniMax to Oculus,

11   just what you would expect, all of this technology was

12   requested by Oculus, sent to Oculus by ZeniMax.

13           But now the Defendants insist after all this evidence

14   and against our common sense that they didn't use any of the

15   technology that was being transferred.  They asked for it but

16   never used it.  It was just free feedback.

17           The evidence actually shows that the Defendants knew

18   the code, the secrets, the technological know-how they needed

19   was all owned by ZeniMax, and the Defendants indeed needed it.

20   But ZeniMax wanted to be paid.  So the Oculus CEO, Mr. Iribe,

21   sent a business proposal and requested from ZeniMax a perpetual

22   license to the source code shared by Carmack.

23           Please note the word "shared."

24           This was source code already provided by Carmack to

25   Oculus.

1          Now, you only request a license to software if you

2    don't own the property.  A license gives you legal permission

3    to use someone else's source code.  So when Mr. Iribe proposes

4    a license, he is expressly acknowledging that Oculus is using

5    ZeniMax source code that Mr. Carmack shared with him in their

6    VR product, in their SDK.

7          Let's talk about Mr. Todd Hollenshead for just a

8    moment, the president of id, who wrote back to Mr. Iribe in

9    that proposal for equity.

10         Mr. Hollenshead refers to the hardware modification

11   and software work by Mr. Carmack and offers in exchange for

12   compensation, a license to use the computer code developed by

13   Mr. Carmack.

14         At the very top of that proposal, if you remember, at

15   the very top it says "subject to nondisclosure agreement."

16         Let's pause on Mr. Hollenshead just for a second.

17         You will recall that the Defendants' counsel, in her

18   opening statement, made a pretty big deal about

19   Mr. Hollenshead.  She promised that Defendants would bring

20   Mr. Hollenshead here, the one independent person, to court and

21   he would say Palmer Luckey was the inventor of VR and that

22   ZeniMax never made any claim of the VR technology until the

23   Facebook deal was announced.

24         What did Mr. Hollenshead actually say?  He said that

25   he always believed that this valuable VR technology was owned

1    by ZeniMax, and he said that ZeniMax repeatedly and

2    consistently demanded compensation from Oculus if it wanted to

3    use ZeniMax's technology.

4           Now, let me take a moment to talk about this

5    distinction between hardware and software.  It's been talked a

6    lot about in this case.

7           And you will hear this a lot.  You will hear "their

8    game on our headset."  "Their game on our headset."

9           Let's take a look at this slide and let's get to the

10   bottom of this, because this three weeks of evidence shows

11   this.

12          This is before John Carmack ever met any of the

13   Defendants.  What is on the right side?  This is id's VR

14   engine.  This is VR testbed.  This is Doom 3 BFG.  This is the

15   technology, head and neck modeling, time warp, latency

16   reduction, chromatic aberration, distortion correction, time

17   warp.  That technology is not a game.  It makes VR possible.

18   It has some game content associated with it, but the

19   fundamental technology is VR technology.

20          Now, this -- this demo, this was in that diamond,

21   that's the best damn VR demo the world has ever seen and John

22   Carmack knew it.

23          It was ready to go.  That's hardware.  Ready to go on

24   the Sony, on a VR 1000, on an Oculus Rift.

25          But what happened?  You need that technology to make

1   that hardware, the lens and -- two lenses and the screen, make

2   it into something.

3          And what's this case about?  Let's take a look.

4          They took that triangle and converted it into their

5   SDK.  And where did that SDK go?

6          Boom.  It went right into that hardware and then they

7   called it the Oculus Rift, because without it, you can try and

8   you can go and you can sell your lenses and your screen and you

9   can have a business on the internet or you could try to make a

10  bigger business, but I don't think you can sell that -- what's

11  in that box to Facebook for $2 billion.  You need that.  That's

12  what this case is about.

13         Ladies and gentlemen, if they could make it, why did

14  they take it?  If they could make it, why did they take it?

15         If it was free, why did they take it?  If it was

16  publicly known, why did they take it?

17         Of course they didn't get our VR code and technical

18  assistance and throw it in the trash.  Of course they used it.

19  That's why they requested it.  They needed it as the foundation

20  of their business.

21         There's another glaring piece of evidence in this

22  case which is extraordinary and thankfully it's rarely seen in

23  court.

24         It's on that board.  The deliberate destruction of

25  key evidence after the Defendants got the notice of this

1   lawsuit.  Let me say that again.  The deliberate destruction of

2   evidence so that you can't see it after notice was given of

3   this lawsuit.

4           Remember the shocking testimony about destroying

5   evidence did not come from us.  It came from Mr. Andrew Rosen,

6   an independent court-appointed computer crime expert -- not our

7   expert, not their expert, an expert appointed by His Honor --

8   who testified that Oculus computers, including most importantly

9   the computer of John Carmack, was deliberately wiped and

10  evidence on it permanently destroyed.

11          So we ask ourselves, are these the actions of

12  innocent people, Defendants with nothing to hide, or do these

13  actions show a consciousness of guilt?  Are these the actions

14  of people who know the evidence will prove what our common

15  sense already tells us?

16          Why wouldn't they say we're happy for you to look at

17  our computers, go ahead, and you will find that there's nothing

18  there?

19          The answer is obvious.  They have 2 billion reasons

20  to hide the evidence.

21          What happened here is clear.

22          Let's detail the claims and let's jump into the

23  evidence.

24          Look at our first slide.

25          This is not a case like television, a criminal case

1   where you need beyond a reasonable doubt.  The standard here

2   for almost all of these claims, and His Honor has instructed

3   you and you have those instructions, is a preponderance of the

4   evidence.  That's a scale.  And that means if it tilts more one

5   way than the other, that's a preponderance, more than

6   50 percent.

7          Let's start with trade secret misappropriation.

8          The existence of a trade secret.

9          Let's walk through.

10         What's a trade secret?  It's a formula, a pattern, a

11  device, a compilation that gives you an advantage.  It's not

12  just source code.  Trade secrets are software, know-how,

13  technical advancements, all of those qualify as trade secrets.

14  What must you consider to decide whether something is a trade

15  secret?  Six factors.  They're in your packet.  Not all of them

16  apply and not all of them need be fulfilled.

17         Things for you to consider.

18         Let's take a look.  What are the trade secrets in

19  this case?

20         ZeniMax's seven.  We've heard a lot about these.  I

21  won't repeat them all, but they're listed there for you, and

22  they're listed in your packet.  There are seven.  Mr. Carmack

23  made them, Mr. Carmack did, id owns them, and so does ZeniMax.

24         Now, Mr. Carmack used these trade secrets to create,

25  as I said before, the best VR demo the world has ever seen.

1          And here he is.  I asked him.  I said, "So when you
2    think that you have something that is probably the best damn
3    thing in the world, that means something, doesn't it?"

4          Yes, it does.  It certainly does.  He's had multiple
5    awards, lifetime achievement awards.  The man is a genius.  It
6    was ready to go on any headset.

7          Now, let's look at the next slide.  Were these trade
8    secrets made public?  What makes it the world's best VR demo is
9    that nobody else had it, and nobody else could make it.

10          We heard from Professor Gleicher.  These technologies
11    were not found in the public domain.  Each one of these seven
12    technologies addressed a critical issue.  But it's very
13    important that we stop for a minute and we think about the two
14    experts we heard from the Defendants, Professor Howe and
15    Professor Balakrishnan.  And their expert opinions were as
16    follows:  Everything is public.  Everything can be found at the
17    library.  Everything is in a paper.

18          100 hours?  100 hours.  We have been in court for
19    three weeks, and all of this could be done by hiring a couple
20    of coders and putting them in a room and giving them 100 hours.
21    Some were as low as 5 hours.  22 hours.  18 hours.  But do we
22    hear anything about a clean room at Oculus?  No.

23          They could have written several versions of our trade
24    secrets while we've been here at trial.

25          Also, here is another reason that we know that the

 1   trade secret weren't public.  Why was E3 such a big deal?

 2          I asked, if you recall, Professor Howe, can you name

 3   for me one commercial VR headset that had low latency and was

 4   ready to go before 2012, 2011, 2010, 2009, 2008?  No.  If

 5   everybody knew it, there would be companies everywhere.  This

 6   is a great country.  There is a lot great people who want to do

 7   a lot of great things.

 8          Now, how do we know that it was not public as well?

 9          Remember the blog post, Mr. Carmack, the paper that

10   he wrote?  Mr. Carmack admitted there's no source code in that

11   blog post.

12          How about open source?  We've heard a lot about open

13   source.  I asked Mr. Carmack, weren't we trying -- didn't

14   ZeniMax take out virtually all of the VR technology from that

15   open source?  And that open source cannot run a VR experience.

16          Did we keep these trade secrets secret?

17          Physical measures, physical security, technology

18   security, source code repository, security camera footage,

19   badges, legal protections -- we're going to talk about these,

20   NDAs, copyrights, trade secrets, trademarks.  Yes, we kept it

21   secret.

22          What are the value of these trade secrets?

23   $2 billion.

24          They're valued by Facebook because they bought them

25   for $2 billion, and they knew what they were buying.  And I

1    will get into that in just a little bit later.

2            What did it take to get there? How much investment?

3    Let's take a look. How much investment and effort was spent?

4    And there's a lot of testimony and argument back and forth

5    between -- was ZeniMax into VR? Was ZeniMax not into VR?

6            Let's go back to Mr. Carmack, the man who is the

7    genius who said in May of 2012, right around the time that the

8    VR demo was being made, the entire genre of first-person games

9    is an attempt at virtual reality.

10           If you remember, ladies and gentlemen, when I first

11   spoke to you, we talked about Pac-Man to first-person shooter,

12   to 3D, every step getting closer into the game, all of this

13   technology funneling towards one thing and one thing only, a VR

14   demo.

15           Now, what did Oculus have? Did Oculus have these

16   trade secrets? Let's take a look. No. We talked about the

17   box. We know what's not in the box. No software was in the

18   box.

19           Mr. Luckey, not a software guy, more of a hardware

20   guy.

21           Mr. Nate Mitchell, his friend and founder. I'm

22   highly skeptical that he's much of a software engineer. And

23   that's okay, but we have to realize who is a real, real genius

24   here.

25           There are some emails that tell us. This is

1    Mr. Palmer Luckey to Mr. Nirav Patel, how hilarious is it that

2    thousands of people are going to pile into a room and listen to

3    a speech given by a 20-year-old who got lucky and was blessed

4    by Carmack?

5          I read that as blessed by trade secrets, blessed by

6    id, blessed by ZeniMax.

7          How did the Defendants acquire the trade secrets?

8    That's the next step.  How did they get them?

9          Two ways.  Breach a confidential agreement, breach a

10   contractual relationship, or get them by improper means, and

11   they did both.

12         What's the confidential relationship?  We will dig

13   into this later a little bit more in the contract.  This is it.

14   This is the NDA.  It's the numbers.

15         We say numbers in this case a lot, and I always call

16   this Plaintiffs' Exhibit Number 1, and there's a reason why

17   it's Plaintiffs' Exhibit Number 1.  It is very important.

18         This is a relationship, one of trust and confidence

19   that was breached to get our trade secrets.

20         How was it breached?  Right there.  Almost

21   immediately, let's go a hotel room, nobody tell id, nobody tell

22   ZeniMax, and let me show this information to other people.  The

23   heist starts here.  The heist starts here.

24         How else?  How did Oculus use our info and pass it

25   off as their own?

```
 1              That's just a better-looking way of me putting emails
 2    on the ELMO and me trying to get documents up and me trying to
 3    hold a board and show you how to go back to the well.  There it
 4    is.  Over and over and over and over again.  We know them by
 5    heart almost, dot, dot, dot, time to open up Doom 3 source?
 6              I don't know how to correct gravity in gyro.
 7              Basically at this point I need Carmack's code.
 8              I think the best starting point to write software is
 9    Carmack's code.
10              What else happened?  Improper means, not just breach
11    of a relationship.  Improper means.  Mr. Carmack stole 10,000
12    files.
13              Do we honestly think that there were 10,000 emails
14    about happy birthdays, dentist office, or notes to friends and
15    family?
16              He admits in this court to copying those files.
17    Where did they go?  They went to an Oculus MacBook.  They went
18    to an Oculus desktop.
19              Is it any coincidence that on those Oculus computers
20    the ZeniMax information was found?  And what's the answer?  I
21    didn't use it.  It provided no benefit to me.  It was useless
22    to me.
23              That is what we hear.  And it's on the same computer
24    that you're doing work on Oculus and you're doing work by
25    ZeniMax.
```

 1            Now, let's see if they used it.  Commercial use.  How
 2    do we know?
 3            Summer, fall, they used the Rage -- VR Rage testbed,
 4    and they went around the world.  They got -- they did
 5    demonstrations, Unity, 3D, Epic Games, Valve.  Even Mr. Carmack
 6    says, wow, that's a really, really impressive slate.
 7            Did they show anything else, "they" being Oculus?  We
 8    heard this testimony.  Was there any other demo to show?  No.
 9    Just us.
10            Let's take a look.  Where did they go?  Everywhere.
11    We knew about some.  We did not know about all.
12            Who else used our trade secrets?
13            Mr. Giokaris, do you remember him?  He gets forgotten
14    sometimes, but I always try to remind people.  He was given
15    access to source code from the creator of Rage, who would be
16    John Carmack, while he was working on HMD warp, and he said I
17    could have cut and pasted that into the code.
18            And you know what we heard?  Do you know what we
19    heard Defendants' experts say?  We heard Defendants' expert,
20    Ms. Frederiksen-Cross say he was playing around.  He might have
21    been playing around with it.
22            That's not playing around when you are trying to
23    solve a problem.
24            Let's take another example.
25            Mr. Cooper.  Mr. Cooper, the evidence shows, was

```
 1  working on chromatic aberration correction for one month.  One
 2  month.  And then what happened?  He was forwarded code from
 3  ZeniMax, and 24 hours later he checked into the Oculus
 4  repository the solution for chromatic aberration.
 5          Now, what happened in those 24 hours?  Did Mr. Cooper
 6  go to the library?  Did he Google it?  What do you think?  What
 7  do I think?  I think we all know what he did.  He used what he
 8  was given in his work, as we all do as normal people.
 9          Now, commercial use of ZeniMax code.  This is
10  Mr. Brendan Iribe, the CEO.  When your boss sends you something
11  and says, here, look at this, I assume you've seen this,
12  let's -- are we doing the same?  That is a big question mark at
13  the end of that sentence.  I assume we're doing the same.
14  Yeah.  If I'm on the receiving end of that, I'm going to do it.
15  Of course I am.
16          How about Mr. Luckey to Mr. Jack McCauley and Nirav
17  Patel?  You heard Nirav Patel sit in that chair and say I made
18  the sensor from scratch.  Here is the picture of me in the
19  factory.  Okay.
20          What does Mr. Luckey email to Mr. McCauley and
21  Mr. Patel?
22          Be careful about putting Carmack on the emails.  Even
23  if we don't really know what we're doing, we should make an
24  effort to appear as we do.
25          Think about that for minute.  We heard from
```

 1   Mr. LaValle.  Remember I asked Mr. LaValle, when you first got

 2   to Oculus, you saw a really awkward exchange between Brendan

 3   Iribe and Jack McCauley saying stay away from Carmack.  These

 4   things add up, tell you something.

 5          Who else is confirmed use?

 6          Professor Dobkin.  He's confirmed that he's looked

 7   through this code and confirmed that these trade secrets were

 8   used in Oculus's code.

 9          Now, again, Ms. Frederiksen-Cross denies it, but I

10   don't think her opinion is supported by the facts.

11          Now, why did they need our trade secrets?  Why do

12   they need them?  Because they are the foundation of Oculus.

13   They are the foundation of Oculus.

14          Mr. Luckey says, yes, I would still be tinkering away

15   on my own, and that's -- and that's -- it's not something to

16   rub anybody face in, but if this is what your business is,

17   that's great.

18          But if you're John Carmack, you can create something

19   better.  And John Carmack says this himself, this next slide.

20   This is it.  This is the heart of the case.  This is Carmack,

21   Mr. Carmack saying it himself.

22          "Everyone agrees they wouldn't exist as a funded

23   company if it weren't for our involvement."  That's the key.

24   That is the foundation.

25          We heard Mr. Zuckerberg talk about foundation.  Let's

1    talk about him for a minute.

2             Facebook knew.  Facebook knew.  I'll tell you how

3    Facebook knew.

4             Mr. Zuckerberg flew down here for one day, and he sat

5    in that chair under oath, and he looked at you, and he looked

6    at me, and I asked him questions, and he said all of your

7    clients' claims are worthless.  I have had my people look into

8    it.  They don't have any merit at all.

9             I think he said something like, if I remember

10   correctly the quote, I, like most of the people in this

11   courtroom before we got sued never heard of ZeniMax.

12            Okay.  So we're, you know -- just to aside.  You

13   never heard of ZeniMax?

14            I saw an email that you wrote to John Carmack after

15   he met on your patio before you shook your hands on a

16   $3 billion deal.  I was surreal meeting you, Mr. Carmack,

17   because I grew up playing your games.  He knows about id, he

18   knows about ZeniMax.

19            And he says to you, to me, to us, to this entire

20   court, he says all these claims are meritless.

21            And then I started asking questions, and the first

22   thing I say is, well, did you know that for months and months

23   Oculus went around the world and the only thing they had was

24   the Rage and the Doom demo?

25            Do you know what he said?  He said, "I don't believe

1    that's true."

2           And we had sat here a week before he got here, and we

3    heard all that evidence from the Defendants themselves.

4           And I said, "Well, do you know anything about the

5    origins of Oculus?  Did it ever come up after you bought them?"

6           Never came up.

7           That's really odd to me.

8           There's more evidence of use.  And we'll get back to

9    that in a second.  But that quote, "if it's gone, it's gone,"

10   that's from Mr. Zuckerberg.

11          I said, "Well, did you know about what's on the

12   board?  Did you know that the evidence is destroyed?"

13          He said, "Well, you know, if it's gone, it's gone."

14          We're not going to know the full extent of the use.

15          Mr. Mitchell's computer is up there too.  You

16   remember him.  He came over to our offices here in Dallas with

17   a desktop computer, download -- you heard him say it --

18   downloaded Doom 3 BFG and related additional data.  I think it

19   was additional data.

20          So what additional data?  The computer has gone

21   missing.

22          Now, let's get to Mr. Rosen for a moment.  When I

23   used the term "wiping," I use that term to describe a process

24   that is the direct result of a volitional act of a computer

25   user that results in the permanent and irrevocable destruction

```
1    of information.
2              That means a person actively does something which
3    results in the data permanently being destroyed.
4              What does that mean?  That means that whatever has
5    been deleted is beyond our reckoning.  We can no longer see it.
6              92 percent of a software coder's computer is zeros,
7    92 percent.
8              By the way, that destruction, it wasn't just by
9    chance.  We have to understand the timing of that destruction.
10             When you're about to get sued, or if somebody writes
11   you a letter and said, you know what, I think we have some
12   claims on intellectual property and the inside lawyer for your
13   company sends a note to every employee and says, okay, we got
14   some letters from ZeniMax.  Then you start destroying evidence?
15   You are under a duty to preserve evidence so that you, the
16   jury, we could look at it and we could see what's there.
17             I talked about Facebook, talked about why -- it's not
18   credible to me -- and I don't think it's credible to you.  Now,
19   if Mr. Zuckerberg doesn't know things, that may be because
20   Mr. Zuckerberg doesn't want to know things or Facebook doesn't
21   want him to know things.  But there are people, obviously, at
22   Facebook who knew a lot of things.
23             So, ladies and gentlemen, on page 18 for trade
24   secrets, please.  Yes.  And I think the evidence shows it
25   clearly.  Oculus, Facebook, Palmer Luckey, Brendan Iribe, John
```

1  Carmack all utilized, misappropriated our trade secrets, every

2  single one of them.

