IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA INC. and ID SOFTWARE LLC, | § § § | |
| Plaintiffs, | § § | CIVIL CASE NO. 3:14-cv-01849-K |
| v. | § § | |
| OCULUS VR, LLC, PALMER LUCKEY, FACEBOOK, INC., BRENDAN IRIBE, and JOHN CARMACK, | § § § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR ENTRY OF PERMANENT INJUNCTION**

P. Anthony Sammi
Kurt Wm. Hemr
Christopher A. Lisy
James Y. Pak
William J. Casey
**SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036

Dated: February 23, 2017

Phillip B. Philbin
Michael D. Karson
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219

*Attorneys for Plaintiffs
ZeniMax Media Inc. and id Software LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 7

    A.    Defendants Infringed ZeniMax's Copyrights ....................................................... 7

    B.    Defendants Breached the NDA ............................................................................. 9

    C.    Defendants Infringed ZeniMax's
            Trademarks And Engaged In False Designation ................................................. 10

    D.    The Jury Was Permitted To Draw
            Adverse Inferences Based On Spoliation ........................................................... 11

ARGUMENT .................................................................................................................... 13

I.      PERMANENT INJUNCTIVE RELIEF IS WARRANTED
       HERE ON MULTIPLE GROUNDS BECAUSE ZENIMAX
       WILL BE IRREPARABLY HARMED BY DEFENDANTS' ONGOING
       MISCONDUCT AND CANNOT BE COMPENSATED WITH DAMAGES ................. 13

    A.    Defendants Expressly Agreed That ZeniMax Would Be Irreparably
            Harmed By A Breach Of The Non-Disclosure Agreement And That
            Injunctive Relief Would Be An Appropriate Remedy For Oculus's Breach ......... 13

    B.    The Copyright Act Expressly Empowers This Court To Grant Final
            Injunctive Relief To Restrain Infringement Of ZeniMax's Copyrights ............... 17

    C.    The Lanham Act Also Expressly Empowers This Court To
            Enter Final Injunctive Relief To Prevent Violations Of That Statute .................. 19

    D.    Damages Are An Inadequate Remedy For Ongoing Harm ................................. 20

II.     THE BALANCE OF HARDSHIPS FAVORS ZENIMAX, WHO
       ASKS ONLY THAT OCULUS CEASE ITS WRONGFUL CONDUCT ...................... 21

III.    PUBLIC POLICY FAVORS ENTRY OF A PERMANENT INJUNCTION .................. 23

IV.    ALTERNATIVELY, THE COURT SHOULD
       GRANT ZENIMAX AN ONGOING ROYALTY FOR DEFENDANTS'
       CONTINUING USE OF ZENIMAX'S INTELLECTUAL PROPERTY ...................... 24

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

*ADT, LLC v. Capital Connect, Inc.*,
   145 F. Supp. 3d 671 (N.D. Tex. 2015) ..................................................20, 21, 24

*Aspen Technology, Inc. v. M3 Technology, Inc.*,
   569 F. App'x 259 (5th Cir. 2014) ..........................................................17, 18, 24

*Bianco v. Globus Med., Inc.*,
   53 F. Supp. 3d 929 (E.D. Tex. 2014) ...............................................................25

*Chanel v. Van Doren*,
   No. 3:15-cv-1393-M, 2016 WL 7444995 (N.D. Tex. Nov. 28, 2016) ............................20

*Covidien LP v. Esch*,
   No. 16-12410-NMG, 2017 WL 111918 (D. Mass. Jan. 11, 2017) ......................16, 22, 23

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..........................................................................13, 19, 21

*Flowserve Corp. v. Hallmark Pump Co.*,
   98 U.S.P.Q.2d 1979 (S.D. Tex. 2011) ...........................................................23, 24

*Fox Film Corp. v. Doyal*,
   286 U.S. 123 (1932)................................................................................19

*Gruma Corp. v. Mexican Restaurants, Inc.*,
   2013 WL 12134147 (E.D. Tex. Sept. 27, 2013) ...................................................23

*Hospitality Staffing Solutions, LLC v. Reyes*,
   736 F. Supp. 2d 192 (D.D.C. 2010) .............................................................16, 21

*Lava Records LLC v. Ates*,
   No. Civ. A. 05-1314, 2006 WL 1914166 (W.D. La. July 11, 2006) ....................22, 23, 24

*Oracle USA, Inc. v. Rimini Street, Inc.*,
   No. 2:10-cv-00106-LRH-PAL, 2016 WL 5213917 (D. Nev. Sept. 21, 2016) 18, 20, 21, 23

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007).................................................................24, 25

*N. Atl. Instruments, Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999)........................................................................14

*Retiree, Inv. v. Anspach*,
   No. 12-2079-JAR, 2013 WL 3820729 (D. Kan. July 23, 2013)........................17

*Retiree, Inc. v. Anspach*,
   660 F. App'x 582 (10th Cir. 2016) .............................................................14, 15

i

*Stoneeagle Services, Inc. v. Gillman*,
    No. 3:11-CV-2408-P, 2011 WL 13129085 (N.D. Tex. Oct. 14, 2011) ................15, 16, 23

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999).................................................................................14

*University Computing v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ...........................................................................25

*Warner Bros. Records, Inc. v. Briones*,
    77 U.S.P.Q.2d 1253 (W.D. Tex. 2005)............................................................24

*Woods v. Boeing Co.*,
    No. 2:11-cv-02855-RMG, 2013 WL 5332620 (D.S.C. Sept. 23, 2013)...............20, 22, 23

*Wright v. Sport Supply Group, Inc.*,
    137 S.W.3d 289 (Tex. App.—Beaumont 2004) .........................................14, 23

## STATUTES        PAGE(S)

15 U.S.C. § 1116.................................................................................................19

15 U.S.C. § 1125.................................................................................................19

17 U.S.C. § 502(a) ..............................................................................................17

## TREATISES        PAGE(S)

5 McCarthy on Trademarks and Unfair Competition § 30:1 (4th ed.) ........................................20

## PUBLICATIONS        PAGE(S)

Michelle Castillo, *Facebook ordered to pay $500 million in damages over VR suit*,
    CNBC, http://www.cnbc.com/2017/02/01/facebook-loses-vr-case.html .........................21

