IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZENIMAX MEDIA INC. and<br>ID SOFTWARE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>OCULUS VR, LLC,<br>PALMER LUCKEY,<br>FACEBOOK, INC.,<br>BRENDAN IRIBE, and<br>JOHN CARMACK,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL CASE NO. 3:14-cv-01849-K** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR A NEW TRIAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 59**

P. Anthony Sammi
Kurt Wm. Hemr
Christopher A. Lisy
James Y. Pak
William J. Casey
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Dated: May 5, 2017

Phillip B. Philbin
Michael D. Karson
HAYNES AND BOONE LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219

*Attorneys for Plaintiffs
ZeniMax Media Inc. and id Software LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ................................................................................................................. 3

I.     THE JURY'S DAMAGES AWARD, AS A WHOLE, WAS A
       REASONABLE REMEDY FOR DEFENDANTS' WRONGDOING ............................. 3

     A.     The Jury Was Entitled To Allocate Damages Across Multiple Claims .................. 3

     B.     The Damages Awarded Were Not Excessive ........................................................ 4

          1.     Defendants Cannot Show That The Jury's Award Was The Result
               Of "Passion Or Prejudice" And Thus Are Not Entitled To A New
               Trial ........................................................................................................ 5

          2.     Defendants' Arguments Regarding The Reliability And
               Admissibility Of Mr. Jackson's Testimony Are Unfounded ...................... 7

     C.     Defendants' Alternative Request For Remittitur Should Be Denied .................... 10

II.    THE JURY'S DETERMINATION THAT DEFENDANTS INFRINGED
     ZENIMAX'S TRADEMARKS AND VIOLATED SECTION 43(a) OF THE
     LANHAM ACT WAS SUPPORTED BY THE EVIDENCE AT TRIAL ....................... 11

     A.     The Jury's Verdict Was Consistent ..................................................................... 11

          1.     Defendants Waived Any Challenge To The Consistency
               Of The Verdict By Failing To Raise That Concern At Trial ...................... 11

          2.     The Verdict Was Consistent With The Court's Instructions ...................... 12

III.   THE JURY'S DETERMINATION THAT DEFENDANTS INFRINGED
     ZENIMAX'S COPYRIGHTS WAS SUPPORTED BY THE EVIDENCE ..................... 13

     A.     Defendants Did Not Challenge Dr. Dobkin's Abstraction-Filtration-
          Comparison Analysis In Their *Daubert* Motion Or Object At Trial, And
          Have Waived Any Challenge To Dr. Dobkin's Testimony On That Subject ........ 13

     B.     Voluminous Evidence Confirmed That
          Oculus Had Access To ZeniMax's Source Code ................................................. 14

IV.    THE JURY'S DETERMINATION THAT THE DEFENDANTS BREACHED
THE NONDISCLOSURE AGREEMENT WAS SUPPORTED BY AMPLE
EVIDENCE.................................................................................................................16

      A.    There Was Overwhelming Evidence
That Defendants Breached The Non-Disclosure Agreement.................................16

      B.    The Jury's Finding For Luckey On His Laches Defense
Does Not Preclude ZeniMax's Breach Of Contract Claim Against Oculus..........18

V.    THE COURT WAS CORRECT TO ALLOW SPOLIATION TESTIMONY AND
A CORRESPONDING JURY INSTRUCTION, SUCH THAT DEFENDANTS'
REQUEST FOR A NEW TRIAL ON THAT BASIS IS WITHOUT MERIT.................19

      A.    Mr. Rosen Found That Carmack Deleted Critical System Generated
Logs And Other Files, Both Of Which Carmack Had A Duty To Preserve..........20

      B.    There Was Ample Trial Evidence By Which The Court (And The Jury)
Could Find That Carmack Acted Intentionally To Delete Critical Evidence........21

      C.    Having Asked That The Court Appoint An Independent Expert, Having
Suggested Mr. Rosen For That Role, And Having Demanded That Mr.
Rosen Testify In Person, Defendants Cannot Ask For A New Trial On
That Ground .......................................................................................................23

VI.    ANY NEW TRIAL SHOULD ADDRESS ALL OF ZENIMAX'S CLAIMS .................25

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

**CASE**                                                                              **PAGE(S)**

*Ashton v. Knight Transportation, Inc.*,
    772 F. Supp. 2d 772 (N.D. Tex. 2011) ................................................................20

*Aspen Technology, Inc. v. M3 Technology, Inc.*,
    569 F. App'x 259 (5th Cir. 2014) ................................................................3, 12

*Automated Solutions Corp. v. Paragon Data Systems, Inc.*,
    756 F.3d 504 (6th Cir. 2014) ................................................................20

*Brunnemann v. Terra International, Inc.*,
    975 F.2d 175 (5th Cir. 1992) ................................................................7, 10

*Bush v. Texaco, Inc.*,
    504 F. Supp. 670 (E.D. Tex. 1981) ................................................................7

*Caldarera v. Eastern Airlines, Inc.*,
    705 F.2d 778 (5th Cir. 1983) ................................................................11

*Caparotta v. Entergy Corp.*,
    168 F.3d 754 (5th Cir. 1999) ................................................................19

*Delahoussaye v. Performance Energy Services, L.L.C.*,
    734 F.3d 389 (5th Cir. 2013) ................................................................11

*Donlin v. Philips Lighting North America Corp.*,
    581 F.3d 73 (3d Cir. 2009) ................................................................9

*Dotson v. Clark Equipment Co.*,
    805 F.2d 1225 (5th Cir. 1986) ................................................................3

*Duff v. Werner Enterprises, Inc.*,
    489 F.3d 727 (5th Cir. 2007) ................................................................7

*Esposito v. Davis*,
    47 F.3d 164 (5th Cir. 1995) ................................................................5

*Fields v. Department of Public Safety*,
    658 F. App'x 694 (5th Cir. 2016) ................................................................12

*Foradori v. Harris*,
    523 F.3d 477 (5th Cir. 2008) ................................................................5

*Gaalla v. Citizens Medical Center*,

Civ. A. No. V-10-14, 2011 WL 2115670 (S.D. Tex. May 27, 2011) .............................20, 21

*Gasoline Products Co. v. Champlin Refining Co.*,
283 U.S. 494 (1931) ............................................................................................25

*GlobeRanger Corp. v. Software AG USA, Inc.*,
836 F.3d 477 (5th Cir. 2016) ............................................................................5, 10

*GlobeRanger Corp. v. Software AG USA, Inc.*,
Civ. A. No. 3:11-CV-0403-B, 2015 WL 3648577 (N.D. Tex. June 11, 2015) .................5, 10

*Hallmark Cards, Inc. v. Murley*,
703 F.3d 456 (8th Cir. 2013) ...................................................................................23

*Indu Craft, Inc. v. Bank of Baroda*,
47 F.3d 490 (2d Cir. 1995) ........................................................................................4

*Jackson v. Host International, Inc.*,
426 F. App'x 215 (5th Cir. 2011) ...............................................................................5

*Kosmynka v. Polaris Industries, Inc.*,
462 F.3d 74 (2d Cir. 2006) .......................................................................................12

*Lincoln Composites, Inc. v. Firetrace USA, LLC*,
825 F.3d 453 (8th Cir. 2016) ...................................................................................23

*Seidman v. American Airlines, Inc.*,
923 F.2d 1134 (5th Cir. 1991) ..................................................................................11

*Sibley v. Lemaire*,
184 F.3d 481 (5th Cir. 1999) ......................................................................................3

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
289 U.S. 689 (1933) .................................................................................................11

*Summit 6 LLC v. Research in Motion Corp.*,
Civ. A. No. 3:11-CV-367-O, 2013 WL 11311769 (N.D. Tex. Aug. 7, 2013) .........................3

*Thomas v. Texas Department of Criminal Justice*,
297 F.3d 361 (5th Cir. 2002) ...................................................................................11

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ..................................................................................9

*Unisplay, S.A. v. American Electronic Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) ......................................................................................9