3          Now, how many -- let's talk about damages for trade

4  secrets for a moment.  How do we show that?  Let's look at the

5  next slide.

6          You heard from Mr. Dan Jackson.  $2 billion.  Big

7  number, right?  That's because that is what Facebook paid for

8  it and that's because what they are paying for is the software,

9  because the magic is in the software.  That is the value of the

10  company.  That diamond that moved from our software into that

11  headset and made it something magical, that is worth a lot of

12  money.

13          I will remind you, and I think we need to remember,

14  Mr. Jackson's testimony is unrebutted.  There was not another

15  damages expert in this case.

16          MS. WILKINSON:  Your Honor, I'm going to object to

17  the implication that we have any burden to bring a damages

18  expert.

19          THE COURT:  You will be able to make your argument.

20  This is argument.

21          MR. SAMMI:  How do we know that the magic is in the

22  software?  Because Oculus said it in their investor deck, the

23  magic is in the software.  This is a hardware company.

24  Shouldn't the magic be in the plastic and the lenses and the

25  silicone?  No.  But the magic is in the software.

1        What else?  Facebook confirmed it.  "Without

2   software, it wouldn't work, and we wouldn't have bought the

3   company."

4        Why is ZeniMax owed the entire value?  Because

5   Facebook would not have purchased it at all without ZeniMax's

6   foundation.

7        We heard Mr. Zuckerberg say that.  He actually said

8   that it's very important to know the foundation of what your

9   business is built on, and ten questions in he had no idea what

10  the foundation of Oculus was.

11       There are alternative measures for damages.  If you

12  want to apportion it, if you want to share that pie and

13  apportion it, there are ways to do it.

14       Mr. Jackson told us, you can split it up by display

15  lenses, sensor, ergonomics, 75 percent.  That's $1.5 billion.

16       You can apportion it in another way, by thirds.  And

17  there is a reason for these apportionments, it is not just

18  pulled out of thin air.

19       Let's see what Mr. Jackson said.

20       Kickstarter video.  That's a Kickstarter video that

21  Oculus put out itself.  "The magic that sets the Rift apart is

22  immersive stereoscopic 3D rendering" -- software -- "a massive

23  field of view" -- screen -- "hardware" -- ultra low latency

24  head tracking -- "software."  That's two out of the three.

25       Mr. Zuckerberg:  "VR is basically tracking,

 1 | rendering, and display," two out of the three.  That's
 2 | $1.33 billion.
 3 |         I will show you a chart for unjust enrichment for
 4 | trade secret misappropriation and virtually many other claims.
 5 | The instructions are in your packet.
 6 |         Facebook, we just went through, 2 billion, 1.33 to
 7 | 1.5.
 8 |         Mr. Carmack, how enriched have people gotten off of
 9 | what was in that diamond on that first slide?  $101.4 million
10 | for Mr. Carmack?
11 |         Mr. Iribe, $427 million, almost half a billion
12 | dollars for one person.
13 |         Mr. Luckey, $206 million for one person.
14 |         I urge you that the entire value of what Oculus is
15 | built on is based on our technology.
16 |         Let's talk about copyright.  What's copyright?
17 | What's a valid copyright?  We have ownership of the copyright.
18 |         This is not in dispute, ladies and gentlemen.  Let's
19 | take a look at the next slide.
20 |         Those are the copyrights filed with the United States
21 | Government, and they are valid.  They cover source code and
22 | object code.
23 |         Source code.  Confidential and proprietary
24 | information, not for disclosure, stamped.  You can't stamp
25 | electronically, but you can put it right in there.

1           Was there copying?  Was there copying?

2           Let's take a look.

3           There was a lot of testimony in this.  Do you

4    remember this?  This was, I believe, just yesterday.  Literal

5    copying.  And Ms. Frederiksen-Cross disagreed, she put a big

6    "X," said no, no, this didn't happen.

7           And then I said, well, did you see that that literal

8    source code was actually plugged in to the Oculus repository

9    earlier?

10          "Well, I'm not sure I saw that.  I'm not sure I saw

11   that."

12          How about the fingerprint?

13          Dr. Dobkin:  "That's a mistake."

14          Cosine scale.  You're calling a tangent a cosine.

15   Not a big mistake, but it's an interesting one.  It's a

16   mistake.  Why would that mistake carry over?  Why would that

17   mistake carry over if you didn't copy it?  It's pretty rare.

18          That's the open source version of it.  We fixed it

19   before it went open source, those couple of lines.  Oculus

20   didn't.

21          Let's take a look at Professor Dobkin.  "I'm

22   absolutely certain that Oculus copied and used ZeniMax's code."

23   They're not exact copies.  Nonliteral copying is copying.

24          Now, we heard this question from defense counsel to

25   Ms. Frederiksen-Cross on every one of these trade secrets.

1          Ms. Frederiksen-Cross, do you see on there, the boxes

2     that Dobkin has.  Professor Dobkin, they don't -- does that

3     code even look the same?

4          No, no, it doesn't even look the same.

5          That's the point of nonliteral copying.  That is why

6     you have to do an analysis and understand that it won't look

7     the same, but it's copying.

8          This man spent two years looking at the code.

9          Now, let's take a look.  There's the boxes, and if

10    they want to say the boxes are silly or the colors are silly,

11    that's okay.  This is -- this is two years of work.  Two years

12    of work.

13         Now, the Defendants will say, well, it's only a small

14    number of lines of code.  Don't be fooled.  Don't be fooled.

15    The Defendants will say that, it's only a small number of

16    lines.

17         Then here's the problem I keep running into.  If it's

18    a such small number of lines of code, then why can't they just

19    go and write it themselves?  If it's such a small amount of

20    code, why do they got to keep going back to be the well?  I

21    just don't get it.

22         There is no evidence.  Here is another thing that

23    we've heard.  No one -- this is a quote.  No one will come in

24    here and tell you that we copied their code.  There is no

25    evidence that we ever got source code -- "we," being Oculus.

```
 1              We have Professor Dobkin.
 2              Who else do we have?  We have Peter Giokaris.  There
 3      was a shader file there, and that was used.
 4              Who else do we have?  We talked about Mr. Cooper.
 5      You received source code.  That is use.  That is copying.
 6              How about Mr. Carmack?  I like this one a lot, but
 7      it's important evidence.  Time to open up Doom 3 source,
 8      Mr. Mitchell.  Let's go forward.
 9              What about Mr. Carmack?
10              "If you write down on paper one thing at id and then
11      you leave the next day and you write that same thing down
12      somewhere else, do you consider that to be id's?
13              "If it was the same, that would be a copyright
14      infringement."
15              Mr. Carmack seems to think that the law says if I do
16      the same exact thing that I did at id -- it's not that anybody
17      owns Mr. Carmack's brain.  It's those specific solutions for
18      problems that were worked on for id in their products in their
19      offices on their computers.  You can't just leave and type it
20      back again.  You can call it reimplementation, you can call it
21      reproduction, you can call it what you want, but it is
22      copyright infringement.  And when he's in a hurry, you know you
23      wrote the exact needed code well at a previous job.  You only
24      had one previous job for 20 years.  That was at id.
25              On the verdict form, ladies and gentlemen, please,
```

1   question 7 and 8, we think yes for all of these.

2          Did each of the following Defendants directly

3   infringe the copyrights?  Yes.  You can infringe copyrights by

4   copying them yourselves.  You don't have to be a coder if to

5   infringe copyrights.  If you make copies of it and send it to

6   other people, if you make copies of and use it in your

7   products.  You can be vicariously liable for copyright

8   infringement if you send it around your company and you know

9   it's wrong.

10         Damages for copyright.

11         Mr. Jackson told us there's a floor, there's a

12  negotiation.  What would the -- what would the parties reach?

13  What agreement would they reach?  $400 million.  We urge you

14  for question 14.

15         Let's talk about breach of contract for a moment.

16         Valid, enforceable contract.

17         Now we're going to dig into the NDA if we can.  Let's

18  look at it, the who, the what, the how.  Let's go.

19         Okay.  The who?

20         Palmer Luckey, id Software, ZeniMax.

21         Now, I suspect that the Defendants will say, well, it

22  was Palmer Luckey, not Oculus that signed that NDA.  It was

23  Palmer Luckey, not Oculus who signed that.  But read it.  Let's

24  see what it says.

25         Let's go back -- let's go back, please.

1                    Thank you, Mr. Frank.

2                    "The receiving party," that is Mr. Luckey, "and each

3     of the receiving party's officers, directors, employees, and

4     counsel will be legally bound by the terms of this agreement."

5                    That's Oculus.

6                    Let's take a look at some other language here.

7                    Who was Oculus?  Luckey was Oculus.  Mr. Luckey was

8     Oculus.

9                    "When you signed the nondisclosure agreement, Oculus

10    was you, correct?

11                   "I was doing business under the name Oculus.

12                   "Would it be fair to say that as of the time of the

13    NDA, Oculus was you and you were Oculus?

14                   "That seems pretty fair."

15                   Indeed it does.

16                   If I sign a contract as Tony Sammi and the next day

17    and I go out and I incorporate some company and I try to get

18    out of that contract, the law says no, you don't get out of it.

19                   The what.  The what.  What is proprietary?

20                   I'm sorry, the print is a little small.  I tried my

21    best at the top.  Highly confidential and proprietary

22    information.

23                   Computer entertainment software, including virtual

24    reality testbed software and related assets.

25                   That is not limited to any particular program.  It is

 1    not limited to object code or source code.

 2             How is proprietary information defined?

 3             Scientific, technical, engineering, information,

 4    procedures, computer programs, whether as source code or object

 5    code, documentation, emails, technologies, plans, research,

 6    marketing.

 7             What is not covered in the NDA?  I mean, you can't

 8    have an NDA on the whole world.  That's not fair.  So what's

 9    not covered in the NDA?

10             What's not covered in the NDA is if you do something

11    on your own without reference to or using my proprietary

12    information, that is yours.  Of course it is yours.  I don't

13    keep that.  You made it, right?  But it's got to be without use

14    or reference to our technology.  Independently developed.  And

15    I think the evidence shows with that tech transfer, the SDK was

16    not independently developed.

17             How?  How do you keep it safe?  You have got to

18    maintain its security, you have to restrict disclosures, you

19    have got to not disclose it.

20             You can't use it to obtain a competitive advantage

21    with respect to the disclosing party.

22             Ownership.  "All proprietary information is and at

23    all times shall be the exclusive property of the disclosing

24    party."

25             Now, we've heard Mr. Carmack gives advice away for

1    free.  Could he give away the VR testbed code for free?  No.

2    He had to ask permission.  We know that, because he asked, said

3    would it be acceptable for me to send it?

4              And we said, okay, but you have to sign an NDA.

5              You didn't just give it away.

6              You had to ask permission, right?

7              I did because it is technology that belongs to id,

8    technology that belongs to ZeniMax.

9              Performance.

10             Next slide.  Thank you.

11             Did we perform our end?  Yes.  We gave them the

12   information.

13             Did they perform their end?  Did they breach?  Yes.

14             Let's take a look.

15             Demonstrations.  There were demonstrations going on

16   that we weren't aware of.  That's Mr. Todd Hollenshead.

17             July 4th, the secret meeting -- I call it the secret

18   meeting -- Defendants say, why do you call it the secret

19   meeting?  Of course I call it the secret meeting.  Because it's

20   things that we got under the NDA that nobody is telling id and

21   ZeniMax about and they are showing it.  That's a breach.

22             There is evidence that we've already seen.  This all

23   is things we don't have to go through again.  It's all the same

24   evidence in this case.  Under breach of contract, flying it

25   around the world.  Lee Cooper, Peter Giokaris.  Remember, don't

1   use it as competitive advantage.  How about the tech transfer?

2   Without reference or use.

3          The verdict form, ladies and gentlemen, yes.  Did

4   Palmer Luckey fail to comply?  Yes.

5          Do you find that Oculus is a party to the

6   nondisclosure agreement?  Yes.

7          Officers, directors, employees.  Luckey was Oculus.

8          Did Oculus fail to comply with the nondisclosure

9   agreement?  Yes.

10          Let's talk about the damages under breach of

11   contract.

12          If we could go --

13          Unjust enrichment.  These are the options that

14   Mr. Jackson told us about.  What's the value?  Everything is

15   built on this technology that was transferred under this NDA,

16   and this contract was breached.

17          $2 billion, 1.5 billion, 1.33.

18          Ladies and gentlemen, under the question 26 and 27,

19   for Mr. Luckey, unjustly enriched by $206 million.

20          Oculus, unjustly enriched by $2 billion, the basis of

21   their very business.

22          Now, let's talk a little bit about tortious

23   interference, Facebook tortious interference.

24          What does that mean?  The contract we're talking

25   about here is the NDA, and we're talking about Facebook, who

1   knew about the NDA and didn't care and knew that if it was

2   going to do something like buy Oculus, that NDA would keep

3   being breached and would be breached again.

4          That's what it means.  Tortious interference with the

5   contract.  This is from the jury charge.

6          The Defendants' intentional making of a contract with

7   a party and proceeding to carry out that contract -- and that's

8   the sale, the purchase of Oculus -- knowing that performance of

9   that contract would be contrary and in violation of a contract

10   with the Plaintiffs.

11          A lot of Plaintiffs and Defendants.  We will break it

12   down.

13          Facebook knows there is an NDA, and if it buys

14   Oculus, that technology would be transferred again under that

15   NDA through a breach.  That's tortious interference.

16          How do we know that Facebook knew?  April 10th

17   letter.  April 10th.  After the deal was announced but before

18   the deal was closed, we wrote a letter to Facebook.

19          And it was polite, but it attached the letter to

20   Oculus.

21          And the letter to Oculus that was attached

22   underneath, it clearly told about the NDA, told the whole

23   story.  It was about three, four pages long.  Facebook knew.

24   And Mr. Zuckerberg may not have ever heard about it, but his

25   lawyers sure did.

1          Diligence in a weekend?  $3 billion deal in a
2   weekend.
3          They never found the NDA?  We told them about it in a
4   letter before they closed.  Never found the NDA.  That is how
5   they knew, and that's how they knew they tortiously would
6   interfere with our contract.
7          Did Facebook do it?  Yes.  The evidence shows that.
8          Damages for tortious interference.  Again,
9   Mr. Jackson.
10          You don't have to add all these up, but use your
11   judgment.
12          We say $2 billion.
13          Unfair competition.  What's that?  It's what it
14   sounds like, unfair competition.  Is it fair?  Can you do
15   business like this?  You're supposed to compete on a level
16   playing field.  You know what?  You want to go into business,
17   go into business.  Let's compete.  You put out a better product
18   than mine, you get the sales.  I put out a better product than
19   yours, I'll get the sales.  We will do it on the up and up, but
20   if you don't do it fairly, it interferes with your business.
21          In addition to everything else you've already heard,
22   what are the elements -- what are the facts that we know how
23   Oculus and Facebook competed unfairly?
24          Mr. Carmack's employment agreement, that's an
25   employment agreement with Oculus that the Defendant,

1   Mr. Carmack, broke.  He breached that employment agreement.  He

2   doesn't want to call it a breach.

3          He want to call -- Luckey wants to call stealing a

4   transgression.  He wants to call breaching his contract I

5   failed to comply.

6          But it's a breach.  It's not fair.

7          How about stealing things?  id Tech 5 game engine

8   code.  This, a laptop that I deposed Mr. Carmack after -- a

9   year after this litigation was pending, and I asked him for 25

10  minutes, can you tell me about all of your computers so we can

11  find the evidence.

12         Didn't remember it.

13         And then a month later, oh, I found a laptop in my

14  closet, and it happens to have millions of lines of id and

15  ZeniMax code on it that has never been publicly released, that

16  has never been licensed outside of the id ZeniMax family.

17         And Ms. Frederiksen-Cross never talked about it.

18  None of their experts did.

19         They stole it.

20         How about the breach of the nonsolicit?  We know

21  that.

22         Mr. Carmack.  Now, Ms. Kennickell has many reasons to

23  do what she wanted to do, but let's focus on Mr. Carmack for a

24  second.  When Mr. Iribe says can you give me the name of top

25  coders that I want to recruit.  What does Mr. Carmack do?

 1    Serves them up on a silver platter and then says I didn't do

 2    anything.  It's not solicitation.

 3            That interfered with our business.  How did it

 4    interfere with our business?  That's one of the elements of

 5    unfair competition.  Let's take a look.

 6            Five of your top coders leave on the same day.  They

 7    sign their resignations.  They put them in on the same day.

 8            What happens?  It harms the studio.  It's very

 9    damaging.  These are talented people.  They are hard to

10    recruit.  Got to get a game out.  It's a working environment.

11    It interferes.  Unfair competition.

12            Ladies and gentlemen, yes, yes to unfair competition.

13            And, remember, I would like to remind you that unfair

14    competition is not just for tortious interference -- not just

15    for the nonsolicitation or the breach of the contract.

16            It's a lot of things you can consider as unfair

17    competition, all the evidence we've already been through that

18    I'm not repeating for each cause of action.  There you have

19    your choice of damages.  We suggest $2 billion.

20            Let's talk about conversion very briefly.  Conversion

21    is another claim, and that just means you took something and we

22    want it back.  You took something, and we want it back.

23            USB drive, right.  That's here.  But there is also

24    code.

25            Next one, please.

1              Millions of lines of code.  Want it back.  Rage code.
2    That's conversion.
3              Carmack has refused to return that property.  I
4    failed to do so.
5              We want it back.
6              Let's talk about trademark for a minute the.  I won't
7    go through this in great detail.  The jury charge, the parties
8    do not dispute that ZeniMax owned legally protectable
9    trademarks.
10             What is the point of the trademark claim?  The point
11   of the trademark claim is that -- it's like my example of when
12   I stand in front of something, a big sign that says Coca-Cola
13   and I'm selling Tony's Cola.  You might look at that and you
14   might think I guess he's sort of in business with Coca-Cola
15   somehow and I might be confused if that's a new type of soda
16   from Coke.
17             What did we say before the Kickstarter?  It's very
18   important that you not use anything that can be construed as
19   ZeniMax property.
20             What happened?  We still used it in the video because
21   it strengthened the video.
22             There's -- there's him.  Now, you watch this video,
23   and it is Doom all over the place, footage of game play, and
24   then what's the excuse the Defendants say?  Well, you know, we
25   got it off the internet.  That means it's free.

1    And then there was a slide when we were going

2    through -- there was a slide when we were going through that

3    testimony, and it had a picture of YouTube and there was a big

4    checkmark, and it said public.

5    We know that's not how it works.  You can't just grab

6    something off the internet and use it in your business.  You're

7    not teaching a class, you're not in a library, you're not using

8    it for educational purposes, you're not at home.  That's fair.

9    You're using it to raise money in your business.

10    How else?

11    The slide decks, the investor presentations, all

12    over.

13    Let's talk about -- one more thing.  This is a slide

14    deck that Mr. Iribe sent, numerous high-profile game companies

15    onboard, id/Bethesda.  Then there's a comma.  Then it says even

16    the big publishers, Activision, have approached us.

17    He's telling people that we're on board.  We had no

18    arrangement relationship.  The deal fell through by March 2013.

19    Let's talk about exemplary damages as we get close.

20    Exemplary damages are damages to punish and deter.  And you

21    have that power.  The Court gives you that power based upon all

22    the information that you've seen, all the evidence that you've

23    seen in this case.  If you find malice, fraud, gross

24    negligence.