## PRELIMINARY STATEMENT

After a three-week trial of this action, the jury awarded Plaintiffs ZeniMax Media Inc. and id Software LLC (collectively, "ZeniMax") $500,000,000 in damages to redress Oculus's theft of the ZeniMax intellectual property, which was the foundation on which Oculus built its business.  As that verdict demonstrated, the jury resoundingly rejected the myth that Defendants had purposely promoted:  that Oculus, without any technological assistance from ZeniMax, independently solved the complex technical challenges of virtual reality ("VR") under the leadership of Defendant Palmer Luckey.  And the jury's rejection of Defendants' fraudulent tale was hardly surprising:  it was contrary to a mountain of evidence presented at trial as well as contrary to common sense.  Put charitably, Defendants' argument that Palmer Luckey and Brendan Iribe (along with two other colleagues) were able to somehow figure out the seemingly insurmountable obstacles to commercially viable VR — although none of them had any expertise or ability to code the critical software that was the key to solving those issues — was simply not credible.  Instead, the jury rightly found that the breakthrough in VR was accomplished by ZeniMax *months* before there was any contact with these Defendants, and that *ZeniMax's* singular technology — source code, VR test beds, software demonstrations, and other technical assistance — was only shared with Defendants after a formal Non-Disclosure Agreement (the "NDA") was entered into between the parties.  That agreement made undeniably clear that, among other things, all the VR technology being provided to Defendants was owned by ZeniMax — and ZeniMax alone.

Specifically, the jury's verdict found Oculus liable for breach of the NDA under which ZeniMax provided its valuable technology to Oculus, for infringement of ZeniMax's copyrights (*i.e.*, unlawful use of ZeniMax's computer code) and trademarks, and for false designation of ZeniMax's technology as its own.  Read as an integrated whole, the jury verdict clearly

1

establishes that Oculus wrongly obtained ZeniMax VR technology under the NDA, and used it (including copyrighted code and valuable trademarks) to establish a business that would not have existed without ZeniMax.

These findings are well supported by the evidence that the jury heard through the testimony of more than twenty witnesses. The basis of Oculus's existence as a company was the work performed for ZeniMax by Defendant John Carmack, the founder and former Technical Director of id Software and a world-renowned programmer who later left id Software to become Oculus's Chief Technology Officer — stealing thousands of files and millions of lines of highly confidential source code from ZeniMax on his way out the door, facts which the jury confirmed in finding Carmack liable for conversion. By early 2012, Carmack had developed cutting edge software to solve VR problems like latency and lens distortion that had previously precluded viable consumer-level virtual reality experiences. And by that time, Carmack had created for ZeniMax proprietary technology (which ZeniMax owned) which made possible what Carmack called "the best damn VR demo the world has ever seen."

While evaluating headsets through which he intended to present his demo, Carmack contacted for the first time a teenage VR hardware "hobbyist," Defendant Palmer Luckey, who volunteered to send Carmack a prototype head-mounted display ("HMD"). Luckey's prototype did not provide a virtual reality experience. Among other things, it had no ability to track a user's movements or change what the user saw based on where the user looked. More fundamentally, Luckey, who is not a computer programmer, had no ability to write the *software* that became the operating system for the VR headset and was the critical element in providing an immersive VR experience. But Luckey's prototype had advantages over other HMDs that Carmack was evaluating, including a wide field of view made possible by some inexpensive, off-

the-shelf lenses that Luckey had purchased.  So Carmack made his breakthrough VR software compatible with Luckey's hardware (which Carmack also modified and improved) to demonstrate ZeniMax's VR technology at the 2012 industry convention E3.  That demonstration at ZeniMax's booth, with no other Defendants present, was met with overwhelming critical acclaim around the world.  It led Luckey, Iribe and their two friends to pursue a VR business at Oculus.  But, of course, Defendants lacked both capital and the VR technology that made the business feasible — and there was only one known source for that technology — ZeniMax.

Accordingly, as the jury found, Oculus, Iribe and Luckey immediately proceeded to infringe ZeniMax's trademarks and other intellectual property to raise the funding they needed — disregarding express written directives not to use any such ZeniMax property and as well as other clear terms of the NDA — and used the valuable ZeniMax VR technology to create interest and support for the new business.  Defendants' violations of the NDA were both numerous and immediate.  In a secret meeting mere weeks after E3, Luckey used ZeniMax's confidential VR software to impress and attract the initial investors in Oculus, including Iribe (who was until recently Oculus's Chief Executive Officer).  In the ensuing months, although ZeniMax continued in good faith to provide VR technology and highly confidential information to Oculus, Defendants repeatedly broke that trust, impermissibly using ZeniMax's intellectual property to raise funds and public awareness for their fledgling company, and to refine and modify ZeniMax's copyrighted software for use with Oculus's headsets.

When ZeniMax simultaneously sought to obtain fair compensation for its technology that was used as the foundation of Oculus, Defendants gallingly proposed that ZeniMax should invest millions of dollars to obtain an equity interest in that technology.  The negotiations seeking compensation broke down, but produced compelling evidence that was presented to the jury.  For

example, Iribe sent a written proposal to ZeniMax in September 2012 in which he requested a license for Oculus to use ZeniMax's VR source code being used to power the headset which had been "shared" with Oculus by ZeniMax.  This proposal is a direct admission that Oculus *had* ZeniMax's VR source code, was using it for its VR business, and that Defendants understood that they needed a license to use ZeniMax's property.  When no license was granted, Oculus simply used the copyrighted source code illegally.  Oculus was ultimately sold to Facebook for billions, making tycoons out of the individual Defendants.  ZeniMax never received a penny for its investment in this revolutionary technology — even though it was *ZeniMax* that had proven its value to the world long before Defendants ever came along.

The jury's damage verdict reflects the severity of Defendants' misconduct in founding and promoting Oculus, and developing Oculus's products which used (illegally and knowingly) ZeniMax's computer code, trademarks, and copyrighted code.  In addition, the jury likely concluded — in view of both the uncontradicted, shocking testimony of the Court's independent forensic expert, and accompanying jury spoliation instruction — that key evidence likely adverse to Defendants (found on Carmack's Oculus computer, the computer of another Oculus programmer, and a USB storage device used to download VR technology from ZeniMax computers) had been "wiped" immediately after Defendants had received notice of the lawsuit. This testimony further confirmed that Carmack's affidavit denying such wiping was false.  But notwithstanding the monetary award by the jury to address these violations, financial damages alone are inadequate to protect ZeniMax from ongoing injury.  Accordingly, ZeniMax now moves this Court for permanent injunctive relief.  That injunctive relief was expressly authorized by Defendants in the NDA that Luckey signed and that they willfully violated.

Each of the counts for which the jury held Defendants liable is an independently

sufficient basis for this Court to award injunctive relief:

*First*, the jury determined that Oculus directly infringed ZeniMax's copyrights, and that individual defendants Luckey, Iribe, and Carmack vicariously or contributorily infringed those copyrights.  Defendants should not be permitted to continue using or distributing products that infringe ZeniMax's copyrights — including Oculus products that use code derived from or developed with reference to ZeniMax's code — as expressly covered by the NDA.