*Waitek v. Dalkon Shield Claimants Trust*,
934 F. Supp. 1068 (N.D. Iowa 1996), aff'd, 114 F.3d 117 (8th Cir. 1997) ..........................14

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ..............................................................................................................9

*Wood v. Holiday Inns, Inc.*,
    508 F.2d 167 (5th Cir. 1975) ..............................................................................................12

*Wooten v. Relco Sys., Inc.*,
    Civ. A. No. 3:12-CV-3905-P, 2015 WL 12765415 (N.D. Tex. May 13, 2015) .................5, 8

**<u>RULE</u>**                                                                                        **<u>PAGE(S)</u>**

Fed. R. Civ. P. 59 ............................................................................................................ *passim*

Fed. R. Civ. P. 37(e) ............................................................................................................21, 23

## INTRODUCTION

In January 2017, after nearly three years of pre-trial proceedings, this Court convened a nine-person jury to try Plaintiffs' claims in this matter. Over three weeks and nearly 60 hours of trial proceedings, those jurors heard testimony from 21 witnesses, including six experts, and reviewed more than 300 exhibits. That evidence included the following, and much more:

- Defendants had unparalleled and nearly unrestricted access to confidential and highly valuable VR technology developed and owned by ZeniMax. Defendants needed this technology (primarily software that solved many technical issues in VR) because they concededly lacked the ability to develop it themselves. Their access to that technology began just after the explosion of interest in commercial VR around ZeniMax's 2012 demonstration at E3, and continued with frequent technology transfers by John Carmack through his defection to join Oculus in August 2013. The evidence included the written admission of Oculus's CEO Brendon Iribe, who requested a license for VR source code that Carmack had "shared with" Oculus. The jury heard all of this evidence.

- There were many examples of Carmack's under-the-radar transfer of cutting-edge ZeniMax VR technology to Oculus: (i) Carmack's provision of code to Palmer Luckey under the NDA; granting Oculus's Vice President of Product, Nate Mitchell, access to ZeniMax's offices where Mitchell downloaded VR files Carmack supplied onto a large-capacity desktop computer that he took with him; (ii) after-hours espionage with fired ZeniMax employee Matt Hooper (part of his and Carmack's "attack plan"); and (iii) written transmissions of ZeniMax technology and know-how to Oculus employees. The jury heard all of this evidence.

- Defendants had gained access to ZeniMax's VR technology initially by executing the Non-Disclosure Agreement, which expressly provided that ZeniMax was the exclusive owner of the VR technology being disclosed, as well as any technology derived from it. But Defendants breached this agreement immediately: (i) first, when Palmer Luckey showed ZeniMax technology to then-outsiders Nate Mitchell, Brendan Iribe and Michael Antonov at a secret meeting in a Los Angeles hotel room; (ii) followed by Oculus's consistent and repeated use of ZeniMax's technology in its work; and (iii) its ultimate use, disclosure, and prohibited transfer of ZeniMax's technology to Facebook. Without these breaches by Oculus, Oculus would not have existed as a company — as Carmack and Luckey themselves admitted in early 2013. The jury heard all of this evidence.

- Unsurprisingly — given Defendants' access to ZeniMax's VR technology and their inability to create it independently — Defendants repeatedly used that technology as their own, without ZeniMax's permission. Oculus software developers admitted to "cutting and pasting" ZeniMax code in their work. A distinguished expert performed a side-by-side comparison confirming with "absolute certainty" that the Oculus code was copied from ZeniMax. The expert even found that a developer had covered his tracks by making code copied from ZeniMax appear to be different. The jury heard all of this evidence.

1

- From the start, Defendants schemed to use ZeniMax's name and technology for profit.  Mitchell, whom Defendants declined to bring to trial, testified on video that even though Oculus had been expressly directed not to use any ZeniMax intellectual property in its Kickstarter video, he used ZeniMax's technology and logos because it would make the video better.  That video also contained interview footage from John Carmack, which Oculus used to falsely suggest that ZeniMax was endorsing Oculus's product — when Carmack was actually talking about the work *he* had done at *ZeniMax*.  Oculus even represented to investors that ZeniMax was "on board" with Oculus at a time when their relationship was utterly broken.  The jury heard all of this evidence.

- Most shockingly, a Court-appointed computer forensic crime expert testified that Carmack intentionally deleted files from a computer he used for VR work at Oculus — *after* he was alerted to this litigation — such that the computer's hard drive was 92% "zeroes."  The expert advised that when ZeniMax sought production of that drive, Carmack and his counsel made false submissions to the Court in an effort to resist production and thus conceal that spoliation of relevant evidence.  The large-capacity desktop computer that Mitchell used to download ZeniMax's VR technology conveniently went "missing."  Had Defendants not destroyed that evidence of their misconduct, the case against them would have been even more overwhelming.  But destroy they did.  And steal they did as well — right up to the time when Carmack left ZeniMax to join Oculus as its Chief Technology Officer, stole millions  of lines of ZeniMax's most valuable source code  and thousands of confidential ZeniMax files, and uploaded those ZeniMax files to his Oculus computer.  The jury heard all of this evidence.

- Oculus was enriched by billions of dollars as a result of all this misconduct, and Luckey, Carmack and Iribe were each enriched by hundreds of millions of dollars, by their wrongdoing.  ZeniMax was never paid a dime.  The jury heard all of this evidence.

Following that presentation of evidence and argument and a lengthy charge, the jury deliberated for three days and returned a unanimous verdict in favor of Plaintiffs on their key claims.  The award of damages was substantial, though less than what Plaintiffs sought.  Defendants were represented by seasoned counsel — indeed, *three* experienced law firms — and offer no reason to suggest that this jury was motivated by passion or unfair prejudice.  Nor can they make any other showing that the jury verdict was unjust, arbitrary, or unfair.  Their Motion demanding a new trial is nothing more than a disappointed litigant's imagined catalogue of unfounded grievances.  They are entitled to no relief.  Their Motion should be denied.

## LEGAL STANDARD

The Seventh Amendment grants litigants the constitutional right to a trial by jury, and Defendants themselves demanded a jury trial in this matter. That jury's verdict cannot lightly be cast aside: to obtain the extraordinary relief of a new trial, Defendants must now meet an extraordinary burden, one they cannot begin to support here. "A trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1227 (5th Cir. 1986). In particular, "[c]ourts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking [a] new trial." *Summit 6 LLC v. Research in Motion Corp.*, No. 3:11-CV-367-O, 2013 WL 11311769, at *1 (N.D. Tex. Aug. 7, 2013) (citing *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999)). Defendants have not met that weighty burden, and other than being unhappy that they lost, have offered no sound legal ground that justifies, after all the time, money, and effort, nullifying the jury verdict rendered after a hard-fought three-week trial, and asking the parties to do it all over again. That would truly be extraordinary and unjust.

## ARGUMENT

### I. THE JURY'S DAMAGES AWARD, AS A WHOLE, WAS A REASONABLE REMEDY FOR DEFENDANTS' WRONGDOING

#### A. The Jury Was Entitled To Allocate Damages Across Multiple Claims

If the evidence supports the jury's total damages award, the jury is entitled to allocate its determination of damages across multiple causes of action. For example, in *Aspen Technology, Inc. v. M3 Technology, Inc.*, the jury awarded damages for tortious interference, trade secret misappropriation, and copyright infringement, and the district court entered judgment on each of those awards. 569 F. App'x 259, 263 (5th Cir. 2014). The Fifth Circuit rejected the defendant's

3

claim that the court had "impermissibly stacked the damages award," observing that juries are permitted to allocate damages awards across multiple causes of action:

> Where there is evidence that the plaintiff suffered the total amount of the damage award on one of its theories, a court may rationally conclude that the jury found that the plaintiff suffered that amount of injuries and "merely allocated that amount between the two different causes of action."