25    Let's take a look at some of the examples.  We have

1    been through so much of this.

2            The destruction of evidence after the lawsuit began.

3    That's not how companies are supposed to act.

4            The theft of 10,000 files and code.

5            Misrepresentations by attorneys to the court expert

6    as to what the evidence was.

7            For example, Mr. Cooper's laptop, files were deleted

8    three minutes before it was imaged, and Mr. Cooper -- Mr. Rosen

9    was given that image for the lawyers for Facebook and Oculus

10   and was told that that is a bit-for-bit image, and Mr. Rosen

11   said no, it's not.  I have to start with the first one of the

12   first zero and end with the last one and the last zero.

13           That's not how companies are supposed to act,

14   reputable companies.

15           Computers missing, management sanctioned, copyright

16   infringement, ripping.

17           It's important.

18           Again, it's not a Blu-Ray that you're going to watch

19   at home.  It is a VR demo.  And then you ask your boss, I don't

20   know where you stand on the ripping approach, and your boss at

21   Oculus says do whatever it takes to get the best result.

22           And then what do we find?  We find those movies

23   ripped illegally on hard drives, shared drives inside the whole

24   company.  Everybody using it.

25           Management sanctioned -- I'm sorry.  I just went

```
 1    through that.
 2            $3 billion deal over a weekend.  $3 billion deal over
 3    a weekend.  Do you think that shows -- that's gross negligence,
 4    I would say to you.
 5            And I will show you that, and we're going to talk
 6    about it in just a second.
 7            Let's talk about Mr. Carmack's false affidavits as
 8    other reasons to find damages to punish and deter.
 9            An affidavit.
10            "I did not induce or attempt to induce any of the
11    employees to quit their employment with id Software."
12            That's signed under oath.  That's an affidavit.
13            So the id 5, the friends just showed up one day, and
14    nobody ever talked about, and you just go to work one day and
15    five of your friends show up and, okay, we want to work for
16    you.  That's not believable.
17            How about deleting files?  Mr. Rosen said these files
18    had been deleted, these system logs files, and here is a
19    declaration, again, a declaration from John Carmack.  "I have
20    never wiped the hard drive of my Oculus MacBook, nor did I wipe
21    any files from the MacBook hard drive before I provided it for
22    imaging."
23            There is an example of exemplary damages, these
24    damages to punish and deter, and it's on page 78, but I will go
25    through it with you.
```

1       It's gross negligence.  It means the act or omission

2   by Defendants that has an extreme degree of risk, right?

3   Defendants have actual subjective awareness of the risk but --

4   actual subjective awareness of the risk but nevertheless

5   proceed with conscience indifference.

6       So let's think about that for a minute, and let's

7   think about Facebook.

8       Awareness of an extreme degree of risk, nevertheless

9   proceed.

10      Are we going to buy Oculus?

11      Mr. Amin Zoufonoun, Mark Zuckerberg's right-hand man,

12  who is running the deal is texting him on that weekend of doing

13  it -- I think it began on a Friday.

14      And he says, "Wow, I think Oculus misrepresented some

15  things to us.  There are things that Oculus told us that simply

16  aren't true."

17      We send Mr. Carmack.  Mr. Carmack actually warns

18  ZeniMax -- warns them that ZeniMax will sue him for his work on

19  VR.  Mr. Carmack puts Facebook on notice.

20      After all those warning signs, Facebook doesn't care.

21  What is it?  It's an awareness of risk, nevertheless proceed

22  with a conscious indifference.  That is gross negligence.

23      What do they do?  There is more warning signs.  Let's

24  go back for a second.  There is more warnings.

25      We wrote to them on April 10th, after they announced

 1   the deal, we being ZeniMax and id.  We said stop, don't do

 2   this.  You are buying stolen goods.  We wrote to Oculus.  We're

 3   going to sue them because they stole our stuff.

 4           Facebook wanted it really badly.  They didn't care.

 5   And they had an exit.  They had an exit.  They had two of them.

 6   The first one is you don't have to make the deal with diligence

 7   in a weekend.

 8           The second one was, even after you announced the

 9   deal, the deal says you could walk away if the warranties made

10   to you by Oculus are not true.

11           But they didn't.  They kept going, and they closed

12   anyway.  And they bought this lawsuit.  Mr. Zuckerberg and

13   people at Facebook are upset that they are in this courtroom.

14           We heard Mark Zuckerberg say it is really important

15   to make sure the foundation that you're building upon is

16   something that you own.

17           Do we really think that in three days Facebook really

18   figured out what it was buying?  It didn't care to figure it

19   out.  It didn't want to figure out.

20           Malice.  Fraud.  Let's take some more examples.

21           Brendan Iribe.  Really bad to send long emails on

22   legal matters.

23           Email is permanent and can be used in court.

24           This is a CEO of a company saying that email is

25   permanent.

1          And I believe the explanation was, well, I had some

2    legal things.  So you can have talks with your lawyers.  So

3    what if the talks to your lawyers stay permanent.  That's okay.

4    They can stay privileged.  But they don't have to be erased.

5    It's like they can be used against you in court.

6          Is this how honest businesses operate?  Is this how

7    honest people and executives operate?

8          Next.  "We need to sync up before your depo."

9    Mr. Zuckerberg's deposition.  I took it.  The night before,

10   text message, "We need to sync up."  To get the story straight.

11         Wiping.  Completely wiped.  Andrew Rosen, expert.

12         He says, in fact, before you wipe a computer, there's

13   a couple of "are you sures" like when you're about to send a

14   reply to all.  Are you sure you want to do this?  Are you sure

15   you want to do this?  Yeah.  He's sure he wanted to do it.

16         Never wiped a Mac.

17         Correct.  To this day I never wiped a Mac.  Those are

18   lies.

19         Let's talk about Mr. Rosen for just a second.  File

20   deletions immediately prior to imaging.

21         Wiping is a volitional act.  We talked about that.

22         He had concerns regarding the integrity of the image.

23         Was this evidence tampered with?

24         Inaccurate submissions to the Court.  Inaccurate

25   submissions to the Court.

1          Under an obligation to preserve anything that is

2    deleted when you're under an obligation to preserve is a very

3    bad thing to do.

4          And you don't need to be a lawyer to understand that.

5          How about this?  I will probably burn in hell for

6    this.  This is the money that is coming out of all this, you

7    know.  It is going to come out soon that the deal was actually

8    4 billion to me, meaning I calculated my cut off of a higher

9    price so I could give myself more.  It's Mr. Iribe talking to

10   his friends on a text message, which he thinks can't be used in

11   court, apparently.

12         Mr. Iribe, $427 million.  Mr. Luckey, $200 million.

13   Mr. Carmack, $100 million.  Facebook Oculus, $2 billion.

14         Ladies and gentlemen, exemplary damages?  Yes, you

15   should find exemplary damages against each and every one of

16   these Defendants.

17         It's wrong.  It's wrong to do those things.

18         Take a look at the verdict form.  You're allowed to

19   award up to two times the amount you award in compensatory

20   damages.  You are allowed to consider the net worth of the

21   Defendants when you decide what is fair to punish and deter

22   this type of behavior.  Facebook is a $350 billion company.

23         The standard is conduct that offends a public sense

24   of justice.  It does.  It certainly does.

25         Now, you may hear -- I will talk to you again in just

1    a little bit, but you may hear from Defendants.

2            Public concept.  We talked about the board that had

3    public on it.  Have you heard of gravity?  Yes, that concept is

4    public.  Have you heard of a prism in the lens?  Yeah, it's

5    public.  Everybody knows that, right?

6            We did it better.  We did it differently.  We didn't

7    use anything.  We sent you our SDK.  As if that proves that the

8    SDK wasn't made using John Carmack's help, id's help and our

9    code.  Why go back to the well?

10           ZeniMax had no vision.  Vision?  Isn't a person with

11   vision the ones who -- the one who develops it and then debuts

12   it to the world before everybody thinks it can even be done?

13   Those are the people with vision.

14           ZeniMax never said we owned it.  Of course we did.

15   Of course we said it.  We had an NDA.  We had negotiations with

16   an offer that said NDA and here's the work we've done right on

17   the front.  Here's how much we want.

18           When you hear from Defendants, ask yourself:  If

19   making a VR engine is easy, why didn't everyone else do it

20   before E3?  Where would Oculus be today without Mr. Carmack,

21   without our technology provided under the NDA?  If they could

22   make it, why did they take it?  Why the destruction of evidence

23   after getting notice of this lawsuit?  Why the wiping of

24   computers?  Why the lies?

25           In her -- in the opening Plaintiffs showed a proverb,

```
 1   "Where there is no vision, the people perish."  The proverb

 2   continues.  "But he that keepeth the law, happy is he."  Today,

 3   ladies and gentlemen, that is you.  There is a difference

 4   between right and wrong.  Let's make it right.

 5             I will be back to you in a bit.  Thank you.

 6             THE COURT:  Do you need a break before you start?

 7             MS. WILKINSON:  Whatever you think is best, Your

 8   Honor.

 9             THE COURT:  Do y'all need a break?  No?  Yes?

10             Okay.  Short break.  Okay.  We will take a short

11   break.

12             SECURITY OFFICER:  All rise.

13             THE COURT:  Don't talk about the case.

14             About five or ten minutes at the most.

15             (Jury out)

16             (Recess at 2:56)

17             THE COURT:  Okay.  Here we go.

18             David, are they ready?

19             SECURITY OFFICER:  Yes, sir.

20             (Pause)

21             SECURITY OFFICER:  All rise for the jury.

22             (Jury in)

23             THE COURT:  Y'all be seated.

24             Thanks.

25             Ms. Wilkinson.
```

```
 1            MS. WILKINSON:  Thank you, Your Honor.
 2                        CLOSING STATEMENT
 3   BY MS. WILKINSON:
 4            Good afternoon, everyone.  It is a little after 3:00
 5   on a Thursday afternoon, and you have been here for three
 6   weeks.
 7            And I join Mr. Sammi telling you how grateful we are
 8   for your service because the only time that you get to talk
 9   during this process, even though you are in the end the most
10   important people, because you have our fate in your hands, is
11   when we did the jury selection.
12            And many of you told us that you were sacrificing
13   your work.  You had family emergencies, you owned small
14   businesses, you have family responsibilities, and you
15   sacrificed all of those things, those important things to sit
16   here and listen to us try and tell you about the case, try and
17   show you the evidence that you are going to need.
18            So the great thing about our justice system is that
19   in the end, at the end of any trial, a big trial like this or a
20   small trial, after all the evidence is done, folks like you,
21   regular folks who work every day, apply their common sense, get
22   to take this evidence and the law His Honor gives you and make
23   your decision.
24            Why is that so important to us?  Because we have been
25   waiting for three years.
```

1          These people dragged us into court, and they are

2     right, we don't want to be here.  I like my job, but these

3     folks are real people, and you heard what they've done.  They

4     have given their blood, sweat, and tears to this business.

5          Mr. Carmack apparently gives his blood, sweat, and

6     tears to everything.  Mr. Luckey is passionate about what he

7     does.  What other nine-year-old reads Nuts & Volts?  My kids

8     don't read Nuts & Volts.

9          He was pursuing what he loved.

10         Mr. Iribe dropped out of college.  He started three

11    businesses.  He was a programmer.  He and Nate and the others

12    specialized in SDKs.

13         These are real people who worked hard, doing what

14    they love, what they cared about, and, yes, they have become

15    incredibly successful.  And they should be.

16         Who wouldn't want to change places with them?  Who

17    would want to do what you love and be successful?  Some of us

18    do what we love and we're successful, and maybe we don't make

19    that kind of money, and that's great.

20         But here, this country, what we really reward is you

21    build something, you persevere, you invest your own money, you

22    work day and night, and you build something for the rest of us,

23    and you're successful, and you're rewarded.  That's what is

24    supposed to happen.

25         And there is competition out there, and there's other

1    people who want to be in business, but most of the time it's

2    the people who work the hardest and the longest and are the

3    most persistent.  They're who prevail.  And that's what

4    happened in this case.

5         And you know what?  They're really mad about it.

6    They're jealous, they're angry, and they're embarrassed,

7    because they had the opportunity to get in on this.  They had

8    an opportunity to be a part of it.

9         There are documents we're going to look at.  You've

10   seen everything.  You heard the witnesses.  This was supposed

11   to be a partnership.

12        They thought we were clowns.  They mocked us in

13   the emails.  They come into the courtroom and do the same

14   thing.  They still bullied.

15        How many times did you hear snapping, yelling at our

16   witnesses and one of the lawyers mocking Mr. Palmer Luckey

17   because he doesn't have a college degree?

18        Well, first of all, I felt like a chump.  I went to

19   college, because I'm certainly not as successful as they are.

20   But so what that they didn't go to college?  So what that

21   Mr. Luckey doesn't have the formal fancy training that

22   Mr. Altman does?

23        He found what he loved, and he was great at it, and

24   he's brilliant, and he doesn't deserve to come into this

25   courtroom and have these people mock him and belittle him just

1  like they did outside the courtroom, they did exactly the same

2  thing in this courtroom.

3          They haven't changed their stripes at all.  You saw

4  with Mr. Altman when he took the stand.  16 times the Judge had

5  to order him to answer my questions.  How many do you think he

6  had to be ordered to answer when Mr. Sammi asked him?  Zero.

7          He thinks he can talk down to me, talk down to the

8  rest of my clients, mock us, make fun of us?

9          The great thing, as I said, about our justice system

10  is that time is done.  You get to deliver justice, and you get

11  to tell them that taking us, dragging these people through the

12  mud for three years, trying to tarnish their reputation, tell

13  some fanciful tale that they stole things, that those people

14  that came from around the world that love virtual reality, the

15  nerds who love to write code, who like to build a sensor from

16  scratch.

17          Those folks came in and talked to you.  They didn't

18  steal their technology.  They got together because they love

19  it.  They wanted to make their own technology.  They're proud

20  of what they do.

21          So I'm going to ask you at the end of this, tell them

22  that's enough after three years because it doesn't matter what

23  little story they tell, it matters what the evidence was, what

24  you saw on the screen, what you saw on the ELMO, and the

25  evidence that you heard from the witnesses.

1          And that's all in this courtroom anyone gets to use

2     to decide what happened.  Not an attorney argument, not

3     berating a witness over and over and over again, trying to get

4     the answer you want when they refuse to do it.

5          It's what was the evidence?  What did the documents

6     show?  What did the people say?  And as I told you at the very

7     beginning, it's amazing in this case.  There is so much

8     evidence that was created at the time, not after the fact, not

9     coming in and making up some story about why you didn't invest

10    and why you called the purchase by Facebook insane.

11         We know what they thought.  You looked at it

12    yourself.  You saw the opportunities that they had, and you met

13    the people.

14         So let's turn to the claims and the evidence that's

15    very important to my clients because this was their final

16    chance to show you what really happened.

17         And it really all started because these people have

18    one thing in common.  They do have a vision.  They did have a

19    vision, and they still have it.

20         Have they solved every problem?  Have they been

21    successful in everything?  No.  No.

22         By most of our standards they have been pretty darn

23    successful.  But, guess what?  Other than being in here with us

24    every day dressed like this, which has got to be the first and

25    the longest they have all ever been in suits and ties or even

1    in closed shoes, honestly.

2            You know, they are at work every day.  They're at

3    Oculus.  They're working for Facebook.  They didn't say, oh, I

4    got my money, you know, I'm going to go lay on the beach.

5    These people want to bring this technology to life because they

6    believe it's more than just a game.  They believe it is more

7    than putting on some goggles.  They believe, like

8    Mr. Zuckerberg told you, that this is a technology of the

9    future.

10           And you know what?  They might be wrong.  $5 billion

11   in investment.  It's a risk.  Some people don't want to take

12   it.

13           Mr. Zuckerberg might be wrong.  But you know what?

14   He's willing to give it a try, just like he did when he was

15   19 years old and he dropped out of Harvard and built his

16   business.  These guys were willing to risk what they had or

17   what they didn't have and try to make this technology a

18   reality.  And they're still at it.

19           Don't let these people stop them from doing what

20   they're still trying to do.  They're still going to work every

21   day.  They're still writing code.  In fact, you probably saw

22   Mr. Carmack.  He is over there using my cards writing new code,

23   because this is not his environment.

24           He doesn't want to be here, because this is what he

25   wants to do.  This is what they all believed in.  This is what

1    brought them all together.

2            And this is the guy with his team who was willing to

3    invest in the people.  He believed in the people.

4            And you heard ZeniMax didn't believe in the people.

5    Of course, they thought Mr. Carmack was a genius.  Okay.  Every

6    single person has said Mr. Carmack is a genius.  His Honor can

7    take judicial notice of that.

8            But that's not really the point.  The point is who

9    was willing to say this was the right team, these were the

10   people who could do it?  And that's what Mr. Zuckerberg and

11   Facebook saw.  They saw the future.

12           They didn't say, oh, look at this SDK or the VR

13   testbed that ZeniMax wrote.  It wasn't even compatible with the

14   headset.

15           What they saw was what these guys could do in the

16   future.  And so they invested, in great contrast to Mr. Altman,

17   who for his own reasons -- and he is entitled to them -- has

18   pursued a narrow strategy of making the best AAA games.

19           And as I said in the opening, there is nothing wrong

20   with that.  But that doesn't mean that you get to say that

21   somebody else's technology is yours, especially when you had

22   the opportunity over and over again to make that investment.

23           And we know what he thought.  Not only did he answer

24   questions eventually on the witness stand, he wrote in 2013,

25   remember?  This is a couple of months before Facebook announces

1    the deal.  They announce the deal in December 2014.  And what

2    does he say?

3           He's so angry at Mr. Carmack for leaving, even though

4    his contract was over, he didn't own the guy forever, four

5    years after buying his company, he let him go by not renewing

6    in 60 days.  He is so mad at him and so bitter because he knows

7    that people, like Gloria, who you met yesterday, loved working

8    for Mr. Carmack and loved working with Mr. Carmack.

9           So what does he say?  He sends around a snarky fan

10   comment.  And why does he like it?  He likes it because it

11   justifies what he did.  He said that he believes in loyalty.

12   Well, we know Mr. Altman believes in that.

13          He said, "He could have focused," meaning John, "on

14   making id better instead of leaving to focus on still unproven

15   technology.  Look at previous attempts at virtual reality, and

16   you'll see it has failed again and again."

17          And he writes, "Exactly."

18          He didn't think these guys could do it.  He didn't

19   think that technology that he made supposedly was so great, or

20   he would have hired all these people himself.

21          You saw Nirav Patel.  Why couldn't he have found him?

22   That gentleman was putting his sensor data and code out on

23   Meant to Be Seen.

24          Professor Steve LaValle wrote a free book.  Remember?

25   He said he put it on the internet in his spare time after being

1    a computer professor.

2          If they wanted to find these folks, they were right

3    there in front of them.  They didn't want to.  They didn't want

4    to do it because they thought it wasn't worth it.  It wasn't

5    going to succeed.

6          And they certainly weren't willing to spend the money

7    that it's taking to try to make this technology successful.

8    Their own expert said -- I asked him, "Is there any evidence

9    that these Plaintiffs" -- these ZeniMax -- "would have ever

10   been willing to spend $3 billion on developing virtual reality

11   technology?"

12         And he said, "I haven't seen any."

13         There is nothing in their books.  There's nothing in

14   the documents that suggests that they were committed or would

15   ever have been committed to do what it takes.

16         The Plaintiffs have brought us into court, and when

17   you bring someone to court, you have to prove your case.  And

18   what the law says is, you don't get to say it's 50/50.  You

19   don't get up and say, well, we have this fancy guy from

20   Princeton, and you have this really smart woman who is a

21   computer coding expert, hum, they both said it, they both say

22   different things, call it a tie.  No.