*Second*, the jury determined that both Luckey and Oculus were parties to the NDA and that both had breached that agreement.  Defendants' breaches of the NDA included not only disclosing ZeniMax's proprietary information to third parties but, more fundamentally, treating the technology that ZeniMax owned exclusively as belonging to Oculus.  The confidential information that Oculus obtained included source and executable code as well as the plans, processes, and other technological advice that ZeniMax shared with Oculus pursuant to the NDA.  Even now, Defendants continue to hold out Oculus to the public as the creator and owner of ZeniMax's technology.  Indeed, at trial, rather than acknowledge the undeniable pioneering role of ZeniMax in developing VR technology, Mark Zuckerberg (Facebook's Chairman and Chief Executive Officer) repeated the insulting characterization that Facebook has employed since this action was first filed: "Now, it is pretty common when you announce a big deal or do something that all kinds of people just kind of come out of the woodwork and try to claim that they own some portion of the deal."  (App'x (Vol. I)[1] Ex. A, at 7 (ECF No. 927, at 88:5-8).) Zuckerberg then denied that Oculus had exclusively used ZeniMax's software as it first tried to establish its business — facts the jury knew to be true after hearing a week's worth of evidence

---

[1]     In connection with this Motion, ZeniMax files herewith two appendices. The first, referenced as "App'x (Vol. I)" herein contains documents that are available publicly (and used in open court during trial), and the second, referenced as "App'x (Vol. II)" contains documents treated confidentially by the Court during trial.

of such use.  The NDA expressly provides for injunctive relief in the event of a breach.  These ongoing violations of the NDA cause irreparable harm to ZeniMax and its reputation and, as the NDA expressly provides, ZeniMax is entitled to injunctive relief for those violations.

*Third*, the jury determined that Oculus and Iribe intentionally and knowingly infringed ZeniMax's trademarks, and that Oculus, Luckey, and Iribe were each liable for intentional and knowing false designation.  The documents and testimony established beyond debate that Defendants had created a business built on ZeniMax's technology — indeed, Carmack specifically admitted this fact in an email to ZeniMax's CEO in which he acknowledged that "*everyone agrees*" that Oculus "*wouldn't exist as a funded company*" without ZeniMax.  At each step of the way as Defendants gathered valuable endorsements and completed their fundraising rounds, they demonstrated their VR technology using the only thing they had:  ZeniMax's technology, trademarks, and intellectual property that Oculus had no license to use.  And these acts of false designation continue today:  a search for "Oculus Kickstarter" still turns up the Kickstarter video that Defendants created to raise capital for Oculus.  (App'x (Vol. I) Ex. B, at 17).)  In that video, Carmack says, "What I've got now is, I honestly think, the best VR demo probably the world has ever seen."  Not stated in the Kickstarter video, but known to all who attended the trial:  Carmack was referring to the VR demo *he* created at *ZeniMax* which *ZeniMax* owns.  Yet Oculus continues to hold that statement out as descriptive of Oculus's own non-existent software.  The Kickstarter video specifically focuses on and emphasizes ZeniMax's trademark for *Doom 3*, describing that game as "The first Oculus-ready game," even though Oculus had not — and indeed, never has — acquired a license to use ZeniMax's intellectual property to promote Oculus products.  That is just one example in a long, ugly list of instances where Oculus treated ZeniMax's intellectual property as its own.

Considered together as reflecting Defendants' extensive infringement of ZeniMax's intellectual property — without which, both Luckey and Carmack contemporaneously acknowledged, Oculus would never have existed — the jury's findings strongly support entry of injunctive relief.  Accordingly, this Court should permanently enjoin Defendants from using or distributing products that constitute continued violations of the NDA and infringement of ZeniMax's copyrights.

Additionally, Defendants should be enjoined from further public display of any materials that perpetuate the false narrative that Oculus — not ZeniMax — created the breakthrough technology that underlies Oculus's existence.  These materials include but are not limited to the Kickstarter video described above.  Although Oculus's Kickstarter campaign concluded in 2012, the video remains available online and should be taken down immediately.

## FACTUAL BACKGROUND

During the course of the three-week trial, the jury was presented with ample evidence of Defendants' egregious wrongdoing.  In reaching its verdict (ECF No. 914), the jury was entitled to rely on the evidence presented at trial, including but not limited to the following:

### A.    Defendants Infringed ZeniMax's Copyrights

1.   The email from Michael Antonov (Oculus's Chief Software Architect), to Luckey, Iribe, and Nate Mitchell (Oculus's Vice President of Product), in July 2012.  In that email, Antonov stated, "As we are planning software development for Oculus, it is becoming important to get access to any source code John Carmack and your prior employer would be willing to provide," including "[c]ode to using libfreespace and Hillcrest interpretation logic," "binaries needed to flash the chip to higher frequency," "[s]ource to shaders," and "anything else he can provide."  (App'x (Vol. I) Ex. C, at 19.)

2.     Luckey's response to that email, in which he stated, "I will see what Carmack can give us right now."  (*Id.* Ex. D, at 21.)

3.     The email from Antonov to Iribe in August 2012 in which he stated about filtering input from sensors that "If I was to implement and try to cover the full scope of it from scratch, it would probably take 3 months or so," and further that "Carmack's code would, however, be the best starting point."  (*Id.* Ex. E, at 23.)

4.     The text-message exchange between Iribe and Antonov where Antonov complained, "Can't get the damn gyro & gravity data to merge :( " and Iribe responded, "Why don't you email Carmack? "  (*Id.* Ex. F, at 26.)

5.     The unrebutted testimony of Oculus coder Peter Giokaris demonstrating that he "cut and pasted" ZeniMax's source code into Oculus's source code repository where distortion correction was being implemented.  (*Id.* Ex. G, at 30-37 (6 Tr. 113:5-120:20).)

6.     The email from Carmack to Antonov, Luckey, and Iribe, in which he provided the source code for his correction for chromatic distortion, which was owned by ZeniMax.  (*Id.* Ex. H, at 40-42.)

7.     The unrebutted testimony of Oculus coder Lee Cooper that he had a "Carmack folder" on his computer and that one day after receiving ZeniMax's source code he was able to complete a solution for chromatic aberration that he had been working on unsuccessfully for many months.  (*Id.* Ex. I, at 46-58 (4 Tr. 219:20-230:12; 231:6-20).)

8.     The email from Iribe to Andrew Reisse (who was Oculus's Lead Engineer), to which Iribe attached shader code written by Carmack and asked whether Oculus was doing the same.  (App'x (Vol. II) Ex. EE, at 254.)