*Id.* at 271 (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)).  The court upheld the damages award, noting the plaintiff's damages expert testified that the defendant may have been unjustly enriched by as much as $9.7 million, and that "the total compensatory damages award fell within this range."  *Id.*

Here, too, the jury's total damage award is well within a range supported by the evidence. The expert testimony presented by Plaintiffs' damages expert Daniel Jackson — to which Defendants offered no rebuttal — was that Oculus benefited as a virtue of its bad acts by more than $2 billion, and that each of the individual Defendants likewise benefited at ZeniMax's expense:  Palmer Luckey was unjustly enriched by as much as $206 million, and Brendan Iribe by as much as $427 million.   (App'x Ex. W, at 92-100 (14 Tr. at 39:19-40:6; 41:15-42:5) (testimony of Mr. Jackson); *id.* Ex. A, at 2.)  The jury's total damages awards against Oculus, Luckey, and Iribe were $300 million, $50 million, and $150 million, respectively.  (ECF No. 914.)  These amounts are all well within the range supported by Mr. Jackson's testimony.

### B.  The Damages Awarded Were Not Excessive

Defendants assert that the jury's award of damages was ill-considered.  (Defts.' Br. at 14.)  Yet the evidence at trial established that Oculus was enriched by billions of dollars — and the individual Defendants by hundreds of millions — in a single transaction that was negotiated in just a few *hours*.  The jury's damage awards, reached after several *days* of deliberation, are sensible, untainted by prejudice, and supported by the evidence presented.

4

Certainly this jury award could not be set aside as excessive.  Courts rarely grant new trials on that basis; instead, "[i]t is well established . . . that a strong presumption exists in favor of affirming a jury award of damages." *Wooten v. Relco Sys., Inc.*, Civ. A. No. 3:12-CV-3905-P, 2015 WL 12765415, at *1 (N.D. Tex. May 13, 2015) (Solis, J.) (citations omitted).  The Fifth Circuit has repeatedly reiterated the "strict standard" that must be met to set aside a jury award:

> We have expressed the extent of distortion that warrants intervention by requiring such awards to be ***so large as to shock the judicial conscience***, so gross or inordinately large as to be ***contrary to right reason***, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, or as clearly ***exceeding that amount that any reasonable man could feel the claimant is entitled to***.

*Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008) (emphasis added); *accord Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 225 (5th Cir. 2011) (noting that courts should "not reverse a jury verdict for excessiveness except on the strongest of showings" where the damages exceed "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury").  Defendants have not met that exacting standard.

### 1.    Defendants Cannot Show That The Jury's Award Was The Result Of "Passion Or Prejudice" And Thus Are Not Entitled To A New Trial

Hypothetically, the Court might order a new trial if the jury's award of damages were "so excessive as to be the product of passion or prejudice" on the part of the jury.  *Esposito v. Davis*, 47 F.3d 164, 168 (5th Cir. 1995).  But when a jury awards *less* than the plaintiffs requested — or when the jury rejects a request for exemplary damages — that shows that the award was *not* the result of passion or prejudice.  *GlobeRanger Corp. v. Software AG USA, Inc.*, Civ. No. 3:11-CV-0403-B, 2015 WL 3648577, at *18 (N.D. Tex. June 11, 2015) (Boyle, J.); *see also GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 501 (5th Cir. 2016) (denying request for new trial and noting, "That the jury did not blindly accept the number of [the plaintiff's] expert indicates the award was not the product of passion or prejudice, but rather

5

reasoned evaluation of competing evidence").  Here, the jury's total award of $500 million is substantially less than what ZeniMax sought, and does not include exemplary damages.  There is no indication that the award resulted from improper "passion or prejudice."

Contrary to Defendants' suggestion that ZeniMax provided "no evidence that justifies a total award of $500 million" (Defts.' Br. at 15), ZeniMax did just that:

*First*, as to ZeniMax's false designation claim, ZeniMax presented evidence of the measures of Defendants' unjust enrichment and the reputational and commercial injury to ZeniMax that flowed from Defendants' unlawful acts.  (*E.g.*, App'x Ex. W, at 96-98 (14 Tr. at 38:19-40:10) (testimony of Mr. Jackson); *id.* Ex. B, at 4-5 (email from Carmack noting that Oculus wouldn't exist as a funded company without ZeniMax); *id.* Ex. W, at 103 (2 Tr. at 96:4-9) ("Q: Didn't you write to Mr. Altman in February of 2013 that everyone agrees that they, Oculus, wouldn't exist as a funded company if it weren't for our involvement? . . . Mr. Carmack:  Yes. It would have been Palmer putting things together in his garage instead of a multi-million-dollar-funded company."); *id.* Ex. Y, at 149 (11 Tr. at 100:10-101:1) (testimony of Mr. Altman concerning the impact on ZeniMax of Defendants' actions)).

*Second*, as to ZeniMax's copyright claim, ZeniMax presented evidence of a "reasonable royalty" that a willing buyer would have paid to license ZeniMax's source code (*see*, *e.g.*, *id.* Ex. W, at 91-96 (14 Tr. at 33:1-38:14) (testimony of Mr. Jackson)).  Mr. Jackson based his opinion on evidence of what Oculus offered to pay in exchange for "ZeniMax [] grant[ing] Oculus a worldwide exclusive perpetual right and *license to source code __shared__ by Carmack regarding Oculus Rift support*" (*id.* Ex. C, at 9 (emphasis added)) and what ZeniMax's CEO, Mr. Altman, would have accepted.  (*Id.* Ex. W, at 94-95 (14 Tr. at 36:6-37:21) (testimony of Mr. Jackson); *id.* Ex. Y, at 145-46 (11 Tr. at 86:20-87:2; 87:10-15) (testimony of Mr. Altman).)

6

***Third***, as to ZeniMax's breach of contract claim, the jury heard of the tremendous value of ZeniMax's proprietary information, which is dependent on that information *remaining* confidential.  (*E.g.*, *Id.* Ex. Y, at 137; 138-39; 141-42  (11 Tr. at 61:7-14; 62:21-63:3; 65:22-66:2) (testimony of Mr. Altman); *id.* Ex. Z, at 162-63 (15 Tr. at 30:2-31:17) (testimony of Mr. Hollenshead)).  Defendants vitiated that value by using that very same information to compete with ZeniMax.

Defendants cite only a *single* case in their Motion in which the Fifth Circuit remanded for a new trial on the issue of damages, and that case is entirely inapposite.  *See Bush v. Texaco, Inc.*, 504 F. Supp. 670, 672-73 (E.D. Tex. 1981) (granting new trial as to damages where jury awarded over $400,000 for a sailor's minor injuries — nearly the entirety of the sailor's work-life income expectancy — which would be reasonable only if the sailor had been "totally and permanently disabled").[1]  On this record, Defendants are simply not entitled to a new trial.

### 2.      Defendants' Arguments Regarding The Reliability And Admissibility Of Mr. Jackson's Testimony Are Unfounded

Defendants argue that they are entitled to a new trial on the issue of damages because in their view the testimony of Mr. Jackson was "unreliable and inadmissible."  (Defts.' Br. at 15.)  Defendants speculate that Mr. Jackson's testimony regarding calculation of trade secret damages "psychologically anchored the jury to a far higher damages number" than would be permissible for the claims for which the jury ultimately found liability, prejudicing or impassioning the jury.  (Defts.' Br. at 15.)  This argument must be rejected.

---

[1]      Defendants cite two additional cases.  In both, the court granted remittitur and only ordered a new trial to the extent the plaintiff rejected the remittitur amount.  Those two cases are also inapposite.  *See Duff v. Werner Enterprises, Inc.*, 489 F.3d 727, 731 (5th Cir. 2007) (remanding for new trial or remittitur of $12,000 on $80,000 damages award where the court accepted every item of damages that the plaintiff offered "after a painstaking review of the record" and the total amounted to just over $68,000); *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 179 (5th Cir. 1992) (remanding for new trial or remittitur on $200,000 damage award where the plaintiff's statutory claim permitted recovery only for wages, which amounted to less than $32,000).