23         The tie goes to the Defendant in our system.  Unless

24   you prove your case, if it looks like, um, I can't decide

25   between the experts, the Defendant wins.  And that's true for

1    everyone, whether you're rich or you're poor, because you don't

2    get to drag people into court unless you can actually prove it.

3            So Plaintiffs have to tip that scale.  They don't get

4    to just say we presented one expert and you presented the

5    other.  And they certainly don't get to say, oh, we had a

6    damages expert and you didn't.  Guess what?  We don't think

7    there is any damages.  And we certainly are not going to prove

8    their case for them.  We don't have to do that.

9            The law says we don't have any burden.  You want to

10   prove your case, you bring your evidence and you guys decide

11   whether that's enough evidence.

12           But what did Plaintiffs focus on?  You spent two

13   weeks of this three-week trial before they virtually said the

14   words "trade secrets" or explained what they were.  I put that

15   chart up in front of Mr. Carmack after they called him as a

16   witness to start talking about them.

17           What did they focus on?  They focused on Gloria's

18   resignation.  Why did we bring her in here?  Not because we

19   wanted to.  She is not central to this case.  But because they

20   were smearing her and the other people that left with her and

21   suggesting they were going because they were taking VR

22   technology.

23           And then D-day comes, judgment day comes, Gloria gets

24   on the witness stand and did they ask her whether she did VR

25   work?  They didn't everyone have the guts to confront her.  You

1    know why?  Because she didn't do any VR work, as she said.

2    They didn't have one piece of paper.  They didn't have anything

3    to show that she actually did VR work.

4            What they heard was she didn't like working there.

5    They didn't treat her colleagues well.  She wasn't getting to

6    do the interesting work that she liked to do with the people

7    that she loved, her family.  That's why she left.

8            But they made us drag her in here because they said

9    she was key, the id 5.  They showed you the silly video, that

10   supposedly this was Mr. Hooper or Mr. Cooper was coming in

11   after he left and this was going to show that John somehow gave

12   him something improper.

13           There's no evidence of that.  They didn't show you

14   anything.  They want to argue isn't this suspicious, we will

15   pull out one clip and that will mean that you can jump to

16   conclusions that they weren't just talking as Mr. Carmack said.

17   The only evidence is they were talking about his work.  And you

18   can somehow leap to the conclusion that Mr. Carmack did

19   something wrong.

20           And then, my favorite, the box, the great box.  The

21   box is gone now, so I can't use it, I'm sure.  But it was out

22   here as you saw during theirs.  First it was that long little

23   box.  What came in the box?  Who saw what was in the box?  Is

24   the box really anything?

25           Mr. Luckey got on the stand, oops wrong box.  Well,

1   we will bring you the right box.  What was the box about?  It

2   was about making fun of what Mr. Luckey did.  It was saying,

3   you just put some cheap goggles in a box.  You didn't even have

4   a strap.  And you didn't make anything.  Your contributions

5   were worthless, Mr. Luckey.

6           What Mr. Luckey did was something that nobody had

7   done in 40 years.  Maybe it looks obvious now to all these

8   geniuses but guess what?  It wasn't.  Nobody else --

9   Mr. Carmack told you nobody else had figured out how to put the

10  right lenses in and the right panel and make it cheap and

11  lightweight and actually viable, commercially viable.  He's the

12  one who did it.

13          And Plaintiffs used some analogy, my favorite of all

14  these little sayings they had, remember, if you steal my bike

15  and you put a bell and you put a basket on my bike and I say

16  it's my bike, you stole my bike.

17          Mr. Luckey sent the headset.  Mr. Carmack slapped the

18  sensor/bell on it and put the strap on it.  It was Mr. Luckey's

19  headset.  And the only people who know -- the only people who

20  were there at the time that know are Mr. Carmack and

21  Mr. Luckey.

22          Mr. Altman has no idea.  He doesn't have the

23  technical expertise.  He certainly wasn't down here in Dallas

24  and he couldn't have cared less back then.

25          At the time everybody said the same thing.  That was

1  Palmer Luckey's invention.  Did it get better thanks to

2  Mr. Carmack?  Of course it did.  And guess what?  It got better

3  after Mr. Carmack had nothing to do with it for a while when

4  Oculus was formed.  And it got better again.  And hopefully it

5  will continue to improve.

6          But Mr. Luckey made a real contribution.  Mr. Carmack

7  was great for him and great for Oculus, but he was also great

8  for ZeniMax.

9          At E3 the only reason ZeniMax got real attention for

10  their Doom 3 BFG demo was because of the headset, so they all

11  got a benefit, all of them.

12          Plaintiffs then said, well, Mr. Carmack, even though

13  he's a great guy and a genius, he's a criminal.  He's a guy --

14  I think they keep calling the court-appointed independent

15  expert a criminal crime -- computer crime guy to make it sound

16  like there is a crime.

17          Here is what Mr. Rosen said.  He said, "I agree that

18  the entire hard drive has not been wiped."

19          Now, why does that matter?  Because if Mr. Carmack

20  was trying to cover up what he did years after this technology

21  is already out on the market, why would he only wipe part of

22  it?  And why would he turn the USB drive back in to these guys?

23  If you wanted to commit a crime, if you wanted to erase all the

24  evidence, why would you find the USB drive a year later or so

25  and hand it over to the other guys with all the files still on

1    it, to show exactly what you did?

2           He handed them the evidence that they now claim, oh,

3    look, this shows he stole the files.  Yes, he copied the files.

4    He shouldn't have done it.  He shouldn't have copied personal

5    emails.  He shouldn't have copied professional.  But this

6    company had been his life for 20 years.  And he got up on the

7    stand and he took his licks over and over again with Mr. Sammi

8    and he said, I did it.  But I didn't use it, and it wasn't part

9    of the Oculus technology.  And everybody said that.

10          Mr. Rosen said, "We don't see any evidence of

11   third-party wiping," which is what these guys were alleging and

12   there was nothing suspicious about MacBook, because they have

13   that normal function that erases automatically.

14          That's Mr. Rosen.  No, not at all.  No, sir.

15          They put up these magnets over and over and over

16   again.  They didn't prove that any of this was given to Oculus.

17   They called these Oculus computers because Mr. Carmack said he

18   did work on them for Oculus.

19          Were they used at Oculus?  No.

20          Are they in any Oculus products?  No.

21          The case is really about one fundamental issue.  We

22   call it trade secrets, we call it copyright, but the truth

23   is -- the question comes down to:  Did we copy their code?

24   That is really what it's all about, because if we didn't copy

25   their code, none of the rest of this matters.

1          And that's really what Plaintiffs have been trying to

2     say for three weeks.  You copied our code.  And after all the

3     witnesses are said and done, the only people who would really

4     know the answer to that are the people who wrote the code and

5     the people who understand how to look at the code.

6          They did not present one person who wasn't a paid

7     expert who could tell you anything about the code.  That should

8     tell you how much they prioritize virtual reality.  They say,

9     oh, Mr. Carmack left and you stole the id 5.  There are plenty

10    of people out there if they wanted to make the investment.

11    They could have hired them before Mr. Carmack left, after E3,

12    when they thought, oh, this was such a great thing, they could

13    have hired them after Mr. Carmack left.  They didn't think it

14    was worth it.  They didn't care.

15         And they didn't prove that they had any secrets.

16    They didn't show you exactly what they were.  And they

17    certainly didn't show you how we used them.

18         The jury instructions that you're going to get -- and

19    I wanted to do one thing for you because I was trying to think

20    what could I do to help you as I was listening to His Honor

21    read to you that 90-page jury charge, and I will tell you even

22    as a lawyer, it's pretty daunting so don't feel badly.  It is

23    really confusing.

24         But so I was trying to -- what's the easiest way just

25    to have some organization?  You obviously don't -- do whatever

1     you like.  One thing I thought is there's lots of instructions

2     in there, but if you want to keep track of all these different

3     claims, at least you could know what page each of the claims

4     where the verdict form is.  So you heard a lot about trade

5     secrets.  If you go to page 35, that's where that question

6     starts.

7             If you answer no, that nobody copied any trade

8     secrets, you don't have to answer any more questions and you

9     can go to copyright -- excuse me, this is page 18.  I'm sorry.

10            Page 18.  And copyright is on page 35.

11            The breach of the NDA is on page 45.  And the

12    tortious interference is on page 51.

13            So while that looks daunting, the questions all go

14    with each of the claim.  And in each case the first question

15    is:  Did they prove that any of our clients -- and you will see

16    the specific names -- actually did any of these things?

17            So let's take a look at the rest of the proof.

18            John didn't keep any secrets from Mr. Altman when he

19    worked there.  He knew that he was exchanging information.  He

20    knew he was working with Oculus.  John wrote him an email and

21    said, I need your official guidance, and here's my

22    recommendation.  I think we should finish Doom 3 BFG for VR and

23    take that technical advisory position, which is the one working

24    with Oculus, and we should lead.

25            They knew exactly what he was doing and they knew

1    what he recommended.  And you know what?  He said we should

2    lead and they rejected it.

3           They didn't want to spend the time and the money that

4    you see here that Facebook and Oculus had to to start getting

5    this technology so that it is consumer -- it is viable in the

6    consumer market.

7           It started, as we said, with Mr. Luckey's passion.

8    His first prototype, which you saw, his prototype at Sundance,

9    and then the prototype that he sent to Mr. Carmack.

10          That was the breakthrough.  That was different.  Look

11   at all these other pictures of all the different VR devices.

12   None of them look like that.  Again, this looks relatively

13   simple, but nobody, not all the guys who were fancy scientists

14   in the areas of optics -- Nintendo, Sony, not anybody, not

15   these huge corporations -- had come up with this idea until

16   Mr. Luckey did.

17          And what was ZeniMax's response?  You don't have to

18   guess.  They wrote it down at the time.  Before they ever

19   thought about suing -- I would say that's the evidence you want

20   to know.  People can say anything after the lawsuit --

21   right? -- and justify it and try to make their story tailored

22   it to.  The question is:  What did they say when they thought

23   nobody was looking?

24          They said, VR, we don't want you to put any further

25   effort toward this, because they didn't have an arrangement

1    with Oculus.  "Your energies are best spent on Doom 4," the

2    game.  That was their business model.  That is what they wanted

3    these guys to do, and they wanted Carmack and his team to get

4    back to work on what they thought was their vision and their

5    priority, getting Doom 4 out.

6           All of these folks that did the work for us, that

7    worked for Mr. Altman and worked with Mr. Carmack and worked

8    for Mr. Iribe, they all came in.  We brought in the people that

9    did the work from Mr. Zuckerberg, obviously Mr. Luckey and

10   Mr. Carmack, Mr. Patel, Gloria, and Steve.  They came in

11   themselves, in addition to the depositions, and allowed these

12   folks to confront them and explain to you what work they had

13   really done.

14          Plaintiffs didn't see any value in that.  Plaintiffs

15   at the same time all these guys are working hard, are calling

16   VR and the Oculus Rift stupid.

17          They called Mr. Willits, who came in at the last

18   minute, remember him, he came in for like 15 minutes, he still

19   works for ZeniMax, he said, "I think the whole Oculus thing is

20   silly," he says in 2013.

21          Mr. Andonov says -- again, before they sued, before

22   anyone was looking -- "This is a silly distraction and have you

23   ever considered that these clowns may fail?  Do you want to be

24   associated with that?  Focus on Doom 4."

25          If you thought you had great technology, like

1  Mr. Iribe did and Mr. Luckey and Mr. Zuckerberg, would you

2  write down that you think they're going to fail and you

3  consider the people, the people that Facebook invested in, as

4  clowns and get back to your job, Doom 4?

5          We know what they thought, ladies and gentlemen.

6  They didn't think anything of this technology.

7          January 29, 2013, that's a year before Facebook

8  announces the purchase.

9          There's a reason that after this they don't come

10 knocking on Oculus's door even though this is out in the

11 marketplace three months later.  They don't come and say, hey,

12 that's our technology.  That's our bike.  They don't say a

13 word, because they don't think it is, and they think the whole

14 thing is going to fail.

15          As I said, they make fun of these guys in the

16 courtroom and they were making fun of them outside the

17 courtroom.

18          Now, some of their folks at least were honest about

19 what benefits they got.  This is Mr. Hines, one of the many

20 people Plaintiffs didn't bring.  And you should remember that,

21 because they have the burden of proof.  And you're allowed to

22 infer from people they don't call that there is a reason they

23 didn't call them, because if this isn't what Mr. Hines

24 believed, don't you think Mr. Altman would have trotted him

25 down in here to tell you that?

1          This is exactly what Mr. Hines thinks.  He thinks the

2   notion that ZeniMax created a business for Oculus is silly.

3   There's that same word again.  He thinks ZeniMax used Oculus's

4   tech to show off ZeniMax's game and got a ton more press and

5   attention for that game than ZeniMax ever would.

6          Mr. Hines wasn't lying.  He was telling exactly what

7   he thought a year before Facebook ever announced the deal.  He

8   was saying we know how this works.  We have an old game.  They

9   have a headset.  It is a new platform.  If we show them

10  together, our game will do better.

11         Yes, Oculus benefited from that press, you bet they

12  did, and so did ZeniMax.

13         Plaintiffs had plenty of people that could have come

14  to testify.  You saw emails.  All these folks were on the

15  email.

16         Mr. Andonov, we know why he didn't come down.  I

17  think he was the one that wrote silly and clowns and mocked us

18  more than anybody.

19         Mr. Hines, we saw why he didn't come down, because he

20  said exactly the opposite of what they are trying to claim in

21  the courtroom, that they actually built our business.

22         Mr. Leder, he was the one who was so impressed with

23  the Sony demo.  I don't know why he didn't come down except I'm

24  sure he doesn't back up their story.

25         Mr. Lesher, the general counsel.

1          Ms. Tallent was the one who said I wished we played

2    our cards differently when she saw the Facebook deal.  They

3    certainly didn't bring her down.

4          And Ms. Thompson, the global communications director.

5    Do you know why?  Because she knows that they knew about these

6    demonstrations.  Whether they knew about every one or not is

7    not the point.  They knew because they wanted us to do it

8    because it was good for them.

9          She's on the emails.  So what do they do?  Who do

10   they have come in here to tell you-all about the technology and

11   their work?  Mr. Altman, the one guy who has the biggest stake

12   in this whole litigation, the same guy that has his lawyers

13   mocking how much money these gentlemen make.

14         What do you think is going to happen if you somehow

15   award $2 billion?  He told you this is not a charity.

16         And what did he say?  I asked him, "What are the

17   parts of this VR technology that you think you actually own?"

18         "I can't define it.  I'm not a technical person."

19         That's fair enough.  He's a businessman.  He runs a

20   successful business.  But then he should have some technical

21   people that work for him that can explain it, right?

22         Mr. Zuckerberg is a really smart guy, but he's not

23   the expert on the virtual reality technology.  He hires these

24   guys, just like we had Nirav Patel.  He came into the

25   courtroom.  We had the guys who did it.  They had no one.

1          And so who did they bring?  They had no one to talk

2   about VR, not a single person who isn't a paid witness, who

3   does it for a living or is paid to come to certain conclusions.

4          They brought in Mr. Willits at the very last minute

5   for about 15 minutes, and Ms. Keefe, with one question, one

6   question on cross, and I will stop here because one of the most

7   important things in a trial, too, is what we call the engine of

8   cross-examination, because you can say anything on direct.  You

9   probably saw that.

10          Somebody presents one side of the story, and you

11  think, oh, that sounds really good.  I wonder what they are

12  going to say.  That sounds terrible for the Defendants.

13          And then you hear the cross-examination, and you're,

14  like, oh, I didn't think that.  That's a totally different side

15  of the story.

16          Ms. Keefe asked him one question.  "You've never

17  written a single line of code at id; isn't that correct?"

18          He wasn't the technical guy.  He's been there his

19  whole life.  He is indebted to Mr. Altman.  He never had any

20  other job.  Just like Gloria told us, she had to accept the job

21  when he threw the contract at them and said take it or leave

22  it.

23          What do you think Mr. Willits is thinking?  He's been

24  there for 20 years.  He couldn't tell us a thing about the work

25  on VR, and that's because, other than Mr. Carmack, they didn't

1  do a thing.

2         One of the most important functions of the jury is

3  that you're the judges of the witnesses and the credibility.

4  And the reason His Honor says he doesn't like these deposition,

5  even though you get to see folks, and we all like it better

6  when people sit on the witness stand, because most of us judge

7  people by how do they respond?  Do they seem forthright?  Do

8  they answer both sides' questions easily and equally?  Are they

9  hesitant?  Do they look down?  Does their story sound

10 ridiculous?

11        So under our system, that's always you guys who get

12 to do that.  And, really, maybe it seems, you know,

13 overwhelming because of the technology, but it's not, because

14 you have common sense.  And you do this every day, whether it's

15 your kid who tells you, you know, with the cookie in his hand

16 that he didn't break the cookie jar or the car with the dent in

17 it, that he didn't drive your car, or whether you're talking to

18 a friend and you can tell whether they are telling the truth.

19        It's no different in here.  And you saw that.  You

20 saw that with people.  And you saw that most with Mr. Altman.

21        I've been doing this for a long time.  A long time.

22 I have never seen someone refuse to answer questions 16 times.

23 And the big difference was it wasn't just that he refused and

24 the judge had to order him, it's that he didn't even hesitate

25 when Mr. Sammi asked him, because he had his speech ready and

 1    off he went.

 2            But when I asked him, he was going to be a lawyer.

 3    He was going to be very careful because he didn't want to admit

 4    anything, and he had his story ready, and he was going to tell

 5    it.

 6            So what did he say?  He couldn't quite keep his story

 7    straight.

 8            On direct, what did he say?  "We saw the opportunity

 9    of VR before the rest of the world.  We're the ones who

10    invented it."

11            "We," I love "we."  He had nothing to do with it.

12            "We are the ones who took it to E3."

13            That's what he said.

14            On cross, "Oh, wait, we weren't the first company to

15    do VR.  We were the first company to have a commercially viable

16    product which we demoed at E3," which he eventually admitted

17    that wasn't true either because the prototype at E3 was

18    never -- never, never, never commercially viable.  It was

19    great.  Kudos to Mr. Carmack and Mr. Luckey, but it wasn't

20    commercially viable.

21            Then what did Mr. Altman say?  And these things

22    matter because they're all about what you have to decide.  Did

23    these guys believe in and own and have this VR technology?

24            He tried to say in direct that they had been

25    looking -- and this is a quote from the transcript.

1          "We had actually looked at VR technology for a long

2   time, going back into the '90s.  In fact, there was a

3   photograph of the fellow who is our vice president of game

4   development on the cover of the PC Gamer."

5          Now, if you're not a lawyer and you're a normal

6   person, that sounds like somebody who worked for him at the

7   time, right, is featured on there, and they are looking at it

8   on behalf of ZeniMax, right?  The normal person would think

9   that.

10          Was that true?  No, of course it wasn't.

11          This magazine was out in 1996.  That is Todd Vaughn,

12   who didn't work for him at the time, and, in fact, ZeniMax

13   didn't even exist in 1996.

14          Why do you have to overreach like that and take

15   credit?

16          Gloria came in and told you she had never heard of

17   these guys working on VR until John started doing it.

18          You know what?  That's the truth.  There's nothing

19   wrong with that.  I don't know why they seem to think they have

20   to say they own all of VR, they started it, everything comes

21   from VR, everything that was ever done.