9.     The request by Iribe in Oculus's initial proposal to ZeniMax in which he acknowledged

       that Carmack had already shared ZeniMax's source code with Oculus:  that proposal

       expressly requested that "ZeniMax [] grant Oculus a worldwide exclusive perpetual right

       and license to source code shared by Carmack regarding Oculus Rift support."  (App'x

       (Vol. I) Ex. J, at 63.)

10.    The testimony of ZeniMax's expert, Dr. David Dobkin (the Phillip Y. Goldman '86

       Professor of Computer Science at Princeton University, where he has served as chair of

       the computer science department from 1994 to 2003, and as Dean of the Faculty from

       2003 to 2014), concerning instances of direct copying that he uncovered in Oculus's

       source code.  (Sealed App'x (Vol. II) Ex. FF, at 260-66 (ECF No. 933, at 26:9-32:5).)

11.    The testimony of Dr. Dobkin that he found nonliteral copying in Oculus's source code of

       ZeniMax's solutions to each of the seven fundamental virtual reality problems at issue in

       this action.  (*Id.* Ex. FF, at 266-305; 307-08 (ECF No. 933, at 32:11-71:3, 132:17-133:9).)

12.    The unrebutted testimony of Dr. Dobkin that literal copies of tens of thousands of source

       code modules from the *id Tech*® engine were found on an Oculus computer.  (*Id.* Ex. FF,

       at 298-99 (ECF No. 933, at 64:25-65:12).)

       **B.     Defendants Breached the NDA**

13.    The multiple communications by which Oculus sought and Carmack transferred

       ZeniMax's technology to Oculus pursuant to the NDA, including but not limited to the

       evidence of technology transfer described above.  (*E.g.*, App'x (Vol. I) Exs. C-E, H, &

       K-N, at 18-24, 39-42, 64-77).)

14.    The testimony of Oculus's Vice President of Product, Nate Mitchell, explaining that in

       August 2012, he came to ZeniMax and downloaded ZeniMax's virtual reality software to

a large desktop computer (which he has since unfortunately "misplaced"). (*Id.* Ex. O, at 84 (ECF No. 926, at 210:3-20).)

15.     The unrebutted testimony of Luckey that he demonstrated ZeniMax's VR technology to entice others to start a company with him. (*Id.* Ex. P, at 89 (ECF No. 929, at 127:4-6).)

16.     The unrebutted testimony of Luckey that Oculus demonstrated and used ZeniMax's VR technology to obtain endorsements from companies such as Unity Technologies SF, Epic Games, Inc., and Valve Corporation. (*Id.* Ex. P, at 92 (ECF No. 929, at 132:6-11).)

17.     The multiple other presentations of ZeniMax's VR Testbed Code by Oculus to other parties without informing or seeking permission from ZeniMax. (*Id.* Ex. Q, at 94-129; *id.* Ex. R, at 130-35 (ECF No. 938, at 28:1-29:22 (Hollenshead)).)

18.     The multi-billion-dollar sale of Oculus to Facebook, through which Facebook obtained ZeniMax's confidential and proprietary information that had been shared with Oculus pursuant to the NDA (notwithstanding the fact that the NDA expressly prohibited Oculus from using ZeniMax's proprietary information "to compete or to obtain any competitive or other advantage" with respect to ZeniMax). (*Id.* Ex. S, at 136-42 (certificate of merger)); *id.* Ex. T, at 144.)

### C.     Defendants Infringed ZeniMax's Trademarks And Engaged In False Designation

19.     The email from Carmack to Luckey in which Carmack instructed Luckey, "It is very important that you NOT use anything that could be construed as ZeniMax property in the promotion of your product." (*Id.* Ex. U, at 149.)

20.     The various investor presentations in which Defendants used ZeniMax's trademarks without permission in direct contravention of Carmack's instruction. (*Id.* Exs. V-W, at 150-217.)

10

21. The Kickstarter video in which Defendants used — indeed, intentionally emphasized — ZeniMax's trademarks without permission in direct contravention of Carmack's instruction.  (*Id.* Ex. B, at 16-17.)

22. The portion of the Kickstarter video including a quotation from Carmack concerning what he viewed as "the best VR demo probably the world has ever seen," which misleadingly attributes that characterization to Oculus, as is clear from Carmack's email to a third party before he had ever interacted with Luckey, in which Carmack stated that he had created "the best damn VR demo the world has ever seen" at ZeniMax.  (*Id.* Ex. X, at 216-17.)

23. The unrebutted testimony of Mitchell that Oculus used ZeniMax property in its Kickstarter video despite Carmack's instruction to the contrary "because it strengthened the video."  (*Id.* Ex. O, at 81 (ECF No. 926, at 206:23-24).)

24. The email from Iribe to Mitchell that the Kickstarter video "should almost screem [sic], PLAY DOOM 3 BFG IN VR for the first time ever!"  (*Id.* Ex. Y, at 219.)

25. The unrebutted testimony of Luckey described above concerning the demonstrations of ZeniMax's VR Testbed Code that were made to Oculus's other founders and endorsers such as Unity, Epic, and Valve.  (*Id.* Ex. P, at 89, 92 (ECF No. 929, at 127:4-6, 132:6-11).)

26. The unrebutted testimony of Carmack that the endorsements Oculus received from companies such as Unity, Epic, and Valve constituted a "very strong endorsement to have this slate of people talking about it."  (*Id.* Ex. Z, at 223 (ECF No. 925, at 104:1-2).)

### D.     <u>The Jury Was Permitted To Draw Adverse Inferences Based On Spoliation</u>

Additionally, the jury was properly instructed that if it determined that any of the Defendants had caused the spoliation of evidence, it was permitted to "infer that the information

was unfavorable to those Defendants." (ECF No. 914 at 9.)   At trial, the court-appointed computer forensic crime expert Andrew Rosen testified at length that substantial evidence — in his independent expert opinion — had been intentionally wiped after ZeniMax sent notice of their claims.   For example, Mr. Rosen testified that files from Carmack's MacBook computer were wiped (*i.e.*, intentionally deleted), including system log files that would have reflected how that computer was used.   (*E.g.*, App'x (Vol. I) Ex. AA, at 229 (ECF No. 926, at 64:14-21).)   According to Mr. Rosen, this wiping by an individual was unquestionably intentional:

> When I use the term "wiping," I use that term to describe a process that is the direct result of a volitional act of a computer user that results in the permanent and irrevocable destruction of information.