7

*First*, in arguing that Mr. Jackson's testimony was "unreliable and inadmissible," Defendants re-raise arguments that this Court has twice rejected — in denying both (i) Defendants' *Daubert* motion as to Mr. Jackson and (ii) Defendants' Motion For Partial Summary Judgment on substantially the same issue.  (ECF Nos. 714, 792.)   Importantly, Defendants *did not* object to Mr. Jackson being proffered as an expert at trial.  (App'x Ex. W, at 87 (14 Tr. at 21:9-12).)   The Court should reject Defendants' demand for a new trial on the issue of Mr. Jackson's qualifications for the same reasons it denied Defendants' prior motions.

*Second*, Defendants were free to offer a competing damages expert at trial to rebut Mr. Jackson's testimony.  They included a damages expert on their witness list, but chose not to call him.   (ECF No. 764 at 11.)   Defendants also had the opportunity to cross-examine Mr. Jackson and to argue against his expert opinion before the jury.  When defendants have not availed themselves of those opportunities, courts have denied post-trial relief.  For example, in *Wooten*, the defendants requested a new trial as to damages, arguing that the testimony of the plaintiffs' damages expert "was speculative and unreliable."  2015 WL 12765415, at *4.  The court held that "the bases and sources of an expert's opinion affect the weight to be assigned that opinion . . . and should be left for the jury's consideration," and reiterated that the defendants "had the chance to discredit Plaintiffs' witnesses and evidence during cross-examination and closing arguments."  *Id.*; *see also Esposito*, 47 F.3d at 168 (denying request for new trial on damages where "the appellants did not seriously contest any of the damage evidence [and] during their jury argument, the appellants never discussed the quantum of damages.  We are puzzled, if not dismayed, that the appellants complain after the fact of the amount of the jury's award").  Defendants failed to convince *this* jury to discredit Mr. Jackson's testimony and are in no way entitled to a second chance with another jury.

**Third**, Defendants do not explain why Mr. Jackson's entirely permissible testimony as to ZeniMax's trade secret damages would have prejudiced the jury's consideration of damages on ZeniMax's claims for false designation, copyright infringement, or breach of contract.[2]   Indeed, the *only* case Defendants cite where the unreliable testimony of a damages expert warranted a new trial presented readily distinguishable facts.   In *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit rejected the applicability of the entire market value theory in a particular patent case and remanded the case for a new trial where all of the methods of damages that the expert provided at trial were excluded.   632 F.3d 1292, 1320 (Fed. Cir. 2011).   That case does not suggest (as Defendants urge) that an expert's entirely permissible discussion of damages as to one claim can serve as the basis for a new trial on damages entirely separate claims.   If that were so, new trials would be warranted whenever a jury finds liability and awards damages on some but not all claims after hearing testimony from a damages expert on all claims.

**Fourth**, Defendants disingenuously criticize Mr. Jackson's testimony as abbreviated. The parties complied with the time limits imposed on them, and Mr. Jackson testified efficiently and provided plentiful testimony to support the jury's verdict — even though Defendants' counsel attempted to cut off Mr. Jackson's testimony after only fifteen minutes had elapsed (App'x Ex. W, at 90 (14 Tr. at 32:19-20)), and renewed that effort after twenty minutes.   (*Id.* at 93 (35:10-11).)[3]   They cannot now complain that Mr. Jackson should have taken longer.

---

[2]        The authorities cited by Defendants do not support their contention.   *See Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000) (considering a Rule 50(a) motion); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009) (remanding for new trial where lay witness's testimony regarding pension should have come from an expert witness and the lay witness's testimony was a "significant" share of the damages evidence); *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (finding no evidence to support reasonable royalty damages amount where the only supporting evidence was from an excluded expert).

[3]        Throughout the trial, Defendants incorrectly complained that ZeniMax had taken an unfair amount of time to present its evidence.   In reality, ZeniMax — which had the burden of proof on its claims — used just 66 minutes more than Defendants over the three-week trial.   No reading of this record can lead to any

*(cont'd)*

In short, Defendants cannot identify any "passion or prejudice" on which the jury's damages award was based, and are not entitled to a new trial on damages.

### C.  Defendants' Alternative Request For Remittitur Should Be Denied

Defendants are likewise not entitled to remittitur.  This Court may issue a remittitur if the jury's damages award is not the result of passion or prejudice but nonetheless "exceeds the bounds of any reasonable recovery."  *GlobeRanger Corp.*, 2015 WL 3648577, at *18.  In making that determination, courts apply the "'maximum recovery rule,' which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded."  *Brunnemann*, 975 F.2d at 178.  Defendants cannot show that the jury's damages award exceeded the "maximum recovery" that ZeniMax could have obtained.  *See GlobeRanger Corp.*, 836 F.3d at 501 (declining to remit damages award where defendant asserted that it could create the misappropriated technology for a lower figure than the jury found, where "the jury did not have to use this measure, nor believe that it was accurate").  Indeed, the exact opposite is true:

- *False Designation*:  ZeniMax's maximum recovery exceeds the $250 million that the jury awarded, including because ZeniMax was entitled to recover Defendants' resulting unjust enrichment, which the evidence showed to exceed $2 billion, $206.2 million, and $427.0 million for Oculus, Luckey, and Iribe, respectively.  (*See* ECF No. 1016 at 9 (ZeniMax's Opposition to Defendants' Rule 50(b) Motion).)  Defendants' alternative suggestion that the maximum recovery on this claim was for $2.4 million (the amount garnered by Defendants' Kickstarter campaign) fails to recognize the proper calculation of false designation damages, and otherwise is improper because Defendants failed to offer evidence of that figure for the jury's consideration in calculating damages.  *See GlobeRanger Corp.*, 836 F.3d at 501.

- *Copyright Infringement*:  ZeniMax's maximum recovery exceeds the $50 million that the jury awarded, including because ZeniMax was entitled to recover a "reasonable royalty" for its infringed copyrights and the evidence presented at trial credibly estimated that amount to be $400 million.  (*See* ECF No. 1016 at 24.)  Defendants' suggestion that the maximum recovery on this claim was $6 million

---

*(cont'd from previous page)*

conclusion other than that the parties had equal time to present their sides and the evidence supporting the jury's findings was credible and extensive.

implicitly concedes that ZeniMax was entitled to a 15% reasonable royalty, but ignores that the jury may consider post-infringement events.  *See Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

- ***Breach of Contract***:  ZeniMax's maximum recovery exceeds of the $200 million that the jury awarded, including because ZeniMax was entitled to recover the natural, probable, and foreseeable consequence of Defendants' using ZeniMax's confidential information to compete, and evidence presented at trial estimated that the value of that breach to be $2 billion.  (*See* ECF No. 1016 at 31-34.)  Defendants' suggestion that ZeniMax was entitled to at most nominal damages is entirely without merit.

Defendants' request for remittitur is thus unfounded as a matter of law, and must be rejected.[4]

## II.    THE JURY'S DETERMINATION THAT DEFENDANTS INFRINGED ZENIMAX'S TRADEMARKS AND VIOLATED SECTION 43(a) OF THE LANHAM ACT WAS SUPPORTED BY THE EVIDENCE AT TRIAL

Defendants' arguments seeking a new trial on ZeniMax's Lanham Act claims are largely the same as their arguments in their Rule 50(b) brief (even citing the same cases).  Those arguments lack merit for the reasons expressed in ZeniMax's opposition to Defendants' Rule 50(b) motion.  Their other arguments also lack merit.