22          Okay.  Technology evolves.  That's true.  But

23   everybody who has come into the courtroom says virtual reality

24   was something different.  And they weren't doing it other than

25   Mr. Carmack, and certainly Mr. Altman when I put that

1    photograph in front of him had to admit, oh, yeah, we didn't

2    exist in 1996.

3          John Carmack, when this first started to happen,

4    before anyone was thinking about suing, before anyone was

5    thinking of even having somebody like Facebook purchase them,

6    in fact, when Mr. Luckey was still thinking he was going to

7    send these little developer kits out to people and people would

8    build themselves.

9          Why?  Not because he doesn't know what he's doing.

10   Because he doesn't have a lot of money.  He was working in his

11   parents' garage, as you heard.  He was, you know, fixing

12   phones.  He was like the rest of us folks.  He was trying to

13   build the business because he loved it.  Yes.  He did not have

14   the money to manufacture it and to get it out there.

15         And Mr. Carmack knew.  He knew that because he had

16   the reputation as someone who is this great programmer who

17   shared information with everybody, that people would try and

18   give him the credit.

19         I don't think he ever thought that he would be hauled

20   into court by his former boss and said that that belonged --

21   that headset belonged to ZeniMax.

22         But he made it clear in 2012.  He wrote to Palmer and

23   said, "I am doing my best not to let anyone mistake the Rift as

24   my work."

25         Now, why would he write that way back then?  Because

```
1    he thought people might misunderstand.

2             And why would ZeniMax ignore it?  Why did they read

3    that email and say I don't believe Mr. Carmack back then?

4             They are certainly not alleging that he was in some

5    kind of conspiracy to steal from them back in May of 2012.  In

6    fact, they said he brought the prototype to E3 and it was

7    great.

8             So why is it that they read that email, exactly what

9    Mr. Carmack said, and they just ignore it?  Because it doesn't

10   go with their fantasy.  It doesn't go with their fairytale.

11   And it is exactly what happened.

12            Mr. Carmack did a great job, but Mr. Luckey started

13   this whole thing off with the headset.

14            And the other way you know that that's exactly what

15   happened is, even Mr. Altman has to admit that he never said to

16   anyone that belonged -- the headset belonged to them.

17            If this was your great technology, if this all

18   belonged to you, not just the game, not just the software, but

19   if the headset, the whole VR experience belonged to you, would

20   you let some other company go out and call it the Oculus Rift

21   and sell it?  Of course not.

22            And he has a company that -- you know, I had to ask

23   him two different days what his company was worth.  And I asked

24   him for documentation.

25            And the only thing he could say was, "Well, when you
```

1  look, Ms. Wilkinson, at the shareholder value, you don't

2  understand.  Yes, it says 700, 800 million dollars, but that's

3  not how we do it.  You don't understand.  The way we value our

4  company is 4 to 8 billion dollars, but, no, we don't have any

5  documents to show you or prove it.

6       Now, why did he want to fight so hard on that?

7  Because he knows nobody who is an $800 million company or even

8  a $2 billion company is going to spend the money it takes to do

9  what Oculus and Facebook did.

10      So he wants you to think he has this big valuable

11 company.  And if he did or didn't, a $2 billion asset, whether

12 your company is worth 800 million or 8 billion is a huge asset.

13 And you would keep it very close, and you wouldn't let anyone

14 say that it's yours -- that it's theirs.

15      What happened here is that Mr. Altman and ZeniMax

16 decided it was worth it to buy id because it had made great

17 games and because John Carmack was so well known in the gaming

18 industry, and that's true.

19      And they knew John liked to talk, they knew John

20 shared his ideas, shared his technology, and they were okay

21 with that because they knew that that was going to be good for

22 them.

23      And you know what?  I think they were more than a

24 little angry, as you heard, that they paid or they promised to

25 pay Mr. Carmack and the others so much money and they didn't

1    think that they got what it was supposed to deliver.

2            And you know what?  That's fair too.  That's totally

3    fair.  They paid a lot of money for the business, and from

4    their perspective, they don't think they got what they should

5    have gotten.

6            But that's a different dispute, and they could have

7    had that dispute.  They didn't.  That's not what they brought

8    the lawsuit about.

9            What they brought the lawsuit was to say that we

10   stole their technology.

11           Mr. Hollenshead told you that this technology and how

12   Mr. Carmack shared it in this instance and in every instance is

13   what he always does.  He talks to other hardware manufacturers.

14           You heard His Honor ask him, do you really call those

15   folks and just tell them what is wrong with your product?  And

16   he said yeah.

17           Because they know who John Carmack is and because you

18   want the software and the hardware to work together.  So of

19   course they talk to each other.

20           And Mr. Hollenshead said that's what he did.  He's

21   always been known for that.  He's always shared his work.  He

22   never patents anything.  That's what he did, and they knew what

23   they were getting.  Not only did they know, they agreed to it.

24           In the contract in 2009, when they bought the

25   company, as we all know, they had a detailed employment

1   contract.  And very specifically they said you are going to do

2   the same thing you did while you were at id it.  They wanted

3   that John Carmack, they wanted his reputation, because they

4   knew other people would want to work with him, and that would

5   be better for ZeniMax.

6            Excuse me.

7            And he did what they wanted, even when it came to VR.

8   He did in March try to plan to have this demonstration.  He did

9   work on his demo and create software, absolutely.  And he did

10  try other devices.  And he did say I'm going to have the

11  world's best demo.

12           He said when I asked him, it might be a little

13  hyperbole, but, yes, as you can tell, he is very enthusiastic

14  when he talks about the tech.

15           Do you remember the two days when he was on the

16  stand?  Even when I asked him, he likes to talk about it.  He

17  loves it.  He is excited about it.  Other than his family,

18  that's his passion.

19           What he said, though, in black and white, on a

20  message board where everybody could see it is, "I am going to

21  be giving several demos in the next month, and Palmer

22  graciously loaned" -- loaned -- "loaned me one of his test

23  HMDs."

24           One of my favorite lines -- where is that? -- I

25  thought you guys left out the demo.  No.  The -- oh, here it

```
 1    is.  I don't want Mr. Sammi to get mad at me so I'm not going
 2    to take it out.
 3              MR. SAMMI:  I haven't gotten mad at you.
 4              MS. WILKINSON:  Are you sure?
 5              MR. SAMMI:  Yes.
 6              MS. WILKINSON:  I'm still not going to do it.
 7              MR. SAMMI:  Don't throw me under the bus.
 8              MS. WILKINSON:  So this is it, right?  This is the
 9    strap and the headset.  That certainly doesn't look
10    commercially viable, does it?  That is why they call it a
11    prototype.
12              So this whole thing that we had a commercially viable
13    thing at E3, this was great.  It got people excited.  Nobody is
14    going to buy this thing in this state.  It has to be turned
15    into that.
16              And what he said was this belonged to Mr. Luckey.  He
17    loaned it to me.  And now they are saying, oh, you can say we
18    know all this technology is ours because we still have it as
19    evidence, because they never gave it back to Mr. Luckey.
20    Mr. Carmack said, I'm -- he loaned it to me.  It's one of his
21    test devices.  And I'm going to take it to the show.
22              One more time, ladies and gentlemen, it's what he
23    said in 2012.  Why are they ignoring what Mr. Carmack said?
24    Why are they even standing up and arguing and saying it's
25    theirs when their own genius programmer, the guy they say is so
```

1    great, tells them in a historical record that he loaned it,

2    Palmer loaned it to him?

3          And of course he would because these folks aren't in

4    the hardware business, right?  We went through this.  They

5    don't make game consoles, they don't make personal computers or

6    mobile devices.  They make really great games.  That's what

7    they do.

8          So you need a platform, right?  You need something to

9    see your game, because just like this won't show you anything

10   without software, you don't see anything if you look at this

11   without a platform.  Honestly, I don't understand that as some

12   great point.  You need both.

13         I'm happy to concede that this does not show anything

14   without software.  I hope they're also happy to concede that

15   this software doesn't -- you can't do anything with it unless

16   you have some hardware, a platform.  That seems like a pretty

17   obvious point.

18         And so they weren't going to be in the business of

19   manufacturing so they need to pair up with people and partner

20   up.

21         Plaintiffs have changed their story so much that

22   Mr. Altman the other day when I was asking him took -- took an

23   email that his own press person, Tracey Thompson, wrote years

24   ago, saying, look, "Best" -- they are talking about the MSNBC

25   awards, those specific awards.

1          And I asked him, "Your game won Best Game at E3.

2    Best Game Play was your game.

3          But the Best Hardware was the Oculus Rift.

4          And up here it says Best Hardware.

5          And what did he say to me?  Oh, no.  He literally

6    looked at the writing and said, "You don't get it.  This --

7    Doom 3 BFG did win the award," because he so much wants that to

8    be gone and that to say it was the game.  But that isn't what

9    happened.

10          It was the hardware that got the attention.  And the

11   hardware that got the money, the hardware that got all these

12   folks to come and work.

13          Now, did Mr. Luckey need their help?  Yes, he did.

14   He certainly did, and he said that when he got on the stand.

15   He said it in the documents.  He knows he's lucky to have

16   worked with Mr. Carmack.

17          But he and Mr. Iribe and Mr. Mitchell, they decided

18   to take the dive.  They decided to put the video together to

19   say here's what we're selling.  If you guys believe in us, you

20   know, one, you're going get Doom 3 because that is what they

21   promised; but you're going to get a developer kit headset and

22   you are going to help us get off the ground.

23          This recording, again, was created and out on the

24   internet long before this lawsuit ever happened.  And not only

25   was it, these people saw it, and they certainly didn't say at

1   the time, whoa, that's our property.

2          So take a look.  I want you to watch it one more

3   time, because honestly, I'm not as good as explaining what they

4   did as they are, so I want you watch it again and see all the

5   people who believed in what they did, what these guys said

6   exactly what they were doing and what their plans were for the

7   future.

8          (Video played as follows:)

9          MR. LUCKEY:  My name is Palmer Luckey and I'm a

10  virtual reality enthusiast.  I'm the designer of the Rift.

11  Games are something I'm really passionate about and even more

12  than playing games, I'm passionate about bringing games to the

13  next level.

14         What we're doing at Oculus is trying to create the

15  world's best virtual reality headset, designed very

16  specifically for gaming.  Where this all started was in my

17  parents' garage in Long Beach, California, and I was interested

18  in stereoscopic displays, I was interested in head mounts, and

19  the problem was there was nothing that gave me the experience

20  that I wanted, The Matrix, where I could plug in and actually

21  be in the game.  And I was sure that somewhere out there, there

22  was something I could buy, and the reality is there's nothing.

23  I set out to change that with the Oculus Rift.

24         The magic that sets the Rift apart is immersive

25  stereoscopic 3D rendering, a massive field of view, and ultra

 1    low latency head tracking.

 2              John Carmack is one of the best developers in the

 3    world -- Doom, Quake, Commander Keen.  Carmack saw some of my

 4    work.  That is originally when he reached out to me.

 5              MR. CARMACK:  For a certain segment of the

 6    population, the hacker/maker crowd, this is going to be

 7    awesomely cool to work with.  What I've got now is, I honestly

 8    think, the best VR demo probably the world has ever seen.

 9              We're certainly going to take this into our future

10    projects.

11              MR. IRIBE:  We're getting involved in Oculus now

12    because we see an incredible opportunity here for game

13    developers to experience something new.

14              MR. BOLAS:  The Rift is taking years of virtual

15    reality research and putting it into a package that everyone

16    can use.

17              MR. BLESZINSKI:  So I recently had a chance in person

18    to check out the Oculus headset and, needless to say, I'm a

19    believer.  Even as a prototype, what I saw was extremely

20    promising.  We are extremely excited here at Epic Games to get

21    the Unreal engine integrated with Oculus, and I think the

22    possibilities for the games are extremely exciting, and I'm

23    thrilled for the whole project.

24              MR. HELGASON:  Well, I have got to say I just tried

25    the Oculus prototype, and it was such an immersive, amazing

1    experience that we pretty quickly, like within an hour, decided

2    to get behind this project.

3            MR. ABRASH:  I got to meet Palmer Luckey and try out

4    the Oculus Rift, and I have to say it was a very exciting

5    moment.  Could be the beginning of a whole new industry that

6    leads us eventually to having true augmentation all the time,

7    every place.  And I'm really looking forward to getting a

8    chance to program with it and to see what we can do.

9            MR. NEWELL:  It looks incredibly exciting.  If

10   anybody is going to tackle the set of hard problems, we think

11   that Palmer is going to do it.  So we'd strongly encourage you

12   to support this Kickstarter.

13           MR. MCCAULEY:  In the past I've looked for these VR

14   headsets and head-mounted displays and this is first one I have

15   seen that I was truly impressed with.

16           MR. LUCKEY:  There is a lot of great head-mounted

17   displays out there, but they are all really, really expensive,

18   up to over $100,000.  What the Rift does is it makes a high-end

19   virtual reality experience available to the average gamer.

20           If you want to be one of first to try the Rift, grab

21   a dev kit.  We will provide access to our SDK, Unreal and Unity

22   engine integration, and a copy of Doom 3 BFG Edition, the first

23   Oculus-ready game.

24           So join the revolution.  Make a pledge and help us

25   change gaming forever.

```
 1              (Video stopped.)
 2              MS. WILKINSON:  It couldn't -- they could haven't
 3    been much clearer what they wanted to do.
 4              Did they have one single headset they had
 5    manufactured at that point?  No.  They were trying to the raise
 6    money to do that.
 7              Had they written their SDK?  No.
 8              Did they even have Doom 3 BFG really compatible yet?
 9    No.
10              That was all that they were saying that was their
11    vision, that was their plan, and they needed people to support
12    them.  And those folks had the opportunity.  They had the
13    opportunity to work with them or partner with them and they
14    chose not to.  They chose to watch the video, to know the
15    plans, and stand on the sidelines.
16              Because this came out August 1st of 2012.  And you
17    may recall that Mr. Altman said -- I asked him, well, if you
18    saw that and you thought it was your technology, did you jump
19    up and down, did you call them and say, hey, take that stuff --
20    my stuff, the Doom 3 and Mr. Carmack out of your Kickstarter?
21    No.  He sent around that email, remember, it said Kickstarter
22    and said we need to discuss.  He saw it, he admits he saw it,
23    and he didn't do a thing about it.
24              If you thought the headset was yours and you thought
25    Mr. Luckey was saying it was his and Mr. Iribe was saying we're
```

1   going to make a business out of it and all your competitors

2   were saying I think it's terrific, you wouldn't do anything

3   about it?  You wouldn't call them and say, whoa, that's my

4   property.  That's my business.  You're talking about what

5   happened at E3.

6           He didn't do anything because he knew it was to their

7   benefit.

8           Again, look at what they did and what they said

9   before there was any hint of a lawsuit.

10          So what do they do?  They complain now, well, you

11  demoed some but we didn't know about that.  But what is really

12  bad is leaving it.

13          And I agree with counsel.  This is what he said in

14  the opening:  "Now, it's one thing to show the demo, which is

15  like, okay, you know, we can see how that might benefit us.

16  It's another thing to leave the code so you can dig into it,

17  open it up, and try to learn its secrets".

18          I agree with him.

19          And he suggested to you that there was going to be

20  evidence that the code, the testbed, was left at Valve and that

21  is why they gave the endorsement.  Guess what?  There wasn't a

22  single witness or document that proved that anything was left

23  at Valve.  They demoed the game.  They brought it back.

24          So the idea that somehow it's a violation of the NDA

25  to show on the headset the game, that's exactly what they were

1   doing at E3 and doing at QuakeCon.  That was exactly the

2   purpose as the NDA says, the reason that they got the game, was

3   so they could demo it and people could get excited about the

4   game and get excited about the headset.

5          But they can't prove, because it didn't happen, that

6   these guys left anything at Valve.  And they can pull up some

7   email like I showed you in opening where he showed the first

8   half of the text and didn't show you the bottom, where

9   Mr. Iribe said, no, you can't do that.  We would have to ask

10  Carmack.  That's the evidence in the case.  That's the

11  evidence, not him arguing, oh, but that doesn't make sense.

12  That's not evidence.  The evidence is, what all the witnesses

13  said was we did the demo, we didn't even have enough headsets

14  to leave at that time, and we certainly -- why would we leave

15  the game?  We didn't leave the game.  And we went back.

16  Mr. Newell showed up and we showed him the demo like everybody

17  else.

18         Now, Mr. Carmack helped them not only with making the

19  demo, but he did email back and forth and we're going to talk

20  about that, because you would have thought listening to counsel

21  that there are a zillion emails and how often it was.  There

22  were 28 emails before we put out our own SDK in March 2013.

23  28.  That's all there were.

24         But Mr. Carmack had in his contract that he was

25  specifically allowed to share any confidential information he

1    wanted if he thought it was to benefit the company.  And that

2    makes sense.  He's the technical guy.  Again, Mr. Altman agrees

3    he knew better.

4         So Mr. Carmack thought it was in the interest of the

5    company, and so did everyone else, to share information, to

6    give feedback on the game to make it compatible with the

7    headset and make the headset compatible with the game with the

8    folks at Oculus.  That was exactly what he was supposed to do

9    and his contract said it.

10        He had to protect confidential information except as

11   necessary to perform his duties as an employee and as the chief

12   technical director and as the person who is trying to get his

13   games out.  That's exactly what he should do.  And that covered

14   every kind of information.

15        This is what confidential information is defined in

16   the contract.  It's everything.  He's allowed to share anything

17   he wants if he thinks it's in the benefit.

18        And that's exactly what he did and that's exactly

19   what witnesses said.

20        Mr. Altman and Mr. Hollenshead, Mr. Hines, Mr. Hatch,

21   in emails and testimony all said that those demonstrations

22   provided benefit to Doom 3 BFG, which it did, an old game that

23   was getting refurbished.

24        Mr. Luckey signed this at 19 years old.  He didn't

25   have a general counsel.  He signed it.  He knew what he was

1  signing, and he took responsibility for it.  And he didn't

2  violate it.

3          He showed the demos, the VR testbed and when they

4  eventually gave him Doom 3 BFG, they showed the demos just like

5  these guys showed them.  That's not a violation.  And it's

6  certainly not when the big exception says "proprietary

7  information shall not include information that has become

8  public."

9          He didn't show the code.  He didn't even have the --

10  he didn't haven't the source code.  What they showed were the

11  pictures.

12          So if -- let's just pretend this is the demo, they

13  stick it in the computer, this is what Mr. Carmack created, all

14  right?  You put on the headset and you see the game, right?

15  You see either Rage, which was the testbed, or you see

16  Doom 3 BFG.  You don't see any -- what did you say?  1's and

17  0's whatever, you don't see the computer program; you don't see

18  the source code.  That's what you see.

19          That's what he's allowed to share and that's what was

20  public.  Reporters were doing the same thing.  They were coming

21  in and watching this.  They were doing it at QuakeCon.  They

22  did not share the code -- there wasn't even code they could

23  get.  This was the executable, as everybody said.  But nobody

24  saw the secret sauce.  Nobody saw the source code.  And

25  Mr. Luckey certainly didn't violate his nondisclosure

1   agreement.  And he told you, he explained why.

2        He said ZeniMax was take making Doom 3 public through

3   Mr. Carmack at E3.  They showed both the Doom at QuakeCon.  It

4   was all public information.  He didn't think he was doing

5   anything wrong.

6        And most importantly they're at QuakeCon together.

7   They're out doing the demos and reporting them.  Nobody said to

8   him, again, before any lawsuit was filed, nobody said you are

9   violating your nondisclosure agreement.  They didn't write him

10  a letter.  They didn't say anything because he wasn't.  He was

11  doing what they had expected, to give publicity to them.