(*Id.* at 244 (ECF No. 926, at 132:7-10).)  This destruction of evidence occurred right after Oculus and its employees received notice of ZeniMax's claims, and just days before Carmack's computer was collected for imaging and preservation in this litigation. Of particular note, files on Carmack's computer were wiped immediately after Carmack had conducted a Google search for "how do you wipe a hard drive on mac osx" — not coincidental timing, as Mr. Rosen's testimony made clear.  (*Id.* at 228-29, 232-33 (ECF No. 926, at 63:15-64:5; 77:10-78:2).)  Mr. Rosen added that Carmack's sworn affidavit was false to the extent it denied that files were deleted, and he testified that counsel for Facebook and Carmack had made false representations to the Court about this evidence.  (*Id.* at 232-33 (ECF No. 926, at 77:10-78:2).)  Mr. Rosen similarly testified that file deletions and other "reformatting" events had taken place on other devices at issue in the case, including the 3515 USB (on which Carmack transferred thousands of id files to an Oculus computer) and the computer of Lee Cooper, an Oculus programmer who, the evidence would later show, was intimately involved in the copying of ZeniMax code.  (*E.g., id.* at 236-37, 239-41 (ECF No. 926, at 81:20-82:3; 93:22-94:4).)  Destruction of evidence on Cooper's computer occurred immediately before the machine was provided to counsel for

imaging.  (*E.g., id.* at 239-41 (ECF No. 926, at 93:22-94:4).)  In light of this independent (and unrebutted) testimony, the jury could hardly avoid finding that key evidence was intentionally destroyed by Defendants in an effort to cover up their misconduct.

## ARGUMENT

ZeniMax can show its entitlement to permanent injunctive relief by establishing the four traditional prerequisites to such relief:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also id.* at 392 ("This approach is consistent with our treatment of injunctions under the Copyright Act.").  The weight of the evidence plainly shows that ZeniMax is entitled to such relief.

**I.     PERMANENT INJUNCTIVE RELIEF IS WARRANTED HERE ON MULTIPLE GROUNDS BECAUSE ZENIMAX WILL BE IRREPARABLY HARMED BY DEFENDANTS' ONGOING MISCONDUCT AND CANNOT BE COMPENSATED WITH DAMAGES**

Each of the jury's findings of liability independently supports injunctive relief.  Taken together, the suitability of injunctive relief is manifest:

**A.     Defendants Expressly Agreed That ZeniMax Would Be Irreparably Harmed By A Breach Of The Non-Disclosure Agreement And That Injunctive Relief Would Be An Appropriate Remedy For Oculus's Breach**

Oculus expressly agreed and acknowledged that ZeniMax would be irreparably harmed by a breach of the NDA, and that money damages would be an insufficient remedy for such a breach.  Indeed, Oculus specifically agreed that ZeniMax should be entitled to an injunction:

> The Receiving Party [*i.e.*, Oculus] acknowledges the insufficiency of money damages as a remedy for any breach of this Agreement by Receiving Party, and that any such breach would cause the Disclosing Party [*i.e.*, ZeniMax] irreparable harm.  Accordingly, the Receiving Party agrees that the Disclosing Party, in

13

addition to any other remedies available at law, shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. The Receiving Party further agrees to waive the securing or posting of any bond in connection with such remedy.

(App'x (Vol. I) Ex. T, at 145 (§ 2.f).) That acknowledgement in the NDA is conclusive evidence that ZeniMax's harms are irreparable and remedies at law are inadequate. For example, in *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289 (Tex. App.—Beaumont 2004), the court noted Texas's "strong public policy in favor of preserving the freedom of contract" when issuing an injunction based in part on a contractual acknowledgement that remedies at law would be inadequate to remedy a breach of a noncompetition agreement. *Id.* at 293-94. Accordingly, that appellate court determined that there was "substantive and probative evidence" supporting the trial court's determination that remedies at law would be inadequate. *Id.* at 294.[2] *See also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("Haber acknowledged . . . that a breach of the confidentiality clause would cause 'irreparable injury' to North Atlantic.") (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (noting that contract at issue "concedes that in the event of [breach] Ticor shall be entitled to injunctive relief, because it would cause irreparable injury. Such, we think, might arguably be viewed as an admission by Cohen that plaintiff will suffer irreparable harm were he to breach")).

Independent of Oculus's express acknowledgment in the NDA, there is ample evidence that ZeniMax's injuries from the breach are irreparable and that damages are insufficient to remedy them. Most fundamental, Oculus's creation of a company based on ZeniMax's confidential information constitutes irreparable injury to ZeniMax. In *Retiree, Inc. v. Anspach*, 660 F. App'x 582 (10th Cir. 2016), the Tenth Circuit affirmed a district court's entry of a

---

[2]   The court ultimately remanded on other grounds for the trial court to craft a narrower injunction. *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d at 298-99.

permanent injunction following the defendant's breach of a confidentiality agreement. *Id.* at 590-91. The defendant had received confidential information under the terms of a confidentiality agreement while the parties were discussing a merger and had then made use of that confidential information in her own business after the merger discussions broke down. *Id.* at 584-86. Just as these Defendants did, the defendant in *Retiree* made use of the plaintiff's technology to develop and market her business. There, the defendant "learned valuable confidential information" concerning the plaintiff's technology and then "used information that she had contractually agreed not to use" to further her business, *id.* at 588; here, Luckey and Oculus used ZeniMax's confidential information, which they had contractually agreed not to use without permission, to attract investors and endorsers and to develop Oculus's products. And just as in *Retiree*, the defendant "was able to develop a spreadsheet far more sophisticated than the one she used prior to her affiliation with [the plaintiff] in only six months," *id.* at 589; here, Oculus developed its software in roughly the same timeframe, even though Oculus had *no* virtual reality software and *no* programmer experienced in developing virtual reality software prior to its interaction with ZeniMax. The defendant was permanently enjoined from using any technology that "utilize[d] th[e] methodology that was shown to [the defendant] during her affiliation with [the plaintiff]." *Id.* at 591.

Numerous other courts have determined that breaches of confidentiality and nondisclosure agreements may constitute irreparable injury. For example, in *Stoneeagle Services, Inc. v. Gillman*, No. 3:11-CV-2408-P, 2011 WL 13129085 (N.D. Tex. Oct. 14, 2011), Judge Solis granted a preliminary injunction barring the use and disclosure of information obtained via several nondisclosure agreements. The court noted:

> If Defendants use the Trade Secrets and Confidential Information in an
> unauthorized manner, that could result in a loss of value to the trade secrets and

information itself, as well as a loss to Plaintiff's business.  The full extent of such losses may not be easily calculated and therefore, there is a substantial threat of irreparable injury should the preliminary injunction be denied.