### A.    The Jury's Verdict Was Consistent

#### 1.    Defendants Waived Any Challenge To The Consistency Of The Verdict By Failing To Raise That Concern At Trial

Defendants did not, at the time of trial, claim that the jury's verdict concerning ZeniMax's trademark and false infringement claims was inconsistent.  They cannot raise that

---

[4]    None of the cases on which Defendants rely compel a different result.  *See Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394 (5th Cir. 2013) (remanding for remittitur where the plaintiff was awarded $200,000 for a workplace injury, notwithstanding that there existed "several hours of surveillance footage" showing the plaintiff performing hard labor without expressing any "outward expressions of pain" and where the average award for such injuries in that district was less than half that amount); *Thomas v. Texas Dep't of Criminal Justice*, 297 F.3d 361, 371 (5th Cir. 2002) (remanding for remittitur where no reasonable jury could find that plaintiff's future emotional distress from being denied a promotion could be three times worse than the emotional distress already suffered); *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1141 (5th Cir. 1991) (remanding for remittitur where the plaintiff was awarded $145,000 in lost future wages, even though the only evidence at trial suggested that the plaintiff earned under $1,000 less per year because of her injury and where her physician testified that she could continue working); *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 785 (5th Cir. 1983) (remanding for remittitur where the amount the jury awarded as compensation for the emotional loss of a spouse "is substantially greater than any we have discovered for the emotional damages resulting from loss of a spouse save one Seventh Circuit decision").

issue now.  *E.g.*, *Fields v. Dep't of Public Safety*, 658 F. App'x 694, 695 (5th Cir. 2016) ("Because DPS could have but failed to object to alleged inconsistencies in the jury verdict before the jury was dismissed and the judgment entered, we REVERSE and REMAND for reinstatement of the . . . damages award and judgment in Fields's favor."); *accord Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.").  If Defendants believed that the verdict was inconsistent, they were obliged to have said so before the jury was discharged.

### 2.        The Verdict Was Consistent With The Court's Instructions

In any event, the jury's verdict is wholly consistent.  Defendants note that the verdict for trademark infringement was $0 while the verdict for false designation was $250 million.  (Defts.' Br. at 5).  But this distinction does not mean the "jury was confused."  (*Id.*)  The jury's $0 infringement award and $250 million false designation award are consistent with the Court's specific instructions: "Plaintiffs are not entitled to recover the same damages for trademark infringement and false designation."  (ECF No. 914 at 70.)  The two causes of action are distinct, and the jury was entitled to find for Plaintiffs on either cause of action (or on both, or neither).  Yet the jury also was entitled to determine that ZeniMax's damages from the two claims overlapped, and was also entitled to allocate its damages award among those causes of action however it saw fit.  *Aspen Technology*, 569 F. App'x at 271.[5]

---

[5]        Defendants cite *Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir. 1975), a forty-plus-year-old case involving a man wrongfully denied credit and so upset about the affair that he suffered a heart attack, for the notion that the Court has the power to order a new trial due to a "facially inconsistent" jury verdict.  (Defts.' Br. at 5.)  That case is inapposite here because this jury's verdict was consistent.

### III.   THE JURY'S DETERMINATION THAT DEFENDANTS INFRINGED ZENIMAX'S COPYRIGHTS WAS SUPPORTED BY THE EVIDENCE

#### A.   Defendants Did Not Challenge Dr. Dobkin's Abstraction-Filtration-Comparison Analysis In Their *Daubert* Motion Or Object At Trial, And Have Waived Any Challenge To Dr. Dobkin's Testimony On That Subject

While criticizing the Court's resolution of the parties' *Daubert* motions (Defts.' Br. at 10), Defendants falsely suggest that their *Daubert* motion concerning Dr. Dobkin involved his application of the abstraction-filtration-comparison ("AFC") mode of analysis.  (*Id.*)  It did not. That motion made no mention whatsoever of that subject.  (ECF No. 625.)  Nor did it challenge in any way Dr. Dobkin's qualifications to provide expert testimony.  (*Id.*[6])  While Defendants' current counsel were not involved with this action when Defendants submitted their *Daubert* motions (eight months and two sets of lawyers ago), current counsel cannot now misrepresent to this Court the content of those motions.  Defendants *did* address Dr. Dobkin's AFC analysis in their separate motion for partial summary judgment (ECF No. 669), which the Court denied in its reasoned order.  (ECF No. 792 at 13-15 ("Defendants' arguments go to the weight of the evidence.").)  But Defendants never sought, not once, to exclude Dr. Dobkin's testimony regarding his application of the AFC methodology.[7]  At trial, ZeniMax qualified Dr. Dobkin as an expert and his testimony was admitted.  (App'x Ex. AA, at 168-72 (10B Tr. at 10-14)) Defendants made no objection at trial to ZeniMax's proffer of Dr. Dobkin's expert testimony. (*Id.*)  Instead, Defendants specifically stated at the time that they had "no reason not to proceed." (*Id.*)

---

[6]     Nor could they have contested his qualifications.  He holds degrees from MIT and Harvard, has been Dean of the Faculty and Chair of the Computer Science Department at Princeton, and has been honored as a Guggenheim Fellow, a Fellow of the Association for Computing Machinery (the leading professional society in his field), and a Fulbright Fellow.  (App'x Ex. D, at 11-22; *id.* Ex. AA, at 169-71 (10B Tr. at 11-13) (testimony of Dr. Dobkin).)  As the Court remarked, "he is an expert."  (*Id.* at 168 (13).)

[7]     Defendants' *Daubert* motion concerning Dr. Dobkin was also denied.  (ECF No. 714.)

Defendants' post-trial challenge to Dr. Dobkin's application of the AFC method has therefore been waived for both Rule 50 and Rule 59 purposes.  *E.g.*, *Waitek v. Dalkon Shield Claimants Trust*, 934 F. Supp. 1068, 1082 (N.D. Iowa 1996), *aff'd*, 114 F.3d 117 (8th Cir. 1997) ("[T]he Trust's failure to object at the earliest opportunity to the admissibility or validity of [the expert's] opinions . . . precludes this court's consideration of this issue as a ground for judgment as a matter of law, absent the existence of plain error.") (internal quotation marks omitted).  The Court may end its analysis of that challenge here.

### B.     Voluminous Evidence Confirmed That Oculus Had Access To ZeniMax's Source Code

Defendants make the remarkable claim that no one at Oculus had access to ZeniMax source code.  (Defts.' Br. at 7.)  The evidence is otherwise. Iribe *admitted* in writing in 2012 that Carmack had given Oculus the ZeniMax VR source code, and Iribe requested a license to use it as part of the proposal he made to ZeniMax to compensate it for the use of ZeniMax's technology in 2012.  (App'x Ex. C, at 9 (requesting a worldwide exclusive perpetual right and license to "***source code shared by Carmack***") (emphasis added).)  It is beyond dispute that Oculus employees were in frequent contact with John Carmack, who provided them with computer code and critical information about using code to solve their VR issues.  (*See, e.g.*, *id.* Ex. BB, at 181-204; 205-221 (8 Tr. at 76:1-99:1; 100:3-116:26) (testimony of Mr. Iribe).)  An Oculus programmer testified that he cut and pasted ZeniMax's source code into the Oculus VR product.  And there is much more testimonial and documentary evidence establishing that numerous Oculus employees accessed ZeniMax source code ***directly***:

- Carmack testified that he provided ZeniMax VR Testbed software (including shader code) to Luckey almost immediately after the Non-Disclosure Agreement was signed. (*Id.* Ex. X, at 121 (2 Tr. at 65:11-17).)

- In summer 2012, Michael Antonov told Luckey that "it is becoming important to get access to any source code John Carmack . . . would be willing to provide," including

14

"[c]ode to using libfreespace and Hillcrest interpretation logic," "source to shaders," and "anything else he can provide." Luckey responded, "I will see what Carmack can give us right now." (*Id.* Ex. E, at 24; *id.* Ex. F, at 26.)

- In 2012, Carmack transferred ZeniMax data onto a desktop computer that Nate Mitchell brought to id Software's offices, a computer that is now "missing" so its contents (and Carmack's testimony that no source code was transferred) cannot be verified. (*Id.* Ex. X, at 111-12; 114 (1 Tr. at 202:20-203:8; 205:1-17) (testimony of Mr. Carmack); *id.* Ex. CC, at 232-33 (4 Tr. at 210:17-211:4) (testimony of Mr. Mitchell).)

- In a text message to Iribe, Mitchell wondered whether it was "Time to open up Doom 3 source." (*Id.* Ex. CC, at 233 (4 Tr. at 211:5-17) (testimony of Mr. Mitchell); *id.* Ex. G, at 28.) The jury could sensibly have inferred that Mitchell suggested that because that ZeniMax source code was in his possession.

- Carmack testified that he stole his id Software emails (which contained source code) and millions of lines of Rage source code when he left ZeniMax and joined Oculus. (*Id.* Ex. X, at 108; 111 (1 Tr. at 160:12-18, 171:17-24).)