12        The best example of this is their own convention.

13  Again, I keep asking, why do they not want to listen to what

14  Mr. Carmack says?  It's in black and white.  You are going to

15  hear it in video.  There is no dispute from the guy who

16  actually understands.

17        We have lawyers making arguments about technology who

18  admit they're not the technology experts, and they are making

19  arguments after they sue.

20        This is what Mr. Carmack said at the time at

21  QuakeCon, August 2012, about the Rift.

22        (Video played as follows:)

23        MR. CARMACK:  And when I ran into Palmer and he had

24  basically built something probably better than I would have

25  done if I had put it together myself, I'm like, okay, I can

1    abandon working on all of these projects, and this -- this is

2    the platform.  Mostly as a software guy, I want something to

3    write software for.  It's fun to tinker with the hardware, but

4    I would really as soon have somebody else do that.

5              (End of video)

6              He is saying it is not his hardware.  Palmer did it

7    better.  He's the software guy.

8              Why are they standing up and saying it's the whole VR

9    experience, they own the whole thing, the prototype is theirs?

10             They don't have one fact witness, one technology

11   person for their company, to dispute what Mr. Carmack said on

12   their stage at their convention.

13             That takes a lot of guts, honestly, ladies and

14   gentlemen, to come into this courtroom with the guy you say is

15   the expert, that you film, and you put him out on the internet,

16   and he said exactly what he is still saying today.  And you

17   come into a courtroom and you say I don't believe what he said

18   even though I recorded it and put it out on the internet and

19   said he was the technical expert.

20             That takes a lot of guts to get up in a courtroom and

21   claim that when you can look at the movie, you can look at the

22   video, and you can look at the documents.

23             And then not only do they want to say that it was

24   their testbed and their demo, they said in opening there's a VR

25   engine, we call that a VR engine, and I said when we started, I

```
 1    have never seen that in the documents.

 2            Well, guess what?  It was nowhere in the documents.

 3    They have an id Tech engine.  There was nowhere where

 4    Mr. Carmack wrote I have invented the VR engine.

 5            Why does that matter?  Not because it's ultimately

 6    the issue in the case, but it shows that they are trying to

 7    exaggerate what contribution they made to Oculus because their

 8    code is not Oculus's code.

 9            They did not even prove to you that Oculus got their

10    code except for a couple of instances.

11            Mr. Carmack said he didn't give any code.  He had --

12    for the VR testbed.  He had an executable.  So the executable

13    was not code.

14            Mr. Hollenshead said the same thing.

15            So that was for the VR testbed.

16            Mr. Hollenshead came in here and said I helped them,

17    we helped them load the version on.  It was the executable.

18            So this whole thing is Nate Mitchell's computer is

19    missing?  Mr. Hollenshead said he helped load the version on.

20    He didn't give away any source code.  Nobody gave that source

21    code.

22            What you're going to see -- what we saw in emails are

23    a few snippets, and I'm going to show you every one of those to

24    show you we are not getting -- Oculus was not getting the

25    source code.
```

1          But in the end the real test is, it doesn't work on

2     any of our prototypes.  If this was so important that we got

3     their source code, then we should be able to play their VR

4     testbed and their Doom 3 BFG on our headset.

5          And everybody told you that Doom 3 and the VR testbed

6     worked on the E3 prototype.  That's true.

7          It did not work on the first developer kit and the

8     headset that we sold, it did not work on the second one, and it

9     did not -- does not work on the most recent one.

10         So what is their theory, that we somehow copied it,

11    but then we changed it enough so it would work on our new

12    headsets because there are different lenses, there are

13    different displays, there's a totally different sensor.

14         We didn't get this code.  If we -- it doesn't show on

15    any of our devices.  So what are they saying?

16         They are saying after the fact that we're mad that

17    John was actually working with you and then he went to work for

18    you permanently.  That's what they're mad about.  Because they

19    had plenty of opportunity to say stop.  And the law actually

20    recognizes that.

21         Another thing about this big charge, part of the

22    reason that it's long, is our fault, because there are claims,

23    and then there is what's called actual defenses.

24         So we don't think they proved their claims, but if

25    there's other ways, even if you thought there was something

1    wrong, the Court says if they prove it they still don't get any

2    recovery.

3         And one of that is if they delay, they didn't bring

4    their claim when they could.  And that is what this is.

5         Defendants are not responsible if there was a delay

6    in asserting a right or a claim.  That's the Plaintiffs

7    asserting it.  The delay was not excusable, and there was undue

8    prejudice.

9         If they thought this was theirs before we sold it,

10   they certainly should have come up.  But when we went out in

11   March 2013 and we made our code public -- remember that? -- we

12   made the code -- where is our code? -- we not only sent it to

13   those guys, which we will talk about, but we made this public

14   on the internet.

15        I go to the, you know, the simple watch.  If I steal

16   your watch, do I then put it up on the internet and say here is

17   the watch that I'm selling?

18        We put our code up as open source.  If they cared and

19   they thought it was their property, they could have looked at

20   it and they could have told us to stop, they could have sued

21   us.

22        They didn't do a thing.  They delayed because they

23   didn't think it was their code.  And that's reason enough for

24   them not to prevail on any of these claims.

25        And there was no doubt they knew what we were doing.

1    We were sending them all the information.  Remember those

2    investor decks?

3          Mr. Altman doesn't deny he got them.  Brendan went up

4    to meet with Mr. Andonov who told them you're a bunch of kids,

5    that's, you know, round six of the treatise dismissively and

6    mock us.

7          We sent them everything we're doing.

8          If you don't think it's ours, we say software, and

9    Mr. Altman said under oath "It did not raise a concern."  If

10   you thought the whole thing was yours and you had been working

11   with Oculus and they wouldn't partner with you, and you see

12   them saying this is what we're going to sell, we're going to

13   have an SDK, we're going to sell the headset, you wouldn't say

14   to somebody "that's mine"?  It didn't raise any concern because

15   he didn't think it was his.

16         And nobody thought it belonged to ZeniMax because

17   Oculus did everything to make them understand that they wrote

18   the code.  They wrote this code, and they sent it to ZeniMax in

19   December of 2012.

20         This is Exhibit 683, which is about 800 pages of

21   code.  And they sent this to Mr. Carmack, and it was checked in

22   to the repository.

23         Remember, you heard Gloria they said that's -- it's

24   like a vault where they keep all the code.  They checked it in,

25   and they've had it.  If they thought there was any problem,

1    they don't have Mr. Carmack, that's true, although they had him

2    for months after this was checked in, they could have hired

3    someone else.  They could have gone and compared it.

4          And the suggestion was, oh, that's expensive or it

5    takes a lot of time?  Right.  You think it's yours, you invest.

6    You value it.  You hire somebody.

7          They didn't do a thing, and it was right in their

8    files.  Why would we steal something and then give it back to

9    them so they could inspect it?

10         Back in November, December 2013, we didn't -- I mean

11   2012 -- excuse me -- because it was right before that -- we

12   didn't think Mr. Carmack was coming to work at Oculus.  Oculus

13   still thought they were going to end up in a partnership and

14   these Doom 3 BFG games would go out and be compatible with the

15   headset.

16         We sent it to them because we wanted Mr. Carmack's

17   feedback, we wanted it to work together.  If we thought we had

18   stolen their code, we wouldn't send it back.

19         And we then announced it.  We sent out the headset

20   and developer kit, and here is the story on the timeline that

21   Plaintiffs want you to believe.

22         They want you to believe -- this is from Mr. Altman's

23   testimony.  He says he knew as early as September 10, 2012,

24   that Oculus had his code.  He didn't just say the headset.  He

25   said remember that proposal that Mr. Iribe sent where they take

1    that language that says, you know, we say we would like a

2    license, and they said, oh, that was for your prior work.  We

3    don't agree with him.  But he says that put me on notice by

4    that date.

5           This is almost two years before he sues.  He says by

6    that date, I knew they had our code.

7           If you believe him, if he did that, then when the

8    code was sent or when Mr. Carmack, who is not hiding anything,

9    he writes an email directly to Mr. Altman and says Oculus is

10   about to ship their headset.

11          And then when you see it publicly announced that we

12   ship our headset and the SDK, you know -- you know he says six

13   months before that you believe -- I don't want to say no -- you

14   believe that somebody else has your code and you see them go

15   out and sell it and you don't say anything.

16          I'm telling you that is not credible.  That doesn't

17   make any sense.  That is a lie.  That is a boldface lie,

18   because nobody who runs a business, no one who is a steward of

19   shareholder value would let code that they protect, they put up

20   this list, oh, we lock it up, we have a repository, we're very

21   careful, we turn square corners.

22          Well, if you turn square corners, you don't let

23   someone have your code for six months and then sell it and you

24   just sit back and say I'm not concerned.  And that's what he

25   said.

1              Look, I asked him because it is ridiculous.

2              I said, "But Oculus was going to commercialize what

3    you thought was your product."

4              Oh, no.  We knew the technology was ours.  We knew it

5    at that time.  We thought we were going to partner with them.

6    Okay.

7              So by the time we went out in the market in March of

8    2013, they had walked away from us.  They didn't want to

9    partner with us.

10             So by the time it was out on the market, I said, "So

11   were you concerned when you found that Oculus was going to

12   commercialize their headset?"

13             "I don't remember a concern."

14             There's only two things that can be true.  Either he

15   didn't believe it was his source code and technology or he

16   didn't care that somebody else was using it.  Either one is not

17   good.

18             And either one, either he's lying or he didn't sue us

19   when he should have or at least write us a letter and say wait,

20   you have my source code.  What are you doing?

21             And he did nothing.  They did nothing.  Mr. Lesher

22   did nothing, Mr. Andonov.  Nobody called Mr. Iribe.  Nobody

23   said, hey, we're not partners anymore.  We told you to take a

24   hike.  We don't want to invest in your company.  Your deal was

25   insulting to us.  Give us back our technology.  You have it.

1    They didn't do a thing.

2           And they certainly didn't go out and get the talent

3    to use the product themselves because if they had this

4    prototype and it was theirs, what have they done with it since

5    then?

6           Look, it is -- I will give them this -- it's in

7    exactly the same condition it was in 2012.  They didn't make

8    one new headset.  They didn't even put a new strap on it.  It's

9    a joke to claim that they were involved with VR.

10          If you thought this was so great and your software

11   was so great and you're a CEO who was in charge, again, of

12   shareholder value, you go out and find the talent.  And it was

13   out there, because Mr. Iribe found it.  Mr. Iribe found these

14   people.  Mr. Mitchell found these people.

15          They had people from Valve who came to work for them.

16   They had Mr. Patel -- Patel who you saw.  And they even had

17   Professor LaValle, who was in Finland.  That's my favorite one,

18   because their allegation is this man who has taught at the

19   University of Illinois, who is, as we could tell, yet another

20   genius, that he actually signed on to this company to steal

21   technology and not write his own with his wife, as he told us.

22          That's what they want you to believe, that he was

23   sitting in Finland and emailing with Brendan and others, and

24   they said, hey, we've got this great idea.  We stole someone's

25   technology, we know you're really good at writing this fancy

 1   code, but we want you to just come and copy the code, and then,

 2   you know, work with us for a year and then go back and teach.

 3          These people don't know each other.  Why would -- why

 4   would Dr. LaValle, Professor LaValle do that?

 5          You know why he wanted to write code?  Because he's

 6   good at it.  He's proud of it.  It's his life's work.  He and

 7   his wife -- we don't ask -- they like to do it together.

 8   They're brilliant, they're good at it, and they should be proud

 9   of it.

10          Mr. Patel since he was a kid has been taking apart

11   sensors and building them himself.  You think he really signed

12   on with these people he didn't know after he put everything out

13   in public?

14          This is how these folks got together.  You think that

15   he signed up to copy code, to build a sensor, to steal a sensor

16   from these guys?  No.  He put his information out on Meant to

17   Be Seen just like Mr. Luckey, Professor LaValle wrote his

18   article, they put things on GitHub, because they all wanted to

19   share the information.  They had a passion, and they wanted to

20   make it work.

21          And that's why it was easy for Barbara

22   Frederiksen-Cross to say nobody copied any code.  Nobody copied

23   any code.

24          Not only was it not similar, was it not literal or

25   nonliteral copying, but these guys wrote it themselves, and

```
 1   they came in and told you about it.
 2          Mr. Patel says I didn't use any -- I didn't even see
 3   any source code from Mr. Carmack.
 4          Mr. LaValle went through the types of code that he
 5   wrote, the exact code that these guys are claiming is their
 6   supposed trade secret, and what did they say?  Mr. LaValle
 7   didn't know what he was doing?  Maybe he's asking for help back
 8   and forth.  He really didn't ask for help, as he said.  He
 9   didn't even know Mr. Carmack.  But so what?  So what if you're
10   asking other people?
11          This is the code he wrote.  And their allegation, if
12   you -- if you actually find that we stole their technology, you
13   have to believe that Mr. LaValle joined the company and
14   immediately started copying Mr. Carmack's code.
15          You saw him on the witness stand.  He was honest,
16   straightforward, he answered both sides' question equally.  He
17   did not copy anyone's code.  And he said it again and again
18   under oath.
19          And Mr. Carmack said back at the time he saw some of
20   their code.  They sent it to him when they sent the SDK and he
21   said it's better than his.
22          And he told you on the witness stand, people who know
23   code and maybe some of you know this, people have different
24   styles and structures.  There is a DNA.  And if you look at the
25   code Oculus wrote, you can see the evolution from DK1 to DK2
```

1    and to the commercial version, CV1.

2            He said there was no DNA from the VR testbed and from

3    Doom 3 BFG that would show any similarities.  He said, "There

4    was an extreme break with the code that I wrote where it's a

5    completely different style."

6            So Plaintiffs then say -- Mr. Sammi had -- maybe he

7    will bring it out again, that chart with all of the emails on

8    it with the writing.  He gets to talk last so I don't know what

9    he is going to do.  I tried to count up -- I might have gotten

10   it wrong, and I apologize if I got it wrong, but I found in

11   evidence about 28 emails that he says show these guys sharing

12   information.  So a simple analysis for me.

13           It was over seven months.  Seven into 28 is four.

14   The outrageous sharing of technology and short emails is four

15   emails a month between the companies, when they were working

16   together.  That's not, oh, my gosh.  These guys can't do

17   anything right.  Why do they need to ask for help.  These are

18   all people who are interested in the same thing and they're

19   allowed to be working together until ZeniMax says stop.

20           And then Mr. Carmack leaves.  He leaves because they

21   don't want to do VR and guess what?  He gets to take his brain

22   and his knowledge and his experience with him.  In his contract

23   all that work that he did is not considered confidential

24   information and Mr. Altman admits it.

25           I asked Mr. Altman, "Did Mr. Carmack gain a lot of

1 experience working on virtual reality while he worked for you?

2       "Yes, never claimed otherwise.

3       "So when he went to Oculus and used that experience

4 and knowledge from VR, that wasn't a violation of his contract,

5 was it?"

6       And he said, "No, it was not a violation."

7       So all this know-how, that is not the question.  The

8 question is:  Did they prove that we copied their code?

9       They go back to this -- and I'm sure you will hear it

10 for the last half hour -- that Mr. Carmack had these different

11 devices.

12       The Rage code which wasn't VR, which had been on his

13 computer since 2009 or 2011, is not anything anyone came in

14 here to say was copied.

15       The HP desktop where that he put that USB, plugged it

16 in, and made his copies of his files was returned to the

17 Plaintiffs with all of the files on it and there is no evidence

18 that those emails, the files, even the snippets of code were

19 used in the Oculus technology.

20       And then the witnesses came in and told you that all

21 the tests you're going to look at, Plaintiffs didn't apply it

22 right.  And you know what?  You can take her word for it or you

23 can remember what Plaintiffs showed you.

24       Remember Dr. Dobkin?  I'm sure he is really smart.

25 Teaching at Princeton, I'm sure.  But this is what he showed

1    you and said, take my word for it.

2            Now, maybe it is similar and maybe we all wouldn't

3    know, but I think Barbara Frederiksen-Cross pulled this out and

4    showed you how different it was.  Why didn't you get that?  Why

5    isn't -- why aren't -- why wasn't the expert showing you how

6    they were similar?  Because if you're not showing literal

7    copying, you're -- they're asking you to take their word that

8    it's similar enough.

9            Well, guess what?  That is not obvious.  That is not

10   like saying these are the same words.  And these are math

11   problems where there are only so many solutions.  You heard

12   that from Mr. LaValle, like how many ways can you measure the

13   head and the neck?  There is only so many ways.

14           So if you have to believe them, they need to present

15   more evidence to you about why this is really similar, this is

16   the same.

17           And what do they have?  They do have one thing, I

18   will tell you that.  We do have seven lines of their shader

19   code.  It was sent.  And I think I told you there were only two

20   emails that show code being sent.  And one is this one.

21   Defense Exhibit 1839, which sends shader code.

22           And I want, if I could, to switch it, if you don't

23   mind, to the ELMO only because I think it's important for you

24   to see how much this is.

25           First of all, this is an email that contains both

1  Oculus's shader code and ZeniMax's.

2        So let's see if I can turn on the power here.

3        Okay.  Oops.  Sorry.

4        This is an email from Mr. Reisse at Oculus that he

5  actually sent saying, this is the Oculus shader code.  Look how

6  short it is.  That's our code.  Okay?

7        The email attached and it says "file produced in

8  native format."  That means that it was the code.  This is the

9  ZeniMax VR testbed shader code.  That's it.  That's how many

10 lines.  And we do have that in our vault.  I call the

11 repository a vault.

12       It's not in our Oculus products.  It's not in any.

13 They did send it to us.  We did get it from the VR testbed.

14 And we kept it in the vault.  We did not use it in our

15 products.  And we had in the same email our own shader code.

16       What is the other one?  The other one is actually

17 even more misleading, I think, because this starts as an

18 email -- as we know starting from the back, this is PX686.

19       It starts in the back as an email from Mr. Antonov to

20 Mr. Carmack and this is about chromatic aberration.  See, this

21 says -- that's Mr. Antonov.  And when you look at it, he's

22 writing to him and talking about the code he's already written.

23       Why do you know that?  See this?  Oculus SDK

24 feedback.  So we've already sent -- Oculus has already sent its

25 code to ZeniMax and Mr. Antonov is asking Mr. Carmack for

1    feedback, and then he says, "By the way" -- sorry, let me make

2    this a little -- "have you had a chance to experiment with our

3    distortion parameters and other data from HMD info?  We would

4    love -- we would -- would you be able to integrate that update

5    if we send it to you within a week?"  Because they need to be

6    able to work together.

7            It's after we say that, that Mr. Carmack sends us --

8    he says, "I haven't looked at your distortion code" -- this is

9    on the 9th back to Mr. Antonov -- "I did add a simple

10   correction for chromatic aberration," and then he gives it to

11   us.

12           That's the only other evidence of code coming across

13   the email.  That's it.  And that is not in our code.  But that

14   is how many lines it is.

15           So when Plaintiff gets up and takes these big

16   notebooks and says, oh my gosh, look at all this code that was

17   copied, this is not what you're going to get back in the

18   evidence room.  This is not.  They have to show you which lines

19   were actually copied.  And it is nothing like this.

20           I don't know exactly what they're going to say are

21   the pages, but these are just big notebooks full of all the

22   code or excerpts of the code.  Not of what their expert says

23   were copied and certainly not what they showed you was copied

24   and that's their burden of proof, because they hauled us in

25   here and they have to prove it.

1          Can we go back to the slides, please?

2          Now, thankfully, you saw this yesterday, so I don't

3    want to go -- I think it's probably pretty fresh in your mind,

4    but I do want to remind you there were articles showing all

5    these trade secrets were out there, because what they are

6    saying is a trade secret are the steps that it takes.  What

7    they say is copyrighted is the code, okay.  But trade secrets

8    they are saying are the steps.  And all the steps are in these

9    articles.  And people that know how to code, not me, know how

10   to follow those steps and implement that.