*Id.* at *3.  Similarly, in *Covidien LP v. Esch*, No. 16-12410-NMG, 2017 WL 111918 (D. Mass. Jan. 11, 2017), the defendant, a former employee of the plaintiff, had formed a new company shortly after his employment with the plaintiff was terminated and then filed patent applications in which he sought to assign rights to certain inventions to that new company.  *Id.* at *1-2.  But the defendant had previously agreed that any inventions he made or conceived during his employment with the plaintiff, including any inventions he sought to reduce to practice within one year after separation from employment, were to be disclosed and assigned to the plaintiff.  *Id.* at *1.  The defendant had also agreed that he would not disclose the plaintiff's confidential information.  *Id.*  The plaintiff alleged that the patent applications constituted breach of the confidentiality agreement.  *Id.*  The court determined that the disclosure of the plaintiff's confidential information constituted irreparable harm, and indeed that "improper disclosure of confidential information is, in itself, an irreparable harm."  *Id.* at *4 (internal quotation marks omitted).  The court enjoined the defendant from "making, developing, manufacturing or selling any product that discloses or uses any confidential information of the plaintiffs."  *Id.* at *5.

*Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010), likewise involved a former employee who, among other things, violated the terms of a confidentiality agreement by disseminating the employer's confidential information.  *Id.* at 194. The defendant had allegedly used the plaintiff's confidential information, including prospective client information, pricing information, and billing rates, to help his new employer win business from the plaintiff.  *Id.* at 195, 199-200.  As in *Stoneeagle* and *Covidien*, the court recognized that the disclosure of confidential information is irreparable.  *Id.* at 200 ("[T]he disclosure of

16

confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature.").

Here, ZeniMax developed and owned groundbreaking virtual reality technology.  As of June 2012, ZeniMax was the only company in the world that had successfully demonstrated that consumer-level virtual reality was viable.  ZeniMax shared its valuable information with Luckey and Oculus, in good faith, and in reliance on the NDA, which expressly provided that the information ZeniMax provided was "the exclusive property of [ZeniMax]."  (App'x (Vol. I) Ex. T, at 145.)  As the jury found, Defendants breached that NDA, impermissibly treating ZeniMax's technology as their own and usurping ZeniMax's standing in the VR marketplace.  The injury cannot be compensated by money damages alone.  *E.g.*, *Retiree, Inc. v. Anspach*, No. 12-2079-JAR, 2013 WL 3820729, at *6 (D. Kan. July 23, 2013) ("[I]f the disclosure allows a competitor to cut corners in the research and development process, the competitor will attain a competing product much sooner, and it is this harm that is irreparable.") (ellipses omitted).  The Court should permanently enjoin these Defendants from profiting from their unlawful ongoing breach of the NDA by continuing to use intellectual property that is owned by ZeniMax.

**B.    The Copyright Act Expressly Empowers This Court To Grant Final Injunctive Relief To Restrain Infringement Of ZeniMax's Copyrights**

The Copyright Act's remedies for infringement allow this Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  Here, Defendants' creation of a business based on their infringement of ZeniMax's copyrights constitutes an irreparable injury to ZeniMax.  Numerous courts have so held.  For example, in *Aspen Technology, Inc. v. M3 Technology, Inc.*, 569 F. App'x 259 (5th Cir. 2014), the Fifth Circuit affirmed the district court's issuance of a permanent injunction after a jury determined that the defendant had infringed the plaintiff's copyrighted

17

source code.  *Id.* at 261-62.  Even though the plaintiff had been awarded damages by the jury, the court determined that "requiring [the defendant] to discontinue the use or sale of its products was not unreasonable because [the defendant's] competing products were found to contain [the plaintiff's] source code," *id.* at 273, just as Oculus's products were found here to infringe ZeniMax's source code.[3]  With regard to irreparable injury, the Fifth Circuit further held that "the district court did not abuse its discretion in finding that Aspen would suffer irreparable harm based on evidence that [the defendant] had been making use of [the plaintiff's] information from the inception of its business."  *Id.*  Here, the jury heard ample evidence that ZeniMax's technology was crucial to Oculus from the beginning of Oculus's existence.  It is thus clear that ZeniMax has been and continues to be irreparably harmed by Oculus's infringement here.

Similarly, in *Oracle USA, Inc. v. Rimini Street, Inc.*, No. 2:10-cv-00106-LRH-PAL, 2016 WL 5213917 (D. Nev. Sept. 21, 2016), after a trial that lasted nearly a month, "the jury returned its verdict and found that defendant Rimini engaged in copyright infringement of Oracle's copyrighted . . . [s]oftware products."  *Id.* at *1.  The jury awarded $35.6 million for copyright infringement, an award similar in magnitude to the $50 million award for copyright infringement here.  *Id.*  Oracle successfully moved after trial for a permanent injunction based on, among other things, the Copyright Act.  *Id.* at *1-2.  Among the reasons that the *Oracle* court determined there was an irreparable injury was that the defendant's infringement had "irreparably injured Oracle's business reputation and goodwill."  *Id.* at *3.  Particularly that the evidence there:

> [E]stablished Rimini's callous disregard for Oracle's copyrights and computer systems when it engaged in the infringing conduct. . . .  In fact, Rimini's business model was built entirely on its infringement of Oracle's copyrighted software and its improper access and downloading of data from Oracle's website and computer

---

[3]     Just as here, the jury in *Aspen* also heard evidence of spoliation by Defendants.  *Id.*

systems, and Rimini would not have achieved its current market share and business growth without these infringing and illegal actions.

*Id.*  Oculus's business was similarly built on ZeniMax's technology.  Indeed, both Luckey and Carmack acknowledged that Oculus would not have existed without ZeniMax's support:  Luckey wrote to Carmack on January 30, 2013, that "none of this would have happened without your involvement, and . . . I would still be tinkering away on my own."  (App'x (Vol. I) Ex. BB, at 247.)  And on February 18, 2013, Carmack wrote to ZeniMax CEO Robert Altman, among others, "Everyone agrees that ***they wouldn't exist as a funded company if it weren't for our involvement***."  (App'x (Vol. I) Ex. CC, at 250 (emphasis added).)

In addition, ZeniMax's copyright includes a "right to exclude others" from use of its copyrighted material.  *eBay*, 547 U.S. at 392 (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)).  And the NDA expressly provides that the proprietary information provided to Oculus pursuant to the NDA remains ZeniMax's exclusive property.  (App'x (Vol. I) Ex. T, at 145.)  ZeniMax should remain in control of how its copyrighted material and other confidential information are used.  This is particularly true where, as here, unfettered use of ZeniMax's technology could lead to the development of all manner of virtual reality content, whether or not savory, which ZeniMax would have no opportunity to influence in the absence of an injunction and ZeniMax's concomitant power to license its intellectual property as it sees fit.