- Iribe forwarded ZeniMax's shader code from Carmack's Rage test level to Antonov and requested that his employee use it. (*Id.* Ex. H, at 31.)

- Lee Cooper testified that he received email containing ZeniMax source code. (*Id.* Ex. DD, at 238 (4 Tr. at 223:6-21).)

- Peter Giokaris testified that he "looked at and played with" code in a ZeniMax Rage demo, and that he "was given access to" that code "from Oculus." (*Id.* Ex. EE, at 243-44 (6 Tr. at 115:8-116:11).)

- In addition, there was testimony from the Court's own expert that Carmack and others destroyed evidence, and testimony that other devices were "missing." The jury could have concluded that evidence would have additionally established Oculus's access to and use of ZeniMax's source code. (*See infra.*)

Defendants' Motion ignores all of this evidence and more, confirming that the Motion is utterly without legal basis or factual support. The Motion invites the Court to substitute Defendants' own views for the jury's commonsense conclusion. It was for the jury to evaluate all the evidence — what both sides presented — and determine what happened.

Defendants assert that the "great weight of the evidence" is with Defendants' expert, Barbara Frederiksen-Cross. (Defts.' Br. at 11.) The jury plainly disagreed. Plaintiffs' expert,

Dr. Dobkin, alone provided ample evidence to support the verdict,[8] and the jury had reason to disregard Ms. Frederiksen-Cross's opinion.  Not only was she caught misleading the jury with a slide in her presentation (App'x Ex. FF, at 249-54 (18B Tr. at 95-100)), but she also acknowledged having previously testified that she could not complete an AFC analysis when there had been spoliation of evidence — as this jury had ample reason to conclude occurred.  (*Id.* Ex. FF, at 257-59 (125-27).)

## IV. THE JURY'S DETERMINATION THAT THE DEFENDANTS BREACHED THE NONDISCLOSURE AGREEMENT WAS SUPPORTED BY AMPLE EVIDENCE

### A. There Was Overwhelming Evidence That Defendants Breached The Non-Disclosure Agreement

Notwithstanding the overwhelming evidence presented at trial conclusively proving that Oculus repeatedly breached its obligations under the Non-Disclosure Agreement, Oculus requests a new trial as to ZeniMax's breach of contract claim.  Defendants first argue that they should be entitled to a new trial on the ground that ZeniMax purportedly did not provide sufficient evidence of breach.  (Defts.' Br. at 12.)  Defendants suggest that the Agreement only protects ZeniMax's *non-public* proprietary information, and that any information that Oculus used in breach of that agreement was already made public by ZeniMax.  (*Id.*)  The *only* evidence that Defendants cite in support is (i) that ZeniMax ran the executable VR Testbed and *DOOM 3* code in a semi-public setting at E3 and QuakeCon and (ii) that Carmack published a "White Paper" regarding his work code online.  Defendants' argument is unpersuasive for three reasons:

*First*, ZeniMax's actions at its gaming conventions and Carmack's publishing of his White Paper did not make ZeniMax's VR Technology "public."  Indeed, the evidence at trial proved that ZeniMax was extremely careful to protect the confidentiality of its VR technology,

---

[8]      Key excerpts of Dr. Dobkin's testimony are provided in Exhibit 1 hereto.

including at gaming conventions:  the "public" was only able to view ZeniMax's VR demo in a private booth, behind velvet ropes, on an appointment-only basis.  (*See* App'x Ex. GG, at 264-65 (6 Tr. at 156:23-157:11) (testimony of Mr. Luckey); *id.* Ex. Z, at 162-63 (15 Tr. at 30:2-31:17) ("Q: "[I]ntellectual property is important to id, right? Mr. Hollenshead: Yes. […] Q: And to the best of your knowledge, neither the Rage code nor the id Tech 5 game engine has been made publicly available? A: No, sir.").)  Those demonstrations did not involve any disclosure of the underlying breakthrough VR technology.   ZeniMax's demonstrations of its proprietary information at those conventions involved running an executable program.   ZeniMax never shared its underlying source code (or even its executable code) with the public.   ZeniMax's technology was only disclosed to the Defendants after signing the Non-Disclosure Agreement, which ensured confidentiality, restricted its use, and confirmed ZeniMax's ownership. Separately, Defendants' suggestion that Carmack's White Paper disclosed ZeniMax's VR Technology simply misstates the record.   ZeniMax's expert convincingly testified that the opposite was true, and the jury plainly found this persuasive.  (*Id.* Ex. AA, at 175-76 (10B Tr. at 129:25-130:11) (testimony of Dr. Dobkin).)  Even Carmack himself admitted that there was "no source code" in that White Paper.  (*Id.* Ex. X, at 131-32 (3 Tr. at 199:16-200:1) (testimony of Mr. Carmack).)

**Second**, Defendants' moving papers wholly ignore the ample evidence presented at trial — entirely unrelated to those gaming conventions or Carmack's White Paper — of Oculus's use of ZeniMax's confidential information to compete with ZeniMax.  The record was replete with emails from Carmack in which he provided ZeniMax's confidential information to Oculus in non-public communications.[9]

---

[9]     *See generally* Exhibit 2 hereto; *see also, e.g.*, App'x Ex. I, at 35 ("simple correction for chromatic

*(cont'd)*

17

**Third,** Defendants ignore that Oculus routinely demonstrated ZeniMax's technology to potential endorsers or investors without informing ZeniMax. Each such demonstration was yet another violation of the Non-Disclosure Agreement. (*E.g.*, *id.* Ex. BB, at 222-27 (8 Tr. at 117-22) (testimony of Mr. Iribe) (conceding that Oculus frequently did not inform ZeniMax of demonstrations); *id.* Ex. Z, at 155 (14 Tr. at 126:3-5) (testimony of Mr. Hollenshead) ("[T]here was certainly some permission at some places. It didn't necessarily mean that we gave them permission to do all things in all circumstances."); *id.* at 159-60 (15 Tr. at 27-28) (testimony of Mr. Hollenshead) ("[I]t's fair to say that there were demonstrations that were conducted that we didn't know about in advance or maybe never came to know about.").)

The great volume of evidence utterly refutes Defendants' suggestion that ZeniMax provided "no evidence" of Oculus's use of ZeniMax's proprietary information.

**B.     The Jury's Finding For Luckey On His Laches Defense
         Does Not Preclude ZeniMax's Breach Of Contract Claim Against Oculus**

Defendants mistakenly contend that the jury's finding for Luckey and against Oculus on their laches defenses is an "inconsistent" jury verdict justifying a new trial. (Defts.' Br. at 14.)

**First,** Defendants were obliged to raise any purported inconsistency in the verdict before the jury was dismissed. (*See supra*.) They did not. Their objection is waived.

**Second,** the evidence demonstrated that Oculus continued breaching the Non-Disclosure

_____

*(cont'd from previous page)*

aberration"), *id.* Ex. J, at 39 ("Carmack's code would . . . be the best starting point")), and Oculus's other uses of ZeniMax's source code (*see, e.g.*, *id.* Ex. G, at 28 ( "time to open up DOOM 3"); *id.* Ex. E, at 24 ("It is becoming important to get access to any source code John Carmack . . . would be willing to provide."); *id.* Ex. F, at 26 ("I will see what Carmack can give us right now."); *id.* Ex. K, at 45 ("Why don't you email Carmack?"); *id.* Ex. L, at 47 ("How do you decide where the Up and Down is. . .?"); *id.* Ex. H, at 31 ("I found the attached shader in Carmack's rage test level."); *id.* Ex. M, at 52 ("Can you [Carmack] describe where you're doing?"); *id.* Ex. I, at 35 ("More interesting feedback from Carmack."); *id.* Ex. N, at 54 ("FYI – interesting feedback from Carmack. . ."); *id.* Ex. O, at 60 ("Gamma correction from Carmack"); Ex. U, at 77 ("That red code of John's puzzles me too. . ."); *id.* Ex. P, at 62 ("Carmack's way of generating a timewarp matrix is pretty unconventional. . ."); *id.* Ex. Q, at 65 ("I was hoping to ask you [Carmack] a few questions about timewarp.").