11         They even made some of their own code public.

12   Mr. Sammi said very carefully, well, we didn't -- we took out

13   virtually all of the VR code from the Doom game because we

14   didn't want to make it compatible, because we were mad at

15   Oculus.  But they didn't take it all out.  They left in the

16   distortion correction.  So I don't know how they can say that

17   wasn't public, everything else was public but they did it

18   themselves.

19         And Dr. Balakrishnan looked at all of those trade

20   secrets and said they were known, they had been public, and

21   they were different.

22         And the same thing, remember Dr. Howe yesterday from

23   Harvard?  He said the same thing.  He looked at these different

24   secrets and he said the math was different, the definitions,

25   the offsets.  Same for predictive tracking, different math,

1    different units, different algorithms and variables.

2            Plaintiffs have to persuade you that it's more likely

3    than not that our code actually was copied.  The overwhelming

4    evidence in this case is that the people that got on the stand

5    and told you that they wrote the code, the experts who said the

6    code was different are telling the truth.  The people who wrote

7    the code themselves came in and told them -- told you.

8            In contrast, Plaintiffs who say that this was their

9    trade secret and it was so valuable have their own expert who

10   admits he can't find anything in their books that say that they

11   value these trade secrets, and that is one of those factors you

12   have to look at.

13           I don't know where it should be.  I don't know

14   whether it should be on their financials.  I don't know whether

15   it should be a budget.  All I know is if you think something is

16   valuable and think it is worth protecting, you would expect it

17   to be valued.  And the reason they have to -- that they have to

18   go and hire an expert is because they couldn't get it out of

19   their own documents.  They couldn't point to anything.

20           So they had Mr. Jackson come in and say, well, I'm

21   not going to say it was valued.  I'm just going to tell you the

22   value of the damages is $2 billion.  And the reason I know that

23   is a prudent investor would have paid that.

24           Look at what that instruction says.  At the time the

25   trade secrets were misappropriated.  It's not when Facebook

1    bought it.  Their claim is that we stole their trade secrets in

2    2012.

3            A reasonably prudent investor would have paid for

4    that -- they don't have any evidence that anyone would have

5    paid anything for those trade secrets at the time.  Mr. Altman

6    says he didn't know how valuable they were.  He wasn't willing

7    to invest.

8            It's not supposed to be when somebody else decided it

9    was valuable.  It is supposed to be what a reasonably prudent

10   investor would have paid for trade secrets when they were

11   stolen.

12           And what do you have?  You have a record of whether

13   they were ever willing to invest in this technology, whether

14   they valued it.  They rejected it offer after offer after

15   offer.  And the real reason is because Mr. Altman -- Mr. Altman

16   thinks he overpaid for Mr. Carmack.

17           He thinks -- he tried to convince you that he made --

18   he says, "Mr. Carmack made his 100 million with us.  I expected

19   him to have some sense of obligation for us having put money in

20   his pocket."

21           And he argued with me over whether he had actually

22   paid that money until we said, well, that is a note and he

23   admitted, well, I haven't paid 40 of the $100 million.  Those

24   are crazy numbers to most people, right?  But it's not the

25   amount that matters.  It's the principle.

1        He comes in and said we've paid him everything and we

2   didn't get what we expected.  No, we really didn't pay him

3   everything.  And when I asked him, are you going to when he

4   comes due in June, he gave the lawyer answer, well, I'll have

5   to talk to my lawyers and see.

6        He's mad at Mr. Carmack.  He said it.  And he is so

7   mad that he didn't fulfill his obligation under the contract.

8        We have one small counterclaim and Plaintiffs mock

9   that too.  Plaintiffs said, you're suing -- to Mr. Carmack,

10  you're suing us for $250,000?

11       And Mr. Carmack said, yes, in the contract it said if

12  you don't give me a 60-day renewal, which would have allowed

13  you to automatically keep me for a year -- that is what

14  termination due to nonrenewal -- you would pay me my base

15  salary for 12 months.

16       And you know what that is?  He made $250,000 a year.

17  That was his base salary.

18       Now, are we asking you for that because that money is

19  going to make a difference to him?  No.  No.  It's the

20  principle.

21       After three years of ruining his reputation and

22  claiming that he, who worked around the clock on this, stole

23  and copied technology that belonged to ZeniMax, and then

24  ZeniMax let him walk out the door and didn't give him an offer

25  that if they want the contracts to be honored, then they should

```
 1   honor the contracts.
 2         Mr. Altman agrees he didn't do it.  He said, I didn't
 3   give him the 60-day offer and if I would, he had to stay for
 4   another year.
 5         He wasn't the only one who didn't want to stay
 6   around.  Yesterday, again, because we had to, because they were
 7   claiming that Mr. Carmack purposely violated his
 8   nonsolicitation agreement and recruited the people that he had
 9   worked with for years, we brought in Gloria, and she told you
10   herself why she left.  Not because she was working on VR.  In
11   fact, she stuck around.
12         She didn't like the benefits because her health care
13   wasn't paid.  She didn't like that Mr. Hooper was fired and
14   Mr. Carmack had no say.  She didn't like that the guy she loved
15   to work with, other than her husband, and her buddies had left,
16   and she saw what was happening at the company when 30 people
17   left id that year.
18         But to top it off, one of the, quote, id 5,
19   Mr. van Waveren, has cancer, and they took credit for giving
20   him two days off, she said, with his pump to work at home.
21         Mr. van Waveren isn't here because he is still very,
22   very sick, but she decided that that was enough.  It wasn't
23   because Mr. Carmack recruited her.  It wasn't because she had
24   been doing VR work and she wanted to take it away from ZeniMax.
25   It was because she didn't like working at ZeniMax.
```

1          And under the category of life is too short, she and
2   her husband and their friends who loved to work together left
3   and they left to go to work for Mr. Iribe and the folks at
4   Oculus because it was exciting, because they were pursuing a
5   dream, because they were starting off, they were risking
6   something to build a new technology.
7          And that's what invigorated, what excited Mr. Luckey,
8   Mr. Carmack, Mr. Patel, Mr. LaValle, Mr. Antonov, Mr. Mitchell,
9   and Mr. Zuckerberg.  That's what they had in common.  They
10  wanted to do something different, and they were willing to risk
11  it to try to bring some kind of new technology and work
12  together as a team that was different from anyone else.
13         It wasn't like working at ZeniMax.  It's nothing like
14  working for old business.  What do you have?  Old business, new
15  tech.  It couldn't be more obvious.
16         There is nothing wrong with old business, secure,
17  loyal, as Mr. Altman said, but there is certainly nothing wrong
18  with going to new tech and taking a risk and working with the
19  people that you like.
20         So I'm sorry that we had to be here for three weeks,
21  that we had to bring in these other people, especially Gloria,
22  to explain why she didn't get solicited, why she left this
23  company, because, honestly, it is really not what the case is
24  about.
25         But when they throw the mud, which I'm sure will

1    happen in the last half hour, we had to defend ourselves.

2           We've showed you the emails of what Mr. Altman said

3    at the time that the deal was announced.  He said when Facebook

4    said they would buy Oculus, it was insanity, an insane

5    valuation and a dubious strategy, and that's what he thought.

6           But because of those emails, Plaintiffs, who get the

7    last word, are not going to want to talk about what the written

8    record is, I can promise you that.  I don't know what Mr. Sammi

9    is going to say.  He gets to say whatever he wants in the last

10   half hour because he has the burden of proof, and I hope you

11   will hold it to him.

12          But I want to give you a list, since I don't get to

13   stand up again, of what I think he will talk about and what he

14   will ignore.

15          What he will ignore is that ZeniMax's alleged trade

16   secrets were well known.  He didn't go through any of that with

17   you.  He just said, oh, they're wrong, they're wrong.

18          He didn't address why ZeniMax disclosed its own

19   technology and made that open source and how that can be

20   reconciled with his claims.

21          He didn't address that ZeniMax's VR testbed and the

22   Doom 3 demo, why they're not compatible with DK1, DK2 or CV1,

23   and that shows somehow we still stole their technology.

24          He doesn't address why Mr. Altman said he knew that

25   they had -- Oculus had their code in 2012 and he did nothing.

1    He certainly didn't address yet why they refused to

2   invest and why they mocked and made fun of Palmer and the Rift

3   and even Mr. Carmack calling him propeller head throughout the

4   documents in this case.

5    What they will want to talk about is the secret

6   meeting, Mr. Carmack copying files, missing devices, those id

7   employees, DVD ripping, which I'm not sure what that is, and

8   the $3 billion deal.

9    So I ask you, as you're trying to figure out what you

10  need to do to do your job, see if Plaintiffs focus on what you

11  need to do your job or if they focus on the story they want to

12  tell to get you angry and upset and not look at the evidence

13  that you've seen in the last three weeks of this case.

14    I know it is very late, and I am very grateful to all

15  of you for listening, but the hardest job is yet to come,

16  because we're done talking.  It is in your hand to decide, and

17  we are very grateful, that we know you will take the time and

18  the effort to come to a just verdict.

19    Thank you very much.

20    MR. SAMMI:  Can you leave that slide up, please?

21                    CLOSING STATEMENT

22  BY MR. SAMMI:

23    Hi, everyone.  I want to address everything.  It's a

24  little out of character for me, and I don't, you know -- I'm

25  pretty private.  I'm a father of two.  I have two girls, seven

1    and two, and I sit there, and I comb through this evidence.  I

2    have been on this case for two and a half years personally

3    looking at this evidence.

4           But you don't have to trust me, but what you just

5    heard is all emotion and misdirection, calling -- as if we come

6    in here, and I cross-examine people, and I do this (indicating)

7    because I'm mocking them or that we try to protect our rights

8    and that means we're making fun of people.  We're not making

9    fun of people.  We're not mocking them for making money.  It's

10   great if you make money in the right way.

11          Let's talk about some of these things.

12          The first thing I want to talk about is ZeniMax's

13   alleged trade secrets were well known.  I did talk about that.

14   I talked about that yesterday with Professor Balakrishnan, with

15   Professor Howe.

16          It's unbelievable to us, and it should be to you and

17   it should be, frankly, to counsel for Facebook and Oculus,

18   because it is one thing to come in here and say ZeniMax is a

19   big bad company.

20          ZeniMax is a big bad company?  This is Facebook, who

21   bought this company over a weekend for $3 billion.  And it

22   strains credulity to think that you can come in here and you

23   can say chromatic aberration can be done in two hours.  Two

24   hours.

25          Did you hear anything about the fellow who was

1    working on it for a month and got that code?

2           What you saw was, I put it on the ELMO, and you

3    said -- and now I'm getting a little passionate about this --

4    I'm not making fun of anybody, and I'm not angry, I'm

5    passionate about this because what you saw was, you saw her put

6    something on the ELMO and say look at this small amount of

7    lines.  What could this possibly mean?

8           And that small amount of lines, their experts back it

9    up and they say it's two hours, two hours.  And a guy works on

10   it for a month?  And he gets sent this email, and the next day,

11   9:36 in the morning, I checked in the solution to chromatic

12   aberration.  That's public?  Yeah, we talked about that.

13          How about ZeniMax's disclosure of its own technology?

14          ZeniMax's disclosure -- we gave it away?  ZeniMax

15   gave it away?  No.  We never gave it away.  It was under an

16   NDA.

17          So much confusion, smoke and mirrors.  Listen to the

18   language.

19          They were showing it publicly.  Palmer Luckey didn't

20   invite any NDA.  It was ZeniMax was showing it publicly.  It

21   was out in the public.

22          Did they mention the fact that they had the

23   executable and they had additional data files?  You saw her

24   read that quote and skipped right over the -- when Mitchell,

25   Nate Mitchell said additional data, just skipped right over it

1    and just said executable.  There was a dot, dot, dot, skipped

2    right over it.

3             We protected that information.

4             Palmer Luckey showing it, oh it is out there in the

5    public?  How about making copy after copy after copy of it and

6    putting it on Dropbox and flying it to Hong Kong and then

7    Valve.  Leave it at Valve.

8             Now, that -- that's now Defendants say no, nobody

9    ever left it at Valve.  Really?  I beg to differ, and I think

10   the evidence shows that that's not -- that's not what happened

11   at all.

12            The counterclaim.  Let me dispense with a few of

13   these things.  I'm the one who is angry when I talk to

14   Mr. Carmack, after everything Mr. Carmack has done.  I had him

15   on the stand, I said, "After all of this, you're suing us?"

16            Yeah.  I said it.  And I will say it again.  For

17   $250,000 for us breaching his employment contract?  After

18   stealing the entire Rage code that has never been released,

19   after walking out the door with 10,000 documents and lines of

20   source code and that night emailing Brendan Iribe saying

21   everything is on the table.

22            Forget the solicitation for minute.  That's our

23   lifeblood, our crown jewels.  And they say you didn't make an

24   offer?  So I want severance after stealing you and robbing you

25   blind.  And the excuse is, you know what?  He left a copy of

1   what is on the USB, so it is not really stealing, he gave it
2   back.
3          It sure is stealing, because you keep it behind
4   closed doors.  The point of its value is that other people
5   don't have it.
6          That's what we believe -- that's what the evidence
7   shows about the counterclaim.
8          Now, misdirection.  Let's talk about misdirection for
9   a minute.
10          ZeniMax's tech not compatible with DK1, DK2, or CV1.
11          I wish I had time to move this table back over there,
12   but let me just -- let me just try to explain this, what we've
13   heard.
14          I don't even know what happened to it over the break.
15   May I borrow -- is this your SDK?
16          MS. WILKINSON:  Sure.
17          MR. SAMMI:  So Mr. Carmack -- this is their SDK.
18   Where is ours?  I will just use this as ours.
19          This is our -- let's pretend this is our SDK.  Okay?
20   And I'm waving a lot of code because I do think Dr. Dobkin
21   found code copied nonliterally.  It is not just that it doesn't
22   look the same, but I'm getting off topic.
23          This is our VR engine.  Imagine it is.  And it is
24   sitting here on top of that USPS postal box that has two lenses
25   and a screen, right?  And then they go from that in six months,

1    in six months to DK1.  Zero to hero in six months, right?

2         And then after that, there is DK2, and then there is

3    CV1.  There's three more things.  They put -- and Samsung

4    mobile.  And they each had an Oculus SDK.

5         And you heard counsel used the word evolution.

6    There's a reason why these things have version numbers on them,

7    version 1.1, 1.2, 1.3, 1.4, because they are all evolved from

8    each other.

9         And Mr. Carmack said it himself.  Oh, they are

10   evolved from each other.  And then I said, well, all right,

11   let's trace that DNA back.

12        They said, no, there's no DNA.

13        We trace it back, and what happens -- that was my

14   karate chop -- boom, stops rights here.  Nothing.  Nothing.

15   Nothing.  After all the evidence you have seen for three weeks,

16   the response is nothing.  Adam and Eve is the first SDK from

17   scratch.

18        28 emails is what they say?  28 emails.  Oh, that's

19   only, what, two every week or whatever it was, right?

20        I'm sorry.  Does that matter to you?  Does that

21   matter to me?  When I think of 28 emails with attachments and

22   information asking how to solve this and how to do that, plus

23   endless phone calls, how about did we count the text messages?

24   Do those count as well?  How about the in-person meetings?

25        I just finished a meeting with Carmack.  Let's

1    discuss it.

2           The evidence is overwhelming that intellectual

3    property was copied, used, trade secrets were transferred.

4           Mr. Altman says he knew that Oculus had ZeniMax tech

5    and did nothing.

6           Now, this case has turned all into Mr. Altman.  We

7    just dragged them into court for no reason, no reason

8    whatsoever, and we knew that Oculus had our tech but did

9    nothing, or we looked at the Kickstarter.  You heard that.

10          We looked at the Kickstarter, and we saw the

11   Kickstarter, and we didn't do anything.  Of course we did.  We

12   had that meeting.

13          Do you remember that meeting at QuakeCon?  Do you

14   remember the meeting where counsel for Defendants had witnesses

15   on the stand that just denied the existence of the meeting like

16   it never happened?

17          The questions from counsel were, can you point to any

18   document or any witness and bring them into this court to show

19   that this meeting occurred?  Yeah.

20          And then I got up and showed you three of them.  Of

21   course it happened.  That meeting at QuakeCon happened.

22          And what happened at QuakeCon, we had an NDA and

23   we're trying to get a relationship going with you, we're trying

24   to negotiate in good faith with you, above the table.

25          And I started this case with a timeline and it was

1    big and it's folded up back there, but it was a big timeline,

2    and it had that fork in the road at that secret meeting and

3    that fork is still down there.  Nothing they say changes that

4    fork.  We didn't know anything that they were doing.  Is that

5    how honest people work?

6              I could even tell story upon story about I'm working

7    in the garage, you can show baby pictures of Mark Zuckerberg.

8    Do you want to talk about misdirection?  We can talk about

9    playing ping-pong in outer space in VR.  That's all great.

10   That's all great.  But that's not what the evidence shows.

11             Misdirection.

12             Here is another one.

13             ZeniMax doesn't value its trade secrets.  I can't

14   find it in their financial documents.  It's not a line item.

15             You had Dan Jackson come in here and said, you know

16   what?  You can't under generally accepted accounting

17   principles, GAAP, that's the rules, companies don't do that.

18   You don't think counsel for Defendants knows that about

19   Facebook, the fact that Facebook's financial statement has them

20   listed as a value of the company of $350 billion and what's on

21   their books is $50 billion?  Is that the crime of the century?

22   No, that's what they do, because that is what the rules say.

23             And then they use that, pretending that they don't

24   know that Facebook does that, and goes to ZeniMax and says

25   ZeniMax, my goodness, you didn't value these trade secrets at

1  all.

2          How about the next id Tech 6 engine that is going to

3  run games that you will see ads for on the playoffs, the Super

4  Bowl, billion dollar AAA games.  How about those, the engine

5  that power those games?  Do you really think those are on the

6  line item?

7          No.  ZeniMax is not in the business cataloging its IP

8  when it comes to trade secrets as a line item on its

9  accounting, and they know it.

10          What is their theory?  I can add some sarcasm to my

11  voice.  And I'm sorry, it's not as if I'm getting mad and I

12  don't mean to be yelling at you, because I -- that's not what

13  I'm trying to do.  But I can put some sarcasm in my voice and

14  say, what's their theory?  We somehow copied it and then we

15  changed it?  Yeah.  Yeah.

16          It doesn't work.  That's another one.  It doesn't

17  fit, right?  This is the biggest red herring, one of the

18  biggest red herrings of the case.  Okay.

19          Remember these two?  This is our code and this is

20  their SDK.  And the question they asked every single person --

21  I don't know if they are smiling at me or something because

22  they think I'm going off the deep end, but I will continue.

23          Our code and the SDK, okay, our code and the SDK and

24  they ask every witness and they say, well, you know what?  The

25  SDK, your code won't work in our Rift.  Your code, your VR

1   testbed from which this was derived, it won't work.  That means

2   it's not the same.  Well, it won't work in this one.  Like it's

3   a piece of a puzzle.  It won't work.  It won't work in this

4   one.

5        That doesn't mean anything.  And Carmack and

6   everybody knows it.  Because these versions of their own SDK,

7   they're not interchangeable, but they are all evolved from each

8   other.  Software isn't necessarily interchangeable as a puzzle

9   piece.  That not the test as to whether something was derived

10  from something else.

11       Laches.  That is a fancy word, talk about we waited

12  too long to sue.