### C.   The Lanham Act Also Expressly Empowers This Court To Enter Final Injunctive Relief To Prevent Violations Of That Statute

The Lanham Act similarly provides this Court with the power to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title [*i.e.*, the false designation statute]."  15 U.S.C. § 1116.  Indeed, "[a] permanent injunction is

19

the usual and normal remedy once trademark infringement has been found in a final judgment."

5 McCarthy on Trademarks and Unfair Competition § 30:1 (4th ed.).

In *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671 (N.D. Tex. 2015), Judge Fish considered whether to impose a preliminary injunction where the defendant was accused of false designation for its sales tactics, which misleadingly associated the defendant's security products with the plaintiff's. *Id.* at 677. The court determined that the plaintiff would suffer irreparable harm without an injunction because the defendant "continues to mislead and confuse" the plaintiff's customers. *Id.* at 696; *accord Chanel v. Van Doren*, No. 3:15-cv-1393-M, 2016 WL 7444995 (N.D. Tex. Nov. 28, 2016), *adopted by* No. 3:15-cv-1393-M (N.D. Tex. Jan. 26, 2017) (ECF No. 30) (affirming order enjoining defendants from continued trademark infringement or false designation). Here, the injury to ZeniMax is likewise irreparable. In particular, continued public display of materials such as the Oculus Rift Kickstarter video, which misleadingly attributes Carmack's work at ZeniMax to Oculus, constitutes irreparable injury to ZeniMax.

### D.   Damages Are An Inadequate Remedy For Ongoing Harm

Although the jury awarded ZeniMax damages for Defendants' misconduct, damages alone are an inadequate remedy here, just as they have been held inadequate in other actions involving breaches of nondisclosure agreements and infringement of intellectual property. For example, remedies at law have been held inadequate where the damages are difficult to quantify. In *Woods v. Boeing Co.*, No. 2:11-cv-02855-RMG, 2013 WL 5332620 (D.S.C. Sept. 23, 2013), the defendant obtained a permanent injunction requiring the return of all documents the plaintiff had retained in violation of a confidentiality agreement. *Id.* at *5. The court noted that "Defendant's loss of control over its valuable proprietary documents is an irreparable injury," and further that a remedy at law would be inadequate based on the difficulty in determining damages. *Id.* at *4. Similarly, in *Oracle*, *supra*, the court determined that injunctive relief was

20

appropriate in addition to the jury's damages award in part because the "infringement damages in th[e] action were complex and difficult to determine," for reasons including that one of the methods presented to the jury was a reasonable royalty analysis that was difficult to apply because Oracle did not actually license its software to competitors.  *Oracle*, 2016 WL 5213917, at *3.   Here, too, the jury was instructed that it could measure damages by "determining a 'reasonable royalty'" (ECF No. 914 at 34), but like Oracle, ZeniMax had not previously licensed its copyrighted virtual reality software, making the jury's task of identifying license terms difficult.  Further, as the *Oracle* court recognized, "one of the most fundamental rights the holder of a copyright has is the right to exclude others, and this right has routinely been held difficult to compensate solely through monetary compensation."  2016 WL 5213917, at *3 (citing *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring)); *see also ADT*, 145 F. Supp. 3d at 697 ("Courts agree that the damage caused by this sort of Lanham Act violation is difficult to quantify.").

The jury's damage award here, however substantial, is an insufficient incentive for Defendants to cease infringing.  Just minutes after the jury revealed its verdict, Facebook's COO, Sheryl Sandberg, publicly stated that the jury's verdict of a half billion dollars was "not material to [Facebook's] financials."   Michelle Castillo, *Facebook ordered to pay $500 million in damages over VR suit*, CNBC, http://www.cnbc.com/2017/02/01/facebook-loses-vr-case.html. In any event, the jury's damages award can do nothing to deter *continued* infringement of ZeniMax's intellectual property — only injunctive relief can do that.

## II.      THE BALANCE OF HARDSHIPS FAVORS ZENIMAX, WHO ASKS ONLY THAT OCULUS CEASE ITS WRONGFUL CONDUCT

Oculus continues to be bound by the terms of the NDA, and Oculus will therefore suffer no undue hardship from being required to comply with the terms of the NDA.  Numerous courts have so held in similar situations.  For example, in *Hospitality Staffing*, the court noted that there

21

was "no evidence in the record to suggest that a preliminary injunction restraining [the defendant] from disclosing [the plaintiff's] confidential and proprietary information would substantially injure [the defendant] or any other third parties." 736 F. Supp. 2d at 200. Indeed, like Luckey and Oculus, the defendant in that case had "consented to injunctive relief to enforce the provisions" of the agreement at issue. *Id.* The court in *Covidien* reached the same result:

> The Court concludes that the balance of hardships weighs in plaintiffs' favor. Because plaintiffs' confidential information was released, they stand to lose significant investment of resources from the development of their . . . products.

2017 WL 111918, at *4; *see also Woods*, 2013 WL 5332620, at *4 (determining that "[e]quity . . . favors an injunction" where "Defendant has a substantial interest in protecting its proprietary information."). Here, ZeniMax has unlawfully been deprived of control of the information it provided to Oculus pursuant to the NDA. Insisting a fallacy, Oculus's purchaser, Facebook, denies ZeniMax's fundamental contributions to Oculus: Mark Zuckerberg testified that he was not aware of the NDA, denied the well-established (and uncontradicted) fact that Oculus's origin relied on using ZeniMax's VR technology, and indeed claimed that he had never heard of ZeniMax before this action commenced. (App'x (Vol. I) Ex. A, at 1-15 (ECF No. 927, at 50:21-23, 88:5-12; ECF No. 928, at 85:9-18, 91:7-23).) If there was any truth to that remarkable testimony, it is only because Oculus utterly failed to honor its contractual commitments to ZeniMax. No prejudice or harm will befall Oculus for respecting its obligations under the NDA.

Likewise, Defendants who infringe intellectual property rights cannot be heard to complain when a plaintiff seeks injunctive relief requiring that the infringer no longer infringe. For example, in *Lava Records, LLC v. Ates*, No. Civ. A. 05-1314, 2006 WL 1914166 (W.D. La. July 11, 2006), the defendant had infringed on the plaintiff's copyrights by downloading or copying sound recordings to a hard drive without authorization. *Id.* at *1. The plaintiff sought injunctive relief under the Copyright Act. *Id.* at *3. The court granted that relief, concluding:

> [A] permanent injunction is appropriate because of the strong public interest in copyright protection; the need to prevent irreparable harm to Plaintiffs, which will not be remedied by a damage award that may or may not be collectible; and the need to deter future infringement by Defendant and others.