Agreement through its sale to Facebook in 2014. With respect to those breaches, there was no affirmative laches defense to "inherit" from Luckey. As explained in ZeniMax's Opposition to Defendants' Rule 50(b) Motion, The jury could have found that Oculus's breach continued long after what the jury considered the conclusion of Luckey's conduct.

*Third*, laches is an equitable defense and the party asserting the defense must have clean hands. (ECF No. 914 at 43.) The jury could have found that Luckey was entitled to that defense but that Oculus acted unfairly or with fraud and deceit (as the evidence indeed showed).

## V. THE COURT WAS CORRECT TO ALLOW SPOLIATION TESTIMONY AND A CORRESPONDING JURY INSTRUCTION, SUCH THAT DEFENDANTS' REQUEST FOR A NEW TRIAL ON THAT BASIS IS WITHOUT MERIT

Defendants seek a new trial because of the spoliation evidence and related instruction provided to the jury. Specifically, Defendants contend that (i) Carmack had no duty to preserve the system logs on his computer; (ii) there was no evidence that Carmack acted with intent; and (iii) Mr. Rosen's testimony unfairly prejudiced the jury. The Court has rejected substantially similar arguments on numerous occasions (*e.g.*, ECF No. 729, 785), and should do so again. Further, Defendants fail to cite a *single* case in which a court ordered a new trial as a result of a court-appointed expert testifying as to spoliation or because of an adverse-inference instruction, and the Court should not adopt that extraordinary remedy here.[10]

---

[10] The only case that Defendants cite that resulted in a new trial involved entirely inapposite facts. In *Caparotta v. Entergy Corp.*, the court found that the defendant's destruction of evidence was not the result of bad faith and that the plaintiff was not entitled to an adverse inference instruction. 168 F.3d 754, 756 (5th Cir. 1999). The jury learned of the missing documents through counsel's opening and closing statements, which the Fifth Circuit described as essentially "relitigating the spoliation issue which had been resolved by the district court at an earlier evidentiary hearing." *Id.* at 758. Only on that basis, which the Fifth Circuit described as "a highly extraordinary method of informing the jury that documents were inadvertently destroyed," was remand for a new trial ordered. *Id.* Those extraordinary circumstances are not present here.

### A.     Mr. Rosen Found That Carmack Deleted Critical System Generated Logs And Other Files, Both Of Which Carmack Had A Duty To Preserve

Defendants do not deny that Carmack deleted a massive quantity of files from his MacBook computer in the days leading up to that computer's imaging for this action. Instead, they proffer an intentionally misleading and absurdly narrow interpretation of their duty to preserve evidence when on notice of potential litigation: that Carmack was under no duty to preserve the system logs of his computer because "[s]ystem logs are not source code." (Defts.' Br. at 20.) But the deletion of those system logs tends to show that Carmack intentionally deleted *other* files from his MacBook after receiving notice of ZeniMax's claims. Indeed, the Court's own expert drew that inference. (App'x Ex. HH, at 270-72; 273-74; 282; 283-84 (4 Tr. at 64:14-66:5; 67:22-68:6; 76:12-15; 77:10-78:2) (testimony of Mr. Rosen).) The jury was entitled to infer that those *other* deleted files would have evinced Carmack's wrongdoing.

Defendants' narrow interpretation of the scope of Carmack's duty to preserve is at odds with Carmack's obligation to preserve any "relevant evidence that might be useful to an adversary." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011). Defendants' interpretation is further at odds with the cases they cite, including *Gaalla v. Citizens Med. Ctr.*, CIV.A. No. V-10-14, 2011 WL 2115670, at *2 (S.D. Tex. May 27, 2011).[11]   In *Gaalla*, the court considered a company's obligation to preserve "back-up tapes" and held that those mediums are not subject to a litigation hold if they are "inaccessible" and maintained "solely for the purposes of disaster recovery," but *are* subject to a litigation hold if they "are accessible (*i.e.*, actively used for information retrieval)" (as Carmack's system logs were) and,

---

[11]     The sole other case that Defendants cite, *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014), which Defendants' describe as holding that the defendant "had no duty to preserve missing hard drive and server files" at issue in the litigation actually held just the opposite. As the Sixth Circuit noted, "[T]he magistrate judge concluded, and the district court agreed, that Paragon had a duty to preserve these pieces of evidence, and that it was negligent in failing to do so." *Id.*

further, that a company would at least have an obligation to preserve the back-up tapes of the "'key players' to the existing or threatened litigation" (like Carmack). *Id.* Accordingly, even under *Gaalla*, Defendants had a duty to preserve Carmack's system logs.

The system logs and other files that were wiped were relevant evidence. As Mr. Rosen testified, those logs would have provided ZeniMax with information about what files had been removed or deleted from the MacBook, any devices (including USBs) that were connected to the MacBook, or any connections, system events, or updates concerning the MacBook. (App'x Ex. HH, at 263 4 Tr. at 65:8-16).) This action addressed how ZeniMax's VR technology was taken *from* ZeniMax *to* Oculus, and the extent to which Oculus thereafter used that information. Evidence regarding what files were removed from Carmack's Oculus MacBook and what devices (including USBs) were connected to that MacBook was critically important to prove what ZeniMax information was on Carmack's MacBook and what he did with it.

## B.     There Was Ample Trial Evidence By Which The Court (And The Jury) Could Find That Carmack Acted Intentionally To Delete Critical Evidence

Rule 37 governs the Court's ability to provide remedies in the event that a party deletes evidence that it had a duty to preserve *First*, "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice." *Second*, "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation [the Court] may . . . instruct the jury that it may or must presume the information as unfavorable to the party." Fed. R. Civ. P. 37(e). In moving for a new trial, Defendants premise their argument solely on the second prong,[12] arguing that there

---

[12]     Defendants offer no argument why the Court should not have found an adverse inference instruction appropriate under the first of those alternatives. It cannot be disputed that ZeniMax was unfairly prejudiced by Carmack's wiping: there is no way for ZeniMax to discover what was deleted from Defendants' computers and what use was made of them. If the Court agrees that ZeniMax may have been unfairly prejudiced by

*(cont'd)*

was no evidence that Carmack intentionally wiped files.  Defendants' arguments in this regard
are contrary to the testimony of Mr. Rosen and the timing of the wipe:[13]

- On **April 10, 2014**, counsel for ZeniMax sent a letter to Facebook's general counsel,
  noting that ZeniMax "claimed interest in certain property used by Oculus" and
  enclosed correspondence sent to Oculus's counsel putting Oculus on notice regarding
  ZeniMax's legal claims in this matter.  (App'x Ex. R, at 67.)

- On **April 18, 2014**, Oculus's internal counsel sent an email to Oculus's management,
  including Carmack, to inform them of the "threatened litigation" by ZeniMax.  (*id.*
  Ex. S, at 69-73.)

- On **April 19, 2014**, Carmack performed a Google search for "how do you wipe a hard
  drive on mac osx." (*Id.* Ex. X, at 127 (2 Tr. at 198:6-23).)

- About one hour later on **April 19, 2014**, Carmack posted to twitter and his over half
  of a million followers, "When you are in a hurry, and you know you wrote the exact
  needed code (well!) at a previous job, reimplementation grates." (*Id.* Ex. T, at 75.)

- Rosen testified that "file system event logs revealed that there were references to
  system-generated log files that were deleted in the days leading up to the imaging on
  **April 29**," and that the device contained ***92% zeros*** — the remaining being largely
  the operating system.  (*Id.* Ex. HH, at 270-81 (4 Tr. at 64:2-5, 64:14-21; 75:7-23).)

Instead of grappling with that timeline of events, Defendants suggest that Carmack deleted
information that was "unimportant to ZeniMax's allegations" during "routine" maintenance on
his MacBook.  (Defts.' Br. at 20, 22.)  The evidence was to the contrary, including Mr. Rosen's
undisputed testimony that the deletions were "the result of a user action as opposed to an internal
machination of the operating system itself."  (App'x Ex. HH, at 283 (4 Tr. at 77:10-25).)  The
jury was entitled to find this testimony persuasive — and revealing.