13       Can we have slide 4 up from the rebuttal side?  I

14  need to address this.  If we can switch, and I will talk about

15  the last two, the things I'm not supposed to talk about.

16       A party asserting a defense of laches.  This is their

17  defense.  They say you waited too long, so you steal our stuff,

18  you pretend to be negotiating above the table, and underneath

19  you're getting massive tech transfer while we trust you because

20  we have an NDA in place, right?

21       And the problem is -- the problem is that, oh, you

22  know, gosh, you guys weren't vocal enough.  I hid it from you,

23  and now it's your fault.

24       The law says it doesn't work that way.  That is

25  why -- that is why if you're going to say that -- if you're

1  going to say that defense, you have to have clean hands.

2  That's what the law says.  It's literally the language.  You

3  can't have unclean hands.

4         They have to be clean, because you want people who

5  have clean hands to say, it's not fair for you to wait that

6  long or do that.  You have to have clean hands.  You can't --

7  you can't steal.  You can't lie.  You can't cheat.  And then

8  come here before you and say, no, no, they waited too long.

9         How about some promises?

10        Let's get this one up.  Can we get slide 14?

11        How much time do I have left?  We will find out.

12        I didn't mean to put you on the spot.

13        MS. COHEN:  14 minutes.

14        MR. SAMMI:  Okay.  Thank you.

15        THE COURT:  You get extra too.

16        MR. SAMMI:  Thank you, sir.

17        This is from the opening.  Okay?  This is the

18  transcript.

19        Now, I just want to stop on Mr. Hollenshead.  We're

20  going to bring him to you.  He's here local.  He's been

21  involved in this whole thing.  And he's not on either side,

22  because he worked for them, he worked with John, and he left

23  the same summer, but he didn't come to work for Oculus.  So he

24  doesn't have a side.  And he's going to come in and tell you

25  that it's Oculus's device, that Palmer was the inventor, and

1    that these guys don't own any of the technology and never did.

2           That is the promise that was made to you about

3    Mr. Todd Hollenshead.  He's the neutral, right?  He's going to

4    come in here and blow this thing wide up and say, I admit, I

5    agree with them.

6           And what did he say?

7           "At this point in time was there any dispute at all

8    in your mind that the work that Mr. Carmack had done for

9    virtual reality was owned by id?

10          "No."

11          No.  He didn't tell you -- he didn't tell you any

12    such thing.  Oh, this is all Palmer Luckey's.  He owns it.

13          QuakeCon, meeting to discuss.  How we would have a

14    business relationship going forward.

15          He agreed the equity stake that ZeniMax sought from

16    Oculus is a compensation component for the work that ZeniMax

17    did on virtual reality.

18          Certainly the software and the content was owned by

19    id.

20          I'm not sure if I have time to go back to that slide

21    that looks like a flag with the diamond, the one I started

22    with, that shows sort of how this all works.  We saw it again

23    and there is another game on the desk and it's held up the

24    headset and say, oh, this is the hardware.  Here's the game.

25    Just buy a game.

1          You know what?  If -- let's just break it down.

2    Okay?  You want to take what's in that USPS box and start a

3    business?  Go buy a game and play it on it and take it on the

4    road.  You can't find a store that sells a game?  Just plug it

5    in.

6          We talked a lot about --

7          There it is.

8          Just plug it in.  You know why?  Because you can't

9    sell that to Facebook for $2 billion.  And they know it.

10         Now, let's talk about witnesses.  Time and time again

11   for an hour and a half, they didn't call this witness, they

12   didn't call this witness, they didn't call this witness, they

13   didn't call this witness.  Well, let's think about something.

14   Let's think about something.  Who is the one man at their

15   company who could have sat in that chair, sworn an oath and

16   looked you in the eye and said, I wrote the SDK?  Their chief

17   software architect, Michael Antonov.

18         This whole case is about code and software.  And what

19   did they rely upon?  They rely upon the Defendants' testimony,

20   Mr. Carmack.  Well, Carmack says -- Carmack says -- Carmack

21   made $100 million from ZeniMax, and you know what happened?  He

22   didn't want to stay because he wanted another payday and he

23   took the technology and guess what?  He sold it again to

24   Facebook and made another 150 -- $100 million.

25         Where is Michael Antonov?  How many times have I said

1   his name in this courtroom, email after email?  Maybe only 28.

2   The guy who says basically at this time I need Carmack's code.

3          Why isn't he there?  I would love to have been

4   standing at this podium, this podium and said, Mr. Antonov

5   explain to us, let's go through this.  What did you mean by

6   this email?  What did you mean by chromatic aberration?  What

7   did you mean that you didn't understand predictive tracking?

8   What did you mean you didn't understand time warp?  Tell us.

9          Where is he?  He's in California.  He's been there

10  for three weeks, I assume.

11         They want you to -- they want you to believe Barbara

12  Frederiksen-Cross, who has an opinion.  I don't think we have

13  been disrespectful, first of all, to any witness, so I resent

14  the implication that we're insulting people, whether it's

15  Ms. Kennickell or Ms. Frederiksen-Cross or any of their

16  witnesses.  We have to find the truth.

17         And yeah, I just banged on the podium again, so I

18  apologize for that.

19         But let's talk about Professor Dobkin and let's talk

20  about Barbara Frederiksen-Cross.  I think that you would agree

21  with me that Professors Howe and Balakrishnan, that is just not

22  credible.  If someone is going to come in here and tell you it

23  will take five hours to do something that it took them months

24  and months to do, I don't believe it and neither should you.

25         Let's talk about Barbara Frederiksen-Cross and

1   Professor Dobkin.  Like I said, one is supported by the weight
2   of a whole host of other evidence.
3           Barbara Frederiksen-Cross admitted, she said there
4   was a case where she wasn't able to finish her entire analysis
5   because of destruction of evidence.
6           There it is.  There's the board.  The boards are down
7   and they're turned around.  And I understand why they want to
8   do that.  I want to put these up all the time, not just because
9   I'm a zealous lawyer and I like to represent my client, because
10  this -- these tell a story.  These tell a story, an important
11  story.
12          If everything is so innocent, it was just a mistake.
13          What do we hear?  He didn't wipe his entire computer.
14  Okay.  Does that make a difference?  If you keep stuff that is
15  not incriminating and you wipe the stuff that is, because you
16  didn't wipe the whole thing, you must be an innocent person?
17  That doesn't make any sense.
18          Let me hit a few other points here.  I heard this as
19  well.
20          John didn't keep any secrets from Mr. Altman.  That's
21  a quote.  You heard that about 20 minutes ago.  John didn't
22  keep any secrets from Mr. Altman.
23          Can we have slide 6 of the rebuttal slides?
24          John didn't keep any secrets from Mr. Altman.  Okay.
25          What Mr. Altman knows is on the right; what

1    Mr. Altman didn't know is on the left.  And now they come in

2    here and they say we should have done something.  You didn't

3    say something if your technology was being used.

4           We were in a relationship trying to negotiate with

5    the other side and this is what they are doing behind our back.

6    I'm going to do an aerospace email to Brendan Iribe from

7    Mr. Carmack, Use this email from our discussions, non-id

8    discussions.  I just got home.  Everything is on the table.

9           Why did I bring up Matt Hooper?  Just for fun, the

10   video?  I got made fun of for that too.  Oh, he's brought up

11   Matt Hooper.  Why does ZeniMax care about that?  Because the

12   email after that was, I think John and I have the same attack

13   plan.  It feels like I'm already working.

14          That was from Mr. Hooper, the same day he was led in

15   from John Carmack to the office after we fired him and where

16   does he work?  He works at Oculus and who is he emailing?  He

17   was emailing Brendan Iribe.

18          Are these random events that are just not related?

19   Is everything so innocent?  How can it be if there is such

20   destruction of evidence?

21          Mr. Rosen.  He said those system logs were wiped.

22   There was increased activity on the computer.  This is what

23   Mr. Rosen said.  Let's be very clear.  And yeah, I called him a

24   court-appointed computer crime expert because that is what his

25   credentials are.  I'm not ashamed to say it.  And he sat there

1    and he said, "Activity on the computer increased right before

2    they collected it for evidence, in the days leading up for

3    collection -- collecting it for evidence, and system logs were

4    wiped."

5            What do the system logs do as well?  Forget the

6    92 percent zeros.  What do the system logs tell you?  They tell

7    you what's going on.  And they were wiped as well.

8            Bear with me for just a moment, and I'll close soon.

9            I think I have to go back to the basic story of four

10   people who want to start a business who meet two days after

11   seeing our demo, two days.

12           And they played the Kickstarter video for you and

13   they say watch this video, it is very cool, it's great, right?

14   And you see all those people, the parade of people, I saw

15   Palmer Luckey's stuff, I thought it was great.

16           What do they see?  Do they see just a game?  Yeah, it

17   was a game, but it was a game with the VR technology that

18   enabled it to work.  They had no software of their own to show.

19   None whatsoever.

20           So I go back to the story of four -- four people,

21   four men in a room in Long Beach, California on July 4, 2012.

22   Two days later they join a company, and they don't know how to

23   do VR.

24           How is it possible that they can go from zero to

25   here?  Because they hired the right people?

1          Okay.  If you hired the right people, then don't come
2     to us for help under the guise of an NDA and ask for it.  I
3     believed your story then.
4          Mr. LaValle, they're saying -- are they saying
5     Mr. LaValle copied code?  No.  What did I ask him?  Listen
6     carefully to the questions because they are trying to elicit
7     the testimony.
8          I asked Mr. LaValle, when you started and were
9     working on your version of head and neck model, was there code
10    already that you were working on that was forwarded to you by
11    Michael Antonov?
12         Yes.
13         That code is already copied code.  So if
14    Mr. LaValle -- nice guy that he is -- is writing code on top of
15    that, it's still derived from ZeniMax's code.
16         I want to end with -- Judge, how much time do I have
17    left, if you don't mind me asking.  I'll try to --
18         MS. COHEN:  Officially two minutes.
19         MR. SAMMI:  Ms. Cohen, thank you.
20         Okay.  Let me just say I have to hit a lot of things.
21    I'm going to end with something.
22         We also got blasted for never using the word engine,
23    VR engine.
24         Let's take a look at PX365.  Go to the ELMO.
25         By the way, just as a reminder, that says "Notes from

1    meeting with John Carmack."  So I wouldn't necessarily count

2    the number of emails, especially if you don't include text,

3    phone calls, and actual meetings.

4            Notes from John Carmack.

5            This is Michael Antonov.  There he is.  This is their

6    chief architect, his engine.  He's calling it his engine.  His

7    engine.

8            Does view matrix transformation pass through into the

9    render thread to reduce latency, although he doesn't believe

10   it's critical?

11           They want to know everything they can about what

12   Mr. Carmack is doing and what he invented at id and ZeniMax,

13   because they can't do it themselves.

14           I mentioned punitive damages, and I need to come back

15   to that because what we've seen in this case is just not right.

16   What we've seen in this case is wrong.  There's right and

17   there's wrong.  And you can have every excuse in the book, but

18   there's right -- there's right, and there is wrong.

19           Now, I went to the same school as Mr. Brendan Iribe,

20   and I don't want to switch places with him.  I'm sure he's a

21   very nice man, and he's made a lot of money, but I don't agree

22   with that behavior because it's wrong.

23           There's right and there's wrong.  It's wrong to steal

24   documents.  It's wrong to destroy evidence in a court of law so

25   a jury doesn't see it.  It's wrong to lie, cheat, and steal on

```
 1   affidavits.  It's wrong to line your pockets and get rich off
 2   of someone else's technology, $400 million, $200 million,
 3   $100 million, and that's just the individuals.
 4           It's wrong to fly down here as Facebook's face, CEO,
 5   and look you in the eye and say, you know what, those guys at
 6   that table, nobody has ever heard of them.  I don't know what
 7   they are.  There's no merit to this at all.
 8           That man finds out about the NDA from me.  That's
 9   weird.  Why is it weird?  I'm opposing counsel.  This is an
10   operative document in the case.  Before the deposition, no one
11   shows him the NDA that governs after even -- before or after
12   he's bought a $3 billion company?
13           Who wants to know the truth and who doesn't want to
14   know the truth?
15           It's remarkable.
16           Speaking of the NDA, what's the testimony about the
17   NDA?
18           The innocent hardworking folks who built this all by
19   themselves, what's the testimony about the NDA?
20           You know what the testimony about the NDA is?  The
21   testimony about the NDA is that Palmer Luckey said he told
22   everybody right around July 4, 2012, because they probably
23   asked -- if I were you, I would -- how do you have this
24   technology?  I signed an NDA with these guys.
25           And, guess what, Nate Mitchell has no idea about the
```

1    NDA.  He was in the room.  He did.  He said -- he claims not to
2    know it until he got sued.
3            Mr. Iribe, his testimony is great.  I never knew
4    about it.  I found out about it.  Then I forgot about it again.
5    And somehow it never got its way to Facebook.
6            And Mr. Carmack when Facebook was buying Oculus, did
7    he know about the NDA?  He forwarded the NDA to Palmer Luckey
8    to get his signature.  Of course he knew about the NDA.
9            Mr. Antonov, he's got -- who is not here -- he's got
10   another version.
11           None of them match.  None of them match.  So this is
12   not the innocent parade that we think it is.
13           Let me end by saying that we cannot allow in this
14   country corporations who are seemingly respectable, like
15   Facebook and Oculus, to act like this, to cover up such
16   horrible things like destruction of evidence.
17           We can't allow individuals to line their pockets
18   using theft as the means.  Whether it's trade secrets or code
19   or computers you found in a closet, it's wrong.  And we all
20   know it's wrong.  And there's a way we can fix it.
21           Number one, ZeniMax has been asking for the
22   compensation it deserves from day one from Oculus -- day one --
23   and everybody has gotten rich, and we've gotten zero.  It's not
24   begging for money.  What have we paid?  Two and a half years of
25   fighting in this litigation.  And our reputation smeared.  It

1    was smeared two weeks ago.  Who has ever heard of ZeniMax?

2    Because we were trying to protect our rights.  That's the one

3    thing.  Compensate.

4            Next thing.  Send a message.  It's not right.

5    Facebook is a $350 billion company.  It is an elephant in the

6    room.  It is a 900-pound gorilla.  It doesn't care.  Make it

7    care.  You can't do this.  There is right and there is wrong.

8            Please make it right.

9            I want to thank you so much for your time and your

10   attention, and I appreciate it.

11           THE COURT:  Ladies and gentlemen, turn to page 87, a

12   couple more pages of instructions.

13           You are the sole and exclusive judges of the facts.

14   You should determine these facts without any bias, prejudice,

15   sympathy, fear, or favor, and this determination should be made

16   from a fair consideration of all the evidence that you have

17   seen and heard in this trial.

18           Do not speculate on matters that are not in evidence.

19   Keep constantly in mind that it would be a violation of your

20   own sworn duty to base a verdict on anything but the evidence

21   in the case.  Your answers and verdict must be unanimous; that

22   is, all of you must agree to each of your answers.  You will

23   carefully and impartially consider all the evidence in the

24   case, follow the law as stated by the Court -- that's me -- and

25   reach a just verdict, regardless of the consequences.

1          The fact that I have given you instructions about a

2     particular claim or defense, or that I have not so instructed

3     you, should not be interpreted by you in any way as an

4     indication that I believe a particular party should, or should

5     not, prevail in this case.

6          Also, you should not interpret the fact that I have

7     given instructions about the Plaintiffs' damages as an

8     indication in any way that I believe that the Plaintiffs

9     should, or should not win this case.

10         Remember that any notes you have taken during this

11    trial are only aids to memory.  If your memory should differ

12    from your notes, then you should rely on your memory and not on

13    the notes.  The notes are not evidence.  A juror who has not

14    taken notes should rely on his or her independent recollection

15    of the evidence and should not be unduly influenced by the

16    notes of other jurors.  Notes are not entitled to any greater

17    weight than the recollection or impression of each juror about

18    the testimony.

19         It is your sworn duty as jurors to discuss the case

20    with one another in an effort to reach agreement if you can do

21    so.  Each of you must decide the case for yourself, but only

22    after full consideration of the evidence with the other members

23    of the jury.  While you are discussing the case, do not

24    hesitate to reexamine your own opinion and change your mind if

25    you become convinced that you are wrong.  However, do not give

1   up your honest beliefs solely because the others think

2   differently or merely to finish the case.

3          Remember that in a very real way you are the judges,

4   judges of the facts.  Your only interest is to seek the truth

5   from the evidence in the case.  You will now retire to the jury

6   room.  In a few minutes, I will send you this charge and the

7   exhibits the Court has admitted into evidence.  Upon receiving

8   the exhibits and the charge, you should select a foreperson and

9   commence deliberations.  Do not deliberate unless all of you

10  are present in the jury room.  In other words, if one or more

11  of you go to lunch together or are together outside the jury

12  room, do not discuss the case.

13         If during the course of your deliberations you wish

14  to communicate with the Court, you should do so only in writing

15  by a note signed by the foreperson.  I will then respond as

16  promptly as possible, either in writing or by having you return

17  to the courtroom so that I can address you orally.

18         I caution you, though, with respect to any message or

19  question you might send that you should never state or specify

20  your numerical division at the time.

21         During your deliberations, today, you will set your

22  own work schedule, deciding for yourselves when and how

23  frequently you wish to recess and for how long.

24  After you have reached your verdict, you will return this

25  charge together with your written answers to the foregoing

1    questions.  Do not reveal your answers to anyone besides other

2    members of the jury until such time as you are discharged,

3    unless otherwise directed by me.  After you have reached a

4    verdict, you are not required to talk with anyone about the

5    case.

6          In fact, I don't let lawyers talk to you about the

7    case after it's over.

8          Your foreperson will sign in the space provided on

9    the following page after you have reached your verdict.

10         Dated:  January 26, 2017.  Ed Kinkeade, United States

11   District Judge

12         Now, I understand y'all aren't going to deliberate

13   tomorrow.  That's fine.  You know I'm not going to be here

14   tomorrow.  So here's my suggestion.

15         You go back in there and then get ready to leave and

16   come back Monday at 9:00 ready to work hard.  Y'all have

17   already worked awful hard.  I know you're tired.  I can look at

18   you and tell.  Your eyes are all red and everything, kind of

19   like mine.

20         But -- so I don't want you to stay late tonight, and

21   I never let people stay beyond 5:00 because it's downtown

22   Dallas, and I don't mean that it's -- this is a horrible place,

23   but I don't want y'all wandering around after it's dark.  It's

24   in the middle of wintertime, as much as we love living here in

25   Texas.

1          So go back in there, wait a few minutes, pick your

2     foreperson.  If you want to do that, that's fine.  You can tell

3     David who that is.  And then I want you to leave for the day,

4     because it's after 5:00, 5:20.

5          So you'll -- enjoy Friday, Saturday, and Sunday.  Be

6     prepared to come back Monday and work hard.  I'll be back then

7     rested and ready, and so will you.

8          I will see you back then.

9          Thank you very much.

10          SECURITY OFFICER:  All rise.

11          (Jury out)

12          (Discussion off the record)

13          (Recessed for the day at 5:19)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX
```

```
2   CLOSING STATEMENT:  Mr. Sammi...................... 11,123

3   CLOSING STATEMENT:  Ms. Wilkinson...................... 58

4   Jury Charge read...................................... 144
```

```
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      I, TODD ANDERSON, United States Court Reporter for the

 2   United States District Court in and for the Northern District

 3   of Texas, Dallas Division, hereby certify that the above and

 4   foregoing contains a true and correct transcription of the

 5   proceedings in the above entitled and numbered cause.

 6      WITNESS MY HAND on this 26th day of January, 2017.

 7

 8

 9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25
```