*Id.* The court further noted, "[T]he balance weighs strongly in favor of Plaintiffs where all that is requested is that Defendant comply with the Copyright Act." *Id.*; *accord Flowserve Corp. v. Hallmark Pump Co.*, 98 U.S.P.Q.2d 1979, 1989 (S.D. Tex. 2011) (citing *Lava Records*).[4] Here, all ZeniMax seeks is for Defendants to no longer infringe its intellectual property or impermissibly use or disclose the confidential information it obtained under the NDA. Injunctive relief to that end is an appropriate remedy and would cause no undue hardship.

## III.   **PUBLIC POLICY FAVORS ENTRY OF A PERMANENT INJUNCTION**

Public policy strongly favors the freedom of parties to contract, just as the parties here contracted for the protection of ZeniMax's valuable technology and the availability of injunctive relief in the event of a breach. *See Wright*, 137 S.W.3d at 293-94; *see also Stoneeagle Services*, 2011 WL 13129085, at *4 (crediting the plaintiff's position that "[i]n situations where a defendant commits to such an agreement and then seeks an economic advantage through the unauthorized disclosure or use of the trade secrets and information, public policy favors restraint."); *see also Covidien*, 2017 WL 111918, at *4 ("[E]nforcing contractual provisions, including non-disclosure provisions which are at issue here, typically benefits the public interest.") (emphasis in original); *Woods*, 2013 WL 5332620, at *4 ("[T]he public interest favors

---

[4]     *See also Oracle*, 2016 WL 5213917, at *4 ("[B]ecause Oracle seeks to enjoin only acts that have already been determined to be unlawful, the balance of hardships weighs in Oracle's favor."); *Gruma Corp. v. Mexican Restaurants, Inc.*, 2013 WL 12134147, at *7 (E.D. Tex. Sept. 27, 2013) ("Denying the injunction would force Gruma to either continually sue MRI for damages that are difficult to prove or endure continued infringement and dilution of the MISSION mark.  Neither option is a remedy adequate to redress the harms done to a prevailing plaintiff in a trademark suit.").

the protection of confidential business information and the enforcement of valid contracts.") (internal quotation marks omitted).  Here, ZeniMax specifically sought to have the protection of injunctive relief available in the event of a breach of the NDA.  Public policy favors enforcing that contractual protection by issuing an appropriate injunction.

Numerous courts have similarly acknowledged the strength of the public interest in protecting copyrights.  *E.g.*, *Warner Bros. Records, Inc. v. Briones*, 77 U.S.P.Q.2d 1253, 1256 (W.D. Tex. 2005) (the "public interest is the interest in upholding copyright protections"); *Lava Records*, 2006 WL 1914166, at *3 ("[A] permanent injunction is appropriate because of the strong public interest in copyright protection"); *accord Flowserve*, 98 U.S.P.Q.2d at 1989.  The same is true with copyrights for source code, such as the copyrights that Defendants infringed here.  For example, in *Aspen*, the Fifth Circuit "agree[d] that it was in the interest of public policy to prohibit the sale and use of . . . products containing infringing source code."  569 F. App'x at 273 & n.58 (internal citations omitted).  So too here:  the public interest favors protecting ZeniMax's investment in the development of the copyrighted works, which the jury has now found that Oculus infringed.  Public policy likewise strongly favors enforcement of the Lanham Act via an appropriate injunction.  *See, e.g.*, *ADT*, 145 F. Supp. 3d at 700-01.

## IV.   ALTERNATIVELY, THE COURT SHOULD GRANT ZENIMAX AN ONGOING ROYALTY FOR DEFENDANTS' CONTINUING USE OF ZENIMAX'S INTELLECTUAL PROPERTY

If the Court elects not to impose the injunctive relief that ZeniMax seeks, it should instead grant ZeniMax an ongoing royalty.  That approach was followed in *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007), a case involving three patents related to hybrid

vehicles.[5]  The court affirmed that "[u]nder some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."  *Id.* at 1314.   Here, injunctive relief is warranted, but if no injunction issues, then an ongoing royalty would be appropriate.   The only alternative would be for ZeniMax to file a new action each time Defendants renew their infringing behavior going forward, which would be an inefficient use of the parties' and the Court's resources.

The Court would be free to determine an appropriate royalty rate and period based on equitable principles, with or without input from the parties.  *Id.* at 1315-16.  At trial, ZeniMax's damages expert, Daniel L. Jackson, testified that if ZeniMax did not obtain injunctive relief, an ongoing royalty of 20 percent for at least ten years on revenues derived from products incorporating ZeniMax's intellectual property would be appropriate.  (App'x (Vol. I) Ex. DD, at 252.)  ZeniMax respectfully submits that if the Court is not inclined to grant injunctive relief, Mr. Jackson's unrebutted opinion would be a reasonable source on which the Court could rely to determine an appropriate rate and period for an ongoing royalty.

## CONCLUSION

For the foregoing reasons, a permanent injunction should be entered in favor of ZeniMax in substantially the form submitted in connection with ZeniMax's Motion For Entry Of Money Judgment.

---

[5]      *Paice* involved patent law, but the Court may consider cases from other branches of intellectual property law when evaluating remedies.  *E.g.*, *University Computing v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) ("It seems generally accepted that 'the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine the damages for copy-right infringement.'" (quotations omitted)).  For example, the court in *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 943 (E.D. Tex. 2014), applied *Paice* and its progeny to a case involving trade secrets, and ultimately imposed a fifteen-year ongoing royalty of 5 percent.

Dated: February 23, 2017

Respectfully submitted,

*s/ Phillip B. Philbin*

P. ANTHONY SAMMI
E-mail: Anthony.Sammi@skadden.com
KURT WM. HEMR
E-mail: Kurt.Hemr@skadden.com
CHRISTOPHER A. LISY
E-mail: Christopher.Lisy@skadden.com
JAMES Y. PAK
Texas State Bar No. 24086376
E-mail: James.Pak@skadden.com
WILLIAM J. CASEY
E-mail: William.Casey@Skadden.com
(the foregoing attorneys admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE,**
   **MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone No.: 212-735-3000
Facsimile No.: 212-735-2000

PHILLIP B. PHILBIN
Texas State Bar No. 15909020
E-mail: phillip.philbin@haynesboone.com
MICHAEL D. KARSON
Texas State Bar No. 24090198
E-mail: michael.karson@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone No.: 214-651-5000
Facsimile No.: 214-651-5940

*Attorneys for Plaintiffs*
*ZeniMax Media Inc. and id Software LLC*

26

## <u>CERTIFICATE OF SERVICE</u>

On February 23, 2017, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Dated: February 23, 2017

*s/ Phillip B. Philbin*
Phillip B. Philbin