Defendants also fault the Court for not making a formal finding that Carmack
*intentionally* deleted evidence on the record before providing the adverse inference instruction to

---

*(cont'd from previous page)*
Carmack's actions, and that an adverse inference instruction was a measure "no greater than necessary" to cure
such prejudice, that would end the inquiry. Fed. R. Civ. P. 37(e)(1).

[13]     ZeniMax briefly outlines that timeline below, but otherwise relies on the extensive briefing that the
Court has already considered on this issue.  (ECF Nos. 690, 711, 738, 745, 901.)

the jury.[14]   (Defts.' Br. at 20.)   Defendants' argument here is unpersuasive for two independent

reasons.  **First**, the advisory committee notes to Federal Rule of Civil Procedure 37(e) make no

specific requirement that the Court include such a finding on the record, but instead provide only

that such a "finding may be made by the court . . . when deciding whether to give an adverse

inference instruction at trial."   Committee Notes on Rules—2015 Amendment ("Rule 37

Committee Notes").   That is precisely what the Court did.   **Second**, the notes also provide that

"[i]f a court were to conclude that the intent finding should be made by a jury, the court's

instruction should make clear . . . [that] the jury first finds that the party acted with the intent to

deprive another party of the information's use in the litigation."   Rule 37 Committee Notes.   The

Court's instruction here did just that.   (ECF No. 914 at 9) ("You have heard conflicting evidence

in this case that certain electronically stored information may have been deleted or lost and

therefore not available for use as evidence at trial.   If you find that any of these Defendants

caused any of these actions to occur, you may, but are not required to, infer that the information

was unfavorable to those Defendants.").   There was ample evidence from which the jury could

conclude that Carmack's action were intentional, warranting any adverse inference they drew.

### C.   Having Asked That The Court Appoint An Independent Expert, Having Suggested Mr. Rosen For That Role, And Having Demanded That Mr. Rosen Testify In Person, Defendants Cannot Ask For A New Trial On That Ground

Defendants fail to remind the Court of the reason for Mr. Rosen's involvement in this

case.  For more than a year, Defendants fought relentlessly to prevent ZeniMax from collecting

or otherwise inspecting the hard drive of Mr. Carmack's MacBook, which ZeniMax believed had

---

[14]     Defendants' criticism is unfounded.  Their counsel expressly declined the Court's offer to make a finding on spoliation.  (App'x Ex. II, at 289 (3 Tr. at 183:5-11) ("The Court:  Do you want me to make a finding?  Do you really want me to make a finding?  Counsel:  No, Your Honor . . . .").)  The only case that Defendants cite in support, *Lincoln Composites, Inc. v. Firetrace USA, LLC*, relies on authority that predates the amendment to Rule 37(e).  825 F.3d 453, 463 (8th Cir. 2016) (citing *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013)).  The notes to the new rule make clear that Defendants' argument is incorrect.

contained ZeniMax's valuable computer code and confidential virtual reality technology. (ECF Nos. 256, 738 (ZeniMax's motions).) Defendants (and their counsel) repeatedly falsely averred in filings made *to this Court* that *nothing* had been deleted from Mr. Carmack's hard drive. (*See, e.g.*, ECF No. 280 at 1 (statement by Attorney Smith) ("There is absolutely no evidence that the MacBook hard drive at issue has been wiped, or that any evidence on it has been destroyed."); ECF No. 281 at 19 (declaration by John Carmack) ("I have never wiped the hard drive of my Oculus MacBook, nor did I wipe any files from the MacBook hard drive, before I provided it for imaging.").)[15] In response to ZeniMax's repeated requests, *Defendants* ultimately proposed that the Court appoint an independent expert. (ECF No. 320 at 2-4.) *Defendants* proposed Mr. Rosen to serve as that expert. (ECF No. 691, Ex. B at 16.) And at trial, *Defendants* objected to admitting Mr. Rosen's findings into evidence without his live testimony. (App'x Ex. V, at 81 (email from Defendants' counsel stating that "the proper way to present Mr. Rosen's findings . . . is through live testimony").) They cannot now be heard to complain that that entire chain of events was some mistake or that Mr. Rosen's testimony was otherwise improper.

Defendants concede that the Court has discretion to appoint an expert and to permit him to testify to the jury. (Defts.' Br. at 23.) Mr. Rosen's testimony was highly probative, and Defendants identify no unfair prejudice that they suffered because of his testimony. They speculate that because Mr. Rosen was an independent, Court-appointed expert, his testimony might have been received by the jury with an "air or neutrality, legitimacy, and importance." (Defts.' Br. at 24.) Those are the actual facts. Mr. Rosen *was* neutral. That Defendants disagreed with his damaging opinions does not render his testimony unfairly prejudicial.

---

[15]     Mr. Rosen unequivocally testified that he believed these declarations to be false. (App'x Ex. HH, at 283-84 (4 Tr. at 77:10-78:2.)

In any event, Defendants did not timely object to Mr. Rosen's testimony at trial, and cannot do so now.  Defendants cite no case where a Court allowed an expert to testify at one party's suggestion, only to thereafter grant that same party a new trial by reason of having granted that request.  There is no basis for this Court to adopt that practice.

## VI. <u>ANY NEW TRIAL SHOULD ADDRESS ALL OF ZENIMAX'S CLAIMS</u>

Defendants cite *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) for the proposition that there can be a partial new trial on only "some of the issues."  (Defts.' Br. at 2.)  But *Gasoline Products* specifically cautions that a partial new trial "may not properly be resorted to unless it clearly appears that the issue[s] to be retried [are] so distinct and separable from the others that a trial of it alone may be had without injustice."  283 U.S. at 500.  Here, Defendants engaged in a single course of conduct by which they misappropriated ZeniMax's intellectual property, breached the Non-Disclosure Agreement, and attempted to cover up that misconduct by destroying evidence.  The jury evaluated all of that interrelated evidence of wrongdoing and arrived at its verdict.  If there were to be a new trial on ZeniMax's false designation, copyright, and breach of contract claims, there should also be a new trial on ZeniMax's other claims so that all of those interrelated claims are heard and determined by a single jury.  A new trial would include the re-evaluation of the exclusion of certain evidence favorable to Plaintiffs, including the unlimited indemnification that Oculus gave Carmack for claims relating to his work on VR at ZeniMax — a document that would establish Carmack's consciousness of guilt, evidence prior notice to Facebook of ZeniMax's ownership of the technology, and provide impeachment of trial testimony.  There are no valid legal grounds to void the jury verdict and order a new trial, and Defendants do not show otherwise.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

Dated:  May 5, 2017

Respectfully submitted,

*s/ Phillip B. Philbin*

P. ANTHONY SAMMI
E-mail: Anthony.Sammi@skadden.com
KURT WM. HEMR
E-mail: Kurt.Hemr@skadden.com
CHRISTOPHER A. LISY
E-mail: Christopher.Lisy@skadden.com
JAMES Y. PAK
Texas State Bar No. 24086376
E-mail: James.Pak@skadden.com
WILLIAM J. CASEY
E-mail: William.Casey@Skadden.com
(the foregoing attorneys admitted *pro hac vice*)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone No.: 212-735-3000
Facsimile No.: 212-735-2000

PHILLIP B. PHILBIN
Texas State Bar No. 15909020
E-mail: phillip.philbin@haynesboone.com
MICHAEL D. KARSON
Texas State Bar No. 24090198
E-mail: michael.karson@haynesboone.com
**HAYNES AND BOONE LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone No.: 214-651-5000
Facsimile No.: 214-651-5940

*Attorneys for Plaintiffs*
*ZeniMax Media Inc. and id Software LLC*

26

## CERTIFICATE OF SERVICE

On May 5, 2017, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Dated: May 5, 2017

*s/ Phillip B. Philbin*
Phillip B. Philbin